SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------- x

In the Matter of the Application of

MARIAH LOPEZ,

                                        Petitioner,

                    -against-

N.Y.C. DEPARTMENT OF HOMELESS SERVICES,
PROJECT RENEWAL,

                                        Respondents.

------------------------------------------------------------------------- x

**VERIFIED ANSWER**

Index No. 100632/2017

Motion Seq. No. 1

I.A.S. Part 12 (Jaffe, J.)

Respondent, N.Y.C. Department of Homeless Services ("DHS") by its attorney,

Zachary W. Carter, Corporation Counsel of the City of New York, as and for its Verified Answer

to the Verified Petition, dated May 11, 2017, respectfully alleges as follows:

    1.   Admits the allegations set forth in paragraph "1" of the Verified Petition.

    2.   Admits the allegations set forth in paragraph "2" of the Verified Petition.

    3.   The first sentence of paragraph "3" of the Verified Petition is a description of

the relief Petitioner seeks which requires no response.   Denies the allegations set forth in the

second, third, fourth, fifth and sixth sentences of paragraph "3" of the Verified Petition, but

admits that Petitioner previously commenced a federal lawsuit against DHS and Project

Renewal; that DHS determined that Petitioner could keep her dog with her while in the shelter

system as a reasonable accommodation for Petitioner's disability; and that DHS decided that

Petitioner be transferred to another shelter within the DHS system.   The seventh sentence of

paragraph "3" of the Verified Petition is a description of the relief Petitioner seeks which

requires no response.   Denies the allegations set forth in the second paragraph of paragraph "3"

of the Verified Petition, but admits that Kaedon Grinnell is Project Renewal's director of Marsha's Place and that Petitioner has confronted Mr. Grinnell.

4.   Petitioner has made no allegations in paragraph "4" of the Verified Petition, so no response is required.

5.   Admits the allegations set forth in paragraph "5" of the Verified Petition.

### AS AND FOR A STATEMENT OF PERTINENT AND MATERIAL FACTS, DHS RESPECTFULLY ALLEGES:

6.   DHS made a lawful, reasonable and appropriate decision to transfer Petitioner from Marsha's House shelter in the Bronx to the Women In Need West shelter ("WIN West") located on 51st Street on the west side of Manhattan.  The need for the proposed transfer resulted from Petitioner's persistent violation of the rules of Marsha's House and threats against the staff at Marsha's House and from DHS' desire to place Petitioner in a facility that will provide her more appropriate social services and be better equipped to address Petitioner's conduct.  WIN West has various services that are more suited to Petitioner and is one of the best operated and safest shelters operated for single adults.  Accordingly, this Article 78 proceeding should be dismissed (i) because the decision to transfer Petitioner from Marsha's house to WIN West was neither arbitrary nor capricious and (ii) because Petitioner has failed to exhaust available administrative remedies.

### OVERVIEW OF THE SHELTER SYSTEM AND MARTHA'S HOUSE

7.   DHS operates a shelter system that provides housing for approximately 59,000 individuals.  DHS generally classifies its shelter clients into three groups: families with children, adult families and single adults.  During Petitioner's most recent stay in DHS' shelter system, Petitioner presented as a single adult, and consequently DHS placed her into a shelter for single adults.

8.     Most of DHS' shelters for single adults are operated by non-profit social service providers ("shelter operators") with which DHS contracts.  The shelter operator and the shelter operator's employees run the shelter subject to requirements established by DHS.  DHS determines to which shelter to assign a particular client, and DHS is responsible for transferring clients from one shelter to another.  In contracted shelter, it is, however, the shelter operator's employees who have routine interactions with the clients in the shelters through the daily provision of shelter and social services.

9.     Shelter operators often contract with other entities to provide services at the shelters they operate.  Specifically, shelter operators often contract with private security businesses to provide security in their shelters.

10.     DHS attempts to provide shelters appropriate to the needs of various sets of its clients, and in 2016 DHS contracted with Project Renewal, a non-profit shelter operator, to operate a shelter designed to house young clients, under age 30, who self-identify as lesbian, gay, bisexual, transgender or questioning ("LGBTQ").  The resulting shelter, known as Marsha's House, opened on February 15, 2017 and is located on East 185th Street in the Mount Eden neighborhood of the Bronx.

