SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------ x

In the Matter of the Application of

MARIAH LOPEZ,

           Petitioner,

     -against-

N.Y.C. DEPARTMENT OF HOMELESS SERVICES,
PROJECT RENEWAL,

          Respondents.

------------------------------------------------------------------------ x

**AFFIDAVIT OF DEAN
UETAKE**

Index No. 100632/2017

Motion Seq. No. 1

I.A.S. Part 12 (Jaffe, J.)

State of New York )
       ) SS.:
County of New York )

   DEAN UETAKE, being duly sworn, makes the following statement:

    1. I am a Program Administrator employed by the New York City Department of Homeless Services.  I have served in this capacity since December 2015.

    2. I have personal knowledge of the decision to transfer Mariah Lopez from Marsha's House in the Bronx to the Women In Need West shelter ("WIN West") on May 11, 2017 in that I personally approved that transfer.

    3. Marsha's House is located at 185th Street in the Bronx and is one of the shelters that operates under my supervision.  I initially agreed to place Ms. Lopez in Marsha's House, although she exceeded the age criteria for the shelter by approximately two years.

    4. I believe my decision to transfer Ms. Lopez to the WIN West shelter located on 51st Street on the west side of Manhattan was lawful, reasonable and appropriate.  The transfer decision resulted from Ms. Lopez' persistent violation of the rules of Marsha's Place and

the rules of the DHS shelter system and from my desire to place Ms. Lopez in a facility that may provide her more appropriate social  services and may be better equipped to address Ms. Lopez' conduct.  WIN West has various services that are more suited to Ms. Lopez and its location should be more convenient for Ms. Lopez.  I also believe WIN West to be one of the best operated, safest and nicest shelters operated for single adults in New York City.  I did not make the transfer decision based upon Ms. Lopez' race, sex, sexual identity or other protected classification.  I made the decision in the best interests of both Ms. Lopez and the DHS shelter system, and my intent was not punitive.

## OVERVIEW OF THE SHELTER SYSTEM AND MARTHA'S PLACE

5.     DHS operates a shelter system that provides housing for approximately 59,000 individuals.  DHS generally classifies its shelter clients into three groups: families with children, adult families and single adults.  During Ms. Lopez' most recent stay in DHS' shelter system, she presented  as a single adult, and I have placed her in shelters for single adults.

6.     Most of DHS' shelters for single adults are operated by non-profit social service providers ("shelter operators") with which DHS contracts.  The shelter operator and the shelter operator's employees run the shelter subject to requirements established by DHS.   In contracted shelters it is the shelter operator's employees who have routine interactions with the clients in the shelters.

7.     Shelter operators often contract with other entities to provide services at the shelters they operate.  Specifically, shelter operators often contract with private security businesses to provide security in their shelters.

8.     In my role as a Program Administrator, I oversee the actions of shelter operators and frequently communicate with the shelter operator's managers.

05/24/17

9.      DHS assigns clients to particular shelters, and DHS is responsible for deciding whether to transfer clients from one shelter to another.  If a shelter operator wants to suspend or transfer a client, a DHS Program Administrator, such as myself, reviews and decides whether to approve, reject or modify the shelter operator's proposed action.

10.      DHS provides some shelters that are tailored to the needs of specific populations.  In 2016, DHS contracted with Project Renewal, a non-profit shelter operator, to operate a shelter designed to house young clients, under age 30, who self-identify as lesbian, gay, bisexual, transgender or questioning ("LGBTQ").  The resulting shelter, known as Marsha's House, opened on February 15, 2017, and I have been the DHS Program Administrator for Marsha's House since its inception.

11.      I routinely communicate with Kaedon Grinnell, the Project Renewal Shelter Director for Marsha's House and Kellie Rivera, the Project Renewal Director of Social Services for Marsha's House, about matters that concern Marsha's House.

12.      The clients who reside at Marsha's House have all requested to be placed there on a voluntary basis, and DHS has not made any involuntary placements to Marsha's House.

