Pro Se Intake Unit
U.S. District Court, Southern District of New York
500 Pearl Street
New York, NY 10007

RECEIVED
SDNY PRO SE OFFICE

2017 JUN 15 PM 2: 07

S.D. OF N.Y.

Mariah Lopez
Write the full name of each plaintiff or petitioner.

Case No. 117 CV 03014

New York City -against-
Department of Homeless
Services
Write the full name of each defendant or respondent.

Letter re: Emergency request
for TRO.

Dear Judge

I am writing the Court to make you aware
of the fact that DHS has placed me at
facilities which cannot reasonably accommodate
my medical disabilities, PTSD and gender identity
Disorder. I believe the decision for DHS to
move me from Marsha's was retaliatory and
DHS refusal to temporarily place me back
at Marsha's is a failure to make "reasonable"

Dated 6/15/17

Signature

Name Mariah Lopez

Prison Identification # (if incarcerated)

Address Homeless

City                State        Zip Code

Telephone Number (if available) 212 470 9687

E-mail Address (if available) Mariah4Change@Gmail.com

accommodations for my disabilities. The refusal by DHS to place me at the only facility that can provide the accommodations I need is motivated by caprice and the desire to silence my whistle blowing at Marsha's House. ALL staff and administration who supported my transfer face dismissal from their jobs if my allegations pan out; this creates a clear conflict of interest by the parties accusing me of misconduct at Marsha's.

- The fact that DHS has denied me an administrative review, by someone outside of conflicted parties (ie Mr Paul Hageow or Kaedon Grinnell) is evidence of DHS mechanizations to silence my valid concerns with my treatment at, and transfer from, Marsha's.

- None of the allegations against me have been substantiated in court or via any type of formal hearing.

- Since May 31st I have faced considerable psychological distress and crisis because I am homeless again.

- The shelter "WIN WEST" is not a reasonable accommodation since

the facility directly causes triggers painful symptoms of my PTSD

- ALL other DHS facilities besides Marsha's are also not "reasonable accommodations for my PTSD or GID since being forced to "hide" my trans-identity, and needs, also triggers my conditions and their symptoms.

- Since may 31st I have almost had a nervous break down and have needed emergency psych' treatment at Mount Sanai Emergency Department. (6/9/17)

- My Service Animal is starting to exhibit behavioral issues because of the instability in my life, I'm concerned that my animal's usefulness as a Service Animal will be negatively impacted if I am not allowed to return to Marsha's

- I'm concerned that I will be hurt or hurt someone else, if I am not provided a reasable accommodation

by DHS, in the form of me being transferred
back to Marsha's while DHS and I work
on permanent housing. My doing sex
work is not an option since I am obligated
to care for my animal. If I dont engage
in sex work, I would have no way to
house/board my animal — Going to "WIN
West" with my animal — or any other
DHS facility besides Marsha's would
trigger my PTSD and exhaust my
animal's abilities to provide relief for
my ~~symptoms~~ symptoms via her training.
My dog would never get to rest!
- My history of PTSD and identity
As a transsexual/transgender woman
is well documented

- I have been working as hard as I
can to secure permanent housing. I
believe I stand to suffer worse irreparable
harm and injuries if my PTSD gets
worse due being homeless or having to
engage in sex work

- DHS decision to "force" me into
a "female" facility is a violation of
New York City and State law. continued →

which proves my traumatic history near WIN West

- Two copies of pych evals by two experts, from when I was in care, proving my history of PTSD and GID (me)

- Excerpt from "Joel A" Federal complaints which also provides proof of history of trauma, and New Yorks history of needing to drastically improve services and the number of beds for GLBTQ individuals, especially youth and homeless persons.

- Letter from Anthony Sgarlato Program Manager at Baltic Street AEH, which attests to my efforts to find permanent housing

- Letter from my retired physician refering to me as "Transsexual" proving the need for me to identify as such without fear of harassment (which DHS cannot gaurantee at Non GLBTQ facilities.

- Letter from my current pychiatrist Dr Pierre Arty recomending I be placed back at Marsha's House

- New York Law prohibits DHS from labeling someone as "female" or "male" in order to house them. New Yorkers get to choose "Transgender/Transsexual" as an option.
- New York law also considers GID (Gender Identity Disorder) to be a disability, because ~~of~~ of a lawsuit which I won as a teen, "Jean Doe v Bell".

- DHS refusal to block Project Renewals request to transfer me from Marsha's house was a violation of my rights to be "reasonably accommodated" under local, state and federal law. (Demanding Project Renewal staff prove their allegations ~~and~~ while I'm still at Marsha's is not unreasonable) its DHS' own fault that only one GLBTQ facility exists where trans people can be safe and not experience environmental triggers.

- DHS has no facilities beside Marsha's which can accommodate my needs around vaginal dilation. I will suffer irreparable harm if I am not able to dilate according to my doctors orders.

On May 31st DHS vigorously argued, very specifically, to be allowed to place me at WIN West placing all their eggs in one proverbial basket. Since my mental health providers disagree and have ~~and MC~~ supported my need to be placed back at Marsha's, I am asking the court to issue a TRO ordering ~~(the following)~~

— DHS to place me back at Marsha's until this court reviews whether I will be harmed by a placement other than Marsha's

— DHS to reserve a bed @ Marsha's until the conclusion of my ADA case in front of this court, ~~please~~ MC or until I have found permanent housing, since Marsha's is the only Trans Shelter which has single bed rooms

I am attaching the following exhibits to support my requests for a TRO (A—H) MC

1 Copy of Family Court Petition

# Exhibit

# A

## STAFF/RESIDENT COMPLAINT FORM

DATE OF INCIDENT: 6/7/17   NAME: Mariah Lopez   DEPT/UNIT #: _____

TIME: 1:54 pm   Subject: Reasonable Accomodation Request

I have medical needs which this facility cannot accomodate. I have severe PTSD and this neighborhood is a trigger for this conditions symptoms; Flash backs, anxiety, Depression, increased aggression. I also cannot sleep in a dorm setting because of my PTSD — the worsed abuses I have experienced have taken place in a "dorm" setting.

The dorm setting would →

Signature: _____   Date: 6/7/17

# win

Win West Residence
341 West 51st Street
New York, NY 10019

## STAFF/RESIDENT COMPLAINT FORM

DATE OF INCIDENT: 6/7/17   NAME: Mariah Lopez   DEPT/UNIT #

TIME: 154 PM   Subject: Reasonable Accomodation Request

Also make impossible for me
to engage in daily Dilation
as per SRS post-op instructions.
I need to be lying down, in
a private sem, clean
environment. WIN had offered
a Bathroom to dilate in, as an
accomodation, which is inappropriate
unsterile, and unsafe.
I'm requesting to be sent back
to Marsha's House Shelter.

Signature: _____   Date: 6/7/17

Exhibit

B

New York City Department of Homeless Services

Re: Mariah Lopez
DOB 4/27/1985

June 7, 2017

Mariah Lopez has been a patient of mine and underwent male to female vaginoplasty on 9/2/2009 after appropriate psychological evaluation and is medically-legally a woman since that time.  She needs to maintain the patency of her neo-vagina with dilations for 15 minutes 3 times a day.  This cannot easily be done standing or sitting.

She needs to be able to have the privacy of lying down during these times, as well as water soluble lubricant such as KY jelly.  She is also expected to douche at least 3 times a week. for cleanliness.

Harold M. Reed, M.D.
Board Certified Urologist and Transgender Surgeon
1-305-865-2000.

Exhibit
C



Cylar House Behavioral Health Clinic
743-749 East 9th St., 2nd Floor
NEW YORK, NY 10009-5334
TEL 212-677-7999 x4202 FAX 212-739-0007
WWW.HOUSINGWORKS.ORG

June 13, 2017

Re: Mariah Lopez

To whom it concerns,

Ms. Lopez is requesting to return to Marsha's Shelter. She is currently on SSD, due to her PTSD and gender dysphoria. Mariah is highly distressed with her current living situation in a women's shelter, where it is a dormitory-like set-up. She considers this as a harm setting, that being with a cisgender female population inhibits herself to express her own gender identity, causing her more distress, mood changes.

The location of her shelter is a triggering factor for her PTSD, since she experienced her trauma within the same neighborhood. Her living situation led her to return to prostitution/ being a sex worker, which placed her in a higher distress. Fearing that she could "snap" at her clients due to her instability, I am recommending that Ms. Lopez be transferred back to Marsha's Shelter and/or LGBTQ facility shelter for her own psychological stability. Whatever can be done to facilitate and expedite this process would be appreciated.

Sincerely,

PIERRE RICHARD ARTY, MD
NYS LIC#194382
DEA BA5426502

Pierre Arty, MD
Director of Psychiatry
Housing Works
Downtown Brooklyn Health Center
57 Willoughby St

Exhibit D

Form W-864
Rev. 9/1/90

Human Res
Child W  4981394

## Voluntary Placement Agreement by Parent or (

(Prepare in Quintuplicate)

## NOTICE

• By signing this agreement, you will voluntarily transfer the care and custody of your child to the Commissioner of Social Services. You do not have to sign the Agreement nor will you be subject to any legal penalties for failure to sign it.

• You have the right to talk to a lawyer of your own choosing, prior to signing this Agreement or at any other time, about the consequences of signing this legal document. If you cannot afford a lawyer, there are several organizations which provide free legal services. The following are some of the organizations that provide free legal services:

Community Action for Legal Services...(212) 431-7200
Legal Aid Society.......................................(212) 227-2755
MFY Legal Services...................................(212) 475-8000

**Name of Person Signing Agreement**

Linda Lopez
Mother

Michael Dominguez
Father*

Lorraine Lopez
Legal Guardian**

**Address**

Deceased
House No. and Street                    Apt.

Borough or PO                              ZIP
23 West 90 Street, Apt 4A
House No. and Street                    Apt.
New York, NY 10024
Borough or PO                              ZIP
250 West 61 Drive, Apt 60
House No. and Street                    Apt.
New York, NY 10023
Borough or PO                              ZIP

Parent(s)/Legal Guardian of _____Brian Lopez_____ born on 4-27-85
request the Commissioner of Social Services to accept care and custody of my (our) child.

*If child is born out-of-wedlock, attach acknowledgement of paternity form; or indicate the date and court where paternity was established: Court_____ Date_____

**If signing as legal guardian, specify the date and court where guardianship was obtained: Court Manhattan Family Date Sept. 1986

Exhibit E

consistently and deliberately remained indifferent to the disfavored treatment that Class members receive in New York City's child welfare system.

67. This general policy of wilful blindness has led to numerous instances in which staff members have deliberately ignored the most basic needs of the Class members. Staff members frequently refuse to intervene on behalf of self-identified lesbian, gay, bisexual or transgendered youth in their group homes where they would not hesitate to do so on behalf of straight youth, allowing them to be subjected to unconscionable treatment. One child welfare system worker recounted:

Gay kids are scared and they have a right to be. . . . In one of our group homes one of the kids said that he was gay and the other kids said that they were going to have a "blanket party (this is when someone rushes in, throws a blanket over the head of the unsuspecting victim and everyone joins in pummeling [sic (pummeling)] the victim) – all of the staff knew this. The staff sanctioned the "blanket party" because [the] kid was gay.

68. In sum, defendants openly discriminate against members of the Class by excluding them from group homes solely because of their actual or perceived sexual orientation and gender atypicality, by setting a double-standard in which Class members are labeled as "problems" for no reason other than the intolerance of those around them, and by turning a blind eye to the most ordinary needs of the Class members—refusing even to intervene to protect the safety of these children in situations where they would not hesitate to do so if the safety of a straight youth were threatened. This pattern of discrimination, blaming, and indifference within the present system is pervasive and continuing.

The Named Plaintiffs

69. Due to the defendants' failure to provide each Named Plaintiff with a safe and supportive environment where each could safely discuss and ask questions about homosexuality and issues relating to sexual identity development, disclose and express feelings of same-sex attraction, form positive peer relationships, and otherwise learn to manage the tasks associated with the development of an adult personal and social identity, the Named Plaintiffs have suffered severe and irreparable injuries, including physical, psychological, emotional, and developmental harm. Rather than fulfilling their legal duty to protect the Named Plaintiffs from such harm and providing them with professional care, the defendants have caused the Named Plaintiffs' injuries by inappropriately placing them in living situations where they are constantly victimized and the residential staff refuses to protect them. Moreover, the defendants have discriminated against the Named Plaintiffs, denying them services provided generally to children in the defendants' custody based upon the Named Plaintiffs' sexual orientation and gender atypicality.

Joel A.

