1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MARIAH LOPEZ,

4                Plaintiff,

5        v.                              17 Civ. 3014 (VEC)

6  PROJECT RENEWAL and THE CITY
   OF NEW YORK,
7
                Defendants.
8
   ------------------------------x
9                                       New York, N.Y.
                                        June 30, 2017
10                                      11:45 a.m.

11 Before:

12              HON. VALERIE E. CAPRONI,

13                                      District Judge

14                      APPEARANCES

15 MARIAH LOPEZ, Plaintiff Pro Se

16 JACKSON LEWIS P.C.
        Attorneys for Defendant Project Renewal
17 BY:  KEVIN CONNOLLY

18 ZACHARY W. CARTER, Corporation Counsel
   For the City of New York
19      Attorney for Defendant The City of New York
   BY:  THOMAS B. ROBERTS
20

21 ALSO PRESENT:  TONIE BAEZ, NYC Department of Homeless Services
                  DAVID A. THOMPSON
22

23

24

25

1              MR. THOMPSON:  Your Honor, may I have a word?

2              THE COURT:  Who are you?

3              MR. THOMPSON:  I'm an attorney.  I met Ms. Lopez

4    yesterday at a community outreach event.  I have not yet

5    entered into an agreement to represent her, but I have agreed

6    to come here today to assess the situation.

7              THE COURT:  Have a seat right there.

8              Your last time is Thompson?

9              MR. THOMPSON:  Correct.

10             THE COURT:  What's your first name?

11             MR. THOMPSON:  David.

12             THE COURT:  This is Ms. Lopez.

13             MS. LOPEZ:  Yes.

14             MR. ROBERTS:  Thomas Roberts, Corporation Counsel.

15             MR. CONNOLLY:  Kevin Connolly for Project Renewal.

16             MS. BAEZ:  Tonie Baez, New York City Department of

17   Homeless Services.

18             THE COURT:  Here is what I see as your claims.  I want

19   to make sure that we are all on the same page, as of right now,

20   what everyone thinks Ms. Lopez's claims are because they

21   shifted from the original complaint.  The original complaint is

22   now moot since.  The dog is in the shelter system or has been

23   accepted into the shelter system, correct?

24             MS. LOPEZ:  Yes, your Honor.

25             THE COURT:  The two claims that appeared in the June

1    15 submission, I am so sorry I was on trial and unable to deal

2    with that.  The two claims are that the removal from Marsha's

3    House was retaliatory?

4              MS. LOPEZ:  Yes.

5              THE COURT:  And that the only reasonable accommodation

6    for her disability is placement at Marsha's House.

7              MS. LOPEZ:  Yes, your Honor.

8              THE COURT:  Those are your claims, right?

9              MS. LOPEZ:  At that time there is one other option

10   I've offered up, if Marsha's is not an option for them or they

11   stand opposed, an SRO or a hotel.  I have given those options

12   to them in writing and I have informed them of that.

13             THE COURT:  That would mean it's not the only

14   reasonable accommodation.  The only reasonable accommodation is

15   Marsha's House or an SRO or.

16             MS. LOPEZ:  Hotel under the auspices of DHS.

17             THE COURT:  Or DHS hotel.

18             What exactly is your claimed disability?

19             MS. LOPEZ:  I have a well-documented compounded

20   posttraumatic stress disorder.

21             THE COURT:  PTSD.

22             MS. LOPEZ:  That's sort of the driving condition, your

23   Honor.  And there are, because I am trans, instances of trauma

24   related to being trans.

25             THE COURT:  What is your disability?  What do you

1    claim your disability is?

2              MS. LOPEZ:  Posttraumatic stress disorder.

3              THE COURT:  To Project Renewal and the city.

4    Accepting that that's her claim, my question is, can we proceed

5    treating the June 15 submission, which pretty clearly states

6    that what she has just laid out or what I just laid out as her

7    claim, as the operative complaint as opposed to having her file

8    an amended complaint.

9              MR. CONNOLLY:  I would like to think that over, your

10   Honor.  I came here under the impression that the only valid

11   complaint here related to the service animal that I was going

12   to seek leave to move to dismiss as being moot.  I have to talk

13   it over with my client.

14             THE COURT:  I view that complaint as being superseded,

15   that, in effect, she has amended her complaint.  I'll save your

16   client that money.  The real question is whether she has to

17   prepare another document which would be an amended complaint

18   which would then need to be served on the defendants.

19             MR. ROBERTS:  Two things, if I could.  Just so you are

20   brought up to date on the state court proceedings, Justice

21   Jaffe issued a decision dismissing the Article 78.

22             THE COURT:  Have you filed it on ECF?

23             MR. ROBERTS:  I have not filed it on ECF.

24             THE COURT:  Thank you.  But please file it on ECF.

25             MR. ROBERTS:  OK.

1          And then two days ago Ms. Lopez started a new Article

2     78 in state court which was assigned to Justice Bannon and

3     yesterday we were before Justice Bannon and she denied a TRO.

4     But she established essentially a briefing schedule for the TRO

5     with our opposition due on July 20 and we were supposed to be

6     back before her on July 27.

7          THE COURT:  What's the claim in that Article 78?

8          MR. ROBERTS:  Here is a copy of the Article 78 papers.

9     The top page is the order to show cause with Justice Bannon's

10    order written in and then the papers supporting behind it.

11         In essence, as I understand it, just so you know, when

12    we were before you last, you essentially denied a TRO

13    preventing the department from transferring her to the WIN West

14    center.

15         THE COURT:  I recall.

16         MR. ROBERTS:  Ms. Lopez then advised us that midtown

17    was a trigger event for her and she never went to WIN West.  So

18    we then transferred her administratively to the Park Slope

19    women's shelter armory on Eighth Avenue in Park Slope.  She has

20    also never gone there.

21         She submitted a doctor's letter, which is an exhibit

22    to the order to show cause, from her psychiatrist making a

23    recommendation to us about what her placement should be.  We

24    evaluated it and issued a decision, which is also attached to

25    her papers, saying the armory Park Slope was an appropriate

 1  placement and that was an administrative decision telling her

 2  there was administrator review she could do.

 3        Instead, she went to Justice Bannon.  Essentially, she

 4  tried for two days to go, but we got in front of Justice Bannon

 5  yesterday and had a pretty extensive argument about that.

 6  Justice Bannon did not grant the TRO requests, which were the

 7  same requests that Ms. Lopez has just articulated to you are

 8  the relief that she is asking of this Court.  She is actively

 9  pursuing both the exact same claims in both fora.  And at least

10  with regard to the initial claim we now have a judgment from

11  the district court on the initial Article 78.

