UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

MARIAH LOPEZ,

                                  Plaintiff,

            -against-

NEW YORK CITY and PROJECT RENEWAL, Inc.,

                              Defendants.

------------------------------------------------------------------------x

**DECLARATION OF THOMAS B. ROBERTS IN SUPPORT OF THE MOTION TO DISMISS OF NEW YORK CITY PURSUANT TO F.R.C.P. 12(B)(1 AND 12(B)(6)**

17 Civ. 3014 (VEC)

      **THOMAS B. ROBERTS** declares, pursuant to 28 U.S.C. §1746, under penalty of perjury, that the following is true and correct:

          1.      I am an Assistant Corporation Counsel in the office of Zachary W. Carter, Corporation Counsel of the City of New York, attorney for Defendant New York City.  As such, I am familiar with the facts and circumstances of this action.  I submit this declaration in support of the City's motion pursuant to Fed. R. Civ. Pro. 12(b)(1) and 12 (b)(6) for an order dismissing this action as to New York City under the doctrines of *res judicata* and collateral estoppel due to the prior final judgment dated June 14, 2017 issued by Justice Barbara Jaffe of the Supreme Court of the State of New York, New York County in the C.P.L.R. Article 78 proceeding of Lopez v. The New York City Department of Homeless Services and Project Renewal, 100632/2017, and for such other and further relief as the Court may deem just and proper.

          2.  Justice Jaffe has already determined that the New York City Department of Homeless Services ('DHS") made a lawful, reasonable and appropriate decision to transfer Plaintiff from the Marsha's House shelter.  She determined that the transfer was not made in retaliation for Plaintiff having filed this action or for Plaintiff's speech at Marsha's House.

Instead, Justice Jaffe determined that the transfer resulted from Plaintiff's threats against and physical attacks upon the staff at Marsha's House.

3.   DHS has since assigned Plaintiff to the Park Slope Women's shelter, which has services that are appropriate for Plaintiff and is among the best operated and safest DHS shelters for single women, and DHS has made reasonable accommodations at the Park Slope Women's shelter for Plaintiff's disabilities.   Plaintiff has since filed a new Article 78 proceeding in New York County against DHS challenging that assignment, Lopez v. New York City Department of Homeless Services, 100871/2017, which has been assigned to Justice Nancy Bannon.

## OVERVIEW OF THE SHELTER SYSTEM AND MARTHA'S HOUSE

4.   DHS operates a shelter system that provides housing for approximately 59,000 individuals.  DHS generally classifies its shelter clients into three groups: families with children, adult families and single adults.  During Plaintiff's most recent stay in DHS' shelter system, Plaintiff presented as a single adult, and consequently DHS has assigned her to shelters for single adults.

5.   Most of DHS' shelters for single adults are operated by non-profit social service providers ("shelter operators") with which DHS contracts.  The shelter operator and the shelter operator's employees run the shelter subject to requirements established by DHS.  DHS determines which shelter to assign a particular client to, and DHS is responsible for transferring clients from one shelter to another.  In contracted shelters, it is, however, the shelter operator's employees who have routine interactions with the clients in the shelters through the daily provision of shelter and social services.

6.   DHS attempts to provide shelters appropriate to the needs of various sets of its clients, and in 2016 DHS contracted with Project Renewal, Inc., a non-profit shelter

operator, to operate a shelter designed to house young clients, under age 30, who self-identify as lesbian, gay, bisexual, transgender or questioning ("LGBTQ").  The resulting shelter, known as Marsha's House, opened on February 15, 2017 and is located on East 185th Street in the Mount Eden neighborhood of the Bronx.  It is the only DHS shelter specifically designated for LGBTQ individuals.

7.      The clients who reside at Marsha's House have all requested to be placed there on a voluntary basis, and DHS has not made any involuntary placements to Marsha's House.  LGBTQ individuals reside in many other DHS shelters, and DHS endeavors to make all of its shelters accessible to LGBTQ individuals.

