# Exhibit 2

1

2 SUPREME COURT OF THE STATE OF NEW YORK
 NEW YORK COUNTY : CIVIL TERM : PART 12
3 ----------------------------------------x
 In the Matter of the Application of
4 MARIAH LOPEZ,

5        Petitioner,   INDEX NO.
               100032/2017
6     -against-

7 NEW YORK CITY DEPARTMENT OF HOMELESS
 SERVICES and PROJECT RENEWAL,
8

9        Respondents.
 ----------------------------------------x
10       May 12, 2017

11       60 Centre Street
       New York, New York

12 B E F O R E :

13     HON. BARBARA JAFFE,

14       Supreme Court Justice.

15 A P P E A R A N C E S :

16 MARIAH LOPEZ
   480 East 185th Street
17   Bronx, New York 10458
   Petitioner Pro Se
18
 NEW YORK CITY LAW DEPARTMENT
19 OFFICE OF THE CORPORATION COUNSEL
   100 Church Street
20   New York, New York 10007
 BY: THOMAS B. ROBERTS, ESQ.
21   Attorneys for the Respondent
   City of New York

22

23
        KAREN MENNELLA
24      Senior Court Reporter

25

26

1

2   A P P E A R A N C E S   (Cont'd):

3   NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES
    HUMAN RESOURCES ADMINISTRATION
4        150 Greenwich Street, 30th Floor
         New York, New York 10007
5   BY: TONIE BAEZ, ESQ.
         Attorneys for Respondents
6        NYC Department of Homeless Services
         and Project Renewal

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1                           Proceedings

2                THE COURT:   Okay.   So, Miss Lopez, you want a stay

3        of the transfer.   Where are you now?

4                MS. LOPEZ:   So since I actually -- so, right now

5        I'm actually in between places, because they effectively

6        forcefully removed me last night.   I informed counsel that I

7        was going -- I was coming here.   We had a conversation.   And

8        they still removed me.

9                Also, do I need to stand, Your Honor?

10               THE COURT:   No.

11               MS. LOPEZ:   Okay.   Since last night -- so I want to

12       address the actual placement, which is the reason for my

13       request for the TRO.   But the City's attorneys are going to

14       mention a WIN West Women's Shelter.   So besides my overall

15       argument, which I think will be enough to get me in the

16       door, since last night two witnesses that are also victims

17       of crimes that are transgender have come forward from being

18       assaulted in that address.   And I wasn't able to add those

19       people's information either via affidavit on my own.   So

20       last night I did not go directly to where they asked me to

21       go, because they said, Mariah, I've been assaulted there for

22       being trans and showed me video.

23               So I am requesting a stay of the transfer.   If the

24       wording isn't correct, I apologize, it's because I had to

25       run around yesterday and didn't get the poor person's order

26       signed until after 5:00.   So I am effectively sort of

```
 1                          Proceedings
 2    homeless again, because I will not enter a facility where
 3    two transgender women have been assaulted within the last
 4    couple of months.
 5              THE COURT:   Okay.  So you don't want to go into
 6    that shelter?
 7              MS. LOPEZ:   Because the proper safe shelter for me
 8    is Marsha's Place.
 9              THE COURT:   You want to stay at Marsha's Place?
10              MS. LOPEZ:   Yes.
11              THE COURT:   Your name?
12              MR. ROBERTS:   I'm Thomas Roberts from Corp Counsel
13    and with me is Tonie Baez from Department of Homeless
14    Services, who is also an attorney.
15              THE COURT:   Thank you.
16              MR. ROBERTS:   And she can speak about it better
17    than I can on the procedures.  But the Women In Need shelter
18    is a shelter on the west side.  The head of the organization
19    is the former Speaker of the City Council, Miss Quinn.  It
20    is a facility that has police protection.  It is, I'm told,
21    been always a nice facility.
22              The reason for the transfer was that Miss Lopez has
23    been -- has threatened staff at Marsha's House.  And she
24    acknowledged to me on the phone yesterday she had a
25    confrontation with a cafeteria worker, who's a 60 year old
26    African-American woman, and told her that outside she would
```

Proceedings

1
2       arrange to have people confront this elderly lady outside in
3       the street if the elderly lady didn't change her behavior in
4       some way.  That kind of threat against the staff is
5       completely unacceptable and totally acceptable reason for
6       DHS to place -- make the different placement.
7               So we're offering her a safe, different placement.
8       It's appropriate.  There have been four transgender women
9       placed in that facility.  Recently two of them have left for
10      permanent housing that was found for them.  I understand two
11      of them are still there.  This is a totally adequate place.
12      And we have, legally, DHS -- there also are all sorts of due
13      process rights if we exclude you from the whole system.  But
14      transfers within the system are within our discretion.
15              I'm citing to the Administrative Directive
16      Transmittal 94 ADM 20, which on Page 36 says -- I'll try to
17      read slowly -- but "whenever a homeless person is
18      transferred from any temporary housing accommodation to
19      another, Department Regulation 18 of New York CRR 358-3.6(e)
20      provides the timely notice generally is not required.  As
21      long as the shelter need is being met in some form, it is
22      unnecessary to provide the timely notice of prior hearing.
23      However, each time a person is moved among temporary
24      accommodations adequate notice of an opportunity for a fair
25      hearing to challenge the adequacy of the new accommodations
26      must be provided for the person."

