Exhibit 3

1

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   NEW YORK COUNTY : CIVIL TERM : PART 12
3  ------------------------------------x
   In the Matter of the Application of
4  MARIAH LOPEZ,

5                      Petitioner,        INDEX NO.
                                          100032/2017
6              -against-

7  NEW YORK CITY DEPARTMENT OF HOMELESS
   SERVICES and PROJECT RENEWAL,
8
                       Respondents.
9  ------------------------------------x
                     May 15, 2017
10
                         60 Centre Street
11                       New York, New York

12  B E F O R E :

13            HON. BARBARA JAFFE,

14                      Supreme Court Justice.

15  A P P E A R A N C E S :

16  MARIAH LOPEZ
        480 East 185th Street
17      Bronx, New York 10458
        Petitioner Pro Se
18
    NEW YORK CITY LAW DEPARTMENT
19  OFFICE OF THE CORPORATION COUNSEL
        100 Church Street
20      New York, New York 10007
    BY: THOMAS B. ROBERTS, ESQ.
21      Attorneys for the Respondent
        City of New York
22

23
                        KAREN MENNELLA
24                  Senior Court Reporter

25

26

2

1

2   A P P E A R A N C E S   (Cont'd):

3   NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES
    HUMAN RESOURCES ADMINISTRATION
4        150 Greenwich Street, 30th Floor
         New York, New York 10007
5   BY: TONIE BAEZ, ESQ.
         Attorneys for Respondents
6        NYC Department of Homeless Services
         and Project Renewal

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1                          Proceedings

2          THE COURT:  Good morning.

3          MS. LOPEZ:  Good morning, Your Honor.

4          MS. BAEZ:  Good morning, Your Honor.

5          MR. ROBERTS:  Good morning, Your Honor.

6          THE COURT:  So what happened over the weekend?  Do

7   you want to go first?

8          MS. LOPEZ:  Sure.  Well, I just wanted to put on

9   the record first that I believe counsel knowingly

10  misrepresented that there were no beds.  As soon as I got

11  back to the facility there were -- I have video -- four

12  whole entire rooms with single beds and three other with

13  double beds.  So they don't have any issue with capacity.

14         And I would just like to inform the court that I

15  believe that this is the second attempt that City counsel

16  and the other counsel is trying to mislead as a last ditch

17  effort to try to sway the outcome of the pleading.  And I

18  believe that they being so dishonest on something so

19  verifiable that either the witnesses or the staff at

20  Marsha's directly or the City's attorneys cannot be deemed

21  as credible.

22         Overall, I had a relatively peaceful weekend.  I

23  would say that --

24         THE COURT:  Slow down.

25         MS. LOPEZ:  I had a relatively peaceful weekend.  I

26  felt a bit harassed, because there were an excess of DHS

1          Proceedings

2  police present and walking around the facility.   You're

3  right, I actually had several instances where we shared

4  casual conversation.   So overall the weekend was without

5  incident.   This morning, though, the same cook staff in

6  question, even though the meal -- the designated mealtime is

7  7:00 to 8:15 and it's very standard, especially on a Monday,

8  for people to walk in at 8 o'clock and get full nutritional

9  benefits of the meal, when I walked in and the other

10  transgender person that walked in, who is also over age and

11  complaining a lot about being mistreated, that person and I

12  were not fed.   I have a video of that.

13          I have also asked the Bronx District Attorney's

14  office to open an investigation criminally into whether or

15  not the fact that me and the other person are disabled

16  violates any penal law of someone to intentionally withhold

17  food.   I would just ask this court to uphold my TRO in the

18  interim given that there haven't been any instances and that

19  a personnel change would be the easiest way to alleviate the

20  fears of this one employee.   I do not pose a significant

21  risk to this facility.

