# Exhibit 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------- x

In the Matter of the Application of

MARIAH LOPEZ,

                                        Petitioner,

                    -against-

N.Y.C. DEPARTMENT OF HOMELESS SERVICES,
PROJECT RENEWAL,

                                        Respondents.

------------------------------------------------------------------- x

**VERIFIED ANSWER**

Index No. 100632/2017

Motion Seq. No. 1

I.A.S. Part 12 (Jaffe, J.)

Respondent, N.Y.C. Department of Homeless Services ("DHS") by its attorney,

Zachary W. Carter, Corporation Counsel of the City of New York, as and for its Verified Answer

to the Verified Petition, dated May 11, 2017, respectfully alleges as follows:

    1.  Admits the allegations set forth in paragraph "1" of the Verified Petition.

    2.  Admits the allegations set forth in paragraph "2" of the Verified Petition.

    3.  The first sentence of paragraph "3" of the Verified Petition is a description of

the relief Petitioner seeks which requires no response.  Denies the allegations set forth in the

second, third, fourth, fifth and sixth sentences of paragraph "3" of the Verified Petition, but

admits that Petitioner previously commenced a federal lawsuit against DHS and Project

Renewal; that DHS determined that Petitioner could keep her dog with her while in the shelter

system as a reasonable accommodation for Petitioner's disability; and that DHS decided that

Petitioner be transferred to another shelter within the DHS system.  The seventh sentence of

paragraph "3" of the Verified Petition is a description of the relief Petitioner seeks which

requires no response.  Denies the allegations set forth in the second paragraph of paragraph "3"

of the Verified Petition, but admits that Kaedon Grinnell is Project Renewal's director of Marsha's Place and that Petitioner has confronted Mr. Grinnell.

    4. Petitioner has made no allegations in paragraph "4" of the Verified Petition, so no response is required.

    5. Admits the allegations set forth in paragraph "5" of the Verified Petition.

### AS AND FOR A STATEMENT OF PERTINENT AND MATERIAL FACTS, DHS RESPECTFULLY ALLEGES:

    6. DHS made a lawful, reasonable and appropriate decision to transfer Petitioner from Marsha's House shelter in the Bronx to the Women In Need West shelter ("WIN West") located on 51st Street on the west side of Manhattan. The need for the proposed transfer resulted from Petitioner's persistent violation of the rules of Marsha's House and threats against the staff at Marsha's House and from DHS' desire to place Petitioner in a facility that will provide her more appropriate social services and be better equipped to address Petitioner's conduct. WIN West has various services that are more suited to Petitioner and is one of the best operated and safest shelters operated for single adults. Accordingly, this Article 78 proceeding should be dismissed (i) because the decision to transfer Petitioner from Marsha's house to WIN West was neither arbitrary nor capricious and (ii) because Petitioner has failed to exhaust available administrative remedies.

### OVERVIEW OF THE SHELTER SYSTEM AND MARTHA'S HOUSE

    7. DHS operates a shelter system that provides housing for approximately 59,000 individuals. DHS generally classifies its shelter clients into three groups: families with children, adult families and single adults. During Petitioner's most recent stay in DHS' shelter system, Petitioner presented as a single adult, and consequently DHS placed her into a shelter for single adults.

8.      Most of DHS' shelters for single adults are operated by non-profit social service providers ("shelter operators") with which DHS contracts.  The shelter operator and the shelter operator's employees run the shelter subject to requirements established by DHS.  DHS determines to which shelter to assign a particular client, and DHS is responsible for transferring clients from one shelter to another.  In contracted shelter, it is, however, the shelter operator's employees who have routine interactions with the clients in the shelters through the daily provision of shelter and social services.

9.      Shelter operators often contract with other entities to provide services at the shelters they operate.  Specifically, shelter operators often contract with private security businesses to provide security in their shelters.

10.     DHS attempts to provide shelters appropriate to the needs of various sets of its clients, and in 2016 DHS contracted with Project Renewal, a non-profit shelter operator, to operate a shelter designed to house young clients, under age 30, who self-identify as lesbian, gay, bisexual, transgender or questioning ("LGBTQ").  The resulting shelter, known as Marsha's House, opened on February 15, 2017 and is located on East 185th Street in the Mount Eden neighborhood of the Bronx.

11.     The clients who reside at Marsha's House have all requested to be placed there on a voluntary basis, and DHS has not made any involuntary placements to Marsha's House.

12.     Marsha's House currently has beds for approximately 80 clients and is operated by Project Renewal.  Project Renewal has contracted with Quality Protection Services, a business corporation, to provide security at Marsha's House.

13.    Marsha's House provides a variety of services to the clients living there, including meals.   There are, however, only limited onsite mental health services provided at Marsha's House.   On Wednesdays from 9 am to 5 pm there is psychiatrist, and on Thursdays from 9 am to 5 pm there is psychiatric nurse scheduled to be at Marsha's House.   These staff mainly perform psychiatric evaluations as a component of clients' housing packages, and not as ongoing clinical work.

## PETITIONER'S HISTORY IN THE DHS SHELTER SYSTEM

14. Petitioner has previously been in the DHS shelter system on at least two occasions, March of 2008 and September of 2014.   The September 2014 stay in the DHS shelter system for adult families came to an end due to a physical altercation between Petitioner and her then partner.   Attached as Exhibit A is a true and correct redacted[1] copy of the DHS "Client Home" record concerning Petitioner's history in the shelter system, which is a business record maintained by DHS.

15. Petitioner returned to the DHS shelter system in April 2017 and requested to be placed in Marsha's House.   Although Petitioner exceeded the age parameters for assignment to Marsha's House, DHS, at its discretion, placed her in that shelter on or about Thursday April 20, 2017.

16. On April 20, 2017, representatives of Project Renewal met with Petitioner to explain the rules of the shelter to her and to obtain her agreement to comply with the rules rules and regulations of the shelter and of the Agency.   Petitioner acknowledged receipt of those rules and signed agreements to comply with the rules.   Attached as Exhibit B is a true and correct

---

[1] The exhibits to this answer have been redacted to remove personal information, such as birth dates, client numbers and the names of clients who are not party to this litigation.

redacted copy of the rules that Petitioner acknowledged receiving on April 20, 2017 and her agreements to comply with those rules signed on April 20, 2017.

17. Among other things, the rules (i) require clients to submit to passage through an x-ray machine at the entry to the shelter and prohibit clients from bringing alcohol and candles into the shelter (See page 3 of Exhibit B, paragraph on "Entry Procedure/Locker Searches"), (ii) prohibit clients from bringing food into the shelter or taking food out of the dining room (See page 4 of Exhibit B, paragraph on "Food and Meals"), (iii) establish a curfew of 10:00 PM for return to the shelter (See page 5 of Exhibit B, paragraph on "Curfew"), and (iv) prohibit clients from entering the sleeping floors while intoxicated or verbally abusing staff or other clients in the shelter (See page 6 of Exhibit B, paragraph listing infractions). The written agreements signed by Petitioner also provide that "Clients cannot bring alcoholic beverages … into the shelter" and that "There is no fighting or use [of] abusive or threatening language. Harassment or intimidation of other residents or staff is strictly prohibited." The agreement also provides that candles and fire hazards are prohibited and that "sexual activity … is not permitted in the shelter facility." (See page 10 of Exhibit B)

18. As detailed below, immediately upon arrival, Petitioner established a pattern of violating the rules of Marsha's House and of threatening the employees of Project Renewal who sought to enforce those rules.

19. Although Marsha's House has a curfew of 10:00 PM when residents must be present, Petitioner arrived at Marsha's House at approximately 12:40 AM on the night of April 20-21, 2017. Petitioner did not have her dog with her at that time, however, Petitioner got into an argument with a Project Renewal employee, Akeem Linton, about whether she could bring her dog to the shelter. Mr. Linton reported that when he advised Petitioner that he would consult

with his supervisors about her dog, Petitioner told him that "she would have unnamed persons come to the shelter to fight him." Mr. Linton also reported that Petitioner "came to the operations office several times afterwards to threaten him and stated that he would be attacked after work." Attached as Exhibit C is a true and correct redacted copy of the April 21, 2017, 12:40 AM incident report concerning these events written by Kaedon Grinnell, the Project Renewal Shelter Director.

20. Later that morning, Petitioner made further threats to Mr. Linton, and their disagreement became so heated the police were called to the shelter. No arrests were made. Attached as Exhibit D is a true and correct redacted copy of the April 21, 2017, 11:51 AM incident report concerning these events written by Kaedon Grinnell, the Project Renewal Shelter Director.

