SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------- x

In the Matter of the Application of

MARIAH LOPEZ,

**AFFIDAVIT OF DEAN UETAKE**

Petitioner,   Index No. 100632/2017

-against-   Motion Seq. No. 1

N.Y.C. DEPARTMENT OF HOMELESS SERVICES,
PROJECT RENEWAL,

I.A.S. Part 12 (Jaffe, J.)

Respondents.

-------------------------------------------------------------------- x

State of New York   )
                    ) SS.:
County of New York  )

DEAN UETAKE, being duly sworn, makes the following statement:

1. I am a Program Administrator employed by the New York City Department of Homeless Services. I have served in this capacity since December 2015.

2. I have personal knowledge of the decision to transfer Mariah Lopez from Marsha's House in the Bronx to the Women In Need West shelter ("WIN West") on May 11, 2017 in that I personally approved that transfer.

3. Marsha's House is located at 185th Street in the Bronx and is one of the shelters that operates under my supervision. I initially agreed to place Ms. Lopez in Marsha's House, although she exceeded the age criteria for the shelter by approximately two years.

4. I believe my decision to transfer Ms. Lopez to the WIN West shelter located on 51st Street on the west side of Manhattan was lawful, reasonable and appropriate. The transfer decision resulted from Ms. Lopez' persistent violation of the rules of Marsha's Place and

the rules of the DHS shelter system and from my desire to place Ms. Lopez in a facility that may provide her more appropriate social services and may be better equipped to address Ms. Lopez' conduct. WIN West has various services that are more suited to Ms. Lopez and its location should be more convenient for Ms. Lopez. I also believe WIN West to be one of the best operated, safest and nicest shelters operated for single adults in New York City. I did not make the transfer decision based upon Ms. Lopez' race, sex, sexual identity or other protected classification. I made the decision in the best interests of both Ms. Lopez and the DHS shelter system, and my intent was not punitive.

## OVERVIEW OF THE SHELTER SYSTEM AND MARTHA'S PLACE

5.     DHS operates a shelter system that provides housing for approximately 59,000 individuals. DHS generally classifies its shelter clients into three groups: families with children, adult families and single adults. During Ms. Lopez' most recent stay in DHS' shelter system, she presented as a single adult, and I have placed her in shelters for single adults.

6.     Most of DHS' shelters for single adults are operated by non-profit social service providers ("shelter operators") with which DHS contracts. The shelter operator and the shelter operator's employees run the shelter subject to requirements established by DHS. In contracted shelters it is the shelter operator's employees who have routine interactions with the clients in the shelters.

7.     Shelter operators often contract with other entities to provide services at the shelters they operate. Specifically, shelter operators often contract with private security businesses to provide security in their shelters.

8.     In my role as a Program Administrator, I oversee the actions of shelter operators and frequently communicate with the shelter operator's managers.

05/24/17

9.   DHS assigns clients to particular shelters, and DHS is responsible for deciding whether to transfer clients from one shelter to another. If a shelter operator wants to suspend or transfer a client, a DHS Program Administrator, such as myself, reviews and decides whether to approve, reject or modify the shelter operator's proposed action.

10.   DHS provides some shelters that are tailored to the needs of specific populations. In 2016, DHS contracted with Project Renewal, a non-profit shelter operator, to operate a shelter designed to house young clients, under age 30, who self-identify as lesbian, gay, bisexual, transgender or questioning ("LGBTQ"). The resulting shelter, known as Marsha's House, opened on February 15, 2017, and I have been the DHS Program Administrator for Marsha's House since its inception.

11.   I routinely communicate with Kaedon Grinnell, the Project Renewal Shelter Director for Marsha's House and Kellie Rivera, the Project Renewal Director of Social Services for Marsha's House, about matters that concern Marsha's House.

12.   The clients who reside at Marsha's House have all requested to be placed there on a voluntary basis, and DHS has not made any involuntary placements to Marsha's House.

13.   Marsha's House currently has beds for approximately 80 clients. There Marsha's House provides a variety of services to the clients living there, including meals. There are, however, only limited onsite mental health services provided at Marsha's House. I understand that on Wednesdays a psychiatrist, and on Thursday a psychiatric nurse are scheduled at Marsha's House from 9 am to 5 pm to see clients, mainly to perform psychiatric evaluations as a component of the clients' housing packages, and not as ongoing clinical work.

05/24/17

14.    I understand that Project Renewal has contracted with Quality Protection Services, a business corporation, to provide security at Marsha's House.

## PETITIONER'S HISTORY IN THE DHS SHELTER SYSTEM

15. I understand that DHS' records show that Ms. Lopez has previously been in the DHS shelter system on at least two occasions, March of 2008 and September of 2014.  I understand that the September 2014 stay in the DHS shelter system for adult families came to an end due to a physical altercation between Ms. Lopez and her then partner.  See Exhibit A attached to DHS' Answer.

16. I also understand that Ms. Lopez has recently been diagnosed to have "impulse control disorder, PTSD and anxiety" and that DHS has determined that permitting her to have her dog in the shelter is a reasonable accommodation for her mental disability.  See the April 6, 2017 letter of Nurse Practitioner Jessica Pacannuayan attached to Exhibit H to DHS' Answer, which stated that Petitioner "is currently under our professional care for treatment for a mental illness defined by the DSM-V. ...  I have prescribed an emotional support animal as part of the treatment program developed for Mariah."