11.     The clients who reside at Marsha's House have all requested to be placed there on a voluntary basis, and DHS has not made any involuntary placements to Marsha's House.

12.     Marsha's House currently has beds for approximately 80 clients and is operated by Project Renewal.  Project Renewal has contracted with Quality Protection Services, a business corporation, to provide security at Marsha's House.

13.     Marsha's House provides a variety of services to the clients living there, including meals.   There are, however, only limited onsite mental health services provided at Marsha's House.   On Wednesdays from 9 am to 5 pm there is psychiatrist, and on Thursdays from 9 am to 5 pm there is psychiatric nurse scheduled to be at Marsha's House.   These staff mainly perform psychiatric evaluations as a component of clients' housing packages, and not as ongoing clinical work.

**PETITIONER'S HISTORY IN THE DHS SHELTER SYSTEM**

14. Petitioner has previously been in the DHS shelter system on at least two occasions, March of 2008 and September of 2014.   The September 2014 stay in the DHS shelter system for adult families came to an end due to a physical altercation between Petitioner and her then partner.   Attached as Exhibit A is a true and correct redacted[1] copy of the DHS "Client Home" record concerning Petitioner's history in the shelter system, which is a business record maintained by DHS.

15. Petitioner returned to the DHS shelter system in April 2017 and requested to be placed in Marsha's House.   Although Petitioner exceeded the age parameters for assignment to Marsha's House, DHS, at its discretion, placed her in that shelter on or about Thursday April 20, 2017.

16. On April 20, 2017, representatives of Project Renewal met with Petitioner to explain the rules of the shelter to her and to obtain her agreement to comply with the rules rules and regulations of the shelter and of the Agency.   Petitioner acknowledged receipt of those rules and signed agreements to comply with the rules.   Attached as Exhibit B is a true and correct

---

[1] The exhibits to this answer have been redacted to remove personal information, such as birth dates, client numbers and the names of clients who are not party to this litigation.

redacted copy of the rules that Petitioner acknowledged receiving on April 20, 2017 and her agreements to comply with those rules signed on April 20, 2017.

17. Among other things, the rules (i) require clients to submit to passage through an x-ray machine at the entry to the shelter and prohibit clients from bringing alcohol and candles into the shelter (See page 3 of Exhibit B, paragraph on "Entry Procedure/Locker Searches"), (ii) prohibit clients from bringing food into the shelter or taking food out of the dining room (See page 4 of Exhibit B, paragraph on "Food and Meals"), (iii) establish a curfew of 10:00 PM for return to the shelter (See page 5 of Exhibit B, paragraph on "Curfew"), and (iv) prohibit clients from entering the sleeping floors while intoxicated or verbally abusing staff or other clients in the shelter (See page 6 of Exhibit B, paragraph listing infractions). The written agreements signed by Petitioner also provide that "Clients cannot bring alcoholic beverages … into the shelter" and that "There is no fighting or use [of] abusive or threatening language. Harassment or intimidation of other residents or staff is strictly prohibited." The agreement also provides that candles and fire hazards are prohibited and that "sexual activity … is not permitted in the shelter facility." (See page 10 of Exhibit B)

18. As detailed below, immediately upon arrival, Petitioner established a pattern of violating the rules of Marsha's House and of threatening the employees of Project Renewal who sought to enforce those rules.

19. Although Marsha's House has a curfew of 10:00 PM when residents must be present, Petitioner arrived at Marsha's House at approximately 12:40 AM on the night of April 20-21, 2017. Petitioner did not have her dog with her at that time, however, Petitioner got into an argument with a Project Renewal employee, Akeem Linton, about whether she could bring her dog to the shelter. Mr. Linton reported that when he advised Petitioner that he would consult

with his supervisors about her dog, Petitioner told him that "she would have unnamed persons come to the shelter to fight him."   Mr. Linton also reported that Petitioner "came to the operations office several times afterwards to threaten him and stated that he would be attacked after work."  Attached as Exhibit C is a true and correct redacted copy of the April 21, 2017, 12:40 AM incident report concerning these events written by Kaedon Grinnell, the Project Renewal Shelter Director.

20. Later that morning, Petitioner made further threats to Mr. Linton, and their disagreement became so heated the police were called to the shelter.   No arrests were made. Attached as Exhibit D is a true and correct redacted copy of the April 21, 2017, 11:51 AM incident report concerning these events written by Kaedon Grinnell, the Project Renewal Shelter Director.