13.      Marsha's House currently has beds for approximately 80 clients. Marsha's House provides a variety of services to the clients living there, including meals.  There are, however, only limited onsite mental health services provided at Marsha's House. I understand that on Wednesdays a psychiatrist, and on Thursday a psychiatric nurse are scheduled at Marsha's House from 9 am to 5 pm to see clients, mainly to perform psychiatric evaluations as a component of the clients' housing packages, and not as ongoing clinical work.

05/24/17

14.    I understand that Project Renewal has contracted with Quality Protection Services, a business corporation, to provide security at Marsha's House.

## PETITIONER'S HISTORY IN THE DHS SHELTER SYSTEM

15. I understand that DHS' records show that Ms. Lopez has previously been in the DHS shelter system on at least two occasions, March of 2008 and September of 2014. I understand that the September 2014 stay in the DHS shelter system for adult families came to an end due to a physical altercation between Ms. Lopez and her then partner. See Exhibit A attached to DHS' Answer.

16. I also understand that Ms. Lopez has recently been diagnosed to have "impulse control disorder, PTSD and anxiety" and that DHS has determined that permitting her to have her dog in the shelter is a reasonable accommodation for her mental disability. See the April 6, 2017 letter of Nurse Practitioner Jessica Pacannuayan attached to Exhibit H to DHS' Answer, which stated that Petitioner "is currently under our professional care for treatment for a mental illness defined by the DSM-V. … I have prescribed an emotional support animal as part of the treatment program developed for Mariah."

17. Ms. Lopez returned to the DHS shelter system in April 2017 and requested to be placed in Marsha's House. Although Ms. Lopez exceeded the age parameters for assignment to Marsha's House, I agreed as a matter of discretion to place her in Marsha's House and that placement occurred on or about Thursday April 20, 2017.

18. On April 20, 2017, representatives of Project Renewal met with Ms. Lopez to explain the rules of the shelter to her and to obtain her agreement to comply with the rules and regulations of the shelter and of the Agency. I have seen documents that establish that Ms. Lopez acknowledged receipt of those rules and signed agreements to comply with the rules. See Exhibit B to DHS' Answer.

05/24/17

19. Among other things, the rules (i) require clients to submit to passage through an x-ray machine when entering the shelter and prohibit clients from bringing alcohol and candles into the shelter (See page 3 of Exhibit B, paragraph on "Entry Procedure/Locker Searches"), (ii) prohibit clients from bringing food into the shelter or taking food out of the dining room (See page 4 of Exhibit B, paragraph on "Food and Meals"), (iii) establish a curfew of 10:00 PM for return to the shelter (See page 5 of Exhibit B, paragraph on "Curfew"), and (iv) prohibit clients from entering the sleeping floors while intoxicated or verbally abusing staff or other clients in the shelter (See page 6 of Exhibit B, paragraph listing infractions). The written agreements signed by Petitioner provide that "Clients cannot bring alcoholic beverages ... into the shelter" and that "There is no fighting or use [of] abusive or threatening language. Harassment or intimidation of other residents or staff is strictly prohibited." The agreement also provides that candles and fire hazards are prohibited and that "sexual activity ... is not permitted in the shelter facility." (See page 10 of Exhibit B)

20. The reports that I have received from Project Renewal's managers demonstrated that Ms. Lopez has established a pattern of violating the rules of Marsha's House and of threatening the employees of Project Renewal and Quality Protection Services, which was a factor in my decision to transfer her to the WIN West shelter. I highlight the rule violations and threats below.

21. I received a report from Project Renewal that Ms. Lopez arrived at Marsha's House at approximately 12:40 AM on the night of April 20-21, 2017. I understand that Ms. Lopez did not have her dog with her at that time, however, she got into an argument with a Project Renewal employee about whether she could bring her dog to the shelter. The report I received stated that Ms. Lopez told the Project Renewal employee that "she would have

unnamed persons come to the shelter to fight him," and that Ms. Lopez "came to the operations office several times afterwards to threaten him and stated that he would be attacked after work." See Exhibit C attached to DHS' Answer.