70. Joel A., who is thirteen years old, has been teased about being gay as far back as he can remember. He has been openly gay since he was nine years old, when the defendants sent him to live at a large residential facility with several hundred children. Almost as soon as Joel arrived, the other kids started calling him "faggot" and other names. After less than a month, the teasing escalated to physical attacks, with the other children throwing objects at Joel and physically attacking him in the shower. Such attacks sometimes happened two or three times a day.

71. Joel's situation grew worse during the three years he lived at the residence. He was punched, thrown down a flight of stairs, and cut by a knife, and he had rocks and batteries thrown at him, and was physically abused and attacked in other ways. His shoulder blade and finger were broken, and his nose broken twice, once from Joel's being hit in the face with a broom. He received numerous other injuries and visited the emergency room repeatedly.

72. Once, in the unit where Joel lived, some children threw a blanket over his head, knocked him down, tipped a locker over onto his leg, and ran out of the room, leaving him lying on the floor. A staff member told Joel that he could not punish these kids because he had not personally witnessed the incident.

73. On another occasion, several children were verbally harassing Joel for being gay while they all waited their turn to be called into a recreation hall. When Joel tried to leave, about fourteen kids jumped him while others watched. One held Joel while another punched him in the face, causing his nose to bleed profusely.

74. Another time, two kids almost drowned Joel. Although Joel had been threatened by one of the kids and had complained to the lifeguard, the lifeguard, rather than intervening effectively, simply assured Joel that he need not worry. Moments later, the two kids ganged up on Joel, and one held his head under water until Joel was able to struggle to the surface, coughing up water and vomiting. The staff did nothing to punish the attackers.

75. These are only some examples of the victimization for which Joel was constantly targeted based on his sexual orientation.

76. When Joel reported such incidents, the staff frequently told him that they could do nothing about any incident that they did not see. At times, however, a staff member would observe other kids harass or attack Joel and would simply ignore the incident. For example, when some older kids stared throwing pieces of wood at Joel in the park one day, Joel ran away from them, but fell and hit his head on the wooden frame of some swings. He saw that a staff member had been watching, but when that staff member came to see how badly Joel was hurt and Joel complained about the attack, the staff member claimed that he had not seen the incident and therefore could not take disciplinary action against the perpetrators.

77. Once when Joel's nose was bleeding badly and it should have been clear that he had been the victim of an attack, the staff punished him on the pretext that he was getting blood on the floor.

78. Even when the staff purported to intervene on Joel's behalf, they sometimes did so in ways that demeaned Joel. For example, when one of the kids threw Joel down a flight of stairs, he heard a staff member ask the child, "Why did you do this? I thought you didn't want to touch him." Also, the staff would frequently try to protect Joel by isolating him from the other kids. Thus, Joel would have to wait while everyone else ate dinner, and then eat alone, and he could not watch TV when the other kids were watching because the TV was in a common room. Such isolation sometimes lasted for months.

79. On information and belief, none of the staff ever made any attempt to teach the other kids that even if they did not like Joel, he was still a member of their community and deserved to be treated decently, fairly, and with respect.

80. Instead, the staff made clear to Joel that they disapproved of his sexual orientation. For example, when Joel tried to hang posters about meetings sponsored by Triangle Tribe—a support group for gay kids—he was told that this was "sexually inappropriate." He was also told that the Gay Pride Parade was sexually inappropriate for him, and that he would not be allowed to attend. One staff member told Joel that he should go to choir rehearsal because he had a "bad attitude" about the gay pride parade. The staff, however, allowed other boys to hang pictures of half-naked women in their rooms. When Joel complained that this was unfair, the staff said that the other kids could hang such pictures because they were "normal."

81. On Family Day, when each resident was allowed to invite eight guests, including friends and girlfriends, Joel was told that he could not invite gay friends because they might get beaten up. Joel was therefore only allowed to invite family members.

82. Joel once overheard a staff member talking about gays kids say that "all they want to do is have sex." Indeed, the staff appeared preoccupied with the fear that Joel would molest other kids because he is gay, and they sentenced Joel to four seven-week terms in a group for kids exhibiting "problematic sexualized behavior." All the kids in the group sessions that Joel attended were gay, and the staff members who led these group sessions always conveyed the same message—that homosexuality is bad and that homosexuals want to force or coerce other people to have sex with them. At one meeting, one child asked a staff member why Joel had to go to those meetings. The staff member responded, "Because [Joel] has a problem."

83. On information and belief, there was no special group for sexually active straight kids.

84. Because of the way the other kids treated Joel, and because the staff either did not care or did not know how to deal with this problem, Joel lived effectively as an outcast, in constant fear of being attacked. Being isolated made him feel even more alone and afraid.

85. Defendants knew or should have known about the constant abuse that Joel suffered. Indeed, Joel wrote numerous letters to defendants and/or their agents explaining what was happening to him.

86. Because of the constant harassment and abuse, and defendants' failure to protect him from it, Joel ran away in June 1998. After Joel slept on the street for at least one night, ACS placed him in approximately five different homes, none of which proved to be safe and appropriate placements for Joel. He continues to be subjected to harassment and abuse because of his sexual orientation.

*Michael D.*

87. Michael D. is fourteen years old. Since he was very small, he always hung out with girls. By the time that he was ten or eleven years old, he realized that he was gay.

88. In 1994, when Michael was ten, he entered the foster care system because his mother couldn't take care of him. He was first placed at a group home.

89. After just a few months, Michael was transferred to a large residential treatment center ("RTC") for several hundred children.

EXHIBIT F

# KATHERINE RACHLIN, PH.D.
### CLINICAL PSYCHOLOGIST

153 WAVERLY PLACE, SUITE 10
NEW YORK, NY 10014

PHONE: (212) 206-3636
FAX: (212) 206-6361
E-MAIL: KRACHLIN@AOL.COM

## Psychological Evaluation

**Client:**     Mariah Lopez

**Date:**     2/9/2004

**Evaluator:**     Katherine Rachlin, Ph.D.  Clinical Psychologist NYS Lic# 012029

**Date of Interview:** February 9, 2004

**Place of interview:** 153 Waverly Place, 10fl New York, NY 10014

### Qualifications of the Evaluator

I am a Psychologist licensed by the state of New York.  I received my clinical training at Teachers College, Columbia University and have become a specialist in the field of Gender Identity Disorders.  For over a decade I have worked with transgender and transsexual individuals, conducting evaluations and psychotherapy.  I also perform transgender-oriented training, research and education.  The attached curriculum vitae detail my extensive experience in this area of specialization.

### Description of Identified Client

Ms. Lopez is an 18 year old Male-to-Female transgender person.  She appeared well groomed and feminine in voice and mannerisms.  During the interview Ms. Lopez appeared calm, relaxed, cooperative, and pleasant.   Ms. Lopez was well related and exceptionally articulate.  She was clear and very direct in her thoughts and communication.  She appeared very mature and confident in her knowledge.  The interview focused on her personal history and her experience of gender.

### Family and Social History

I spoke with David Rubin, Director of Social Services at St Christopher Ottilie regarding Ms. Lopez.  We discussed her long documented relationship with children's services and his knowledge of her.  He reported that he had not been successful in attempts to contact her family, but planned to try again in the near future.  Please see the attached Uniform Case Record dated 4/10/04, supplied by Mr. Rubin.

### Gender History
Like many transsexuals, Ms. Lopez's earliest memory is of pretending to be a girl and believing that this was possible.  She was always drawn to things feminine and soft.  Ms.

Lopez reported that by the age of six or seven she had decided that she would "get out of this body". By age nine she was demoralized as she realized that she would have to go through puberty and become male. She plucked facial hair as it came in and avoided sports so as not to get any muscle development. When she was thirteen she became aware of the possibility of gender transition through medical treatment. She began using hormones at that time and continued to pray for an opportunity to have surgery and make a complete transition. Since age thirteen she has continued hormone treatment and silicone injections to her hips and thighs which have aided her feminine presentation. Ms. Lopez identifies as a heterosexual female and has recently ended a long-term relationship with her last boyfriend.

Like many disadvantaged transgender youth Ms. Lopez has a history of prostitution. There are few job opportunities for transgender teens. The sex industry is one of the few professional communities that is supportive of transgender people. For transgender teens, prostitution provides both a source of income and reinforcement that they are attractive in a feminine way.

Ms. Lopez presents as an attractive young woman. She has no confusion about her gender. She is fully and confidently female. Her discomfort arises out of the dissonance between her internal identity and her external body. Though she may appear female to most who know her, she still has male genitals, and this is a source of pain and shame to her. At this time in her life she is requesting sex reassignment surgery to create genitals which will reflect her inner identity and allow her to live a full life as a woman.

**Psychiatric History**

According to her report, Ms. Lopez was first sent to a psychotherapist when she was six years old. She believes that the adults in her life thought that it would help her to deal with the death of her mother. She claims that the therapist she saw at age six diagnosed her with Gender Identity Disorder. Over the years she has received psychotherapy or psychiatric treatment in response to aggressive behavior. She reports that she was hospitalized once for approximately ten days after getting in a fight in her group home. She claims that she has never been on psychiatric medication. She also reports no history of suicide attempts. She does report a private fantasy "Since age 13 every year on my birthday I tell myself that if I don't have sex change by next birthday I will kill myself". Such thoughts are normal for people with her condition. Suicidal gestures and attempts are common among transgender teens. They are often in an impossible position in which they can not escape their own transgenderism but are not able to express it without incurring negative consequences.

Ms. Lopez has been visibly transgender from an early age. She is a clear case of a transsexual child growing into a transsexual adult. She had to learn to survive by both hiding her gender and expressing it. Like other transgender children her gender expression made her vulnerable to prejudice and even violence. Children learn to cope with their difference in a variety of ways. They may postpone many activities such as dating, working, or pursuing a career until they can engage in them in their preferred

gender. Like many transgender individuals she may be most comfortable in places where gender variance is embraced. The environments perceived to be safest and most affirming are likely to be certain night clubs, Greenwich Village, and anywhere that transgender teens gather, including the subculture of transgender prostitution.

**Education and Employment History**
Ms. Lopez reported that her career goal is to get her GED and go to college and then Law School. For several years she has been active as a peer counselor in an HIV/AIDs prevention program.

**The Standards of Care for the Treatment of Gender Identity Disorders.**

The Standards of Care for Gender Identity Disorders (SOC) published by The Harry Benjamin International Gender Dysphoria Association, Inc (Meyer et al., 2001) are attached. These standards set out recommended guidelines for the treatment of individuals with Gender Identity Disorders. The section which addresses sex reassignment surgery suggests that individuals meet certain criteria for Eligibility and Readiness. Ms Lopez meets all of the following criteria: (I have shortened and paraphrased some of these. Please see the standards for the full text of each of these items.)

Readiness
1. Legal age of majority.
2. Twelve months of hormonal therapy.
3. Twelve months of living as a woman.
4. A psychological evaluation. Psychotherapy if required or recommended by the evaluating mental health professional. ... Psychotherapy per se is not an absolute eligibility criterion for surgery,
5. Demonstrable knowledge of the cost, procedures, complications, etc. of various surgical approaches
6. Awareness of different competent surgeons.

Eligibility
1. A stable, enduring, comfortable gender identity
2. Progress in dealing with work, family and interpersonal issues. Lack of mood or thought disorders or other psychiatric contraindications to surgery.

Ms. Lopez fulfills all of the eligibility and readiness criteria for surgery. Though she has not had extended gender-oriented psychotherapy, she has demonstrated success living as a woman. Psychotherapy is not a "cure", though it can often provide support for dealing with the anxiety, depression, and social challenges which accompany the experience. The only proven successful treatment is sex reassignment surgery. (For documentation of this, the outcomes, and evidence of the very low rate of regret for this procedure please see the references attached to this letter, particularly The Standards of Care for Gender Identity Disorders, Meyer et al. 2000, and the review of the literature by Carroll 1999).

## Summary and Recommendations

Transgender youth are visibly different from others in that their feminine characteristics go beyond gender expression. Ms. Lopez is not capable of changing or controlling her feminine qualities. Even when dressed in male clothing her transgenderism will be apparent. If she remains on feminizing hormones she will continue to experience breast development, soft skin, loss of muscle strength, softening of facial features, slower and sparser growth of facial and body hair, redistribution of weight to create fuller hips and buttocks, and increased emotionality and tendency to cry. All of these characteristics may make her more vulnerable to violence and discrimination. At this time Ms. Lopez is requesting sex reassignment surgery which will allow her to more seamlessly live as a woman. Such surgery will reduce the risk she currently faces on a daily basis. Living as a woman with a penis is a hardship. There is always the danger that someone may challenge her, invalidate her, or cause her serious harm in the face of this evidence of difference. A woman with a penis is also at a disadvantage in social situations, in romantic relationships. In a society that genders bathrooms, locker rooms, dormitories, fitting rooms, and more, she must constantly hope that no one will find out the true status of her body.