12        THE COURT:  From the supreme court.  You said the

13  district court.

14        MR. ROBERTS:  From the state supreme court.

15        THE COURT:  What did Justice Jaffe decide?  What was

16  the issue in front of her?

17        MR. ROBERTS:  Was whether the transfer from Marsha's

18  House to WIN West was essentially arbitrary and capricious.

19        THE COURT:  Or retaliatory.

20        MR. ROBERTS:  Or retaliatory.  That was certainly an

21  issue that was presented on the papers.  I've put in the record

22  now this rather large answer with an affirmative statement that

23  laid out the rationale.  I believe the retaliation theory was

24  there.  I don't believe she advanced her retaliation theory

25  about the ADA.  I don't really quite understand what -- should

1   counsel get involved, I would hope that he would submit an

2   amended complaint.

3          THE COURT:  While I appreciate that Mr. Thompson is

4   here, I am not going to count on him filing a notice of

5   appearance in this case.  If he does, that will change things.

6   As of right now I've got a pro se litigant and I'm dealing with

7   this as a pro case.

8          Thank you for all that history.  It is helpful.  What

9   I'm hearing you say, it is conceivable that Jaffe's decision is

10  going to be res judicata or collateral estoppel at least,

11  conceivably, as to the removal claim.

12         MR. ROBERTS:  I believe we will advance that argument.

13         THE COURT:  There is the question of, and this may be

14  in front now of Bannon, whether the only reasonable

15  accommodation under the ADA and presumably under city and state

16  law is Marsha's House, an SRO, or a hotel.  Do you understand

17  that to be in front of Bannon?

18         MR. CONNOLLY:  For the record, Project Renewal was not

19  named in the proceeding before Judge Bannon.

20         MR. ROBERTS:  That statement is correct.  You've just

21  articulated the relief that she has requested.

22         THE COURT:  From Bannon.

23         MR. ROBERTS:  From Justice Bannon and the Article 78.

24  That's the way I read the papers that I just submitted to you.

25         THE COURT:  What are you proposing?

1          Not you yet.  I am going to come back to you.  I have

2     always given you more than ample opportunity to speak.

3          What are you proposing we do?

4          MR. ROBERTS:  So in the letter that we submitted we --

5     in essence, my answer is due August 1.  His answer is due a day

6     or two later.

7          THE COURT:  To the original complaint.

8          MR. ROBERTS:  Correct.

9          THE COURT:  Seriously, that complaint is overtaken by

10    events several times over.  I am either going to need to order

11    her to file an amended complaint or, which I think would be

12    more efficient for me to deem the June 15 filing that ended up

13    in front of Judge Batts as the amended complaint, which means

14    you have to accommodate.  The dog is out.  The dog is

15    accommodated.  That's moot.  That claim is dismissed.

16         MR. ROBERTS:  What I don't fully understand from the

17    papers that were submitted before Judge Batts was, what is the

18    nature of the retaliation?

19         THE COURT:  The nature of the retaliation was her

20    removal from Marsha's House.

21         MR. ROBERTS:  What was allegedly the motivation?  Is

22    it because of the ADA issue, the dog issue?

23         THE COURT:  I think so, but let me double-check.

24         Ms. Lopez, is that your theory, that you were removed

25    from Marsha's House because you brought a federal lawsuit?

1          MS. LOPEZ:  In addition to getting two criminal

2    investigations underway around Marsha's House and I would like

3    to give a little more background.  If I need to amend it, your

4    Honor, I will.

5          THE COURT:  I am not sure that's a federal claim.  The

6    theory is that Marsha's House retaliated against you because

7    you brought a federal lawsuit and because you called the police

8    on them.

9          MS. LOPEZ:  District attorney, but yes.

10         THE COURT:  District attorney.

11         That would be the claim.

12         Do you want to confab for a second?

13         MR. CONNOLLY:  I would suggest, maybe we can have a

14   week to decide.  We can submit a letter whether we will accept

15   that June 15.  I'd like to review it in greater detail.  I

16   wasn't aware that would serve as a de facto complaint.

17         THE COURT:  That is my proposal.  Actually, as a pro

18   se complaint, it's not bad in terms of kind of a short plain

19   statement of the facts.  I don't think she alleged in there

20   anything about the police report.  That would be new.

21         Here is my problem.  My problem is, Judge Batts' view

22   of this is, it was a request for a TRO that was denied and then

23   a preliminary injunction.  I am prepared to set a schedule for

24   the preliminary injunction.  But if you want to move to

25   dismiss, I also want to give you an opportunity to do that.

1    But I kind of thought we could expedite that if we can treat

2    the June 15 filing as functionally a complaint so that you will

3    be moving against that.

4              MR. ROBERTS:  The city will agree to that.

5              MR. CONNOLLY:  My phone is downstairs.  I really would

6    like to talk to my client about that.

7              THE COURT:  I'll tell you what we are going to do.  I

8    am going to assume that your client is going to agree because

9    that is the reasonable thing to do.

10             MR. CONNOLLY:  Sure.

11             THE COURT:  I am going to set a schedule accordingly.

12   It's without prejudice.  If your client says they can't live

13   with that, then you are going to be ordered to file an amended

14   complaint which needs to be a short plain statement of your

15   claim.  If you come in, it would make sense to file an amended

16   complaint.  Recognizing all this, and you've got litigation

17   going in state supreme, how long would you like to make the

18   motion to dismiss?  Today is June 30.

19             MR. ROBERTS:  I would like the last Friday in August,

20   if possible, that works for me.

21             THE COURT:  That is too long.  You have vacation in

22   August?

23             MR. ROBERTS:  I do have the first two weeks.

24             THE COURT:  You're out the first two weeks.  How about

25   the end of July then?

1           MR. ROBERTS:  OK.  It's when Justice Bannon's papers

2    are due and several others.

3           THE COURT:  You come from a big office.  Tell Zach to

4    get you some help.

5           MR. CONNOLLY:  Our original answer was due August 4.

6    Would that date work?

7           THE COURT:  Yes.  Except you are going to be on

8    vacation.

9           MR. ROBERTS:  The reality for me is I have to have it

10   done by whatever that last Friday in July is.  I think it's the

11   29th.  That doesn't mean that he shouldn't have four more days.

12          THE COURT:  August 4 it is.  Your motion is due on

13   August 4.  Again, this is without prejudice.  You need to let

14   me know by next Friday.

15          MR. CONNOLLY:  If we have an objection.

16          THE COURT:  If you object.  At which point you'll be

17   ordered to file an amended complaint.  You have to serve the

18   amended complaint.  You're beginning all over again.  But

19   assume that they don't do that because that would be

20   unreasonable.