8.      Marsha's House currently has beds for approximately 80 clients and is operated by Project Renewal, Inc.  Marsha's House provides a variety of services to the clients living there, including meals.  There are, however, only limited onsite mental health services provided at Marsha's House.  On Wednesdays from 9 am to 5 pm there is psychiatrist, and on Thursdays from 9 am to 5 pm there is psychiatric nurse scheduled to be at Marsha's House. These staff mainly perform psychiatric evaluations as a component of clients' housing packages, and not as ongoing clinical work.

## PLAINTIFF'S RECENT HISTORY IN THE DHS SHELTER SYSTEM

9.      Plaintiff returned to the DHS shelter system in April 2017 and requested to be placed in Marsha's House.  Although Plaintiff exceeded the age parameters for assignment to Marsha's House, DHS, at its discretion, placed her in that shelter on or about Thursday April 20, 2017.

10. On April 20, 2017, representatives of Project Renewal, Inc. met with Plaintiff to explain the rules of the shelter and to obtain her agreement to comply with the rules and regulations of DHS and the shelter.  Plaintiff acknowledged receipt of those rules and signed

agreements to comply with the rules.  Attached as Exhibit B to DHS' Answer in <u>Lopez v. DHS</u> <u>& Project Renewal</u>, 100632/2017, which Answer is Exhibit 7 hereto, is a true and correct redacted copy of the rules that Plaintiff acknowledged receiving on April 20, 2017 and her agreements to comply with those rules signed on April 20, 2017.

11. Among other things, the rules (i) require clients to submit to passage through an x-ray machine at the entry to the shelter and prohibit clients from bringing alcohol and candles into the shelter (See page 3 of Exhibit B to DHS' Answer in <u>Lopez v. DHS & Project</u> <u>Renewal</u>, 100632/2017, which Answer is Exhibit 7 hereto, paragraph on "Entry Procedure/Locker Searches"), (ii) prohibit clients from bringing food into the shelter or taking food out of the dining room (See page 4 of Exhibit B, paragraph on "Food and Meals"), and (iii) prohibit clients from entering the sleeping floors while intoxicated or verbally abusing staff or other clients in the shelter (See page 6 of Exhibit B, paragraph listing infractions).  The written agreements signed by Plaintiff also provide that "Clients cannot bring alcoholic beverages … into the shelter" and that "There is no fighting or use [of] abusive or threatening language. Harassment or intimidation of other residents or staff is strictly prohibited."  The agreement also provides that candles and fire hazards are prohibited and that "sexual activity … is not permitted in the shelter facility." (See page 10 of Exhibit B)

12. As detailed in DHS' Answer in <u>Lopez v. DHS & Project Renewal</u>, 100632/2017, which Answer is Exhibit 7 hereto, immediately upon arrival, Plaintiff established a pattern of violating the rules of Marsha's House and of threatening the employees of Project Renewal, Inc.

13. On Tuesday April 25, 2017, Plaintiff filed the complaint in this federal action (Dkt No.2) alleging that DHS and Project Renewal, Inc. were violating the Americans with

Disabilities Act ("ADA") in that Plaintiff has "impulse control disorder, PTSD and anxiety" and that she needed her dog due to these disabilities.

14. On Thursday April 27, 2017, Judge Caproni issued a Temporary Restraining Order that ordered DHS to permit Plaintiff to bring her dog to the shelter until Monday May 1, 2017. (Dkt. No. 8)

15. On Friday April 28, 2017, DHS determined that permitting Plaintiff to have her dog was a reasonable accommodation for her disability.   Since then Plaintiff has been permitted to bring her dog into Marsha's House and any other DHS facility, and the parties to the federal action accordingly permitted the TRO to dissolve.  As noted by the Court on June 30, 2017, Plaintiff's ADA claim set forth in the original complaint is accordingly moot.   See transcript of June 30, 2017 at page 2.

16. Despite having her dog, Plaintiff continued to threaten the staff at Marsha's House and to violate the shelter's and DHS' rules, as detailed in DHS' Answer in Lopez v. DHS & Project Renewal, 100632/2017, which Answer is Exhibit 7 hereto.