Proceedings

1

2      So if she -- if Miss Lopez wants to challenge the

3   procedure, she can make a fair hearing challenge.  But DHS

4   has the right to transfer clients from one shelter to

5   another, particularly in a safety concern where she has

6   threatened staff at the existing facility.  That's the gist

7   of it.  I think we're providing a safe, appropriate place

8   for her to go.

9      Last night she left Marsha's House.  We arranged to

10  have a cab for her to take her there, paid for the cab.  She

11  left the facility, she never showed up to the WIN West.  So

12  she's never been there.  She's never looked at the place

13  we've offered.  It is a well-established, well-run shelter.

14  And I request that you deny the application and she can go

15  there.

16     For what it's worth, I note that we were before

17  Judge Caproni in the Federal Court about ten days ago

18  concerning the dog.  I am surprised that Judge Caproni ended

19  the hearing.  We conceded to letting her bring the dog.

20  She's got the dog.  She can bring the dog to a new shelter.

21  That's not been an issue.  Judge Caproni concluded the

22  hearing by telling Miss Lopez that she had to behave and to,

23  quote, "not be a jerk".

24     THE COURT:  That is --

25     MR. ROBERTS:  It was not to be a jerk.  And now she

26  has, indeed, threatened people.  And it's appropriate to

Proceedings

1
2     transfer.

3          THE COURT:  Mr. Roberts, what about her fear

4     about -- arising from her understanding that two women were

5     attacked; what about that?

6          MR. ROBERTS:  We have no -- there's no evidence

7     that that's the case.  What we do know is -- well, you can

8     talk to this more directly.

9          MS. BAEZ:  Your Honor, we reached out to the

10    program administrator, who is actually overseeing the

11    facility WIN West.  They are, indeed, an employee and their

12    responsibility is to ensure that the providers are complying

13    with all regulations, including any safety issues.  They're

14    reviewing all of the transfers and making sure that there's

15    adequate placement and all of that.

16          We reached out to the program administrator at WIN

17    West to verify that, in fact, there were transgender

18    individuals currently placed there, placed there in the

19    past.  They are not aware of any sort of incidents there,

20    particularly to transgender individuals.  There are criminal

21    incidents at pretty much every single shelter facility

22    within New York City.  Just like there's criminal incidents

23    occurring in every single apartment building in New York

24    City, whenever you have people living in an environment

25    together things occur.  So there's no guarantee of

26    100 percent safety at any particular site.  But there

Proceedings

1  doesn't seem to be any particular pattern; there doesn't

2  seem to be a history of incidents related specifically to

3  transgender individuals.  We have DHS police are on site.

4  If there's any issue they have arrest powers; they have

5  powers to search; they have powers to confiscate weapons.

6  So we do have a very secure facility there and there isn't

7  any evidence that this far we've seen that there's a

8  particular danger there.

9        THE COURT:  But, Miss Lopez -- well, actually,

10  Mr. Roberts mentioned that two women had recently

11  transferred out.  Could that have been tied to what Miss

12  Lopez says were these two incidents?

13        MS. BAEZ:  Actually, Mr. Roberts said that two

14  women moved out.  The moved into permanent housing.  They

15  weren't transferred out.  So actually were -- I don't know

16  the details of their permanent housing, but they were either

17  placed in some type of supportive housing environment or

18  through some other type of City subsidy were able to acquire

19  their own apartment and move out.

20        THE COURT:  Okay.  My other question is -- this is

21  just a question.  How does she go about, since she's

22  already -- you already moved her out, how does she then do

23  the challenge?  I mean, why didn't you give her a chance to

24  make the challenge?  You're relying on your discretion to

25  transfer her, but she can reserve her rights to have a

Proceedings

1

2    hearing; is that true?

3          MS. BAEZ:  She hasn't exhausted all of her

4    administrative remedies.  As of now there has been no fair

5    hearing requested on the transfer --

6          THE COURT:  She can do that after the transfer?

7          MS. BAEZ:  Absolutely.

8          THE COURT:  I see.  So, in other words, she can go

9    to this new shelter or anywhere else, for that matter, and

10    she could still have her fair hearing?

11          MS. BAEZ:  Absolutely.

12          THE COURT:  Where everything will be out on the

13    record and then she either wins at the hearing or doesn't.

14    Let's say she does win at the fair hearing, what is her next

15    step?

16          MS. BAEZ:  If she did succeed at the fair hearing?

17          THE COURT:  Then she goes back to Marsha's Place?

18          MS. BAEZ:  Yes.  And most likely the Administrative

19    Law Judge would rule that DHS must place her back.

20          THE COURT:  That's if she wins.  If she does not

21    win at the fair hearing, what happens next?

22          MS. BAEZ:  Then she would remain at her current

23    facility.