22          And I've attempted, before the proceedings today,

23  to reach a settlement off the record with counsel that would

24  allow for maybe an interim third-party entity to be placed

25  in the facility while I'm there, maybe an administrator or

26  someone to help.   Cadon Grennell, who is the director, sort

```
 1                              Proceedings
 2      of run things.  But, Your Honor, this is a little
 3      uncomfortable for me, but Cadon has sexually harassed or, I
 4      believe, because I didn't reciprocate --
 5               THE COURT:  I'm sorry, who?
 6               MS. LOPEZ:  The director that --
 7               THE COURT:  Mentioned in your papers?
 8               MS. LOPEZ:  And he's here today.  And I informed
 9      counsel on Friday and in an e-mail that Cadon had contacted
10      me inappropriately before I was even a resident of the
11      facility.  So all of this, I think, is connected to the fact
12      that I am being the proverbial squeaky wheel and blowing the
13      loudest whistle possible.  And I also brought serious
14      complaints from the other clients, including consensual
15      sexual intercourse with staff.  But the fact that there was
16      so much going on with the facility being open for so little
17      time, I believe that Cadon Grennell was acting in his own
18      best interest to try to expedite the administrative transfer
19      that led to these proceedings.
20               THE COURT:  You just said Marsha's Place.  How long
21      has it been open?
22               MS. LOPEZ:  Three months.  It's very new, Your
23      Honor.
24               THE COURT:  It's new.
25               MS. LOPEZ:  And all of the staff, all of the direct
26      care staff, identify as heterosexual, sis, non-transgender.
```

1                    Proceedings

2    I don't know any other facility of a comparable demographic

3    whose hired administration and direct care staff have either

4    no experience direct with this population or don't

5    themselves identify as either LGBT or Q.

6         MR. ROBERTS:  Your Honor, several things.  There

7    were incidents this weekend.  I have incident reports from

8    Friday night and Saturday morning.  If I could offer that.

9    And I have here --

10        THE COURT:  Well, I want you to give it to

11   Miss Lopez.

12        MS. LOPEZ:  I have a copy.

13        MR. ROBERTS:  I just gave her a copy.  So because

14   there was so much uncorroborated statements, I have here

15   today outside Mr. Cadon Grennell, who's the director of

16   Marsha's House.  And if you had questions you wanted to ask

17   him concerning the operation, he's available to do that.  I

18   have also the cafeteria worker who Miss Lopez is now trying

19   to get criminal proceedings brought against.  She came also.

20        There was apparently another dispute because they

21   ran out of food this morning because there was not a

22   delivery, and she feels discriminated against because the

23   eggs were gone, but they got her cereal.  That's the level

24   we're dealing with.  We're dealing with, you know, things

25   about -- high school stuff about food.  And then I also have

26   here the program director.  Those two that I mentioned were

Proceedings

1.

2  employees of Project Renewal who operate Marsha's House, the

3  shelter.  They're not city employees.  I also have outside

4  the program administrator for the WIN West Center, who is a

5  city employee, who could describe the program at the WIN

6  West Center.  And the WIN West Center has mental health

7  capacity at the site, unlike Marsha's House.  So there will

8  be not only all this conflict that Miss Lopez continues to

9  have at Marsha's House can be terminated, but there are, its

10  our belief, that she'll have a better experience and be able

11  to access appropriate services better at the WIN Center.

12         With regard to the normal showing, you have to show

13  irreparable harm to obtain a preliminary injunction or a

14  TRO.  The irreparable harm was argued last week on Friday

15  was that some client might disrespect Miss Lopez at the

16  facility.  There are efforts made to take care of that.  But

17  if that risk occurs at the Marsha's Center, and the report

18  that I've shown you here, shows that on Friday night,

19  Saturday morning Miss Lopez apparently felt disrespected by

20  some other client who closed the door on --

21         MS. LOPEZ:  That's the staff, and I have video.  Do

22  not misrepresent.