21. On Friday April 21, 2017, Petitioner and Kaedon Grinnell, the Project Renewal Shelter Director for Marsha's House, and Katina Roye, the Project Renewal Assistant Director for Marsha's House, signed a "DHS Commitment Contract." In the contract, Petitioner again agreed, among other things, to "adhere to all shelter/clinical rules and regulations." Petitioner also expressly acknowledged that she "will be transferred to another DHS facility if I am not successfully housed within 60 days of entry to the program." Attached as Exhibit E is a true a correct redacted copy of the DHS Commitment Contract.

22. Petitioner again violated the curfew on Sunday night April 23-24, 2017, arriving at 1:11 AM with food from outside, which is not permitted in Project Renewal shelters. Ms. Lopez was informed that she could not bring the outside food into the shelter, but she disregarded the directive and stated, "if you want to keep your fucking job you better leave me the fuck alone," and proceeded to enter the shelter with food. Attached as Exhibit F is a true a

- 6 -

correct copy of the April 24, 2017, 1:10 AM incident report concerning these events written by Kaedon Grinnell, the Project Renewal Shelter Director.

23. Forty minutes later, Petitioner violated another important rule and again refused to comply with staff instructions. At the 2:00 AM bed count, staff found Petitioner in bed with another client, which is against the terms of the agreement Petitioner had signed. The staff member informed Petitioner and the other client that they were not permitted to be in bed together, but Petitioner defied the rule and advised the staff member that Petitioner and the other client would stay in bed together. Attached as Exhibit G is a true and correct redacted copy of the April 24, 2017, 2:00 AM incident report concerning these events written by Kaedon Grinnell, the Project Renewal Shelter Director.

24. On Tuesday April 25, 2017 Petitioner filed a complaint in the United States District Court for the Southern District of New York alleging that DHS and Project Renewal were violating the Americans with Disabilities Act ("ADA") in that she has "impulse control disorder, PTSD and anxiety" and that she needed her dog due to these disabilities. Petitioner attached to her federal complaint a letter from Nurse Practitioner Jessica Pacannuayan, which stated that Petitioner "is currently under our professional care for treatment for a mental illness defined by the DSM-V. … I have prescribed an emotional support animal as part of the treatment program developed for Mariah." Attached as Exhibit H is a true and correct redacted copy of the April 25, 2017 Federal Complaint with its exhibits.

25. On Thursday April 27, 2017, Judge Caproni issued a Temporary Restraining Order that ordered DHS to permit Petitioner to bring her dog to the shelter until Monday May 1, 2017. Attached as Exhibit I is a true and correct copy of the April 27, 2017 Federal TRO.

26. On Friday April 28, 2017, DHS determined that permitting Petitioner to have her dog was a reasonable accommodation for her disability, and Petitioner has been permitted to bring her dog into Marsha's House.

27. Despite having her dog, Petitioner continued to threaten the staff at Marsha's House and to violate the shelter's and DHS' rules.

28. On Tuesday May 2, 2017, Petitioner made threatening statements to two staff members and told them "the same thing that happened to your friend can happen to you. I know people that can make a lot of things happen, and your dead friend on the other side watches over you." Attached as Exhibit J is a true and correct redacted copy of the May 2, 2017, 8:13 AM incident report concerning these events written by Katina Roye, the Project Renewal Assistant Director.

29. On Thursday May 4, 2017, Petitioner permitted her dog to walk around the first floor of Marsha's House unsupervised. Attached as Exhibit K is a true and correct copy of the May 4, 2017, 5:00 PM incident report concerning these events written by Kaedon Grinnell, the Project Renewal Shelter Director.

30. On Sunday May 7, 2017 at 10:30 AM Petitioner's dog was again roaming within Marsha's House unattended. Attached as Exhibit L is a true and correct redacted copy of the May 9, 2017 case notes describing the May 7 incident written by Kaedon Grinnell, the Project Renewal Shelter Director.

31. Later on Sunday May 7, 2017, at approximately 8:15 PM, Petitioner created a fire hazard at Marsha's House by leaving lit candles unattended in her room. As noted above, having candles in the shelter is against the rules of Marsha's House, and leaving them unattended while lit endangers everyone in the building. See Exhibit L for true and correct redacted copy of

the May 9, 2017 case notes describing the incident with the candles and Mr. Grinnell's meeting with Petitioner. Petitioner falsely asserted that she had not left lit candles unattended (three days later she admitted they were lit and unattended, see Exhibit N, which is a true and correct redacted copy of the Case Notes dated May 10, 2017 6:09 PM written by Kaedon Grinnell).

32. Also on Sunday May 7 at 11:25 PM, Petitioner came back to Marsha's House intoxicated and with a bottle of wine. As noted above, possession of alcohol in the shelter is against the rules. As before, Petitioner refused to comply with the rules and brought the wine into the shelter over the objections of the staff at the front door of Marsha's House. Attached as Exhibit M is a true and correct redacted copy of the May 7, 2017, 11:25 PM incident report concerning these events written by Katina Roye, the Project Renewal Assistant Director. See also Exhibit L for a true and correct redacted copy of the May 9, 2017 case notes describing the incident with the bottle of wine.

33. On Monday May 8, 2017, Mr. Grinnell met with Petitioner to discuss the three incidents of the prior day. See Exhibit L for true and correct redacted copy of the May 9, 2017 case notes describing the incidents and Mr. Grinnell's meeting with Petitioner.

34. On Tuesday May 9, 2017, Project Renewal requested that Petitioner be suspended for three days due to the alcohol incident. Attached as Exhibit P is a true and correct copy of the May 9, 2017 Suspension Request Form submitted by Kaedon Grinnell, the Project Renewal Shelter Director.

35. On Wednesday May 10, 2017, at approximately noon, Petitioner threatened a food service worker at Marsha's House, Tonya Fowler, due to what Petitioner contended was an inadequately sized meal provided by Ms. Fowler to another client. Petitioner threatened Ms. Fowler that "she would beat the shit out of [Ms. Fowler]", and that she would be going outside to

"get someone to put their hands on [Ms. Fowler]." The Assistant Director of Marsha's House, Katina Roye, intervened to move Petitioner away from Ms. Fowler. Ms. Fowler reported that she feels unsafe at work and that she believes Petitioner intends to harm her. Attached as Exhibit O is a true and correct redacted copy of the May 10, 2017 6:08 PM Notes History recounting the incident and Ms. Fowler's comments written by Kaedon Grinnell, the Project Renewal Shelter Director.

36. On Wednesday May 10, 2017, Mr. Uetake decided to transfer Petitioner to a shelter with greater mental health services and DHS police, instead of private security guards. However, Mr. Uetake had not yet decided which shelter to transfer Petitioner to.

37. Ms. Roye and Mr. Grinnell subsequently met with Petitioner on May 10, 2017 at approximately 4:15 PM (i) to advise Petitioner that she was being transferred to another shelter and (ii) to discuss Petitioner's threats against Ms. Fowler. Petitioner admitted making the threats quoted above and asserted that they were "conditional threats." In the meeting, Petitioner went on to reiterate her threats against Ms. Fowler and stated that if DHS transferred Petitioner out of Marsha's House there would be a number of people waiting to attack Ms. Fowler. See Exhibit O attached hereto.

38. At the meeting on May 10, 2017, at approximately 4:15 PM, Petitioner was given a copy of the Client Notification of Transfer advising Petitioner that she would be transferred to another shelter on May 11, 2017. Petitioner refused to sign the form. Attached as Exhibit Q is a true and correct redacted copy of the May 10, 2017 Client Notification of Transfer.

39. Mr. Uetake subsequently decided that Petitioner should be transferred to the WIN West shelter, and Ms. Lopez was given notice of her new shelter assignment on May 11,

2017. Attached as Exhibit R is a true and correct copy of the May 11, 2017 Shelter Client

Transfer Referral advising Petitioner that she was being transferred to WIN West.

## THE WIN WEST SHELTER

40. WIN West is a shelter for single adult females run by Women In Need, Inc. at

341 West 51st Street in Manhattan (between 8th and 9th avenues) with approximately 68 beds that

has prior and ongoing experience with transgender clients.

41. Women in Need, Inc. is a non-profit corporation that has contracted with DHS

to be a shelter operator.

42. WIN West has extensive mental health services on site and provides the

following on site services: Psychiatric Nurse Practitioner; four (4) social workers; four (4)

clinical background Masters Level Case Managers; psychoeducational groups daily; a licensed

practical nurse; DHS Police security; and a licensed creative arts therapist.