17. Ms. Lopez returned to the DHS shelter system in April 2017 and requested to be placed in Marsha's House.  Although Ms. Lopez exceeded the age parameters for assignment to Marsha's House, I agreed as a matter of discretion to place her in Marsha's House and that placement occurred on or about Thursday April 20, 2017.

18. On April 20, 2017, representatives of Project Renewal met with Ms. Lopez to explain the rules of the shelter to her and to obtain her agreement to comply with the rules and regulations of the shelter and of the Agency.  I have seen documents that establish that Ms. Lopez acknowledged receipt of those rules and signed agreements to comply with the rules.  See Exhibit B to DHS' Answer.

05/24/17

19. Among other things, the rules (i) require clients to submit to passage through an x-ray machine when entering the shelter and prohibit clients from bringing alcohol and candles into the shelter (See page 3 of Exhibit B, paragraph on "Entry Procedure/Locker Searches"), (ii) prohibit clients from bringing food into the shelter or taking food out of the dining room (See page 4 of Exhibit B, paragraph on "Food and Meals"), (iii) establish a curfew of 10:00 PM for return to the shelter (See page 5 of Exhibit B, paragraph on "Curfew"), and (iv) prohibit clients from entering the sleeping floors while intoxicated or verbally abusing staff or other clients in the shelter (See page 6 of Exhibit B, paragraph listing infractions). The written agreements signed by Petitioner provide that "Clients cannot bring alcoholic beverages ... into the shelter" and that "There is no fighting or use [of] abusive or threatening language. Harassment or intimidation of other residents or staff is strictly prohibited." The agreement also provides that candles and fire hazards are prohibited and that "sexual activity ... is not permitted in the shelter facility." (See page 10 of Exhibit B)

20. The reports that I have received from Project Renewal's managers demonstrated that Ms. Lopez has established a pattern of violating the rules of Marsha's House and of threatening the employees of Project Renewal and Quality Protection Services, which was a factor in my decision to transfer her to the WIN West shelter. I highlight the rule violations and threats below.

21. I received a report from Project Renewal that Ms. Lopez arrived at Marsha's House at approximately 12:40 AM on the night of April 20-21, 2017. I understand that Ms. Lopez did not have her dog with her at that time, however, she got into an argument with a Project Renewal employee about whether she could bring her dog to the shelter. The report I received stated that Ms. Lopez told the Project Renewal employee that "she would have

05/24/17

unnamed persons come to the shelter to fight him," and that Ms. Lopez "came to the operations office several times afterwards to threaten him and stated that he would be attacked after work." See Exhibit C attached to DHS' Answer.

22. I also received a report that later that same morning, Ms. Lopez made further threats to that same employee and their disagreement became so heated the police were called to the shelter. See Exhibit D attached to DHS' Answer.

23. I received another report that Ms. Lopez again violated the rules by arriving after curfew on Sunday night April 23-24, 2017 with food from outside, which is not permitted in Project Renewal shelters. Ms. Lopez was informed that she could not bring the outside food into the shelter, but she disregarded the directive and stated, "if you want to keep your fucking job you better leave me the fuck alone," and proceeded to enter the shelter with food. See Exhibit F attached to DHS' Answer.

24. I received a further report that forty minutes later, Ms. Lopez violated another important rule and again refused to comply with staff instructions. At the 2:00 AM bed count, staff found Ms. Lopez in bed with another client, which is against the terms of the agreement Petitioner had signed with Marsha's House. The staff member informed Ms. Lopez and the other client that they were not permitted to be in bed together, but Ms. Lopez defied the rule and advised the staff member that Ms. Lopez and the other client would stay in bed together. See Exhibit G attached to DHS' Answer.

25. I then received reports of a series of incidents with Ms. Lopez on Sunday May 7, 2017. First, at approximately 8:15 PM, Ms. Lopez created a fire hazard at Marsha's House by leaving lit candles unattended in her room. Having candles in the shelter is against the rules of Marsha's House, and leaving them unattended while lit endangers everyone in the building. See

05/24/17

Exhibit L attached to DHS' Answer.  I understand that when questioned about this, Ms. Lopez falsely asserted that she had not left lit candles unattended, although three days later she admitted she had left lit candles unattended. See Exhibit N attached to DHS' Answer

26. I also received a report that on Sunday May 7 at 11:25 PM, Ms. Lopez came back to Marsha's House intoxicated and with a bottle of wine.  Possession of alcohol in the shelter is against the rules. The report stated that Ms. Lopez refused to comply with the rules and brought the wine into the shelter over the objections of the staff at the front door of Marsha's House.  See Exhibits L and M attached to DHS' Answer.

27. On Tuesday May 9, 2017 Project Renewal requested that Petitioner be suspended for three days due to the alcohol incident.  See Exhibit P attached to DHS' Answer.