21. On Friday April 21, 2017, Petitioner and Kaedon Grinnell, the Project Renewal Shelter Director for Marsha's House, and Katina Roye, the Project Renewal Assistant Director for Marsha's House, signed a "DHS Commitment Contract."  In the contract, Petitioner again agreed, among other things, to "adhere to all shelter/clinical rules and regulations." Petitioner also expressly acknowledged that she "will be transferred to another DHS facility if I am not successfully housed within 60 days of entry to the program."  Attached as Exhibit E is a true a correct redacted copy of the DHS Commitment Contract.

22. Petitioner again violated the curfew on Sunday night April 23-24, 2017, arriving at 1:11 AM with food from outside, which is not permitted in Project Renewal shelters. Ms. Lopez was informed that she could not bring the outside food into the shelter, but she disregarded the directive and stated, "if you want to keep your fucking job you better leave me the fuck alone," and proceeded to enter the shelter with food.  Attached as Exhibit F is a true a

correct copy of the April 24, 2017, 1:10 AM incident report concerning these events written by

Kaedon Grinnell, the Project Renewal Shelter Director.

23. Forty minutes later, Petitioner violated another important rule and again

refused to comply with staff instructions.  At the 2:00 AM bed count, staff found Petitioner in

bed with another client, which is against the terms of the agreement Petitioner had signed.  The

staff member informed Petitioner and the other client that they were not permitted to be in bed

together, but Petitioner defied the rule and advised the staff member that Petitioner and the other

client would stay in bed together.  Attached as Exhibit G is a true and correct redacted copy of

the April 24, 2017, 2:00 AM incident report concerning these events written by Kaedon Grinnell,

the Project Renewal Shelter Director.

24. On Tuesday April 25, 2017 Petitioner filed a complaint in the United States

District Court for the Southern District of New York alleging that DHS and Project Renewal

were violating the Americans with Disabilities Act ("ADA") in that she has "impulse control

disorder, PTSD and anxiety" and that she needed her dog due to these disabilities.  Petitioner

attached to her federal complaint a letter from Nurse Practitioner Jessica Pacannuayan, which

stated that Petitioner "is currently under our professional care for treatment for a mental illness

defined by the DSM-V. …   I have prescribed an emotional support animal as part of the

treatment program developed for Mariah."  Attached as Exhibit H is a true and correct redacted

copy of the April 25, 2017 Federal Complaint with its exhibits.

25. On Thursday April 27, 2017, Judge Caproni issued a Temporary Restraining

Order that ordered DHS to permit Petitioner to bring her dog to the shelter until Monday May 1,

2017.  Attached as Exhibit I is a true and correct copy of the April 27, 2017 Federal TRO.

26. On Friday April 28, 2017, DHS determined that permitting Petitioner to have her dog was a reasonable accommodation for her disability, and Petitioner has been permitted to bring her dog into Marsha's House.

27. Despite having her dog, Petitioner continued to threaten the staff at Marsha's House and to violate the shelter's and DHS' rules.

28. On Tuesday May 2, 2017, Petitioner made threatening statements to two staff members and told them "the same thing that happened to your friend can happen to you. I know people that can make a lot of things happen, and your dead friend on the other side watches over you." Attached as Exhibit J is a true and correct redacted copy of the May 2, 2017, 8:13 AM incident report concerning these events written by Katina Roye, the Project Renewal Assistant Director.

29. On Thursday May 4, 2017, Petitioner permitted her dog to walk around the first floor of Marsha's House unsupervised. Attached as Exhibit K is a true and correct copy of the May 4, 2017, 5:00 PM incident report concerning these events written by Kaedon Grinnell, the Project Renewal Shelter Director.

30. On Sunday May 7, 2017 at 10:30 AM Petitioner's dog was again roaming within Marsha's House unattended. Attached as Exhibit L is a true and correct redacted copy of the May 9, 2017 case notes describing the May 7 incident written by Kaedon Grinnell, the Project Renewal Shelter Director.