22. I also received a report that later that same morning, Ms. Lopez made further threats to that same employee and their disagreement became so heated the police were called to the shelter. See Exhibit D attached to DHS' Answer.

23. I received another report that Ms. Lopez again violated the rules by arriving after curfew on Sunday night April 23-24, 2017 with food from outside, which is not permitted in Project Renewal shelters. Ms. Lopez was informed that she could not bring the outside food into the shelter, but she disregarded the directive and stated, "if you want to keep your fucking job you better leave me the fuck alone," and proceeded to enter the shelter with food. See Exhibit F attached to DHS' Answer.

24. I received a further report that forty minutes later, Ms. Lopez violated another important rule and again refused to comply with staff instructions. At the 2:00 AM bed count, staff found Ms. Lopez in bed with another client, which is against the terms of the agreement Petitioner had signed with Marsha's House. The staff member informed Ms. Lopez and the other client that they were not permitted to be in bed together, but Ms. Lopez defied the rule and advised the staff member that Ms. Lopez and the other client would stay in bed together. See Exhibit G attached to DHS' Answer.

25. I then received reports of a series of incidents with Ms. Lopez on Sunday May 7, 2017. First, at approximately 8:15 PM, Ms. Lopez created a fire hazard at Marsha's House by leaving lit candles unattended in her room. Having candles in the shelter is against the rules of Marsha's House, and leaving them unattended while lit endangers everyone in the building. See

05/24/17

Exhibit L attached to DHS' Answer.  I understand that when questioned about this, Ms. Lopez falsely asserted that she had not left lit candles unattended, although three days later she admitted she had left lit candles unattended. See Exhibit N attached to DHS' Answer

26. I also received a report that on Sunday May 7 at 11:25 PM, Ms. Lopez came back to Marsha's House intoxicated and with a bottle of wine.  Possession of alcohol in the shelter is against the rules. The report stated that Ms. Lopez refused to comply with the rules and brought the wine into the shelter over the objections of the staff at the front door of Marsha's House.  See Exhibits L and M attached to DHS' Answer.

27. On Tuesday May 9, 2017 Project Renewal requested that Petitioner be suspended for three days due to the alcohol incident.  See  Exhibit P attached to DHS' Answer.

28. I then received a report that on Wednesday May 10, 2017 at approximately noon, Ms. Lopez threatened a food service worker at Marsha's House, Tonya Fowler, due to what Ms. Lopez contends was an inadequately sized meal provided by Ms. Fowler to another client.  I understand that Ms. Lopez threatened Ms. Fowler that "she would beat the shit out of [Ms. Fowler]", and that she would be going outside to "get someone to put their hands on [Ms. Fowler]."  I understand that Ms. Fowler reported that she feels unsafe at work and that she believes Ms. Lopez intends to harm her and was so emotionally distraught after these threats that she had to leave work soon after the threats were made.  See Exhibit P attached to DHS' Answer.

29. On Wednesday May 10 2017, in light of this pattern of breaches of rules, I decided that Ms. Lopez should be transferred to another shelter that had significant mental health services onsite and DHS police.  I had not yet determined which shelter to transfer Ms. Lopez to.

30. I understand that Ms. Roye and Mr. Grinnell met with Ms. Lopez on May 10, 2017 at approximately 4:15 PM (i) to advise her that she was being transferred to another shelter

05/24/17

and (ii) to discuss her threats against Ms. Fowler. I understand that Ms. Lopez admitted making the threats against Ms. Fowler and reiterated her threats against Ms. Fowler saying that if DHS transferred Ms. Lopez out of Marsha's House there would be a number of people waiting to attack Ms. Fowler. See Exhibit P attached to DHS' Answer.

31. I subsequently decided that Ms. Lopez should be transferred to the WIN West shelter, and Ms. Lopez was given notice of her new shelter assignment on May 11, 2017. See Exhibit R attached to DHS' answer.

32. I made this decision for a series of reasons intended to benefit Ms. Lopez and the shelter system. The transfer was not intended to be punitive.