If Ms. Lopez undergoes surgery and has satisfying surgical results, she can expect the following: reduced anxiety and defensiveness due to fears of being "found out" or challenged; increased comfort in social and sexual situations; increased acceptance by potential friends, employers, and sexual partners; increased personal comfort with her own body; satisfying sexual relationships, including penetration and orgasm; all of the necessary criteria for changing her name and gender on official documents to the extent allowed by law. For example, she will be able to apply for employment as a woman, show identification as a female to human resources, use the women's room, and dress as a woman without question or disruption.

Ms. Lopez appeared to be of above-average intelligence, had adequate judgment, and good social skills. She showed no signs of mood or thought disorder and there was nothing to suggest any underlying psychopathology which would impact on her gender identity. From her report, she appeared to meet all of the criteria for the DSMIV diagnosis of Gender Identity Disorder. She is classically transsexual because of her uncomplicated female gender identity. She reported a lifelong cross-gender identification which seems to have been intense, stable, and enduring. She has had hormonal treatment to appear more feminine and she has been happy with the results.

Ms. Lopez has been living and as a female for some time. In this respect, she has achieved a great deal, but her ability to interact in the world is still limited by the existence of male reproductive organs. To anyone meeting her Ms. Lopez is an attractive woman with a feminine figure enhanced by female hormones. The incongruity between her physical self, her gender identity, and her genitals may cause her to be a target of prejudice and even violence. It is necessary both for her emotional well being, and her physical safety, that she appears fully female. For these reasons, gender confirming surgery/vaginoplasty and labiaplasty is appropriate and necessary.

From this brief evaluation it would seem that she is capable of making good decisions for herself regarding gender transition and that she is an appropriate candidate for sex reassignment surgery. There do not appear to be any psychiatric contraindications to her undergoing such surgery at this time. It is likely that such surgery will enhance her quality of life and enable her to fully engage in social and professional activities. To deny her this surgery could compromise her mental health as well as her physical safety. If you would like more information regarding my work with this patient please contact me at 212 206-3636.


Katherine Rachlin, Ph.D.

## References for the Necessity of Sex Reassignment Surgery in the Treatment of Gender Identity Disorder

American Psychiatric Association.(2000). *Diagnostic and statistical manual of mental disorders,* Fourth Edition Text Revision). Author: Washington, DC.

Barrett, J. (1998). Psychological and Social Function Before and After Phalloplasty. *Int J. Trans. 1: Http://www.symposion.com/ijt/.*

Benjamin, H. (1966). *The Transsexual Phenomenon.* Julian Press, New York, NY.

Bockting, W.O. and Coleman, E. (1992). A comprehensive approach to the treatment of gender dysphoria. In W. O. Bockting and Coleman, E. (Eds.), Gender Dysphoria: Interdisciplinary Approaches in Clinical Management (pp. 131-155). New York: Haworth.

Boltzer, M.C. and Vehrs, B. (1993). Factors contributing to favorable outcomes of gender reassignment surgery. Paper presented at the 1993 XIII International Symposium on Gender Dysphoria: Advances in Treatment, The Harry Benjamin International Gender Dysphoria Association, Inc. New York, NY.

Bodlund, O. and Kullgren G. (1996). Transsexualism – general outcome and prognostic factors: a five-year follow-up study of nineteen Transsexuals in the process of changing sex. *Archives of Sexual Behavior.* 25: 303-316.

Brown, G. R. (1990). A review of clinical approaches to gender dysphoria. Journal of Clinical Psychiatry, 51, 57-64.

Brown, G. R. (2001). Transvestism and Gender Identity Disorder in Adults. In Gabbard, G.O. (Ed.), *Treatment of Psychiatric Disorders* (3^nd ed. Vol. 2) pp.2002-2067. American Psychiatric Publishing, Inc., Washington DC:

Carroll, R. (1999). Outcomes of treatment for gender dysphoria. *Journal of Sex Education and Therapy.* 24: 128-136.

Green, R. and Fleming D. (1990). Transsexual surgery follow-up: status in the 1990s. *Annual Review of Sexual Research.* 7: 351-369.

Ettner, R. (1999). *Gender Loving Care a Guide to Counseling Gender-Variant Clients.* W.W. Norton & Co. New York.

Hale, J. C. (2001). *Medical Ethics and Transsexuality.* Paper presented at the 2001 XVII Harry Benjamin International Symposium on Gender Dysphoria. Galveston, Texas.

Israel, G. and Tarver, E. (eds.) (1997). *Transgender Care.* Temple University Press, Philadelphia.

Kuiper, B.... and Cohen-Kettenis, P. (1988). Sex reassignment surgery: a study of 141 Dutch transsexuals. Archives of Sexual Behavior, 17, 5: 439-457.

Landen, M. MD; Walinder, J. MD PhD; Lundstrom, B. MD, PhD. (1997). Predicting regrets in sex reassignment. Paper presented at the XV Harry Benjamin International Gender Dysphoria Association Symposium, The State of Our Art and the State of Our Science. Vancouver Canada.

Lundstrom B, Pauly I, and Walinder, J. (1984). Outcome of sex reassignment surgery. *Acta Psychiatrica Scandinavia.* 70: 289-94.

W. Meyer III (Chairperson), W. Bockting, P. Cohen-Kettenis, E. Coleman, D. DiCeglie, H. Devor, L. Gooren, J. Joris Hage, S. Kirk, B. Kuiper, D. Laub, A. Lawrence, Y. Menard, J. Patton, L. Schaefer, A. Webb, C. Wheeler. (2001) *The Standards of Care for Gender Identity Disorders -- Sixth Version.* Int J. Trans. 5: http://www.symposion.com/ijt/.

Pauly, I. B. (1981). Outcome of sex reassignment surgery for Transsexuals. *Australian & New Zealand Journal of Psychiatry.* 14: 45-51.

Pfafflin, F. and Junge, A. (1998). *Sex Reassignment Thirty Years of International Follow-Up Studies SRS: A Comprehensive Review, 1961-1991.* Symposium Publishing, Dusseldorf, Germany.

Rachlin, K. *(2002). Transgendered Individuals' Experiences of Psychotherapy.* International Journal of Transgenderism, Volume 6, Number 1, available at http://www.symposion.com/ijt/.

Rehman, J. Lazer, S. Benet, A.E., Schaefer, L.C. and Melman, A. (1999). The reported sex and surgery satisfaction of 28 postoperative Male-to-Female Transsexual patients. *Arch. Sex. Behav. 28(1): 71-89.*

Ross, M.W. and Need, J. A. (1989). Effects of adequacy of gender reassignment surgery on psychological adjustment: A follow-up of fourteen male-to-female patients. *Archives of Sexual Behavior.* 18(2): 145-153.

Schaefer, L.C., Wheeler, C.C., and Futterweit, W. (1995). Gender Identity Disorders (Transsexualism). In Gabbard, G.O. (Ed.), *Treatment of Psychiatric Disorders* (2nd ed. Vol. 2) pp. 2015-2079. American Psychiatric Press: Washington DC.

# CURRICULUM VITAE
## Katherine Louise Rachlin

153 Waverly Place suite 10, New York, NY. 10014
Telephone: (212) 206-3636 Fax: (212) 206-6361 e-mail:KRachlin@aol.com

### Professional Credentials

Licensed Psychologist since 1993. New York State # 012029.
AASECT Certified Sex Therapist since 1997

### Education

| | |
|---|---|
| Sept. 1996 | Postdoctoral Respecialization, Clinical Psychology. Teachers College, Columbia University. |
| Dec. 1991 | **Ph.D.** Psychology, Applied Research and Evaluation. Hofstra University. |
| Dec. 1986 | **M.A.** Psychology, Applied Research and Evaluation. Hofstra University. |
| May 1983 | **B.A.** *cum laude*, Psychology. Marymount Manhattan College. |

### Clinical Experience

| | |
|---|---|
| Nov. 1996-Present | **Psychotherapist, Supervisor, and Trainer** in private practice. Provide psychotherapy for individuals and couples, specializing in issues of sexuality and gender identity. Provide supervision for psychotherapists who want training in working with transgender and sexually diverse clients. Deliver training in educational institutions, health care settings, and corporations to provide staff with a greater understanding of transgender issues. |
| Aug. 1999-July. 2000 | **Psychologist** PsychAssociates Group, AIDS Services Center of Lower Manhattan. Conducted individual and group psychotherapy and psychological assessments with HIV positive individuals. |
| Nov. 1996-Aug. 1999 | **Psychologist** PsychAssociates Group, ARC. Conducted individual and group psychotherapy and psychological assessments in group homes and sheltered workshops with developmentally delayed adults. |
| Sept. 1995-Sept. 1996 | **Psychology Intern** Manhattan State Psychiatric Center, Ward's Island, New York, New York. (APA approved full-time year-long internship) Worked with acute admissions and severely and chronically mentally ill inpatient population at state psychiatric hospital. |
| Sept. 1994 -July. 1995 | **Psychology Extern** Adult Outpatient Psychiatric Clinic, St. Luke's-Roosevelt Hospital, New York City. Conducted individual psychotherapy, intake interviews, and psychological testing. |
| Jan. 1994 -May 1995 | **Psychotherapist** The Center For Psychological Services, Teachers College, Columbia University Conducted intake interviews, psychological testing, and psychotherapy with individuals and couples. |
| Sept. 1994 -Aug. 1995 | **Family and Couples Support Group Leader.** - The Gender Identity Project, The Lesbian, Gay, Bisexual and Transgender Community Services Center of New York City. Facilitated two bi-monthly support groups: One for families of transsexuals and one for transsexual couples. |
| 1989 - | Hosted the Fraternity, an information network and support group for female-to-male |

1993                 transsexuals, crossdressers, their significant others and helping professionals.

## Additional Work Experience

1991-93         **Medical Writer and Project Director.** Myofascial Pain and Fibromyalgia:  Triggerpoint Management. Mosby Publishers.
1990-91         **Adjunct Assistant Professor of Psychology,** Hofstra University.
1986-92         **Researcher, Management Consultant,** and **Human Resources Associate** (details available upon request)
Prior to 1986   While a student, I held numerous jobs in cultural institutions around Manhattan including The Metropolitain Museum of Art, The Metropolitain Opera, The Marlborough Gallery, and The New York Lyric Opera.  Details available upon request.

## Published Papers

Paper currently in Preparation for Publication - *FTMs experiences of Hysterectomy and Oophorectomy (coauthors Griffin Hansbury and Gabrie Fenigsohn)*

Paper currently in Preparation for Publication -  *A Six-Stage Model applied to Gender Identity Development in Psychotherapy*

Paper currently in Preparation for Publication - *Flexible Use of the Standards of Care #1: Psychological Evaluation in Lieu of Psychotherapy* (coauthor John Capozuca)

Paper currently under review for Publication  *Utilization of Health Care Among FTMs in the United States.* (Coauthor Jamison Green)

*Transgendered Individuals' Experiences of Psychotherapy.* International Journal of Transgenderism, 2002, Volume 6, Number 1, available at http://www.symposion.com/ijt/.

*FTM 101: Dispelling Myths About the Invisible and Impossible.*  Book Chapter in The Phallus Palace: Female-to-Male Transsexuals.  2002. Dean Kotula editor. Alyson Publications: Los Angeles CA.

*Factors Which Influence Individual's Decisions When Considering FTM Genital Surgery.* International Journal of Transgenderism, 1999, Volume 3, Number 3, available at http://www.symposion.com/ijt/.

## Papers Presented

*Transmasculine Individual's Experiences with Hysterectomy/Oophorectomy.* Poster Presentation. Coauthors Gabriel Fenigsohn, MA. and Griffin Hansbury.  The XVIII Harry Benjamin International Symposium on Gender Dysphoria. 10-13 September 2003, Ghent, Belgium.

*Flexible Use of the Standards of Care: First in a Series.*  Presented with John Capozuca, Ph.D.  at the XVIII Harry Benjamin International Symposium on Gender Dysphoria. 10-13 September 2003, Ghent, Belgium.

November 2001, *Trends in the Evolving FTM Community: Challenges for Clinical Providers.* Paper presented at the XVII Harry Benjamin International Symposium on Gender Dysphoria. October 31-November 4, 2001, Galveston, Texas.

November 2001, *Utilization of Health Care Among FTMs in the United States.* (Coauthor Jamison Green) Paper presented at the XVII Harry Benjamin International Symposium on Gender Dysphoria. October 31-November 4, 2001, Galveston, Texas.

August 2001, *Transgendered Individuals' Experiences of Psychotherapy.* Paper presented at the American Psychological Association 109th Annual Convention, San Francisco, CA. August 24-28, 2001.

March 2001, Work*ing With Transgendered Women in Recovery.* Presented at Speakout conference sponsored by The Lesbian and Gay Community Services Center of New York City.