21          How long do you want to respond?  Their motion to

22   dismiss is going to say, assuming everything she says is true,

23   she is not entitled to relief.

24          MS. LOPEZ:  A month from the day.

25          THE COURT:  A month.  OK.  I am going to give you

```
 1    until September 8, so that's past Labor Day.

 2              MS. LOPEZ:  Yes, your Honor.

 3              THE COURT:  If you want to respond sooner, that's

 4    fine.  I'll give you until September 8.  Any reply is due

 5    September 22.  Does anybody celebrate Rosh Hashanah?

 6              MS. LOPEZ:  I do not.

 7              MR. CONNOLLY:  I do not.

 8              THE COURT:  September 22 it is.  That's the motion to

 9    dismiss.

10              If the motion to dismiss is denied, I am going to set

11    expedited discovery and we are going to have a preliminary

12    injunction hearing at that point.  But I think the motion to

13    dismiss is not totally beyond the pale.  So it makes sense to

14    proceed this way rather than moving into discovery.

15              What do you want to say?

16              MS. LOPEZ:  Your Honor, I did not have a chance to go

17    down this morning to the other courtroom or the pro se office,

18    excuse me, at NYLAG.

19              I have an emergency and I want to address the res

20    judicata issue first because there have been many developments

21    since the last court date and I want to be clear, it is not my

22    intention to shop around every single night at 5 p.m.  I am

23    still homeless and I have an emergency again that I'd like to

24    place before the Court today.  I want to make my intentions

25    clear.
```

 1              I would love to withdraw the case in front of Judge

 2    Bannon.  I, as a person in the street, with access to the

 3    courts, and with medical documentation I am going to submit to

 4    the Court now -- I know they are exhibits in the complaint in

 5    front of Judge Bannon -- every single night I have a choice to

 6    either go to where my psychiatrists are telling me not to go or

 7    to do what I've been doing for 20 years.  I would like to stop

 8    doing what I've been doing for 20 years.

 9              I would happily, if I make an application today for a

10    TRO, or even tomorrow, withdraw the state or cease the state

11    proceedings.  I believe Judge Jaffe's position was based on

12    misinformation and I understand that I have relitigated or

13    attempted to relitigate or reassert the same relief over, but

14    it's because it's what I need.

15              THE COURT:  You don't get to do that.  Understand that

16    you can't keep relitigating the issue.  Once it's decided, it's

17    decided, and you are bound by that.  You can appeal it.  You

18    can tell a higher court, she got it wrong, but you don't get to

19    keep relitigating it.

20              MS. LOPEZ:  Your Honor, may I at least -- every time

21    I'm in front of you, I feel like you give the other side more

22    time.

23              THE COURT:  You've got the floor.

24              MR. THOMPSON:  This judge is listening to you.

25              MS. LOPEZ:  Judge Jaffe did not hear my request for a

 1   TRO or ask the city to place me in an SRO.

 2          I would like to move orally to ask this Court,

 3   considering I can submit medical documents to prove that I am

 4   at imminent risk for irreparable harm if the city does not

 5   place me as per the direction of my doctor.

 6          It is within my amended complaint or within my updated

 7   complaint that I believe that the city is attempting to

 8   retaliate by moving me out of Marsha's.  This photograph never

 9   got in front of the Court the first time I was in front of you

10   on April 27, but I believe it is physical evidence of at least

11   Project Renewal or the city's mechanizations to get me out of

12   Marsha's, no matter where I was going.

13          They represented to this court that there were no beds

14   at Marsha's and residents quickly sent me a photocopy that

15   there were over 20 beds available.  There are 12 listed on the

16   board.  In the papers submitted in front of Judge Jaffe there

17   is -- it's an 80-bed facility, so there are beds not even

18   listed here, including many private rooms that are empty as of

19   an hour ago before I walked into court.

20          THE COURT:  I'm confused.  The last time you were in

21   front of me was not that there were no beds at Marsha's House.

22   It was that you had been removed from Marsha's House for

23   failure to comply with the rules.

24          MS. LOPEZ:  I am trying to lay the entire history.

25          THE COURT:  You don't have to lay out the whole

1    history.

2            MS. LOPEZ:  Yes.  And so I may appeal Judge Jaffe's

3    decision, and I really need to stress on the record to this

4    court that I am sitting here calm and responding to your

5    requests, but I'm in absolute crisis and it is not reasonable

6    to expect me, with a broken handheld phone and no access to a

7    computer and the dog with me who would be exhausted if she had

8    to run around to each court like I have to, to be able to

9    respond, even through my due process, to every decision.

10           The city lawyers are, I believe, attempting to, as a

11   part of their strategy, uproot me or make me unstable.  I just

12   want to explain what had happened.

13           Your Honor heard from witnesses about WIN West, and

14   the city was unaware of the fact that I had, since foster case,

15   had a history in the neighborhood.  This was not made up.  The

16   city continues or at least before the last time we were in

17   front of you did not sort of check with me or my doctors about

18   my history or my PTSD needs.

19           This is a petition filed in family court when I was a

20   child listing my home addresses several blocks away from the

21   facility they tried to put me in.  These are not

22   mechanizations.  They are not a motive to try to subvert

23   everything the city is doing and make excuses.

24           They also did not hear information from my

25   psychiatrist that he since submitted that I cannot be placed in

1   a dorm setting.  My psychiatrist called them and explained to

2   them that he has extensive knowledge of my history.

3        I have been orphaned and under sort of the city's

4   auspices since I was a child or even while facing criminal

5   cases that have been dismissed while on Rikers.  All other

6   agencies, from HHS to DOC, never placed me in dorms.  When WIN

7   West was not an option, my psychiatrist, when they attempted to

8   place me in the Park Slope Armory, contacted them again and

9   said, this is not appropriate.  There were several reasons for

10  that and I will expound if you need to.

11       I have given them every bit of documentation to

12  support the fact that every provider that I'm dealing with,

13  from the surgeon that performed my SRS, to a Dr. Sara Akard

14  that I saw yesterday morning before court, is telling the city,

15  you cannot, simply to win a case, continue to ignore her needs.

16       So according to the doctors' instructions, I have not

17  shown up to the Park Slope shelter because it would be a

18  trigger with the dorm setting and it is my fight or flight

19  response not to fight and risk criminal prosecution if I'm

20  arrested or involved in an incident.

21       I am asking this Court to please take time to review

22  the updated medical documentation that I was not able to submit

23  on the 15th in the TRO request in front of Judge Batts.  If I

24  need to, I will try to stabilize myself for a day or two to try

25  to figure out if I could seek relief through an appeal of Judge

1    Jaffe's order.

2           This is where I started and the city made very, very

3    specific requests in front of your Honor about it being WIN

4    West that I had to go to.  That option is completely removed

5    from them now.