17. On Tuesday May 9, 2017, Project Renewal, Inc. requested that Plaintiff be suspended for three days due to her bringing alcohol into the shelter.  Attached as Exhibit P to DHS' Answer in Lopez v. DHS & Project Renewal, 100632/2017, which Answer is Exhibit 7 hereto, is a true and correct copy of the May 9, 2017 Suspension Request Form submitted by Kaedon Grinnell, the Project Renewal Shelter Director.

18. On Wednesday May 10, 2017, Mr. Uetake, the DHS Program Administrator responsible for Marsha's House, decided to transfer Plaintiff to a shelter with greater mental health services and permanent DHS police, instead of private security guards.  However, Mr. Uetake had not yet decided which shelter to transfer Plaintiff to.

19. At a meeting on May 10, 2017, at approximately 4:15 PM, Project Renewal's shelter director for Marsha's House gave Plaintiff a copy of the Client Notification of Transfer advising Plaintiff that she would be transferred to another shelter on May 11, 2017. Plaintiff refused to sign the form. Attached as Exhibit Q to DHS' Answer in Lopez v. DHS & Project Renewal, 100632/2017, which Answer is Exhibit 7 hereto, is a true and correct redacted copy of the May 10, 2017 Client Notification of Transfer.

20. DHS' Program Administrator for Marsha's House, Mr. Uetake, subsequently decided to transfer Plaintiff to the WIN West shelter, and Ms. Lopez was given notice of her new shelter assignment on May 11, 2017. Attached as Exhibit R to DHS' Answer in Lopez v. DHS & Project Renewal, 100632/2017, which Answer is Exhibit 7 hereto, is a true and correct copy of the May 11, 2017 Shelter Client Transfer Referral advising Plaintiff that she was being transferred to the WIN West shelter.

21. WIN West is a shelter for single adult females run by Women In Need, Inc. at 341 West 51st Street in Manhattan (between 8th and 9th avenues) with approximately 68 beds that has prior and ongoing experience with transgender clients. WIN West has extensive mental health services on site and DHS Police security.

22. In May 2017, WIN West had transgender individuals residing in the shelter, and the WIN West staff receives EEO Diversity Training and Employment Sensitivity Training.

23. On information and belief, as of May 2017 WIN West had not had any Priority 1, 2 or 3 Incidents – as defined in the DHS Incident report form, see e.g. Exhibit C to DHS' Answer in Lopez v. DHS & Project Renewal, 100632/2017, which Answer is Exhibit 7 hereto - related to transgender clients during 2017.

24. As explained in more detail in Mr. Uetake's May 24, 2017 affidavit that accompanied DHS' Answer in <u>Lopez v. DHS & Project Renewal</u>, 100632/2017, which Affirmation is part of Exhibit 7 hereto, Mr. Uetake decided to transfer Plaintiff to the WIN West shelter.

## LITIGATION BEFORE JUSTICE JAFFE

25. On Friday May 12, 2017, Plaintiff commenced an Article 78 proceeding, <u>Lopez v. DHS & Project Renewal</u>, 100632/2017, challenging DHS' decision to reassign her from Marsha's House and asserting that the reassignment was illegal retaliation (i) for Plaintiff having brought the federal action under the ADA and (ii) for Plaintiff having objected to what Plaintiff believed to be discrimination against transgender clients of Marsha's House.   Specifically, Plaintiff alleged at page 2 of her Article 78 petition that "[I] believe that the Administrative Transfer [Project Renewal's Director Keadon Grinnell] personally requested and pushed for is retaliation for my lawsuit and TRO in Federal Court as well as my confronting him yesterday in a private meeting.   The transfer came after an incident where I passionately objected to discrimination I witnessed by food-service staff against trans clients.   The incident is simply an excuse to transfer me." Attached as Exhibit 1 hereto is a true and correct copy of Plaintiff's May 12, 2017 Request For Judicial Intervention, Order to Show Cause as endorsed by Justice Jaffe, and Notice of Petition in <u>Lopez v. DHS & Project Renewal</u>, 100632/2017.