24          THE COURT:  Would she have appeal from that or then

25    she gets an Article 78?

26          MS. BAEZ:  Then she be would be able to file for an

1                           Proceedings

2       Article 78.

3                   THE COURT:  That would be her final administrative

4       remedy?

5                   MS. BAEZ:  Yes.

6                   MS. LOPEZ:  So I want to just first apologize for

7       coming so unprepared.  A lot of what I'm going to cite to

8       first address my fear of irreparable harm is really why I'm

9       here.  I wasn't able to exhaust every single remedy that I

10      requested.  I did request for instructions on how to go

11      about a fair hearing.  And what I spent all day yesterday

12      doing was trying to do everything that I could but file an

13      Article 78 or even do things simultaneously.  New York State

14      allows for an exception to leading to exhaust all

15      administrative remedies in an Article 78 proceeding where

16      someone believes that there will be irreparable harm.

17                  I'm glad that counsel mentions Speaker Quinn,

18      because I've known the ex-speaker since I was a teenager.  I

19      gave testimony in front of the City Council that helped pass

20      New York's regulation Local Law 3, Article 24 of the Human

21      Rights Law for trans people.  So the biggest thing I fear is

22      being put in the position where I would either be forced to

23      leave the shelter out of fear and return to doing sex work.

24      In Judge Caproni granting the application in Federal Court

25      across the street, the City is very aware that I have done

26      sex work.  Speaker Quinn is aware that I have done sex work

Proceedings

openly.  I'm an advocate for women's rights for the last

decade or more.  I have reached a point, because of my post

traumatic stress disorder, that I just don't ever want to be

put in that position.

Again, yesterday, in my conversations with counsel,

I've come across a woman named Destiny Payon, who is

actually my transgender daughter.  Within trans culture you

take on mentees.  She was transferred out of WIN West on a

similar administrative transfer after a physical

altercation.  While I was sitting here, Your Honor, I found

it difficult to restrain myself in responding and keeping

the decorum of the courtroom, because I do have impulse

control disorder.  And if put in a situation like Destiny

where she claimed to me -- and if we need to have an

evidentiary hearing we could do that -- if she claims she

was afraid, I feel that if I'm put in that situation I might

not be able to control my impulses.  And the dog's safety,

my safety, the safety of the staff there are what I'm

considering.

In addition to that, I have the right to be around

other transgender people.  I am a transgender woman.  And I

actually fought in my teen years for New York City's

Department of Homeless Services to even allow transgender

identified people into sis or non-trans shelters.  That does

not mean we can be forced into them.  So Marsha's Place is a

1                         Proceedings

2    first of its kind shelter.  I do not know if Your Honor is

3    aware that Marsha was my gay aunt or trans aunt.  And I am

4    now the executive director of Marsha's organization STAR,

5    which was originally the Street Transvestite Action

6    Revolutionaries and it's now the Strategic Transgender

7    Alliance For Radical Reform.  We've even been recognized by

8    the White House and President Obama.

9            The incident that counsel keeps referring to has

10   witnesses.  And those witnesses aren't available on a Friday

11   afternoon in front of this court in order to provide

12   testimony about the incident and even if there was a direct

13   threat.  There is a lot that is not included in my request

14   for TRO, because I'm a poor person who's disabled and not a

15   lawyer and I had to rush because I was afraid.  So number

16   one, on principle, as the executive director of America's

17   oldest trans rights group and someone that I have three

18   landmark pieces of litigation under my belt for gay or trans

19   people where I was one of the Plaintiffs.  And so I want to

20   say that even if this sets the precedent I'm going to try to

21   set now, someone cannot force me into a facility that is for

22   sis or legal females if I am transgender.  Now --

23            THE COURT:  So what about that, Miss Baez?  That's

24   a new issue that I don't see in the papers from you.  So

25   this new -- WIN West is it called?

26            MS. BAEZ:  No.  WIN West is the facility that we

```
 1                        Proceedings
 2    are -- that she's currently assigned to.
 3              THE COURT:  She's in Marsha's now and you want to
 4    transfer to WIN West?
 5              MS. BAEZ:  She's not a resident of Marsha's.  She's
 6    already transferred into WIN West.
 7              THE COURT:  She was in Marsha's?
 8              MS. BAEZ:  Yes.
 9              THE COURT:  I understand that.  She wants to go to
10    WIN West, correct?  I mean, no, you want to send her to WIN
11    West?
12              MS. BAEZ:  Yes, that's correct.
13              THE COURT:  And she's saying that's a sis facility;
14    is that true?
15              MS. BAEZ:  Your Honor, I don't know what that
16    means.
17              THE COURT:  For straight women.
18              MR. ROBERTS:  For women, Your Honor.  Not straight
19    women, just women.
20              MS. BAEZ:  It's not designated as a straight
21    women's shelter.  It's a women's shelter.  DHS does have a
22    transgender policy where we would place the individual in
23    whatever they recognize as their gender, not where we would
24    place them.
25              MS. LOPEZ:  I'm transgender.
26              MS. BAEZ:  The LGBTQ facility, which is Marsha's
```

1                            Proceedings

2      House, is a newer facility.  It was recently opened up a few

3      months ago and it is the only facility of its kind in the

4      system.  However, Miss Lopez did not qualify for Marsha's

5      House because there's an age requirement up to the age of

6      30.  The DHS actually made an exception to allow her to come

7      into the shelter.  She had to sign a contract with Project

8      Renewal indicating that she would comply with all the rules

9      and regulations, as well as any sort of case management

10     services that were provided to her, which she did sign.