23         THE COURT:  I'll hear you out.

24         MR. ROBERTS:  So if, indeed, the staff is unable to

25  deal with her, I would of thought the normal case would be

26  someone saying get me out of here, put me somewhere else,

Proceedings

1
2   which is what we're trying to do, which will be a better
3   facility.  The alleged harm is that a non-city employee may
4   disrespect.  And with all due respect, that unfortunately
5   can happen in any city shelter, including Marsha's House and
6   it is not irreparable harm.  It is just part of living in
7   city shelters.  And to presume that there will be a perfect
8   city shelter where no client will ever get in a disagreement
9   with another client is just there's no basis for that.  And
10  being moved to the new one is not irreparable harm.
11          And I'm just sort of astounded.  We got an
12  individual who's had nothing but conflict in the facility
13  she's in.  We're trying to put her in a more appropriate
14  place and we're not being allowed to do that.  And I don't
15  understand why we can't try to run our operation in a
16  peaceful way and resolve this.
17          THE COURT:  We will try to resolve it.
18          MR. ROBERTS:  I hope so.  But, I mean, it's not --
19  essentially, she's bringing criminal -- trying to bring
20  criminal charges against the employee.
21          THE COURT:  Right now there are no criminal charges
22  pending, correct?
23          MS. LOPEZ:  I've informed the proper --
24          THE COURT:  That's all that's happened, right, Miss
25  Lopez?
26          MS. LOPEZ:  Yes, Your Honor.

1                            Proceedings

2            THE COURT:  Nothing else has happened.

3            MS. LOPEZ:  It's only Monday.

4            THE COURT:  I'm not a Criminal Court judge.  It's

5    not before me right now.  So let's --

6            MS. LOPEZ:  Can I address this?

7            THE COURT:  Hold on.

8            MR. ROBERTS:  I think the employees at Project

9    Renewal are advising Mr. Grennell that they feel that they

10   are having to work in a hostile work environment.  They

11   shouldn't have to be subject to that.  They should be able

12   to work in a place where they're not feeling threatened.

13            I would like to submit the following.  I've got six

14   incident reports where she's threatening employees.  I will

15   not -- she has not physically attacked them, but there's a

16   consistent pattern of telling people we'll get you outside

17   of work or I'll have you fired, I'll have you reported.  The

18   proposition that this warrants protection is really

19   wrongful.  So I'd like to offer -- here is the report.

20            MS. LOPEZ:  I was there in the first person,

21   Counsel.  I don't need to necessarily read this.

22            MR. ROBERTS:  And just, Your Honor --

23            THE COURT:  I think, you know, all this might be

24   perfectly good evidence for later on.  You're kind of

25   putting the cart before the horse.  Given everybody -- I

26   want to give Miss Lopez an opportunity to be heard.  I want

Proceedings

1
2  to give you an opportunity to be heard. But perhaps this is

3  for a hearing maybe down the pike. I don't know. Right now

4  let's look at the -- I took a really good look at the

5  papers, and I took a really good look at the law and right

6  now we're -- I see that you did get a bed for her.

7        MR. ROBERTS: Yes.

8        THE COURT: Okay. There is some problems on her

9  part. She also says there are problems. I mean, this is a

10 two-sided dispute, Mr. Roberts, right?

11       MS. LOPEZ: Actually, I would argue, Your Honor,

12 about 11-sided, because most of the other first person

13 individuals aren't here and were offered to come, but I

14 explained to them the procedure. They also thought this

15 would not be a hearing today.

16       THE COURT: I'm not holding a hearing today.

17       MS. LOPEZ: May I just address --

18       THE COURT: Maybe there are 11 sides. Who knows

19 how many sides there are. There are sides. But I wanted

20 strictly to go by the law. And I would note that on my own

21 motion I can make this an application for a TRO or a stay,

22 even though it's not really, you know, take a good look at

23 everything over the weekend, this is really just seeking a

24 preliminary injunction. It's a regular, ordinary

25 proceeding.