43. WIN West currently has transgender individuals assigned to the shelter.

44. WIN West staff receives EEO Diversity Training and Employment Sensitivity

Training.

45. On information and belief, WIN West has not had any recent Priority 1, 2 or 3

Incidents – as defined in the DHS Incident report form, see e.g. Exhibit C hereto -- related to

transgender clients.

46. None of the transgender clients at WIN West have requested a transfer out of

WIN West for any reason, including incidents occurring at WIN West.

47. The security at the WIN West shelter is provided by DHS Police. DHS Police

have often had success obtaining compliance with DHS rules from clients, and clients seem to be

less inclined to violate DHS rules or to try to bring prohibited items into shelters where DHS

Police are providing security than where security is provided by a private security firm retained by the shelter operator.

48. As detailed above, Petitioner repeatedly brought prohibited items into Marsha's House and otherwise defied the shelter's rules. Petitioner seems to understand the limited authority of the security staff at Marsha's House, and she takes advantage of the limitations placed upon the security staff at Marsha's House.

49. As explained in more detail in Mr. Uetake's affidavit, Mr. Uetake reasonably balanced these and other factors in deciding to transfer Petitioner to the WIN West shelter.

50. Petitioner continued to make threats against Marsha's House's staff after the transfer decision, which confirmed Mr. Uetake's belief that transferring Petitioner to the WIN West shelter is appropriate.

51. Petitioner did not accept the transfer, however, she did not file an administrative appeal requesting a fair hearing challenging the transfer decision.

52. On the night of Thursday May 11, 2017, Petitioner left Marsha's House with most of her possessions in a taxi or similar car service that was paid for by DHS. The driver was given instructions to take Petitioner to the WIN West shelter, but Petitioner never arrived at that location.

53. On Friday May 12, 2017, Petitioner commenced this proceeding, and the Court ordered DHS to permit Petitioner to return to Marsha's House over the weekend.

54. The Court is respectfully referred to the attached affidavits of Dean Uetake, Paul Hargrow, Keadon Grinnell, Tonya Fowler, and Trevor Ollivievre for additional details concerning the transfer decision, Petitioner's behavior, and the WIN West shelter.

## AS AND FOR A FIRST DEFENSE

55. DHS' actions were in all respects legal, proper, reasonable, and in conformity with all applicable laws and regulations, and were neither arbitrary nor capricious.

56. It is well-established that Temporary Housing Assistance recipients in New York do not have a right to choose their own shelter placement.   Petitioner's allegations challenging her transfer to the WIN West shelter accordingly fails to state a claim and should be dismissed.

57. Under New York law, DHS has broad discretion in assigning Temporary Housing Assistance recipients to specific shelters. The administrative directive promulgated by OTDA to advise local districts of their responsibilities in providing temporary housing explicitly states that "[h]omeless persons do not have the right to choose their own temporary placements." 94 ADM-20(V)(D)(3)(attached as Exhibit S hereto is a true and correct copy of Administrative Directive 94 ADM-20); see also McCain v. Koch, 117 A.D.2d 198, 218 (1st Dep't 1986) ("Emergency shelter residents do not have a due process right to be housed in any particular neighborhood or type of housing."), rev'd on other grounds, 70 N.Y.2d 109 (1987).

58. Since there is no right to a specific shelter placement, homeless individuals also do not have a right to advance notice and a hearing prior to a shelter transfer. Nuraina v. OTDA, 2011 N.Y. Misc. LEXIS 5024, at *3-4 (Sup. Ct., N.Y. Co. Oct. 7, 2011) (citing 94-ADM-20(V)(F)(1)). While Petitioner may request a fair hearing to challenge the adequacy of the shelter to which she was transferred, Petitioner does not have a right to challenge the transfer itself. See id. at *6.

## AS AND FOR A SECOND DEFENSE

59. Petitioner has failed to exhaust available administrative remedies.

60. Under CPLR § 3211(a)(2), a pleading is subject to dismissal if the court does not have jurisdiction over the subject matter of the cause of action. A court lacks subject matter jurisdiction over an action where the plaintiff is required to exhaust her administrative remedies but has failed to do so. See, e.g., Ancrum v. St. Barnabas Hosp., 301 A.D.2d 474, 474-75 (1st Dep't 2003); Harold Levinson Assocs., Inc. v. New York State Dep't of Taxation & Fin., 2005 N.Y. Misc. LEXIS 2931, at *8 (Sup. Ct., N.Y. Co. Dec. 23, 2005) ("[B]ecause plaintiff did not exhaust its administrative remedies, this court lacks jurisdiction over the subject matter of this action.").

61. Petitioner has brought this Article 78 proceeding to challenge DHS' decision to transfer her to the WIN West shelter. However, a litigant who wishes to challenge the action of an administrative agency pursuant to an Article 78 proceeding "may not do so until they have exhausted their administrative remedies." Walton v. New York State Dep't of Correctional Servs., 8 N.Y.3d 186, 195 (2007). The New York Court of Appeals has held that this requirement to exhaust administrative remedies:

> furthers the salutory goals of relieving the courts of the burden of deciding questions entrusted to an agency, preventing premature judicial interference with the administrators' efforts to develop, even by some trial and error, a co-ordinated, consistent and legally enforceable scheme of regulation and affording the agency the opportunity, in advance of possible judicial review, to prepare a record reflective of its expertise and judgment.

Watergate II Apartments v. Buffalo Sewer Authority, 46 N.Y.2d 52, 57 (1978) (internal citations omitted).

62. A claim challenging an agency action brought pursuant to Article 78 should be dismissed where the litigant fails to exhaust her administrative remedies by challenging the

agency action at a fair hearing. <u>Bien-Aime v. New York City Human Resources Admin.</u>, 685 N.Y.S.2d 54, 55 (App. Div. 1st Dep't 1999).

63. Temporary housing assistance, which Petitioner has been receiving, is a public assistance benefit, and public assistance recipients have the right to a fair hearing to challenge the adequacy of their services. 18 N.Y.C.R.R. §§ 352.35(b)(4), 358-3.1(b)(6) & 358-5.9. State regulations even provide priority in fair hearing scheduling and determination to those public assistance recipients requesting hearings to challenge the adequacy or appropriateness of their shelter placement. 18 N.Y.C.R.R. § 358-3.2(b)(3). Emergency hearings are generally scheduled within 48 hours of the request. State regulations therefore explicitly provide Petitioner with the right to request a fair hearing to challenge the adequacy of her placement at the WIN West shelter.

**WHEREFORE**, Respondent DHS respectfully requests that the Verified Petition be denied in its entirety and the relief sought therein be denied in all respects, with costs and disbursements.

Dated:    New York, New York
          May 24, 2017

ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for DHS
100 Church Street, Room 2-110
New York, New York 10007
(212) 356-0872
throbert@law.nyc.gov


By: _____
    THOMAS B. ROBERTS
    Assistant Corporation Counsel

- 15 -

To:  **BY EMAIL and REGULAR MAIL**
Mariah Lopez
Marhsa's House
480 East 185th St.
Bronx, NY
Mariah4change@
*Petitioner*

Richanrd Greenberg, Esq.
Jackson Lewis P.C.
666 Third Avenue, 29th Floor
New York, NY 10017
GreenbeR@JacksonLewis.com
*Counsel for Respondent Project Renewal*

## VERIFICATION

STATE OF NEW YORK    )
                        SS.:
COUNTY OF NEW YORK  )

        Tonie Baez, being duly sworn, deposes, and says, that she is an attorney employed by the Department of Homeless Services of the City of New York, that she is acquainted with the facts herein, that she has read the foregoing Verified Answer and it is true based on her own knowledge and information obtained from the records of the Department of Homeless Services of the City of New York, and statements made by certain, officers, agents, and employees of the Department of Homeless Services of the City of New York and other city employees, except as to matters stated therein to be based on information and belief and, as to those matters, he believes them to be true.