28. I then received a report that on Wednesday May 10, 2017 at approximately noon, Ms. Lopez threatened a food service worker at Marsha's House, Tonya Fowler, due to what Ms. Lopez contends was an inadequately sized meal provided by Ms. Fowler to another client.  I understand that Ms. Lopez threatened Ms. Fowler that "she would beat the shit out of [Ms. Fowler]", and that she would be going outside to "get someone to put their hands on [Ms. Fowler]." I understand that Ms. Fowler reported that she feels unsafe at work and that she believes Ms. Lopez intends to harm her and was so emotionally distraught after these threats that she had to leave work soon after the threats were made. See Exhibit P attached to DHS' Answer.

29. On Wednesday May 10 2017, in light of this pattern of breaches of rules, I decided that Ms. Lopez should be transferred to another shelter that had significant mental health services onsite and DHS police.  I had not yet determined which shelter to transfer Ms. Lopez to.

30. I understand that Ms. Roye and Mr. Grinnell met with Ms. Lopez on May 10, 2017 at approximately 4:15 PM (i) to advise her that she was being transferred to another shelter

05/24/17

and (ii) to discuss her threats against Ms. Fowler. I understand that Ms. Lopez admitted making the threats against Ms. Fowler and reiterated her threats against Ms. Fowler saying that if DHS transferred Ms. Lopez out of Marsha's House there would be a number of people waiting to attack Ms. Fowler. See Exhibit P attached to DHS' Answer.

31. I subsequently decided that Ms. Lopez should be transferred to the WIN West shelter, and Ms. Lopez was given notice of her new shelter assignment on May 11, 2017. See Exhibit R attached to DHS' answer.

32. I made this decision for a series of reasons intended to benefit Ms. Lopez and the shelter system. The transfer was not intended to be punitive.

33. First, it is appropriate to transfer clients away from shelters where they have established a pattern of breaking the rules of the shelter or of threatening staff. It is difficult for shelter operators to maintain order and employee morale in their shelters if they are confronted with a client who defiantly breaches rules and threatens staff. Sometimes a change in shelter assignment results in improved client behavior.

34. Second, the WIN West shelter seemed well suited to Ms. Lopez' needs. The WIN West shelter is a women's shelter at 341 West 51st Street in Manhattan (between 8th and 9th avenues) with approximately 68 beds. It is small compared to most DHS single adult shelters (comparable in size with Marsha's House) and has excellent mental health services and housing staff capable of addressing Ms. Lopez' needs. In addition, I understand that the WIN West shelter has prior and ongoing experience with transgender clients. I am not aware of any reports of discrimination by transgender clients at the WIN West shelter and do not believe that Ms. Lopez' assertions of conflict between transgender and non-transgender clients at the WIN West

-8-

05/24/17

center are based in fact. I certainly did not assign her to WIN West believing she would be faced with a hostile environment and do not believe that to be the case.

35. Third, the WIN West shelter, being a mental health shelter, has onsite mental health services. Marsha's House has limited mental health services onsite, and I hoped that Ms. Lopez would find it easier to access such services at the WIN West shelter.

36. Fourth, the WIN West shelter also has superior security to that at Marsha's House. Specifically, the security guards at Marsha's House are provided by a private contractor, Quality Protection Services, whose employees are instructed that if their efforts to deter clients from bringing prohibited items into the shelter are unsuccessful, they are not to physically prevent the client from entering with the prohibited items. Instead, the security staff at Marsha's House is to report the incident to the managers of Project Renewal. Ms. Lopez seems to understand the instruction that limit the actions of the security staff at Marsha's House, and she seems to takes advantage of the limitations placed upon the security staff. Security at the WIN West shelter, however, is provided by DHS Police, who have somewhat greater discretion to enforce the rules of the shelter and have a history of successfully deterring clients from bringing prohibited items into the shelter and deterring clients from violating the rules of the shelter.

37. Fifth, the WIN West shelter is in a location that most people find more desirable than Marsha's House. Ms. Lopez has advised DHS that she is unwilling to look at places in the Bronx, as it was too far, and that the she was willing to accept permanent housing in Brooklyn or Staten Island. If she lives in mid-town Manhattan, she should have an easier time inspecting the prospective properties DHS will offer her than if she lives in the Bronx.

38. In balancing these factors, I decided to transfer Petitioner to the WIN West shelter.

05/24/17

39. I understand that Ms. Lopez has continued to make threats against Marsha's House's staff after my transfer decision, which has confirmed my belief that transferring Ms. Lopez to the WIN West shelter is appropriate.

40. I stand by my decision to transfer Ms. Lopez to the WIN West shelter, and I reiterate that I did not make this decision based upon Ms. Lopez' race, sex, sexual identity or other protected classification. The decision was made in the best interests of both Ms. Lopez and the DHS shelter system.

Dated:          New York, New York
                May 24, 2017

                                                    _____
                                                    DEAN UETAKE


Sworn to before me this
24th day of May 2017

NOTARY PUBLIC

**NATASHA L. GODBY**
Notary Public, State of New York
No.01GO5040606
Qualified in Richmond County
Commission Expires, March 20, 20_19_

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of

MARIAH LOPEZ,

                                                            Petitioner,

                          -against-

NEW YORK CITY DEPARTMENT OF HOMELESS SERVICES
and PROJECT RENEWAL,

                                                            Respondents.