31. Later on Sunday May 7, 2017, at approximately 8:15 PM, Petitioner created a fire hazard at Marsha's House by leaving lit candles unattended in her room. As noted above, having candles in the shelter is against the rules of Marsha's House, and leaving them unattended while lit endangers everyone in the building. See Exhibit L for true and correct redacted copy of

the May 9, 2017 case notes describing the incident with the candles and Mr. Grinnell's meeting with Petitioner. Petitioner falsely asserted that she had not left lit candles unattended (three days later she admitted they were lit and unattended, see Exhibit N, which is a true and correct redacted copy of the Case Notes dated May 10, 2017 6:09 PM written by Kaedon Grinnell).

32. Also on Sunday May 7 at 11:25 PM, Petitioner came back to Marsha's House intoxicated and with a bottle of wine. As noted above, possession of alcohol in the shelter is against the rules. As before, Petitioner refused to comply with the rules and brought the wine into the shelter over the objections of the staff at the front door of Marsha's House. Attached as Exhibit M is a true and correct redacted copy of the May 7, 2017, 11:25 PM incident report concerning these events written by Katina Roye, the Project Renewal Assistant Director. See also Exhibit L for a true and correct redacted copy of the May 9, 2017 case notes describing the incident with the bottle of wine.

33. On Monday May 8, 2017, Mr. Grinnell met with Petitioner to discuss the three incidents of the prior day. See Exhibit L for true and correct redacted copy of the May 9, 2017 case notes describing the incidents and Mr. Grinnell's meeting with Petitioner.

34. On Tuesday May 9, 2017, Project Renewal requested that Petitioner be suspended for three days due to the alcohol incident. Attached as Exhibit P is a true and correct copy of the May 9, 2017 Suspension Request Form submitted by Kaedon Grinnell, the Project Renewal Shelter Director.

35. On Wednesday May 10, 2017, at approximately noon, Petitioner threatened a food service worker at Marsha's House, Tonya Fowler, due to what Petitioner contended was an inadequately sized meal provided by Ms. Fowler to another client. Petitioner threatened Ms. Fowler that "she would beat the shit out of [Ms. Fowler]", and that she would be going outside to

"get someone to put their hands on [Ms. Fowler]."  The Assistant Director of Marsha's House, Katina Roye, intervened to move Petitioner away from Ms. Fowler.  Ms. Fowler reported that she feels unsafe at work and that she believes Petitioner intends to harm her.  Attached as Exhibit O is a true and correct redacted copy of the May 10, 2017 6:08 PM Notes History recounting the incident and Ms. Fowler's comments written by Kaedon Grinnell, the Project Renewal Shelter Director.

36. On Wednesday May 10, 2017, Mr. Uetake decided to transfer Petitioner to a shelter with greater mental health services and DHS police, instead of private security guards. However, Mr. Uetake had not yet decided which shelter to transfer Petitioner to.

37. Ms. Roye and Mr. Grinnell subsequently met with Petitioner on May 10, 2017 at approximately 4:15 PM (i) to advise Petitioner that she was being transferred to another shelter and (ii) to discuss Petitioner's threats against Ms. Fowler.  Petitioner admitted making the threats quoted above and asserted that they were "conditional threats."  In the meeting, Petitioner went on to reiterate her threats against Ms. Fowler and stated that if DHS transferred Petitioner out of Marsha's House there would be a number of people waiting to attack Ms. Fowler.  See Exhibit O attached hereto.

38. At the meeting on May 10, 2017, at approximately 4:15 PM, Petitioner was given a copy of the Client Notification of Transfer advising Petitioner that she would be transferred to another shelter on May 11, 2017.  Petitioner refused to sign the form.  Attached as Exhibit Q is a true and correct redacted copy of the May 10, 2017 Client Notification of Transfer.

39. Mr. Uetake subsequently decided that Petitioner should be transferred to the WIN West shelter, and Ms. Lopez was given notice of her new shelter assignment on May 11,

2017.  Attached as Exhibit R is a true and correct copy of the May 11, 2017 Shelter Client

Transfer Referral advising Petitioner that she was being transferred to WIN West.

## THE WIN WEST SHELTER

40. WIN West is a shelter for single adult females run by Women In Need, Inc. at

341 West 51st Street in Manhattan (between 8th and 9th avenues) with approximately 68 beds that

has prior and ongoing experience with transgender clients.

41. Women in Need, Inc. is a non-profit corporation that has contracted with DHS

to be a shelter operator.