33. First, it is appropriate to transfer clients away from shelters where they have established a pattern of breaking the rules of the shelter or of threatening staff. It is difficult for shelter operators to maintain order and employee morale in their shelters if they are confronted with a client who defiantly breaches rules and threatens staff. Sometimes a change in shelter assignment results in improved client behavior.

34. Second, the WIN West shelter seemed well suited to Ms. Lopez' needs. The WIN West shelter is a women's shelter at 341 West 51st Street in Manhattan (between 8th and 9th avenues) with approximately 68 beds. It is small compared to most DHS single adult shelters (comparable in size with Marsha's House) and has excellent mental health services and housing staff capable of addressing Ms. Lopez' needs. In addition, I understand that the WIN West shelter has prior and ongoing experience with transgender clients. I am not aware of any reports of discrimination by transgender clients at the WIN West shelter and do not believe that Ms. Lopez' assertions of conflict between transgender and non-transgender clients at the WIN West

05/24/17

center are based in fact.  I certainly did not assign her to WIN West believing she would be faced

with a hostile environment and do not believe that to be the case.

35. Third, the WIN West shelter, being a mental health shelter, has onsite mental

health services.  Marsha's House has limited mental health services onsite, and I hoped that Ms.

Lopez would find it easier to access such services at the WIN West shelter.

36. Fourth, the WIN West shelter also has superior security to that at Marsha's

House.  Specifically, the security guards at Marsha's House are provided by a private contractor,

Quality Protection Services, whose employees are instructed that if their efforts to deter clients

from bringing prohibited items into the shelter are unsuccessful, they are not to physically

prevent the client from entering with the prohibited items.  Instead, the security staff at Marsha's

House is to report the incident to the managers of Project Renewal.  Ms. Lopez seems to

understand the instruction that limit the actions of the security staff at Marsha's House, and she

seems to takes advantage of the limitations placed upon the security staff.  Security at the WIN

West shelter, however, is provided by DHS Police, who have somewhat greater discretion to

enforce the rules of the shelter and have a history of successfully deterring clients from bringing

prohibited items into the shelter and deterring clients from violating the rules of the shelter.

37. Fifth, the WIN West shelter is in a location that most people find more

desirable than Marsha's House.  Ms. Lopez has advised DHS that she is unwilling to look at

places in the Bronx, as it was too far, and that the she was willing to accept permanent housing in

Brooklyn or Staten Island.  If she lives in mid-town Manhattan, she should have an easier time

inspecting the prospective properties DHS will offer her than if she lives in the Bronx.

38. In balancing these factors, I decided to transfer Petitioner to the WIN West

shelter.

05/24/17

39. I understand that Ms. Lopez has continued to make threats against Marsha's House's staff after my transfer decision, which has confirmed my belief that transferring Ms. Lopez to the WIN West shelter is appropriate.

40. I stand by my decision to transfer Ms. Lopez to the WIN West shelter, and I reiterate that I did not make this decision based upon Ms. Lopez' race, sex, sexual identity or other protected classification.  The decision was made in the best interests of both Ms. Lopez and the DHS shelter system.

Dated:     New York, New York
           May 24, 2017


                                             _____
                                             DEAN UETAKE


Sworn to before me this
24th day of May 2017

NOTARY PUBLIC

NATASHA L. GODBY
Notary Public, State of New York
No.01GO5040606
Qualified in Richmond County
Commission Expires, March 20, 20_19_

-10-

05/24/17

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of

MARIAH LOPEZ,

                                     Petitioner,

-against-

NEW YORK CITY DEPARTMENT OF HOMELESS SERVICES
and PROJECT RENEWAL,

                                    Respondents.

---

## AFFIDAVIT OF DEAN UETAKE

---

### *ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Respondent*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Thomas B. Roberts*
*Tel: (212) 356-0872*
*Matter #. 2017-025551*

---

*Due and timely service is hereby admitted.*

*New York, N.Y. ......................................................, 20......*

*........................................................................., Esq.*

*Attorney for...............................................................*