February 2001, *The View From The Wings.* Key Note Address at the True Spirit Conference sponsored by AMBOYZ, Washington, DC.

October 2000, *The Effects of Gate-Keeping on Experiences with Psychotherapists,* presented at The Fourth International Congress on Sex and Gender, October 6-8, Philadelphia, Pennsylvania.

August 1999, *Meeting At The Gate: A National Survey of Transgendered Individuals' Experiences of Psychotherapy,* presented at The Harry Benjamin International Dysphoria Association XIV Symposium August 17-21, 1999, London, England.

September 1998, *Factors Which Influence Consumers' Decisions Regarding Female-To-Male Genital Reconstructive Surgery,* presented at The Third International Congress on Sex and Gender, September 18-20, 1998, Oxford, England.

September 1997, *Factors Which Influence Consumers' Decisions Regarding Female-To-Male Genital Reconstructive Surgery,* presented at The Harry Benjamin International Gender Dysphoria Association XV Symposium, September 10-13, 1997, Vancouver, BC, Canada.

August 1997, *Intimacy Issues for Partners of Female-to-Male Transsexuals,* presented at The Third FTM Conference of the Americas, Boston, Mass.

June 1997, *Partners in the Journey: Psychotherapy and Six Stages of Gender Revelation,* presented at the Second Congress on Sex and Gender, King of Prussia, PA.

April 1996, *Sexual Issues Brought Into Psychotherapy Early in Gender Transition* presented at The Second Annual Transsexual Health and Empowerment Conference, sponsored by The Gender Identity Project of The Lesbian and Gay Community Services Center of New York City.

August 1995, *No-Hormone Non-Operative options for Female-to-Male Transsexuals,* and *Observations on FTM Men - a Therapist's perspective,* both presented at the First FTM Conference of the Americas, San Francisco, CA.

April 1995, *Transgender Issues in Psychotherapy,* presented at The First Annual Transsexual Health and Empowerment Conference, sponsored by The Gender Identity Project of The Lesbian and Gay Community Services Center of New York City.

January 1992, *Self-Managed Teams: Implications for Assessment.* Presented at the International Personnel Management Association Assessment Council Convention, Baltimore, MD. In collaboration with Ira Kaplan, Ph.D. and William Metlay, Ph.D.

**Thesis**

Doctoral Dissertation: July 1991 <u>Measurement of Group Behavior</u>. Exploration of a systems model and metatheories of systems models that had been applied to work groups. Doctoral Dissertation, Hofstra University, Department of Psychology.

**Professional Affiliations**

The American Psychological Association - **Member Division 44 TransTaskforce**

The Harry Benjamin International Gender Dysphoria Association - **Member of the Committee to Rrevise the Standards of Care for the Treatment of Gender Disorders**
FTM International - **Member of the Board of Directors 1999-2002**
The New York State Psychological Association
The American Association of Sex Educators, Counselors, and Therapists
The Society for The Scientific Study of Sexuality
The New York Working Group on Gender Disorders, New York State Psychiatric Institute

**C. Christine Wheeler, Ph.D.**
310 East 46th Street, Suite 12-H
New York, New York 10017 USA
Telephone: 1 (212) 599-2254
Facsimile: 1 (212) 973-9431

October 11, 2005

Michael Katch, Ph.D.
Associate Commissioner
Administration for Children's Services       RE:    Mariah Joel Lopez
Direct Congregate Care Services              SS:     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
2 Washington Street, 20th Floor              DOB:   April 27, 1985
New York, New York 10004

RE: Psychiatric Evaluation and Prognosis

Dear Dr. Katch:

I am a psychotherapist and degreed sexologist for over 30 years and have been specializing in the diagnosis and treatment of Gender Identity Disorders, as well as disorders resulting from addictive, phobic, compulsive or abusive behaviors, parapheliac conditions, sexual dysfunction, body dysmorphic disorders for the past 33 of those years. I am a charter member, fellow and current Board Member of the oldest professional organization The Harry Benjamin International Gender Dysphoria Association, Inc. (HBIGDA), coauthor of the current medical treatment guidelines for Gender Identity Disorders entitled, "The Standards of Care," and coauthor of a well known treatment chapter entitled, "Gender Identity Disorders (Transsexualism)" published in <u>Treatments of Psychiatric Disorders</u> (Second Edition) by American Psychiatric Press, Inc. (1995).

<u>PRESENTING PROBLEM</u>

Mariah Lopez was referred by Administration for Children's Services, through recommendation from Lawyers for Children. The purpose of this lengthy evaluation, as I understand it, is to determine the current psychological status of Mariah Lopez, assess diagnostics and co-morbidity, and to render an opinion regarding whether or not any dysfunction assessed may be attributable to her eligibility or readiness for genital restructuring surgery, in diagnostic confirmation of Gender Identity Disorder.

<u>METHODOLOGY</u>

Psycho diagnostic Interview and clinical intake with Mariah Lopez totaled twenty-three hours. Subsequent to my clinical intake, with signed consent from the patient, I have reviewed the following materials, including clinical reports and patient charts, from other practitioners or agencies inclusively for this report: (1) office records, intake assessment and report from endocrinologist Michael K. Bartalos, M.D., and assessment dated 2003 from Katherine Rachlin, Ph.D. (2) medical records of psychiatrist Lawrence Sheff, M.D., as well as medical report from surgeon Arnold Melman, M.D., (3) Criminal History Record Information, and (4) other related documents and correspondence from Mariah Lopez, reviewed in preparation for writing this report.

<u>CLINICAL PICTURE</u>

I initially saw Mariah Lopez (birth name Brian Joel Lopez) for psychiatric diagnostic evaluation on May 26, 2005, followed by a series of sessions subsequently through October 6, 2005 for a total of 23 clinical in-person hours. In addition to my intake assessment and in response to my request, the patient has provided me with additional written material concerning her history and perspective on her Gender Identity Disorder. Mariah Lopez is not currently in treatment of any kind whatsoever to more adequately prepare her for the consequences of choices regarding her requested genital restructuring

surgery. Ms. Lopez's attitudes have been naively negative toward psychotherapy in general – she initially states, "I don't need therapy. I know who I am. I've been in the community since I'm eleven. Sylvia Rivera was my trans mother. I know what I want." I believe, her attitudes are due to her history of being misunderstood, coupled with unsatisfying experiences, rather than due to financial distress.

On the basis of having examined Mariah Lopez, reviewing the above materials and my professional experience, I am of the opinion that Mariah Lopez has suffered an ongoing socially-disabling condition primarily as a result of her Gender Identity Disorder, accompanied by atypical anxiety, Borderline Personality Disorder, since the mid – 1990's, and more recently, posttraumatic stress disorder, and chronic depression. To explain:

## DIAGNOSTICS

By history, since 1988, Mariah Lopez has suffered from the pain and the stress related to four serious conditions: Gender Identity Disorder (DSM IV 302.85), Generalized Anxiety Disorder (DSM IV 300.02), Dissociative Disorder, specifically Depersonalization Disorder (DSM IV 300.06), Dysthymic Disorder with atypical features (DSM IV 300.4), Borderline Personality Disorder (DSM IV 301.83), and more recently since the mid – 1990's, Posttraumatic Stress Disorder (DSM IV 309.81) and chronic depression. Early childhood gender conflict was noted in the medical records of Brian/Mariah's pediatrician who, as a result of concerns about early effeminateness and of being caught using magic marker for makeup, referred him/her for weekly therapy to the childhood gender program at Roosevelt St. Lukes Hospital. Patient reports being followed weekly from ages 3-6.

Historically, and most recently, there are no medical psychotherapy treatment documents concerning this patient's gender dysphoria, no known written records – other than medical records of psychiatrist Lawrence Sheff, M.D., and the requested written report from Dr. Katherine Racklin (2004).

This patient had received medication for both symptoms and the diagnosed conditions—hormones for GID and antidepressant for PSD insomnia and interrupted sleep. Hormones are successful in addressing gender relief, adding to the original impetus for her medical stabilization. Other medication, while initially reported as providing some relief from the patient feeling immobilized and nonfunctional, are reported to be of little relief from the overwhelming fears experienced currently. Available documentation reflects that this patient has continued life in a chronic state of impulse control behaviors, apparent discrimination and without question whatsoever, this individual has suffered with Gender Identity Disorder, Early Childhood Onset.

## GENDER IDENTITY DISORDERS – STANDARD OF CARE

Standard of Care. The standard of care in evaluating an individual for any gender condition involves interviewing the patient and obtaining information from agencies in charge, family members, friends, previous pertinent medical treatments, and other sources if possible with the patient's consent. Diagnostic evaluation clinically focuses primarily on psychosexual and social development, psychiatric history and current mental status. No specialized tests exist that can assist with differential diagnosis. Additionally, the presence of co morbid diagnoses[1] needs to be assessed. As my colleagues and I have written in the chapter "Gender Identity Disorders" in Treatment of Psychiatric Disorders (Vol. 2) edited by Glen O. Gabbard, M.D. and published by the American Psychiatric Association in 1995, "Although histories of psychiatric treatments for substance abuse, adjustment disorders, serious suicidal thoughts, and depression are not uncommon in gender dysphoric patients, there is no evidence of a frequent occurrence of co morbidity, making comparison with estimates in the general population meaningless. Many of these disorders are defense mechanisms against the

---

[1] Axis I psychiatric symptoms, as anxiety disorders, dissociation, schizophrenia, mood and other psychotic disorders (e.g., paranoia), plus Axis II personality disorders as borderline, avoidant, narcissistic, obsessive-compulsive, etc.

frustration, psychological pain, anxiety, and discrimination stemming from patients' inability to live safely and comfortably in society with their condition or in their desired gender roles."

A clinical picture emerges when a person's concerns and uncertainties, distress and questions about their gender identity continue and they remain feeling conflicted.[2]  Gender conflicted or dissatisfied people are diagnosed as suffering from a gender identity disorder when they meet specified criteria in one of two official diagnostic sources – Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition (DSM-IV) or the International Classification of Diseases – 10 (ICD-10).  For example, DSM IV 302.85 Gender Identity Disorder (GID) in adolescents or adults diagnostic criteria includes:  a strong and persistent cross-gender identification;[3] and persistent discomfort with one's sex, or sense of inappropriateness in the gender role of that sex[4]; absence of physical intersex condition; and disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

While a clinician can help a person to understand their symptoms and dilemmas as a gender condition, most people seeking help for Gender Identity Disorders come 'self-diagnosed' in that they bring their diagnosis to the clinician.  In diagnostics and treatment, there are many patients seeking treatments, both psychotherapeutic and endocrinological, for *social* – rather than *genital* – sex reassignment.  Surgery as a treatment modality has yet to be fully examined by this patient in psychotherapy treatment.

Further, the Harry Benjamin International Gender Dysphoria Association's "*Standards of Care*" (original document 1977, revised publications 1978, 1979, 1980, 1981, 1985, 1990, 2001) articulate professional consensus about the psychiatric, psychological, medical and surgical management of GID.  Clinicians use these guidelines to understand the range of assistance needed for gender patients.  There are five elements of clinical work:  diagnostic assessment, psychotherapy, real life experience, hormonal therapy, and surgical therapy.  People with gender distress, and others (i.e., families, employers and social institutions) may use the SOC to better understand treatment possibilities and professional thinking.  Treatment goals include learning a prolonged personal comfort with one's gender identity and expression to maximize overall psychological well being and self-fulfillment.  The SOC are intended to provide flexible directions for treatment of GID.  Clinical departures from these guidelines are appropriate in light of a patient's unique psychological, social, or anatomical needs, as well as the development of an experienced professional's method of handling a common situation, or due specifically to a research protocol.  Such departures should be recognized, explained to the patient, documented both for legal protection and for short and long term results.

1.)      All medical records reviewed complied with the standard for the evaluation of gender identity disorders along with co morbid diagnoses in the initial intake and assessment (2005) of Mariah Lopez.  The techniques of assessment for diagnoses and course of treatment is identified to include interviewing, psychiatric history and past hospitalizations, medications including self-medications, suicidal interest and attempts, personal observation of the individual, contact with foster care authorities, representative authorities at Lawyers for Children, and review of other records, when available.  The medical records indicate that the following were considered:  depression, chronic physical illness, a history of hospitalization for depression, gender issues including the patient's goal of transitioning on female hormones, the patient's support network – extended family, friends, treatment

---

[2] Emotional struggles are known clinically as:  gender issues, a gender problem, a gender concern, gender distress, gender dysphoria, gender identity problem, cross dressing, transvestism, transgenderism, or transsexualism.  They are expressed throughout one's lifetime – from childhood into old age – in various degrees of dissatisfaction with sexual anatomy, gender body characteristics, gender roles, gender identity, as well as the perceptions of others.