6           And I believe that their attempts to say, we are going

7    to give you everywhere else, you have to go where we tell you

8    is not only unfair, it doesn't take into consideration my long

9    documented history of abuse in dorm settings.

10          There is a case that was in front of this Court called

11   *Joel A v. Giuliani*.  I'm the named lead plaintiff in that case

12   from 1998.  Lawyers from Paul Weiss alleged severe abuse in

13   dorm settings that were outlined in that case that led to a

14   settlement.  I'm not making things up.  The city just won't do

15   the simplest thing, and that is, evaluate if the affidavit is

16   within Project Renewal's requests from their staff, if those

17   affidavits were not written by a select few staff to follow a

18   motive of retaliation to get me out of Marsha's, regardless.

19          When we were in front of the Court on April 27, they

20   made the assertion that there were no beds until they couldn't

21   anymore, and they made the same strenuous argument that I have

22   to go to Broadway House, I have to go to Broadway House.  I

23   believe that their stern assertions each time, that they know

24   where I need to go and completely ignoring the up-to-date

25   information from my medical team is not reasonable and is

1   irrational.

2          She is sorting of sensing I'm either upset or I want

3   to go outside.  I apologize if she is disruptive.

4          I would also point out, your Honor, my dog, which is

5   under the ADA to be considered a piece of equipment, so to

6   speak, by many case law that I read, my dog stands to be made

7   rendered useless as a service animal because of the issues with

8   her behavior that are a result of my instability.

9          I have been running away doing sex work because of the

10  city's inability to either have enough beds or to simply listen

11  to my doctors as a means to an end to win a case since I was a

12  teenager.  It is unfair and unreasonable for the city to ignore

13  the fact that my doctor accepts that every night I am doing sex

14  work, not because I am a porn criminal, but because it is

15  actually worked into my mechanisms of fight or flight around my

16  fear of either going to the shelter and having a confrontation.

17  I'd like to give your Honor an example.

18          THE COURT:  I don't think that's necessary.

19          MS. LOPEZ:  I am exhausted.  I have been suicidal in

20  the last couple of weeks.  Mr. Roberts is aware of this.  My

21  psychiatrist was expressed with him.  And what it sounds like

22  to me -- I apologize, your Honor.  Chica, sit.  I believe it is

23  also unreasonable and irrational to sort of make the argument

24  that I'm such a danger and so aggressive that I can't go back

25  to Marsha's.

1          And then my psychiatrist tell Mr. Roberts she has

2     PTSD -- and I would really appreciate if your Honor could

3     review the medical documents -- used the word snapped.  My

4     doctor was express with them.  He knows what I need and it is

5     not to be in a dorm setting.

6          I want to just point something else out.  I want to be

7     in a shelter.  I have done everything I can in the middle of

8     litigating to get out of the DHS system by -- my health

9     insurance, Immedicare, care sent me on interviews with private

10    agencies that take the 2010(e) request and distribute them to

11    agencies that place people in transitional or scattered site

12    housing.

13         I am sort of spinning multiple plates, but I cannot

14    stabilize myself.  And I cannot even take the medication that

15    my doctor gives me because he tells me not to take it unless I

16    can get more than eight hours of sleep.  I cannot sleep around

17    other people.

18         I would appreciate your Honor either giving me the

19    chance to make the res judicata issue, if they raise it, and I

20    know I can't keep amending or restating things.  But give me a

21    chance to sort of get my stuff together so I can submit to the

22    Court evidence at least that I am at risk of death or -- some

23    attorneys say I shouldn't say this, but I'm in control now.

24    I'm not a danger to anyone else.

25              But people with PTSD sometimes lash out.  And if I

1    lash out because someone is hurting me, I face criminal

2    jeopardy.  It is not reasonable to ignore all of the doctors.

3    They are going to say they have had doctors review this.  They

4    are going to say that they are aware of all of this.  They are

5    making a point to simply make it, your Honor, to win a case,

6    like they have done in the three landmark cases that I

7    eventually won.  And I don't think it is fair to simply ignore

8    the experts.

9           I don't want to keep rambling, but I would like to

10   know what the Court would be interested in terms of possibly

11   considering hearing my doctors.  My doctors would come.  But

12   they are sort of salt-of-the-earth people that are right now

13   treating people.  They always show up.  My doctors are treating

14   people now.  My surgeon is performing sex change operations

15   right now.

16          If I do not dilate according to his instructions --

17   because there are several issues.  There is PTSD treatment that

18   involves medication and therapy that I cannot comply with and

19   there is the treatment for the gender identity disorder.  That

20   is not covered under federally.  But the trauma and stress

21   related to the worsening of my gender identity disorder can

22   trigger symptoms of PTSD.

23          If I'm not allowed to dilate, your Honor, I will face

24   the need for more surgery, which comes with risks of infections

25   and death.  I will begin soon to need opioid drugs to control

1    the pain associated with dilation.  I don't mean to be too

2    graphic, your Honor.  If you do not dilate, your vagina closes.

3        The other side, Project Renewal, knew that I had very

4    expressed medical needs when I was accepted into the shelter

5    system.  The single-person bed at Marsha's was given to me to

6    accommodate those medical needs, not because of the dog.

7    Kaedon Grinnell was very clear, you are not in your own room

8    because of the dog.  You are in your own room because you need

9    to dilate.

10        Why now is the city allowed to ignore my needs around

11    dilation or they are appearing to be grasping at straws to sort

12    of anything but do what the doctors say because that one inch

13    may give me a mile.  They are telling me to go in a special

14    room when I need to do what my doctor says to comply with his

15    orders.  Those orders, your Honor -- again, I apologize that

16    sexual health is a part of these proceedings.  But my doctor

17    essentially tells me to focus on erotic thoughts to increase

18    blood flow to the region and to decrease pain.  Every time I

19    might have to medically masturbate, I have to seek permission

20    and get keys.

21        When I implied with Mr. Roberts yesterday, what would

22    you do if I went into the room that I'm not allowed to sleep in

23    alone, but where you guys are representing I can go in alone

24    whenever I need, they are sort of trying to make the arguments

25    so Judge Bannon would believe their accommodation was

1    reasonable, I have to get permission and alert the staff that

2    maybe I'm feeling frisky with myself or I am about to do

3    something to my private parts.