26. Justice Jaffe heard oral argument from Plaintiff and from counsel for DHS on May 12, 2017.   Plaintiff contended that the WIN West shelter was not a reasonable accommodation for her because it was not safe for transgender women.   Attached as Exhibit 2 hereto is a true and correct copy of the transcript of the argument on May 12, 2017.   See pages 3, 4, 11 & 19.   Plaintiff also contended that DHS had transferred her because she had witnessed and

objected to what she believed was discrimination at Marsha's House: "Mariah's here now in this court because she was transferred after seeing discrimination." Id. at page 16.  At the end of the argument Justice Jaffe orally instructed DHS to permit Plaintiff to return to Marsha's House for the weekend and instructed the parties to return on Monday May 15, 2017.

27. Justice Jaffe heard further oral argument from Plaintiff and from counsel for DHS on Monday May 15, 2017.  Attached as Exhibit 3 hereto is a true and correct copy of the transcript of the argument on May 15, 2017.  Plaintiff continued to contend, among other things, that her transfer resulted from retaliation for her speech: "So all of this, I think, is connected to the fact that I am being the proverbial squeaky wheel and blowing the loudest whistle possible. And I brought serious complaints from the other clients,…" Id. at page 5.

28. At the end of that argument, Justice Jaffe ordered DHS to permit Plaintiff to return to Marsha's House.  Specifically, Justice Jaffe ordered: "Pending the determination of this proceeding, respondents are stayed from enforcing the transfer referral of petitioner to the Win West Shelter.  Respondents to appear or answer on or before 5/24 before 5 pm.  This order is conditioned on petitioner complying with respondents' rules & regulations.  Respondents' employees are likewise directed to comply with the pertinent laws & rules of the facility."  See endorsement to OTSC in Exhibit 1 hereto.

29. Plaintiff was unable to comply with Justice Jaffe's requirement that Plaintiff comply with DHS' and Marsha's House's rules and regulations.  Specifically, on Wednesday May 24, 2017, Plaintiff became involved in a variety of incidents at Marsha's House and hit a security guard at the shelter.  The New York City Police were called, the police arrested Plaintiff and reportedly, during the arrest, Plaintiff bit one of the arresting officers.  Attached as Exhibit 4 hereto is a true and correct copy of the incident reports concerning Plaintiff's actions on May 24,

2017.  Attached as Exhibit 5 hereto is a true and correct copy of the New York Unified Court System, Case Details Summary, dated May 25, 2017, concerning the criminal charges brought against Plaintiff arising from these incidents.

30. As a result of this incident, DHS suspended Plaintiff on May 24 from the shelter system for seven days, until May 31, 2017.  Attached as Exhibit 6 hereto is a true and correct copy of the DHS Suspension Request Form dated May 24, 2017.

31. Also on May 24, 2017, DHS filed its answer and supporting affidavits to the Verified Petition in <u>Lopez v. DHS & Project Renewal</u>, 100632/2017, the Article 78 proceeding before Justice Jaffe.  Attached as Exhibit 7 hereto is a true and correct copy of DHS' Answer and supporting affidavits as filed in <u>Lopez v. DHS & Project Renewal</u>, 100632/2017.

32. On the evening of Friday May 26, 2017, Plaintiff returned to Marsha's House and threatened to kill one of the staff, telling the staff member "I showed your picture to everyone in Fort Green Brooklyn."  "I'm going to have my cousins come and blow your fucking head off."  "I hate your fucking ass I'm going to get you killed."  Attached as Exhibit 8 hereto is a true and correct copy of the incident reports concerning Plaintiff's actions on May 26, 2017.

33. On May 31, 2017, the parties appeared before Justice Jaffe, who heard argument concerning the Article 78 proceeding.  Counsel for DHS submitted a copy of Exhibit 8 hereto to Justice Jaffe on May 31.  Attached as Exhibit 9 hereto is a true and correct copy of the transcript of the May 31, 2017 argument before Justice Jaffe.  Plaintiff objected to defendants' arguments and continued to assert that defendants were acting in retaliation for her federal suit and her speech at Marsha's House: "But, since the TRO was granted, I started organizing, in a civilized way, which is, I think, the most concerning to the City attorneys.  I believe that the ten page report that I wrote is telling and disturbing for more than one reason." <u>Id.</u> at page 16.