11              So, as I said, she was actually allowed in as an

12     exception because she's over the age limit and has now

13     basically broken several of the requirements under the

14     contract that allowed her in as an exception, because she's

15     not eligible for that facility.

16              THE COURT:  The age?

17              MS. BAEZ:  Yes.

18              MS. LOPEZ:  May I address that, Your Honor?

19              THE COURT:  Hang on.  But didn't you also mention

20     that there are transgendered women at WIN West?

21              MS. BAEZ:  Yes.

22              THE COURT:  I see.  Okay.

23              MS. LOPEZ:  New York City Human Rights Law, as well

24     as the state executive order under Governor Cuomo issued, I

25     think the year before last, gives the express authority to

26     the individual to identify as they please.  I want to say

1          Proceedings

2     that as to the exception to the policy, the shelter director

3     his self has said that the exception was imposed on Project

4     Renewal by the Department of Homeless Services and there is

5     not any -- the entirety of DHS is not separated or

6     segregated per facility by age.  Just like Marsha's is the

7     only facility within DHS that accepts coed trans, gay,

8     lesbian, bi-sexual, everyone, it is the only facility, the

9     only one, that has a cap on the age.

10         Now, the irony of my place in New York's history as

11    a trans activist and pioneer, as well as being the executive

12    director of Marsha's organization and in need of immediate

13    housing was the reason the exception was made.  Because

14    exceptions are made and I signed an agreement does not mean

15    that I'm supposed to be subject to different rules than

16    everyone in the facility.

17         And I will then please posit that I am without my

18    witnesses that I can present at the hearing that would make

19    my entire argument that, yes, I must follow rules.  But,

20    Your Honor, there have been incidents both between threats

21    from staff and actual clients assaulting staff and other

22    clients within the last three days.  And whether DHS has

23    honored the request for Project Renewal transfers or even if

24    Project Renewal has requested transfers, I'll never be privy

25    to that information because that is protected information.

26    There are at least 15 gay, lesbian, bi-sexual, transgender

Proceedings

1
2    and gay people that are willing to come to court if Your
3    Honor doesn't issue the TRO to follow through with any
4    Article 78 proceeding or even at any fair hearing proceeding
5    to assert the fact that Mariah's here now in this court
6    because she was transferred after seeing discrimination.
7    And as the executive director of America's oldest
8    transgender rights group with impulse control disorder, I
9    snapped verbally.  My threats, words coming out of my mouth
10    from someone with post traumatic stress disorder and impulse
11    control disorder, cannot be deemed more serious than the
12    physical assaults that have taken place over the last couple
13    of days at Marsha's.

14        Simply put, Your Honor, since the day where they
15    opposed Judge Caproni's order across the street to put me
16    back in Marsha's, they have applied the rules unfairly.  And
17    without actually having witnesses around about the incident
18    that they used as the catalyst to transfer me, I'd like to
19    ask Your Honor to rely on the fact that no court can
20    determine when one person that's a sex worker says that they
21    can't deal with even the prospect of having to do it again,
22    that is the irreparable harm.  In addition to the fact that
23    I'm afraid that I will be pushed to the brink of potentially
24    defending myself or my service animal and that two days,
25    three days back at Marsha's --

26        THE COURT:  Miss Lopez, that's not a threat, is it?

1            Proceedings

2    I mean, you know.

3            MS. LOPEZ:  No.  What was?  Wait.

4            THE COURT:  I think that, you know, either you can

5    comply with the rules or you can't comply with the rules.

6            MS. LOPEZ:  No, no, no.  What I meant was --

7            THE COURT:  You're talking about you can't comply

8    with the rules because you have a problem with impulse

9    control.

10           MS. LOPEZ:  No, no, Your Honor.  I apologize.  What

11   I was trying to point out is that there are other people

12   with similar conditions.  And if those are the reasons that

13   the facility chooses to be lax on physical assaults or other

14   actual threats and breaking stuff in the facility, literally

15   people have been going around being worse than I have,

16   assaulting staff and actually --

17           THE COURT:  I don't think I heard that from that

18   sentence.  At any rate --

19           MS. LOPEZ:  I apologize.  I wasn't trying to

20   actually excuse my behavior.  What I was trying to point

21   out -- I'm sorry, I'm not an attorney -- was that the rules

22   are simply, since the day we left across the street, not

23   being followed properly and that I did request --

24           THE COURT:  Even if I should accept every single

25   thing you say -- well, let me just ask them a question.