26       MR. ROBERTS: For what it's worth, I've never

1                                  Proceedings

2      received a copy of the papers.

3              THE COURT:  Yes.  That's my next order of business.

4      I am going to sign the OSC.  I'm going to add to it that the

5      stay, pending determination of this proceeding, Respondents

6      are stayed from enforcing the transfer or referral of

7      Plaintiff to the WIN West shelter.

8              Now, that raises some issue, Mr. Roberts.  Is there

9      anywhere else she can go?

10             MS. LOPEZ:  Your Honor --

11             THE COURT:  I asked him.  I'll ask you after.

12             MR. ROBERTS:  So if she -- I understand there are

13     other sites.  We would be willing to talk to Miss Lopez.  If

14     she's willing to move to another site, we can try that.

15             THE COURT:  But are there other sites that

16     accommodate transgendered?

17             MS. BAEZ:  Your Honor, we accommodate transgender

18     clients at all of the facilities.

19             THE COURT:  Are there any that are more known for

20     it?

21             MR. ROBERTS:  There are facilities that have been

22     specially trained.  So we could try to look for placement

23     within one of those facilities and try to find a similar

24     facility.  So that is a possibility.

25             THE COURT:  Just a question, Miss Lopez, okay.

26     That's a possibility that maybe you want to discuss with

1              Proceedings

2   them?

3           MS. LOPEZ:  I actually attempted to do that before

4   we walked in here.

5           THE COURT:  Okay.  Why don't you take a few minutes

6   off the record and discuss it and see what you can come up

7   with.

8           MS. LOPEZ:  Sure.

9           THE COURT:  In the meantime -- and then we'll go on

10  to address this further, okay.

11          MS. LOPEZ:  Sure.  They've just been very nasty to

12  me.

13          THE COURT:  Talk to them.  Make nice.  You could

14  step out with her.

15          (Pause in proceedings.)

16          MR. ROBERTS:  Your Honor, Miss Lopez just walked

17  away from us before we could even advise her the name of the

18  other location.

19          THE COURT:  Okay.  Give me the name.  What's the

20  name?

21          MS. BAEZ:  The Broadway House.  It was the

22  original -- prior to WIN West, that was the facility that we

23  were looking at to place her.

24          THE COURT:  Okay.

25          MS. LOPEZ:  So, Your Honor, a couple of things in

26  order, if I may just address for the record.  So the

1       Proceedings

2    incident over the weekend appeared to be Project Renewal

3    doing everything they could do to document any sort of even

4    minutely out-of-line thing.  What occurred, though, which

5    should be concerning to the DHS counsel, are repeated, on

6    video documented incidents of the staff mis-gendering

7    transgender people.

8           And, Your Honor, I think that this is an important

9    point that I cannot emphasis enough.  To mis-gender, to call

10   a transgender woman sir or call him him is tantamount to

11   using the N word.  It is totally unacceptable, violation of

12   New York City Human Rights Law, State Human Rights Law, in

13   some instances interpreted as violating Federal PTSD

14   protections under the ADA.  So what happened this weekend

15   was me, because I knew I would be under a microscope,

16   confronting, by request, each staff that would use the wrong

17   pronouns.  In addition to that, just so you know, because I

18   think it's important if officers of the court are being

19   misled by employees there, I had an incident with an

20   employee who was seen buying an illegal substance across the

21   street and then coming back into the facility.  That's the

22   person he cited.  And it's not a -- it's not a resident.

23   It's an employee.

24          So addressing where I could go, Your Honor, I

25   believe that on the day of the Federal Court proceedings the

26   judge heard their arguments around Broadway.  It was entered

1      Proceedings

2      into, it was expounded upon on the record across the street

3      on why it was so amazing and the best facility for me.  Now

4      it's WIN West is the best facility for me.  Your Honor, I'm

5      not trying to mock them.  I am transgender, and I have the

6      right to be around people that are transgender.  I also have

7      the right not to be forced back into the closet.  And these

8      facilities accommodating transgender people doesn't mean

9      that I'm not going to have to either hide the fact that I'm

10     transgender or be peppered with harassment and inappropriate

11     questions.