                                      TONIE BAEZ

Sworn to before me this
24th day of May 2017

NOTARY PUBLIC

**NATASHA L. GODBY**
Notary Public, State of New York
No.01GO5040606
Qualified in Richmond County
Commission Expires, March 20, 20_19_

EXHIBIT A

Client Home: MARIAH LOPEZ - 745918                                          Page 1 of 1



Client Home: MARIAH LOPEZ -

Back Edit Generate Cover Sheet Refer To Intake Generate O-PATH Client

**Name**

| First Name: MARIAH ) | Middle Name: |
| Last Name: LOPEZ | Suffix: |
| Mother's Last Name: UNKNOWN | |

**Demographics**

| SSN: | OSIS ID: |
| PA Case #: | Date of Birth: |
| Marital Status: Single | Gender: Female |
| Primary Race: Native Hawaiian or Other Pacific Islander | Secondary Race: White |
| Ethnic Origin: Hispanic/Latino | Preferred Language: English |
| Veteran Status (Client Reported): No | Veteran Verification Status: |
| Pregnant: No | Citizenship Status: N/A |
| Client Creation Date: 3/3/2008 | Adult/Child: Adult |

**Managerial Flags**

| Reason | Created By User | Last Updated By | Effective Date | End Date | Comments |
|---|---|---|---|---|---|
| Domestic Violence | RCHEW | | 9/18/2014 | | 9/21/14: (A.Winston): Single Adult Shelters: Please refer to note below entered on 9/18 by R. Chew. If client presents for shelter in the single adult system, immediately contact PA Winston at 9/18/14 (R. Chew): This is an high profile adult family case. The co-appl is scheduled for a NoVA appointment at PATH on Fri, Sept 19 at 9am and the appl is scheduled for a NoVA appointment at PATH on Fri, Sept 19 at 3pm. Please allow client entry and expedite the NoVA appointments. Please contact Vida Chavez-Downes immediately if the co-appl and appl present at PATH. 9/19/14 (B; DiStefano): This case was determined to be ineligible for nbo cooperation with NoVA and failure to be NoVA evaluated after two appointments. If this adult family reapplies they cannot be placed together in shelter until evaluated by NoVA and can be offered the option of the single shelter system respectively. |

**Alerts**

| Sanction Status: | Sanction Start Date: |
| Sanction End Date: | Suspension Status: |
| Suspension Start Date: | Suspension End Date: |
| Brad H Status: No | SPMI: |
| Active Institutional Referral: | Parole: No |
| Accutrac: | Chronic Street Homeless: No |
| Reasonable Accommodations: No | |

All Cases

**Case History**

| Case Number | Service Type | Case Type | Case Composition | Optional | Creation Date | Case Status |
|---|---|---|---|---|---|---|
| | Shelter | Single Adult | 1/0 | Eligible | 4/19/2017 | Open |
| | Shelter | Adult Families | 2/0 | Ineligible – Non Cooperation | 9/5/2014 | Closed |
| | Shelter | Single Adult | 1/0 | Eligible | 3/3/2008 | Closed |

**Shelter Stay**

| Case Number | Shelter Name | Type | Start Date | Exit Date | Exit Reason |
|---|---|---|---|---|---|
| | Marsha's House | Official | 5/6/2017 | | |
| | Marsha's House | Official | 5/1/2017 | 5/6/2017 | Exit Unknown |
| | Marsha's House | Official | 4/27/2017 | 4/30/2017 | Exit Unknown |
| | Marsha's House | Official | 4/24/2017 | 4/24/2017 | Exit Unknown |
| | Marsha's House | Official | 4/23/2017 | 4/23/2017 | Exit Unknown |
| | Marsha's House | Official | 4/21/2017 | 4/23/2017 | Exit Unknown |
| | Marsha's House | Official | 4/20/2017 | 4/20/2017 | Exit Unknown |
| | Franklin Women's Shelter | Official | 4/19/2017 | 4/19/2017 | Program Assignment |
| | STAR BRIGHT RESIDENCE | Conditional | 9/11/2014 | 9/19/2014 | Ineligible |
| | EL CAMINO INN | Conditional | 9/6/2014 | 9/11/2014 | Transfer – Administrative |
| | HELP Women's Center | Official | 3/20/2008 | 3/20/2008 | Independent Living - NYC |
| | HELP Women's Center | Official | 3/3/2008 | 3/4/2008 | Exit Unknown |

Back Edit Generate Cover Sheet Refer To Intake Generate O-PATH Client

# EXHIBIT B

# Project Renewal — Marsha's House

## CLIENT FACE SHEET

Date of Entry: 4/20/17         Medicald #: _____ Seq: _____

Name: Mariah Lopez            Race/Ethnicity: Mixed

HA#: _____                  SS#: [redacted]

Referring Shelter: N/A        D.O.B: _____ Age: _____

Place of Birth: NYC           Years in Shelter System: _____

Street Time (dates): 6 yrs    Education level: Some College/GED

Marital Status: Single        Primary Language: _____

Allergies: N/A

How you became homeless: _____

## Current Substance Abuse Treatment Program Information

Name of Program/MMTP(circle): _____         Date of Admission: _____

Address: _____              Phone: _____

Counselor's Name: _____     Methadone Dosage: _____

Substance abuse history: marijuana, cocaine, nicotine

Clean Since?: _____

## Income and Benefits

Current Active Benefits & Amount: $730 SSI

Current Employer: _____      Position: _____

Monthly Income: _____ Veteran? Yes /No - If yes, discharge type: _____

## Medical / Psychiatric Issues

Medical Conditions: PTSD

Medical Provider Name & Phone: _____

Psychiatric Conditions: _____

Psychiatric Provider & Phone: _____

Medications: _____

## Legal Issues

Are you on Parole/Probation? _____ Reason: _____

Parole/Probation Officer Name and Number: _____

Address of Reporting Office: _____ End Date: _____

Outstanding Warrants: _____ Upcoming Court Dates: _____

## Emergency Contact

Name _____ Relationship _____

Address _____

Day phone (_____) _____ Night phone (_____) _____

Client's Cell Phone #: _____

Place Picture Here

416A

 **Department of Homeless Services**

Division of Adult Services

## CLIENT ACKNOWLEDGMENT OF RESPONSIBILITY FORM

SHELTER NAME : _Marshe's House._     DATE: _4/20/17_

| LAST NAME: _Lopez_ | FIRST NAME: _Norah_ | MI: |
|---|---|---|
| SOCIAL SECURITY NUMBER: | DATE OF BIRTH: | CARES ID#: |

I am seeking Temporary Housing Assistance (shelter) from the Department of Homeless Services ("DHS). I have received a copy of the "Statement of Client Rights and DHS Code of Conduct".  I understand that I must comply with the "Statement of Client Rights and DHS Code of Conduct" explained in this document and by shelter staff. These responsibilities will help me to achieve independence and find a permanent place to live.

**Listed below is a summary of the Client Responsibility rules (shelter staff will provide further details)**

1. You are required to apply for, and if eligible, maintain any benefits and resources applicable to you, including but not limited to an open and active Public Assistance (PA) case with HRA.
2. I must participate in developing, carrying out, and completing a service plan known as the "Independent Living Plan" (ILP).
3. I will seek and accept housing other than emergency shelter.
4. I must follow shelter rules and avoid behavior that places other clients or shelter staff at risk.
5. I will not have my shelter discontinued if I am unable to obey Client Responsibility rules due to a physical or mental condition or illness.

**Listed below is what may happen if I do not follow the rules of Client Responsibility**

1. I may have to leave the shelter if I am able to obey the rules and I choose not to do so.
2. I will have the right to challenge DHS's decision to discontinue my shelter by requesting a New York State Fair Hearing.
3. If the Fair Hearing Judge agrees with DHS's decision to discontinue my shelter, I will have to leave the shelter for a period of 30 days or until I decide that I will obey the rules, whichever period of time is longer.
4. I must follow the "Statement of Client Rights and DHS Code of Conduct".

CLIENT:
I have read and have had this form explained to me.  I understand that I may be told to leave the shelter if I do not comply with the "Statement of Client Rights and DHS Code of Conduct" even if I refuse to sign this form.

_Norah Lopez_          _[signature]_          _4/20/17_
Print Name              Signature              Date

STAFF:
I have explained this form to the client.        ( ) Client refused to sign.

_Vanessa Murray_        _[signature]_          _4-20-17_
Print Name              Signature              Date

Revised 04/01/13

# MARSHA'S HOUSE GUIDELINES

WAKE-UP SCHEDULE: WEEKDAYS – 6AM

Getting up on time is the responsibility of each resident. Requests to be awakened for work or any other reason requires staff approval. On weekdays clients are not permitted in the sleeping areas between the hours of 8am and 4pm, except with medical clearance or staff permission in writing in the form of a bed rest pass. Medical bed rest must be requested by a doctor or nurse practitioner in the form of a letter; the client must submit this letter to the shelter nurse. Additionally, in order for bed rest to be approved; clients must sign consent for the nurse to speak to their doctor if he or she is an outside provider. **Lights Out: Sunday-Thursday at 11:00pm; Friday and Saturday at 1:00am**

## MEETINGS AND APPOINTMENTS

All clients are required to meet with their case manager, shelter nurse, housing coordinator, supervisors, vocational counselor, entitlements coordinator, peer counselors or program psychiatrist as requested. If you are unable to make an appointment you must let the person know *in advance* and request to be rescheduled. Documentation must be provided for all missed appointments.