---

**AFFIDAVIT OF DEAN UETAKE**

---

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Respondent*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Thomas B. Roberts*
*Tel: (212) 356-0872*
*Matter #. 2017-025551*

---

*Due and timely service is hereby admitted.*

*New York, N.Y. ............ ......................................................., 20......*

*.......................................... ..........................................................., Esq.*

*Attorney for..........................................................................................*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------- x

In the Matter of the Application of

MARIAH LOPEZ,

                             Petitioner,

-against-

N.Y.C. DEPARTMENT OF HOMELESS SERVICES,
PROJECT RENEWAL,

                          Respondents.

-------------------------------------------------------------------- x

**AFFIDAVIT OF PAUL
HARGROW**

Index No. 100632/2017

Motion Seq. No. 1

I.A.S. Part 12 (Jaffe, J.)

State of New York    )
                     ) SS.:
County of New York  )

       PAUL HARGROW, being duly sworn, makes the following statement:

       1.     I am a Program Administrator ("PA") in the Adult Services Division of the New York City Department of Homeless Services ("DHS" or "Agency").  DHS Adult Services includes shelters for single adults as well as adult families.  I have held this position since I joined DHS on February 21, 2017.

       2.     I submit this affidavit upon my personal knowledge of the facts and circumstances, as well as my conversations with City employees and my review of City records.

**I.**    **Introduction**

       3.     I am the Program Administrator for WIN West, which is located at 341 West 51st Street in mid-town Manhattan.

       4.     As a Program Administrator, I am responsible for: managing shelter budgets and staff as well as providing guidance to shelter providers regarding DHS programs and procedures.

In addition, I audit shelter providers to ensure program performance levels are met and managed in accordance with evidence based practice.

**II.     Reasonable Accommodations**

5.      DHS has approved Ms. Lopez' emotional support animal as a reasonable accommodation.  Once a reasonable accommodation is approved, DHS recognizes the approval at any site the client is transferred to.

6.      Therefore Ms. Lopez is authorized by DHS to bring her emotional support animal with her to the WIN West shelter or any other DHS shelter where she may be assigned.

**III.    WIN West**

7.      WIN West is a shelter for single adult females.  It has mental health services on site.

8.      WIN West is run by Women In Need, Inc. ("WIN").  WIN is a non-profit contracted shelter provider for DHS.  WIN West provides the following services on site: Psychiatric Nurse Practitioner; four (4) social workers; four (4) clinical background Masters Level Case Managers; psychoeducational groups daily; a licensed practical nurse; DHS Police security; and a licensed creative arts therapist.

9.      WIN West currently has transgender individuals assigned to the shelter.

10.     In addition to EEO Diversity Training and Employment Sensitivity Training, WIN West staff receives training for working with serious and persistent mentally ill clients.

11.     As the DHS PA for WIN West, I review all Incident Reports submitted to DHS from WIN West.

12.     To my knowledge, WIN West has not had any Priority 1, 2 or 3 Incidents – as defined on the DHS incident reports – related to transgender clients since I have been PA.

05/24/17

13.     None of the transgender clients at WIN West have requested a transfer out of WIN West for any reason, including incidents occurring at WIN West.

14.     If DHS learned of incidents at WIN West related to transgender clients, DHS could take actions against both WIN West staff and clients.

15.     If WIN West clients behave inappropriately towards transgender individuals, DHS has several remedies available.  DHS can transfer the offending client to another shelter, suspend shelter for up to seven (7) days, and/or sanction (terminate housing assistance) for the offending client.

16.     I do not believe that Ms. Lopez' assertions that she will find a hostile environment at the WIN West shelter are based in fact, and I am aware of no factual basis for her contention.

17.     I also note that the security at the WIN West shelter is provided by DHS Police. DHS Police have often had success obtaining compliance with DHS rules from clients, and clients seem to be less inclined to violate DHS rules or to try to bring prohibited items into shelters where DHS Police are providing security than where security is provided by a private security firm retained by the shelter operator.

IV.     **Conclusion**

18.     DHS has granted Ms. Lopez' request to have her emotional support animal, and she is authorized to access WIN West with her dog.

05/24/17

19.     WIN West is a safe shelter facility with social services as well as mental health services on site and security provided by DHS Police.

20.     I believe WIN West would be an appropriate placement for Ms. Lopez.

PAUL HARGROW

Sworn before me this 24th

Day of May, 2017

Notary Public State of New York

**NATASHA L. GODBY**
Notary Public, State of New York
No.01GO5040606
Qualified in Richmond County
Commission Expires, March 20, 20_19_

-4-

05/24/17

Index No. 100632/201               Part 12 (Jaffe, J)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of

MARIAH LOPEZ,

                                          Petitioner,

-against-

NEW YORK CITY DEPARTMENT OF HOMELESS SERVICES
and PROJECT RENEWAL,

                                       Respondents.