42. WIN West has extensive mental health services on site and provides the

following on site services: Psychiatric Nurse Practitioner; four (4) social workers; four (4)

clinical background Masters Level Case Managers; psychoeducational groups daily; a licensed

practical nurse; DHS Police security; and a licensed creative arts therapist.

43. WIN West currently has transgender individuals assigned to the shelter.

44. WIN West staff receives EEO Diversity Training and Employment Sensitivity

Training.

45. On information and belief, WIN West has not had any recent Priority 1, 2 or 3

Incidents – as defined in the DHS Incident report form, see e.g. Exhibit C hereto – related to

transgender clients.

46. None of the transgender clients at WIN West have requested a transfer out of

WIN West for any reason, including incidents occurring at WIN West.

47. The security at the WIN West shelter is provided by DHS Police.  DHS Police

have often had success obtaining compliance with DHS rules from clients, and clients seem to be

less inclined to violate DHS rules or to try to bring prohibited items into shelters where DHS

Police are providing security than where security is provided by a private security firm retained by the shelter operator.

48. As detailed above, Petitioner repeatedly brought prohibited items into Marsha's House and otherwise defied the shelter's rules. Petitioner seems to understand the limited authority of the security staff at Marsha's House, and she takes advantage of the limitations placed upon the security staff at Marsha's House.

49. As explained in more detail in Mr. Uetake's affidavit, Mr. Uetake reasonably balanced these and other factors in deciding to transfer Petitioner to the WIN West shelter.

50. Petitioner continued to make threats against Marsha's House's staff after the transfer decision, which confirmed Mr. Uetake's belief that transferring Petitioner to the WIN West shelter is appropriate.

51. Petitioner did not accept the transfer, however, she did not file an administrative appeal requesting a fair hearing challenging the transfer decision.

52. On the night of Thursday May 11, 2017, Petitioner left Marsha's House with most of her possessions in a taxi or similar car service that was paid for by DHS. The driver was given instructions to take Petitioner to the WIN West shelter, but Petitioner never arrived at that location.

53. On Friday May 12, 2017, Petitioner commenced this proceeding, and the Court ordered DHS to permit Petitioner to return to Marsha's House over the weekend.

54. The Court is respectfully referred to the attached affidavits of Dean Uetake, Paul Hargrow, Keadon Grinnell, Tonya Fowler, and Trevor Ollivievre for additional details concerning the transfer decision, Petitioner's behavior, and the WIN West shelter.

## AS AND FOR A FIRST DEFENSE

55. DHS' actions were in all respects legal, proper, reasonable, and in conformity with all applicable laws and regulations, and were neither arbitrary nor capricious.

56. It is well-established that Temporary Housing Assistance recipients in New York do not have a right to choose their own shelter placement.   Petitioner's allegations challenging her transfer to the WIN West shelter accordingly fails to state a claim and should be dismissed.

57. Under New York law, DHS has broad discretion in assigning Temporary Housing Assistance recipients to specific shelters. The administrative directive promulgated by OTDA to advise local districts of their responsibilities in providing temporary housing explicitly states that "[h]omeless persons do not have the right to choose their own temporary placements." 94 ADM-20(V)(D)(3)(attached as Exhibit S hereto is a true and correct copy of Administrative Directive 94 ADM-20); see also McCain v. Koch, 117 A.D.2d 198, 218 (1st Dep't 1986) ("Emergency shelter residents do not have a due process right to be housed in any particular neighborhood or type of housing."), rev'd on other grounds, 70 N.Y.2d 109 (1987).

58. Since there is no right to a specific shelter placement, homeless individuals also do not have a right to advance notice and a hearing prior to a shelter transfer. Nuraina v. OTDA, 2011 N.Y. Misc. LEXIS 5024, at *3-4 (Sup. Ct., N.Y. Co. Oct. 7, 2011) (citing 94-ADM-20(V)(F)(1)). While Petitioner may request a fair hearing to challenge the adequacy of the shelter to which she was transferred, Petitioner does not have a right to challenge the transfer itself. See id. at *6.