[3] Symptoms may include a stated desire to be, frequent passing as, desire to live or be treated as, or the conviction that one has the typical feelings and reactions of, the other sex.

[4] Symptoms may include a pre-occupation with getting rid of primary and secondary sex characteristics (e.g. request for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or belief that he or she was born the wrong sex.

providers, suicidal ideation, and an assessment of risk of mental stability in the decision concerning diagnoses. Documentation of the presenting problem and the patient's chief complaint is "I've been trying to get my surgery since last year. I have no gender identity issues. I know who I am."

Records all concluded that Mariah Lopez has suffered from recurrent and severe major depressive disorder, generalized anxiety disorder, gender identity disorder, and while reporting desire to not live in the past, Mariah does not particularly pose a risk for suicide in the near future.

Current indications recommend short-term psychotherapy sessions specifically and conclusively in preparation for genital restructuring surgery, and postoperative therapy during the first year to facilitate adjustments to the changes this unique path of psychosocial and sexual development entail. Ancillary issues, i.e., impulse controls, can clearly be addressed in psychotherapy at a later time post-op surgery.

2.)　　My diagnostic evaluation and records, as well as this report, repeat again the factors comprising clinical formulation and course of treatment, and continues to document assessment in supportive correspondence for this patient. There appears to be no organicity (brain condition affecting psychological problems).

3.)　　Written correspondence from Mariah Lopez about her life disclosing the history of her gender dysphoric struggles, her heightened anxiety about gender expression, her inabilities to deal effectively with other's reactions to her transgender feelings, presentation and expressions in her youth, and her guilt. The Gender Identity Disorder turmoil clearly began long before admission into foster care and before beginning treatment with any practitioners during adolescence.

Mariah Lopez reports sustained cross gender identification desires, interests and incidences, and the torment that accompanied throughout childhood and puberty stating, "No one ever acknowledged my gender condition – no mental health worker, nobody." Maria Lopez reports her gender dysphoria escalating in feelings of despair, desiring to be a part of girl/womanhood, to have acceptance by others for who she is, and continuing to keep her preferred gender secret by hiding in her inabilities to apply herself educationally and work hard.

This health care practitioner's assessment confirms the clinical picture assessed early on concerning Mariah Lopez's history of Gender Identity Disorder, inability to deal with her trangenderism, uncontrolled feelings of guilt and fear, chronic depression and endless experiences of running away from living conditions of peer torment and unaccepting adults, and need for treatment with a specialist in gender identity disorders.

In essence, historically, few have carried out many of the responsibilities of the mental health professional in their work with Mariah Lopez as regards her gender distress. She would have benefited greatly from a specialist over the past five years.

4.)　　The medical records reviewed comply with an acceptable clinical standard for record keeping of medical treatment with Mariah Lopez. While note taking and record keeping can vary widely among clinicians from brief cryptic codes to voluminous descriptions, most of these records and notes, along with various correspondence in support of GID treatment modalities, help document the course of treatment to lower this patient's anxiety, mood swings related to Gender Identity Disorder, her feelings of hopelessness and helplessness and her preoccupation and obsessive thinking about her focus on SRS. Prior to the mid-1990s, by history, this patient's diagnostics are confirmed. All records confirm this individual's lack of conflict and confusion concerning acceptance of his/her own gender identity condition.

As my colleagues and I further point out in our medical treatment chapter for gender identity disorders, "one option not open to patients is the option to do *nothing* about their gender condition, because such an attitude can only have disastrous consequences. Suppression and repression causes depression and are always immobilizing and sometimes fatal. Sadly, suicide

attempts are not unknown for those who live their lives immersed in feelings of helplessness and hopelessness. To ignore totally one's gender or one's inner awareness of it – a fundamental aspect of the human personality – is, in and of itself, a form of gender suicide."

     5.)     This patient's story is replete with references to Mariah's response to gender identity issues and her overwhelming fear of disclosure with her grandmother and mother, with childhood playmates, later with places of work and her anxiety and frustration at having to deal with attempting to complete an education process and find meaningful work.

     6.)     There is no risk of suicide currently. Risk, however, would increase if the patient were re-incarcerated. Mariah Lopez states, "I thought about suicide and attempted it ......my fantasy was always a way out – I could just go to sleep and just never wake up. I never had the sense of killing myself." Mariah denies any history of overt mutilation behaviors. Body markings include a best friend's name, "Junior" – tattooed center rear neck. {The same friend has "Mariah" tattooed center rear neck.}

     I concur with the patient, Mariah Lopez, concerning diagnostics, appropriate treatment modalities, including genital reassignment surgery. Again, I do not concur with the patient's dismissal of the importance of psychotherapy treatment.

     In concluding this segment, documentation reviewed has complied with the standard of care in the assessment and adequate treatment of Mariah Lopez's Gender Identity Disorder, along with co morbid diagnoses, her mental status, with limited suicide potential, and life experiences. However, no one has carried out many of the responsibilities of the mental health professional (as listed in the HBIGDA's *Standards of Care*) in their treatment/work with Mariah Lopez over the course of the past six years – thus exacerbating her mental stability and emotional well-being.

## MEDICATIONS

     Endocrine medications include Estradiol 2.0 mg. tabl., twice daily by mouth; Spironolactone 100 mg tab., one twice daily by mouth; Estradiol Cypionate injectible solution (aka DepoEstradiol) 5.0 mg per ml strength, 1.0 ml intramuscularly bimonthly. The patient reports being prescribed 5mValium. Antidepressant prescribed is Trazadone. [There is a history of extensive experience with the known street drugs recreationally.]

## SUMNATIVE OVERVIEW

     **Family History**: Youth reports being raised "Hispanic" by a maternal grandmother, Loraine Lopez, who had custody, as the mother was a drug addict who had abandoned family life. Mariah (ages 5-8) knew her mother only three years before she died of AIDS in 1993. The grandmother suffered from asthma, obesity, and was disabled. As the grandmother was unable to take care of Clayton and Mariah (Brian), the two siblings were placed into Foster care. Her death in 1997 (at age 48) secured Mariah as a ward of the State. Youth reports her parents being "victim's of their time......1985 crack and heroin were a norm for street teenagers.....I'm the result of "a one night stand. My biological father never had custody of me, only my half brother, Clayton, who is three years older." Mariah claims her religious grandmother was protective of her gender expressions and completely supportive, finding her the care needed. She reports a happy upbringing, living in the projects, with no difficulty playing double Dutch with both boys and girls and being totally accepted. Grandmother's name of endearment for Mariah was "Bree-Bree."

     **Early Childhood and Adolescent History**: *First cross gender thinking* is reported at age 3 – "I liked to be like a girl. I peed sitting on the toilet. I thought I was a girl....always effeminate. I truly believed I could decide my gender. In my youth, I always wondered if I was gay, but it didn't fit. I didn't know about trans. The gay thing didn't fit but I like companionship. The concept of transcending gender was beyond my recognition. By seven or eight, I realized I wasn't a girl I was severely depressed, frustration and hopeless feelings overcame me. Discovering you are trans is enough, but feeling trapped, no options, I was horrified." *Cross-dressing* did not begin until teenage years, with

interest early on restricted to articles of her grandmother's clothing. No one was aware of this behavior. *Childhood playmate preference* included both genders, youth believing that she could eventually will her own gender in time. *Toy preference* included coloring books in pastels, dolls, jump rope and double Dutch; never sports or rough and tumble play. *Clothing and hairstyles* were typical for a young boy until age 13 when "I was introduced to the transgender community in the Village and saw my first fem queen. I let my hair grow and got into trouble for it." *Activity preferences* centered on dancing (tap) and acting with patient's report of a longstanding history of discrimination and punishment due to trans interests. *Rough and tumble play*, by report, were never engaged in, short of self-defense. *Satisfaction with physical characteristics* is reported as completely satisfied today since hormone treatment, with the exception of anticipated genital surgery. *Energy expenditure* is viewed and interpreted by youth as focused on human rights (especially her own). Youth reports feeling the most comfortable and very accepted in femaleness. She confirms, "No one's going to believe I'm not a girl. I'm accepted everywhere. No one even knows, except those who know my past." *Identification figures* are other transgender individuals, trans people who are successful drag performers, movie stars as Jennifer Lopez. *Relationship with deceased mother, deceased grandmother, father, and uncle* is reported as no relationship with the mother, a loving close relationship with the grandmother, a new effort at connection with the father who is fully accepting of her condition, and protective uncle unknown. *First notion of being different* is initially identified in childhood but confirmed by age 13. *First conscious cross-gender feeling* is reported at age 3. *Reaction of environment to perceive sissy-ness* is reported as torment, name-calling ("Fagot" being the word that sends youth into rage), fighting with peers, home discipline, and ultimate withdrawal at onset of puberty. *Emotional reaction of individual to maturation of body* was to prevent onset of secondary sex characteristic by "getting on street hormones by age 13" before puberty began. *Attempts to hide sex characteristics or harm them* were denied with the exception of ages 13-14, "the most difficult year of my life," and currently, hormone atrophy negates the necessity of "tucking" genitalia.

<u>Sexual Orientation</u>:  Mariah sees herself as exclusively heterosexual; she reports only thinking of self as female with either bisexual or heterosexual men. She reports having no erotic experience with females -- the idea of having sex with females while being male is too uncomfortable.

<u>Sexual Activity</u>:  Sexual play or penetration with females is reported as "NEVER!" First sex with a male partner, youth was 12, the partner 14, included kissing, genital fondling, without intercourse. First oral-genital contact and anal penetration were experienced at age 13, reported with erotic satisfaction.

<u>Sex Industry Worker</u>:  Youth reports an extensive history in prostitution, beginning at age 13 on the Strole in midtown Manhattan, and includes being paid for pornography. Youth's rap sheet confirms arrests and incarcerations in this regard. When asked about practicing safe sex, youth states, "It was easy money. I've been a good judge of character but without my training in AIDS and drug use, I would probably be HIV positive. It's teaches me a lot about sexuality and the roles played in erotic interest on the streets." Highest fees paid at any one time are reported as $3,000.

<u>Significant Primary Relationship</u>:  Two long-term primary love connections are reported, both with heterosexual males. The current partner is incarcerated upstate for the foreseeable future.

<u>Friends:</u>  All current friends are reported as being transgender people.

<u>Endocrine History</u>:  By age 13, youth reports inconsistent use of birth control pills purchased on the streets; by 16 youth was treated with Premarin in the West Village by Dr. Taviano, at 17 through a health clinic with anti androgens, and has been followed since age 18 by Michael K. Bartalos, M.D.

<u>Other Feminizing Procedures</u>:  No known silicone procedures have been administered. No orchiectomy confirmed by Dr. Arnold Melman's report. Youth discusses her interest to consider adding breast augmentation.

**Surgical Restructuring of Genitalia**:  In response to being asked what would she do if she could not have genital restructuring surgery, youth responds, "it's something that must be corrected.  I could not live...my life would not be right.  At 14, I was saying if I don't get surgery, I just don't know what will happen to me.  I can't explain how horrifying it is.....let me die a woman....it's like sitting on death row, without clemency.  I've been actively trying to get the surgery for over two years."

**Influence of Transgender/Transsexual Community**:  By age 13, youth was introduced to the TG/TS scene in Manhattan.  The influence of exposure to the community was enormous on this young person's psychosocial development.

**Current Gender Identity**:  Youth says "I'm 24/7 a girl.  I know that I'm transgender.  But I've believed myself to be female and since learning that surgery is possible, I need it to be correct.

**Religious or Spiritual Enlightenment/Interest**:  Youth reports a history of Sunday school religious upbringing while her grandmother was alive, but claims no faith, but is spiritual.

**Sex Partner Attraction**:  Youth is attracted to male partners accepting of her as female.

**Recreational Drug Use**:  Youth has extensive history of recreational drug use but explains that she fears her "mother's waste of her life."  Current recreational use is reported as pot smoking, occasional alcohol, and cigarettes.

**Self-Mutilation or Suicide Attempts**:  Youth reports no self-destructive behaviors involving cutting, puncturing, or burning her body.  Three suicide attempts are reported, all related to feelings of despair not feeling able to live in femaleness, being restricted in gender expression, being attacked and despondent in recovery.

**Self-expressed Life Goals**:  Youth reports wishing to complete her GED and study law, ultimately to become a paralegal or lawyer.

**Persistent Fear**:  The overwhelming fear currently is reported as on-going nightmares concerning re-incarceration and not being successful in getting Sex Reassignment Surgery.