4            There is no way, also, in that situation for the city

5    to guarantee that my confidentiality is respected.  There is no

6    way for the city, and even your Honor had implied, to sort of

7    believe or be assured that even if I'm quiet, no one will find

8    out I'm trans, even if that results in whispers around me.  The

9    only place in the city right now that has other transgender

10   people that won't ever have questions about where did you get

11   your vagina made and did they tuck it in and the questions that

12   are unreasonable and abhorrent from people that are not trans

13   or GLBTQ, those are the things that trigger me.

14           I would also like your Honor to understand that the

15   city made representations about my behavior, that they claim my

16   behavior worsened over the course of me being at Marsha's.

17           I would beg the Court the opportunity to present the

18   fact that I have a documented past of being triggered

19   specifically by the police.  But I want to be very, very clear

20   here.  The sounds of the walkie-talkies, the sounds of the

21   keys, the actual smell of the uniform.  There are things about

22   the police that expressly trigger me.

23           Since your Honor ordered -- excuse me.  I apologize.

24   The day Judge Jaffe ordered them to take me at Marsha's again

25   as a part of the TRO with the Article 78 that I lost so far,

 1    they placed DHS police in the facility only for me.  Those

 2    police followed me around and harassed me specifically.  You

 3    have someone that originally claimed to this court she had

 4    PTSD.

 5          None of what I'm saying now is a legal argument to win

 6    a case.  It's all documented.  The police and the sounds of

 7    their keys and their presence are what triggers me, so they

 8    place me in this facility.  The staff, only certain ones, start

 9    to harass me, staff that 47 signatures back up are either

10    harassing me or I was not violent or aggressive to, begin to

11    sort of follow me around in furtherance of the motives of

12    Project Renewal and the city to sort of write me up for every

13    little thing.  They exaggerated claims in front of Judge Jaffe.

14          I didn't want to say this on the record or in front of

15    the other side just because it might be part of my strategy.

16    But the day that I was arrested, I believe that the Court,

17    Judge Jaffe, yes, judges make mistakes, had inappropriate ex

18    parte communication with the other side, and I'll explain.  She

19    gave an expression.

20          THE COURT:  You have gone way, way off track.

21          MS. LOPEZ:  I believe that everything that happened is

22    sort -- makes it seem like I'm aggressive and things are

23    confusing.  I just think they are more straightforward.

24          THE COURT:  Here is the thing, though.  If you think

25    Justice Jaffe got it wrong, your answer is to appeal.  You

 1    can't come to me and complain about the same things that you

 2    litigated in front of Justice Jaffe.

 3              MS. LOPEZ:  I was giving you background.

 4              THE COURT:  I appreciate the background.  You can't do

 5    that.  You chose that forum and now you have got to deal with

 6    that forum.  You lost the case.  Appeal it or don't.  You can't

 7    say they acted inappropriately in front of Justice Jaffe to me,

 8    correct?  That's inappropriate.

 9              MS. LOPEZ:  Yes.  Background.

10              What I would say now is, based on everything --

11              THE COURT:  Everything you have just told me is what

12    is in front of Justice Bannon.  You chose that forum yesterday.

13    You are stuck with Justice Bannon.  He will deal with your

14    appeal --

15              MS. LOPEZ:  She.

16              THE COURT:  She.  Whoever -- the appeal of your

17    placement.  That's essentially what's in front of Justice

18    Bannon.

19              MR. ROBERTS:  Correct.

20              THE COURT:  Justice Bannon will deal with that.

21    Unless I'm wrong.  That's why I started out trying to clarify

22    what your claim is.

23              Ms. Lopez, understand something.  I'm not the mayor of

24    the city.  I'm not the commissioner of the Department of

25    Homeless Services.

1            MS. LOPEZ:  Your Honor, I am going to get back to what

2    I think your Honor would like to hear.  Your Honor has broad

3    discretion and there are placements that I did not or types of

4    relief that were not specified in front of Judge Bannon, like a

5    scattered site facility.

6            THE COURT:  That's all in front of Justice Bannon.

7            MS. LOPEZ:  No.

8            THE COURT:  SRO, temporary hotel.  That's splitting

9    your claim.  You can't say, OK --

10           MS. LOPEZ:  Am I supposed to just be on the street?

11   I'm not an attorney, your Honor.

12           THE COURT:  Ms. Lopez, I have given you lots of

13   opportunity to talk.

14           MS. LOPEZ:  If I were to die before the court

15   proceeding -- not now.  My doctor says I'm fine now -- then

16   what?

17           THE COURT:  Then I would be very sad.

18           MS. LOPEZ:  Your Honor, I'm not asking --

19           THE COURT:  Again, Ms. Lopez --

20           MS. LOPEZ:  I'm not finished asking what I'm asking

21   for.  That's not a duplication, your Honor.  There are things

22   that I can ask for that I did not ask for.

23           THE COURT:  I think you misunderstand the role of a

24   federal judge.  I am not a psychiatrist.  I cannot wave my wand

25   and change -- I'm not in control of the Department of Homeless

1    Services.  I'm interested in your claims.  That's the issue, is

2    what --

3            MS. LOPEZ:  How do you ignore the fact that I am back

4    in front of you and only because of the mechanizations to

5    disable me in this case.  Not -- to disable me.  There are

6    worsenings of my conditions that were named in the complaint or

7    in the new complaint on the 15th, and I stand to potentially

8    either be forced back into the street because my psychiatrist

9    has recommended me not go.  I have nowhere to stay today on an

10   issue that is in front of another court, yes, but that

11   originated here.  It is not --

12           THE COURT:  I disagree with that.  It doesn't matter.

13   What are you asking from me?  What are you asking me to do?

14           MS. LOPEZ:  At least an opportunity -- can I have a

15   couple of minutes to have a conversation with the attorney that

16   is here?

17           MR. THOMPSON:  Sure.

18           THE COURT:  Yes.

19           (Recess).

20           MR. THOMPSON:  If I may.

21           THE COURT:  OK.

22           MR. THOMPSON:  Ms. Lopez has a question.  She believes

23   that the case that was decided, the first state case --

24           THE COURT:  The Jaffe decision.

25           MR. THOMPSON:  Correct.  Dealt only with the question

1    of removal from Marsha's, as opposed to her need to be in an

2    SRO or some other solitary circumstance.  And she wants to know

3    if she can dismiss or withdraw the other --

4              THE COURT:  Justice Bannon.

5              MR. THOMPSON:  Justice Bannon proceeding and pursue

6    the relief that she wants here.

7              THE COURT:  I don't give legal advice.  That's the

8    answer.

9              MR. THOMPSON:  That's the request that she is --

10             THE COURT:  She is asking me for advice on how to

11   proceed procedurally and I am not going to do that.