34. After hearing this argument, Justice Jaffe lifted her prior stay, permitted DHS to transfer Plaintiff to a shelter other than Marsha's House, including the WIN West shelter, and took the merits of the Article 78 proceeding under advisement.  In her June 14, 2017 decision and judgment, Justice Jaffe explained her lifting of the stay as follows: "Given the incidents that preceded those allegedly precipitating petitioner's arrest, which were essentially uncontested except to the extent that petitioner sought to excuse them, and absent a sufficient showing that immediate and irreparable injury would result if DHS were not restrained from transferring petitioner to WIN West, I lifted the stay and marked as fully submitted petitioner's motion for a preliminary injunction and her petition." Attached as Exhibit 10 hereto is a true and correct copy of Justice Jaffe's June 14, 2017 decision and judgment, see page 6 thereto.

## EMERGENCY MOTIONS IN FEDERAL COURT AND SUBSEQUENT PROCEEDINGS

35. Immediately after concluding the appearance before Justice Jaffe on May 31, 2017, the parties appeared before Judge Caproni in the federal case on an emergency motion that Plaintiff had filed on May 30, 2017 seeking an order enjoining Defendants from moving Plaintiff from Marsha's House. (Dkt Nos. 22 & 23)

36. Judge Caproni heard arguments and took testimony on the emergency motion on May 31, 2017.  Plaintiff continued to contend that the WIN West shelter was not a reasonable accommodation for her because it was not safe for transgender women and called a witness to support that contention.  Judge Caproni heard the testimony, ruled that Plaintiff had not demonstrated irreparable harm if she were transferred to the WIN West shelter, and denied Plaintiff the preliminary relief she requested.

37. In the wake of these two May 31 proceedings, DHS transferred Plaintiff to the WIN West shelter.

38. Plaintiff never spent a night at the WIN West shelter.  At the end of the hearing before Judge Caproni, Plaintiff asserted that she viewed the neighborhood in which the WIN West shelter is located, the Theater District, to be a trigger for her PTSD because she had been sexually abused in that neighborhood when she was a child.

39. DHS subsequently took this assertion into account, and in an effort to find Plaintiff a shelter she would accept, DHS offered her a bed at four other women's shelters with mental health services.  Plaintiff rejected them all. Attached as Exhibit 11 hereto is a true and correct copy of the June 7, 2017 email chain between Plaintiff and Assistant Corporation Counsel Evan Schnittman concerning such placements.

40. In the wake of Plaintiff's refusal to accept shelter at WIN West, DHS assigned her to the Park Slope Women's shelter at the Park Slope Armory, a safe location far from the Theater District with significant mental health services provided in part by Housing Works Healthcare, which is the same mental health provider Plaintiff uses.

41. The Park Slope Women's shelter has beds for approximately 100 women, is safe, and accommodates transgender women.  Currently there are at least two transgender women in residence at the Park Slope Women's shelter.

42. Plaintiff has refused this assignment and has never spent a night at the Park Slope Women's shelter.

43. On June 14, 2017, Justice Jaffe issued a decision and judgment in Lopez v. DHS & Project Renewal, 100632/2017, denying the Article 78 petition in its entirety and dismissing the proceeding on the merits.  In her decision and judgment, Justice Jaffe stated that Plaintiff "alleges that the transfer constitutes a retaliatory measure against her for having obtained an order from the Southern District of New York enjoining respondents from refusing

the entry of her service dog into Marsha's Place.  Since then, she contends she has been treated differently by staff in that they document her alleged infractions more than they do those of other clients, resulting in a 'paper trail' and her transfer out of Marsha's Place, which transfer she claims  resulted from her objection to the mistreatment of transgender clients by food service staff." Justice Jaffe's decision and judgment also noted that Plaintiff sought "an order directing respondent NYC Department of Homeless Services (DHS) to 'reverse its decision to approve Project Renewal's request to transfer [her] from Marsha's Place Shelter (for transgender people).'" See Exhibit 10 hereto at page 1.