26   Miss Lopez says that there is an exception to the failure to

1                          Proceedings

2   exhaust.  Can you enlighten me about that?  Where it's

3   irreparable harm, that that somehow relieves her of

4   exhausting her administrative remedies.  Do you know

5   anything about that?  Did I say that right?

6          MS. LOPEZ:  Yes, Your Honor.  I know it's the law.

7   I cannot cite it now.

8          THE COURT:  Well, they might know the law better

9   than me, at this point, because I just got this.  I didn't

10   get the chance to research.

11          Do you know anything about that, Miss Baez or

12   Mr. Roberts?

13          MR. ROBERTS:  Your Honor, I'm not aware of that

14   exception, but I haven't researched it.  I wouldn't swear to

15   you that it doesn't exist.  I'm sorry, I can't help you.

16          THE COURT:  I'm not sure either.  I think -- I do

17   know it's black letter law pretty much that you have to

18   exhaust your administrative remedies and that right now the

19   fact -- tell me why.  Tell me really why, Miss Lopez.  The

20   fact that two people were assaulted doesn't mean that you're

21   going to be assaulted.

22          MS. LOPEZ:  Absolutely.  In fact, in keeping with

23   the City's arguments, I can actually be afraid of being

24   criminally liable myself.  I'm afraid that in the defense of

25   my personal safety I'll be involved in a physical

26   altercation that could lead to a cross complaint and I could

1      Proceedings

2   physically be incarcerated.  I am not so much putting out

3   there that because I have impulse control disorder I'll get

4   there and I will somehow be violent to other people.  I

5   happen to have -- I've been transgender since I was a

6   teenager.  What I'm hearing firsthand from people I trust is

7   that, at minimal, Your Honor, the verbal harassment from the

8   females that are born females there against the very few

9   transgender people there are too much to stand.

10          THE COURT:  But that's anecdotal, right?  I mean,

11   right now I hear from them --

12          MS. LOPEZ:  No, it's not anecdotal.  I watched an

13   actual video.  And, obviously, I do not have that video.

14   What happens is if this court rules that, number one,

15   because this court isn't directly aware of the law that I

16   cited without being an attorney or that it's only hearsay

17   and it's anecdotal, then of course I know I have rights to

18   re-approach and to potentially try to present the same

19   evidence at the fair hearing.  But what if then there is

20   video or footage that I saw at 5:00 -- after 5:00 yesterday

21   physically within the facility of WIN West where I saw a

22   transgender person being attacked or assaulted verbally, how

23   then do I determine --

24          THE COURT:  By other shelter employees?

25          MS. LOPEZ:  Yes, ma'am.  I'm not so much concerned

26   with that.  I want to point out too that -- well, I think

1                            Proceedings
2     you asked me a question, Your Honor.  And, yes, it is
3     anecdotal.  However, I don't know how casual we are getting
4     on the record.  I transitioned when I was 13.  The person
5     there, her name was Tonya, and she told me -- she actually
6     gave me my first hormone injection when I was 13.  I trust
7     her with my life, literally.  And if she says to me, doll
8     baby, I'm a little older than you, you have a very bad
9     temper, you might have a problem with the girls.  And
10    Destiny Payon shows me a video and I know it's WIN West,
11    because there's staff I.D. as identified as WIN West, I'm
12    concerned enough that I don't want to be criminally liable
13    for a real physical altercation or I don't have to be
14    subject to the type of verbal abuse that I can expect.
15              THE COURT:  But, Miss Lopez, if you do have this
16    problem, aren't you going to have this problem anywhere?
17              MS. LOPEZ:  No, Your Honor, because I won't deal
18    with people literally calling me tranny or him or saying why
19    is that man in our facility.  The dog attracts additional
20    attention.
21              And I want to put something on the record really
22    important.  I'm a post-operative transgender woman, who
23    actually had a landmark case across the street to get SRS
24    for everyone, sexual reassignment for everyone in New York
25    that can't afford it from foster care to people on Medicaid.
26    I'm at the point in my transition where I may not want to

| | |
|---|---|
| 1 | Proceedings |
| 2 | always either have to be in the closet as transgender or |
| 3 | answer uncomfortable questions from women who I co-habitate |
| 4 | with, that the transgender and gay people at Marsha's will |
| 5 | not ask me questions about my body or genitals or how long |
| 6 | I've been transgender. |
| 7 | THE COURT:  Okay.  So what's the harm in her going |
| 8 | back to Marsha's Place? |
| 9 | MS. BAEZ:  Your Honor, the staff there is very much |
| 10 | in fear of their safety.  The transfer was based on the |
| 11 | issue that we've mentioned, but that's not the only incident |
| 12 | that Miss Lopez has had at the facility.  So it's been a |
| 13 | progression.  And they, you know, they've tried to work with |
| 14 | her and, at this point, they don't feel safe.  I don't know |
| 15 | whether or not the employee has actually filed a police |
| 16 | report, but from what they're reporting that was the plan |
| 17 | and maybe even filed an order of protection. |
| 18 | MS. LOPEZ:  She can't file an order of protection. |
| 19 | THE COURT:  Well, she doesn't feel safe at WIN |
| 20 | West.  She says she saw videotape, she heard it firsthand |
| 21 | about these issues there.  That it hasn't been reported to |
| 22 | you doesn't mean it didn't happen. |
| 23 | MS. BAEZ:  That is true, Your Honor, there is -- it |
| 24 | is possible that especially verbal altercations that don't |
| 25 | necessarily rise to a physical fight or a bigger issue that |
| 26 | is going to be necessarily reported to us.  However, we |