12          THE COURT:  Miss Lopez, let's cross that bridge

13     when we come to it.

14          MS. LOPEZ:  Okay, Your Honor.

15          THE COURT:  Let's first talk about Broadway Place,

16     which is what I sense you want to discuss.

17          MS. LOPEZ:  True.

18          THE COURT:  If you don't want to discuss it

19     outside, let's discuss it here.

20          MS. LOPEZ:  Sure.

21          THE COURT:  How about it?

22          MS. LOPEZ:  So the problem is that, Your Honor, I

23     just said to him before I came in here, before the

24     proceeding started, that I was open to hearing --

25          THE COURT:  Water under the bridge.  Now, what

26     about --

1          Proceedings

2          MS. LOPEZ:  No, I just don't want to be jerked

3     around.  I'm not willing to be thrown into a facility --

4          THE COURT:  I don't want you either to be jerked

5     around and I'm trying to stop it.  So let's talk about

6     Broadway Place.  How about it?  That's my question.

7          MS. LOPEZ:  No.  Not because I'm raising concerns

8     with people and they want me out.  No, Your Honor.  I will

9     not concede to being moved because every one of the staff

10    have a conflict of interest and they're creating a never

11    ending paper trail to support an erroneous argument.  I'm

12    not going to be put anywhere but with transgender people.

13    In a transgender specific location.

14         THE COURT:  Miss Baez, are there transgendered

15    women at Broadway Place?

16         MS. BAEZ:  I don't know if there's currently any

17    transgender women currently placed there today.

18         THE COURT:  But there are at Marsha's Place and

19    there are at WIN West, correct?

20         MS. BAEZ:  Yes.

21         THE COURT:  Any other places.

22         MS. BAEZ:  I wouldn't know.  There are several

23    transgender clients throughout the system, but I would be

24    able to tell you specifically what facilities they're

25    currently in.

26         THE COURT:  I certainly don't think it's an

1                          Proceedings

2      unreasonable position.  Whether it will eventually prevail

3      is another issue.  But in the first instance, it's not

4      entirely unreasonable given the circumstances.  The news

5      media has a lot about violence again transgender people and

6      I'm mindful of that.  And I think that, Miss Lopez, whether

7      it's a realistic concern at WIN West, I can't say.  Or at

8      anyplace I can't say.  None of us can say what's going to

9      happen tomorrow.  But we do know that there are issues.

10             MS. BAEZ:  Your Honor, the City would be willing to

11     look into whether there are transgender clients at Broadway

12     House.  If there aren't and that is of concern to Miss

13     Lopez, there are 12 mental health facilities that we could

14     look at, if that's an issue and we need to be specifically

15     looking for a site with other transgender individuals, we

16     may be able to find the placement for her that would fit

17     that.

18             THE COURT:  How about that?  Finding -- hang on

19     here.  Hear me out.

20             MS. LOPEZ:  I refuse to entertain the option where

21     the City counsel put forth that it be a mental health

22     facility.

23             THE COURT:  I am going to totally delete that.  I

24     was going to mention that.  Miss Lopez, I was going to say

25     where there are other transgendered women.

26             MS. LOPEZ:  That's the other thing, Your Honor.

1                           Proceedings

2           THE COURT:  Is that a yes or no?

3           MS. LOPEZ:  No, because that forces them to reveal

4     they're trans.  What are we doing here?  What are we doing?

5     Saying that to another transgender person in the shelter

6     show yourself so we can send her there?  It's preposterous.

7     What is underlying these proceedings is the fact that a new

8     facility named for my organization's founder was opened too

9     soon with staff that are untrained and they got proverbial

10    squeaky wheel and the loudest whistle.