Clients may not enter any office spaces without a pass from the lobby RA. Passes to the office areas will not be issued, except under special circumstances, without a scheduled appointment with staff. As a rule, Social Services staff does not take walk-in appointments. Clients on bed rest and in the dining area may not enter any offices without a pass. They must go downstairs and call from the front desk to gain access to program staff and services.

## REQUIRED GROUPS

Mandatory house meetings are held on the 3rd Wednesday of each month at 6:15pm. These house meetings are tended by the Social Services team and have a focus on housing and operational issues.

## MAIL

Mail is distributed each day during bed signing (8pm – 10pm). Unless you have made special arrangements with your case manager, housing coordinator, or other social services program staff, you may not pick up your mail at any other time.

## BED ASSIGNMENTS

Bed assignments are made by staff. You may not change your bed or locker assignment without staff approval. Clients may not enter another sleeping area. You are required to make your bed and clean your area. All clothing and shoes must be put away. One pair of shoes may be kept under each client's bed; all other items will be thrown out immediately.

## ENTRY PROCEDURES/LOCKER SEARCHES

Staff has the right to inspect any bags, boxes or similar containers coming into and going out of the premises; this includes personal lockers. Clients must comply with all entry procedures, which include placing all packages through the x-ray machine, emptying pockets, removing jackets and hats and allowing them to be searched, opening wallets to be searched and walking through the metal detector. Clients may also be asked to remove shoes and socks. All contraband will be confiscated. Contraband includes: drugs (including controlled prescription medication not supervised by the shelter nurse), alcohol, syringes (unless supervised by shelter nurse), tools that can be used as weapons, lighters, silverware, sharp metal objects, scissors, bleach, caustic cleaning supplies, matches, incense, candles, any items relating to drug or alcohol use.

## URINE

Urine tampering is unacceptable and the storage of urine is not permitted anywhere in the shelter.

## TELEPHONES
Clients may request access to telephone use with social service program staff.  Be courteous and limit calls to 10 minutes (no calls during program meetings).  Cell phones can be charged on the first floor only.  Project Renewal is not responsible for any electronics lost or stolen while left charging.

## SMOKING
Pursuant to city law, there is no smoking on the premises, except in the designated yard.  Smoking in front of the building is prohibited.  Smoking inside the facility will result in a suspension of all shelter services for up to seven days. **The sale of cigarettes is prohibited.**

## FIRE SAFETY
No items may block fire escapes.  All clients are required to participate in fire drills and follow the requests of the staff during evacuation drills. Failure to comply with a fire drill may result in a suspension of shelter services for up to seven days.  Charging electronic devices is not permitted on any sleeping floors.  Ironing and cell phone charging can be done during limited hours in a designated area.  Lighters are not permitted in the building.

## BED REST
Bed rest passes are only distributed for medical reasons and issued by medical staff.  If you see an outside provider, they must provide documentation to the shelter nurse, who in turn will review and determine if a bed rest pass is to be issued. Clients must sign consent for the shelter nurse to communicate with any outside provider requesting bed rest on behalf of the client.  Bed rest for any other reason, such as working overnight, must be approved and signed by the Program Director or the Director of Social Services. You are expected to be in your bed If you receive bed rest passes; if you are caught socializing, walking around, and/or not using your bed rest appropriately, it can be revoked.

## FOOD AND MEALS
Meal time:  Breakfast is from 7:00 am to 8:15 am, Lunch is from 12:00 pm to 1:00 pm and Dinner is from 5:00 pm to 6:15 pm.  Meals are to be eaten in the dining room only.  Clients who are caught with food or beverages aside from later outside of the dining room will receive a write-up. Clients are not allowed to bring food in or take food out of the shelter. Meals can be saved with staff approval from social services.

Clients who are not able attend dinner may sign up for a save-a-plate.  Clients must be in full compliance with shelter rules and regulations to receive a save-a-plate and this will be monitored by the social services and operational team. The sign up sheet will be placed in operations at 6am. Clients requesting save-a-plates for Saturday and Sunday must sign up by Friday at 3pm.  Clients who do not comply with their Independent Living Plans are not eligible for save-a-plates.  If clients miss lunch due to a scheduled appointment they can check with operations to receive lunch at a different time.

## DRESS CODE
Clients shall be properly dressed at all times.  No hats or non religious head gear are to be worn in the facility. Tank tops may not be worn in the dining area for sanitary reasons.

## EMPLOYMENT
All clients shall receive a vocational assessment.  Clients will be directed to the Vocational Counselor and the Job Developer if appropriate.

## SAVINGS
All clients receiving income in addition to PA are required to save a minimum of 60% of their income and show proof of savings (i.e. bank account statements).  Clients without bank accounts can purchase money orders made out in their names, which will be in the shelter safe.  Receipts will be issued.  Project Renewal employees cannot hold cash for any client under any circumstances.

## RECREATION
Project Renewal has a recreation program that it offers to its clients.  Throughout the year, the shelter will take a number of clients to movies, sporting events, museums, plays, and other outings. Clients must place their name on the sign-up sheet when the event is announced as well as receive the recommendation of their case manager. Clients who are not compliant with their Independent Living Plans will not be permitted to attend recreational events.

## LOCKERS

Locks that are not DHS issued will be cut. You may only use a lock issued by this shelter on your locker. Illegal items (i.e., lighters, weapons, drugs, alcohol, food) will be confiscated. Lockers are checked regularly.

Lockers at Marsha's House are generally safe places to keep property but we are not responsible for property that might be taken from lockers by other clients. Clients are *highly* encouraged to keep anything of value such as money, electronics, or important documents elsewhere.

Due to space limitations, only personal belongings that fit into the assigned locker may be kept at the shelter. Excess personal items found in or around locker areas (under beds) are subject to disposal. Contraband, such as weapons, dangerous items, illegal drugs and articles prohibited from facilities either by law or by facility regulations, will be confiscated.

If any client's location is unknown, their locker should be opened on the morning after they have missed curfew. A team of at least two staff, including one supervisor, opens the locker to remove belongings, which will be inventoried and held in a designated clean locked storage area. Belongings are held for one week from the date the locker is emptied. A former client can retrieve their stored belongings within that one-week holding period by presenting proper identification and signing for their items at the designated property retrieval hours posted in the facility. A relative or friend may also claim belongings — provided the shelter receives authorization in writing from the former client and the relative or friend provides appropriate identification to shelter staff at the time of retrieval.

Lockers are subject to random search with or without the client present, per DHS policy. When lockers are searched there will always be at least two staff present and clients will always receive a notice of locker search.

Clients are not permitted to possess cleaning supplies, as they contain hazardous chemicals.

## COURTYARD

The courtyard is available for use throughout the day. Loitering in front of the building is **NOT** permitted.

## CURFEW

As per DHS policy, the shelter curfew is 10pm. Curfew can be extended with late night and overnight passes, which can be issued for clients with documented employment (on the books only) or in school. Clients must be in full compliance with their Independent Living Plan to be granted passes and passes can be revoked at anytime if clients are involved in incidents within the shelter.

## MEDICATION

Any client on medication must notify the shelter nurse of their meds, so that the nurse can determine whether or not management and supervision is needed. Staff will monitor your medication intake. Upon entry at Marsha's House all prescription medication will be turned in to the operations office until the shelter nurse can record what medications each client is taking. Clients will have access to their medication at the operations office whenever they need to take their medication. If clients store medication in their lockers that is not recorded with the shelter nurse it may be confiscated if a client's locker is searched.

Because Marsha's House is an emergency shelter, all clients who are prescribed controlled substances (i.e., Xanax, Klonopin, Morphine, Codeine, Ambien, Trazadone, Percocet, Oxycodone, Hydrocodone, Buprenorphine/Suboxone, etc) **MUST** surrender these medications in their entirety to the shelter nurse, who will dispense them periodically. If new clients arrive on the weekend or at another time when the shelter nurse is not in the facility, medication will be stored in the cabinet in the Operations office. Clients will sign the medication book at the time of taking any medication until the shelter nurse is able to assess the client's medication.