---

## AFFIDAVIT OF PAUL HARGROW

---

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Respondent*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Thomas B. Roberts*
*Tel:  (212) 356-0872*
*Matter #.  2017-025551*

---

*Due and timely service is hereby admitted.*

*New York, N.Y.  ..............................................................., 20......*

*..............................................................................., Esq.*

*Attorney for ................................................................................*

05/24/17

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x

MARIAH LOPEZ,

                        Petitioner,

         - against –

NYC DEPARTMENT OF HOMELESS SERVICES,   **AFFIDAVIT**
PROJECT RENEWAL,

               Respondents.      Index No. 100632/2017

-------------------------------------------------------------------x

STATE OF NEW YORK   )

COUNTY OF NEW YORK  )

Kaedon Grinnell, being duly sworn, deposes and says:

       1.    I am employed as the Shelter Director at Project Renewal.

       2.    The following statements are true based upon my own knowledge, review of pertinent documents, and, where noted, information and belief.

       3.    In 2016, the New York City Department of Homeless Services contracted with Project Renewal, a non-profit shelter operator, to operate a shelter designed to house young clients, under age 30, who self-identify as lesbian, gay, bisexual, transgender or questioning ("LGBTQ"). The resulting shelter, known as Marsha's House, opened on February 15, 2017 and is located on East 185th Street in the Mount Eden neighborhood of the Bronx.

       4.    Marsha's House currently has beds for approximately 81 clients and is operated by Project Renewal. Project Renewal has contracted with Quality Protection Services, a business corporation, to provide security at Marsha's House.

       5.    Petitioner was assigned to Marsha's House by the New York City Department of Homeless Services on or about April 20, 2017.

6.      As detailed below, Petitioner immediately established a pattern of violating the rules and regulations of Marsha's House and of threatening the employees of both Project Renewal ("staff members") and Quality Protection Services ("QPS employees") who sought to enforce those rules.

7.      Although Marsha's House has a curfew of 10:00 PM, Petitioner arrived at Marsha's House at approximately 12:40 AM on April 21, 2017. Petitioner entered the facility and asked staff member, Akeem Linton, if she was permitted to have her emotional support animal enter the facility. Mr. Linton informed Petitioner that the request would have to be cleared with his supervisors beforehand. Petitioner then became irate with Mr. Linton at one point stating that she would have unnamed persons come to Marsha's House to fight him. Mr. Linton reported that Petitioner also took a picture of him and posted it on social media. He also reported that Petitioner returned to the operations office on several occasions throughout the night to threaten him and told him that he would be attacked after work.

8.      On April 21, 2017 at 11:51AM, Petitioner became verbally abusive to staff member, Dionne Barnes, after she approached Ms. Barnes about retrieving her property from another location. Petitioner raised her voice at Ms. Barnes, took her phone out and began filming Ms. Barnes and telling her that she was steaming the video on Facebook live. Ms. Barnes asked Petitioner to please step away from her as she felt threatened that Petitioner was invading her personal space. Ms. Barnes also told Petitioner that she did not consent to being recorded. Petitioner continued to be verbally abusive to Ms. Barnes by threatening her that, "You are going to gag when you get off work." At this time, Petitioner also began to threaten Mr. Linton. The situation continued to escalate until police were called to the shelter. No arrests were made.

9.     On April 24, 2017 at 2:00AM, Petitioner violated another rule when Ms. Murray witnessed Petitioner in bed with another client during a bed count. Ms. Murray informed Petitioner and the other client that they were not permitted to be in bed together, but Petitioner defied the rule and advised Ms. Murray that Petitioner and the other client would stay in bed together.

10.     On the morning of April 24, 2017, Petitioner again violated Project Renewal rules when she entered Marsha's House with outside food. When staff member Troy Miller informed her that outside food was prohibited in the facility, Petitioner stated, "If you want to keep your fucking job, you better leave me the fuck alone." Petitioner proceeded to enter the facility despite the staff's orders.

11.     On the morning of April 24, 2017, Petitioner refused to comply with a Project Renewal fire drill.

12.     On April 27, 2017, Petitioner requested a plate of food from staff member Lamont Barkley. When asked to wait a minute so that Mr. Barkley could check to see if there were extra plates available, Petitioner became verbally aggressive and stated, "If you want your fucking job, you better have a plate for me." Petitioner was subsequently handed a plate of food from the kitchen.

13.     On May 2, 2017, Petitioner approached staff members Troy Miller and Dionne Barnes and stated, "The same thing that happened to your friend can happen to you. I know people that can make a lot of things happen, and your dead friend on the other side watches over you." Mr. Miller and Ms. Barned removed themselves from the situation.

14.     On May 3, 2017, at 2:41AM, Petitioner exited Marsha's House without her emotional support animal, leaving the emotional support animal unattended inside the facility. She returned at 2:54AM.

15.     On the morning of May 7, 2017, Petitioner's emotional support animal was found roaming Marsha's house unattended.

16.     On the night of May 7, 2017, Petitioner created a fire hazard by leaving lit candles unattended in her room.

17.     Also on the night of May 7, 2017, Petitioner's emotional support animal relieved herself on the fifth floor of the shelter when she was left unattended by Petitioner. Project Renewal employees were forced to clean up after Petitioner's emotional support animal.

18.     Later that same night, on May 7, 2017, Petitioner entered Marsha's House with a bottle of wine. When Petitioner was asked by staff members to leave the bottle at the front desk, she refused and proceeded upstairs.