## AS AND FOR A SECOND DEFENSE

59. Petitioner has failed to exhaust available administrative remedies.

60. Under CPLR § 3211(a)(2), a pleading is subject to dismissal if the court does not have jurisdiction over the subject matter of the cause of action. A court lacks subject matter jurisdiction over an action where the plaintiff is required to exhaust her administrative remedies but has failed to do so. See, e.g., Ancrum v. St. Barnabas Hosp., 301 A.D.2d 474, 474-75 (1st Dep't 2003); Harold Levinson Assocs., Inc. v. New York State Dep't of Taxation & Fin., 2005 N.Y. Misc. LEXIS 2931, at *8 (Sup. Ct., N.Y. Co. Dec. 23, 2005) ("[B]ecause plaintiff did not exhaust its administrative remedies, this court lacks jurisdiction over the subject matter of this action.").

61. Petitioner has brought this Article 78 proceeding to challenge DHS' decision to transfer her to the WIN West shelter. However, a litigant who wishes to challenge the action of an administrative agency pursuant to an Article 78 proceeding "may not do so until they have exhausted their administrative remedies." Walton v. New York State Dep't of Correctional Servs., 8 N.Y.3d 186, 195 (2007). The New York Court of Appeals has held that this requirement to exhaust administrative remedies:

> furthers the salutory goals of relieving the courts of the burden of deciding questions entrusted to an agency, preventing premature judicial interference with the administrators' efforts to develop, even by some trial and error, a co-ordinated, consistent and legally enforceable scheme of regulation and affording the agency the opportunity, in advance of possible judicial review, to prepare a record reflective of its expertise and judgment.

Watergate II Apartments v. Buffalo Sewer Authority, 46 N.Y.2d 52, 57 (1978) (internal citations omitted).

62. A claim challenging an agency action brought pursuant to Article 78 should be dismissed where the litigant fails to exhaust her administrative remedies by challenging the

agency action at a fair hearing. <u>Bien-Aime v. New York City Human Resources Admin.</u>, 685 N.Y.S.2d 54, 55 (App. Div. 1st Dep't 1999).

   63. Temporary housing assistance, which Petitioner has been receiving, is a public assistance benefit, and public assistance recipients have the right to a fair hearing to challenge the adequacy of their services. 18 N.Y.C.R.R. §§ 352.35(b)(4), 358-3.1(b)(6) & 358-5.9. State regulations even provide priority in fair hearing scheduling and determination to those public assistance recipients requesting hearings to challenge the adequacy or appropriateness of their shelter placement. 18 N.Y.C.R.R. § 358-3.2(b)(3). Emergency hearings are generally scheduled within 48 hours of the request. State regulations therefore explicitly provide Petitioner with the right to request a fair hearing to challenge the adequacy of her placement at the WIN West shelter.

   **WHEREFORE**, Respondent DHS respectfully requests that the Verified Petition be denied in its entirety and the relief sought therein be denied in all respects, with costs and disbursements.

Dated:  New York, New York
    May 24, 2017

        ZACHARY W. CARTER
        Corporation Counsel of the City of New York
        Attorney for DHS
        100 Church Street, Room 2-110
        New York, New York 10007
        (212) 356-0872
        throbert@law.nyc.gov


By:             
        THOMAS B. ROBERTS
        Assistant Corporation Counsel

- 15 -

To:   **BY EMAIL and REGULAR MAIL**
      Mariah Lopez
      Marhsa's House
      480 East 185th St.
      Bronx, NY
      Mariah4change@
      *Petitioner*

      Richanrd Greenberg, Esq.
      Jackson Lewis P.C.
      666 Third Avenue, 29th Floor
      New York, NY 10017
      GreenbeR@JacksonLewis.com
      *Counsel for Respondent Project Renewal*

## VERIFICATION

STATE OF NEW YORK   )
                              SS.:
COUNTY OF NEW YORK  )

        Tonie Baez, being duly sworn, deposes, and says, that she is an attorney employed by the Department of Homeless Services of the City of New York, that she is acquainted with the facts herein, that she has read the foregoing Verified Answer and it is true based on her own knowledge and information obtained from the records of the Department of Homeless Services of the City of New York, and statements made by certain, officers, agents, and employees of the Department of Homeless Services of the City of New York and other city employees, except as to matters stated therein to be based on information and belief and, as to those matters, he believes them to be true.

<br>

                                                TONIE BAEZ

Sworn to before me this
24th day of May 2017

NOTARY PUBLIC

**NATASHA L. GODBY**
Notary Public, State of New York
No.01GO5040606
Qualified in Richmond County
Commission Expires, March 20, 20_19_