## MENTAL STATUS

Admittedly Mariah's abilities to be productive in her life is episodically compromised during the period of time she has been in transition and leading an unsettled life.  In the course of overwhelming gender dysphoric collapse, a major depression and anxiety attacks elevated causing great stress in all of her daily functions.  She reports, "I had horrible issues with my gender because I felt false identifying as male."  Initially, this dilemma was brought on by intense feelings of fear that she would never be given opportunity in life to be interacted with as female and be able to secure work as a female.

Although extraordinarily bright, street-smart, aggressive and demanding, a non-compliant patient frequently during the period I have known her, a series of distressing events, coupled with an unsuspected and sudden collapse of a trusted relationship (with her boyfriend's formerly supportive parents) that was completely trustworthy and cost her immeasurably in emotional investment and time exacerbated all of Mariah's cumulative fears.  Her most recent incident in incarceration catapulted her deeper into anxiety and depression.

Subsequently, Posttraumatic Stress Disorder was shortly diagnosed after suffering a major panic attack.  Mariah reports, "I still have flashbacks.  I have endured a lot of verbal and physical abuse.  My daily function problems have left me so greatly hampered, I just shut down, feeling totally abandoned and lost, helpless and hopeless.  I just don't know what will happen to me if I go back to jail."

In the course of Mariah Lopez's psychotherapy assessment over the past few months, the interactions and treatment has demonstrated little improvement for her to be able to address her difficulties with pro-action and resolve. This leaves Mariah with a somewhat desperate perception about what the future might hold for her and her ability to take care of herself. Mariah Lopez has never worked at a fixed job, because of a number of factors, not excluding depression and anxiety attacks, accompanied by the gender feelings of weakness and hopelessness, in addition to the physical deterioration in health resulting from chronic fatigue due to nightmares.

On review of Mariah Lopez's Mental Status:

<u>Attitude, Appearance, Behavior</u>:

Mariah Lopez is of average height (5' 7") and slightly over-weight (175 lbs.), naturally thick in the torso with shoulder length straightened black hair (which she covers with a bandana or head wrap), who has genetic male phenotype, maximal facial features and bone structure more female prominent, and makes a presentable appearance dressed casually in clothes typical of her age group. Although Mariah's life and well-being had been threatened in the past while dressing in female attire publicly, today she is careful about how she presents herself in my offices – with neatness, cleanliness and a determination that her clothing is appropriate for the environment she expects to be in. She has a good attitude that she cannot always fulfill, in that she expresses an interest to fit in wherever she is. Mariah is clear spoken, not at all shy, outgoing and engaging if she believes she can trust the situation and is in competent care; she clearly in not always effective in speaking up in her own defense either out of naivety, inexperience or a sense of misinterpretation of intent. Mariah is highly suspicious and guarded and, I sense a desperate internal need to be unnecessarily demanding. This affect, however, can leave Mariah confused, frustrated and dissatisfied with her own efforts, as well as the efforts of others, that exacerbates her disabling personality characteristics. This patient is non compliant with and although requesting prescriptive meds, states she does not believe in the usefulness of any psychotropic medications that have been prescribed thus far, except anti-anxiety prescriptions. However, of note, is an extensive history of recreational and abusive drug use.

<u>Speech, Thought, Perception</u>:

The way/manner in which Mariah Lopez expresses herself is today primarily truthful, direct and somewhat driven by desperation, but unfortunately, her manner of engaging with others clearly has not allowed her to be understood by others and has put her at risk to be completely mistreated. Consequently, she has been left feeling unclear, suspicious and agitated with some of her encounters. Previously, her mood tended to be somewhat erratic, because she is very influenced by what appears to be the response she gets from the outside world; and, like many people with GID and anxiety symptoms, she assumes that other people are much more critical and concerned than they actually are. As might be assumed, Mariah's concentration while having been somewhat impaired, appears today to not be limited; however, she has suffered from a long-standing pattern of interpersonal rejection sensitivity that has resulted in significant social and I suspect, perhaps some occupational impairment. Confounding the circumstances is the observation that Mariah presents as a highly manipulative individual frequently in her interactions with others. Mariah appears highly intelligent and articulates accurately at a rapid rate, but due to her swings in anxiety symptoms and other distracting and disabling interference's in her life, she cannot put to use the mental strengths that she has to aid her in her best interest.

<u>Sensorial and Intellectual Functions</u>:

- Attention and Concentration: Mariah's orientation is quite adept, and she definitely knows where she is emotionally, what her goals are, the sequencing of daily task-related responsibilities, what the date is and why she is in appointments. I believe that she would remain interactive in treatment far more so than she has been in the past, if it was focused primarily on Gender Identity Disorders issues.

- Memory:  Mariah's memory has in the past frequently failed her because in depression, coupled with the unsettling living experiences she had while male, she could not be sure if what she remembered was accurate.  Although today, she appears to have good retentive process, exacerbation of multiple disabling psychiatric conditions can be expected to interfere with memory.

- Information:  Mariah is very good about keeping track of appointments and certainly knows why her health care providers were treating her. .She has so often been devastated by the inability to act on what she knows and felt to be important and imperative to her own well being.  She appears to be more cognizant and stable today than in the past.  While her ability to perform calculations is not limited, she is not as proficient at integrating herself comfortably in living a life of constructive well-being.

- Insight and Judgment:  Mariah's capacity for insight is good and, like so many other people with gender identity conditions, she has the ability to get to the "heart of the matter;" but she is impaired in her use of constructive insight, because she does not feel that she fits into the life around her.  To explain this further, when Mariah knows she is truthful, she cannot always understand why this does not give her universal acceptance.

<u>Current Functional Assessment</u>:

Mariah Lopez satisfactorily takes care of her daily living needs through the foster care program in New York City.  She lives alone in an apartment in a house, primarily due to her preop status as a transgender youth.  She reports being lackadaisical in being able to maintain her residence in an orderly fashion and admits to being sloppy about waste disposal habits.  She is perfectly capable of being able to shop both within and outside of her neighborhood according to available financial support and need; she reports enjoying light cooking at home and is highly competent and comfortable in taking public transportation.  She appears devoid of social phobias.  She has maintained a few close friends (trans and industry workers) for social support and who can be called upon if an emergency arises.  She is able to enjoy very light reading and selective television programs, and likes to keep up with what's happening in specific activist groups in the Metropolitan area, even though she does not always understand the why's and where fore's.  She clearly is liberal but her true political interests, beyond her own goals, are unknown to me.

To my knowledge, Mariah has never been gainfully employed to date.  She states that she has been exploring work possibilities, including researching and working on writing a book and being a spokesperson for human rights causes.  However, currently she clearly is less equipped to be able to deal with levels of physical stress that can be naturally associated with being arrested as a transgender person, a long standing history of being discriminated against because she is transgender, coupled with the panic and despair she clearly feels fearing the possibility of incarceration again.  However, beyond key individuals whose connection with Mariah is protection and support (i.e., caseworkers and health care providers in various agencies, physicians, and lawyers), Mariah has yet to be able to establish herself with strong stable allies in her life and her network of support.  She reports being restricted in her personal resources

In terms of getting along with others, especially peers, trans community contacts, professionals, etc., I do believe Mariah has been too overbearing and demanding in her interactions with others, revealing her fragile ego strength to be able to cope with the kind of demands or expectations placed on her in mainstream life.  This aspect of her emotional development clearly has not shown progress in the past or currently for that matter, as credibility and trust were lacking both in her makeup and in the circumstances.

<u>PSYCHIATRIC SUMMARY</u>

In my opinion, Mariah Lopez's abilities to do work related mental activities and to live her life productively, with knowledge and understanding, and in personally secure and stable ways has been significantly impaired due to her transgender condition and other diagnoses.

In the course of her contact with me in assessment for the preparation of this evaluation, while knowledgeable about her early years and life in foster care, Mariah has not sufficiently been able to unravel the influences on her life from an early childhood raised in a lower-class Catholic-highly religious family, through establishing herself [educationally/academically and professionally in life], and beyond the loss of family. At this point, in light of the subsequent relapses, I believe Mariah Lopez has felt pushed to her very limits just to survive. She has been treated for depression anxiety and while no longer considered a suicidal risk, she has not recovered from the cumulative debilitating events and symptoms that created psychiatric collapse for her years ago. Simply stated, she just keeps reliving it. As a result, she finds it impossible to engage in any meaningful work due to her conditions and expected discrimination from the world.

However, Mariah Lopez remains episodically optimistic but fearful about her future.

## CONCLUSIONS AND RECOMMENDATIONS

While presenting some unique aspects, in most respects, Mariah Lopez's psychosexual and social history is that characteristic of male-to-female transgender people. She fully meets the primary DSM-IV criteria for Gender Identity Disorders in that: while she is a bit uncomfortable with her male genitalia (although uses it in erotic interaction), she has been uncomfortable with her masculine anatomic sex; she does wishes to have her genitalia restructured to conform with her inner female gender identity; and she does wish to continue to live her life as a young woman; she has felt this way since both early childhood and adolescence; she shows no evidence of physical intersex; and this condition is not due to any mental disorder or exacerbated neurosis of any determinable kind. Mariah, while still filled with anxiety and financial concerns related to her being able to acquire the long requested SRS, she remains somewhat unstable and unclear about how she can live her life. Her romantic interests and experiences have been somewhat unrealistic and she in femaleness has been exclusively heterosexual, while depending on her close friendships primarily with women for support in the past few years.

On interview, Mariah Lopez presents most comfortably as a harried, almost manic, quite intelligent and I suspect creative, very purposeful, and an authentic female. There is no evidence of thought disorder, active psychosis or affective disorder, gross cognitive deficit or impairment of judgment or insight concerning the need for genital reassignment surgery. She is quite literal in her interpretation of her own presentation and her dreams and expectations for her future. Her deepest fear is twofold: false accusations, arrest and not being able to survive incarceration, and not being able to get her desired surgery soon.

Mariah's personality is defined and, over the brief but intense course of my knowing her, she is in the process of coming full circle in understanding her options for living a female life and for surgical intervention. Mariah has grown in her trust with me and expresses her feelings and fears about the future with openness and hopefulness. Emotionally, Mariah has yet to truly develop her own acceptance of herself in her genuine female gender. This is a dynamic rapidly acquired postop when the alteration of body phenotype and life experiences confirm acceptance.

The hope for the future is that Mariah becomes even more orderly in how she prepares for her decisions and plans for living her life in the years ahead. She certainly has accomplished finding the correct medical treatments that enable her to proceed as she has for many years imagined or wished for since very young and she continues to prepare herself for living a life worthwhile and beneficial to her. Her emotional wellbeing and success is dependent on her current source of support is predicated by financial necessity of allocating the required monies to pay for expensive medical treatments in gender confirmation. But it is my hope for her that moving from no to low-paying work to more profitable employment will secure her in the years ahead. She is bright and driven in her desire to survive, and while she does not always conduct her life with careful precautions, she certainly does have tenacity, and in time, with the needed emotional detachments. She is street industry-smart, and

sexually informed (but not always wise) and lacks prudence in some decision-making when under stress.

Mariah seems clearly much happier and more comfortable living as she is in femaleness than as a male even with all of the challenges she has faced and problems she has had to resolve. Thus far, I do feel that Mariah has undergone many decisions toward treating her gender identity condition and learning how to live with it with the type of insight unique to her life experiences, and with less emotional difficulty within herself personally. She has appeared to proceed as carefully as one can with limited resources and displays a confidence about the process of her gender transition that I feel assured will continue to sustain her as she seeks survival currently, and throughout her life. Mariah knows she can continue to count on insightful help from her agency contacts, me, as well as others she sees, as she continues grappling with the foreseeable and potential concerns. Those concerns include: enhancing or changing work focus, dealing with discrimination, dating, finding greater intimacy, sexual and emotional fluctuations, the continuation of maturing herself, and ultimately, the making of a life-partner relationship -- in the post-operative months and years ahead.

In this regard (and for some additional reasons which Mariah and I have been exploring together), I know that Mariah will be far more content and more greatly integrated as a person, if she continues to avail herself of her psychotherapy treatment throughout her first year post-op period. There are certain fundamental benefits to the peace and enrichment for the life of a person who provides herself with all the unique and rich education that she can acquire through a prolonged contact with a therapy specially adapted for this most extraordinary path of psychosexual development and interaction. My recommendation for continued therapy is twofold: first, to quickly determine in a few quick sessions the appropriate surgical technique and surgeon, and second, in order for Mariah to insure herself of a life filled with profound self-understanding, responsibility, and security.

In summary, I believe that Mariah Lopez is a true transgender person (medically known as transsexual) who is strongly interested in and in need of the genital restructuring surgery. **Without question whatsoever, sex reassignment surgery is medically necessary for Mariah Lopez.** Mariah is a fully prepared surgical candidate for SRS (genital restructuring surgery), she meets all eligibility and readiness criteria according to the medical guidelines -- The Standards of Care -- one could expect, and she expresses being clear about what the surgery can and cannot do for her. I believe that this surgery will help Mariah Lopez feel much more comfortable and consonant with her predominant inner gender awareness and the public expression of female gender in her life today.