12             MS. LOPEZ:  I didn't actually specifically want that

13   addressed to the Court.

14             THE COURT:  You might want to explain to her that

15   having started down that path, abandoning it may have legal

16   consequences.  I have done no legal research.  From an Article

17   78 perspective it may well be that that's the right place for

18   her to be, given the nature of the challenge, which seems to be

19   that the city is acting arbitrarily and capriciously, ignoring

20   the advice of her doctors and putting her in inappropriate

21   placements.  That's, in essence, the claim.  She has got it

22   dressed up in front of me in terms of reasonable accommodation,

23   retaliation for coming to court in the first place.

24             But you might want to talk to her about the fact that

25   my answer may be, she had an administrative remedy that she did

 1    not pursue, which was the Article 78.  Life is difficult.  The

 2    Court is not always the appropriate way to deal with some of

 3    these problems, which was, again, I tried to start out with

 4    what exactly is the claim in front of me.  These seem like the

 5    claims.  I guess I'm back to, what are you asking me to do?

 6         MS. LOPEZ:  I'd like to -- I need somewhere to stay,

 7    your Honor, and I believe.  You are asking me what I'm asking.

 8    Whether I get the relief or not, there are options or solutions

 9    that were not named again in any of that litigation.

10         And, in addition to that, I think it is cruel for any

11    court to ignore simply that it may be the mechanizations of

12    opposing counsel against a pro se litigant to simply keep them

13    out of the shelter system because they know I will not assume

14    that bed because my doctors have told me not to assume it.

15         Today I get my check from Social Security and I am

16    going to have to spend it, which will make it so that if I'm

17    accepted into any of the apartments and the agencies are fining

18    me, I won't have the money I'm supposed to because I will have

19    to either tonight prostitute for somewhere to stay because my

20    doctor told me, do not go where you know you will be triggered,

21    or I could just spend my money and go in a hotel and in a

22    couple of days my money will be gone.

23         What I would like is an opportunity to add infliction

24    of emotional distress to my claim in front of this Court.  I

25    believe that the burden for proving that is much lower or would

1   give me the opportunity to litigate some of the issues that are

2   not in front of Judge Bannon.

3           THE COURT:  You are probably not going to have

4   jurisdiction for that.

5           MR. THOMPSON:  The attorneys for the city are here and

6   I'm just wondering, if it might be possible, is there any way

7   that we can discuss placing her in the shorter term someplace

8   that might be acceptable to her while we figure out if any of

9   these litigations need to continue.

10          MR. CONNOLLY:  This doesn't involve me.

11          MS. BAEZ:  We are willing to discuss it.  We have

12  brought several options forward to her, even in relation to the

13  SRO placement.  We are willing to assist her with that.  But

14  that is not something that we could immediately place her into.

15  That's a process.  There is an application for funding for

16  that.  Once that's approved, then there have to be interviews

17  set up.

18          There is nonprofit organizations that run these SROs

19  as landlords and they get to decide who is actually eligible

20  for their programs.  DHS can make referrals and we can work

21  with her to expedite, for example, if she did not have the

22  money for a deposit or a broker's fee or whatever else was

23  necessary in order to process that housing application.

24          But that is not something that can happen in a day or

25  two.  That is a process that, again, we would be willing to

 1   assist her with, but that's not something that we could place

 2   her in today.

 3          MR. THOMPSON:  There is no nondormitory setting that

 4   you could place her in the short term?

 5          MS. BAEZ:  Not at this time.

 6          MR. ROBERTS:  We have an extremely limited number of

 7   single rooms, as I understand it, other than at Marsha's and

 8   those were not single rooms, anyway.  She may have been the

 9   only occupant, but it was a room with four beds, as I

10   understand.

11          MS. LOPEZ:  That's not true.

12          MR. ROBERTS:  At least as of yesterday, we have one

13   place where generally people are extremely sick in chemotherapy

14   or something and yesterday that was full.  So far the medical

15   director has not thought that -- Ms. Lopez's statements of what

16   her doctors have submitted to us greatly exaggerates what her

17   doctors have in fact said to us.

18          MS. LOPEZ:  That's not true.

19          MR. ROBERTS:  What her doctors said to us is in

20   writing before you.  The medical director of DHS reviewed the

21   recommendation.  We still think Park Slope is an appropriate

22   place.  There is a medical room that will be provided in --

23   that was a letter --

24          THE COURT:  You said we have got everything from her

25   doctor.  Is that part of the New York supreme package?

1           MR. ROBERTS:  In the New York supreme package the

2    first exhibit there, the one that's A, is the letter from her

3    psychiatrist.  The middle paragraph of that reference, while it

4    doesn't refer to WIN West, it is a reference that going to

5    midtown was a problem for Ms. Lopez.

6           So then we have transferred her to Park Slope.  Park

7    Slope Armory has about 100 beds.  It's all women.  At the

8    moment there are at least four transgender women who are

9    residing there.  It is a well administered place with regard to

10   the vaginal dilation issue.  We have agreed to make a medical

11   examining room available to her three times a day for 15

12   minutes.  There is an examining table.  She can go in.  She can

13   do the dilation that's needed.  It's been through that review.

14          She simply refuses even to go to Park Slope to even

15   try it.  The medical evaluation, I think, is fully supported by

16   the decision that was issued, is that essentially she can go

17   there and it is safe and appropriate.

18          I would also mention, as I said yesterday in court,

19   for what it's worth, the contractor that runs the Park Slope

20   Armory retains mental health professionals who are from Housing

21   Works, which is the same organization.

22          THE COURT:  Be quiet.  Ms. Lopez, you have got to

23   behave.  Thank you.

24          MR. ROBERTS:  It's the same organization that her

25   psychiatrist works from.  So hopefully the delivery of mental

 1    health services can have continuity from Park Slope with her

 2    own private physician because they work for the same

 3    organization.

 4         Ms. Lopez is just bound and determined to reject all

 5    this.  I think they are totally reasonable and the state

 6    supreme court has repeatedly -- and you decided there was no

 7    irreparable injury.  I think we are still at a no irreparable

 8    injury posture and the state supreme court has evaluated it and

 9    decided at least the transfer out of Marsha's was appropriate.

10         THE COURT:  Or at least that it wasn't an abuse of

11    discretion.

12         MR. CONNOLLY:  It wasn't arbitrary and capricious.

13         MR. ROBERTS:  I don't know.  Sorry.  I find it --

14         THE COURT:  Counsel, what I hear is that the city is

15    willing to talk to you, but they have a story that suggests a

16    different fact pattern than what Ms. Lopez believes.