44. At pages 2 through 6 of her decision and judgment, Justice Jaffe detailed the procedural history of the case and the parties' submissions.  Justice Jaffe found that Plaintiff "admits having threatened staff at Marsha's Place" Id. at page 2.  The Justice also noted that it has been "petitioner's avowed purpose in advocating for others by verbally threatening staff at Marsha's Place …" Id. at page 7.  Justice Jaffe thus determined that Plaintiff threatened the staff at Marsha's House, that her transfer resulted from such threats, and that the transfer from Marsha's House was justified by those threats: "To the extent that her conduct may be characterized as civil disobedience, under the circumstances presented here, she is herself to blame for the consequences of her conduct." Id. at 9-10.  Justice Jaffe concluded that Marsha's House was not the only reasonable placement for Plaintiff in the shelter system, denied the petition in its entirety, dismissed the proceeding, and judgment was entered.

45. On June 15, 2017, Plaintiff then filed an additional Emergency Request for TRO in this action (Dkt. Nos. 31), which this Court deemed an amended complaint. (Dkt. No. 39).

46. In the Emergency Request for TRO/Amended Complaint, Plaintiff asserted that "I believe the decision for DHS to move me from Marsha's was retaliatory and DHS refusal to temporarily place me back at Marsha's is a failure to make 'reasonable' accommodations for my disabilities.  The refusal by DHS to place me at the only facility that can provide the accommodations I need is motivated by caprice and the desire to silence my whistle blowing at Marsha's House." (Dkt. No. 31 at pages 1-2).

47.  In the Emergency Request for TRO/Amended Complaint, Plaintiff demanded the following relief: "DHS to place me back at Marsha's until this Court reviews whether I will be harmed by a placement other than Marsha's.   DHS to reserve a bed at Marsha's until the conclusion of my ADA case in front of this Court or until I have found permanent housing, since Marsha's is the only trans shelter which has single bed rooms." (Dkt. No. 31 at page 7).

48. Judge Batts denied the requested TRO on June 15, 2017.  (Dkt. No. 32)

49.  After Justice Jaffe's decision and judgment and Judge Batts' ruling, Plaintiff continued her effort to have DHS reassign her to Marsha's House.  On or about June 7, 2017, DHS received a letter from Dr. Harold M. Reed, Plaintiff's surgeon, which letter says that Plaintiff "needs to maintain the patency of her neo-vagina with dilations for 15 minutes 3 times a day.  This cannot easily be done standing or sitting.  She needs to be able to have the privacy of lying down during these times, as well as water soluble lubricant such as KY jelly." (Attached as Exhibit 12 hereto and Dkt. No. 31 at page12).

50. On June 20, 2017, Dr. Pierre Arty, a psychiatrist with Housing Works Healthcare, provided DHS with a letter recommending that Plaintiff be reassigned to Marsha's House or be provided SRO housing.  Attached as Exhibit 13 hereto is a true and correct copy of Dr. Arty's June 20, 2017 letter.

51. DHS treated Dr. Reed and Dr. Arty's letters as requests for reasonable accommodations on behalf of Plaintiff.

52. DHS' Medical Director, Fabienne Laraque, MD, MPH, evaluated these letters and spoke with Dr. Reed and Dr. Arty by phone.  In their conversation, Dr. Arty acknowledged that he did not have prior knowledge of the conditions in DHS shelters, that he believed DHS had offered Plaintiff reasonable shelter options, and that he did not have knowledge of Plaintiff's conduct at Marsha's House.

53. With Dr. Laraque's participation and approval, on June 26, 2017 DHS issued a "Reasonable Accommodation Request Determination" in response to Dr. Reed and Dr. Arty's letters.  Attached as Exhibit 14 hereto is a true and correct copy of the June 26, 2017 Reasonable Accommodation Request Determination.