Proceedings

1
2  still do not believe that it is an unsafe environment.  A
3  verbal altercation is something that you could remove
4  yourself from or you can tell staff and the staff will deal
5  with it.
6           THE COURT:  The basis for this is a verbal
7  altercation with the woman in the kitchen or in the
8  cafeteria?
9           MS. BAEZ:  Yes.  But then she threatened.  It
10  wasn't just the verbal.  It was the threat of possible
11  physical -- of a physical altercation.
12           THE COURT:  That's verbal, too, no?
13           MS. BAEZ:  It is.  However, as I stated, Miss Lopez
14  has a shelter history.  There's other evidence throughout
15  her shelter history that she is willing to actually involve
16  herself in physical altercations.
17           THE COURT:  There have been physical altercations
18  in Marsha's Place?
19           MS. BAEZ:  In Marsha's Place, no.  They've only
20  been verbal incidents.  But in other facilities there have
21  been physical altercations.
22           THE COURT:  Listen, I think right now she should be
23  given a second chance there until Wednesday.
24           MS. BAEZ:  Your Honor, I can't guarantee that
25  there's actually a bed available there.  I would have to
26  verify whether or not there's a vacancy.

1                      Proceedings

2          THE COURT:  Miss Lopez, she didn't interrupt you.

3          MS. LOPEZ:  I apologize.

4          MS. BAEZ:  Just for a brief explanation on how the

5      system works is generally once somebody losses their bed

6      there would be somebody else that's assigned to that bed.

7      So I can't guarantee whether or not her bed is available.

8      That's something that I would have to find out.  And, you

9      know, if we do end up having to place her back in that bed

10     then, basically, we're going to have to remove a third party

11     from that bed somewhere else.

12         THE COURT:  You wouldn't want that to happen, would

13     you?

14         MS. LOPEZ:  Your Honor, physically I saw a picture

15     of my room taken by one of the clients about ten minutes

16     before I came to court.  It's exactly how I left it

17     yesterday.  And the DHS officer's in charge of property

18     security and he left my stuff in the room because I told him

19     I would come back tomorrow with a court order.

20         THE COURT:  She seems to have more recent

21     information than you, Miss Baez.

22         MS. BAEZ:  Well, let me explain.  We did leave the

23     room available for her to come back and get her belongings.

24     She came back and packed.  She did not take all of her

25     belongings.  At that point, the staff packed everything else

26     up and now the belongings are in storage.  They're no longer

```
 1                          Proceedings
 2      in the area where she was residing.
 3                 THE COURT:  I see.  As I said -- do you have
 4      anywhere to stay tonight?
 5                 MS. LOPEZ:  No, Your Honor.  Your Honor, may I
 6      please address what --
 7                 THE COURT:  No, not yet.
 8                 MR. ROBERTS:  She has a place at WIN West.  And the
 9      proposition, Your Honor, with all due respect, is that you
10      can assert that because you're scared that we can't place
11      you would, in essence, mean that we can't place anybody in
12      our whole system.
13                 THE COURT:  I didn't say --
14                 MR. ROBERTS:  It's not the staff.
15                 THE COURT:  Mr. Roberts, this is a TRO we're
16      talking about, a temporary restraining order.  This is not
17      permanent.
18                 MR. ROBERTS:  But at the same time it's changing
19      the status quo.  It's not -- because the status quo is she's
20      got an assignment to WIN West.  And we put her -- we
21      provided that last night.  We arranged specially for a taxi
22      to take her there.  We paid for the taxi.  She removed her
23      goods and left and didn't -- and then presumably told the
24      taxi driver not to take her there.
25                 THE COURT:  Okay.  Where are your belongings now?
26                 MS. LOPEZ:  At my mom's, actually, who's an
```

```
 1                     Proceedings
 2   attorney, who told me to divert the cab last night to her
 3   house.
 4              THE COURT:  Just answer the question.  Where are
 5   your belongings?
 6              MS. LOPEZ:  In the basement of 45 Park Terrace West
 7   where my foster mother lives.
 8              THE COURT:  Are you able to stay with her?
 9              MS. LOPEZ:  No, Your Honor.  That's why they're in
10   the basement.
11              THE COURT:  Okay.  So pending -- I can't -- I think
12   Mr. Roberts makes a point.  I can't order you back there.
13   First of all, I don't know if there's a bed.  So that's
14   impossible right now.  But I will put it on for a hearing.
15              MS. LOPEZ:  Your Honor, may I?  I think that
16   subjecting me to two or three days of potential homelessness
17   and sex work because we cannot ascertain quick enough if
18   there is a bed is not necessarily the right thing to do.
19              THE COURT:  Miss Lopez, you don't have to engage in
20   that.  You can go to WIN West.  And you can go there and you
21   can sleep there, and you ignore everybody and stay out of
22   trouble there, okay.  And I am going to, in the meantime,
23   see whether I can even sign this TRO or this order to show
24   cause for your failure to exhaust remedies.  I'm going to
25   research that myself in the next few days, because it could
26   be that you don't get any relief at all.  But I'm willing to
```

Proceedings

1  keep an open mind.  And so I'm going to do my due diligence.