11          At the end of the day what this is about is I will

12    not abandon -- I will not abandon the peers that I have

13    there.  And I will not be forced into the closet or allow or

14    even support the City to go on a searching expedition for

15    where there are other transgender people, by which the

16    medical protocols say once you have a SRS you're supposed

17    to, if you choose, become stealth.

18          THE COURT:  I thought that's what you wanted.

19    Maybe I misunderstood.

20          MS. LOPEZ:  Then what is it that you believed and

21    allow me to --

22          THE COURT:  That you wanted to be with other

23    transgendered women.

24          MS. LOPEZ:  I'm in a unique position, Your Honor.

25    And as the executive director of Star and a quasi-celebrity.

26    I do not have the option of sort of remaining completely

1            Proceedings
2    stealth always.  I'm referring, though, that your previous
3    inquiry about other transgender people would force, unless
4    these transgender people have always wore this on their
5    sleeve, this attorney to go searching for either transgender
6    identified individuals or prove that other people are
7    transgender, this is what we're doing here.  This is what
8    we're litigating.
9            THE COURT:  I don't really think so, Miss Lopez.  I
10   think it's a good faith response from Miss Baez just to try
11   to accommodate you.
12           MS. LOPEZ:  Sure.  I want to say I cannot reiterate
13   enough, besides myself and the court, I believe everyone
14   here are attorneys and what's happening is that there were
15   GLBTQ people that are not being treated right, including
16   myself, and the label of needing mental health or extra
17   mental health protections because of their response to
18   mistreatment is out of line.
19           MR. ROBERTS:  Your Honor, just one correction.
20   When we were in front of Judge Caproni there was no
21   discussion of the nature of Broadway House.  That was not --
22   the issue was about the dog.  We did say we wanted to
23   transfer her there, but there was no discussion concerning
24   that facility or its program.  So I just want to correct
25   that for the record.
26           THE COURT:  Fine.  Right now Miss Lopez indicates

Proceedings

1
2    she's not interested in Broadway Place or House, whichever
3    it is.  At any rate, so I know that.  Let's move on to what
4    I'm going to do here.  I did sign this.  I'm going to grant
5    a stay.  The issue is if there's nowhere else right now she
6    should be at Marsha's Place in the interim pending my
7    determination on the PI.  That's what I'm doing.  And just
8    like Judge Caproni did, it will be contingent on Miss Lopez
9    abiding by the rules, trying to get along.  If you can't --
10   what is it?  If you can't get along without going along or
11   something like that.
12           MS. LOPEZ:  Yes, Your Honor.
13           THE COURT:  Absent anything illegal, immoral
14   effect, you're going to get along, right?
15           MS. LOPEZ:  Yes.  Your Honor, may I please?  May I
16   please?
17           THE COURT:  Not right now.  That's a condition of
18   your remaining at Marsha's House.
19           MS. LOPEZ:  Yes, Your Honor.
20           THE COURT:  And should I hear something to the
21   contrary, I'll listen.  I will listen.  That's all I do as a
22   judge right now.  I listen.  You can't be --
23           MS. LOPEZ:  No, I meant at Marsha's, Your Honor.
24           THE COURT:  So that can I deem you served with
25   these papers?  Have you been served with these?
26           MR. ROBERTS:  No, I have not been served.  I have

1                          Proceedings

2      never seen them.

3              THE COURT:  Okay.  You're going to serve them with

4      your papers.

5              MS. LOPEZ:  Yes, Your Honor.

6              THE COURT:  What's the quickest you can -- knowing

7      that the quickest you can do it the more we can resolve

8      this, when can you do that?  Personal service, which

9      means --

10             MS. LOPEZ:  I have doctors payments today, Monday.

11     Can I do it by Wednesday morning; is that unreasonable?

12             THE COURT:  Wednesday morning.  And then you can

13     either appear in op or file an answer, whatever you want to

14     do.  How long do you need after you're served?