## HOSPITAL ADMISSIONS

All clients must notify their case manager via phone when admitted to the hospital to ensure appropriate discharge planning. Any client returning from a visit to the emergency room must see the shelter nurse upon return.

## TB CLEARANCE

All clients must have current TB clearance; either in the form of a PPD or Chest X-ray. These tests expire after one year. See your case manager for a referral for this test.

## MAIL

All shelter residents have the right to receive and to send mail or any other correspondence without interception or interference. All mail addressed to residents will be delivered to them in a timely fashion. All unclaimed mail will be safeguarded in a locked room until staff distributes it to clients or returns to sender. Monday-Saturday, the United States Postal Service hands the mail to staff in the Operations office. The staff member who is in charge of the mail sorts it and gives it to Operations to be distributed. Clients receiving packages must be present to receive them -- shelter staff cannot accept packages for clients.

## RADIOS

Personal music devices may be turned on after wake up, but must be turned off after lights out. All music devices must be played using headphones; they may not be played out loud. Cafeteria and Community Room TV schedules will be posted throughout the facility.

## POSSESSIONS

We are not responsible for client possessions. Theft does sometimes occur and we urge residents to use their lockers and locks to protect anything of value. Upon leaving the program for any reason you have (7) days to claim your property, unless you can provide documentation that you are in detox, rehab, or the hospital, in which case your property can be held for longer. If you would like a family member or friend to pick up your property for you, you must sign written documentation verifying that that is your wish. Property left here for seven days without the needed documentation of advance notice will be discarded.

## METRO CARDS

Metro cards are provided for appointments related to housing and vocational training that does not supply carfare, opening a PA case or documented medical/psychiatric appointments. Metro cards are not provided for appointments with parole officers or foster care appointments. **You must submit proof of your appointments to receive metro cards from your case manager.** Only case managers, **the Program** Director, and Director of Social Services may give out metrocards. Clients receiving income other than Public Assistance **are not eligible for metro cards**; they must supply their own.

## HOUSING

The number one goal at Marsha's House is to find housing for every client. Clients must be aware that they are required to accept first suitable housing offered to them. Clients cannot deny due to borough preference or shared housing. It usually takes 9 months to place clients in housing, sometimes longer. If clients have another realistic option (family, friends, etc.) they should consider taking it. If a client has friends or family anywhere in the world with which they can live, DHS' Project Reconnect will purchase a one way ticket to your location. Clients must have income in order to obtain housing. This can be PA, unemployment, SSI, SSD or employment, but it must be a documented source of income. Clients MUST work with us. If clients are not compliant with obtaining documented income it will be very difficult to find them suitable housing. Every case is different, and due to various reasons some clients' cases may have more obstacles to housing than others. Clients must work with our social services team in order to overcome these obstacles.

Failing to meet any of the following guidelines is considered an infraction:

- All residents must sign each night for their beds beginning at 8:00 PM
- If you miss signing the bed sheet, you may lose your bed. Even if you do sign for your bed prior to 10pm, you may still be marked as a missed curfew if you leave your sleeping area during the night.
- You cannot enter the sleeping floors intoxicated.
- You cannot verbally abuse staff or other residents.
- You cannot engage in physical violence or exhibit any threat of violence.
- Loitering is prohibited.
- You must complete required medical follow-ups.
- Residents must attend all scheduled appointments.
- Failure to follow smoking guidelines will result in disciplinary action.

- You are required to attend on site groups, including house meeting and caseload meetings.

Repeated infractions may result in discharge from this shelter.  If you carry yourself in a respectful manner, there should not be any issues during your stay here.

( ) understand the rules of Marsha's House and agree to comply with all of the guidelines listed.  I understand that if I do not, I can be suspended from shelter services.  I agree to participate in my Independent Living Plan and to make all efforts to secure housing outside of Marsha's House.

Client Signature _____     Date _____

Shelter Staff Signature _____

Project Renewal – Marsha's House
## Shelter Client Rights

**You have the right to:**

- Exercise all civil and legal rights as prescribed by law.
- Free speech and worship.
- Join with other residents or individuals to work for improvements in resident care.
- Privacy in sending and receiving mail or verbal communications without interception or interference.
- Manage your own finances in accordance with shelter requirements.
- Privacy in treatment and caring for your personal needs.
- Have personal, medical, social, financial and other records treated confidentially.
- Make complaints verbally and/or in writing to shelter administrators without fear of reprisal.
- Leave and return to the shelter within curfew.
- Have your version of the events leading to an accident or incident in which you are involved included in all accident or incident reports.
- Fair and respectful treatment by staff.

**You also have the right NOT to:**

- Be restrained or locked in a room at any time.
- Be made to perform work by force or threat. You may be required, however, to participate in work placements by Public Assistance, in work related to program rules and regulations or in work experience programs or employment as part of an ILP.
- Be made to give tips or gratuities to any shelter employee, security guard or other resident. If any staff asks you for money, or engages in inappropriate behavior report it immediately to the program director.

Remember, besides your rights, you have responsibilities as a shelter resident, which you must know. If you have any questions or need help, **speak to your case manager.**

-------------------------------------------------------------------------

I understand my rights as a shelter client and that I have the responsibility to comply with all Shelter Rules and Responsibilities, as well as to respect the rights and private property of other shelter residents.

_____                    4/20/17
_Signature_                                  _Date_

I have reviewed the Shelter Rights, Rules and Responsibilities with the client and have provided him/her a copy.

_____                    4-20-17
_Signature_                                  _Date_

## CONTRACT

I understand that I am being assigned to a special population shelter and I am expected to follow all rules and regulations.

I understand that I will participate in the development of my Independent Living Plan and that I will be asked to sign it.

I understand that I will be required to attend individual and group case management sessions designed to help me develop more independence in my life.

I understand that I will be required to surrender all prescribed medications that are considered controlled substances to the shelter nurse, who will dispense them to me periodically. I may be asked to turn over all non-controlled prescription medications to the nurse as well. In addition, I agree to notify the shelter nurse of any medications I am prescribed.

Urine testing and breathalyzers will be conducted regularly and I am expected to be involved in substance abuse treatment if I provide a positive toxicology or breathalyzer.

I understand that if I refuse to comply with toxicology or breathalyzer requests, my results will be considered positive

I understand that if I enter the shelter intoxicated I may be placed in the Observation Area until staff determines that it is safe for me to enter my sleeping floor.

I agree to notify my case manager if I am admitted to the hospital, as soon as I am admitted. I agree to see the shelter nurse after returning from any emergency room visits.

I have read the enclosed rules and regulations, and agree to abide by them all.

_____                                    X _4/20/17_
Client's Name                                                        Date

_____                                    _4-20-17_
Witness                                                              Date

# ADULT SHELTER RULES AND RESPONSIBILITIES

FAILURE TO COMPLY WITH THESE RULES MAY RESULT IN DENIAL OF SHELTER (FOR APPLICANTS) OR DISCHARGE FROM THE SHELTER SYSTEM

- Clients must carry identification at all times and sign the "bed roster" daily and cannot change beds without approval of staff.

- Clients will observe curfew rules as posted and vacate beds during posted hours. Curfew is 10pm unless employment or school is verified by case manager and client is in full compliance.

- Clients cannot bring alcoholic beverages, unauthorized medicines or illegal drugs into the shelter. Any alcohol or drugs will be confiscated and the clients involved may be subject to arrest.

- Clients will not bring weapons or instruments/materials potentially dangerous to other residents or staff, including but not limited to, box cutters, needles, etc. into the shelter. These items will be confiscated and clients involved may be subject to arrest.

- There is no stealing or entry into unauthorized areas in the shelter. These acts may subject clients to arrest.

- There is no fighting or use abusive or threatening language. Harassment or intimidation of other residents or staff is strictly prohibited.

- Smoking is allowed only in the yard. There is no smoking allowed anywhere inside of the shelter.

- Eating is permitted only in designated areas; cooking is not allowed by clients inside the shelter. Clients may not bring food in or out of the shelter

- Electrical appliances incense, lighters, matches, or candles or other items which may be a fire hazard are prohibited.

- All clients must cooperate with and participate in all fire evacuation and other safety drills.

- Sexual activity, including pornography, is not permitted in the shelter facility. If staff suspects child pornography it will be turned in to the NYPD. Any pornographic materials will be confiscated and may or may not be returned to the client per social services staff discretion.

- All clients are required to meet with their case manager on a regular basis, develop, agree to and follow an Independent Living Plan designed to help them develop resources and obtain other housing outside the shelter system.