19.     On May 8, 2017, staff members observed Petitioner speaking to another client on the fourth floor of the shelter. When staff members notified Petitioner that she was not permitted on the fourth floor and instructed her to return to the fifth floor, where her room was located, Petitioner waved her hand and refused to comply with the request.

20.     On May 10, 2017 at 12:15PM, Petitioner threatened a food service worker at Marsha's House, named Tonya Fowler, due to what Petitioner contended was an inadequately sized meal provided by Ms. Fowler to another client. Petitioner threatened Ms. Fowler that "she would beat the shit out of [Ms. Fowler]", and that she would be going outside to "get someone to put their hands on [Ms. Fowler]." The Assistant Director of Marsha's House, Katina Roye, intervened to move Petitioner away from Ms. Fowler. Ms. Fowler reported that she feels unsafe

working under said conditions, that she believes Petitioner intends to harm her and that Petitioner regularly harasses her in the cafeteria area.

21. Employees from Project Renewal subsequently met with Petitioner on May 10, 2017 at approximately 4:15PM (i) to advise Petitioner that she was being transferred to the WIN West shelter and (ii) to discuss Petitioner's threats against Ms. Fowler. Petitioner admitted making the threats quoted above and asserted that they were "conditional threats." In the meeting, Petitioner went on to reiterate her threats against Ms. Fowler and stated that if the New York City Department of Homeless Services transferred Petitioner out of Marsha's House there would be a number of people waiting to attack Ms. Fowler.

22. On May 12, 2017, the Honorable Barbara Jaffe issued an Order staying Respondents from enforcing Petitioner's transfer to the Win West Shelter pending the outcome of this Article 78 proceeding. Significantly, the Order was conditioned upon Petitioner complying with Respondents' rules and regulations.

23. Despite Judge Jaffe's Order, Petitioner has continued her pattern of violating the rules and regulations of Marsha's House and of threatening the staff members, QPS employees and New York City Department of Homeless Services Officer ("DHS officers") who sought to enforce those rules.

24. On May 13, 2017, Petitioner taunted and insulted QPS employee LaShaunda Griffin before other QPS employees intervened to defuse the situation.

25. On May 13, 2017, two clients began threatening QPS employees and telling them that they "needed to watch their backs." Petitioner recorded this incident from her phone.

26.     On May 14, 2017, Petitioner approached staff member Vanessa Murray, and read an address and phone number to Ms. Murray before asking her to verify whether it was another staff member's contact information. Petitioner then told Ms. Murray to inform the other staff member to "back down or it's going to be a problem." During this interaction, Petitioner did not have her emotional support animal with her and the emotional support animal was seen moving freely throughout the facility without being restrained.

27.     On May 20, 2017, at approximately 3:00AM, QPS employees were called to the third floor of Marsha's House due to an altercation between Petitioner and another client. After the QPS employees arrived, Petitioner began to threaten QPS employee Toni Smith by telling her that she was going to get Ms. Smith jumped by Petitioner's friends and that she was also going to get Ms. Smith fired. Ms. Smith felt so threatened by this incident that she called her boyfriend to ask him to come to the shelter to escort her home at the end of her shift. When Ms. Smith's boyfriend arrived a few hours later, Petitioner began threatening him until the police had to be called to defuse the situation. Following this incident, Ms. Smith stated that she would not return to work the following day out of fear for her safety.

28.     On May 20, 2017, a client of Marsha's House named Trevor Ollivierre reported to DHS Officers that he was being harassed by Complainant and that he had notified the New York Police Department.

29.     On May 20, 2017, DHS officers asked Petitioner to remove her belt as she walked through a metal detector located at the entrance of the building. However, Petitioner refused to comply and began screaming about transgender sexual harassment. After leaving the area, Petitioner continued to scream through an open window. She then returned to the security

area five minutes later with her pants unbuttoned and again screaming about transgender sexual harassment.

30.     In another incident that occurred on May 20, 2017, Petitioner attempted to bypass security by walking through the employees' entrance of the shelter and stating that "she researched that apple phones are not allowed in x-ray machines."

31.     Also on May 20, 2017, Petitioner taunted QPS employee LaSahunda Griffin in the cafeteria of Marsha's House. Following her exchange with Ms. Griffin, Petitioner left her emotional support animal in the cafeteria without a leash and unattended. The emotional support animal eventually had to be tracked down and brought to Petitioner by another client.

32.     On May 20, 2017 and May 21, 2017, Petitioner also harassed several other staff members and QPS employees by using inappropriate language towards them and threatening that she would get them all fired.

33.     On May 21, 2017, Petitioner entered the search area of Marsha's House and did not comply with a request from DHS officers to place her sweater in the security scanner. When Petitioner proceeded through the metal detector, an alarm went off causing DHS officers to respond. Petitioner then began waving her hands in the faces of the DHS officers while swearing at them. After several minutes of harassment, Petitioner exited the area.