In Mariah's own words concerning surgery, "I always felt miscast as a male. As a gay male, I believe my difficulty in forming intimate relationships had to do, in part, with wanting to be a woman. Existing as a female has given me hope, in regard to forming closer relationships, as I have less to prove to myself and the world. The intimacy and expression of warmth which society now allows me to express has been a happy surprise. ......I do have some doubts about surgery. But my yearning for physical completeness is very powerful and something I've wanted for a long time."

I find Mariah's beliefs and expressions of her feelings to be genuine, realistic, honest, and most typical of a more evolved M-F transsexual mentality. Mariah and I both feel that her biggest emotional growth will transpire post-op.

I know that Mariah Lopez's expectations for genital restructuring surgery will help her feel that she can finally completely inhabit her body ... and that it will help her be more free to be able to relate to people and to have them in her life socially, as well as, both romantically and sexually. I feel that the sexual reassignment surgery Mariah seeks is fully indicated in light of her history, her presentation and her potential success in the real life experience thus far. She is seeking both vaginoplasty and labiaplasty as soon as funding is available.

I consider it a privilege to be in contact with all those individuals Mariah Lopez is in the care of, and I'm looking forward to hearing your impressions and the disposition of this urgent matter. If I may

be of further service, please feel free to contact me at any time. With deep appreciation for the opportunity to evaluate a person of the caliber of Mariah Lopez, I am,

Very truly yours,

C. Christine Wheeler, Ph.D.
Psychotherapist/Sexologist
No. 1971 Expir. 12-31-07
Board Member, The Harry Benjamin
International Gender Dysphoria Assoc., Inc.

Initial draft June 6, 2005

CCW/tw

Exhibit

G

GUIDELINES REGARDING

# GENDER
# IDENTITY
# DISCRIMINATION

A Form of Gender Discrimination Prohibited by
The New York City Human Rights Law

Title 8 of the Administrative Code of the
City of New York

**NEW YORK CITY COMMISSION ON HUMAN RIGHTS**
MICHAEL R. BLOOMBERG, **Mayor**   PATRICIA L. GATLING, **Commissioner/Chair**

# GUIDELINES REGARDING GENDER IDENTITY DISCRIMINATION

## CONTENTS

**I. Purpose**

**II. Definitions**
    A. Gender Identity/Gender Expression
    B. Transgender
    C. Intersex Individuals

**III. Areas of Application**
    A. Employment
    B. Public Accommodations
    C. Housing & Lending Institutions
    D. Discriminatory Harassment or Violence
    E. Retaliation

**IV. Avoiding Discriminatory Practices**
    A. Preventing Harassment and Hostile Environment
    B. Dress Codes
    C. Access to Restrooms and Other Sex-Segregated Facilities
    D. Public Accommodations/Unavoidable Nudity
    E. Policy/Training

**V. Enforcement and Penalties**

**Appendix**
    Local Law 3

## ACKNOWLEDGEMENTS

The Commission on Human Rights thanks the following individuals for their assistance in the creation of these guidelines: Randolph Wills, Matt Foreman, Michael Silverman, Carrie Davis, Pauline Park, Melissa Sklarz, Dean Spade, and Moonhawk Stone.

If you have been discriminated against, call to set up an intake appointment and speak to an attorney at the Commission: (212) 306–7450.

**New York City Commission on Human Rights**
**40 Rector Street, New York, NY 10006**

December 2006

# GENDER IDENTITY DISCRIMINATION

## I. Purpose

In April 2002, the New York City Human Rights Law, located in Title 8 of the Administrative Code of the City of New York, was amended to make it clear that an individual's gender identity is an area of protection under the Law.

It is the law and policy of the City of New York to eliminate discrimination based upon an individual's "actual or perceived gender."

"Gender" is defined in the City's Human Rights Law to include:

- actual or perceived sex;
- gender identity;
- self-image;
- appearance; and,
- behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth.

The Human Rights Commission developed these guidelines:

- To educate the public about the prohibition of gender discrimination, particularly as it protects transgender and gender-variant people in New York City;

- To inform individuals of their rights under the Law; and,
- To assist employers, housing providers, businesses, organizations, service providers (including government) and other entities in understanding their responsibilities under the Law.

These guidelines do not constitute legal advice and do not cover every aspect of the Law. For specific questions regarding the coverage of the Human Rights Law, see the Administrative Code of the City of New York, contact the New York City Commission on Human Rights, or seek legal counsel.

## II. Definitions

### A. Gender Identity/Gender Expression

Gender identity is an individual's sense of being either male or female, man or woman, or something other or in-between. Gender expression describes the external characteristics and behaviors that are socially defined as either masculine or feminine, such as dress, mannerisms, speech patterns and social interactions.

### B. Transgender

"Transgender" is an umbrella term that includes anyone whose

gender identity and/or gender expression does not match society's expectations of how an individual who was assigned a particular sex at birth should behave in relation to their gender. The term includes, but is not limited to:

- pre-operative, post-operative and non-operative transsexuals who may or may not use hormones;
- intersex individuals;
- persons exhibiting gender characteristics and identities that are perceived to be inconsistent with their gender at birth;
- persons perceived to be androgynous;
- transvestites;
- cross-dressers; and,
- drag queens or kings.

### 1. Transsexuals

Transsexuals are individuals whose gender expression or identity is perceived to conflict with the sex assigned to them at birth, and who may or may not begin or continue the process of hormone replacement therapy and/or gender confirmation surgery. Transsexuals are often described as female-to-male (FTM) or male-to-female (MTF).

### 2. Gender Variant, Gender Non-conforming or Gender Different

Gender variant, gender non-conforming, or gender different individuals have a gender identity and/or gender expression that is not completely male or female. This includes individuals who do not conform to expectations of a specific gender role and individuals who express both masculine and feminine qualities. These individuals are sometimes referred to as "androgynous."

### C. Intersex Individuals

Intersex individuals are born with chromosomes, external genitalia, and/or an internal reproductive system that varies from what is considered "standard" for either males or females.

## III. Areas of Application

### A. Employment
(Administrative Code: Section 8-107(1))

It is an unlawful discriminatory practice for an employer, or an employee or agent thereof, to discriminate against any employee or applicant for employment based upon actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth) with regard to recruitment, hiring, firing, promotions, wages, job

assignments, training, benefits, and other terms and conditions of employment.

## B. Public Accommodations
(Administrative Code: Section 8-107(4))

"Public accommodations" refer to providers of goods and/or services to the public. Restaurants, hospitals, stores, theaters, and service providers (including government) are some examples of public accommodations.

It is an unlawful discriminatory practice for a place or provider of a public accommodation directly or indirectly to refuse, withhold from, or deny a person any of the accommodations, advantages, facilities, services or privileges of an accommodation based upon the person's actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth).

## C. Housing & Lending Institutions
(Administrative Code: Section 8-107(5))

The housing discrimination provisions apply to the owner, lessor, managing agent or other person having the right to sell, rent or lease or approve the sale, rental or lease of a housing accommodation.

It is an unlawful discriminatory practice for such persons to refuse to sell, rent, lease, approve the sale, rental or lease or otherwise deny to or withhold a housing accommodation or an interest therein from, or otherwise discriminate against any person on the basis of actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth).

Real estate brokers, real estate salespersons, employees or agents thereof may not discriminate on the basis of actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth) in the rental or sale of property. The prohibited behavior includes all aspects of real property transactions, such as the refusal to show, rent, or sell real property

that is available for sale or lease, the addition of different or additional terms or conditions in a lease or mortgage, and the refusal to provide services or make repairs or improvements for any tenant or lessee.

Banks and other lending institutions may not discriminate against an applicant for credit on the basis of actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth).

### D. Civil Action for Discriminatory Harassment or Violence
(Administrative Code: Section 8-602)

It is illegal to interfere by force or threat of force, or knowingly injure, intimidate or interfere with, oppress, or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him or her by the constitution or laws of this state or by the constitution or laws of the United States or by local law of the city when such injury, intimidation, interference, oppression or threat is motivated in whole or in part by the victim's actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance,

behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth).

It is also illegal to knowingly deface, damage or destroy the real or personal property of any person for the purpose of intimidating or interfering with the free exercise or enjoyment of any right or privilege secured to the other person by the constitution or laws of this state or by the constitution or laws of the United States or by local law of the city when such defacement, damage or destruction of real or personal property is motivated in whole or in part by the victim's actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth).

In addition to coming to the New York City Commission on Human Rights, victims of bias-related harassment or violence are encouraged to report the incident immediately to the police and/or their County's District Attorney's Office.

### E. Retaliation

It is against the law for an employer, housing provider, lending institution, or provider of a public accommodation to retaliate against an individual because the individual opposed an unlawful discriminatory practice or made a charge, or because the individual testified, assisted, or participated in an investigation, proceeding or hearing.

## IV. Avoiding Discriminatory Practices

### A. Preventing Harassment and Hostile Environment

Discrimination on the basis of actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth) is a violation of the Human Rights Law. Discrimination may take the form of unwelcome verbal or physical conduct, including, but not limited to, derogatory comments, jokes, graffiti, drawings or photographs, touching or gestures.

To avoid the appearance of discrimination, individuals should be addressed with names, titles, pronouns, and other terms appropriate to their gender identity. The refusal to address individuals in a manner appropriate to their gender identity is a factor that the Commission will consider when determining if discrimination exists.

- In general, individuals in New York may change their names without having to go through a formal legal process, as long as the new name is used consistently and without intent to defraud others. Prefixes such as "Ms." and "Mr." and suffixes such as "Jr." and "Sr." do not have legal significance.

- When an individual is uncertain about which name, pronoun (he/she; him/her) or title (Ms./Miss/Mrs./Mr.) to use in addressing or referring to another individual, it is generally appropriate to ask the individual.

Requesting proof of an individual's gender, except when legally required, challenging an individual's gender, or asking inappropriate questions about intimate details of an individual's anatomy, are factors that the Commission will consider when determining if discrimination exists.

### B. Ensuring that Dress Codes Allow for Expression of Gender Identity

When developing and enforcing dress codes that are gender-specific,

employers should permit employees to comply with the gender-specific provisions in the codes in an appropriate manner that is consistent with their gender identity and gender expression.

### C. Providing Access to Restrooms and Other Sex-Segregated Facilities

Nothing in the Human Rights Law prohibits restrooms from being designated by gender. With respect to facilities that are restricted on the basis of sex, the following are some of the factors that suggest that discriminatory conduct related to gender identity has occurred:

- Not allowing individuals to use a restroom or other sex-segregated facility consistent with their gender identity or gender expression; or
- Requiring individuals to provide identification as a means of identifying their gender before allowing them to use the restroom or other sex-segregated facility.

Policies and practices aimed at preventing or addressing lewd behavior or conduct that violates the privacy of others should apply to and protect all individuals. The Commission recommends that, where single occupancy restrooms are available, they be designated as "gender neutral." The Commission also encourages

covered entities to provide accommodations to individuals who have concerns about use of public restrooms because of gender identity or gender expression. Such accommodations could include, for example, offering the use of a private restroom to a member of the public. If an individual feels uncomfortable using a particular restroom because of another individual's presence in the restroom, he or she may be encouraged to wait until that individual has left, or to use another restroom.

### D. Public Accommodations Where Nudity is Unavoidable
(e.g., health clubs, dressing or changing rooms, etc.)

Public accommodations should provide access to appropriate facilities for all individuals.

The Human Rights Commission recommends that public accommodation facilities, such as locker rooms, which are designated for use based on sex, take steps to create private spaces within them (for example, by installing curtains or cubicles).

Factors that suggest discriminatory conduct has occurred will include not allowing individuals to use a dressing or changing room consistent with their gender identity or gender expression.

### E. Policy/Training

The Commission recommends that employers, housing providers, providers of public accommodations, and banks/lending institutions implement anti-discrimination policies that address gender identity and gender expression issues, as well as all other areas covered by the Human Rights Law, and institute training for employees and agents on an ongoing basis.

## V. Enforcement and Penalties

The City Human Rights Law is enforced in a number of ways:

- The Commission on Human Rights provides opportunities for mediation of complaints and also investigates and prosecutes violations of the Law. If the Commission, after a hearing, finds that violation of the Law has occurred, it may award damages and order other affirmative relief such as, for example, hiring, reinstating, or upgrading an employee and requiring admission to an organization. In addition, the Commission may order civil penalties up to $250,000. A person who fails to comply with an order issued by the Commission may also be liable for a civil penalty of not more than $50,000 and an additional civil penalty of not more than $100 per day for each day the violation continues.