17         The city is going to move to dismiss.  To have a

18    preliminary injunction hearing on a complaint that has at least

19    some number of issues does not make a lot of sense other than

20    satisfying psychic desires to have a hearing.  I have heard

21    from people.  I heard from people about WIN West.

22         MS. LOPEZ:  You have not heard any of my experts, your

23    Honor.  I have not been given the opportunity to compel them to

24    show up.

25         THE COURT:  Hang on a second.  The issue, Ms. Lopez,

 1    is as to your primary claim, which is the removal was

 2    retaliatory.  That has nothing to do with your experts.  The

 3    only reasonable accommodation for your disability is Marsha's

 4    House, an SRO, or a hotel.  Based on what is before me, it does

 5    not appear there is a high degree of likelihood that you are

 6    going to succeed on the merits of that.

 7            MS. LOPEZ:  Can you repeat that.  I apologize, your

 8    Honor.

 9            THE COURT:  Your experts, your psychiatrist and your

10    physician, have nothing to do with your primary claim, which is

11    that the removal -- are you listening to me?

12            MS. LOPEZ:  Yes, I am now following you.  That the

13    removal from Marsha's.

14            THE COURT:  From Marsha's House was retaliatory.

15    That's one claim.  Your second claim is that the only

16    reasonable accommodation for your disability is Marsha's House,

17    an SRO, a hotel, or scattered housing, but basically that means

18    individual housing, is my understanding.  That is the only

19    reasonable accommodation.  That is, in essence, what is in

20    front of Justice Bannon.

21            From my perspective, I am not sure what we are going

22    to have a hearing on because I don't need to hear from your

23    psychiatrists that the Marsha's House was retaliatory.  That

24    ultimately is going to be a discovery issue of what did they

25    have in front of them, what was the basis for their decision.

1    Was it because you were engaged in misconduct or was it because

2    they were retaliating for you coming to court and for calling

3    the district attorney's office.  That's not in the 6/15

4    complaint, but she orally added it.  And whether as a matter of

5    the Americans with Disability Act is the only reasonable

6    accommodation, Marsha's House or the SRO.  That's what's in

7    front of Justice Bannon.  You've got a date in front of him of

8    July --

9              MS. LOPEZ:  Her.

10             THE COURT:  Her.  Excuse me -- of July 27.

11             MS. LOPEZ:  First of all, I believe that the day that

12   we were in front of you --

13             THE COURT:  We are not rearguing that.  That's done.

14             MS. LOPEZ:  What's happened is this, your Honor.

15   Attorneys that have more resources than I do put me in a

16   situation to have to, for my well-being, my safety, my life

17   seek my judicial remedies because, even according to the

18   administrative remedies, those judicial remedies in state court

19   were available to me if the relief I was seeking could not have

20   been sought within the time frame I needed or there was

21   potential irreparable harm.  Even if Judge Bannon did not sign

22   my TRO yesterday, that does not mean -- and I know we are going

23   back to sort of, well, maybe that's where I need to litigate

24   it -- but it doesn't mean that I will not be harmed.

25             THE COURT:  Ms. Lopez, to get a preliminary injunction

1    there are several things you have to show.  That's only one

2    thing.  The other is a probability of success on the merits.

3    That is what you're litigating in front of Justice Bannon.

4         MS. LOPEZ:  Yes, your Honor.  But we keep

5    referencing -- the city is winning only because they forced me

6    back into that situation which is sort of then, by design,

7    creates this back and forth that's even happening now.

8         The city does not, and history shows this, and sort of

9    my merits in winning can be demonstrated by the three case laws

10   that I've already won.  The city never, ever gets to say, we

11   know best for a patient with special needs.  The city's experts

12   never win, not when it comes to trans or gay lesbian bisexual

13   trans people.  Again, never.  That alone demonstrates a higher

14   likelihood of success.

15        What they are doing is trying to compare my sort of

16   higher-functioning self or my apparent lack of real disability

17   to just giving an argument to the very sick and frail people

18   that are in the DHS that exist.  Instead of saying, you know

19   what, hers is a constellation of issues and medical needs that

20   is parallel, at least in its urgency, to the people that are in

21   the SRO, I am as deserved of an SRO and a room by myself than

22   someone that is unfortunate enough to have cancer.

23        THE COURT:  That's not the issue.  You just heard that

24   they are willing to work with you on an SRO placement.  But

25   they can't just snap their fingers and have it happen.  It's a

1    process.

2          MS. LOPEZ:  I'm representing that they are lying to

3    you, your Honor, just like the day they represented that there

4    were no beds and there over 20.  It serves their interest to

5    sort of use their broad language around their procedures to

6    imply it be very difficult.

7          THE COURT:  I really do not appreciate litigants

8    accusing others of lying.  That's really --

9          MS. LOPEZ:  Misrepresenting?

10         THE COURT:  To the extent it was a misrepresentation,

11   I think is a matter of common sense.  I'm pretty sure that

12   getting into an SRO and getting a contractor to accept a new

13   person in the SRO is a matter of a process because there are

14   lots of homeless people in this city.  And if it was not simply

15   a matter of a process, it would not be people living on the

16   streets.

17         I've heard enough.  I really have heard enough.  I

18   have given you ample opportunity to explain your position.

19   I've set a date for the motion to dismiss.  Your response is

20   going to be due September 8.  I anticipate I am going to order

21   the city to let me know what happened in front of Justice

22   Bannon.  If you disagree with their report, you can respond to

23   their submission.  I want to keep track of what's going on in

24   state court so we are not duplicating efforts.

25         If you come in, please file a notice of appearance.

 1    If you decide to come into this case and you want to file an

 2    amended complaint to clean up the June 15 filing, tell me when

 3    you want to do it by and we will proceed on that basis.  If you

 4    come into the case and you see some arguments that have not

 5    occurred to me that would alter this plan moving forward with

 6    the motion to dismiss, seeing what happens in state court, if

 7    the complaint survives, then I'll set an expedited discovery

 8    schedule.

 9              MR. THOMPSON:  I understand, your Honor.

10              THE COURT:  If you don't come in, we have got a plan.

11              MS. LOPEZ:  Your Honor made statements the last time

12    we were here that I find are inappropriate legally.  You

13    implied that I should be quiet and not tell anybody that I am

14    transgender.  I think I've consulted with several

15    organizations, including the transgender law center.  And if

16    those words did come out of your mouth in that order, I would

17    be asking your Honor to recuse yourself and transfer it to a

18    different judge.

19              It is never acceptable to tell a transgender person,

20    who is one of the most notable transgender activists in the

21    country, that you might face discrimination if someone knows

22    you are trans if you speak and don't speak.  I believe that

23    even though there are no federal protections for transgender

24    people that I could bring in front of this Court that your

25    Honor should have been more cautious than to make those

 1    statements.