54. In that determination, DHS denied Plaintiff's request for a private room in a shelter as a habitation but granted Plaintiff access to a private room with a place to lie down and a locking door at the Park Slope Women's shelter when Plaintiff needed to perform her dilation. DHS denied Plaintiff's request to return to Marsha's House as unreasonable due to the prior safety incidents and the risk Plaintiff presented to the health and safety of other shelter residents and staff at Marsha's House.  DHS continued Plaintiff's assignment to the Park Slope Women's shelter, and DHS noted that the experienced mental health professionals at the Park Slope Women's shelter were competent to treat PTSD.  DHS also assured Plaintiff of its willingness to assist her in finding permanent housing as soon as possible.

55. The determination concluded with a statement explaining the administrative appeal procedure available to Plaintiff if she disagreed with the determination.

56. Plaintiff did not file an administrative appeal, and instead on June 27, 2017 she filed a new Article 78 proceeding in New York County challenging DHS' June 26, 2017 Reasonable Accommodation Request Determination. <u>Lopez v. New York City Department of Homeless Services</u>, 100871/2017, which was assigned to Justice Bannon.

57. On June 29, 2017, Plaintiff amended her Order to Show Cause by adding an additional letter dated June 29, 2017 from Sarah Acker, ANP-BC, Nurse Practitioner (and Exhibit E to the Verified Petition). Ms. Acker disputed that the accommodation DHS was making for Plaintiff to dilate was sufficient. Attached as Exhibit 15 hereto is a true and correct copy of the Amended Order to Show Cause with TRO, Request for Judicial Intervention and Verified Petition in <u>Lopez v. New York City Department of Homeless Services</u>, 100871/2017.

58. Also on June 29, 2017, the parties appeared before the Honorable Nancy Bannon to argue whether Plaintiff's application for a TRO should be granted. After argument, Justice Bannon denied the application for a stay, required DHS to answer the Verified Petition on or before July 20, 2017 and made the Order to Show Cause returnable on July 27, 2017. See endorsement to Exhibit 15 hereto. Subsequently, Justice Bannon extended the return date to July 31, 2017.

59. Dr. Laraque reviewed Ms. Acker's letter, and with Dr. Laraque's agreement, DHS continues to adhere to its June 26, 2017 determination. Dr. Laraque discounts Ms. Acker's letter because, among other things, Ms. Acker makes assertions that are not supported by Dr. Reed's letter or Dr. Laraque's conversation with Dr. Reed. Specifically, Dr. Reed made no assertion that Ms. Lopez needed to have erotic thoughts to dilate or that Ms. Lopez could not sleep in a congregate room.

60. On July 20, 2017, DHS filed its Verified Answer and the affirmation of Dr. Laraque in <u>Lopez v. New York City Department of Homeless Services</u>, 100871/2017. Attached as Exhibit 16 hereto is a true and correct copy of the July 20 Verified Answer without exhibits. Attached as Exhibit 17 hereto is a true and correct copy of Dr. Laraque's affirmation.

61. In the Verified Answer, DHS contends, among other things, that at the Park Slope Women's shelter, DHS will provide Plaintiff with access to a medical examination room with an examining table upon which Plaintiff can lie down in private, lock the door, and safely perform her dilation. In the Verified Answer, DHS also contends that Plaintiff's request for a single room to sleep in at a DHS shelter is not reasonable.

62. In this federal action, Plaintiff seeks to challenge DHS' determination to transfer her out of Marsha's House and to assign her to another location in DHS' shelter system, but those issues are precluded from further review by the June 14, 2017 decision and judgment of Justice Jaffe in <u>Lopez v. DHS & Project Renewal</u>, 100632/2017, which is *res judicata* and collateral estoppel on all issues which were before Justice Jaffe or could have been brought based upon the facts described in the Verified Petition in <u>Lopez v. DHS & Project Renewal</u>, 100632/2017.

**WHEREFORE**, the Emergency Request for TRO/Amended Complaint should be dismissed in its entirety and the relief sought therein denied in all respects, with costs and disbursements.

Dated:      New York, New York
            July 28, 2017


                                    THOMAS B. ROBERTS
                                    Assistant Corporation Counsel