2  In the meantime, I cannot grant you any relief now,

3  because I don't have chapter and verse as to whether or not

4  you need to exhaust your administrative remedies.

5  MS. LOPEZ:  If in the court's failure to be

6  familiar with the statute is actually in conflict with the

7  statute saying that I have due process to access the court

8  when there is irreparable harm, how could your unfamiliarity

9  with the statute, Your Honor -- may I please finish?  How

10  could your unfamiliarity with the statute, in addition to

11  the fact that City Corporation Counsel is misrepresenting

12  facts, how could that sway the decision -- the decision that

13  you look like you were going to make several minutes ago

14  where if there were a bed?

15  So it seems like right now it is fair to presume if

16  someone was physically in that room, of course removing them

17  wouldn't be right, and I might not even have the grounds.

18  But the Legislature put out certain procedures.  And if this

19  court isn't familiar with them, the answer isn't telling the

20  layperson, who has an emergency and a pro se hearing, we're

21  all unfamiliar and someone rushed.

22  THE COURT:  Miss Lopez, I really understand your

23  point, and I'm really trying to dance with you.  But I'm

24  going to hold on to this before I sign anything and make

25  sure, because not every judge has the entire Civil Practice

Proceedings

1

2     Laws and Rules in their noggin.  They don't.  Forgive me.

3          MS. LOPEZ:  But I'm in an emergency, which is why

4     statute was created to begin with.

5          THE COURT:  I'm going to look at that.  I'm going

6     to make sure.  But I think that you're going -- first of

7     all, you've been exercising excellent self control and

8     impulse control right now before me.  So I have confidence

9     that you can --

10          MS. LOPEZ:  Your Honor, may I please on the record,

11    the incident at that facility --

12          THE COURT:  I'm confident that you can manage over

13    the weekend.

14          MS. LOPEZ:  I was witnessing literally a food

15    service person under serve someone.

16          THE COURT:  Miss Baez, can you make sure that at

17    WIN West she can feel confident there?

18          MS. BAEZ:  Yes, Your Honor.

19          THE COURT:  I'm ordering you to do that.

20          MS. BAEZ:  Yes.

21          THE COURT:  In the meantime.  Okay.  Come back

22    Monday instead of Wednesday.  Come back Monday here to this

23    courtroom, and I will --

24          MS. LOPEZ:  With witnesses?

25          THE COURT:  No.  I'm not going to have a hearing.

26    Off the record for a minute.

| 1 | Proceedings |
| 2 | (Whereupon, there was an off-the-record |
| 3 | discussion.) |

4          MS. LOPEZ:  A transgender person was murdered in a

5     New York City Department of Homeless Service shelter.  I'm

6     leaving here to go to that vigil as the executive director

7     of America's oldest transgender rights group.  I have no

8     expectation of actual privacy within the shelter.  The

9     homicide that occurred happened outside of the shelter.

10         THE COURT:  That was at WIN West?

11         MS. LOPEZ:  No, Your Honor, but similar

12    circumstances, and I am afraid.

13         THE COURT:  Miss Baez, she's really afraid.  What

14    can you do for her?

15         MS. BAEZ:  Your Honor, we could reach out to --

16         THE COURT:  I asked her.  What can you do for her?

17         MS. BAEZ:  We can reach out to the facility and

18    ensure that they're available to her when she arrives on

19    site that comforts her and ensures her that she's aware of

20    all the security procedures and who she would need to go to

21    if there was an issue.  We do have remedies when clients

22    misbehave.  So, for example, if there is a situation where

23    she is being verbally attacked, we would look at that and

24    possibly transfer the other individual based on their

25    behavior.  Or we, you know, maybe would even suspend the

26    individual or sanction.  There are other remedies.

1           Proceedings

2    Suspension would be they wouldn't be able to come into the

3    facility for a certain period of time.  And a sanction is

4    actually a termination of housing assistance for 30 days or

5    longer if it is warranted by the behavior.  So we do have

6    remedies for those types of issues when they occur.

7           THE COURT:  It seems to me, Miss Lopez, that she's

8    telling me the staff, for whatever reason, at Marsha's Place

9    she says they're afraid of you.  That's what she says.  That

10   could be just as dangerous for you as WIN West.

11          MS. LOPEZ:  No, Your Honor.

12          THE COURT:  They're all afraid of you, who knows

13   what they're going to do.