15             MR. ROBERTS:  Well, how long --

16             THE COURT:  And then the return date would be

17     shortly thereafter.

18             MR. ROBERTS:  So I haven't seen the papers.  I

19     don't know how hard it is to answer, but I assume -- may I

20     look?

21             THE COURT:  I can't hear you.  I think you pretty

22     much know what's in them, but they'll be served.

23             MR. ROBERTS:  Well, we'll file some appropriate

24     response within the week, the following Wednesday; is that

25     appropriate?

26             THE COURT:  The following Wednesday.

1          Proceedings

2          MR. ROBERTS:  So the 17th, I guess it's the 24

3    then.

4          THE COURT:  Before 5:00 p.m.  And the return date

5    shall be on May 31st.  That's my regular motion day.

6          MS. LOPEZ:  Thank you, Your Honor.  Mr. Casper will

7    let you know what time.

8          MR. ROBERTS:  Your Honor, could you provide some

9    clarity about what you mean that she has to comply with the

10   rules?  Because threatening the staff is against the rules

11   and there are a lot of rules, but I would like to know what

12   it is you understood by that.  But it does seem to me f

13   she's threatening the staff we should be able to come back

14   here.

15         THE COURT:  Well, certainly that would be not be

16   appropriate behavior, nor would any inappropriate behavior

17   by staff be allowed.  But I cannot be ordering them, but I

18   would assume that they would be also behaving themselves.

19   Everybody should be behaving themselves.

20         MR. ROBERTS:  But if she threatens staff, they can

21   transfer her?

22         MS. LOPEZ:  Threaten for what?  To sue them is

23   different, is civil.

24         THE COURT:  She knows, just like Judge Caproni

25   said, she has to behave herself, abide by the rules.  I

26   wouldn't be threatening people.  That's not a good idea.

1                       Proceedings

2          MS. LOPEZ:  Yes, Your Honor.  But I cannot -- Your

3    Honor, I just want to be clear, because I do not even agree

4    on the record if I --

5          THE COURT:  I understand that there's no finding

6    here about anything.

7          MS. LOPEZ:  I mean, to abide, I'm not going to

8    abide by rules that require me to stand by if someone is

9    being mis-gendered in front of me.  That's all.  That's all.

10   I, of course, will follow curfew.

11         THE COURT:  Miss Lopez, right now you have a case

12   pending.  And I certainly understand and, you know, it's

13   nice that you want to defend people and do this, but for the

14   time being maybe you should stand back because you have a

15   bigger -- don't you have a bigger goal here?

16         MS. LOPEZ:  Yes, Your Honor.

17         THE COURT:  Right.  Think about your bigger goals.

18         MS. LOPEZ:  Yes, Your Honor.

19         THE COURT:  Which is --

20         MS. LOPEZ:  Yes, Your Honor.

21         THE COURT:  That's self-described, by the way.  So

22   if I were you, I would be very careful.  Very careful.

23         MS. LOPEZ:  Yes, Your Honor.

24         THE COURT:  And I would avoid all potentials,

25   because it's not just your case, it's a bigger issue now.

26         MS. LOPEZ:  Your Honor, yes.  Thank you.

                              Proceedings

1                    THE COURT:  All right.  Thank you.  And I'll write

2        that into the order.  As soon as I finish, I'll bring it

3        out.

4                    MR. ROBERTS:  Is that both parties?

5                    THE COURT:  If you want to remain.  I have to give

6        this back to you, so give me a few minutes, let me go in the

7        back and settle this up appropriately.

8                              * * * * * * * * * * *

9                              C E R T I F I C A T E

10

11       I, Karen M. Mennella, a Senior Court Reporter for the State of

12       New York do hereby certify that the foregoing is a true and

13       accurate transcription of my original stenographic notes.

14

15

16                                    Karen M. Mennella,

17                                    Senior Court Reporter