## SUSPENSION OF SHELTER SERVICES

Shelter services may be immediately suspended for seven days for the following:

1. Intentional setting of a fire or vandalizing shelter or client property or equipment.

2. Possession, sales or use of illegal drugs or alcohol, or drug paraphernalia in or around the shelter.

3. Assault or physical attack of another person, threatening behavior or the possession of a weapon.

4. Criminal activity including trespassing, theft, harassment, extortion, loan-sharking, intimidation or victimization of residents or staff in and around the shelter, gang participation, and sale of cigarettes.

5. Smoking in unauthorized areas.

6. Noncompliance with fire or evacuation drills.

I understand the New York City Department of Homeless Services Rules and agree to comply with the rules and regulations as a condition of being in Marsha's House:

X _____          4/20/17
Signature                             Date

# ADULT SHELTER RULES AND RESPONSIBILITIES

FAILURE TO COMPLY WITH THESE RULES MAY RESULT IN DENIAL OF SHELTER (FOR APPLICANTS) OR DISCHARGE FROM THE SHELTER SYSTEM

- Clients must carry identification at all times and sign the "bed roster" daily and cannot change beds without approval of staff.

- Clients will observe curfew rules as posted and vacate beds during posted hours. Curfew is 10pm unless employment or school is verified by case manager and client is in full compliance.

- Clients cannot bring alcoholic beverages, unauthorized medicines or illegal drugs into the shelter.  Any alcohol or drugs will be confiscated and the clients involved may be subject to arrest.

- Clients will not bring weapons or instruments/materials potentially dangerous to other residents or staff, including but not limited to, box cutters, needles, etc. into the shelter.  These items will be confiscated and clients involved may be subject to arrest.

- There is no stealing or entry into unauthorized areas in the shelter.  These acts may subject clients to arrest.

- There is no fighting or use abusive or threatening language.  Harassment or intimidation of other residents or staff is strictly prohibited.

- Smoking is allowed only in the yard.  There is no smoking allowed anywhere inside of the shelter.

- Eating is permitted only in designated areas; cooking is not allowed by clients inside the shelter.  Clients may not bring food in or out of the shelter

- Electrical appliances incense, lighters, matches, or candles or other items which may be a fire hazard are prohibited.

- All clients must cooperate with and participate in all fire evacuation and other safety drills.

- Sexual activity, including pornography, is not permitted in the shelter facility.  If staff suspects child pornography it will be turned in to the NYPD.  Any pornographic materials will be confiscated and may or may not be returned to the client per social services staff discretion.

- All clients are required to meet with their case manager on a regular basis, develop, agree to and follow an independent Living Plan designed to help them develop resources and obtain other housing outside the shelter system.

## SUSPENSION OF SHELTER SERVICES

Shelter services may be immediately suspended for seven days for the following:

1. Intentional setting of a fire or vandalizing shelter or client property or equipment.

2. Possession, sales or use of illegal drugs or alcohol, or drug paraphernalia in or around the shelter,

3. Assault or physical attack of another person, threatening behavior or the possession of a weapon.

4. Criminal activity including trespassing, theft, harassment, extortion, loan-sharking, intimidation or victimization of residents or staff in and around the shelter, gang participation, and sale of cigarettes.

5. Smoking in unauthorized areas.

6. Noncompliance with fire or evacuation drills.

I understand the New York City Department of Homeless Services Rules and agree to comply with the rules and regulations as a condition of being in Marsha's House:

4/2017

Signature                                              Date



PROJECT RENEWAL

Renewing lives. Reclaiming hope

Project Renewal - Marsha's House

# No Smoking Contract

There is no smoking inside of Marsha's House. I agree to abide by the rules and regulations regarding no smoking at Marsha's House.

I understand that I may be suspended from Marsha's House if I am found smoking, or if evidence I have been smoking is found in or around my sleeping area. I understand that smoking in the shelter is a fire hazard, is against the rules and regulations of the Department of Homeless Services and puts everyone in the shelter in danger.

I further understand that if I am found smoking I may be suspended from the shelter up to and including a 30-day sanction, as per the Department of Homeless Services' Client Responsibility regulations. When I am suspended, I may not be able to return to Marsha's House if a bed is not available when my suspension is complete.

I agree to comply with the shelter rules and regulations and to refrain from smoking in Marsha's House

Signature: _____   Date: 4/20/17

Printed Name: Maria by Lopez

Staff witness signature: _____   Date: 4/20/17

### Client Responsibility Reminder

All clients at Marsha's House are required to comply with the Department of Homeless Services' Client Responsibility Regulations. Your failure to participate in an Independent Living Plan, to seek and accept housing, to follow rules or any behavior you engage in that puts others at risk will result in your discharge from this program and the shelter system. Your suspension will be <u>no less</u> than 30 days. You will only be readmitted when and if you agree to follow the rules.

# EXHIBIT C

 **Department of Homeless Services**

## NYC Department of Homeless Services Incident Report

Priority Code: 3
Time: 12:40 AM
Facility Class: Shelter

Date: 04/21/2017
Facility Name: Marsha's House
Facility Type: Adult Shelter

Day of Week: Friday
Facility Code: X185

Primary Type: On-site incidents that are not classified as Priority One or Priority Two, but occur in the shelter involving clients, staff, visitors or property, including: thefts, physical fights, personal injury, minor property damage, and/or evacuations

Secondary Types: On-site incidents that are not classified as Priority One or Priority Two, but occur in the shelter involving clients, staff, visitors or property, including: thefts, physical fights, personal injury, minor property damage, and/or evacuations

PERSONS INVOLVED: O=Other S=Staff C=Client   V=Victim W=Witness Ob=Observer P=Perpetrator O=Other

| O-S-C | V-W-Ob-P-O | Last Name | First Name | Sex | CARESID | SSN | Age | DOB |
|---|---|---|---|---|---|---|---|---|
| C | P | LOPEZ | MARIAH | Female | ▉ | ▉ | 31 | ▉ |
| S | V | Linton | Akeem | | | | | |

**BRIEF DESCRIPTION OF INCIDENT: (Who, what, where, when) Attach additional sheet if necessary**

Created by: Kaedon Grinnell
04/21/2017 07:53 PM
On 4/21/17 at approximately 12:40 AM, client Mariah Lopez CID ▉ entered the facility and asked RA Linton if she was permitted to have her service animal enter with her. RA Linton informed the client that the request would have to be cleared with his supervisors before hand. The client became irate and became verbally aggressive with RA Linton at one point stating that she would have unnamed persons come to the shelter to fight him. RA Linton reports that shortly after, the client took a picture of him and posted it on social media. He reports that the client came to the operations office several times afterwards to threaten him and stated that he would be attacked after work. The client eventually went up to her bed without further incident.

**IMMEDIATE ACTION TAKEN: (By on-site staff responding to the incident)**
An incident report was filed.

DOC|INCIDENT_REPORTS



**Department of
Homeless Services**

RESIDENT STATEMENT ATTACHED, WHEN APPLICABLE. (See Part 491.7(d)(15))

☐ Resident statement attached.
☐ Resident refused but offered.
☐ Resident unable to provide statement due to medical or related emergency reason.
☐ Other _____

Report Prepared By/Signature: _____   Title: _Shelter Directors_
Date: _4/21/17_

Report Reviewed By/Signature: _____   Title: _ASSISTANT DIRECTOR_
Date: _4/21/17_

☐ Security/Peace Officer Report Attached

**REVIEW/RECOMMENDATION:** *To be completed by DHS Staff*

**INDICATORS:** *To Be Completed by DHS Staff*

_____   Date: _____
Signature of DHS Program Analyst

**DISPOSITION/FINAL ACTION TAKEN:** *To be completed by DHS Program Administrator*

_____   Date: _____
Signature of DHS Program Administrator

DATE REPORT RETURNED TO FACILITY (CLIENT SUSPENSIONS ONLY): _____

Priority One Incidents are the most serious and urgent. Priority One Incidents include:
- Homicide, suicide, or death on site attempted homicide, attempted suicide, assault resulting in life-threatening injury, or accident resulting in life-threatening injury (including drug overdose) Use of a firearm Rape, attempted rape, or sexual assault Arrest for alleged child abuse or emergency transport of child for medical treatment due to suspected child abuse Fire, disaster, or other environmental concern that involves a life-threatening injury or the evacuation of an entire site as directed by emergency personnel or FDNY response Riot, bomb threat, hostage taking/abduction; or missing children Unscheduled on-site presence of the press or elected official Assault or threatening behavior that results in life-threatening injury or accident resulting in life-threatening injury (including