34.     On May 21, 2017, Petitioner attempted to enter Marsha's House with a cup of hot coffee before being informed by DHS officers that outside beverages were not allowed in the facility. Petitioner responded by yelling at the DHS officers that she should be allowed to bring the cup inside due to her "religious observances." Petitioner then entered the building through the employees' entrance, without being searched, while yelling, "Fuck you

Sergeant", "Wake up Sergeant, you fucking idiot", "Fuck you, you fat bastard", and "Don't make me call Al Sharpton."

35.     On May 21, 2017, Petitioner again attempted to enter Marsha's House with another cup of hot coffee.  When DHS officers again reminded her that outside beverages were not allowed in the facility, Petitioner pushed open a door striking a DHS officer before attempting to sprint into the building.

36.     On May 22, 2017, staff members and QPS employees smelled a noticeable scent of marijuana coming from a bathroom in the shelter.  When they arrived, they found a number of clients, including Petitioner inside the bathroom.

37.     Since filing the instant Order to Show Cause, Petitioner has also made several baseless accusations of sexual harassment against staff members.

38.     Since about the beginning of May, a number of people (both staff and residents) have reported to me that they do not feel comfortable with Petitioner being at Marsha's House.  The reasons given include threats they have heard Petitioner make about getting people fired or bringing about physical harm if they cross her, in addition to her generally bullying and intimidating behavior.  Unfortunately, most of these individuals are not willing to come forward publicly due to fear of reprisal from Petitioner.

**KAEDON GRINNELL**

Sworn to before me this
24th day of May 2017

NOTARY PUBLIC

**KATINA S. ROYE**
Notary Public - State of New York
No. 01RO6292978
Qualified in Bronx County
My Commission Expires November 12, 2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

MARIAH LOPEZ,

                                        Petitioner,

                - against -

NYC DEPARTMENT OF HOMELESS SERVICES,     **AFFIDAVIT**
PROJECT RENEWAL,

                                    Respondents.     Index No. 100632/2017

------------------------------------------------------------------x

STATE OF NEW YORK     )

COUNTY OF NEW YORK    )

Tonya Fowler, being duly sworn, deposes and says:

1. I have been employed by Project Renewal as a Cook for approximately three years.

2. I was assigned to work at the Marsha's House facility from its opening in February 2017 to approximately on or after May 17, 2017.

3. Breakfast is served from 7:00AM to 8:15AM. There is a possibility that food will run out, so I don't start serving residents "seconds" immediately, to help make sure that everyone has a chance to get a meal.

4. Lunch is served from 12:00PM to 1:15 PM. There is a possibility that food will run out, so I don't start serving residents "seconds" until about 12:45 pm, to help make sure that everyone has a chance to get a meal.

5. About a day or two after she arrived, Ms. Lopez came into the food service area and was being very loud. She had her dog with her. Ms. Lopez asked for lunch, and I gave it to her. A little while later, and well before 12:45pm when I start serving seconds of lunch, Ms. Lopez returned and asked for another lunch plate. I advised Ms. Lopez that I didn't normally give "seconds" until 12:45 pm, but that I would I accommodate her this one time, and I gave her a second lunch plate. I saw that she gave it to her dog to eat. I notified facility staff about what had happened.

6. Two or three days later, I was waiting in the lobby for my ride home after my shift, and I saw Ms. Lopez. She was complaining about the kitchen. She called me a "bitch" who didn't want to feed anybody.

7. Ms. Lopez had something negative to say pretty much every time she came to where I was serving food. Sometimes it was about the food, but she also complained about how I look, claiming that I gave her "dirty looks" and that I should smile when I served her food.

8. On or about May 10, 2017, I served Ms. Lopez a lunch plate and she started yelling and screaming about the amount of food I gave her and that I wasn't giving everyone the same amount of food. She also demanded that if someone came up and asked for sugar or something, I was supposed to stop serving food and go get it for them. Ms. Lopez said that she would "whip my ass" and "beat the shit out of me" if I didn't comply with her demand or if she thought someone was getting more food than another person. She also said that, if she got put out of Marsha's House, she would go back to her aunt's house and tell her that she had tried to hang out but that one of the kitchen staff (meaning me) took her outside of her usual character.

9. I left the food service area as soon as I could after lunch service that day because I was concerned that Ms. Lopez might put her hands on me. I felt physically threatened, and I also felt threatened because if I responded physically to a physical attack, I could lose my job.

10. I went straight to Kaedon Grinnell, the Director of Marsha's House, and told him what happened. I then went to the New York Police Department precinct and filed a complaint about Ms. Lopez threatening me.

11. I was out for a few days after this incident due to Ms. Lopez's threats against me. When I returned to Marsha's House on or about May 17, 2017 I prepared and served breakfast as usual. We were serving eggs that morning, but, as sometimes happens, we ran out. Ms. Lopez came in towards the end of breakfast service. We had already run out of the egg, so I offered her cereal. Ms. Lopez refused the cereal, started recording things on her phone, and started complaining that she should get eggs because everyone else got eggs. I went to get security. Ms. Lopez claimed that I had refused to serve her. I explained that I just couldn't' serve her eggs because we ran out and there weren't any more eggs, but that I had offered her cereal instead.

12. I transferred to another location after these incidents. I believe that Ms. Lopez intends to harm me, and I don't feel safe at Marsha's House any more. I also believe that Ms.