- A private cause of action may be brought under the City's Human Rights Law. Upon finding that a violation of the Law has occurred, a court may award damages, injunctive relief, and attorney's fees.

- The New York City Corporation Counsel may bring a civil action when there is reasonable cause to believe that a person or group is engaging in a pattern or practice that denies to any person the full enjoyment of rights under the City Human Rights Law. In this instance, the court may award damages, injunctive relief, and attorney's fees, and may also award civil penalties of not more than $250,000.

- In a case involving discriminatory harassment or violence, where a person has been found to have interfered or attempted to interfere by threats, intimidation or coercion with rights protected under the Law, and the interference or attempted interference was motivated in whole or in part by the victim's actual or perceived gender, the New York City Corporation Counsel may ask a court to award civil penalties of not more than $100,000.

## Appendix

Local Law 3

## LOCAL LAWS
### OF
### THE CITY OF NEW YORK
#### FOR THE YEAR 2002

---

#### No. 3

---

Introduced by Council Members Perkins, Lopez, Quinn, Reed, the Speaker (Council Member Miller), Moskowitz, Rodriguez, Boyland, Avella, Davis, de Blasio, Gennaro, Gerson, Katz, Koppell, Liu, McMahon, Monserrate, Rivera, Sears, Weprin, Brewer, Barron, Serrano and Stewart; also Council Members Addabbo, Jr., Martinez, Yassky, Clarke, Baez and Recchia, Jr.

A Local Law to amend the administrative code of the city of New York, in relation to gender-based discrimination.

Be it enacted by the Council as follows:

**Section 1. Legislative finding and intent.** The City Council finds and declares that it is in the interest of the City of New York to protect its citizens from discrimination. Discrimination, prejudice, intolerance and bigotry directly and profoundly threaten the rights and freedom of New Yorkers. The City Council established the Human Rights Law to protect its inhabitants from these dangers. Included in the City's Human Rights Law is a prohibition of discrimination against individuals based on gender. The scope of this gender-based protection, however, requires clarification. This local law is intended to make clear that all gender-based discrimination — including, but not limited to, discrimination based on an individual's actual or perceived sex, and discrimination based on an individual's gender identity, self-image, appearance, behavior, or expression — constitutes a violation of the City's Human Rights Law.

Gender-based discrimination affects a broad range of individuals. But the impact of gender-based discrimination is especially debilitating for those whose gender self-image and presentation do not fully accord with the legal sex assigned to them at birth. For those individuals, gender-based discrimination often leads to pariah status including the loss of a job, the loss of an apartment, and the refusal of service in public accommodations such as restaurants or stores. The impact of such discrimination can be especially devastating for those who endure other prejudices due to their race, ethnicity, national origin, or citizenship status, in addition to gender-based discrimination. In adopting this legislation, the City Council declares that the ability of all New Yorkers to work and to live free from invidious discrimination based on gender is the guiding principle of public policy and law.

**§2.** Section 8-102 of chapter one of title eight of the administrative code of the City of New York is amended by adding a new subdivision 23 to read as follows:

**23.** The term "gender" shall include actual or perceived sex and shall also include a person's gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth.

**§3.** This local law shall take effect immediately.

THE CITY OF NEW YORK, OFFICE OF THE CITY CLERK, s.s.:

I hereby certify that the foregoing is a true copy of a local law of the City of New York, passed by the Council on April 24, 2002, and approved by the Mayor on April 30, 2002.

VICTOR L. ROBLES
City Clerk, Clerk of the Council



**OCTOBER 22, 2015**   Albany, NY

# Governor Cuomo Introduces Regulations to Protect Transgender New Yorkers from Unlawful Discrimination

## First Executive in the Nation to Issue State-Wide Regulations Prohibiting Harassment and Discrimination on the Basis of Gender Identity, Transgender Status or Gender Dysphoria

Governor Andrew M. Cuomo today introduced regulations through the New York State Human Rights Law that unequivocally bans harassment and discrimination against transgender people. These regulations affirm that all transgender individuals are protected under the State's Human Rights Law, and all public and private employers, housing providers, businesses, creditors and others should know that discrimination against transgender persons is unlawful and will not be tolerated anywhere in the State of New York.

This is the first time that any Governor has issued statewide regulations to prohibit harassment and discrimination on the basis of gender identity, transgender status or gender dysphoria. Governor Cuomo announced the regulations in a speech at the Empire State Pride Agenda's fall dinner, where he was also honored with the group's Silver Torch award.

"The scourge of harassment and discrimination against transgender individuals is well-known – and has also has gone largely unanswered for too long," Governor Cuomo said. "New York has always been a beacon for the country on LGBT rights. We started the movement at Stonewall, we led the way with marriage equality, and now we are continuing to show the nation the path forward. We will not tolerate discrimination or harassment against transgender people anywhere in the State of New York – period."

These regulations represent the first state regulatory action in the nation to affirm that harassment and other forms of discrimination, by both public and private entities, on the basis of a person's gender identity, transgender status, or gender dysphoria is considered unlawful discrimination. Under state law, the New York State Division of Human Rights has the statutory authority to promulgate regulations interpreting the Human Rights Law. Further, while discrimination against transgender people has been specifically forbidden in New York State by Executive Order since 2009, in practice that order only protects state workers.

Additionally, New York currently has limited pockets of legal protection for transgender people because of municipal ordinances or laws that also ban harassment or discrimination, to varying degrees. However, many municipalities do not guarantee these protections, and there is no statewide ban on discrimination or harassment for individuals not employed by the state. The Governor's action today will ensure that all transgender individuals do not lose their rights simply by traveling from one county or city to another.

The State of New York has had a long history of protecting the rights of transgender persons under the provisions of the Human Rights Law. In the 1977 case of Richards v. U.S. Tennis Association, it was recognized that discrimination claims under the Human Rights Law may be brought by individuals alleging sex discrimination because of their gender identities, and it has long been the practice of the Division of Human Rights to accept and process gender identity discrimination complaints on the basis of the protected categories of sex, and where appropriate, disability.

Over the years, both New York and federal case law in this area has developed to support protection for transgender individuals on the basis of sex. In the State of New York, the Human Rights Law offers substantially more protection than federal antidiscrimination laws, because gender dysphoria is a recognized medical condition that falls within the broad definition of disability found in the state law, as New York courts have recognized. This additional protection affords increased rights for transgender individuals in New York, such as the right to reasonable accommodation for those who allege a diagnosis of gender dysphoria.

New York was the first state in the nation to enact an anti-discrimination Human Rights Law. The Law, enacted in 1945, affords every citizen "an equal opportunity to enjoy a full and productive life." Individuals who feel they have been harassed or discriminated against can file complaints in State court, or with the New York State Division of Human Rights, without charge. Those complaints are promptly investigated at regional offices throughout the state.

If the Division determines there is probable cause to believe harassment or discrimination has occurred, the Commissioner of Human Rights will decide the case after a public hearing, and may award job, housing or other benefits, back and front pay, compensatory damages for mental anguish, civil fines and penalties, and may also require policy changes and training as appropriate.

Civil fines and penalties can be up to $50,000 or up to $100,000 if the discrimination is found be "willful, wanton or malicious" and, unlike under federal law, compensatory damages to individuals are not capped.

**The new regulations can be viewed <u>here</u>**. The State's existing Human Rights Law can be viewed <u>here</u>.

**Senator Brad Hoylman said:** "Transgender rights are part of the unfinished business of the LGBT civil rights movement in New York and I commend Governor Cuomo for taking this bold and courageous step of enacting housing and employment protections for transgender people through regulation. Because of the Governor's actions today, soon thousands of New Yorkers will no longer be considered second-class citizens simply because they identify as transgender. The Gender Expression Nondiscrimination Act, sponsored by Senator Squadron and Assembly Member Gottfried, has been blocked from consideration for years by the Republican majority in the State Senate. As the only openly-LGBT person in the Senate, I'm extremely grateful to Governor Cuomo for taking this historic step and look forward to working with him, advocates and my Democratic Senate colleagues to codify his actions in a future legislative session."

**Senator Daniel Squadron said:** "This is a big step to correct one of the state's great injustices. Transgender New Yorkers will now have more confidence that discrimination in homes, jobs, and public accommodations will not be tolerated. I thank Governor Cuomo for this strong executive action; my legislative colleagues, Senator Hoylman, and Assemblymembers Gottfried and Glick, with whom I will continue to push the Gender Expression Non-Discrimination Act; and, most importantly, the advocates and members of the community who have fought tirelessly to demand basic fairness."

**Assemblywomen Deborah Glick said:** "Transgender New Yorkers have faced years of discrimination, because our laws have lagged behind the reality of

people's lives. But I, and others, have argued that our anti-discrimination laws actually do extend their protections to transgender New Yorkers. I am extremely pleased that Governor Cuomo, once again, is stepping up to ensure that New York is a leader in protecting rights for all LGBT New Yorkers."

**Assemblyman Harry Bronson said:** "This is a tremendous step forward for New York State. Harassment and discrimination against transgender people is unacceptable, and Governor Cuomo is absolutely right to take this bold stand. This is about making sure that equality and justice really are 'for all' – and we hope other states and the federal government will take action as well."

**Assemblyman Richard Gottfried said:** "Governor Cuomo's executive action to interpret New York's Human Rights Law to cover transgender discrimination is a major step for dignity for all. Employers, housing providers, places of public accommodations and creditors must now apply the interpretation that transgender discrimination is a form of sex discrimination to their practices and policies. But the State Senate is not off the hook and must pass the GENDA bill so there is no question that we support equality for all New Yorkers."

**Nathan Schaefer, Executive Director of the Empire State Pride Agenda (ESPA), said:** "After years of tireless advocacy, we've won a tremendous victory for transgender civil rights with Governor Cuomo's announcement tonight."

**ESPA Board Co-Chairs Norman C. Simon and Melissa Sklarz** also praised the Governor's announcement, noting "This victory will only quicken our stride as Pride Agenda keeps moving toward winning full equality and justice for LGBT New Yorkers."

The regulations will be subject to a 45 day notice and comment period before full implementation.

Today's announcement builds on Governor Cuomo's past groundbreaking support for the transgender community. In 2014, the Governor introduced new regulations to include transgender health care services under New York State's Medicaid program, ensuring that enrollees could receive treatment coverage for hormone therapy and gender reassignment surgery. The Governor's administration also issued regulatory guidance to commercial insurers stating that they may not deny medically necessary treatment for gender dysphoria.

Additionally, this summer, Governor Cuomo announced that New York would be the first state in the nation to commit to ending the HIV/AIDS epidemic. The Governor's pledge will be accomplished by reducing the annual number of new HIV infections to just 750 (from an estimated 3,000) by the end of 2020 and achieve New York's first ever decrease in HIV prevalence. This would mark the first time there is a reduction in the pervasiveness of AIDS due to a drop in new cases.

# Contact the Governor's Press Office

NYC Press Office: 212.681.4640

Albany Press Office: 518.474.8418

**Contact us by email:** press.office@exec.ny.gov

# Advocacy | Employment | Housing

Brooklyn Self-Help and
Advocacy Center
250 Baltic Street, 3rd Floor
Brooklyn, NY 11201
Tel: 718 875-7744
Fax: 718 243-0763

Bronx Self-Help and
Advocacy Center
369 East 148th Street
Lower Level
Bronx, NY 10455
Tel:718 562-6712/82
Fax: 718 562-6491

Staten Island Peer
Advocacy Center
South Beach
Psychiatric Center
777 Seaview Ave.
Building #10
Staten Island, NY 10305
Tel: 718 667-1609/2382
Fax: 718 667-5017

Self Help and Advocacy
Sevices for Older Adults
Kingsboro Psychiatric Center
681 Clarkson Ave.
Building #25
Brooklyn, NY 11203
Tel: 718 774-1027
Fax: 718 221-0271

Manhattan West Self-Help
and Advocacy Program
163 125th Street
11th Floor
New York, NY 10027
Tel: 212 961-8989/8967
Fax: 212 866-2760

www.balticstreet.org

June 12, 2017

Re: Ms. Mariah Lopez

To whom it may concern:

I Anthony Sgarlato advocate of Brooklyn Self-Help and Advocacy Center am writing in regards to Ms. Mariah Lopez who is currently homeless and in need of a subsidized housing opportunity. She diligently fulfilled her paperwork agreement we requested and she is doing all she can to work accordingly to acquire housing interviews. Her housing packet was sent to single point of access a program of Center for Urban Community Services to acquire three guaranteed housing interviews.  We are working hard to find her housing. If you have any questions please feel free to call me at (718) 855-5929.

Sincerely,

Thank you,

Anthony Sgarlato
Program Manager
Brooklyn Self-Help and Advocacy Center

Exhibit

H