 2         THE COURT:  If I've offended you, I really didn't mean

 3    to.  I think it was in response to your argument that everyone

 4    was going to know you were transgender, and my suggestion was,

 5    if you don't tell people, people won't know, because you look

 6    like a very attractive woman --

 7         MS. LOPEZ:  That's also inappropriate.

 8         THE COURT:  I'm not trying to offend you.  I'm really

 9    just saying that was in response to an argument that you made.

10    I'm not going to repeat myself.  That motion is denied.

11         MR. CONNOLLY:  Your Honor, given that the hearing in

12    front of Judge Bannon is July 27 and she may issue a decision

13    that could have further res judicata implications for a motion

14    to dismiss, can we push that date back a week to allow her -- I

15    don't know how quickly Judge Bannon will issue a decision.

16    That could provide further grounds for a motion.

17         THE COURT:  I am not going to change the date.  I am

18    going to keep it there.  If she does something that affects it,

19    you can write me with that.

20         MR. CONNOLLY:  Thank you.

21         THE COURT:  Anything further from this side of the

22    table?

23         MR. CONNOLLY:  No, your Honor.

24         THE COURT:  Anything further from this side of the

25    table?

1          MS. LOPEZ:  Yes.  My medical team is planning to have

2     me hospitalized today for a possible surgical consult to have

3     surgery.  If that happens, I will be reapproaching both courts

4     to attempt to try to sort this mess out.

5          I believe that even you, your Honor, have an

6     obligation -- everyone in this room are officers of the Court.

7     And if because of procedural, civil procedure in terms of state

8     and federal are complicating things, I'm a human being in the

9     middle of this.  And federal law obliges you to sort of lessen

10    the standards and be considerate of a pro se litigant.

11         THE COURT:  I have been incredibly considerate of the

12    pro se litigant.

13         MS. LOPEZ:  Not the risk of death that your Honor not

14    taking action poses to me.  There is a risk of death associated

15    an additional surgery.  There is a risk of death.

16         THE COURT:  I'm sorry.  The Court has nothing to do

17    with your additional surgery.  We are not ordering additional

18    surgery.

19         MS. LOPEZ:  You are right.  But if I need additional

20    surgery because of the actions of the defendant, the direct

21    actions, and there are four or five doctors and surgeons

22    agreeing that I will be hospitalized today simply to give a

23    medical surgical team the opportunity to evaluate if I need

24    additional surgery already because of vaginal stenosis, then I

25    sort of believe that surgery and the risk of nonsurgery are

1   irreparable.

2          Again, instead of sort of just one upping me and sort

3   of pointing out all of the conflicts that arise procedurally,

4   because I'm desperately trying to get a court to intervene,

5   that officers of the court here and this Court need to sort of

6   set an expedited schedule besides this if, again, I'm

7   hospitalized today, to consider whether or not I could be

8   irreparably harmed.

9          I think it is setting up the city for an additional

10  liability for all the other women in the shelter.  If I were to

11  go to that shelter and get into an assault and one of the other

12  women were hurt, they have been given ample notice from my

13  psychiatrist that I could potentially become aggressive and

14  hurt someone else.  I'm putting you guys on notice that the

15  other women in the facility in the dorm setting have rights

16  that you guys are ignoring as well.

17         Lastly, your Honor, I don't think it's legal, and

18  again I've sort of helped define this area, for this Court to

19  force me into a non -- or to allow them to force me into any

20  non trans shelter, which is what this Court did when you made

21  the statement about not saying you're trans or being quiet.  We

22  call that passability or stealth.  Your comments --

23         THE COURT:  You misunderstood my comments.

24         MS. LOPEZ:  Your comments were:  Maybe if you don't

25  tell people you are trans.  Transgender people, according to

1    the state --

2           THE COURT:  No.  It was only in response to your

3    argument.

4           MS. LOPEZ:  That they will know I'm trans.

5           THE COURT:  Right.

6           MS. LOPEZ:  But if they find out from some other

7    way --

8           THE COURT:  We are not talking WIN West anymore.  You

9    don't want to go to WIN West.

10          MS. LOPEZ:  Women that are not transgender that could

11   have issue with transgender people validly that weren't aware

12   that I'm bringing a dog and are also not aware that they will

13   be sleeping next to a dog.

14          THE COURT:  The dog is entirely different.

15          MS. LOPEZ:  Yes.  But if I go back in front -- if I go

16   to -- this is what's going to happen, your Honor.  He is

17   saying, try it out.  I am going to show up.  There will be,

18   that's a tranny.  I will respond.  If I assault one of them if

19   they violate my personal space, if the police are called, we

20   will be back in this situation.

21          They are trying to make a point.  But they are

22   endangering the lives of myself, the other people in the

23   facility, my dog.  And I'm going to state in front of the

24   Court, if I go to the Park Slope facility and they are required

25   to give me the access to the room, I will just stay there and

1    not leave, and then they will have another situation.

2           Every one of you are practiced in the law.  And

3    instead of trying to make me figure out desperate solutions,

4    whether civil, criminal or psychiatrist or medical, this Court

5    has an obligation to make sure I'm not that desperate.

6    Everything has been presented to this court to demonstrate that

7    I might be that desperate, and I don't think it's fair to the

8    other women in the shelter.  None of them are parties to this

9    litigation.  None of them know that I might show up this

10   afternoon on a Friday with no judicial remedies to them over

11   the weekend or myself, and they will be literally stuck with

12   me, my dog, my aggressive behavior, and a conflict all weekend.

13   I think that's unreasonable.

14          I think that the other side has options in terms of

15   placing me in SROs and they are misrepresenting to this court.

16   People with HIV or other medical conditions walk in, according

17   to their own -- and they are placed immediately -- shh.  You

18   need to be quiet, immediately.  They are misrepresenting that

19   for the extenuating circumstances in front of them they don't

20   have options.  They do.

21          If I report to Park Slope, because I cannot rest

22   around other women, I will assume the room for dilation and I

23   will not leave it.  And they represented this in front of Judge

24   Bannon.  What choice do I have.  Do I ignore my psychiatrist's

25   recommendations and go without sleep and leave the facility?

1   They will be back in front of your Honor or the other judge

2   saying, look, she ran away, and she has not been there.  That's

3   not proof that I am OK.

4           I don't think I should be forced to take this Social

5   Security check that I am going to get today and get a hotel

6   room.

7           THE COURT:  Thank you, all.

8           If you come in, file a notice of appearance, please.

9                                o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25