14          MS. LOPEZ:  Your Honor, it is not the same, because

15   if we're going to keep referencing that food service staff,

16   that food service staff has been the subject of at least 18

17   direct grievances from separate transgender people.

18          THE COURT:  There you go.

19          MS. LOPEZ:  Your Honor, let me put this --

20          THE COURT:  I don't have the power to get rid of

21   them.

22          MS. LOPEZ:  Your Honor, the transgender people that

23   live there feel that she literally or have reported to me,

24   and I actually witnessed the day of the reported incident,

25   giving transgender people less food with no explanation;

26   dietary, nutritional or procedural for why one transgender

1                           Proceedings

2      person -- so what I'm explaining is, Your Honor, what might

3      have facilitated the verbal interaction between myself and

4      the food service person was me defending my civil rights.

5      The altercations that could occur and arise and that have

6      arose throughout the entire shelter system and that I

7      believe to have occurred within WIN West are the type that

8      are physical and violent in nature and are not two people

9      arguing over civil liberties or protected civil rights.

10     They are you have a certain genital, you should not be here.

11     That is sexual harassment.

12              THE COURT:  This is not -- I can't go into this

13     detail now, Miss Lopez.  I just can't.  Come back Monday and

14     we'll go into further detail, but --

15              MR. ROBERTS:  What time, Your Honor?

16              THE COURT:  What time is a good time on Monday?

17              THE COURT CLERK:  10:30.

18              MS. LOPEZ:  I'm going to appeal to the First

19     Department.

20              THE COURT:  There's nothing to appeal.  I'm not

21     declining it, I'm holding on to it.

22              MS. LOPEZ:  Is that what you're doing to me?  I'm a

23     bit confused.  And what -- so you're holding on to it, not

24     ruling it, still leaves me actually not in the status quo.

25     It actually leaves me worse off than when I walked into this

26     courtroom.  I have not --

1                           Proceedings

2           THE COURT:  Miss Lopez, I can't make factual

3    findings.  I can't make factual findings.

4           MS. LOPEZ:  I understand that, but -- and the only

5    reason --

6           THE COURT:  Listen.  I understand your position.  I

7    got to go now.

8           MS. LOPEZ:  Sure.  Thank you.  Am I going to get

9    those papers back?

10          THE COURT:  No, I got to read it.  I got to look

11   through them.  I got to look at them.  I want to make a

12   thoughtful decision, Miss Lopez.  I'm not nature.  I don't

13   just knee jerk.

14          MS. LOPEZ:  I understand that.  There are pieces --

15          THE COURT:  And you come in at 4:20 on a weekend

16   and that's what happens sometimes.  A judge can't know

17   everything.

18          MS. LOPEZ:  Your Honor, you're right.  I came in

19   yesterday, and I also my dog was physically in the facility

20   yesterday while I was running around.

21          THE COURT:  I'm not faulting you.  I'm just telling

22   you the circumstances are not great.  And for you they're

23   not great.  I get that.

24          MS. LOPEZ:  Okay.  So, Your Honor, right now what

25   I'm not understanding --

26          THE COURT:  She can't put you back there.

1                          Proceedings

2                 MS. LOPEZ:  Because?

3                 THE COURT:  She doesn't have a bed.

4                 MS. LOPEZ:  And that's not accurate, Your Honor.

5                 THE COURT:  She just told me that they removed your

6       stuff.

7                 MS. LOPEZ:  I was, Your Honor, because I had

8       surgery, in a single bed, which is there are only three of

9       them.  There have not been admitted to the facility three

10      other people that meet the special requirements for the

11      single room.  There is absolutely -- there are still three

12      single rooms for people with medical conditions.

13                MS. BAEZ:  I would have to verify that.  And I

14      don't know how she would be aware of that considering she

15      wasn't at the facility last night.

16                THE COURT:  I can't do anything.  Can you

17      accommodate her?

18                MS. BAEZ:  I don't know whether or not there's a

19      vacancy.

20                THE COURT:  Do your best to accommodate her over

21      the weekend and Monday we'll revisit this.

22                MS. LOPEZ:  And if there is a bed at Marsha's, is

23      that an accommodation, Your Honor, which she's representing

24      that the only reason I'm not being placed back there --

25                THE COURT:  Give her a bed at Marsha's Place over

26      the weekend.  And we'll come back Monday, and I'll make a

33

1               Proceedings

2    determination.

3              MS. BAEZ:  The best we can do, Your Honor, is have

4    her go there and wait for a bed to become available, if

5    there is one available.

6              THE COURT:  Wonderful.

7              MS. LOPEZ:  So I'm going back to Marsha's to wait

8    for a bed?

9              THE COURT:  Yes.

10             MS. LOPEZ:  Thank you, Your Honor.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

34

1          Proceedings

2          * * * * * * * * * * * *

3          C E R T I F I C A T E

4

5   I, Karen M. Mennella, a Senior Court Reporter for the State of

6   New York do hereby certify that the foregoing is a true and

7   accurate transcription of my original stenographic notes.

8

9                              Karen M. Mennella,

10                             Karen M. Mennella,

11                             Senior Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26