**NYC Department of Homeless Services**

overdose) Arrest of DHS staff on site Heating, water, electrical failure, or other environmental issue (i.e. asbestos, lead, radon), that is expected to last more than 4 hours Domestic violence that results in the victim pressing charges, arrest of the assailant and/or the relocation of the victim

**Priority Two Incidents** include problems that are not immediately life-threatening or dangerous, but still must be reported promptly, so that agency administrators are informed of the incident and can resolve the matter within appropriate time frames

- Physical fights that do not result in arrest
- Allegations of: rape, attempted rape or sexual assault that do not result in arrest
- Arrest of a client, staff, or visitor for criminal activity occurring in the facility, including harassment, intimidation or victimization (i.e. stealing, extortion, loan sharking)
- Incidents that occur off shelter premises (including client deaths) and/or involve persons known to be current shelter clients and that would otherwise be classified as Priority One
- Child abuse that is reported and results in the removal of children by ACS, but no arrests are made
- Theft or vandalism of property valued at $1500 or more
- Intentional fire setting or damage to facility equipment by a client
- Possession, use, or sale of drugs or alcohol on premises resulting in suspension of a client
- Possession of a firearm

**Priority Three Incidents** include unusual occurrences that need to be recorded and reviewed for possible corrective action:

- On-site incidents that are not classified as Priority One or Priority Two, but occur in the shelter involving clients, staff, visitors or property, including: thefts, physical fights, personal injury, minor property damage, and/or evacuations
- Off-site incidents involving clients and/or staff that affect community quality of life, including: thefts, physical fights, personal injury, minor property damage, and/or evacuations
- Removal, via EMS, of any client for any reason other than a Priority One or Priority Two event

**Special Cases;**

- If NYPD, FDNY or EMS has been called, and is not responding within a reasonable time, immediate notification must be made to at least the Assistant Commissioner for guidance and assistance
- In confirmed or suspected cases of contagious disease (i.e. chickenpox, Hepatitis A, tuberculosis, measles, meningitis), the Assistant Commissioner should alert the Agency Medical Director immediately

# EXHIBIT D



## Department of
## Homeless Services

### NYC Department of Homeless Services Incident Report

Priority Code: 3

Time: 11:51 AM

Facility Class: Shelter

Date: 04/21/2017

Facility Name: Marsha's House

Facility Type: Adult Shelter

Day of Week: Friday

Facility Code: X185

Primary Type: On-site incidents that are not classified as Priority One or Priority Two, but occur in the shelter involving clients, staff, visitors or property, including: thefts, physical fights, personal injury, minor property damage, and/or evacuations

Secondary Types: On-site incidents that are not classified as Priority One or Priority Two, but occur in the shelter involving clients, staff, visitors or property, including: thefts, physical fights, personal injury, minor property damage, and/or evacuations

PERSONS INVOLVED: O=Other S=Staff C=Client   V=Victim W=Witness Ob=Observer P=Perpetrator O=Other

| O-S-C | V-W-Ob-P-O | Last Name | First Name | Sex | CARESID | SSN | Age | DOB |
|---|---|---|---|---|---|---|---|---|
| S | W | Gordon | Calvin | | | | | |
| S | O | Barnes | Dionne | | | | | |
| S | W | Roye | Katina | | | | | |
| C | O | LOPEZ | MARIAH | Female | ███ | ███ | 31 | ███ |
| S | O | Linton | Akeem | | | | | |

BRIEF DESCRIPTION OF INCIDENT: (Who, what, where, when) Attach additional sheet if necessary

Created by: Kaedon Grinnell

04/21/2017 07:37 PM

On Friday, 4/21/17 at approximately 11:51am, client Mariah Lopez ███ bed #5-001 entered operations inquiring as to the procedure to retrieve her property from another location. RA Barnes, contacted A.D Katina Roye to further assist the client. RA Barnes was instructed to ask the client if her property was in someone else's apartment or another facility, she began yelling at staff and became verbally abusive. Client then took her phone out and began recording staff inside operations. RA Barnes reiterated several times that she did not consent to being recorded as the client continued to film operations staff and stream the video on Facebook live, RA Barnes asked the client to please step away from her as she felt threatened and that the client was invading her personal space. Client continued to be



DOC|INCIDENT_REPORTS



**Department of Homeless Services**

verbally abusive and making threats to staff saying "You are going to gag when you get off work." The client continued to engage staff including RA Linton. The client and RA Linton's verbal altercation continued to escalate and RA Linton and the client began to make inappropriate comments towards one another. Eventually, RA Linton invited the client outside to engage in a fight. RA Linton was asked to leave the building in order to diffuse the situation. AD Roye arrived at the office shortly after the altercation began. LPN Gordon contacted 911 after it was clear that the situation was escalating. At 12:08PM Officers #956 and #17131 arrived. At 12:11PM, FDNY #3413, #1110 and #1635 entered the facility. All parties spoke with AD Roye, LPN Gordon and CARES ID# 745918, NYPD and FDNY exited the facility at 12:30 with no arrests made.

**IMMEDIATE ACTION TAKEN: (By on-site staff responding to the incident)**
NYPD was contacted. The staff involved in the verbal altercation were removed from the building.

**RESIDENT STATEMENT ATTACHED, WHEN APPLICABLE. (See Part 491.7(d)(15))**

- ☐ Resident statement attached.
- ☐ Resident refused but offered.
- ☐ Resident unable to provide statement due to medical or related emergency reason.
- ☐ Other _____

Report Prepared By/Signature: _____   Title: Shelter Director
Date: 4/21/17

Report Reviewed By/Signature: Katina Long   Title: ASSISTANT DIRECTOR
Date: 4/21/17

☐ Security/Peace Officer Report Attached

**REVIEW/RECOMMENDATION:** *To be completed by DHS Staff*

**INDICATORS:** *To Be Completed by DHS Staff*

_____   Date: _____
Signature of DHS Program Analyst

**DISPOSITION/FINAL ACTION TAKEN:** *To be completed by DHS Program Administrator*



**Department of**
**Homeless Services**

Date: _____

_____
Signature of DHS Program Administrator

DATE REPORT RETURNED TO FACILITY (CLIENT SUSPENSIONS ONLY): _____

**Priority One Incidents** are the most serious and urgent.  Priority One Incidents include:

- Homicide, suicide, or death on site attempted homicide, attempted suicide, assault resulting in life-threatening injury, or accident resulting in life-threatening injury (including drug overdose) Use of a firearm Rape, attempted rape, or sexual assault Arrest for alleged child abuse or emergency transport of child for medical treatment due to suspected child abuse Fire, disaster, or other environmental concern that involves a life-threatening injury or the evacuation of an entire site as directed by emergency personnel or FDNY response Riot, bomb threat, hostage taking/abduction, or missing children Unscheduled on-site presence of the press or elected official Assault or threatening behavior that results in life-threatening injury or accident resulting in life-threatening injury (including overdose) Arrest of DHS staff on site Heating, water, electrical failure, or other environmental issue (i.e. asbestos, lead, radon), that is expected to last more than 4 hours Domestic violence that results in the victim pressing charges, arrest of the assailant and/or the relocation of the victim

**Priority Two Incidents** include problems that are not immediately life-threatening or dangerous, but still must be reported promptly, so that agency administrators are informed of the incident and can resolve the matter within appropriate time frames

- Physical fights that do not result in arrest
- Allegations of: rape, attempted rape or sexual assault that do not result in arrest
- Arrest of a client, staff, or visitor for criminal activity occurring in the facility, including harassment, intimidation or victimization (i.e. stealing, extortion, loan sharking)
- Incidents that occur off shelter premises (including client deaths) and/or involve persons known to be current shelter clients and that would otherwise be classified as Priority One
- Child abuse that is reported and results in the removal of children by ACS, but no arrests are made
- Theft or vandalism of property valued at $1500 or more
- Intentional fire setting or damage to facility equipment by a client
- Possession, use, or sale of drugs or alcohol on premises resulting in suspension of a client
- Possession of a firearm

**Priority Three Incidents** include unusual occurrences that need to be recorded and reviewed for possible corrective action;

- On-site incidents that are not classified as Priority One or Priority Two, but occur in the shelter involving clients, staff, visitors or property, including: thefts, physical fights, personal injury, minor property damage, and/or evacuations
- Off-site incidents involving clients and/or staff that affect community quality of life, including: thefts, physical fights, personal injury, minor property damage, and/or evacuations
- Removal, via EMS, of any client for any reason other than a Priority One or Priority Two event