Lopez would continue to harass me if I returned to Marsha's House. She regularly had something negative to say pretty much every time she came to where I was serving food. Sometimes it was about the food, but she also complained about how I look, complaining that I gave her "dirty looks" and that I didn't smile at her when I served her food.

*Tonya Fowler*

**TONYA FOWLER**

Sworn to before me this
24th day of May 2017

*Katina S. Roye*
NOTARY PUBLIC

KATINA S. ROYE
Notary Public - State of New York
No. 01RO6292976
Qualified in Bronx County
My Commission Expires November 12, 2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x

MARIAH LOPEZ,

                                        Petitioner,

                 - against –

NYC  DEPARTMENT  OF  HOMELESS  SERVICES,        **AFFIDAVIT**
PROJECT RENEWAL,

                                        Respondents.        Index No.  100632/2017

-------------------------------------------------------------------x

STATE OF NEW YORK        )

COUNTY OF NEW YORK      )

Trevor Ollivierre, being duly sworn, deposes and says:

      1.     I have been a resident at Marsha's House since April 4, 2017.

      2.     Another resident at Marsha's House, Mariah Lopez, has been threatening me, bullying me, and trying to disrupt me as I go about my daily life.  This behavior started shortly after Ms. Lopez arrived at Marsha's House in late April, 2017.

      3.     On or about May 20, 2017, at approximately 2 am, I was startled by yelling right next to my door.  I opened the door and found out that it was Ms. Lopez.  She was verbally threatening security and me as well.

      4.     Ms. Lopez made inappropriate remarks about my health status and medical issues, and said that she is going to have all gay males transferred out of this facility.

      5.     Ms. Lopez has a dog in the facility.  Her dog tried to bite me two times and was off leash.

6.      I have also heard Ms. Lopez make derogatory remarks about staff at Marsha's House, and I have witnessed her harassing QPS Security staff.  She also said she killed a staff member that passed away after he was fired for arguing with her and she publicly humiliated him on Facebook Live.

**Trevor Ollivierre**

Sworn to before me this
24th day of May 2017

NOTARY PUBLIC

**AUDREY JONES**
NOTARY PUBLIC-STATE OF NEW YORK
No. 01JO6145854
Qualified in Bronx County
My Commission Expires 05-08-2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------- x

In the Matter of the Application of

MARIAH LOPEZ,

                                Petitioner,

                -against-

N.Y.C. DEPARTMENT OF HOMELESS SERVICES,
PROJECT RENEWAL,

                           Respondents.

------------------------------------------------------------- x

**AFFIRMATION OF
SERVICE**

Index No. 100632/2017

Motion Seq. No. 1

I.A.S. Part 12 (Jaffe, J.)

**Thomas B. Roberts**, an attorney admitted to practice in the courts of New York State, hereby affirms under the penalties of perjury:

        That on May 24, 2017, I served the accompanying (i) Verified Answer and the exhibits attached thereto, (ii) Affidavit of Dean Uetake, (iii) Affidavit of Paul Hargrow, (iv) Affidavit of Kaedon Grinnell, (iv) Affidavit of Tonya Fowler, and (v) Affidavit of Trevor Ollivierre on Mariah Lopez by electronic mail at mariah4change@gmail.com, and by overnight mail addressed to Mariah Lopez, Marsha's House, 480 East 185th St., Bronx, N.Y. 10458 by causing true copies of the same, enclosed in a properly addressed, securely sealed, prepaid wrapper, to be delivered to a representative of the United Parcel Service with instructions that they be delivered by overnight courier service for delivery on May 25, 2017.

        That on May 24, 20176, I also served the accompanying (i) Verified Answer and the exhibits attached thereto, (ii) Affidavit of Dean Uetake, (iii) Affidavit of Paul Hargrow, (iv) Affidavit of Kaedon Grinnell, (iv) Affidavit of Tonya Fowler, and (v) Affidavit of Trevor Ollivierre on Richard Greenberg, counsel for Project Renewal by electronic mail at greenber@jacksonlewis.com, and by overnight mail addressed to Richard Greenberg, Jackson Lewis P.C., 666 Third Ave, 29th floor, New York, NY 10017 by causing true copies of the same, enclosed in a properly addressed, securely sealed, prepaid wrapper, to be delivered to a representative of the United Parcel Service with instructions that they be delivered by overnight courier service for delivery on May 25, 2017.

Dated: New York, New York
       May 24, 2017

                                              THPOMAS B. ROBERTS

Index No. 100632/201                          Part 12 (Jaffe, J)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of

MARIAH LOPEZ,

                                                              Petitioner,

                              -against-

NEW YORK CITY DEPARTMENT OF HOMELESS SERVICES
and PROJECT RENEWAL,

                                                              Respondents.

---

### ANSWER OF DHS AND SUPPORTING AFFIDAVITS

---

**ZACHARY W. CARTER**
*Corporation Counsel of the City of New York*
*Attorney for Respondent*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Thomas B. Roberts*
*Tel: (212) 356-0872*
*Matter #. 2017-025551*

---

*Due and timely service is hereby admitted.*

*New York, N.Y. ............................................................ , 20......*

*............................................................................, Esq.*

*Attorney for .........................................................................*

- 18 -