# EXHIBIT I

RECEIVED
SDNY PRO SE OFFICE

2017 JUN 15 PM 2:07

S.D. OF N.Y.

Pro Se Intake Unit
U.S. District Court, Southern District of New York
500 Pearl Street
New York, NY 10007

Mariah Lopez
_____
Write the full name of each plaintiff or petitioner.

New York City -against-
Department of Homeless
Services
_____
Write the full name of each defendant or respondent.

Case No. 1/7 cv 03014

Letter re: Emergency request for TRO,

Dear Judge

I am writing the court to make you aware of the fact that DHS has placed me at facilities which cannot reasonably accommodate my medical disabilities, PTSD and gender identity disorder. I believe the decision for DHS to move me from Marsha's was retaliatory and DHS refusal to temporarily place me back at Marsha's is a failure to make "reasonable"

Dated: 6/15/17

Name: Mariah Lopez

Signature: _____

Prison Identification # (if incarcerated)

Address: Homeless

Telephone Number (if available): 212 470 9687

City _____ State _____ Zip Code _____

E-mail Address (if available): Mariah4Change@gmail.com

accommodations for my disabilities. The refusal by DHS to place me at the only facility that can provide the accommodations I need is motivated by caprice and the desire to silence my whistle blowing at Marsha's House. ALL staff and administration who supported my transfer face dismissal from their jobs if my allegations pan out; this creates a clear conflict of interest by the parties accusing me of misconduct at Marsha's.

- The fact that DHS has denied me an administrative review, by someone outside of conflicted parties (ie Mr Paul Hagrow or Kaedon Brinnell) is evidence of DHS mechanizations to silence my valid concerns with my treatment at, and transfer from, Marsha's.

- None of the allegations against me have been substantiated in court or via any type of formal hearing.

- Since May 31st I have faced considerable psychological distress and crisis because I am homeless again.

- The shelter "WIN West" is not a reasonable accommodation since

the facility directly causes triggers painful
symptoms of my PTSD

- ALL other DHS facilities besides
Marsha's are also not "reasonable
accommodations for my PTSD or GID
since being forced to "hide" my
trans-identity, and needs, also triggers
my conditions and their symptoms.

- Since may 31st I have almost had
a nervous break down and have needed
emergency pych' treatment at Mount
Sanai Emergency Department (6/9/17)

- My Service Animal is starting to
exhibit behavioral issues because of
the instability in my life. I'm concerned
that my animal's usefulness as a
service animal will be negatively impacted
if I am not allowed to return to
Marsha's

- I'm concerned that I will be hurt
or hurt someone else, if I am not
provided a reasable accommodation

by DHS, in the form of me being transferred back to Marsha's while DHS and I work on permament housing. My doing sex work is not an option since I am obligated to care for my animal. If I dont engage in sex work, I would have no way to house/board my animal — Going to "WIN West" with my animal —— or any other DHS facility besides Marsha's would trigger my PTSD and exhaust my animal's abilities to provide relief for my ~~symptoms~~ symptoms via her training. My dog would never get to rest!

- My history of PTSD and identity as a transsexual/transgender woman is well documented

- I have been working as hard as I can to secure permanent housing. I believe I stand to suffer worse irreparable harm and injuries if my PTSD gets worse due being homeless or having to engage in sex work

- DHS decision to "force" me into a "female" facility is a violation of New York City and State law. continued →

which proves my traumatic history near
WIN West
- Two copies of pych evals by two
experts, from when I was in care, ⊗ (mc)
proving my history of PTSD and GID

- Excerpt from "Joel A" Federal complaints (m)
which also provides proof of history of
trauma, and New Yorks history of needing
to drastically improve services and the
number of beds for ⊗(m) GLBTQ individuals,
especially youth and homeless persons.

- Letter from Anthony Sgarlato Program Manager
at Baltic Street A⊕H, which attests to my
efforts to find permanent housing

- Letter from my retired physician refering
to me as "Transsexual" proving the need
for me to identify as such without fear of
harassment (which DHS cannot gaurantee at
Non GLBTQ facilities.

- Letter from my current pychiatrist
Dr Piere Arty recomending I be placed
back at Marsha's House

- New York Law prohibits DHS from labeling someone as "female" or "male" in order to house them. New Yorkers get to choose "Transgender/TransSexual" as an option.

- New York law also considers GID (Gender Identity Disorder) to be a disability, because of a lawsuit which I won as a teen, "Jean Doe v Bell".

- DHS refusal to block Project Renewals request to transfer me from Marsha's house was a violation of my rights to be "reasonably accommodated" under local, state and federal law. (Demanding Project Renewal staff prove their allegations while I'm still at Marsha's is not unreasonable) Its DHS' own fault that only one GLBTQ facility exists where trans people can be safe and not experience environmental triggers.

- DHS has no facilities beside Marsha's which can accommodate my needs around vaginal dilation. I will suffer irreparable harm if I am not able to dilate according to my doctors orders.

On May 31st DHS vigorously argued very specifically, to be allowed to place me at WIN West placing all their eggs in one proverbial basket. Since my mental health providers disagree and have me supported my need to be placed back at Marsha's, I am asking the court to issue a TRO ordering (the following)

— DHS to place me back at Marsha's until this court reviews whether I will be harmed by a placement other than Marsha's

— DHS to reserve a bed a Marsha's until the conclusion of my ADA case in front of this court, place or until I have found permanent housing, since Marsha's is the only trans shelter which has single bed rooms

I am attaching the following exhibits to support my requests for a TRO (A—H)

1 Copy of Family Court Petition

Exhibit

A

**win**
Win West Residence
341 West 51st Street
New York, NY 10019

## STAFF/RESIDENT COMPLAINT FORM

DATE OF INCIDENT: 6/7/17  NAME: Mariah Lopez  DEPT/UNIT # _____

TIME: 1:54 PM  Subject: Reasonable Accomodation Request

I have medical needs which this
facility cannot accomodate. I have
Severe PTSD and this neighborhood
is a trigger for this conditions
Symptoms; Flash backs, anxiety,
Depression, increased aggression.
I also cannot Sleep in a dorm setting
because of my PTSD — the
worsed abuses I have experienced
have taken place in a "dorm"
Setting.

The dorm Setting would →

Signature: _____  Date: 6/7/17

# win

Win West Residence
341 West 51st Street
New York, NY 10019

## STAFF/RESIDENT COMPLAINT FORM

DATE OF INCIDENT: 6/7/17  NAME: Mariah Lopez  DEPT/UNIT #

TIME: 154 pm  Subject: Reasonable Accomodation Request

Also make impossible for me
to engage in daily Dilation
as per SRS post-op instructions.
I need to be lying down, in
a private Sem, clean,
environment. WIN had offered
a Bathroom to dilate in, as an
accomodation, which is inappropriate
unSterile, and unsafe.
I'm requesting to be sent back
to Marsha's House Shelter.

Signature:  Date: 6/7/17

Exhibit

B

## THE REED CENTRE for Ambulatory Urological Surgery

1111 KANE CONCOURSE, BAY HARBOR ISLANDS, FL 33154     (305) 865-2000     FAX 865-2002

New York City Department of Homeless Services

Re: Mariah Lopez
DOB 4/27/1985

June 7, 2017

Mariah Lopez has been a patient of mine and underwent male to female vaginoplasty on 9/2/2009 after appropriate psychological evaluation and is medically-legally a woman since that time.  She needs to maintain the patency of her neo-vagina with dilations for 15 minutes 3 times a day.  This cannot easily be done standing or sitting.


She needs to be able to have the privacy of lying down during these times, as well as water soluble lubricant such as KY jelly.  She is also expected to douche at least 3 times a week. for cleanliness.

*[signature]*

Harold M. Reed, M.D.
Board Certified Urologist and Transgender Surgeon
1-305-865-2000.

Exhibit

C



Cylar House Behavioral Health Clinic
743-749 East 9th St., 2nd Floor
NEW YORK, NY 10009-5334
TEL 212-677-7999 x4202 FAX 212-739-0007
WWW.HOUSINGWORKS.ORG

June 13, 2017

Re: Mariah Lopez

To whom it concerns,

Ms. Lopez is requesting to return to Marsha's Shelter. She is currently on SSD, due to her PTSD and gender dysphoria. Mariah is highly distressed with her current living situation in a women's shelter, where it is a dormitory-like set-up. She considers this as a harm setting, that being with a cisgender female population inhibits herself to express her own gender identity, causing her more distress, mood changes.

The location of her shelter is a triggering factor for her PTSD, since she experienced her trauma within the same neighborhood. Her living situation led her to return to prostitution/ being a sex worker, which placed her in a higher distress. Fearing that she could "snap" at her clients due to her instability, I am recommending that Ms. Lopez be transferred back to Marsha's Shelter and/or LGBTQ facility shelter for her own psychological stability. Whatever can be done to facilitate and expedite this process would be appreciated.

Sincerely,

Pierre Arty, MD
Director of Psychiatry
Housing Works
Downtown Brooklyn Health Center
57 Willoughby St

PIERRE RICHARD ARTY, MD
NYS LIC#194382
DEA BA5426502

Exhibit D

Form W-864
Rev. 9/1/90

Human Res
Child W  **4981394**

# Voluntary Placement Agreement by Parent or (

(Prepare in Quintuplicate)

## NOTICE

• By signing this agreement, you will voluntarily transfer the care and custody of your child to the Commissioner of Social Services. You do not have to sign the Agreement nor will you be subject to any legal penalties for failure to sign it.

• You have the right to talk to a lawyer of your own choosing, prior to signing this Agreement or at any other time, about the consequences of signing this legal document. If you cannot afford a lawyer, there are several organizations which provide free legal services. The following are some of the organizations that provide free legal services:

Community Action for Legal Services...(212) 431-7200
Legal Aid Society.......................................(212) 227-2755
MFY Legal Services....................................(212) 475-8000

**Name of Person Signing Agreement**

Linda Lopez
Mother

Michael Dominguez
Father*

Lorraine Lopez
Legal Guardian**

**Address**

Deceased
House No. and Street                    Apt.

Borough or PO                              ZIP
23 West 90 Street, Apt 4A
House No. and Street                    Apt.
New York, NY 10024
Borough or PO                              ZIP
250 West 61 Drive, Apt 6D
House No. and Street                    Apt.
New York, NY 10023
Borough or PO                              ZIP

Parent(s)/Legal Guardian of ____Brian Lopez____ born on 4-27-85
request the Commissioner of Social Services to accept care and custody of my (our) child.

*If child is born out-of-wedlock, attach acknowledgement of paternity form; or indicate the date and court where paternity was established: Court_____ Date_____

**If signing as legal guardian, specify the date and court where guardianship was obtained:
Court Manhattan Family Date Sept. 1986

Exhibit E

consistently and deliberately remained indifferent to the disfavored treatment that Class members receive in New York City's child welfare system.

67. This general policy of willful blindness has led to numerous instances in which staff members have deliberately ignored the most basic needs of the Class members. Staff members frequently refuse to intervene on behalf of self-identified lesbian, gay, bisexual or transgendered youth in their group homes where they would not hesitate to do so on behalf of straight youth, allowing them to be subjected to unconscionable treatment. One child welfare system worker recounted:

> Gay kids are scared and they have a right to be. . . . In one of our group homes one of the kids said that he was gay and the other kids said that they were going to have a "blanket party" (this is when someone rushes in, throws a blanket over the head of the unsuspecting victim and, everyone joins in pummeling [sic (pummeling)] the victim) – all of the staff knew this. The staff sanctioned the "blanket party" because [the] kid was gay.

68. In sum, defendants openly discriminate against members of the Class by excluding them from group homes solely because of their actual or perceived sexual orientation and gender atypicality, by setting a double-standard in which Class members are labeled as "problems" for no reason other than the intolerance of those around them, and by turning a blind eye to the most ordinary needs of the Class members—refusing even to intervene to protect the safety of these children in situations where they would not hesitate to do so if the safety of a straight youth were threatened. This pattern of discrimination, blaming, and indifference within the present system is pervasive and continuing.

## The Named Plaintiffs

69. Due to the defendants' failure to provide each Named Plaintiff with a safe and supportive environment where each could safely discuss and ask questions about homosexuality and issues relating to sexual identity development, disclose and express feelings of same-sex attraction, form positive peer relationships, and otherwise learn to manage the tasks associated with the development of an adult personal and social identity, the Named Plaintiffs have suffered severe and irreparable injuries, including physical, psychological, emotional, and developmental harm. Rather than fulfilling their legal duty to protect the Named Plaintiffs from such harm and providing them with professional care, the defendants have caused the Named Plaintiffs' injuries by inappropriately placing them in living situations where they are constantly victimized and the residential staff refuses to protect them. Moreover, the defendants have discriminated against the Named Plaintiffs, denying them services provided generally to children in the defendants' custody based upon the Named Plaintiffs' sexual orientation and gender atypicality.

### Joel A.

70. Joel A., who is thirteen years old, has been teased about being gay as far back as he can remember. He has been openly gay since he was nine years old, when the defendants sent him to live at a large residential facility with several hundred children. Almost as soon as Joel arrived, the other kids started calling him "faggot" and other names. After less than a month, the teasing escalated to physical attacks, with the other children throwing objects at Joel and physically attacking him in the shower. Such attacks sometimes happened two or three times a day.

71.   Joel's situation grew worse during the three years he lived at the residence. He was punched, thrown down a flight of stairs, and cut by a knife, and he had rocks and batteries thrown at him, and was physically abused and attacked in other ways. His shoulder blade and finger were broken, and his nose broken twice, once from Joel's being hit in the face with a broom. He received numerous other injuries and visited the emergency room repeatedly.

72.   Once, in the unit where Joel lived, some children threw a blanket over his head, knocked him down, tipped a locker over onto his leg, and ran out of the room, leaving him lying on the floor. A staff member told Joel that he could not punish these kids because he had not personally witnessed the incident.

73.   On another occasion, several children were verbally harassing Joel for being gay while they all waited their turn to be called into a recreation hall. When Joel tried to leave, about fourteen kids jumped him while others watched. One held Joel while another punched him in the face, causing his nose to bleed profusely.

74.   Another time, two kids almost drowned Joel. Although Joel had been threatened by one of the kids and had complained to the lifeguard, the lifeguard, rather than intervening effectively, simply assured Joel that he need not worry. Moments later, the two kids ganged up on Joel, and one held his head under water until Joel was able to struggle to the surface, coughing up water and vomiting. The staff did nothing to punish the attackers.

75.   These are only some examples of the victimization for which Joel was constantly targeted based on his sexual orientation.

76.   When Joel reported such incidents, the staff frequently told him that they could do nothing about any incident that they did not see. At times, however, a staff member would observe other kids harass or attack Joel and would simply ignore the incident. For example, when some other kids started throwing pieces of wood at Joel in the park one day, Joel ran away from them, but fell and hit his head on the wooden frame of some swings. He saw that a staff member had been watching, but when that staff member came to see how badly Joel was hurt and Joel complained about the attack, the staff member claimed that he had not seen the incident and therefore could not take disciplinary action against the perpetrators.

77.   Once when Joel's nose was bleeding badly and it should have been clear that he had been the victim of an attack, the staff punished him on the pretext that he was getting blood on the floor.

78.   Even when the staff purported to intervene on Joel's behalf, they sometimes did so in ways that demeaned Joel. For example, when one of the kids threw Joel down a flight of stairs, he heard a staff member ask the child, "Why did you do this? I thought you didn't want to touch him." Also, the staff would frequently try to protect Joel by isolating him from the other kids. Thus, Joel would have to wait while everyone else ate dinner, and then eat alone, and he could not watch TV when the other kids were watching because the TV was in a common room. Such isolation sometimes lasted for months.

79.   On information and belief, none of the staff ever made any attempt to teach the other kids that even if they did not like Joel, he was still a member of their community and deserved to be treated decently, fairly, and with respect.

29

30

80.     Instead, the staff made clear to Joel that they disapproved of his sexual orientation. For example, when Joel tried to hang posters about meetings sponsored by Triangle Tribe—a support group for gay kids—he was told that this was "sexually inappropriate." He was also told that the Gay Pride Parade was sexually inappropriate for him, and that he would not be allowed to attend. One staff member told Joel that he should go to choir rehearsal because he had a "bad attitude" about the gay pride parade. The staff, however, allowed other boys to hang pictures of half-naked women in their rooms. When Joel complained that this was unfair, the staff said that the other kids could hang such pictures because they were "normal."

81.     On Family Day, when each resident was allowed to invite eight guests, including friends and girlfriends, Joel was told that he could not invite gay friends because they might get beaten up. Joel was therefore only allowed to invite family members.

82.     Joel once overheard a staff member talking about gays kids say that "all they want to do is have sex." Indeed, the staff appeared preoccupied with the fear that Joel would molest other kids because he is gay, and they sentenced Joel to four seven-week terms in a group for kids exhibiting "problematic sexualized behavior." All the kids in the group sessions that Joel attended were gay, and the staff members who led these group sessions always conveyed the same message—that homosexuality is bad and that homosexuals want to force or coerce other people to have sex with them. At one meeting, one child asked a staff member why Joel had to go to those meetings. The staff member responded, "Because [Joel] has a problem."

31

83.     On information and belief, there was no special group for sexually active straight kids.

84.     Because of the way the other kids treated Joel, and because the staff either did not care or did not know how to deal with this problem, Joel lived effectively as an outcast, in constant fear of being attacked. Being isolated made him feel even more alone and afraid.

85.     Defendants knew or should have known about the constant abuse that Joel suffered. Indeed, Joel wrote numerous letters to defendants and/or their agents explaining what was happening to him.

86.     Because of the constant harassment and abuse, and defendants' failure to protect him from it, Joel ran away in June 1998. After Joel slept on the street for at least one night, ACS placed him in approximately five different homes, none of which proved to be safe and appropriate placements for Joel. He continues to be subjected to harassment and abuse because of his sexual orientation.

*Michael D.*

87.     Michael D. is fourteen years old. Since he was very small, he always hung out with girls. By the time he was ten or eleven years old, he realized that he was gay.

88.     In 1994, when Michael was ten, he entered the foster care system because his mother couldn't take care of him. He was first placed at a group home.

89.     After just a few months, Michael was transferred to a large residential treatment center ("RTC") for several hundred children.

32

# EXHIBIT F

KATHERINE RACHLIN, PH.D.
CLINICAL PSYCHOLOGIST

153 WAVERLY PLACE, SUITE 10
NEW YORK, NY 10014

PHONE: (212) 206-3636
FAX: (212) 206-6361
E-MAIL: KRachlin@aol.com

## Psychological Evaluation

**Client**:      Mariah Lopez

**Date**:      2/9/2004

**Evaluator**:      Katherine Rachlin, Ph.D. Clinical Psychologist NYS Lic# 012029

**Date of Interview**: February 9, 2004

**Place of interview**: 153 Waverly Place, 10fl New York, NY 10014

### Qualifications of the Evaluator

I am a Psychologist licensed by the state of New York. I received my clinical training at Teachers College, Columbia University and have become a specialist in the field of Gender Identity Disorders. For over a decade I have worked with transgender and transsexual individuals, conducting evaluations and psychotherapy. I also perform transgender-oriented training, research and education. The attached curriculum vitae detail my extensive experience in this area of specialization.

### Description of Identified Client

Ms. Lopez is an 18 year old Male-to-Female transgender person. She appeared well groomed and feminine in voice and mannerisms. During the interview Ms. Lopez appeared calm, relaxed, cooperative, and pleasant. Ms. Lopez was well related and exceptionally articulate. She was clear and very direct in her thoughts and communication. She appeared very mature and confident in her knowledge. The interview focused on her personal history and her experience of gender.

### Family and Social History

I spoke with David Rubin, Director of Social Services at St Christopher Ottilie regarding Ms. Lopez. We discussed her long documented relationship with children's services and his knowledge of her. He reported that he had not been successful in attempts to contact her family, but planned to try again in the near future. Please see the attached Uniform Case Record dated 4/10/04, supplied by Mr. Rubin.

### Gender History

Like many transsexuals, Ms. Lopez's earliest memory is of pretending to be a girl and believing that this was possible. She was always drawn to things feminine and soft. Ms.

Lopez reported that by the age of six or seven she had decided that she would "get out of this body". By age nine she was demoralized as she realized that she would have to go through puberty and become male. She plucked facial hair as it came in and avoided sports so as not to get any muscle development. When she was thirteen she became aware of the possibility of gender transition through medical treatment. She began using hormones at that time and continued to pray for an opportunity to have surgery and make a complete transition. Since age thirteen she has continued hormone treatment and silicone injections to her hips and thighs which have aided her feminine presentation. Ms. Lopez identifies as a heterosexual female and has recently ended a long-term relationship with her last boyfriend.

Like many disadvantaged transgender youth Ms. Lopez has a history of prostitution. There are few job opportunities for transgender teens. The sex industry is one of the few professional communities that is supportive of transgender people. For transgender teens, prostitution provides both a source of income and reinforcement that they are attractive in a feminine way.

Ms. Lopez presents as an attractive young woman. She has no confusion about her gender. She is fully and confidently female. Her discomfort arises out of the dissonance between her internal identity and her external body. Though she may appear female to most who know her, she still has male genitals, and this is a source of pain and shame to her. At this time in her life she is requesting sex reassignment surgery to create genitals which will reflect her inner identity and allow her to live a full life as a woman.

**Psychiatric History**

According to her report, Ms. Lopez was first sent to a psychotherapist when she was six years old. She believes that the adults in her life thought that it would help her to deal with the death of her mother. She claims that the therapist she saw at age six diagnosed her with Gender Identity Disorder. Over the years she has received psychotherapy or psychiatric treatment in response to aggressive behavior. She reports that she was hospitalized once for approximately ten days after getting in a fight in her group home. She claims that she has never been on psychiatric medication. She also reports no history of suicide attempts. She does report a private fantasy "Since age 13 every year on my birthday I tell myself that if I don't have sex change by next birthday I will kill myself". Such thoughts are normal for people with her condition. Suicidal gestures and attempts are common among transgender teens. They are often in an impossible position in which they can not escape their own transgenderism but are not able to express it without incurring negative consequences.

Ms. Lopez has been visibly transgender from an early age. She is a clear case of a transsexual child growing into a transsexual adult. She had to learn to survive by both hiding her gender and expressing it. Like other transgender children her gender expression made her vulnerable to prejudice and even violence. Children learn to cope with their difference in a variety of ways. They may postpone many activities such as dating, working, or pursuing a career until they can engage in them in their preferred

gender. Like many transgender individuals she may be most comfortable in places where gender variance is embraced. The environments perceived to be safest and most affirming are likely to be certain night clubs, Greenwich Village, and anywhere that transgender teens gather, including the subculture of transgender prostitution.

**Education and Employment History**
Ms. Lopez reported that her career goal is to get her GED and go to college and then Law School. For several years she has been active as a peer counselor in an HIV/AIDs prevention program.

**The Standards of Care for the Treatment of Gender Identity Disorders.**

The Standards of Care for Gender Identity Disorders (SOC) published by The Harry Benjamin International Gender Dysphoria Association, Inc (Meyer et al., 2001) are attached. These standards set out recommended guidelines for the treatment of individuals with Gender Identity Disorders. The section which addresses sex reassignment surgery suggests that individuals meet certain criteria for Eligibility and Readiness. Ms Lopez meets all of the following criteria: (I have shortened and paraphrased some of these. Please see the standards for the full text of each of these items.)

Readiness
1. Legal age of majority.
2. Twelve months of hormonal therapy.
3. Twelve months of living as a woman.
4. A psychological evaluation. Psychotherapy if required or recommended by the evaluating mental health professional. ... Psychotherapy per se is not an absolute eligibility criterion for surgery,
5. Demonstrable knowledge of the cost, procedures, complications, etc. of various surgical approaches
6. Awareness of different competent surgeons.

Eligibility
1. A stable, enduring, comfortable gender identity
2. Progress in dealing with work, family and interpersonal issues. Lack of mood or thought disorders or other psychiatric contraindications to surgery.

Ms. Lopez fulfills all of the eligibility and readiness criteria for surgery. Though she has not had extended gender-oriented psychotherapy, she has demonstrated success living as a woman. Psychotherapy is not a "cure", though it can often provide support for dealing with the anxiety, depression, and social challenges which accompany the experience. The only proven successful treatment is sex reassignment surgery. (For documentation of this, the outcomes, and evidence of the very low rate of regret for this procedure please see the references attached to this letter, particularly The Standards of Care for Gender Identity Disorders, Meyer et al. 2000, and the review of the literature by Carroll 1999).

### Summary and Recommendations

Transgender youth are visibly different from others in that their feminine characteristics go beyond gender expression. Ms. Lopez is not capable of changing or controlling her feminine qualities. Even when dressed in male clothing her transgenderism will be apparent. If she remains on feminizing hormones she will continue to experience breast development, soft skin, loss of muscle strength, softening of facial features, slower and sparser growth of facial and body hair, redistribution of weight to create fuller hips and buttocks, and increased emotionality and tendency to cry. All of these characteristics may make her more vulnerable to violence and discrimination. At this time Ms. Lopez is requesting sex reassignment surgery which will allow her to more seamlessly live as a woman. Such surgery will reduce the risk she currently faces on a daily basis. Living as a woman with a penis is a hardship. There is always the danger that someone may challenge her, invalidate her, or cause her serious harm in the face of this evidence of difference. A woman with a penis is also at a disadvantage in social situations, in romantic relationships. In a society that genders bathrooms, locker rooms, dormitories, fitting rooms, and more, she must constantly hope that no one will find out the true status of her body.

If Ms. Lopez undergoes surgery and has satisfying surgical results, she can expect the following: reduced anxiety and defensiveness due to fears of being "found out" or challenged; increased comfort in social and sexual situations; increased acceptance by potential friends, employers, and sexual partners; increased personal comfort with her own body; satisfying sexual relationships, including penetration and orgasm; all of the necessary criteria for changing her name and gender on official documents to the extent allowed by law. For example, she will be able to apply for employment as a woman, show identification as a female to human resources, use the women's room, and dress as a woman without question or disruption.

Ms. Lopez appeared to be of above-average intelligence, had adequate judgment, and good social skills. She showed no signs of mood or thought disorder and there was nothing to suggest any underlying psychopathology which would impact on her gender identity. From her report, she appeared to meet all of the criteria for the DSMIV diagnosis of Gender Identity Disorder. She is classically transsexual because of her uncomplicated female gender identity. She reported a lifelong cross-gender identification which seems to have been intense, stable, and enduring. She has had hormonal treatment to appear more feminine and she has been happy with the results.

Ms. Lopez has been living and as a female for some time. In this respect, she has achieved a great deal, but her ability to interact in the world is still limited by the existence of male reproductive organs. To anyone meeting her Ms. Lopez is an attractive woman with a feminine figure enhanced by female hormones. The incongruity between her physical self, her gender identity, and her genitals may cause her to be a target of prejudice and even violence. It is necessary both for her emotional well being, and her physical safety, that she appears fully female. For these reasons, gender confirming surgery/vaginoplasty and labiaplasty is appropriate and necessary.

Case 1:17-cv-03014-MKV-GTW Document 51-2 Filed 06/05/17 Page 27 of 186
Case 1:17-cv-03014-MKV-GTW Document 35-1 Filed 05/03/17 Page 26 of 64

5

From this brief evaluation it would seem that she is capable of making good decisions for herself regarding gender transition and that she is an appropriate candidate for sex reassignment surgery. There do not appear to be any psychiatric contraindications to her undergoing such surgery at this time. It is likely that such surgery will enhance her quality of life and enable her to fully engage in social and professional activities. To deny her this surgery could compromise her mental health as well as her physical safety. If you would like more information regarding my work with this patient please contact me at 212 206-3636.

Katherine Rachlin, Ph.D.

## References for the Necessity of Sex Reassignment Surgery in the Treatment of Gender Identity Disorder

American Psychiatric Association.(2000). *Diagnostic and statistical manual of mental disorders,* Fourth Edition Text Revision). Author: Washington, DC.

Barrett, J. (1998). Psychological and Social Function Before and After Phalloplasty. *Int J. Trans. 1: Http://www.symposion.com/ijt/.*

Benjamin, H. (1966). *The Transsexual Phenomenon.* Julian Press, New York, NY.

Bockting, W.O. and Coleman, E. (1992). A comprehensive approach to the treatment of gender dysphoria. In W. O. Bockting and Coleman, E. (Eds.), Gender Dysphoria: Interdisciplinary Approaches in Clinical Management (pp. 131-155). New York: Haworth.

Boltzer, M.C. and Vehrs, B. (1993). Factors contributing to favorable outcomes of gender reassignment surgery. Paper presented at the 1993 XIII International Symposium on Gender Dysphoria: Advances in Treatment, The Harry Benjamin International Gender Dysphoria Association, Inc. New York, NY.

Bodlund, O. and Kullgren G. (1996). Transsexualism – general outcome and prognostic factors: a five-year follow-up study of nineteen Transsexuals in the process of changing sex. *Archives of Sexual Behavior.* 25: 303-316.

Brown, G. R. (1990). A review of clinical approaches to gender dysphoria. Journal of Clinical Psychiatry, 51, 57-64.

Brown, G. R. (2001). Transvestism and Gender Identity Disorder in Adults. In Gabbard, G.O. (Ed.), *Treatment of Psychiatric Disorders* (3rd ed. Vol. 2) pp.2002-2067. American Psychiatric Publishing, Inc., Washington DC:

Carroll, R. (1999). Outcomes of treatment for gender dysphoria. *Journal of Sex Education and Therapy.* 24: 128-136.

Green, R. and Fleming D. (1990). Transsexual surgery follow-up: status in the 1990s. *Annual Review of Sexual Research.* 7: 351-369.

Ettner, R. (1999). *Gender Loving Care a Guide to Counseling Gender-Variant Clients.* W.W. Norton & Co. New York.

Hale, J. C. (2001). *Medical Ethics and Transsexuality.* Paper presented at the 2001 XVII Harry Benjamin International Symposium on Gender Dysphoria. Galveston, Texas.

Israel, G. and Tarver, E. (eds.) (1997). *Transgender Care.* Temple University Press, Philadelphia.

Kuiper, B.... and Cohen-Kettenis, P. (1988). Sex reassignment surgery: a study of 141 Dutch transsexuals. Archives of Sexual Behavior, 17, 5: 439-457.

Landen, M. MD; Walinder, J. MD PhD; Lundstrom, B. MD, PhD. (1997). Predicting regrets in sex reassignment. Paper presented at the XV Harry Benjamin International Gender Dysphoria Association Symposium, The State of Our Art and the State of Our Science. Vancouver Canada.

Lundstrom B, Pauly I, and Walinder, J. (1984). Outcome of sex reassignment surgery. *Acta Psychiatrica Scandinavia.* 70: 289-94.

W. Meyer III (Chairperson), W. Bockting, P. Cohen-Kettenis, E. Coleman, D. DiCeglie, H. Devor, L. Gooren, J. Joris Hage, S. Kirk, B. Kuiper, D. Laub, A. Lawrence, Y. Menard, J. Patton, L. Schaefer, A. Webb, C. Wheeler. (2001) *The Standards of Care for Gender Identity Disorders -- Sixth Version*. Int J. Trans. 5: http://www.symposion.com/ijt/.

Pauly, I. B. (1981). Outcome of sex reassignment surgery for Transsexuals. *Australian & New Zealand Journal of Psychiatry*. 14: 45-51.

Pfafflin, F. and Junge, A. (1998). *Sex Reassignment Thirty Years of International Follow-Up Studies  SRS: A Comprehensive Review, 1961-1991.* Symposium Publishing, Dusseldorf, Germany.

Rachlin, K. *(2002). Transgendered Individuals' Experiences of Psychotherapy.* International Journal of Transgenderism, Volume 6, Number 1, available at http://www.symposion.com/ijt/.

Rehman, J. Lazer, S. Benet, A.E., Schaefer, L.C. and Melman, A.  (1999). The reported sex and surgery satisfaction of 28 postoperative Male-to-Female Transsexual patients. *Arch. Sex. Behav. 28(1): 71-89.*

Ross, M.W. and Need, J. A. (1989). Effects of adequacy of gender reassignment surgery on psychological adjustment:  A follow-up of fourteen male-to-female patients. *Archives of Sexual Behavior*. 18(2): 145-153.

Schaefer, L.C., Wheeler, C.C., and Futterweit, W. (1995). Gender Identity Disorders (Transsexualism). In Gabbard, G.O. (Ed.), *Treatment of Psychiatric Disorders* (2nd ed. Vol. 2)  pp. 2015-2079. American Psychiatric Press: Washington DC.

CURRICULUM VITAE
Katherine Louise Rachlin

153 Waverly Place suite 10, New York, NY. 10014
Telephone: (212) 206-3636 Fax: (212) 206-6361 e-mail:KRachlin@aol.com

## Professional Credentials

Licensed Psychologist since 1993.  New York State # 012029.
AASECT Certified Sex Therapist since 1997

## Education

| | |
|---|---|
| Sept. 1996 | Postdoctoral Respecialization, Clinical Psychology. Teachers College, Columbia University. |
| Dec. 1991 | **Ph.D.** Psychology, Applied Research and Evaluation. Hofstra University. |
| Dec. 1986 | **M.A.** Psychology, Applied Research and Evaluation.  Hofstra University. |
| May 1983 | **B.A.** *cum laude*, Psychology.  Marymount Manhattan College. |

## Clinical Experience

| | |
|---|---|
| Nov. 1996-<br>Present | **Psychotherapist, Supervisor, and Trainer** in private practice.  Provide psychotherapy for individuals and couples, specializing in issues of sexuality and gender identity. Provide supervision for psychotherapists who want training in working with transgender and sexually diverse clients.  Deliver training in educational institutions, health care settings, and corporations to provide staff with a greater understanding of transgender issues. |
| Aug. 1999-<br>July. 2000 | **Psychologist**  PsychAssociates Group, AIDS Services Center of Lower Manhattan.  Conducted individual and group psychotherapy and psychological assessments with HIV positive individuals. |
| Nov. 1996-<br>Aug. 1999 | **Psychologist**  PsychAssociates Group, ARC. Conducted individual and group psychotherapy and psychological assessments in group homes and sheltered workshops with developmentally delayed adults. |
| Sept. 1995-<br>Sept. 1996 | **Psychology Intern**  Manhattan State Psychiatric Center, Ward's Island, New York, New York. (APA approved full-time year-long internship) Worked with acute admissions and severely and chronically mentally ill inpatient population at state psychiatric hospital. |
| Sept. 1994 -<br>July. 1995 | **Psychology Extern**  Adult Outpatient Psychiatric Clinic, St. Luke's-Roosevelt Hospital, New York City.  Conducted individual psychotherapy, intake interviews, and psychological testing. |
| Jan. 1994 -<br>May 1995 | **Psychotherapist**  The Center For Psychological Services, Teachers College, Columbia University  Conducted intake interviews, psychological testing, and  psychotherapy with individuals and couples. |
| Sept. 1994 -<br>Aug. 1995 | **Family and Couples Support Group Leader.** - The Gender Identity Project, The Lesbian, Gay, Bisexual and Transgender Community Services Center of New York City. Facilitated two bi-monthly support groups: One for families of transsexuals and one for transsexual couples. |
| 1989 - | Hosted the Fraternity, an information network and support group for female-to-male |

| | |
|---|---|
| 1993 | transsexuals, crossdressers, their significant others and helping professionals. |

**Additional Work Experience**

| | |
|---|---|
| 1991-93 | **Medical Writer and Project Director.** Myofascial Pain and Fibromyalgia:  Triggerpoint Management.  Mosby Publishers. |
| 1990-91 | **Adjunct Assistant Professor of Psychology**, Hofstra University. |
| 1986-92 | **Researcher, Management Consultant**, and **Human Resources Associate** (details available upon request) |
| Prior to 1986 | While a student, I held numerous jobs in cultural institutions around Manhattan including The Metropolitain Museum of Art, The Metropolitain Opera, The Marlborough Gallery, and The New York Lyric Opera.  Details available upon request. |

**Published Papers**

Paper currently in Preparation for Publication - *FTMs experiences of Hysterectomy and Oophorectomy (coauthors Griffin Hansbury and Gabrie Fenigsohn)*

Paper currently in Preparation for Publication -  *A Six-Stage Model applied to Gender Identity Development in Psychotherapy*

Paper currently in Preparation for Publication - *Flexible Use of the Standards of Care #1: Psychological Evaluation in Lieu of Psychotherapy* (coauthor John Capozuca)

Paper currently under review for Publication  *Utilization of Health Care Among FTMs in the United States.* (Coauthor Jamison Green)

*Transgendered Individuals' Experiences of Psychotherapy.* International Journal of Transgenderism, 2002, Volume 6, Number 1, available at http://www.symposion.com/ijt/.

*FTM 101: Dispelling Myths About the Invisible and Impossible.*  Book Chapter in The Phallus Palace: Female-to-Male Transsexuals.  2002. Dean Kotula editor. Alyson Publications: Los Angeles CA.

*Factors Which Influence Individual's Decisions When Considering FTM Genital Surgery.* International Journal of Transgenderism, 1999, Volume 3, Number 3, available at http://www.symposion.com/ijt/.

**Papers Presented**

*Transmasculine Individual's Experiences with Hysterectomy/Oophorectomy.* Poster Presentation. Coauthors Gabriel Fenigsohn, MA. and Griffin Hansbury.  The XVIII Harry Benjamin International Symposium on Gender Dysphoria. 10-13 September 2003, Ghent, Belgium.

*Flexible Use of the Standards of Care: First in a Series*.  Presented with John Capozuca, Ph.D.  at the XVIII Harry Benjamin International Symposium on Gender Dysphoria. 10-13 September 2003, Ghent, Belgium.

November 2001, *Trends in the Evolving FTM Community: Challenges for Clinical Providers*. Paper presented at the XVII Harry Benjamin International Symposium on Gender Dysphoria. October 31-November 4, 2001, Galveston, Texas.

November 2001, *Utilization of Health Care Among FTMs in the United States*. (Coauthor Jamison Green) Paper presented at the XVII Harry Benjamin International Symposium on Gender Dysphoria. October 31-November 4, 2001, Galveston, Texas.

August 2001, *Transgendered Individuals' Experiences of Psychotherapy.* Paper presented at the American Psychological Association 109th Annual Convention, San Francisco, CA. August 24-28, 2001.

March 2001, Work*ing With Transgendered Women in Recovery.* Presented at Speakout conference sponsored by The Lesbian and Gay Community Services Center of New York City.

February 2001, *The View From The Wings.* Key Note Address at the True Spirit Conference sponsored by AMBOYZ, Washington, DC.

October 2000, *The Effects of Gate-Keeping on Experiences with Psychotherapists*, presented at The Fourth International Congress on Sex and Gender, October 6-8, Philadelphia, Pennsylvania.

August 1999, *Meeting At The Gate: A National Survey of Transgendered Individuals' Experiences of Psychotherapy*, presented at The Harry Benjamin International Dysphoria Association XIV Symposium August 17-21, 1999, London, England.

September 1998, *Factors Which Influence Consumers' Decisions Regarding Female-To-Male Genital Reconstructive Surgery,* presented at The Third International Congress on Sex and Gender, September 18-20, 1998, Oxford, England.

September 1997, *Factors Which Influence Consumers' Decisions Regarding Female-To-Male Genital Reconstructive Surgery,* presented at The Harry Benjamin International Gender Dysphoria Association XV Symposium, September 10-13, 1997, Vancouver, BC, Canada.

August 1997, *Intimacy Issues for Partners of Female-to-Male Transsexuals,* presented at The Third FTM Conference of the Americas, Boston, Mass.

June 1997, *Partners in the Journey: Psychotherapy and Six Stages of Gender Revelation,* presented at the Second Congress on Sex and Gender, King of Prussia, PA.

April 1996, *Sexual Issues Brought Into Psychotherapy Early in Gender Transition* presented at The Second Annual Transsexual Health and Empowerment Conference, sponsored by The Gender Identity Project of The Lesbian and Gay Community Services Center of New York City.

August 1995, *No-Hormone Non-Operative options for Female-to-Male Transsexuals,* and *Observations on FTM Men - a Therapist's perspective*, both presented at the First FTM Conference of the Americas, San Francisco, CA.

April 1995, *Transgender Issues in Psychotherapy*, presented at The First Annual Transsexual Health and Empowerment Conference, sponsored by The Gender Identity Project of The Lesbian and Gay Community Services Center of New York City.

January 1992, *Self-Managed Teams: Implications for Assessment.* Presented at the International Personnel Management Association Assessment Council Convention, Baltimore, MD. In collaboration with Ira Kaplan, Ph.D. and William Metlay, Ph.D.

**Thesis**

Doctoral Dissertation: July 1991 Measurement of Group Behavior. Exploration of a systems model and metatheories of systems models that had been applied to work groups. Doctoral Dissertation, Hofstra University, Department of Psychology.

**Professional Affiliations**

The American Psychological Association - **Member Division 44 TransTaskforce**

The Harry Benjamin International Gender Dysphoria Association - **Member of the Committee to Rrevise the Standards of Care for the Treatment of Gender Disorders**
FTM International - **Member of the Board of Directors 1999-2002**
The New York State Psychological Association
The American Association of Sex Educators, Counselors, and Therapists
The Society for The Scientific Study of Sexuality
The New York Working Group on Gender Disorders, New York State Psychiatric Institute

C. Christine Wheeler, Ph.D.
310 East 46th Street, Suite 12-H
New York, New York 10017 USA
Telephone: 1 (212) 599-2254
Facsimile: 1 (212) 973-9431

October 11, 2005

Michael Katch, Ph.D.
Associate Commissioner
Administration for Children's Services        RE:        Mariah Joel Lopez
Direct Congregate Care Services               SS:         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
2 Washington Street, 20th Floor    DOB:     April 27, 1985
New York, New York 10004

RE:  Psychiatric Evaluation and Prognosis

Dear Dr. Katch:

I am a psychotherapist and degreed sexologist for over 30 years and have been specializing in the diagnosis and treatment of Gender Identity Disorders, as well as disorders resulting from addictive, phobic, compulsive or abusive behaviors, parapheliac conditions, sexual dysfunction, body dysmorphic disorders for the past 33 of those years.  I am a charter member, fellow and current Board Member of the oldest professional organization The Harry Benjamin International Gender Dysphoria Association, Inc. (HBIGDA), coauthor of the current medical treatment guidelines for Gender Identity Disorders entitled, "The Standards of Care," and coauthor of a well known treatment chapter entitled, "Gender Identity Disorders (Transsexualism)" published in Treatments of Psychiatric Disorders (Second Edition) by American Psychiatric Press, Inc. (1995).

PRESENTING PROBLEM

Mariah Lopez was referred by Administration for Children's Services, through recommendation from Lawyers for Children.  The purpose of this lengthy evaluation, as I understand it, is to determine the current psychological status of Mariah Lopez, assess diagnostics and co-morbidity, and to render an opinion regarding whether or not any dysfunction assessed may be attributable to her eligibility or readiness for genital restructuring surgery, in diagnostic confirmation of Gender Identity Disorder.

METHODOLOGY

Psycho diagnostic Interview and clinical intake with Mariah Lopez totaled twenty-three hours. Subsequent to my clinical intake, with signed consent from the patient, I have reviewed the following materials, including clinical reports and patient charts, from other practitioners or agencies inclusively for this report:  (1) office records, intake assessment and report from endocrinologist Michael K. Bartalos, M.D., and assessment dated 2003 from Katherine Rachlin, Ph.D. (2) medical records of psychiatrist Lawrence Sheff, M.D., as well as medical report from surgeon Arnold Melman, M.D., (3) Criminal History Record Information, and (4) other related documents and correspondence from Mariah Lopez, reviewed in preparation for writing this report.

CLINICAL PICTURE

I initially saw Mariah Lopez (birth name Brian Joel Lopez) for psychiatric diagnostic evaluation on May 26, 2005, followed by a series of sessions subsequently through October 6, 2005 for a total of 23 clinical in-person hours.  In addition to my intake assessment and in response to my request, the patient has provided me with additional written material concerning her history and perspective on her Gender Identity Disorder.  Mariah Lopez is not currently in treatment of any kind whatsoever to more adequately prepare her for the consequences of choices regarding her requested genital restructuring

surgery. Ms. Lopez's attitudes have been naively negative toward psychotherapy in general – she initially states, "I don't need therapy. I know who I am. I've been in the community since I'm eleven. Sylvia Rivera was my trans mother. I know what I want." I believe, her attitudes are due to her history of being misunderstood, coupled with unsatisfying experiences, rather than due to financial distress.

On the basis of having examined Mariah Lopez, reviewing the above materials and my professional experience, I am of the opinion that Mariah Lopez has suffered an ongoing socially-disabling condition primarily as a result of her Gender Identity Disorder, accompanied by atypical anxiety, Borderline Personality Disorder, since the mid – 1990's, and more recently, posttraumatic stress disorder, and chronic depression. To explain:

## DIAGNOSTICS

By history, since 1988, Mariah Lopez has suffered from the pain and the stress related to four serious conditions: Gender Identity Disorder (DSM IV 302.85), Generalized Anxiety Disorder (DSM IV 300.02), Dissociative Disorder, specifically Depersonalization Disorder (DSM IV 300.06), Dysthymic Disorder with atypical features (DSM IV 300.4), Borderline Personality Disorder (DSM IV 301.83), and more recently since the mid – 1990's, Posttraumatic Stress Disorder (DSM IV 309.81) and chronic depression. Early childhood gender conflict was noted in the medical records of Brian/Mariah's pediatrician who, as a result of concerns about early effeminateness and of being caught using magic marker for makeup, referred him/her for weekly therapy to the childhood gender program at Roosevelt St. Lukes Hospital. Patient reports being followed weekly from ages 3-6.

Historically, and most recently, there are no medical psychotherapy treatment documents concerning this patient's gender dysphoria, no known written records – other than medical records of psychiatrist Lawrence Sheff, M.D., and the requested written report from Dr. Katherine Racklin (2004).

This patient had received medication for both symptoms and the diagnosed conditions—hormones for GID and antidepressant for PSD insomnia and interrupted sleep. Hormones are successful in addressing gender relief, adding to the original impetus for her medical stabilization. Other medication, while initially reported as providing some relief from the patient feeling immobilized and nonfunctional, are reported to be of little relief from the overwhelming fears experienced currently. Available documentation reflects that this patient has continued life in a chronic state of impulse control behaviors, apparent discrimination and without question whatsoever, this individual has suffered with Gender Identity Disorder, Early Childhood Onset.

## GENDER IDENTITY DISORDERS – STANDARD OF CARE

Standard of Care. The standard of care in evaluating an individual for any gender condition involves interviewing the patient and obtaining information from agencies in charge, family members, friends, previous pertinent medical treatments, and other sources if possible with the patient's consent. Diagnostic evaluation clinically focuses primarily on psychosexual and social development, psychiatric history and current mental status. No specialized tests exist that can assist with differential diagnosis. Additionally, the presence of co morbid diagnoses[1] needs to be assessed. As my colleagues and I have written in the chapter "Gender Identity Disorders" in Treatment of Psychiatric Disorders (Vol. 2) edited by Glen O. Gabbard, M.D. and published by the American Psychiatric Association in 1995, "Although histories of psychiatric treatments for substance abuse, adjustment disorders, serious suicidal thoughts, and depression are not uncommon in gender dysphoric patients, there is no evidence of a frequent occurrence of co morbidity, making comparison with estimates in the general population meaningless. Many of these disorders are defense mechanisms against the

---

[1] Axis I psychiatric symptoms, as anxiety disorders, dissociation, schizophrenia, mood and other psychotic disorders (e.g., paranoia), plus Axis II personality disorders as borderline, avoidant, narcissistic, obsessive-compulsive, etc.

frustration, psychological pain, anxiety, and discrimination stemming from patients' inability to live safely and comfortably in society with their condition or in their desired gender roles."

A clinical picture emerges when a person's concerns and uncertainties, distress and questions about their gender identity continue and they remain feeling conflicted.[2] Gender conflicted or dissatisfied people are diagnosed as suffering from a gender identity disorder when they meet specified criteria in one of two official diagnostic sources – Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition (DSM-IV) or the International Classification of Diseases – 10 (ICD-10).  For example, DSM IV 302.85 Gender Identity Disorder (GID) in adolescents or adults diagnostic criteria includes:  a strong and persistent cross-gender identification;[3] and persistent discomfort with one's sex, or sense of inappropriateness in the gender role of that sex[4]; absence of physical intersex condition; and disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

While a clinician can help a person to understand their symptoms and dilemmas as a gender condition, most people seeking help for Gender Identity Disorders come 'self-diagnosed' in that they bring their diagnosis to the clinician.  In diagnostics and treatment, there are many patients seeking treatments, both psychotherapeutic and endocrinological, for *social* – rather than *genital* – sex reassignment.  Surgery as a treatment modality has yet to be fully examined by this patient in psychotherapy treatment.

Further, the Harry Benjamin International Gender Dysphoria Association's "*Standards of Care*" (original document 1977, revised publications 1978, 1979, 1980, 1981, 1985, 1990, 2001) articulate professional consensus about the psychiatric, psychological, medical and surgical management of GID. Clinicians use these guidelines to understand the range of assistance needed for gender patients. There are five elements of clinical work:  diagnostic assessment, psychotherapy, real life experience, hormonal therapy, and surgical therapy.  People with gender distress, and others (i.e., families, employers and social institutions) may use the SOC to better understand treatment possibilities and professional thinking.  Treatment goals include learning a prolonged personal comfort with one's gender identity and expression to maximize overall psychological well being and self-fulfillment.  The SOC are intended to provide flexible directions for treatment of GID.  Clinical departures from these guidelines are appropriate in light of a patient's unique psychological, social, or anatomical needs, as well as the development of an experienced professional's method of handling a common situation, or due specifically to a research protocol.  Such departures should be recognized, explained to the patient, documented both for legal protection and for short and long term results.

1.)    All medical records reviewed complied with the standard for the evaluation of gender identity disorders along with co morbid diagnoses in the initial intake and assessment (2005) of Mariah Lopez.  The techniques of assessment for diagnoses and course of treatment is identified to include interviewing, psychiatric history and past hospitalizations, medications including self-medications, suicidal interest and attempts, personal observation of the individual, contact with foster care authorities, representative authorities at Lawyers for Children, and review of other records, when available.  The medical records indicate that the following were considered:  depression, chronic physical illness, a history of hospitalization for depression, gender issues including the patient's goal of transitioning on female hormones, the patient's support network – extended family, friends, treatment

[2] Emotional struggles are known clinically as:  gender issues, a gender problem, a gender concern, gender distress, gender dysphoria, gender identity problem, cross dressing, transvestism, transgenderism, or transsexualism.  They are expressed throughout one's lifetime – from childhood into old age – in various degrees of dissatisfaction with sexual anatomy, gender body characteristics, gender roles, gender identity, as well as the perceptions of others.
[3] Symptoms may include a stated desire to be, frequent passing as, desire to live or be treated as, or the conviction that one has the typical feelings and reactions of, the other sex.
[4] Symptoms may include a pre-occupation with getting rid of primary and secondary sex characteristics (e.g. request for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or belief that he or she was born the wrong sex.

providers, suicidal ideation, and an assessment of risk of mental stability in the decision concerning diagnoses. Documentation of the presenting problem and the patient's chief complaint is "I've been trying to get my surgery since last year. I have no gender identity issues. I know who I am."

Records all concluded that Mariah Lopez has suffered from recurrent and severe major depressive disorder, generalized anxiety disorder, gender identity disorder, and while reporting desire to not live in the past, Mariah does not particularly pose a risk for suicide in the near future.

Current indications recommend short-term psychotherapy sessions specifically and conclusively in preparation for genital restructuring surgery, and postoperative therapy during the first year to facilitate adjustments to the changes this unique path of psychosocial and sexual development entail. Ancillary issues, i.e., impulse controls, can clearly be addressed in psychotherapy at a later time post-op surgery.

2.) My diagnostic evaluation and records, as well as this report, repeat again the factors comprising clinical formulation and course of treatment, and continues to document assessment in supportive correspondence for this patient. There appears to be no organicity (brain condition affecting psychological problems).

3.) Written correspondence from Mariah Lopez about her life disclosing the history of her gender dysphoric struggles, her heightened anxiety about gender expression, her inabilities to deal effectively with other's reactions to her transgender feelings, presentation and expressions in her youth, and her guilt. The Gender Identity Disorder turmoil clearly began long before admission into foster care and before beginning treatment with any practitioners during adolescence.

Mariah Lopez reports sustained cross gender identification desires, interests and incidences, and the torment that accompanied throughout childhood and puberty stating, "No one ever acknowledged my gender condition – no mental health worker, nobody." Maria Lopez reports her gender dysphoria escalating in feelings of despair, desiring to be a part of girl/womanhood, to have acceptance by others for who she is, and continuing to keep her preferred gender secret by hiding in her inabilities to apply herself educationally and work hard.

This health care practitioner's assessment confirms the clinical picture assessed early on concerning Mariah Lopez's history of Gender Identity Disorder, inability to deal with her trangenderism, uncontrolled feelings of guilt and fear, chronic depression and endless experiences of running away from living conditions of peer torment and unaccepting adults, and need for treatment with a specialist in gender identity disorders.

In essence, historically, few have carried out many of the responsibilities of the mental health professional in their work with Mariah Lopez as regards her gender distress. She would have benefited greatly from a specialist over the past five years.

4.) The medical records reviewed comply with an acceptable clinical standard for record keeping of medical treatment with Mariah Lopez. While note taking and record keeping can vary widely among clinicians from brief cryptic codes to voluminous descriptions, most of these records and notes, along with various correspondence in support of GID treatment modalities, help document the course of treatment to lower this patient's anxiety, mood swings related to Gender Identity Disorder, her feelings of hopelessness and helplessness and her preoccupation and obsessive thinking about her focus on SRS. Prior to the mid-1990s, by history, this patient's diagnostics are confirmed. All records confirm this individual's lack of conflict and confusion concerning acceptance of his/her own gender identity condition.

As my colleagues and I further point out in our medical treatment chapter for gender identity disorders, "one option not open to patients is the option to do *nothing* about their gender condition, because such an attitude can only have disastrous consequences. Suppression and repression causes depression and are always immobilizing and sometimes fatal. Sadly, suicide

attempts are not unknown for those who live their lives immersed in feelings of helplessness and hopelessness. To ignore totally one's gender or one's inner awareness of it – a fundamental aspect of the human personality – is, in and of itself, a form of gender suicide."

     5.)    This patient's story is replete with references to Mariah's response to gender identity issues and her overwhelming fear of disclosure with her grandmother and mother, with childhood playmates, later with places of work and her anxiety and frustration at having to deal with attempting to complete an education process and find meaningful work.

     6.)    There is no risk of suicide currently. Risk, however, would increase if the patient were re-incarcerated. Mariah Lopez states, "I thought about suicide and attempted it ......my fantasy was always a way out – I could just go to sleep and just never wake up. I never had the sense of killing myself." Mariah denies any history of overt mutilation behaviors. Body markings include a best friend's name, "Junior" – tattooed center rear neck. {The same friend has "Mariah" tattooed center rear neck.}

     I concur with the patient, Mariah Lopez, concerning diagnostics, appropriate treatment modalities, including genital reassignment surgery. Again, I do not concur with the patient's dismissal of the importance of psychotherapy treatment.

     In concluding this segment, documentation reviewed has complied with the standard of care in the assessment and adequate treatment of Mariah Lopez's Gender Identity Disorder, along with co morbid diagnoses, her mental status, with limited suicide potential, and life experiences. However, no one has carried out many of the responsibilities of the mental health professional (as listed in the HBIGDA's *Standards of Care*) in their treatment/work with Mariah Lopez over the course of the past six years – thus exacerbating her mental stability and emotional well-being.

## MEDICATIONS

     Endocrine medications include Estradiol 2.0 mg. tabl., twice daily by mouth; Spironolactone 100 mg tab., one twice daily by mouth; Estradiol Cypionate injectible solution (aka DepoEstradiol) 5.0 mg per ml strength, 1.0 ml intramuscularly bimonthly. The patient reports being prescribed 5mValium. Antidepressant prescribed is Trazadone. [There is a history of extensive experience with the known street drugs recreationally.]

## SUMNATIVE OVERVIEW

     **Family History**: Youth reports being raised "Hispanic" by a maternal grandmother, Loraine Lopez, who had custody, as the mother was a drug addict who had abandoned family life. Mariah (ages 5-8) knew her mother only three years before she died of AIDS in 1993. The grandmother suffered from asthma, obesity, and was disabled. As the grandmother was unable to take care of Clayton and Mariah (Brian), the two siblings were placed into Foster care. Her death in 1997 (at age 48) secured Mariah as a ward of the State. Youth reports her parents being "victim's of their time......1985 crack and heroin were a norm for street teenagers.....I'm the result of "a one night stand. My biological father never had custody of me, only my half brother, Clayton, who is three years older." Mariah claims her religious grandmother was protective of her gender expressions and completely supportive, finding her the care needed. She reports a happy upbringing, living in the projects, with no difficulty playing double Dutch with both boys and girls and being totally accepted. Grandmother's name of endearment for Mariah was "Bree-Bree."

     **Early Childhood and Adolescent History**: *First cross gender thinking* is reported at age 3 – "I liked to be like a girl. I peed sitting on the toilet. I thought I was a girl....always effeminate. I truly believed I could decide my gender. In my youth, I always wondered if I was gay, but it didn't fit. I didn't know about trans. The gay thing didn't fit but I like companionship. The concept of transcending gender was beyond my recognition. By seven or eight, I realized I wasn't a girl I was severely depressed, frustration and hopeless feelings overcame me. Discovering you are trans is enough, but feeling trapped, no options, I was horrified." *Cross-dressing* did not begin until teenage years, with

C. Christine Wheeler, Ph.D.          Page 6          10/16/2005

interest early on restricted to articles of her grandmother's clothing. No one was aware of this behavior. *Childhood playmate preference* included both genders, youth believing that she could eventually will her own gender in time. *Toy preference* included coloring books in pastels, dolls, jump rope and double Dutch; never sports or rough and tumble play. *Clothing and hairstyles* were typical for a young boy until age 13 when "I was introduced to the transgender community in the Village and saw my first fem queen. I let my hair grow and got into trouble for it." *Activity preferences* centered on dancing (tap) and acting with patient's report of a longstanding history of discrimination and punishment due to trans interests. *Rough and tumble play,* by report, were never engaged in, short of self-defense. *Satisfaction with physical characteristics* is reported as completely satisfied today since hormone treatment, with the exception of anticipated genital surgery. *Energy expenditure* is viewed and interpreted by youth as focused on human rights (especially her own). Youth reports feeling the most comfortable and very accepted in femaleness. She confirms, "No one's going to believe I'm not a girl. I'm accepted everywhere. No one even knows, except those who know my past." *Identification figures* are other transgender individuals, trans people who are successful drag performers, movie stars as Jennifer Lopez. *Relationship with deceased mother, deceased grandmother, father, and uncle* is reported as no relationship with the mother, a loving close relationship with the grandmother, a new effort at connection with the father who is fully accepting of her condition, and protective uncle unknown. *First notion of being different* is initially identified in childhood but confirmed by age 13. *First conscious cross-gender feeling* is reported at age 3. *Reaction of environment to perceive sissy-ness* is reported as torment, name-calling ("Fagot" being the word that sends youth into rage), fighting with peers, home discipline, and ultimate withdrawal at onset of puberty. *Emotional reaction of individual to maturation of body* was to prevent onset of secondary sex characteristic by "getting on street hormones by age 13" before puberty began. *Attempts to hide sex characteristics or harm them* were denied with the exception of ages 13-14, "the most difficult year of my life," and currently, hormone atrophy negates the necessity of "tucking" genitalia.

**Sexual Orientation:** Mariah sees herself as exclusively heterosexual; she reports only thinking of self as female with either bisexual or heterosexual men. She reports having no erotic experience with females – the idea of having sex with females while being male is too uncomfortable.

**Sexual Activity:** Sexual play or penetration with females is reported as "NEVER!" First sex with a male partner, youth was 12, the partner 14, included kissing, genital fondling, without intercourse. First oral-genital contact and anal penetration were experienced at age 13, reported with erotic satisfaction.

**Sex Industry Worker:** Youth reports an extensive history in prostitution, beginning at age 13 on the Stroll in midtown Manhattan, and includes being paid for pornography. Youth's rap sheet confirms arrests and incarcerations in this regard. When asked about practicing safe sex, youth states, "It was easy money. I've been a good judge of character but without my training in AIDS and drug use, I would probably be HIV positive. It's teaches me a lot about sexuality and the roles played in erotic interest on the streets." Highest fees paid at any one time are reported as $3,000.

**Significant Primary Relationship:** Two long-term primary love connections are reported, both with heterosexual males. The current partner is incarcerated upstate for the foreseeable future.

**Friends:** All current friends are reported as being transgender people.

**Endocrine History:** By age 13, youth reports inconsistent use of birth control pills purchased on the streets; by 16 youth was treated with Premarin in the West Village by Dr. Taviano, at 17 through a health clinic with anti androgens, and has been followed since age 18 by Michael K. Bartalos, M.D.

**Other Feminizing Procedures:** No known silicone procedures have been administered. No orchiectomy confirmed by Dr. Arnold Melman's report. Youth discusses her interest to consider adding breast augmentation.

**Surgical Restructuring of Genitalia**:  In response to being asked what would she do if she could not have genital restructuring surgery, youth responds, "It's something that must be corrected.  I could not live…my life would not be right.  At 14, I was saying if I don't get surgery, I just don't know what will happen to me.  I can't explain how horrifying it is…..let me die a woman….it's like sitting on death row, without clemency.  I've been actively trying to get the surgery for over two years."

**Influence of Transgender/Transsexual Community**:  By age 13, youth was introduced to the TG/TS scene in Manhattan.  The influence of exposure to the community was enormous on this young person's psychosocial development.

**Current Gender Identity**:  Youth says "I'm 24/7 a girl.  I know that I'm transgender.  But I've believed myself to be female and since learning that surgery is possible, I need it to be correct.

**Religious or Spiritual Enlightenment/Interest**:  Youth reports a history of Sunday school religious upbringing while her grandmother was alive, but claims no faith, but is spiritual.

**Sex Partner Attraction**:  Youth is attracted to male partners accepting of her as female.

**Recreational Drug Use**:  Youth has extensive history of recreational drug use but explains that she fears her "mother's waste of her life."  Current recreational use is reported as pot smoking, occasional alcohol, and cigarettes.

**Self-Mutilation or Suicide Attempts**:  Youth reports no self-destructive behaviors involving cutting, puncturing, or burning her body.  Three suicide attempts are reported, all related to feelings of despair not feeling able to live in femaleness, being restricted in gender expression, being attacked and despondent in recovery.

**Self-expressed Life Goals**:  Youth reports wishing to complete her GED and study law, ultimately to become a paralegal or lawyer.

**Persistent Fear**:  The overwhelming fear currently is reported as on-going nightmares concerning re-incarceration and not being successful in getting Sex Reassignment Surgery.


MENTAL STATUS

Admittedly Mariah's abilities to be productive in her life is episodically compromised during the period of time she has been in transition and leading an unsettled life.  In the course of overwhelming gender dysphoric collapse, a major depression and anxiety attacks elevated causing great stress in all of her daily functions.  She reports, "I had horrible issues with my gender because I felt false identifying as male."  Initially, this dilemma was brought on by intense feelings of fear that she would never be given opportunity in life to be interacted with as female and be able to secure work as a female.

Although extraordinarily bright, street-smart, aggressive and demanding, a non-compliant patient frequently during the period I have known her, a series of distressing events, coupled with an unsuspected and sudden collapse of a trusted relationship (with her boyfriend's formerly supportive parents) that was completely trustworthy and cost her immeasurably in emotional investment and time exacerbated all of Mariah's cumulative fears.  Her most recent incident in incarceration catapulted her deeper into anxiety and depression.

Subsequently, Posttraumatic Stress Disorder was shortly diagnosed after suffering a major panic attack.  Mariah reports, "I still have flashbacks.  I have endured a lot of verbal and physical abuse.  My daily function problems have left me so greatly hampered, I just shut down, feeling totally abandoned and lost, helpless and hopeless.  I just don't know what will happen to me if I go back to jail."

In the course of Mariah Lopez's psychotherapy assessment over the past few months, the interactions and treatment has demonstrated little improvement for her to be able to address her difficulties with pro-action and resolve. This leaves Mariah with a somewhat desperate perception about what the future might hold for her and her ability to take care of herself. Mariah Lopez has never worked at a fixed job, because of a number of factors, not excluding depression and anxiety attacks, accompanied by the gender feelings of weakness and hopelessness, in addition to the physical deterioration in health resulting from chronic fatigue due to nightmares.

On review of Mariah Lopez's Mental Status:

### Attitude, Appearance, Behavior:

Mariah Lopez is of average height (5' 7") and slightly over-weight (175 lbs.), naturally thick in the torso with shoulder length straightened black hair (which she covers with a bandana or head wrap), who has genetic male phenotype, maximal facial features and bone structure more female prominent, and makes a presentable appearance dressed casually in clothes typical of her age group. Although Mariah's life and well-being had been threatened in the past while dressing in female attire publicly, today she is careful about how she presents herself in my offices – with neatness, cleanliness and a determination that her clothing is appropriate for the environment she expects to be in. She has a good attitude that she cannot always fulfill, in that she expresses an interest to fit in wherever she is. Mariah is clear spoken, not at all shy, outgoing and engaging if she believes she can trust the situation and is in competent care; she clearly in not always effective in speaking up in her own defense either out of naivety, inexperience or a sense of misinterpretation of intent. Mariah is highly suspicious and guarded and, I sense a desperate internal need to be unnecessarily demanding. This affect, however, can leave Mariah confused, frustrated and dissatisfied with her own efforts, as well as the efforts of others, that exacerbates her disabling personality characteristics. This patient is non compliant with and although requesting prescriptive meds, states she does not believe in the usefulness of any psychotropic medications that have been prescribed thus far, except anti-anxiety prescriptions. However, of note, is an extensive history of recreational and abusive drug use.

### Speech, Thought, Perception:

The way/manner in which Mariah Lopez expresses herself is today primarily truthful, direct and somewhat driven by desperation, but unfortunately, her manner of engaging with others clearly has not allowed her to be understood by others and has put her at risk to be completely mistreated. Consequently, she has been left feeling unclear, suspicious and agitated with some of her encounters. Previously, her mood tended to be somewhat erratic, because she is very influenced by what appears to be the response she gets from the outside world; and, like many people with GID and anxiety symptoms, she assumes that other people are much more critical and concerned than they actually are. As might be assumed, Mariah's concentration while having been somewhat impaired, appears today to not be limited; however, she has suffered from a long-standing pattern of interpersonal rejection sensitivity that has resulted in significant social and I suspect, perhaps some occupational impairment. Confounding the circumstances is the observation that Mariah presents as a highly manipulative individual frequently in her interactions with others. Mariah appears highly intelligent and articulates accurately at a rapid rate, but due to her swings in anxiety symptoms and other distracting and disabling interference's in her life, she cannot put to use the mental strengths that she has to aid her in her best interest.

### Sensorial and Intellectual Functions:

- Attention and Concentration: Mariah's orientation is quite adept, and she definitely knows where she is emotionally, what her goals are, the sequencing of daily task-related responsibilities, what the date is and why she is in appointments. I believe that she would remain interactive in treatment far more so than she has been in the past, if it was focused primarily on Gender Identity Disorders issues.

- Memory:  Mariah's memory has in the past frequently failed her because in depression, coupled with the unsettling living experiences she had while male, she could not be sure if what she remembered was accurate.  Although today, she appears to have good retentive process, exacerbation of multiple disabling psychiatric conditions can be expected to interfere with memory.

- Information:  Mariah is very good about keeping track of appointments and certainly knows why her health care providers were treating her. .She has so often been devastated by the inability to act on what she knows and felt to be important and imperative to her own well being.  She appears to be more cognizant and stable today than in the past.  While her ability to perform calculations is not limited, she is not as proficient at integrating herself comfortably in living a life of constructive well-being.

- Insight and Judgment:  Mariah's capacity for insight is good and, like so many other people with gender identity conditions, she has the ability to get to the "heart of the matter;" but she is impaired in her use of constructive insight, because she does not feel that she fits into the life around her.  To explain this further, when Mariah knows she is truthful, she cannot always understand why this does not give her universal acceptance.

<u>Current Functional Assessment</u>:

Mariah Lopez satisfactorily takes care of her daily living needs through the foster care program in New York City.  She lives alone in an apartment in a house, primarily due to her preop status as a transgender youth.  She reports being lackadaisical in being able to maintain her residence in an orderly fashion and admits to being sloppy about waste disposal habits.  She is perfectly capable of being able to shop both within and outside of her neighborhood according to available financial support and need; she reports enjoying light cooking at home and is highly competent and comfortable in taking public transportation.  She appears devoid of social phobias.  She has maintained a few close friends (trans and industry workers) for social support and who can be called upon if an emergency arises. She is able to enjoy very light reading and selective television programs, and likes to keep up with what's happening in specific activist groups in the Metropolitan area, even though she does not always understand the why's and where fore's.  She clearly is liberal but her true political interests, beyond her own goals, are unknown to me.

To my knowledge, Mariah has never been gainfully employed to date.  She states that she has been exploring work possibilities, including researching and working on writing a book and being a spokesperson for human rights causes.  However, currently she clearly is less equipped to be able to deal with levels of physical stress that can be naturally associated with being arrested as a transgender person, a long standing history of being discriminated against because she is transgender, coupled with the panic and despair she clearly feels fearing the possibility of incarceration again.  However, beyond key individuals whose connection with Mariah is protection and support (i.e., caseworkers and health care providers in various agencies, physicians, and lawyers), Mariah has yet to be able to establish herself with strong stable allies in her life and her network of support.  She reports being restricted in her personal resources

In terms of getting along with others, especially peers, trans community contacts, professionals, etc., I do believe Mariah has been too overbearing and demanding in her interactions with others, revealing her fragile ego strength to be able to cope with the kind of demands or expectations placed on her in mainstream life.  This aspect of her emotional development clearly has not shown progress in the past or currently for that matter, as credibility and trust were lacking both in her makeup and in the circumstances.

<u>PSYCHIATRIC SUMMARY</u>

In my opinion, Mariah Lopez's abilities to do work related mental activities and to live her life productively, with knowledge and understanding, and in personally secure and stable ways has been significantly impaired due to her transgender condition and other diagnoses.

In the course of her contact with me in assessment for the preparation of this evaluation, while knowledgeable about her early years and life in foster care, Mariah has not sufficiently been able to unravel the influences on her life from an early childhood raised in a lower-class Catholic-highly religious family, through establishing herself [educationally/academically and professionally in life], and beyond the loss of family. At this point, in light of the subsequent relapses, I believe Mariah Lopez has felt pushed to her very limits just to survive. She has been treated for depression anxiety and while no longer considered a suicidal risk, she has not recovered from the cumulative debilitating events and symptoms that created psychiatric collapse for her years ago. Simply stated, she just keeps reliving it. As a result, she finds it impossible to engage in any meaningful work due to her conditions and expected discrimination from the world.

However, Mariah Lopez remains episodically optimistic but fearful about her future.

CONCLUSIONS AND RECOMMENDATIONS

While presenting some unique aspects, in most respects, Mariah Lopez's psychosexual and social history is that characteristic of male-to-female transgender people. She fully meets the primary DSM-IV criteria for Gender Identity Disorders in that: while she is a bit uncomfortable with her male genitalia (although uses it in erotic interaction), she has been uncomfortable with her masculine anatomic sex; she does wishes to have her genitalia restructured to conform with her inner female gender identity; and she does wish to continue to live her life as a young woman; she has felt this way since both early childhood and adolescence; she shows no evidence of physical intersex; and this condition is not due to any mental disorder or exacerbated neurosis of any determinable kind. Mariah, while still filled with anxiety and financial concerns related to her being able to acquire the long requested SRS, she remains somewhat unstable and unclear about how she can live her life. Her romantic interests and experiences have been somewhat unrealistic and she in femaleness has been exclusively heterosexual, while depending on her close friendships primarily with women for support in the past few years.

On interview, Mariah Lopez presents most comfortably as a harried, almost manic, quite intelligent and I suspect creative, very purposeful, and an authentic female. There is no evidence of thought disorder, active psychosis or affective disorder, gross cognitive deficit or impairment of judgment or insight concerning the need for genital reassignment surgery. She is quite literal in her interpretation of her own presentation and her dreams and expectations for her future. Her deepest fear is twofold: false accusations, arrest and not being able to survive incarceration, and not being able to get her desired surgery soon.

Mariah's personality is defined and, over the brief but intense course of my knowing her, she is in the process of coming full circle in understanding her options for living a female life and for surgical intervention. Mariah has grown in her trust with me and expresses her feelings and fears about the future with openness and hopefulness. Emotionally, Mariah has yet to truly develop her own acceptance of herself in her genuine female gender. This is a dynamic rapidly acquired postop when the alteration of body phenotype and life experiences confirm acceptance.

The hope for the future is that Mariah becomes even more orderly in how she prepares for her decisions and plans for living her life in the years ahead. She certainly has accomplished finding the correct medical treatments that enable her to proceed as she has for many years imagined or wished for since very young and she continues to prepare herself for living a life worthwhile and beneficial to her. Her emotional wellbeing and success is dependent on her current source of support is predicated by financial necessity of allocating the required monies to pay for expensive medical treatments in gender confirmation. But it is my hope for her that moving from no to low-paying work to more profitable employment will secure her in the years ahead. She is bright and driven in her desire to survive, and while she does not always conduct her life with careful precautions, she certainly does have tenacity, and in time, with the needed emotional detachments. She is street industry-smart, and

sexually informed (but not always wise) and lacks prudence in some decision-making when under stress.

Mariah seems clearly much happier and more comfortable living as she is in femaleness than as a male even with all of the challenges she has faced and problems she has had to resolve. Thus far, I do feel that Mariah has undergone many decisions toward treating her gender identity condition and learning how to live with it with the type of insight unique to her life experiences, and with less emotional difficulty within herself personally. She has appeared to proceed as carefully as one can with limited resources and displays a confidence about the process of her gender transition that I feel assured will continue to sustain her as she seeks survival currently, and throughout her life. Mariah knows she can continue to count on insightful help from her agency contacts, me, as well as others she sees, as she continues grappling with the foreseeable and potential concerns. Those concerns include: enhancing or changing work focus, dealing with discrimination, dating, finding greater intimacy, sexual and emotional fluctuations, the continuation of maturing herself, and ultimately, the making of a life-partner relationship -- in the post-operative months and years ahead.

In this regard (and for some additional reasons which Mariah and I have been exploring together), I know that Mariah will be far more content and more greatly integrated as a person, if she continues to avail herself of her psychotherapy treatment throughout her first year post-op period. There are certain fundamental benefits to the peace and enrichment for the life of a person who provides herself with all the unique and rich education that she can acquire through a prolonged contact with a therapy specially adapted for this most extraordinary path of psychosexual development and interaction. My recommendation for continued therapy is twofold: first, to quickly determine in a few quick sessions the appropriate surgical technique and surgeon, and second, in order for Mariah to insure herself of a life filled with profound self-understanding, responsibility, and security.

In summary, I believe that Mariah Lopez is a true transgender person (medically known as transsexual) who is strongly interested in and in need of the genital restructuring surgery. **Without question whatsoever, sex reassignment surgery is medically necessary for Mariah Lopez.** Mariah is a fully prepared surgical candidate for SRS (genital restructuring surgery), she meets all eligibility and readiness criteria according to the medical guidelines -- The Standards of Care -- one could expect, and she expresses being clear about what the surgery can and cannot do for her. I believe that this surgery will help Mariah Lopez feel much more comfortable and consonant with her predominant inner gender awareness and the public expression of female gender in her life today.

In Mariah's own words concerning surgery, "I always felt miscast as a male. As a gay male, I believe my difficulty in forming intimate relationships had to do, in part, with wanting to be a woman. Existing as a female has given me hope, in regard to forming closer relationships, as I have less to prove to myself and the world. The intimacy and expression of warmth which society now allows me to express has been a happy surprise. ......I do have some doubts about surgery. But my yearning for physical completeness is very powerful and something I've wanted for a long time."

I find Mariah's beliefs and expressions of her feelings to be genuine, realistic, honest, and most typical of a more evolved M-F transsexual mentality. Mariah and I both feel that her biggest emotional growth will transpire post-op.

I know that Mariah Lopez's expectations for genital restructuring surgery will help her feel that she can finally completely inhabit her body ... and that it will help her be more free to be able to relate to people and to have them in her life socially, as well as, both romantically and sexually. I feel that the sexual reassignment surgery Mariah seeks is fully indicated in light of her history, her presentation and her potential success in the real life experience thus far. She is seeking both vaginoplasty and labiaplasty as soon as funding is available.

I consider it a privilege to be in contact with all those individuals Mariah Lopez is in the care of, and I'm looking forward to hearing your impressions and the disposition of this urgent matter. If I may

C. Christine Wheeler, Ph.D.                    Page 12                    10/16/2005

be of further service, please feel free to contact me at any time.  With deep appreciation for the
opportunity to evaluate a person of the caliber of Mariah Lopez, I am,

Very truly yours,

C. Christine Wheeler, Ph.D.
Psychotherapist/Sexologist
No. 1971 Expir. 12-31-07
Board Member, The Harry Benjamin
International Gender Dysphoria Assoc., Inc.

Initial draft June 6, 2005

CCW/tw

Exhibit

G

GUIDELINES REGARDING

# GENDER IDENTITY DISCRIMINATION

A Form of Gender Discrimination Prohibited by
The New York City Human Rights Law

Title 8 of the Administrative Code of the
City of New York

**NEW YORK CITY COMMISSION ON HUMAN RIGHTS**
MICHAEL R. BLOOMBERG, **Mayor**   PATRICIA L. GATLING, **Commissioner/Chair**

# GUIDELINES REGARDING GENDER IDENTITY DISCRIMINATION

## CONTENTS

### I. Purpose

### II. Definitions
A. Gender Identity/Gender Expression

B. Transgender

C. Intersex Individuals

### III. Areas of Application
A. Employment

B. Public Accommodations

C. Housing & Lending Institutions

D. Discriminatory Harassment or Violence

E. Retaliation

### IV. Avoiding Discriminatory Practices
A. Preventing Harassment and Hostile Environment

B. Dress Codes

C. Access to Restrooms and Other Sex-Segregated Facilities

D. Public Accommodations/Unavoidable Nudity

E. Policy/Training

### V. Enforcement and Penalties

### Appendix
Local Law 3

## ACKNOWLEDGEMENTS

The Commission on Human Rights thanks the following individuals for their assistance in the creation of these guidelines: Randolph Wills, Matt Foreman, Michael Silverman, Carrie Davis, Pauline Park, Melissa Sklarz, Dean Spade, and Moonhawk Stone.

If you have been discriminated against, call to set up an intake appointment and speak to an attorney at the Commission: (212) 306–7450.

**New York City Commission on Human Rights**
**40 Rector Street, New York, NY 10006**

December 2006

## GUIDELINES REGARDING
# GENDER
# IDENTITY
# DISCRIMINATION

## I. Purpose

In April 2002, the New York City Human Rights Law, located in Title 8 of the Administrative Code of the City of New York, was amended to make it clear that an individual's gender identity is an area of protection under the Law.

It is the law and policy of the City of New York to eliminate discrimination based upon an individual's "actual or perceived gender."

"Gender" is defined in the City's Human Rights Law to include:

- actual or perceived sex;
- gender identity;
- self-image;
- appearance; and,
- behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth.

The Human Rights Commission developed these guidelines:

- To educate the public about the prohibition of gender discrimination, particularly as it protects transgender and gender-variant people in New York City;

- To inform individuals of their rights under the Law; and,
- To assist employers, housing providers, businesses, organizations, service providers (including government) and other entities in understanding their responsibilities under the Law.

These guidelines do not constitute legal advice and do not cover every aspect of the Law. For specific questions regarding the coverage of the Human Rights Law, see the Administrative Code of the City of New York, contact the New York City Commission on Human Rights, or seek legal counsel.

## II. Definitions

### A. Gender Identity/Gender Expression

Gender identity is an individual's sense of being either male or female, man or woman, or something other or in-between. Gender expression describes the external characteristics and behaviors that are socially defined as either masculine or feminine, such as dress, mannerisms, speech patterns and social interactions.

### B. Transgender

"Transgender" is an umbrella term that includes anyone whose

## GUIDELINES REGARDING **GENDER IDENTITY DISCRIMINATION**

gender identity and/or gender expression does not match society's expectations of how an individual who was assigned a particular sex at birth should behave in relation to their gender. The term includes, but is not limited to:

- pre-operative, post-operative and non-operative transsexuals who may or may not use hormones;
- intersex individuals;
- persons exhibiting gender characteristics and identities that are perceived to be inconsistent with their gender at birth;
- persons perceived to be androgynous;
- transvestites;
- cross-dressers; and,
- drag queens or kings.

### 1. Transsexuals

Transsexuals are individuals whose gender expression or identity is perceived to conflict with the sex assigned to them at birth, and who may or may not begin or continue the process of hormone replacement therapy and/or gender confirmation surgery. Transsexuals are often described as female-to-male (FTM) or male-to-female (MTF).

### 2. Gender Variant, Gender Non-conforming or Gender Different

Gender variant, gender non-conforming, or gender different individuals have a gender identity and/or gender expression that is not completely male or female. This includes individuals who do not conform to expectations of a specific gender role and individuals who express both masculine and feminine qualities. These individuals are sometimes referred to as "androgynous."

### C. Intersex Individuals

Intersex individuals are born with chromosomes, external genitalia, and/or an internal reproductive system that varies from what is considered "standard" for either males or females.

## III. Areas of Application

### A. Employment
(Administrative Code: Section 8-107(1))

It is an unlawful discriminatory practice for an employer, or an employee or agent thereof, to discriminate against any employee or applicant for employment based upon actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth) with regard to recruitment, hiring, firing, promotions, wages, job

NEW YORK CITY COMMISSION ON HUMAN RIGHTS

**3**

## GUIDELINES REGARDING GENDER IDENTITY DISCRIMINATION

assignments, training, benefits, and other terms and conditions of employment.

### B. Public Accommodations
(Administrative Code: Section 8-107(4))

"Public accommodations" refer to providers of goods and/or services to the public. Restaurants, hospitals, stores, theaters, and service providers (including government) are some examples of public accommodations.

It is an unlawful discriminatory practice for a place or provider of a public accommodation directly or indirectly to refuse, withhold from, or deny a person any of the accommodations, advantages, facilities, services or privileges of an accommodation based upon the person's actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth).

### C. Housing & Lending Institutions
(Administrative Code: Section 8-107(5))

The housing discrimination provisions apply to the owner, lessor, managing agent or other person having the right to sell, rent or lease or approve

the sale, rental or lease of a housing accommodation.

It is an unlawful discriminatory practice for such persons to refuse to sell, rent, lease, approve the sale, rental or lease or otherwise deny to or withhold a housing accommodation or an interest therein from, or otherwise discriminate against any person on the basis of actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth).

Real estate brokers, real estate salespersons, employees or agents thereof may not discriminate on the basis of actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth) in the rental or sale of property. The prohibited behavior includes all aspects of real property transactions, such as the refusal to show, rent, or sell real property

## GUIDELINES REGARDING GENDER IDENTITY DISCRIMINATION

that is available for sale or lease, the addition of different or additional terms or conditions in a lease or mortgage, and the refusal to provide services or make repairs or improvements for any tenant or lessee.

Banks and other lending institutions may not discriminate against an applicant for credit on the basis of actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth).

### D. Civil Action for Discriminatory Harassment or Violence
(Administrative Code: Section 8-602)

It is illegal to interfere by force or threat of force, or knowingly injure, intimidate or interfere with, oppress, or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him or her by the constitution or laws of this state or by the constitution or laws of the United States or by local law of the city when such injury, intimidation, interference, oppression or threat is motivated in whole or in part by the victim's actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance,

behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth).

It is also illegal to knowingly deface, damage or destroy the real or personal property of any person for the purpose of intimidating or interfering with the free exercise or enjoyment of any right or privilege secured to the other person by the constitution or laws of this state or by the constitution or laws of the United States or by local law of the city when such defacement, damage or destruction of real or personal property is motivated in whole or in part by the victim's actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth).

In addition to coming to the New York City Commission on Human Rights, victims of bias-related harassment or violence are encouraged to report the incident immediately to the police and/or their County's District Attorney's Office.

**5**

## GUIDELINES REGARDING GENDER IDENTITY DISCRIMINATION

### E. Retaliation

It is against the law for an employer, housing provider, lending institution, or provider of a public accommodation to retaliate against an individual because the individual opposed an unlawful discriminatory practice or made a charge, or because the individual testified, assisted, or participated in an investigation, proceeding or hearing.

## IV. Avoiding Discriminatory Practices

### A. Preventing Harassment and Hostile Environment

Discrimination on the basis of actual or perceived gender (including the individual's actual or perceived sex, gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to an individual at birth) is a violation of the Human Rights Law. Discrimination may take the form of unwelcome verbal or physical conduct, including, but not limited to, derogatory comments, jokes, graffiti, drawings or photographs, touching or gestures.

To avoid the appearance of discrimination, individuals should be addressed with names, titles, pronouns, and other terms appropriate to their gender identity. The refusal to address individuals in a manner appropriate to their gender identity is a factor that the Commission will consider when determining if discrimination exists.

- In general, individuals in New York may change their names without having to go through a formal legal process, as long as the new name is used consistently and without intent to defraud others. Prefixes such as "Ms." and "Mr." and suffixes such as "Jr." and "Sr." do not have legal significance.

- When an individual is uncertain about which name, pronoun (he/she; him/her) or title (Ms./Miss/Mrs./Mr.) to use in addressing or referring to another individual, it is generally appropriate to ask the individual.

Requesting proof of an individual's gender, except when legally required, challenging an individual's gender, or asking inappropriate questions about intimate details of an individual's anatomy, are factors that the Commission will consider when determining if discrimination exists.

### B. Ensuring that Dress Codes Allow for Expression of Gender Identity

When developing and enforcing dress codes that are gender-specific,

## GUIDELINES REGARDING **GENDER IDENTITY DISCRIMINATION**

employers should permit employees to comply with the gender-specific provisions in the codes in an appropriate manner that is consistent with their gender identity and gender expression.

### C. Providing Access to Restrooms and Other Sex-Segregated Facilities

Nothing in the Human Rights Law prohibits restrooms from being designated by gender. With respect to facilities that are restricted on the basis of sex, the following are some of the factors that suggest that discriminatory conduct related to gender identity has occurred:

- Not allowing individuals to use a restroom or other sex-segregated facility consistent with their gender identity or gender expression; or
- Requiring individuals to provide identification as a means of identifying their gender before allowing them to use the restroom or other sex-segregated facility.

Policies and practices aimed at preventing or addressing lewd behavior or conduct that violates the privacy of others should apply to and protect all individuals. The Commission recommends that, where single occupancy restrooms are available, they be designated as "gender neutral." The Commission also encourages

covered entities to provide accommodations to individuals who have concerns about use of public restrooms because of gender identity or gender expression. Such accommodations could include, for example, offering the use of a private restroom to a member of the public. If an individual feels uncomfortable using a particular restroom because of another individual's presence in the restroom, he or she may be encouraged to wait until that individual has left, or to use another restroom.

### D. Public Accommodations Where Nudity is Unavoidable
(e.g., health clubs, dressing or changing rooms, etc.)

Public accommodations should provide access to appropriate facilities for all individuals.

The Human Rights Commission recommends that public accommodation facilities, such as locker rooms, which are designated for use based on sex, take steps to create private spaces within them (for example, by installing curtains or cubicles).

Factors that suggest discriminatory conduct has occurred will include not allowing individuals to use a dressing or changing room consistent with their gender identity or gender expression.

NEW YORK CITY COMMISSION ON HUMAN RIGHTS

## GUIDELINES REGARDING **GENDER IDENTITY DISCRIMINATION**

### E. Policy/Training

The Commission recommends that employers, housing providers, providers of public accommodations, and banks/lending institutions implement anti-discrimination policies that address gender identity and gender expression issues, as well as all other areas covered by the Human Rights Law, and institute training for employees and agents on an ongoing basis.

## V. Enforcement and Penalties

The City Human Rights Law is enforced in a number of ways:

- The Commission on Human Rights provides opportunities for mediation of complaints and also investigates and prosecutes violations of the Law. If the Commission, after a hearing, finds that violation of the Law has occurred, it may award damages and order other affirmative relief such as, for example, hiring, reinstating, or upgrading an employee and requiring admission to an organization. In addition, the Commission may order civil penalties up to $250,000. A person who fails to comply with an order issued by the Commission may also be liable for a civil penalty of not more than $50,000 and an additional civil penalty of not more than $100 per day for each day the violation continues.

- A private cause of action may be brought under the City's Human Rights Law. Upon finding that a violation of the Law has occurred, a court may award damages, injunctive relief, and attorney's fees.

- The New York City Corporation Counsel may bring a civil action when there is reasonable cause to believe that a person or group is engaging in a pattern or practice that denies to any person the full enjoyment of rights under the City Human Rights Law. In this instance, the court may award damages, injunctive relief, and attorney's fees, and may also award civil penalties of not more than $250,000.

- In a case involving discriminatory harassment or violence, where a person has been found to have interfered or attempted to interfere by threats, intimidation or coercion with rights protected under the Law, and the interference or attempted interference was motivated in whole or in part by the victim's actual or perceived gender, the New York City Corporation Counsel may ask a court to award civil penalties of not more than $100,000.

## Appendix

Local Law 3

LOCAL LAWS
OF
THE CITY OF NEW YORK
FOR THE YEAR 2002

———————

No. 3

———————

Introduced by Council Members Perkins, Lopez, Quinn, Reed, the Speaker (Council Member Miller), Moskowitz, Rodriguez, Boyland, Avella, Davis, de Blasio, Gennaro, Gerson, Katz, Koppell, Liu, McMahon, Monserrate, Rivera, Sears, Weprin, Brewer, Barron, Serrano and Stewart; also Council Members Addabbo, Jr., Martinez, Yassky, Clarke, Baez and Recchia, Jr.

A Local Law to amend the administrative code of the city of New York, in relation to gender-based discrimination.

Be it enacted by the Council as follows:

**Section 1. Legislative finding and intent.** The City Council finds and declares that it is in the interest of the City of New York to protect its citizens from discrimination. Discrimination, prejudice, intolerance and bigotry directly and profoundly threaten the rights and freedom of New Yorkers. The City Council established the Human Rights Law to protect its inhabitants from these dangers. Included in the City's Human Rights Law is a prohibition of discrimination against individuals based on gender. The scope of this gender-based protection, however, requires clarification. This local law is intended to make clear that all gender-based discrimination — including, but not limited to, discrimination based on an individual's actual or perceived sex, and discrimination based on an individual's gender identity, self-image, appearance, behavior, or expression — constitutes a violation of the City's Human Rights Law.

Gender-based discrimination affects a broad range of individuals. But the impact of gender-based discrimination is especially debilitating for those whose gender self-image and presentation do not fully accord with the legal sex assigned to them at birth. For those individuals, gender-based discrimination often leads to pariah status including the loss of a job, the loss of an apartment, and the refusal of service in public accommodations such as restaurants or stores. The impact of such discrimination can be especially devastating for those who endure other prejudices due to their race, ethnicity, national origin, or citizenship status, in addition to gender-based discrimination. In adopting this legislation, the City Council declares that the ability of all New Yorkers to work and to live free from invidious discrimination based on gender is the guiding principle of public policy and law.

§2. Section 8-102 of chapter one of title eight of the administrative code of the City of New York is amended by adding a new subdivision 23 to read as follows:

**23.** The term "gender" shall include actual or perceived sex and shall also include a person's gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth.

§3. This local law shall take effect immediately.

THE CITY OF NEW YORK, OFFICE OF THE CITY CLERK, s.s.:
I hereby certify that the foregoing is a true copy of a local law of the City of New York, passed by the Council on April 24, 2002, and approved by the Mayor on April 30, 2002.

_____
VICTOR L. ROBLES
City Clerk, Clerk of the Council

**9**



OCTOBER 22, 2015     Albany, NY

# Governor Cuomo Introduces Regulations to Protect Transgender New Yorkers from Unlawful Discrimination

First Executive in the Nation to Issue State-Wide Regulations Prohibiting Harassment and Discrimination on the Basis of Gender Identity, Transgender Status or Gender Dysphoria

Governor Andrew M. Cuomo today introduced regulations through the New York State Human Rights Law that unequivocally bans harassment and discrimination against transgender people. These regulations affirm that all transgender individuals are protected under the State's Human Rights Law, and all public and private employers, housing providers, businesses, creditors and others should know that discrimination against transgender persons is unlawful and will not be tolerated anywhere in the State of New York.

This is the first time that any Governor has issued statewide regulations to prohibit harassment and discrimination on the basis of gender identity, transgender status or gender dysphoria. Governor Cuomo announced the regulations in a speech at the Empire State Pride Agenda's fall dinner, where he was also honored with the group's Silver Torch award.

Case 1:17-cv-00563-LMB-IDD  Document 31-1  Filed 06/23/17  Page 59 of 69  PageID# 583

"The scourge of harassment and discrimination against transgender individuals is well-known – and has also has gone largely unanswered for too long," Governor Cuomo said. "New York has always been a beacon for the country on LGBT rights. We started the movement at Stonewall, we led the way with marriage equality, and now we are continuing to show the nation the path forward. We will not tolerate discrimination or harassment against transgender people anywhere in the State of New York – period."

These regulations represent the first state regulatory action in the nation to affirm that harassment and other forms of discrimination, by both public and private entities, on the basis of a person's gender identity, transgender status, or gender dysphoria is considered unlawful discrimination. Under state law, the New York State Division of Human Rights has the statutory authority to promulgate regulations interpreting the Human Rights Law. Further, while discrimination against transgender people has been specifically forbidden in New York State by Executive Order since 2009, in practice that order only protects state workers.

Additionally, New York currently has limited pockets of legal protection for transgender people because of municipal ordinances or laws that also ban harassment or discrimination, to varying degrees. However, many municipalities do not guarantee these protections, and there is no statewide ban on discrimination or harassment for individuals not employed by the state. The Governor's action today will ensure that all transgender individuals do not lose their rights simply by traveling from one county or city to another.

The State of New York has had a long history of protecting the rights of transgender persons under the provisions of the Human Rights Law. In the 1977 case of Richards v. U.S. Tennis Association, it was recognized that discrimination claims under the Human Rights Law may be brought by individuals alleging sex discrimination because of their gender identities, and it has long been the practice of the Division of Human Rights to accept and process gender identity discrimination complaints on the basis of the protected categories of sex, and where appropriate, disability.

Over the years, both New York and federal case law in this area has developed to support protection for transgender individuals on the basis of sex. In the State of New York, the Human Rights Law offers substantially more protection than federal antidiscrimination laws, because gender dysphoria is a recognized medical condition that falls within the broad definition of disability found in the state law, as New York courts have recognized. This additional protection affords increased rights for transgender individuals in New York, such as the right to reasonable accommodation for those who allege a diagnosis of gender dysphoria.

New York was the first state in the nation to enact an anti-discrimination Human Rights Law. The Law, enacted in 1945, affords every citizen "an equal opportunity to enjoy a full and productive life." Individuals who feel they have been harassed or discriminated against can file complaints in State court, or with the New York State Division of Human Rights, without charge. Those complaints are promptly investigated at regional offices throughout the state.

If the Division determines there is probable cause to believe harassment or discrimination has occurred, the Commissioner of Human Rights will decide the case after a public hearing, and may award job, housing or other benefits, back and front pay, compensatory damages for mental anguish, civil fines and penalties, and may also require policy changes and training as appropriate.

Civil fines and penalties can be up to $50,000 or up to $100,000 if the discrimination is found be "willful, wanton or malicious" and, unlike under federal law, compensatory damages to individuals are not capped.

**The new regulations can be viewed <u>here</u>.** The State's existing Human Rights Law can be viewed <u>here</u>.

**Senator Brad Hoylman said:** "Transgender rights are part of the unfinished business of the LGBT civil rights movement in New York and I commend Governor Cuomo for taking this bold and courageous step of enacting housing and employment protections for transgender people through regulation. Because of the Governor's actions today, soon thousands of New Yorkers will no longer be considered second-class citizens simply because they identify as transgender. The Gender Expression Nondiscrimination Act, sponsored by Senator Squadron and Assembly Member Gottfried, has been blocked from consideration for years by the Republican majority in the State Senate. As the only openly-LGBT person in the Senate, I'm extremely grateful to Governor Cuomo for taking this historic step and look forward to working with him, advocates and my Democratic Senate colleagues to codify his actions in a future legislative session."

**Senator Daniel Squadron said:** "This is a big step to correct one of the state's great injustices. Transgender New Yorkers will now have more confidence that discrimination in homes, jobs, and public accommodations will not be tolerated. I thank Governor Cuomo for this strong executive action; my legislative colleagues, Senator Hoylman, and Assemblymembers Gottfried and Glick, with whom I will continue to push the Gender Expression Non-Discrimination Act; and, most importantly, the advocates and members of the community who have fought tirelessly to demand basic fairness."

**Assemblywomen Deborah Glick said:** "Transgender New Yorkers have faced years of discrimination, because our laws have lagged behind the reality of

people's lives. But I, and others, have argued that our anti-discrimination laws actually do extend their protections to transgender New Yorkers. I am extremely pleased that Governor Cuomo, once again, is stepping up to ensure that New York is a leader in protecting rights for all LGBT New Yorkers."

**Assemblyman Harry Bronson said:** "This is a tremendous step forward for New York State. Harassment and discrimination against transgender people is unacceptable, and Governor Cuomo is absolutely right to take this bold stand. This is about making sure that equality and justice really are 'for all' – and we hope other states and the federal government will take action as well."

**Assemblyman Richard Gottfried said:** "Governor Cuomo's executive action to interpret New York's Human Rights Law to cover transgender discrimination is a major step for dignity for all. Employers, housing providers, places of public accommodations and creditors must now apply the interpretation that transgender discrimination is a form of sex discrimination to their practices and policies. But the State Senate is not off the hook and must pass the GENDA bill so there is no question that we support equality for all New Yorkers."

**Nathan Schaefer, Executive Director of the Empire State Pride Agenda (ESPA), said:** "After years of tireless advocacy, we've won a tremendous victory for transgender civil rights with Governor Cuomo's announcement tonight."

**ESPA Board Co-Chairs Norman C. Simon and Melissa Sklarz** also praised the Governor's announcement, noting "This victory will only quicken our stride as Pride Agenda keeps moving toward winning full equality and justice for LGBT New Yorkers."

The regulations will be subject to a 45 day notice and comment period before full implementation.

Today's announcement builds on Governor Cuomo's past groundbreaking support for the transgender community. In 2014, the Governor introduced new regulations to include transgender health care services under New York State's Medicaid program, ensuring that enrollees could receive treatment coverage for hormone therapy and gender reassignment surgery. The Governor's administration also issued regulatory guidance to commercial insurers stating that they may not deny medically necessary treatment for gender dysphoria.

Additionally, this summer, Governor Cuomo announced that New York would be the first state in the nation to commit to ending the HIV/AIDS epidemic. The Governor's pledge will be accomplished by reducing the annual number of new HIV infections to just 750 (from an estimated 3,000) by the end of 2020 and achieve New York's first ever decrease in HIV prevalence. This would mark the first time there is a reduction in the pervasiveness of AIDS due to a drop in new cases.

# Contact the Governor's Press Office

NYC Press Office: 212.681.4640

Albany Press Office: 518.474.8418

✉ **Contact us by email:**     press.office@exec.ny.gov

Case 1:17-cv-05314-VEC   Document 51   Filed 06/15/17   Page 52 of 64

**BALTIC STREET AEH, INC.**

# Advocacy | Employment | Housing

Brooklyn Self-Help and
Advocacy Center
250 Baltic Street, 3rd Floor
Brooklyn, NY 11201
Tel: 718 875-7744
Fax: 718 243-0763

June 12, 2017

Bronx Self-Help and
Advocacy Center
369 East 148th Street
Lower Level
Bronx, NY 10455
Tel:718 562-6712/82
Fax: 718 562-6491

Re: Ms. Mariah Lopez

To whom it may concern:

    I Anthony Sgarlato advocate of Brooklyn Self-Help and Advocacy Center am

writing in regards to Ms. Mariah Lopez who is currently homeless and in need of a

subsidized housing opportunity. She diligently fulfilled her paperwork agreement we

requested and she is doing all she can to work accordingly to acquire housing

interviews. Her housing packet was sent to single point of access a program of Center

for Urban Community Services to acquire three guaranteed housing interviews.  We are

working hard to find her housing. If you have any questions please feel free to call me at

(718) 855-5929.

Staten Island Peer
Advocacy Center
South Beach
Psychiatric Center
777 Seaview Ave.
Building #10
Staten Island, NY 10305
Tel: 718 667-1609/2382
Fax: 718 667-5017

Self Help and Advocacy
Sevices for Older Adults
Kingsboro Psychiatric Center
681 Clarkson Ave.
Building #25
Brooklyn, NY 11203
Tel: 718 774-1027
Fax: 718 221-0271

Sincerely,

Thank you,

Anthony Sgarlato
Program Manager
Brooklyn Self-Help and Advocacy Center

Manhattan West Self-Help
and Advocacy Program
163 125th Street
11th Floor
New York, NY 10027
Tel: 212 961-8989/8967
Fax: 212 866-2760

www.balticstreet.org

Exhibit

H

# EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
Mariah Lopez,

                    Plaintiff,

                                        17 Civ. 3014
          -against-                     ORDER

NYC Department of Homeless Services,
et al.,

                    Defendants.
------------------------------------X
Deborah A. Batts, United States District Judge:


     Plaintiff filed this pro se action on April 25, 2017. On

June 15, 2017, Plaintiff filed a Motion seeking a Temporary

Restraining Order. In essence, Plaintiff seeks to have the Court

order Defendants to transfer her back to Marsha's House, an

LGBTQ-focused homeless facility in which she was previously

sheltered, from WIN West, a shelter that Plaintiff claims cannot

provide her with reasonable accommodations. Plaintiff has

removed herself from WIN West and is currently homeless.


     In the Second Circuit, a plaintiff seeking a temporary

restraining order must show: "(1) irreparable harm in the

absence of the injunction and (2) either (a) a likelihood of

success on the merits or (b) sufficiently serious questions

going to the merits to make them a fair grounds for litigation

and a balance of hardships tipping decidedly in the movant's

favor." Chan v. Chinese-Am. Planning Council Home Attendant

Program, Inc., No. 15-CV-9605 (KBF), 2016 WL 3004516, at *1
(S.D.N.Y. Jan. 21, 2016) (quoting MyWebGrocer, L.L.C. v.
Hometown Info., Inc., 375 F.3d 190, 192 (2d Cir. 2004)). The
purpose of a temporary restraining order is "to maintain the
status quo for a short period of time, usually only until a
hearing can be held." Id. "When the movant seeks affirmative and
not merely prohibitory relief, the plaintiff must make either a
heightened showing on the merits or show that extreme or very
serious damage will flow from denial of an injunction." Herrick
v. Grindr, LLC, 17-CV-932 (VEC), 2017 WL 744605, at *2 (S.D.N.Y.
Feb. 24, 2017) (quotation marks omitted).

Here, Plaintiff seeks reinstatement to her former shelter,
and thus requests affirmative, and not prohibitory, relief.
However, she has left the custody of the Department of Homeless
Services since the date of her transfer, and it is unclear what
irreparable harm the current Motion seeks to avoid. In light of
the heightened standard governing requests for affirmative
emergency relief, the Court is not able to grant a temporary
restraining order.

However, the Court interprets Plaintiff's request for a
temporary restraining order as incorporating a request for a
preliminary injunction. At the Parties' previously scheduled
initial pre-trial conference on June 30, 2017, Judge Caproni

2

will set a schedule for a preliminary injunction hearing.

Plaintiff is instructed to serve the moving papers on Defendants

by June 23, 2017.

      SO ORDERED.

Dated:    June 15, 2017
          New York, New York


                                     Deborah A. Batts
                     United States District Judge

# EXHIBIT K

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___7/5/2017___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
MARIAH LOPEZ,                                                :
                                                             :
                              Plaintiff,                     :
                                                             :          17-CV-3014 (VEC)
              -against-                                      :
                                                             :          ORDER
THE CITY OF NEW YORK, and PROJECT                            :
RENEWAL, INC.                                                :
                              Defendants.                    :
------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

        WHEREAS on June 30, 2017 the Court held a status conference in the above-captioned

matter;

        IT IS HEREBY ORDERED that the Court shall construe Ms. Lopez's June 15, 2017

application for a temporary restraining order, Dkt. 31, as an amended complaint.  In the event

defendant Project Renewal, Inc. objects to treating the June 15, 2017 application as an amended

complaint, it must inform the Court by July 7, 2017.

        IT IS HEREBY FURTHER ORDERED that Defendants' Rule 12 motions shall be due

by August 4, 2017.  Plaintiff's response is due by September 8, 2017.  Defendants' replies are

due by September 22, 2017.

        IT IS HEREBY FURTHER ORDERED that the City is directed to inform the Court

promptly of any material developments in the parallel state court Article 78 proceedings.

IT IS HEREBY FURTHER ORDERED that briefing on Plaintiff's motion for a

preliminary injunction is adjourned *sine die.*

**SO ORDERED.**

**Date:  July 5, 2017**
      **New York, NY**                               **VALERIE CAPRONI**
                                                      **United States District Judge**

# EXHIBIT L

# REQUEST FOR JUDICIAL INTERVENTION
UCS-840 (3/2011)

For Court Clerk Use Only

_Supreme_ COURT, COUNTY OF _NY_

Index No: _#00632/17_  Date Index Issued: _5/12/17_

IAS Entry Date _5-12-17_

Judge Assigned _SAffe_

RJI Date

**CAPTION:** Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

× _Mariah Lopez_

PETITIONER(S)
Plaintiff(s)/Petitioner(s)

SUPREME COURT
NEW YORK COUNTY
EX-PARTE MOTION PART

-against-

_NYC Dep. Homeless Services_
× _Project Renewal_

RESPONDENTS (S)
NEW YORK
COUNTY CLERK'S OFFICE

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING:** Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ◯ Contested
- ◯ Uncontested

NOTE: For all Matrimonial actions where the parties have children under the age of 18, complete and attach the MATRIMONIAL RJI Addendum.

**TORTS**
- ◯ Asbestos
- ◯ Breast Implant
- ◯ Environmental: _____ (specify)

- ◯ Medical, Dental, or Podiatric Malpractice
- ◯ Motor Vehicle
- ◯ Products Liability: _____ (specify)

- ◯ Other Negligence: _____ (specify)

- ◯ Other Professional Malpractice: _____ (specify)

- ◯ Other Tort: _____ (specify)

**COMMERCIAL**
- ◯ Business Entity (including corporations, partnerships, LLCs, etc.)
- ◯ Contract
- ◯ Insurance (where insurer is a party, except arbitration)
- ◯ UCC (including sales, negotiable instruments)
- ◯ Other Commercial: _____ (specify)

NOTE: For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the COMMERCIAL DIV RJI Addendum.

**REAL PROPERTY:** How many properties does the application include? _____
- ◯ Condemnation
- ◯ Foreclosure
Property Address: _____
Street Address   City   State   Zip
NOTE: For Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the FORECLOSURE RJI Addendum.
- ◯ Tax Certiorari - Section: _____ Block: _____ Lot: _____
- ◯ Other Real Property: _____ (specify)

**OTHER MATTERS**
- ◯ Certificate of Incorporation/Dissolution   [see NOTE under Commercial]
- ◯ Emergency Medical Treatment
- ◯ Habeas Corpus
- ◯ Local Court Appeal
- ◯ Mechanic's Lien
- ◯ Name Change
- ◯ Pistol Permit Revocation Hearing
- ◯ Sale or Finance of Religious/Not-for-Profit Property
- ◯ Other: _____ (specify)

**SPECIAL PROCEEDINGS**
- ◯ CPLR Article 75 (Arbitration)   [see NOTE under Commercial]
- ◯ CPLR Article 78 (Body or Officer)
- ◯ Election Law
- ◯ MHL Article 9.60 (Kendra's Law)
- ◯ MHL Article 10 (Sex Offender Confinement-Initial)
- ◯ MHL Article 10 (Sex Offender Confinement-Review)
- ◯ MHL Article 81 (Guardianship)
- ◯ Other Mental Hygiene: _____ (specify)
- ◯ Other Special Proceeding: _____ (specify)

**STATUS OF ACTION OR PROCEEDING:** Answer YES or NO for EVERY question AND enter additional information where indicated.

|  | YES | NO |  |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ◯ | ◯ | If yes, date filed: _____ |
| Has a proceeding being filed post judgment? | ◯ | ◯ | If yes, judgment date: _____ |

[Print in *black* ink all areas in bold letters. Other spaces are for Court use.]

At I.A.S. Part _12_ of the Supreme Court of the State of New York, held in and for the County of New York, at the Courthouse, thereof, 60 Centre Street, New York, N.Y., on the _15_ day of ____May____ , 20_17_

PRESENT: HON. ___JAFFE___

Justice of the Supreme Court

In the Matter of the Application of

*Manah Lopez*

[fill in name(s)]

- against -

Petitioner(s)

*NYC Department of Homeless Services and Project*

[fill in name(s)]

Respondent(s)

Index Number

_150652/17_

ORDER TO SHOW CAUSE IN SPECIAL PROCEEDING

MS#

Upon reading and filing the petition(s) of *Manah Lopez*

_____ [your name(s)], sworn to on ___MAY 11___ , 20_17_

[date Verified Petition notarized] and upon the exhibits attached to the petition,

[Identify Exhibits below. List additional Exhibits on separate page.]

Exhibit A - *"Shelter Client Ref @ Transfer Referral Form (Form 402B)"*

Let the respondent(s) show cause at I.A.S. Part _12_ , Room _341_ , of this Court, to be held at the Courthouse, 60 Centre Street, New York, N.Y., on the _31_ day of ___May___ , 20_17_ , at _11:30_ o'clock in the _am_ noon or as soon as the parties this proceeding may be heard why an order should not be made, providing the following relief:

briefly describe what you are asking the Court to do] *Restrain DHS and Project Renewal from carrying out an administrative transfer*

from "Marsha's Place" Shelter located at 480 E 185 st
Bronx 10458, until then

for the reasons that [*briefly* describe the reasons why you should be granted what you are requesting] Because I have tried to exhaust my administrative remedies (I actually am Certain that I have infact exhausted all remedies with Department of Homeless Services and Project Renewal) concerning a challenge to and the "Administrative Transfer" from Marsha's place, and am still set to be transfered. My safety and wellbeing are in jeopardy if I am Transfered. I am disabled, and have unique Medical needs as a Trans woman

Sufficient cause appearing therefore, let personal service of a copy of this order,

the petition and all other papers upon which this order is granted, upon all parties to this

proceeding, on or before the 17th day of May , 2017 be deemed good and

sufficient. A copy of an affidavit or acknowledgment of service shall be filed with the County Clerk

(Room 141-B) immediately after service and the original of such proof of service shall be

presented to this court on the return date directed in the second paragraph of this order.

ENTER

Pending the determination of this proceeding, respondents are stayed from enforcing the transfer/referral of petitioner to the Win West Shelter.

BARBARA JAFFE
J.S.C.                                              J.S.C.

Respondents to appear or answer on or before 5/24 before 5pm.

This order is conditioned on petitioner complying with respondents' rules & regulations. Respondents' employees are likewise directed to comply with the pertinent law & rules of the facility.

[Print in *black* ink all areas in bold letters.]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of ―――――――――――――――x    Index Number

*Moriah Lopez*

[fill in name(s)]                                    Petitioner(s)

- against -                                          NOTICE OF PETITION

*Department of Homeless Services and*
*Project Renewal*

[fill in name(s)]

                                                     Respondent(s)
―――――――――――――――x

PLEASE TAKE NOTICE that upon the verified petition(s) of *Moriah*
*Lopez* _____, [your name(s)], sworn to on _____, 200___
[date Verified Petition notarized], and the attached exhibits, petitioner(s) will request this Court,
at 9:30 AM on the ____ day of _____, 200 ___, [return date] at the Courthouse, at
60 Centre Street, New York, N. Y., in the Motion Support Courtroom, Room 130, for a judgment,
pursuant to the Civil Practice Law and Rules (CPLR), granting the following relief to the
petitioner(s): [briefly describe what you are asking the Court to do] *To order NYC Dep.*
*of Homeless Services to postpone or reverse its decision*
*to approve Project Renewals request to transfer me*
*from Marsha's Place shelter (for Transgender People).*

and for such other and further relief as this Court may deem just and proper.

Dated: _____, 200__
       [date signed]

                                                     Respectfully submitted,

                                                     _____

                                                     _____

                                                     _____

To: Respondent(s)

_____
                                                     Petitioner(s)
_____                            [your name, address, telephone number ]
_____

[name, address, telephone number]

4-06

[Print in _black_ ink to fill in the spaces next to the instructions]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of
------------------------------------------------------------x

Mariah Lopez

[fill in name(s)]                                    Petitioner(s)

                    - against -

NYC Department of Homeless
Services, Project Renewal

[fill in name(s)]
------------------------------------------------------------
                                     Respondent(s)
------------------------------------------------------------x

Index Number

VERIFIED PETITION

TO THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK:

The petition of Mariah Lopez _____ [your name] respectfully
shows to this Court as follows:

1. Petitioner resides at 480 E 185 St, Bronx 10458
_____ [your address]

2. The respondent(s) is/are [identify the respondent(s)] New York City Department
Of Homeless Services and Project Renewal

3. [Describe what you are requesting. Add more pages if needed. If you are appealing
the decision of a government agency, give the date and outcome of the final determination.
Explain why this Court should reverse that decision.] For the Court to order
NYC DHS (TRO) to stay HS decision/approval for
an Administrative Transfer from Project Renewls
"Marsha's Place" Transgender (GLBTQ) Shelter,
NYC DHS and Project Renewal are using an
"Admin Transfer" to move me from Marsha's
Place after a Federal Court issued a TRO against
such a move on April 27th. I brought a lawsuit
Pro Se against the respondents for refusing
entry of my Service Dog. I allowed the TRO

to dissolve after DHS and Project Renewal allowed my dog in. Since then, staff at Marsha's Place have been treating me "different" than other clients. Rules are cited and enforced more against me than the other clients, and the apparent "stricter" attitude, in addition to staff seeming to document more of my alleged infractions than other clients have resulted in a "paper trail" and so I am being transferred. Under CPLR "78" article 78, I'm challenging the DHS transfer.

Project Renewals Director Kae Don Crimell has also shared inappropriate details about his personal life with me, leading me to believe that the Administrative Transfer he personally requested and pushed for and is retaliation for my lawsuit and TRO in Federal Court, as well as my confronting him yesterday in a private meeting. The transfer came after an incident where I passionately objected to discrimination I witnessed by Front-Service staff against Trans clients. The incident is simply an excuse to transfer me.

4. Attached are copies of all relevant documents. [Attach the decision you are asking the court to reverse as Exhibit A. Attach any other documents as Exhibit B, Exhibit C, and so on. List additional Exhibits on separate page.]

Exhibit A -

Exhibit B -

Exhibit C -

Exhibit D -

Exhibit E -

5. A prior application has not / has [circle one] been made for the relief now requested. If you made this application before in this or any other court, describe where, when, the sult and why you are making it again.] _____

_____

_____

2

VerDate cc

WHEREFORE, your deponent respectfully requests that this Court [briefly describe what you are requesting]: *That DHS and Project Renewal be barred from transferring me from Marsha's Place Shelter until this Court determines if retaliation was the main reason behind the request for an "Admin-Transfer."*

5/11/17
[date signed] , 200___

Petitioner [sign your name]

*Mariah Lopez*
[print your name]

*480 E 185 Street*
*Bronx 10458*
[your address and telephone no.]

**VERIFICATION**

STATE OF NEW YORK
COUNTY OF *New York*          ss:

*Mariah Lopez* [your name], being duly sworn, deposes and says that: I am the petitioner in this proceeding; I have read the foregoing petition and know the contents thereof; the same is true to my own knowledge, except as to matters therein stated to be alleged on information and belief; and as to those matters I believe it to be true.

Sworn to before me on
11th day May , 2017

Notary Public

Petitioner [sign your name in front of a Notary]

*Mariah Lopez*
[print your name]

FRANKIE ALMANZAR
Notary Public, State of New York
Reg. No. 04AL6287906
Qualified in New York County
Commission Expires Sept. 9, 20___

3

VerPet4-06

Form 402B
Revised 8/10/98

Division of Adult Services
Department of Homeless Services

# SHELTER CLIENT TRANSFER REFERRAL

| CLIENT'S SURNAME: | FIRST NAME: | H.A. NUMBER: |
|---|---|---|
| Lopez | Mariah | 745918 |

\* You are being OFFICIALLY transferred on <u>05</u> / <u>11</u> / <u>17</u> to    Win West Shelter            , because:

Administrative Transfer - Safety Concern

| NAME OF SHELTER REFERRED TO: | ADDRESS OF SHELTER REFERRED TO:: |
|---|---|
| Win West Shelter | 341 W. 51st Street NY NY |
| CONTACT PERSON AT SHELTER REFERRED TO:<br>Diana Santos | DATE REFERRED / TIME OF CALL: |

\* Beginning on <u>05</u> / <u>11</u> / <u>2017</u>, your new shelter is your OFFICIAL SHELTER. You are <u>not</u> eligible to transfer for services at any other DHS or DHS contracted Adult Services shelter. You may <u>not</u> transfer to any other DHS or DHS contracted Adult Services shelter without agency approval.

Your Official shelter will provide the following services to you:

1) bed      3) three meals a day      5) toiletries      7) recreation
2) locker      4) clothing      6) carfare      8) social services

**TRANSFER APPROVED BY:**   Kaedon Grinnell        _(signature)_      5/11/17
                          Print Name                                  Signature             Date

[ ] I did NOT request a Supervisory Review and <u>accept</u> the transfer as a change in my official shelter.

     Client's Signature (X) _____      Date: _____

[ ] I have had a Supervisory Review on __ / __ / __ and I <u>accept</u> transfer to my new official shelter.

     Client's Signature (X) _____      Date: _____

[ ] I have had a Supervisory Review on __ / __ / __ , but continue to <u>disagree</u> with the change in my official shelter.

     Client's Signature (X) _____      Date: _____

[ ] Client refused to sign; however, form was explained to client.

**WITNESSING WORKER:** _____

                                Print Name                            Signature                  Date

| Time that client left referring shelter | A.M. or P.M. |
|---|---|

Form 402A                                                          Division of Adult Services
i/98  Revised                                                     Department of Homeless Services

# CLIENT NOTIFICATION OF TRANSFER

Shelter:   Marsha's House - 480 e. 185th St. BX NY                 Date:  05 / 10 / 2017

| CLIENT'S SURNAME: | FIRST NAME: | H.A. NUMBER: |
|---|---|---|
| Lopez | Mariah | 745918 |

You are being OFFICIALLY transferred by  05/ 11 / 2017  because

Administrative Transfer - Safety Concern

## Right of Review

Upon receipt of this notice, you are entitled to meet with your caseworker to discuss why you are being transferred.
If you disagree with the transfer, you may have a Supervisory Review to respond to the reason(s) for your transfer.

[  ]  I accept the reason(s) for transfer and I do NOT request a Supervisory Review.

Client's Signature (X) _____        Date: _____

I do not accept the reason(s) for transfer and I request a Supervisory Review.

Client's Signature (X) _____        Date: _____

[  ]  I do not accept the reason(s) for transfer and  I do NOT request a Supervisory Review.

Client's Signature (X) _____        Date: _____

[  ]  Client refused to sign;   however, reason(s) for transfer was explained to client.  Supervisory Review mandated.

WITNESSING CASEWORKER:
                    Print Name                    Signature                    Date

SOCIAL SERVICE DIRECTOR/
SHIFT SUPERVISOR:
                                                           Print Name
                    Signature                    Date

I have scheduled a SUPERVISORY REVIEW with client on ____ / ____ / ____

SHELTER DIRECTOR/DEPUTY:  I have reviewed the reasons for transfer with the client, and find that the transfer is:
(  ) Withdrawn; no transfer at this time   (  ) Upheld; transfer will proceed as above   (  ) Revised; new Transfer Shelter and 402A.

     Print Name                        Signature                        Date

Distribution:   Original to client, copy to case record.

Form 402B
Revised 8/10/98

Division of Adult Ser
Department of Homeless Ser

# SHELTER CLIENT TRANSFER REFERRAL

| CLIENT'S SURNAME: | FIRST NAME: | H.A. NUMBER: |
|---|---|---|
| Lopez | Mariah | 745918 |

\* You are being OFFICIALLY transferred on  05 / 11 / 17  to   Win West Shelter                           , becaus

Administrative Transfer - Safety Concern

| NAME OF SHELTER REFERRED TO: | ADDRESS OF SHELTER REFERRED TO:: |
|---|---|
| Win West Shelter | 341 W. 51st Street NY NY |
| CONTACT PERSON AT SHELTER REFERRED TO: | DATE REFERRED / TIME OF CALL: |
| Diana Santos | |

\* Beginning on  05 / 11  / 2017 , your new shelter is your OFFICIAL SHELTER.  You are not eligible to
transfer for services at any other DHS or DHS contracted Adult Services shelter.  You may not transfer
to any other DHS or DHS contracted Adult Services shelter without agency approval.

Your Official shelter will provide the following services to you:
1) bed                    3) three meals a day              5) toiletries              7) recreation
2) locker                 4) clothing                       6) carfare                 8) social services

TRANSFER APPROVED BY:  Kaedon Grinnell
                       Print Name                    Signature                    Date

[ ]  I did NOT request a Supervisory Review and accept the transfer as a change in my official shelter.

    Client's Signature (X) _____          Date: _____

[ ]  I have had a Supervisory Review on __ / __ / ___ and I accept transfer to my new official shelter.

    Client's Signature (X) _____          Date: _____

[ ]  I have had a Supervisory Review on __ / __ / __ , but continue to disagree with the change in my
    official shelter.

    Client's Signature (X) _____          Date: _____

[ ]  Client refused to sign;  however,  form was explained to client.

WITNESSING WORKER: _____
                   Print Name                    Signature                    Date

| Time that client left referring shelter _____ A.M. or P.M. |
|---|

Case 1:17-cv-03014-VEC   Document 8   Filed 04/27/17   Page 1 of 3

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/27/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

MARIAH LOPEZ,

                     Plaintiff,

          -against-

THE CITY OF NEW YORK, and PROJECT
RENEWAL, INC.

                   Defendants.

-------------------------------------------------------- X

17-CV-3014 (VEC)

TEMPORARY RESTRAINING
ORDER

VALERIE CAPRONI, United States District Judge:

On April 25, 2017 Plaintiff, proceeding *pro se*, filed a complaint for preliminary and

permanent injunctive relief alleging that Defendants have refused to permit her service animal

access to a public accommodation in violation of Title III of the Americans with Disabilities Act

(the "ADA"), 42 U.S.C. § 12182(a).  Plaintiff concurrently moved for a temporary restraining

order ("TRO") pursuant to Rule 65 of the Federal Rules of Civil Procedure.  On April 27, 2017

the Court held a conference in respect of Ms. Lopez's application for a temporary restraining

order.

The standard for entry of a TRO in this circuit is the same as for a preliminary injunction.

*See Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008).  In order to obtain a TRO (or

preliminary injunction) a moving party must demonstrate: "(1) irreparable harm in the absence of

the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious

questions going to the merits to make them a fair grounds for litigation and a balance of

hardships tipping decidedly in the movant's favor." *MyWebGrocer, L.L.C. v. Hometown Info.,

Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (*quoting Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei

Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002)).

Federal regulations require public accommodations to modify their "policies, practices, or procedures to permit the use of a service animal by an individual with a disability."[1] 28 C.F.R. § 36.302(c)(1). The Court finds that Plaintiff has shown that there are "sufficiently serious questions going to merits" of whether her dog is a service animal within the meaning of federal regulations. *See* 28 C.F.R. § 36.104 ("Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability . . . ."). Plaintiff has provided the Court and Defendants with information relative to the tasks performed by the animal and an unverified letter from a treating psychiatrist as to the animal's role in her care. While the Defendants take the position that the animal is in fact an "emotional support" or a "therapy" dog, which the City is not required to accommodate under the ADA, at this provisional stage, plaintiff's showing is adequate.

The Court further finds that Plaintiff has adequately shown a risk of irreparable harm. Failure to accommodate Plaintiff and the service animal would potentially cause Plaintiff to be without shelter.

Accordingly, IT IS HEREBY ORDERED that the Defendants are provisionally directed to accommodate Plaintiff and her service animal at the "Marsha's House" homeless shelter until 3:00 p.m. on May 1, 2017, unless this Court orders otherwise. This Order is without prejudice to the Defendants' and Marsha's House's right to require Plaintiff to comply with all applicable

---

[1] At this stage, the Court assumes, and Defendants do not appear to dispute, that Plaintiff has a "disability" for purposes of the ADA. This is without prejudice to the City's right to dispute Plaintiff's disability at later stages of the litigation.

shelter rules and City and State regulations.[2]  Plaintiff's failure to comply with shelter rules or City and State regulations is grounds to dissolve this TRO.

IT IS HEREBY FURTHER ORDERED that the parties are directed to appear at **3:00 p.m. on May 1, 2017** in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007 at which time the Court will hold a hearing in respect of Plaintiff's application for temporary injunctive relief.

**SO ORDERED.**

Date:   **April 27, 2017**
      **New York, NY**
      **4:00 p.m.**

                                     **VALERIE CAPRONI**
                                  **United States District Judge**

---

[2]     This temporary restraining order is also without prejudice to the City's resolution of Plaintiff's outstanding application for a reasonable accommodation and the City's administrative procedures concerning placement of Plaintiff in an acceptable shelter.  The Court notes that resolution of the accommodation application or a showing that there are new independent grounds for the City's decision to discharge Plaintiff from the Marsha's House shelter may moot this case.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

MARIAH LOPEZ,

                                    Plaintiff,

              -against-

NYC DEPARTMENT OF HOMELESS
SERVICES. and PROJECT RENEWAL, INC.
                                    Defendants.
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/26/2017

17-CV-3014 (VEC)

ORDER

VALERIE CAPRONI, United States District Judge:

WHEREAS on April 25, 2017 Plaintiff filed a complaint for preliminary and permanent

injunctive relief, alleging that Defendants have effectively denied her request for an

accommodation for her service animal, in violation of the Americans with Disabilities Act; and

WHEREAS Plaintiff alleges that she will be without shelter on April 27, 2017 if the

accommodation is not granted;

IT IS HEREBY ORDERED that Plaintiff and representatives of defendant Project

Renewal and the Office of the Corporation Counsel of New York City are directed to appear

before the Court in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New

York, New York 10007 **at 1:00 p.m. on April 27, 2017** in order to show cause why Plaintiff's

application for temporary injunctive relief should not be granted;

IT IS HEREBY FURTHER ORDERED that Plaintiff is directed to immediately notify

the Defendants of this action and her request for provisional relief.

IT IS HEREBY FURTHER ORDERED that Plaintiff is directed to immediately deliver

to the Defendants copies of her complaint, supporting materials, order to show cause, and this

Order at the following addresses:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARIAH LOPEZ,

                  Plaintiff,

-against-

NYC DEP HOMELESS SERVICES;
PROJECT RENEWAL, INC.,

                  Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:_____

17-CV-3014 (VEC)

ORDER OF SERVICE

**VALERIE CAPRONI, United States District Judge:**

       Plaintiff, appearing *pro se*, brings this action under the Americans with Disabilities Act of 1990. By order dated April 26, 2017, the Court granted Plaintiff's request to proceed without prepayment of fees, that is, *in forma pauperis*. Plaintiff names the New York City Department of Homeless Services ("DHS") and Project Renewal, Inc., as defendants. For the reasons set forth below, the Court dismisses Plaintiff's claims against DHS and adds the City of New York as a defendant. The Court directs service on the City of New York and Project Renewal, Inc.

## STANDARD OF REVIEW

       The Court must dismiss an *in forma pauperis* complaint, or portion thereof, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint, or portion thereof, when the Court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3). While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of*

It is Plaintiff's responsibility to ensure that service is made within 90 days of the date the summons is issued and, if necessary, to request an extension of time for service. *See Meilleur v. Strong*, 682 F.3d 56, 63 (2d Cir. 2012). Plaintiff also must notify the Court in writing if Plaintiff's address changes, and the Court may dismiss the action if Plaintiff fails to do so.

## CONCLUSION

The Court dismisses Plaintiff's claims against the New York City Department of Homeless Services. The Court directs the Clerk of Court to add the City of New York as a defendant in this action. Fed. R. Civ. P. 21. The Clerk of Court is further instructed to complete the USM-285 forms with the addresses for the City of New York and Project Renewal, Inc., and deliver all documents necessary to effect service to the U.S. Marshals Service.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

SO ORDERED.

Dated:   April 26, 2017
         New York, New York

VALERIE CAPRONI
United States District Judge

3



**United States District Court
Southern District of New York**

# INSTRUCTIONS FOR LITIGANTS WHO DO NOT HAVE ATTORNEYS

Case Name:　　　　　Lopez v. New York City Dept. Homeless Services

Docket No.:　　　　　17cv03014

District Judge Assigned:　　Valerie E. Caproni

Magistrate Judge Assigned:　Sarah Netburn

Your case has been assigned a docket number, a district judge, and a magistrate judge. Everything that you send to the court concerning this case must be labeled with the case name and docket number (including the initials of the district judge and any magistrate judge before whom the case is pending) listed above. You must mail or deliver any papers you file in your case to the Pro Se Intake Unit at 500 Pearl Street, Room 200, New York, New York, 10007, or, if your case is pending in the White Plains Courthouse, at 300 Quarropas Street, White Plains, NY 10601-4150. *Do not send any documents directly to a judge unless ordered to do so.*

If your contact information changes, it is your responsibility to notify the court in writing, even if you are incarcerated and transferred to another facility or released from custody. Fill out the "Notice of Change of Address" form included with this letter (or write a letter asking for your address to be changed) and send it to the Pro Se Intake Unit. It is not sufficient to send an envelope with a new return address or submit a letter with a new address listed without asking for your address to be officially changed. Your case could be dismissed if you do not notify the court of an address change.

Your case has been assigned to a district judge and a magistrate judge. The district judge may handle all matters in your case or may "refer" your case to the magistrate judge for certain pretrial issues. If you and all the other parties in your case agree to have your case proceed before the magistrate judge for *all purposes*, including trial, your case may proceed more quickly. A form for all parties to complete if they agree to have the trial before a magistrate judge is enclosed. For more information, refer to the handout "United States Magistrate Judges: Referrals and Consents."

## ENCLOSED DOCUMENTS

☑ a copy of the order of service or order to answer and any other orders entered to date

☐ a copy of the Mediation Referral Order for Pro Se Employment Discrimination Cases, if one has been issued

☑ the individual practices of the district judge and magistrate judge assigned to your case

☑ Instructions for Litigants Who Do Not Have Attorneys, including:

> ☑ Notice Regarding Privacy and Public Access to Electronic Case Files
>
> ☑ a flyer about the free legal assistance clinic located in the Thurgood Marshall Courthouse
>
> ☑ a Motions guide
>
> ☑ a notice that the Pro Se Manual has been discontinued
>
> ☑ a Notice of Change of Address form to use if your contact information changes
>
> ☑ a handout explaining matters handled by magistrate judges and a consent form to complete if all parties agree to proceed for all purposes before the magistrate judge

☑ a form for you to complete if you consent to receive court filings electronically (only in nonprisoner cases)

☐ in social security cases only, a flyer about pro bono attorneys available through the New York County Lawyers' Association

☐ USM-285 forms for you to complete so that the Marshals Service can serve certain defendants, and instructions on how to complete the forms (only for use if the judge has ordered you to submit 285 forms; follow the instructions in the order of service)

☐ one or more summonses (only if you have paid the fee in person or if the judge has ordered that a summons be issued to you)

# EXHIBIT M

301-00333-1
67L
T.Roberts

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT: _BARBARA JAFFE_ _____
 _____ J.S.C.
                              *Justice*

PART _12_

_100632-17_

Lopez, MARIAH

INDEX NO. _____

-v-

MOTION DATE _____

NYC Dept. Homeless Services

MOTION SEQ. NO. _1_

The following papers, numbered 1 to _____ , were read on this motion to/for _____

| Notice of Motion/Order to Show Cause — Affidavits — Exhibits | _____ | No(s). _____ |
| Answering Affidavits — Exhibits _____ | | No(s). _____ |
| Replying Affidavits _____ | | No(s). _____ |

Upon the foregoing papers, it is ordered that this motion is

DECIDED IN ACCORDANCE WITH
ACCOMPANYING DECISION/ORDER

Judgment

M O T I O N / C A S E   I S   R E S P E C T F U L L Y   R E F E R R E D   T O   J U S T I C E
F O R   T H E   F O L L O W I N G   R E A S O N ( S ):

Dated: _6/14/17_                                       _BJ_____, J.S.C.

BARBARA JAFFE
J.S.C.

1. CHECK ONE: ...................................... ☑ CASE DISPOSED          ☐ NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: ..................MOTION IS: ☐ GRANTED  ☑ DENIED  ☐ GRANTED IN PART  ☐ OTHER
3. CHECK IF APPROPRIATE: ........................................ ☐ SETTLE ORDER          ☐ SUBMIT ORDER
                                                            ☐ DO NOT POST   ☐ FIDUCIARY APPOINTMENT   ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK  :  IAS PART 12
------------------------------------------------------------------x
In the Matter of the Application of                    Index no. 100632/17
MARIAH LOPEZ,
                                                      **DECISION AND JUDGMENT**
                              Petitioner,

                -against-


NYC DEPARTMENT OF HOMELESS SERVICES,
PROJECT RENEWAL,

                              Respondents.
------------------------------------------------------------------x
BARBARA JAFFE, JSC:

      Petitioner seeks an order directing respondent NYC Department of Homeless Services

(DHS) to "reverse its decision to approve Project Renewal's request to transfer [her] from

Marsha's Place Shelter (for transgender people)." (Verified Petition).  She alleges that the

transfer constitutes a retaliatory measure against her for having obtained an order from the

Southern District of New York enjoining respondents from refusing the entry of her service dog

into Marsha's Place.  Since then, she contends, she has been treated differently by staff in that

they document her alleged infractions more than they do those of other clients, resulting in a

"paper trail" and her transfer out of Marsha's Place, which transfer she claims resulted from her

objection to the mistreatment of transgender clients by food service staff.  She accuses Project

Renewal's director of inappropriately sharing with her personal details about himself. (*Id.*).

Petitioner also seeks a temporary stay and an order preliminarily enjoining her transfer. (Order to

Show Cause, dated May 11, 2017).

## I.  BACKGROUND

Annexed to the petition are respondents' Client Notification of Transfer, dated May 10,

2017, setting forth a shelter client's right to a review of the reasons for a transfer, a Shelter Client

Transfer Referral form, dated May 11, 2017, by which petitioner was notified of her transfer as of

that day, and a copy of the aforementioned federal temporary restraining order, dated April 27,

2017, which reflects that it was issued "without prejudice to the Defendants' and Marsha's

House's right to require [petitioner] to comply with all applicable shelter rules and City and State

regulations." (*Mariah Lopez v City of New York*, US Dist Ct, SD NY, 17cv3014, Caproni, J.,

Apr. 27, 2017).

On May 12, 2017, when the parties appeared before me with respect to the requested stay,

petitioner argued that she should not be forced to leave Marsha's Place and take up residence at

WIN West Women's Shelter (WIN West) as two transgender residents of that shelter had

recently reported being assaulted there. (Transcript of proceedings, May 12, 2017).  According to

petitioner, her fear of being assaulted at WIN West and of again being placed in an environment

where, if disrespected or attacked, her "post-traumatic stress disorder" and "impulse control

disorder" could result in her physically defending herself.  Thus, she claimed that being

transferred from Marsha's Place will result in an irreparable injury which excuses her from any

obligation to exhaust her administrative remedies before seeking judicial review of DHS's

determination.  She added that she lacks any option but to perform "sex work" if she cannot

remain at Marsha's Place, and claimed a right to be with other transgender people there and not

be forced into a shelter for "cis or legal females."

While she admits having threatened staff at Marsha's Place, she observed that she has not

assaulted anyone.  She reiterated and refined her position as a fear of being forced by

discriminatory behavior to defend herself and thereby be exposed to potential criminal charges,

and distinguished the discriminatory conduct directed against transgender people by food service staff at Marsha's Place from the violence at WIN West.

Notwithstanding petitioner's fear of being transferred to WIN West, respondents insist that it is safe given the police protection it affords, and is thus more suitable for petitioner, who has engaged in threatening conduct at Marsha's Place, where there is no police presence.  They asserted that there is no evidence of any assaults at WIN West nor does there appear to be a history or pattern of incidents at WIN West related to transgender individuals, otherwise observing that criminal conduct occurs "at pretty much every single shelter facility within New York City," and that there is no guarantee of safety at any particular shelter.  Although staff members at Marsha's Place have tried to work with petitioner, respondents reported that they do not feel safe as a result of her confrontations with them.

Respondents expressed willingness to reach out to WIN West to ensure that a bed was available to petitioner and offered her assistance in utilizing security procedures there, and observed that shelters are designated for women solely according to their gender identity, although they acknowledged that Marsha's Place is a uniquely LGBTQ shelter.  While petitioner was exempted from the below-30 age requirement at Marsha's Place, respondents maintained that given her repeated violation of the shelter rules and regulations contained within a written contract she signed with Project Renewal, she no longer qualifies.

Respondents also argued that DHS has the discretionary authority to effect transfers between shelters, and that if a shelter need is not being met, such as one related to safety, timely notice and a pre-transfer hearing are not required.  Rather, a client may request a fair hearing to challenge the transfer post-transfer.  Given the availability of that remedy, respondents asserted,

3

petitioner is not entitled to any injunctive relief, having failed to exhaust her administrative fair-hearing remedy, and claim that the status quo ante is petitioner's assignment to WIN West, even though she refused placement there.

I ordered respondents to accommodate petitioner at Marsha's Place for the weekend and directed them to appear on May 15 for consideration of petitioner's order to show cause.

On May 15, petitioner characterized the weekend at Marsha's Place as "without incident," although she complained about not having been fed that morning. (Transcript of proceedings, dated May 15, 2017). By contrast, respondents reported that over the weekend, six incidents were reported concerning threats leveled at staff members by petitioner, and that petitioner was given cereal that morning as the kitchen had run out of eggs when she appeared for breakfast near the end of the breakfast period. Nonetheless, I temporarily stayed respondents from enforcing the transferral of petitioner to WIN West, conditioned on her compliance with respondents' rules and regulations. I signed the order to show cause and the parties were directed to return to court on May 31. Respondents were given until May 24 to file their answers to the petition.

On May 24, respondents filed and served their verified answers.

By letter dated May 25, 2017, DHS advised that on May 24, the police had been called to Marsha's Place and petitioner was thereupon arrested. As a result, and given my order conditioning the stay of her transfer to WIN West on her compliance with the shelter's rules and regulations, DHS "suspended" petitioner from shelter services for seven days, which according to counsel, is the standard procedure followed under the circumstances.

On May 26, 2017, petitioner brought a new order to show cause and petition, seeking an order compelling DHS to permit her to return to Marsha's Place. Another justice of this court

4

denied her request for a stay, and scheduled the application to be heard by me on May 31, 2017.

On May 31, DHS advised that petitioner's May 24 arrest resulted in the lodging of felony and lesser charges. (Transcript of proceedings, dated May 31, 2017). It was agreed that the underlying facts would not be discussed to avoid any incriminatory statements from petitioner, although she maintained that the charges lodged against her are the exaggerated product of DHS's urging staff at Marsha's Place to press charges against her in an attempt to deny her "fair access to this Court and its procedures," and she complained that counsel for DHS was not communicating with her. Specifically, she alleged that she had informed him, apparently without response, that there were serious safety concerns at Marsha's Place. She accused counsel of taking advantage of the condition set forth in my order to show cause that she comply with the rules knowing that she would violate them, and thereby rendering her "helpless" in having to resort to sex work.

In response, DHS counsel referenced petitioner's "long history [of] defiantly violating rules and when asked to comply . . ." refusing to do so, alleging that petitioner has slept with other clients, burned candles in her room, brought prohibited wine and food into the shelter, and has a "long history" of threatening shelter employees. He reported that petitioner had called him, proposing to settle the case by "completely reorganizing the management of Project Renewal," which he declined as unproductive. It was soon thereafter, he stated, that occurred the incidents leading to her arrest and suspension from services.

As the suspension was to expire that day, DHS asked that I lift the stay to permit petitioner's transfer to a different facility in order to avoid her further disruption of Marsha's Place, and strongly denied petitioner's suggestion that safety issues were not taken seriously by

Project Renewal.  Counsel observed that upon petitioner's return to the shelter on May 26, she

confronted one of the directors and told him that "she thought she knew where he lived and she

would have his fucking head blown off."  He thus contended that a transfer to a shelter with

better mental health services is appropriate, especially as several staff members refused to come

to work with petitioner in the building.

Petitioner additionally complained that counsel intentionally served her with DHS's

verified answer the day she "was made homeless," and that her transfer from Marsha's Place

would "impact[]" her canine service animal.  Petitioner maintained that all of the evidence

against her cited by respondents originates from individuals whose words are tainted by  conflicts

of interest given the departmental investigation she commenced against them the previous week.

She denied "sneaking" wine into the shelter, as she had only forgotten that she had it, claimed

that she had burned candles in her room as part of a religious observance, and denied that her

conduct endangered any clients, a majority of whom had signed a petition calling for the ouster

of the shelter's present director.  She asked that I modify the stay to prevent her transfer to any

facility, not just WIN West, and amend it to extend to a determination of her application,

asserting that the only facility for an open transgender person to feel safe from harassment is

Marsha's Place.

Given the incidents that preceded those allegedly precipitating petitioner's arrest, which

were essentially uncontested except to the extent that petitioner sought to excuse them, and

absent a sufficient showing that immediate and irreparable injury would result if DHS were not

restrained from transferring petitioner to WIN West, I lifted the stay and marked as fully

submitted petitioner's motion for a preliminary injunction and her petition.

## II.  ANALYSIS

### A.  Exhaustion of remedies

Although petitioner seeks a preliminary injunction, she ultimately requests that I review the determination of an agency.  "[A]s a general principle, absent extraordinary circumstances, courts are constrained not to interject themselves into ongoing administrative proceedings until final resolution of those proceedings before the agency." (*Galin v Chassin*, 217 AD2d 446, 447 [1st Dept 1995], citing *Doe v St. Clare's Hosp. & Health Ctr*, 194 AD2d 365, 366 [1st Dept 1993], *lv denied* 82 NY2d 662).  Thus, one seeking such review must first exhaust administrative remedies.  The exhaustion rule is not, however, inflexible, as it "need not be followed, for example, when an agency's action is challenged as either unconstitutional or wholly beyond its grant of power, or when resort to an administrative remedy would be futile or when its pursuit would cause irreparable injury." (*Watergate II Apts. v Buffalo Sewer Auth.*, 46 NY2d 52, 57 [1978]).

Given DHS's broad discretionary authority to effect transfers between homeless shelters, the transfer of petitioner from Marsha's Place to WIN West is neither unconstitutional nor wholly beyond DHS's grant of authority; petitioner's avowed purpose in advocating for others by verbally threatening staff at Marsha's Place and her complaints about shelter services do not encroach on that authority.  As respondents' answers were to be filed and served on May 24, they cannot be faulted for serving her then.  Moreover, her attempt to minimize the impact of her threats is unpersuasive.

Petitioner also offers no reason to believe that an effort to obtain a fair hearing would be futile (*see McFadden v Fonda*, 148 AD3d 1430, 1431 [3d Dept 2017] [no evidence offered

7

substantiating petitioner's contention that his ability to file appeal in accordance with administrative directive was hindered]), or that a hearing would be other than fair.  At that hearing, she would have an opportunity to argue and prove her allegations of retaliatory conduct by shelter staff.

Although it was reported in 2016 that, nationally, 22 percent of transgender residents of homeless shelters were sexually assaulted by staff or other residents,[1] and notwithstanding petitioner's report of hearing from two such recent victims at WIN West, her fear of being assaulted there is nonetheless speculative and does not constitute irreparable injury (*see eg Heyliger v Trombley*, 2017 WL 1064680, *2 [ND NY 2017] [preliminary injunction seeking transfer to different correctional facility denied as plaintiff's concern of possible assault or mistreatment speculative]; *Trowell v Upstate Correctional Facility*, 2016 WL 7156559, *8 [ND NY 2016], and cases cited therein [allegations of possible future assault speculative and thus insufficient to establish irreparable harm]), nor does her anticipation of having to defend herself or others.  That she cannot control her impulses does not entitle her to relief, nor does her claim that she has no choice but to engage in "sex work" to avoid being homeless.  A professed inability to conform one's conduct to the law or to support oneself in any capacity other than in sex work cannot be countenanced as to do so would condone illegality and unjustifiably ignore available onsite social services, as well as others such as the Urban Justice Center's Sex Workers Project (www.urbanjusticecenter.org).

---

[1] Demoya Gordon, "Transgender People Need Safe and Dignified Access to Homeless Shelters," Lambda Legal, Feb. 16, 2016, https://www.lambdalegal.org/blog/20160216_ transgender-people-need-access-to-homeless-shelters.

### B.  Preliminary injunction

Even had petitioner exhausted her administrative remedies, the result is the same.  To

obtain a preliminary injunction, she must demonstrate, by non-conclusory statements, the

likelihood of success on the merits, a danger of irreparable injury, and that the balance of equities

is in her favor (Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of New

York, CPLR 6312, Bk 7B, C6312:1 [2010]).  That petitioner is no longer at Marsha's Place poses

no obstacle, as it has been held that injunctive relief may restore the status quo as it existed

before the defendant's wrongful act. (Vincent C. Alexander, Supplementary Practice

Commentaries, McKinneys Consol Law of New York, CPLR 6301, Bk 7B, C6301:1 [2014]; *Bd.*

*of Ed. of City of New York v Marcus*, 63 Misc 2d 268, 271 [Sup Ct, Kings County 1970], citing

7-A Weinstein-Korn-Miller § 6301.16).  However, for the reasons set forth above (II.B.), namely,

respondents' broad discretion and the speculative nature of her fears, petitioner fails to

demonstrate, respectively, a likelihood of success on the merits and irreparable injury.  And given

the indisputable public interest in the safe administration of homeless shelters, the balance of

equities here lies in respondents' favor.

Petitioner's May 26, 2017 order to show cause and petition, is thus moot and the

"Preliminary Report" annexed to it is not reviewed as it addresses issues beyond the purview of

her application and is neither signed nor notarized.

### III.  CONCLUSION

As a self-described experienced advocate whose professed goal is to reform the shelter

system as it relates to transgender individuals, it should come as no surprise to petitioner that a

more nuanced approach to reaching her goal may be more productive.  To the extent that her

9

conduct may be characterized as civil disobedience, under the circumstances presented here, she

is herself to blame for the consequences of her conduct. (*See United States v Kroncke*, 459 F2d

697, 703 [8th Cir 1972] ["Among philosophers and religionists throughout the ages there has

been an incessant stream of discussion as to when, if at all, civil disobedience, whether by

passive refusal to obey a law or by its active breach, is morally justified. However, they have

been in general agreement that while in restricted circumstances a morally motivated act contrary

to law may be ethically justified, the action must be non-violent and the actor must accept the

penalty for his action. In other words, it is commonly conceded that the exercise of a moral

judgment based upon individual standards does not carry with it legal justification or immunity

from punishment for breach of the law."]).

     Accordingly, it is hereby

     ORDERED and ADJUDGED, that the petition is denied in its entirety; it is further

     ORDERED and ADJUDGED, that petitioner's May 26, 2017 order to show cause and

petition are denied as moot and dismissed; and it is further

     ORDERED and ADJUDGED, that the proceeding is dismissed.

               ENTERED:

               Barbara Jaffe, JSC

DATED:     June 14, 2017
            New York, New York

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT: _____ JAFFE _____          PART __12__
                          *Justice*

LOPEZ, MARIAH                           INDEX NO. __100632/17__

                -v-                     MOTION DATE _____

NYC. DEPT HOMELESS SERVICES             MOTION SEQ. NO. __02__

The following papers, numbered 1 to _____ , were read on this motion to/for _____

Notice of Motion/Order to Show Cause — Affidavits — Exhibits     _____  | No(s). _____

Answering Affidavits — Exhibits _____  | No(s). _____

Replying Affidavits _____       | No(s). _____

Upon the foregoing papers, it is ordered that this motion is

This petition is decided in accordance with
the decision and order and judgment filed
under motion sequence number __001__

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: __6/14/17__                          _____ , J.S.C.
                                              BARBARA JAFFE
                                                    J.S.C.

1. CHECK ONE: ......................................  ☒ CASE DISPOSED        ☐ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: ................MOTION IS:  ☐ GRANTED  ☒ DENIED  ☐ GRANTED IN PART  ☐ OTHER

3. CHECK IF APPROPRIATE: ...........................  ☐ SETTLE ORDER         ☐ SUBMIT ORDER

                                                     ☐ DO NOT POST  ☐ FIDUCIARY APPOINTMENT  ☐ REFERENCE

# Exhibit N



**A** Neutral
As of: July 25, 2017 8:11 PM Z

## Allah-Kasiem v. Rivera

United States District Court for the Southern District of New York

January 18, 2011, Decided; January 18, 2011, Filed

09 Civ. 9665 (DLC)

**Reporter**
2011 U.S. Dist. LEXIS 4793 *; 2011 WL 166929

ALLAH-KASIEM, Plaintiff, -v- JOSE RIVERA, et al., Defendants.

**Subsequent History:** Summary judgment granted by, Partial summary judgment denied by Allah-Kasiem v. Sidorowicz, 2012 U.S. Dist. LEXIS 99248 (S.D.N.Y., July 17, 2012)

## Core Terms

allegations, confinement, grievance, days, motion to dismiss, keeplock, retaliation, inmate, prison, constitutional right, retaliation claim, conspiracy, liberty interest, disciplinary, defendants', retaliatory, conditions, conspired, atypical, hearings, damages, due process claim, false report, deprivation, conclusory, misconduct, contends, hardship, charges, rights

**Counsel:** [*1] Allah-Kasiem, Plaintiff, Pro se, Fallsburg, NY.

For Defendants: Kevin R. Harkins, Assistant Attorney General, State of New York, New York, NY.

**Judges:** DENISE COTE, United States District Judge.

**Opinion by:** DENISE COTE

## Opinion

### OPINION & ORDER

DENISE COTE, District Judge:

<u>Pro se</u> plaintiff Allah Kasiem brings this 42 U.S.C. §

1983 action for a declaratory judgment, injunctive relief, and compensatory damages against seventeen officers and employees at the Sullivan Correctional Facility ("Sullivan") and the New York State Department of Correctional Services ("DOCS"). [1] Thirteen of those defendants have filed a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim. [2] For the following reasons, the defendants' motion is granted as to eleven of the thirteen defendants. The plaintiff is granted leave to amend his complaint to state a claim for deliberate indifference to a serious medical condition under the Eighth Amendment.

### BACKGROUND

The following facts are drawn from the complaint of October 23, 2009, and are assumed to be true for the purposes of deciding this motion to dismiss. Kasiem principally alleges that in retaliation for Kasiem's filing of grievances -- many of which were filed against Sgt. Rivera -- various defendants falsely charged him of misconduct and interfered with his use of the grievance process. He further alleges that defendants violated his right to due process during his Tier II and Tier III

---

[1] The defendants have moved to dismiss on behalf of defendant Captain James Gilmore ("Capt. Gilmore"). Capt. Gilmore is not listed in the caption of the complaint, but the body of the complaint alleges wrongdoing by him and the plaintiff [*2] has attempted to serve him. This Opinion assumes he is a defendant and grants his motion to dismiss.

[2] As of January 6, 2011, four defendants -- Corrections Officer ("CO") Martin Albert ("CO Albert"), Sergeant Jose Rivera ("Sgt. Rivera"), CO Brian Villegas ("CO Villegas"), and Sergeant Edward Madison ("Sgt. Madison") -- had not yet been served.

disciplinary hearings. The plaintiff's most significant allegations are as follows:

A. September 30, 2008 Tier III Hearing and Sgt. Rivera's Threatening Gesture

Kasiem alleges that due to racial discrimination and in retaliation for grievances that he had filed against Sgt. Rivera, on or about August 23, 2008, Sgt. Rivera and CO Villegas "framed" or falsely [*3] accused him of attempting to smuggle gang-related material to an inmate in the Special Housing Unit ("SHU"). The discrimination charge against Sgt. Rivera rests on Kasiem's allegation that Sgt. Rivera wanted to replace him as chief administrative law clerk at the Sullivan Law Library with an Hispanic inmate.

On or about September 30, 2008, Capt. Gilmore conducted a Tier III hearing and refused to permit Kasiem to call a witness because Capt. Gilmore was conspiring with Sgt. Rivera. Capt. Gilmore found Kasiem guilty and sentenced him to sixty days in keeplock confinement. This decision was affirmed on appeal.

In October 2008, plaintiff filed a grievance against Sgt. Rivera and CO Villegas with DOCS Commissioner Brian Fischer ("Comm. Fischer"). This grievance was referred to Superintendent James Walsh ("Supt. Walsh") who, in turn, referred it to Deputy Superintendent for Security Patrick Griffin ("DSS Griffin"). DSS Griffin assigned Lieutenant Sandra Ostrowski ("Lt. Ostrowski") to investigate the complaint. During Lt. Ostrowski's investigation, plaintiff was taken to the sergeant's office to be interviewed. While Kasiem was awaiting the start of the interview, Sgt. Rivera -- who was accompanied [*4] by Sgt. Villegas -- threatened Kasiem by standing in the corridor outside the office and drawing his finger across his throat. Lt. Ostrowksi did not observe the threat. Lt. Ostrowski reported to DSS Griffin that there was no evidence to support Kasiem's grievance against Sgt. Rivera and CO Villegas. She did not, however, interview the plaintiff's witnesses before reaching this conclusion. DSS Griffin referred

Lt. Ostrowski's findings to Supt. Walsh who passed them on to Deputy Commissioner Lucien LeClaire. Lt. Ostrowski also told DSS Griffin that she had been with the plaintiff at all times during his interview at the sergeant's office and that she did not see Sgt. Rivera gesture toward the plaintiff from the hallway. Kasiem contends that Lt. Ostrowski failed to report Sgt. Rivera's threat to DSS Griffin "solely on the basis of retaliatory reprisal."

B. January 20, 2009 Tier III Hearing

On or about December 30, 2008 [3] Sgt. Rivera, CO Albert and CO Gordon Simpson ("CO Simpson") "frame[d] [the] plaintiff with a false report and fabricated charges of stealing a medical dictionary from the Law Library." On January 20, 2009, at a Tier III hearing, the charge was dismissed. Kasiem alleges, [*5] however, that the officer who presided over the hearing, Education Supervisor Robert Woods ("ES Woods"), confiscated three of Kasiem's law books. Plaintiff appealed ES Woods's seizure of his books to the Director of Special Housing/Inmate Disciplinary Program Norman Bezio ("DSH Bezio"). By letter dated February 25, 2009, DSH Bezio instructed Supt. Walsh to return the books to Kasiem, but this was never done.

C. March 19, 2009 Tier III Hearing

On or about March 9, 2009, Kasiem filed a sexual harassment grievance with Sergeant Rene Lawrence ("Sgt. Lawrence") based on a conversation that he overheard in which other officers, including Sgt. Rivera, referred to Sgt. Lawrence using derogatory language. Sgt. Lawrence did not investigate the plaintiff's claim and retaliated against him for filing the grievance by placing the plaintiff in keeplock confinement. On March 19, Kasiem was found guilty of a violation that he does not identify, after a Tier III hearing conducted by Steward Sandra Camio ("S. Camio"). S. Camio sentenced Kasiem [*6] to 90 days in keeplock confinement. On April 13, DSH Bezio reversed the decision, but Kasiem had already spent thirty-five days in keeplock confinement.

D. June 4, 2009 Tier II Hearing and Oral Threat by Sgts. Rivera and Madison

Next, on May 29, 2009, Sgt. Rivera filed a false report based on fabricated evidence, alleging that Kasiem had "evaded" medical keeplock. Plaintiff had been released from medical keeplock nine days earlier. At a Tier II hearing convened on June 4, 2009, Sgt. Rivera's charge against Kasiem was dismissed.

Around the same time, Kasiem filed a grievance against Sgt. Rivera for filing the May 29 false report. At some point thereafter, Sgt. Rivera called Kasiem to his office and "made a death threat" to try to force him to withdraw his grievance.

On June 11, Sgt. Madison made a racially derogatory

─────────────────────

[3] Kasiem alleges that the above-described incident occurred on December 30, 2009. Since the complaint is dated October 23, 2009, it is assumed that the year is 2008.

and sexual remark to Kasiem and threatened to harm him unless he withdrew his grievances against Sgt. Rivera. On the same day, Kasiem responded to these threats by filing a grievance against Sgt. Madison for unlawful racial discrimination and sexual harassment.

E. June 22 and June 30, 2009 Tier II Hearings

On June 12, 2009, CO Albert gave Kasiem a pass for sick call and then **[*7]** alerted Sgt. Madison that the plaintiff was on his way. When Kasiem reached "the crossgates," Sgt. Madison wrongly accused Kasiem of attempting to "smuggle one peppermint candy to Sick Call and refusing to obey direct orders." Sgt. Madison sent Kasiem to keeplock confinement and filed a false report against him.

Kasiem attempted to prepare for his upcoming Tier II hearing concerning the June 12 incident by asking Sgt. Lawrence to provide him with employee assistance. On or about June 16, Sgt. Lawrence denied Kasiem's request for assistance and filed false charges against him, alleging that he had disobeyed a direct order.

On June 22, plaintiff appeared before Lieutenant Gary Sipple ("Lt. Sipple") for a Tier II hearing concerning the June 12 charges filed by Sgt. Madison. Several years earlier, in October 2007, Lt. Sipple, who was then a sergeant, filed false charges against Kasiem that were subsequently dismissed at a Tier II hearing. Due to this prior incident, Lt. Sipple was biased against Kasiem and agreed to help Sgt. Madison and Sgt. Rivera by prohibiting Kasiem from introducing certain evidence at his Tier II hearing and ordering that Kasiem be removed from the hearing when he **[*8]** attempted to place his objections on the record. After the plaintiff was taken from the hearing, Lt. Sipple -- in concert with Sgt. Rivera -- imposed a sentence of twenty-one days in keeplock confinement. On the same day, Kasiem filed a grievance against Lt. Sipple as well as a Tier II administrative appeal with Supt. Walsh and Captain Dale Long ("Capt. Long"). On June 26, 2009, Capt. Long affirmed the Tier II hearing decision without reviewing the record.

On June 30, Kasiem appeared at a second Tier II hearing before Lt. Sipple, this one arising from Sgt. Lawrence's June 16 report. Lt. Sipple prevented the plaintiff from calling certain witnesses who would have offered testimony regarding Kasiem's vision and hearing impairments. Lt. Sipple did, however, permit R.N. Lindsay to testify that Kasiem had excessive ear wax which may have interfered with his hearing between May 21 and June 25, 2009. [4] At the hearing, Lt. Sipple imposed a sanction of thirty days keeplock confinement. The plaintiff appealed the Tier II decision to Supt. Walsh. DSS Griffin was ultimately assigned to review the appeal, and dismissed the appeal without reviewing the hearing record.

F. July 21, 2009 Tier III Hearing

On or about June 30, 2009, CO Albert, Sgt. Rivera, CO Villegas, and CO Simpson conducted a search of Kasiem's cell and recovered legal documents belonging to another inmate and a legal assistance approval form signed by Superintendent Patty Nelson ("Supt. Nelson") that was missing an expiration date. CO Villegas and CO Simpson forged an expiration date on the form to make it appear as if Kasiem had impermissibly provided legal assistance to a fellow prisoner. CO Albert then filed a false report regarding the incident.

At a July 21, 2009 Tier III hearing before Deputy Superintendent for Mental Health Bryan Hilton ("DSMH Hilton"), Supt. Nelson falsely testified that she had not forgotten to put an expiration date on Kasiem's legal assistance form. At the hearing, DSMH Hilton "failed to produce the physical evidence" underlying the charge against the plaintiff and he failed to "consider [Kasiem's] defense of retaliatory reprisals." DSMH Hilton found Kasiem guilty and imposed a penalty of **[*10]** 120 days in keeplock confinement. Kasiem appealed the decision to Comm. Fischer. DSH Bezio affirmed the decision on or around August 25, after Lt. Sipple requested that DSH Bezio deny the appeal as a personal favor to him.

G. Failure of Supervisors to Adequately Address Kasiem's Grievances

Finally, Kasiem contends that Supt. Walsh, Supt. Nelson and DSS Griffin, as supervisory officials, are liable for the injuries he suffered due to the conduct of CO Albert, CO Villegas, and CO Simpson. In support of this claim, Kasiem points out that he filed numerous grievance complaints against these individuals, but that no corrective action was taken.

On November 20, 2009, Kasiem, proceeding pro se, filed this lawsuit. On May 7, defendants filed this motion to dismiss. The motion to dismiss was fully submitted on August 27.

---

[4] The complaint states that R.N. **[*9]** Lindsay testified that Kasiem had excessive ear wax from May 21, 2009 to June 25, 2008, but based on the context, it is assumed Kasiem intended to refer to June 25, 2009.

<u>DISCUSSION</u>

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). For a plaintiff's claim to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that **[*11]** is plausible on its face.'" <u>Id.</u> (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted)). Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> at 1950.

A court considering a motion to dismiss pursuant to Rule 12(b)(6) "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." <u>Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.</u>, 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted). Moreover, pleadings filed by <u>pro se</u> plaintiffs are to be construed liberally. See <u>Erickson v. Pardus</u>, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam); <u>Harris v. Mills</u>, 572 F.3d 66, 72 (2d Cir. 2009). A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." <u>Iqbal</u>, 129 S. Ct. at 1949-50 (quoting <u>Twombly</u>, 550 U.S. at 555, 557).

The defendants' motion to dismiss identifies four principle reasons why the plaintiff's complaint should be dismissed: (1) that four defendants were not personally **[*12]** involved in the alleged violations; (2) that plaintiff has failed to state a First Amendment claim for retaliation against certain defendants; (3) that plaintiff's confinement did not create a liberty interest giving rise to a right to due process, and thus plaintiff does not have a due process claim against the officers involved in the disciplinary hearings; and (4) that plaintiff has failed to state a claim for conspiracy.

1. Lack of Personal Involvement

Defendants Supt. Walsh and Supt. Nelson contend that the claims against them should be dismissed because they merely supervised the defendants who committed the alleged violations and were not personally involved in any constitutional wrongdoing. [5] For example, the

complaint alleges that Supt. Nelson gave false testimony at a Tier III hearing, that Supt. Walsh referred the plaintiff's grievances to others for investigation and denied Kasiem's appeal from a Tier II hearing decision, and that both defendants had responsibility for the supervision of other defendants who violated Kasiem's rights.

Section 1983 **[*13]** provides in part that

> [e]very person who, under color of any statutes, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured.

42 U.S.C. § 1983. In <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 173 L. Ed. 2d 868, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, <u>through the official's own individual actions</u>, has violated the Constitution." <u>Id.</u> at 1948 (emphasis supplied). The Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," because that "conception of supervisory liability is inconsistent with [the principle that supervisors] may not be held accountable for the misdeeds of their agents." <u>Id.</u> at 1949. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." <u>Id.</u>

In <u>Colon v. Coughlin</u>, 58 F.3d 865 (2d Cir. 1995), **[*14]** the Second Circuit identified five ways in which supervisory officials may be personally involved in a violation of constitutional rights. <u>Id.</u> at 873. Liability may attach to a supervisor when she has

> (1) Directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

<u>Iqbal v. Hasty</u>, 490 F.3d 143, 152-53 (2d Cir. 2007)

---

[5] The defendants have not made this argument on behalf of defendants DSH Bezio and DSS Griffin, but it appears it could

apply to them as well.

(citation omitted), rev'd on other grounds sub nom, Ashcroft v. Iqbal, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). [6]

To the extent that Kasiem's claims rest on allegations that Supt. Walsh and Supt. Nelson referred his complaints/appeals to others for investigation and that [*15] they were the supervising officers for defendants who violated his rights, those claims must be dismissed for failure to allege personal involvement in the violation of the plaintiff's rights. These allegations seek to hold these supervisors accountable for wrongdoing committed by others, and thereby impermissibly plead their vicarious liability.

Kasiem's claim against Supt. Walsh for affirming the findings of a Tier II hearing must also be dismissed. Even if Supt. Walsh erred in affirming the hearing officer's decision, this act alone does not constitute an intentional deprivation of Kasiem's constitutional rights.

Kasiem alleges that Supt. Nelson personally engaged in misconduct when Supt. Nelson gave false testimony against him at a Tier III hearing. But, a prison inmate has no "general constitutional right" to be free from false accusations. See Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997); Martin v. Connelly, 07 Civ. 7199 (DLC), 2008 U.S. Dist. LEXIS 32420, 2008 WL 1821732, at *5 (S.D.N.Y. Apr. 18, 2008). Thus, all claims against Supt. Walsh and Supt. Nelson are dismissed.

2. Claim for Retaliation in Violation of the First Amendment

Many of Kasiem's claims rest on his assertion that defendants retaliated [*16] against him because he had engaged in protected activity. Nine defendants have moved to dismiss the retaliation claims on the grounds that the plaintiff's allegations are too conclusory, that the complaint does not provide any support for an inference that the protected activity caused the alleged retaliatory conduct, or that the complaint does not sufficiently identify the plaintiff's protected speech.

To state a First Amendment retaliation claim, a plaintiff must allege

(1) that the speech or conduct at issue was protected,

(2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.

Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (citation omitted) (prison case); accord Williams v. Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008). To show causation a plaintiff's "allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." Davis v. Goord, 320 F.3d 346, 354 (2d Cir. 2003) (citation omitted) (emphasis supplied). Since it is "near[ly] inevitabl[e]" that "prisoners will take exception" with the decisions of prison officials, [*17] the Second Circuit has cautioned that prisoners' retaliation claims must be "examin[ed] . . . with skepticism and particular care." Colon, 58 F.3d at 872; see also Davis, 320 F.3d at 352. "To survive a motion to dismiss, such claims must be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." Friedl v. City of New York, 210 F.3d 79, 85-86 (2d Cir. 2000) (citation omitted).

Plaintiff's claims for retaliation against seven of the defendants -- Capt. Gilmore, Lt. Ostrowski, ES Woods, S. Camio, Capt. Long, DSS Griffin, and DSMH Hilton -- must be dismissed as too conclusory. For instance, plaintiff alleges that "Lt. Ostrowski . . . made a false report to DSS Griffin . . . [that she] did not witness Sgt. Rivera made [sic] a death threat to plaintiff, solely on the basis of retaliatory reprisal." Similarly, plaintiff contends that, "solely on the basis of retaliatory reprisal[,]" ES Woods "exceeded his legal authority by confiscating all three personal law books of plaintiff."

The claim of retaliation against Lt. Sipple is dismissed for failure to plead causation. Kasiem alleges that the defendant, who acted as a hearing officer, denied him a fair [*18] hearing on June 22, 2009 because almost two years earlier -- in October 2007 -- a charge that this defendant had filed against Kasiem was dismissed. While temporal proximity may provide a basis from which to infer causation, twenty months is too long a gap in time to support such an inference. See Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009); Cronin v. St. Lawrence, 08 Civ. 6346(KMK), 2009 U.S. Dist. LEXIS 68320, 2009 WL 2391861, at *5 (S.D.N.Y. Aug. 5, 2009); Morriseau v. DLA Piper, 532 F. Supp. 2d 595, 617 n.142 (S.D.N.Y. 2008) (collecting cases).

Kasiem points out in opposition to this motion that on

_____

[6] The Second Circuit has not yet addressed how the Supreme Court's decision in Iqbal, 129 S. Ct. 1937, 173 L. Ed. 2d 868, may affect the five Colon categories of conduct that may give rise to supervisory liability. For purposes of deciding this motion, it is unnecessary to explore this issue further.

June 29, 2009 he filed a grievance against Lt. Sipple. The filing of this grievance, however, does not support an inference that Lt. Sipple acted with a retaliatory intent seven days earlier. Therefore, Kasiem's claim of retaliation brought against Lt. Sipple must be dismissed.

Sgt. Lawrence moves to dismiss the retaliation claim brought against her on the ground that Kasiem has failed to identify any protected activity which motivated Sgt. Lawrence's actions against Kasiem. [7] Sgt. Lawrence is alleged to have filed false misbehavior charges against Kasiem because she was "infuriated with the fact that plaintiff [*19] had won a reversal of her March 9, 2009 Tier III report." An inmate's appeal of an adverse hearing decision constitutes protected speech, much as the filing of a lawsuit or the filing of any petition to redress grievances does. See Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002).

Sgt. Lawrence contends alternatively that the retaliation claim against her must be dismissed since Sgt. Lawrence's conduct was protected under the doctrine of qualified immunity. "Under qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Faghri v. Univ. of Conn., 621 F.3d 92, 96 (2d Cir. 2010) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). A right is "clearly established if it would be clear to a reasonable [*20] officer in the position of the defendant that his conduct was unlawful in the situation he confronted." Id. at 96-97 (citing Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). This inquiry, in turn, hinges on "the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Id. at 97 (citing Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 822, 172 L. Ed. 2d 565 (2009)). But, even if Second Circuit decisions "have not explicitly held a law or course of conduct to be unconstitutional, . . . the course of conduct will nonetheless be treated as clearly established if decisions by [the Second Circuit] clearly foreshadow a particular ruling on the issue." Scott v. Fischer, 616 F.3d 100, 105 (2d Cir. 2010) (citation

omitted).

It was clearly established in 2009 that a corrections officer could not retaliate against an inmate in reaction to an inmate's complaint about the officer. See Davis, 320 F.3d at 352-53 (2d Cir. 2003) (prison grievances). Thus, if discovery establishes that Kasiem's appeal of the Tier III hearing decision contained allegations of misconduct against Sgt. Lawrence, these allegations would constitute protected activity. Moreover, [*21] this finding was clearly foreshadowed by Second Circuit precedent that existed as of 2009. Consequently, Sgt. Lawrence is not entitled to dismissal of Kasiem's retaliation claim on the ground of qualified immunity.

3. Due Process Claims

The complaint brings due process claims against four defendants who served as hearing officers in five disciplinary proceedings against Kasiem. Kasiem asserts that he was denied his right to a fair hearing at hearings conducted by Capt. Gilmore, S. Camio, Lt. Sipple, and DSMH Hilton. Four of the hearings resulted in sanctions of less than 101 days. [8] A fifth hearing, convened by DSMH Hilton on July 21, 2009, resulted in a penalty of more than 101 days in keeplock confinement.

When asserting a due process claim under § 1983 "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the [*22] defendants deprived him of that interest as a result of insufficient process." Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004) (citation omitted). "To be actionable, the liberty interest must subject the prisoner to 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" Vega v. Lantz, 596 F.3d 77, 83 (2d Cir. 2010) (quoting Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)). While keeplock confinement, more commonly referred to as confinement in a SHU, without unusual conditions [9] for a period of up to 101

---

[7] Lt. Sipple also moves to dismiss the retaliation claim filed against him on the grounds that Kasiem's appeal of a hearing decision is not protected activity. Since the claim against Lt. Sipple is dismissed on other grounds, it is unnecessary to reach Lt. Sipple's argument.

[8] The four hearings occurred on September 30, 2008, March 19, 2009, June 22, 2009, and June 30, 2009, and resulted in confinement in keeplock for 60, 35, 21, and 30 days, respectively. Although Kasiem was sentenced to 90 days of confinement at the March 19, 2009 hearing, Kasiem had only served 35 days of this sentence before it was reversed on appeal.

[9] Under the "normal conditions of SHU confinement in New York," the prisoner is:

   placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for

days will generally not constitute an atypical hardship, confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." Ortiz, 380 F.3d at 654; Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000). When an inmate is confined for "an intermediate duration -- between 101 and 305 days -- development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required" in order for an inmate to establish an atypical hardship. Palmer, 364 F.3d at 65 (citation omitted). The "frequency of . . . confinements" is also relevant when assessing whether a prisoner has been [*23] subjected to an atypical hardship. Ortiz v. McBride, 323 F.3d 191, 195 n.1 (2d Cir. 2003) (citation omitted).

Assuming an inmate has stated a valid liberty interest, due process requires that he receive certain procedural protections, including:

> advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.

Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004).

The [*24] Due Process Clause also dictates the "quantum of evidence required to support a prison's decision to discipline an inmate." Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004). To "comport with the minimum requirements of procedural due process" a prison disciplinary board's findings must be "supported by some evidence in the record." Id. at 487-88 (quoting Superintendent v. Hill, 472 U.S. 445, 455, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985)). This standard is met if there is "any evidence in the record that supports the disciplinary ruling," so long as this minimal amount of evidence is "reliable." Sira, 380 F.3d at 69 (citation omitted).

Kasiem has not plead or otherwise identified any facts

---

one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited.

Palmer v. Richards, 364 F.3d 60, 65 n.3 (2d Cir. 2004) (citation omitted).

concerning the conditions of his confinement in keeplock at Sullivan. [10] Even if the four shorter keeplock confinements are considered as a pattern, they do not constitute a significant or atypical hardship. As a result, he has failed to plead the existence of a valid liberty interest with respect to the four claims which resulted in SHU confinement for periods of less than 101 days.

The fifth claim -- which relates to a July 21, 2009 hearing that culminated in Kasiem serving 120 days in SHU -- may not be dismissed for the failure to identify a liberty interest. Instead, defendants argue that the claim should be dismissed because Kasiem was afforded all the process he was due. This argument can be swiftly rejected.

The complaint pleads a claim for a violation of Kasiem's right to procedural due process. Kasiem contends that DSMH was not a "fair and impartial hearing officer" and his findings were not supported by "some evidence" in the record. Specifically, Kasiem asserts that DMSH Hilton "failed to produce the physical evidence" underlying the June 30 report, based his decision on the allegedly false testimony of Supt. Nelson, and refused to "consider [Kasiem's] defense of retaliatory reprisals."

Defendants argue that since Supt. Nelson testified at the hearing, DSMH Hilton's findings must meet the "some evidence" standard. In order for the Court to accept this [*26] argument, it would have to conduct a review of the hearing record. Such review would be premature in addressing a motion to dismiss.

4. Claims for Conspiracy

Kasiem makes numerous allegations of conspiracy against the defendants. These allegations can be grouped into two general categories: (1) On various occasions, Sgt. Rivera and Sgt. Madison, angered by plaintiff's grievances against them, conspired with four hearing officers -- Capt. Gilmore, S. Camio, Lt. Sipple, DSMH Hilton -- and one witness -- Supt. Nelson -- to deny Kasiem fair and impartial hearings; and, (2) on two occasions, CO Albert, Sgt. Rivera, CO Villegas, and CO Simpson conspired to falsely accuse Kasiem of misconduct in order to retaliate against him for filing

---

[10] In his opposition to this motion to dismiss, Kasiem does not identify any unusual conditions of confinement despite the defendants' argument that his due [*25] process claims should be dismissed because "normal" keeplock confinement for a period of less than 101 days does not constitute an atypical and significant hardship giving rise to a valid liberty interest.

grievances.

In order to state a § 1983 conspiracy claim, Kasiem must allege:

> (1) an agreement between two or more state actors . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.

Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). In pleading these elements, it is not enough for a plaintiff to make only "conclusory, vague, or general allegations that the defendants have [*27] engaged in a conspiracy to deprive the plaintiff of his constitutional rights . . . . [D]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 325 (2d Cir. 2002) (citation omitted). Put differently, a plaintiff must plead facts sufficient to put defendants on notice of the claims against them and "enable defendants intelligently to prepare their defense." Id. (citation omitted).

Plaintiff's claims of conspiracy are too conclusory to survive a motion to dismiss. For example, plaintiff alleges that on or about September 30, 2008, when conducting a Tier III hearing, Capt. Gilmore "conspired with Sgt. Rivera to violate plaintiff's constitutional rights." Similarly, Kasiem contends that "[o]n or about June 30, 2009, defendant C.O. Martin Albert conspired with Sgt. Rivera, C.O. Villegas and C.O. Simpson to violate the constitutional rights of plaintiff."

In response to the defendants' contention that his allegations of conspiracy are too conclusory, Kasiem asserts in his opposition to the motion, that "on various occasions[,]" he "overheard Sgt. Rivera state to other officers that he (Sgt. Rivera) [*28] personally spoke" with eleven of the other defendants in this case and that they had "made an agreement to conspire to retaliate against plaintiff for having filed grievance and formal complaints against their co-workers." Kasiem does not identify the dates or places of Sgt. Rivera's statements or the persons with whom he was speaking, nor does Kasiem explain how he was able to overhear Sgt. Rivera describe the plot to conspire against him. This additional statement, therefore, even if it were included in a pleading, would be inadequate to survive defendants' motion to dismiss. 5. Compensatory Damages

Finally, the defendants have moved to dismiss Kasiem's demand for compensatory damages based on his emotional distress. Federal law prohibits prisoners from bringing a "civil action . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). This provision bars prisoners from recovering more than nominal damages "for mental or emotional injury" arising from a "constitutional violation in the absence of a showing of actual physical injury." Thompson v. Carter, 284 F.3d 411, 417 (2d Cir. 2002).

Kasiem's complaint does not [*29] identify any physical injury that he suffered as a result of the defendants' alleged violation of his rights under federal law. In his opposition to this motion, however, Kasiem reports that he suffered permanent damage to his vision because Sgt. Rivera "induced Dr. Sidorowicz . . . to retaliate against [him] for having filed grievance[s] and formal complaints . . . by depriving plaintiff of prompt medical treatment for his vision." The complaint does not contain any claim based on inadequate medical care, contain any allegation regarding Dr. Sidorowicz, or name the doctor as a defendant. The plaintiff will be permitted to amend his pleading to allege an intentional deprivation of medical care for a serious medical condition. In the meantime, the defendants' motion to strike any demand for compensatory damages based on the claims currently pleaded is granted.

## CONCLUSION

For the reasons stated above, all of the claims against the following eleven defendants are dismissed: Supt. Walsh, Supt. Nelson, DSH Bezio, Capt. Gilmore, Lt. Ostrowski, ES Woods, S. Camio, Capt. Long, DSS Griffin, Lt. Sipple, and CO Simpson. Additionally, Kasiem's conspiracy claim against DSMH Hilton is dismissed. Kasiem's [*30] First Amendment retaliation claim against Sgt. Lawrence and his due process claim against DSMH Hilton, however, survive. The plaintiff will be allowed to file an amended complaint for the sole purpose of alleging claims based on deliberate indifference to a serious medical condition. An order setting a schedule for Kasiem's amended complaint and scheduling an initial pretrial conference accompanies this Opinion.

SO ORDERED:

Dated: New York, New York

January 18, 2011

/s/ Denise Cote

DENISE COTE

United States District Judge.

_____



Positive
As of: July 25, 2017 8:11 PM Z

# Crawford v. Lutheran Med. Ctr.

United States District Court for the Eastern District of New York

March 9, 2011, Decided; March 14, 2011, Filed

08-CV-3429 (NGG) (LB)

**Reporter**
2011 U.S. Dist. LEXIS 26072 *; 2011 WL 887806

DORIS D. CRAWFORD, Plaintiff, -against- LUTHERAN MEDICAL CENTER, Defendant.

## Core Terms

alleges, co-workers, hostile, abusive, work environment, retaliation, fianc, hostile work environment, disparate treatment, factual allegations, hostile work environment claim, employees, harassment, quotation, ex-wife, administrative assistant, plaintiff's claim, protected class, discriminatory, communicating, complaining, delusional, baseless, speaking, pleaded, notice, marry

**Counsel:** **[*1]** Doris D. Crawford, Plaintiff, Pro se, Brooklyn, NY.

For Lutheran Medical Center, Defendant: Joan M. Gilbride, LEAD ATTORNEY, Kaufman, Borgeest & Ryan, New York, NY; Laura Baldwin Juffa, Kaufman Borgeest & Ryan LLP, New York, NY.

**Judges:** NICHOLAS G. GARAUFIS, United States District Judge.

**Opinion by:** NICHOLAS G. GARAUFIS

## Opinion

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Judge.

Pro se Plaintiff Doris Crawford ("Crawford"), proceeding *in forma pauperis* under 28 U.S.C. § 1915, brings this

Complaint (Docket Entry # 1) against her former employer, Defendant Lutheran Medical Center ("LMC"), alleging employment discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e et seq. LMC moves to dismiss the action under Federal Rules of Civil Procedure 12(b)(6) and 8(a)(2). For the reasons set forth below, the court grants Defendant's motion in part and denies it in part.

## I. BACKGROUND

Plaintiff, an African-American woman, was employed by LMC as an administrative assistant. (Compl. at 6-7.) [1] She alleges that LMC violated Title VII by "[f]ail[ing] to hire" her, "[t]erminat[ing] [her] employment," allowing or fostering a "hostile work environment," **[*2]** and giving her "[u]nequal terms and conditions of □ employment" because of her race, and further alleges that LMC retaliated against her when she complained about the discrimination to which she was subjected. (*Id.* at 3.)

Plaintiff was "permanently" employed by LMC, though in a probationary status, as an administrative assistant in LMC's executive office beginning on February 11,2008. (*Id.* at 6.) An email attached to her Complaint indicates that Plaintiff worked in some capacity at LMC prior to that date. (*Id.* at 10.) Plaintiff's employment was terminated on March 18, 2008. (*Id.* at 6.) Plaintiff alleges that personal enemies of hers, who did not work at LMC and were "known to [Plaintiff] through [her] religious affiliation, . . . which is one of Jehovah's Witnesses,"

---

[1] Plaintiff's Complaint is comprised of several documents filed with the court together as a single document. For ease of reference the court uses the pagination of the electronic case filing system in referring to Plaintiff's Complaint.

began conspiring against her with Plaintiff's co-workers at LMC. (Id.) Those personal enemies include Mr. Rodney Jones ("Jones"), who Plaintiff alleges has been "involved in crimes against **[\*3]** [Plaintiff] for several years now through harassment, stalking, and other serious means being investigated"; and Ms. Dwani Bush, Plaintiff's alleged fiancé's ex-wife, who Plaintiff alleges "is stalking and harassing" her and her alleged fiancé, a Mr. Kevin Bush. (Id.)

Though Plaintiff states that she does not believe that any of her co-workers at LMC knew Jones or Dwani Bush, she nonetheless alleges that at least two of her co-workers began regularly and frequently communicating with them after Plaintiff started working at LMC. (Id. at 6-7.) Plaintiff alleges that she overheard LMC employee Christian Richardson ("Richardson") "constantly" speaking on the phone with Jones, and that Richardson took time off from work to "visibly] support" Dwani Bush by going to the place "where [Dwani Bush] was being forcibly removed and taken to jail for not leaving premises she'd been given notice prior to several weeks before to leave." (Id.) Plaintiff further alleges that Richardson assisted in Dwani Bush's release from jail, and used a web site to organize other LMC employees to help Dwani Bush. (Id.) She also alleges that LMC employee Thomas Gerardi ("Gerardi") "has taken Dwani Bush into his home **[\*4]** since no one would take her in due to her actions." (Id.) Plaintiff further alleges that an LMC employee she worked for, Karen Lennon ("Lennon"), somehow had knowledge of Plaintiff's problems with Dwani Bush and was "very emotionally attached to the publicly known personal situation." (Id. at 7.)

Plaintiff alleges that LMC employees—primarily Lennon—opposed her decision to marry Kevin Bush because Plaintiff is African American and Kevin Bush's ex-wife, Dwani Bush, is "a young Spanish lady." (Id.) Plaintiff claims that LMC employees preferred Dwani Bush "simply because she is 'Spanish.'" (Id.) As evidence, Plaintiff alleges that "[t]hey made no bones about letting me know that by speaking words, not conversations in Spanish like 'hola,' 'adios' and other." (Id.) Plaintiff also alleges that "[e]ach day Karen [Lennon] and a particular doctor would have their daily conversations about it making it clear they wanted the 'Spanish girl' to be 'remarried' to [Kevin Bush]." (Id.) Plaintiff alleges that "Karen [Lennon] even made the statement that 'they're only fighting over some rings,' 'why don't she just suck it up and let it go' — that was in reference to [Plaintiff] leaving [her] fiancé **[\*5]** to give

him to the 'Spanish girl.'" [2] (Id.) In further support of her claim that LMC employees have a preference for Hispanics, Plaintiff attaches an email to her complaint in which an LMC employee relates a statement made by a third-party to that LMC employee suggesting that LMC has a preference for hiring people with Hispanic last names. (See id. at 10.)

Plaintiff claims that because of the race-based preferences of LMC employees, specifically Lennon, Plaintiff was denied a permanent position as an executive administrative assistant because she is African American. (Id. at 7.) Plaintiff further claims that she was fired in retaliation for complaining about the hostile work environment that resulted from LMC employees becoming involved in her personal feud with Jones and Dwani Bush. (Id. at 6-7.)

## II. DISCUSSION

### A. Legal Standards

#### 1. Notice Pleading Standard

The purpose of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency **[\*6]** of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007). In reviewing the complaint, the court accepts as true all allegations of fact, and draws all reasonable inferences from these allegations in favor of the plaintiff. ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

"[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (quotation omitted). But while "the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest," Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-75 (2d Cir. 2006) (quotation omitted), even a pro se complaint will be dismissed for failing to meet the notice pleading standard of Rule 8(a)(2) if it does not contain "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)

---

[2] Plaintiff also alleges a litany of perceived slights and petty incivilities perpetrated by Lennon against her, which appear to bear no relation to her claims of race discrimination. (See Compl. at 7.)

(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that **[*7]** allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. "[M]ere 'labels and conclusions' or 'formulaic recitation[s] of the elements of a cause of action will not do'; rather, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Arista Records. LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 555). Though courts are required to accept a plaintiff's non-conclusory factual allegations as true, courts may nevertheless determine that the "fantastic [or] delusional" character of some factual allegations renders a plaintiff's claims to relief implausible. See Samuel v. Bellvue Hospital Center, 366 F. App'x 206, 207 (2d Cir. 2010) (finding that "in the context of the fantastic and delusional nature of the majority of his complaint, [the plaintiff] failed to allege sufficient facts to render plausible his conclusory assertion that the defendants discriminated against him on the basis of his membership in a protected class" under Iqbal); see also Tyler v. Carter, 151 F.R.D. 537, 539-40 (S.D.N.Y. 1993) (dismissing complaint containing **[*8]** fantastic and delusional claims sua sponte under Rule 12(b)(6)).

In deciding a motion to dismiss, the court may consider matters of which judicial notice may be taken, as well as documents extrinsic to the complaint where a plaintiff "relies heavily upon [the documents] terms and effect, [thus] rendering] the document integral to the complaint." Chambers v. Time Warner, Inc., 282 F.3d 147,152-53 (2d Cir. 2002) (quotations omitted).

2. Pleading Standard under In Forma Pauperis Statute

The notice pleading standard of Federal Rule of Civil Procedure 8(a)(2) is not the only one that applies to Plaintiff's Complaint. Because Plaintiff is proceeding *in forma pauperis*, the court must dismiss the case if "at any time □ the court determines that the action or appeal is frivolous or malicious." 28 U.S.C. § 1915(e)(2)(B)(i). "[A] complaint, containing as it does both factual allegations and legal conclusions, is frivolous where it lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989). Section 1915(e)(2)(B)(i) "accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the **[*9]** veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless."

Id. at 327. This includes "claims describing fantastic or delusional scenarios, □ with which federal district judges are all too familiar." Id. at 328.

**B. Disparate Treatment Claim**

Plaintiff alleges that she applied for a position at LMC as an executive administrative assistant and was denied that position because she is African American. (Compl. at 7.) "To prevail on a Title VII disparate treatment claim, a plaintiff must ultimately prove that '(1) [she] is a member of a protected class; (2) [she] is competent to perform the job or is performing [her] duties satisfactorily; (3) [she] suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on [her] membership in the protected class.'" La Grande v. DeCrescente Distributing Co., Inc., 370 Fed. Appx. 206, 212 (2d Cir. 2010) (quoting Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005)). At the pleading stage, however, Plaintiff need only allege facts sufficient to support the reasonable inference that Plaintiff **[*10]** suffered an adverse employment action because of her membership in a protected class. See Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); Iqbal, 129 S. Ct. 1937,1949, 173 L. Ed. 2d 868.

In sum and substance, Plaintiff alleges that Lennon, an employee of LMC for whom Plaintiff worked, denied Plaintiff the position for which she applied because Lennon knew that Plaintiff was planning to marry Kevin Bush, and disapproved of Plaintiff's marriage because Lennon preferred that Kevin Bush remarry his ex-wife, Dwani Bush, "because [Dwani Bush] is 'Spanish.'" (Compl. at 7.) Plaintiff's disparate treatment claim, like Plaintiff's hostile work environment claim, hinges on Plaintiff's factual allegations that her co-workers became deeply embroiled in her personal life through the actions of Plaintiff's nemeses—Jones and Dwani Bush—and came to oppose Plaintiff because of Plaintiff's desire to marry Kevin Bush. Plaintiff believes that her co-workers preferred that Kevin Bush remarry Dwani Bush and not Plaintiff because they favor Hispanics over African Americans and Plaintiff is African American. Plaintiff alleges that her co-workers' preference for Hispanics resulted in her being denied the position of executive **[*11]** administrative assistant, and in a hostile work environment.

Although the court is obligated to assume the truth of all factual allegations in the Complaint, it reviews those

allegations to determine whether they "plausibly suggest an entitlement to relief." Iqbal, 129 S. Ct. 1937, 1951, 173 L. Ed. 2d 868. Furthermore, for actions filed in forma pauperis the court is obligated to "dismiss those claims whose factual contentions are clearly baseless." Neitzke, 490 U.S. at 327.

Plaintiff's own Complaint contains troubling indications that her allegations as to the existence of a conspiracy against her are Plaintiff's own delusional beliefs with no basis in fact or reality. Plaintiff never explains how she knew that her co-worker, Richardson, was speaking with Jones and Dwani Bush simply from overhearing his telephone conversations, or how she knew that Dwani Bush started living with her former supervisor, Thomas Gerardi. (Compl. at 6.) Indeed, Plaintiff admits that it is highly improbable that Richardson or Gerardi would know Jones or Dwani Bush, and states that she did not inform anyone of her personal problems with Jones and Bush. (Id.) In a letter to LMC management attached to her Complaint, Plaintiff [*12] stated that she found it "very strange" that Richardson was talking to Jones and Bush, writing that Jones and Bush "are not from New York and basically would be known only to others of us not having been raised here, gone to school here, worked here." (Id. at 9.) Plaintiff assumes that Richardson and Gerardi came into contact with Jones and Dwani Bush through Jones's efforts to "infiltrate☐ [her] work relations." (Id. at 6, 8.) Plaintiff states that Jones has persecuted her "for years" and "finds ways to connect with people [Plaintiff] work[s] with to create a hostile and volatile work environment for [Plaintiff]." (Id.)

Plaintiff's Complaint states that after she sent the letter complaining about the perceived conspiracy against her, an LMC human resources employee interviewed her co-workers about her allegations and told Plaintiff that the people he interviewed "said they had no idea what [Plaintiff] was speaking about." (Id. at 7.) Furthermore, in her letter to LMC executives, Plaintiff admits that Kevin Bush, the man Plaintiff claims is her fiancé, called an employee of LMC to complain that Plaintiff was making harassing phone calls to him from her telephone at work. (Id. at 8.) [*13] According to the letter to LMC management, Plaintiff stated that she had been instructed not to call Kevin Bush while at work, and that she had complied with that instruction. (Id.)

Considered together, Plaintiff's own factual allegations render her claims of disparate treatment implausible, and indicate that the factual predicate of that claim—i.e., the existence of a conspiracy against her—is clearly baseless. Under either Iqbal or 28 U.S.C. §

1915(e)(2)(B)(i), Plaintiff's disparate treatment claim must be dismissed.

## C. Hostile Work Environment Claim

Title VII prohibits employers from "discriminati[ng] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This prohibition on disparate treatment encompasses claims that an employer required "that an employee 'work in a discriminatorily hostile or abusive environment,' so long as the discriminatory conduct at issue is 'severe or pervasive enough to create an objectively hostile or abusive work environment.'" Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (quoting Harris v. Forklift Systems, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). [*14] To state a hostile work environment claim, a plaintiff must plead facts that tend to show that the complained of conduct: (1) is objectively severe or pervasive, that is, it creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates an environment that is discriminatorily hostile or abusive to the plaintiff because of the plaintiff's membership in a protected class. See Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007).

"[A] work environment's hostility should be assessed based on the 'totality of the circumstances.'" Id. (quoting Harris, 510 U.S. at 23). "Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'" Id. The Supreme Court and Second Circuit have repeatedly cautioned that "Title VII does not establish a 'general civility code' for the American workplace." Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004) [*15] (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)). "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." Petrosino, 385 F.3d at 223.

Plaintiff contends that her work environment was "extremely hostile" to her because: her co-workers communicated and maintained relationships with people with whom she has an acrimonious relationship outside

of work (Compl. at 6); Plaintiff's co-workers opposed her marriage to her fiancé because they supported her fiancé's ex-wife, and they discussed their opposition to Plaintiff's marriage behind her back (id. at 7); her co-workers used Spanish words in conversation, thus demonstrating their preference for those of Hispanic origin (id.); and her co-workers, "predominantly Christian Richardson," directed unspecified "verbal taunts on a regular and daily basis" at Plaintiff, apparently as a result of Richardson's alleged friendship with Plaintiff's enemies (id. at 6). Furthermore, Plaintiff alleges that because Lennon knew and disapproved of Plaintiff's decision to marry Kevin Bush, Lennon chose not to work with Plaintiff [*16] professionally. (Id. at 8.)

Plaintiff's hostile work environment claim suffers from the same defect as her disparate treatment claim—i.e., that it is implausible and that the factual predicate is clearly baseless. However, this claim suffers from the additional defect that the Complaint fails to state a claim to relief on a hostile work environment theory. Even in view of the Second Circuit's admonition "against setting the bar too high in this context," Plaintiff's Complaint comes nowhere near to alleging the kind of conduct that a reasonable person could find to create a hostile or abusive work environment. Patane, 508 F.3d at 113 (quotation omitted). The actions of Plaintiff's coworkers, as alleged in the Complaint, amount to nothing more than impolite meddling in Plaintiff's personal life, not "'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" Id. (quoting Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)).

Moreover, Plaintiff's factual allegations are insufficient to support the inference that Plaintiff's work environment was hostile or abusive to Plaintiff *because of her race*. "To prevail [*17] on [a hostile work environment] claim under Title VII, a plaintiff must show not only that the working environment is pervasively hostile or abusive, but also that the conduct creating that atmosphere actually constituted discrimination because of race." Hicks v. Rubin, 6 F. App'x 70, 73 (2d Cir. 2001) (quotation and alterations omitted).

Reading the Complaint liberally, it is clear that the hostile work environment Plaintiff complains of in her Complaint and in her letter to LMC management was the product of her coworkers' alleged involvement in her personal affairs, and their communications with Plaintiff's personal enemies—not race discrimination. Only two of Plaintiff's allegations regarding the hostility of the work environment relate in some way to Plaintiff's

race. First, Plaintiff alleges that Lennon declined to work with Plaintiff because Lennon preferred that Plaintiff's fiancé, Kevin Bush, stay with his ex-wife, Dwani Bush, instead of marrying Plaintiff because Lennon prefers Hispanics, and Dwani Bush is Hispanic and Plaintiff is African American. Second, Plaintiff alleges that her co-workers at LMC occasionally used Spanish phrases, which she contends are evidence of her [*18] co-workers' racial preferences for her fiancé's ex-wife over Plaintiff. (Compl. at 7.) The bulk of Plaintiff's allegations regarding the hostility of her work environment have nothing to do with Plaintiff's race. The Complaint alleges that Plaintiff's acrimonious relationships with two outsiders "infiltrated [her] work relations" and led to the deterioration of her relationships with her fellow co-workers. (See id. at 8.) Assuming for the sake of argument that Plaintiff had actually alleged the existence of an objectively hostile work environment, Plaintiff's allegation that her work environment was hostile or abusive because of her race is simply implausible.

Plaintiff has failed to sufficiently plead a hostile work environment claim. Plaintiff has not pleaded the existence of discriminatory conduct that is objectively severe or pervasive such that a reasonable person could find it to be hostile or abusive. Furthermore, even if Plaintiff had pleaded facts that would be sufficient to permit a reasonable person to conclude that her work environment was objectively hostile or abusive, Plaintiff has failed to plead facts that would be sufficient to permit a plausible inference that her [*19] work environment was hostile because of Plaintiff's race.

## D. Retaliation Claim

Plaintiff alleges that LMC retaliated against her for complaining about her discriminatory treatment to LMC management by terminating her employment. (Id. at 7.) "Title VII □ provides that 'it shall be an unlawful employment practice for an employer to discriminate against any employee because the employee has opposed any practice made an unlawful employment practice by' Title VII." La Grande v. DeCrescente Distributing Co., Inc., 370 F. App'x 206, 212 (2d Cir. 2010) (quoting 42 U.S.C. § 2000e-3(a)) (alterations omitted). "To state a claim for retaliation in violation of Title VII, a plaintiff must plead facts that would tend to show that: (1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there exists a causal connection between the protected activity and the adverse action." Patane, 508 F.3d at

115. "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as [she] can establish that [she] possessed a good faith, reasonable belief that the underlying **[*20]** challenged actions of the employer violated the law." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (applying anti-retaliation provision of Americans with Disabilities Act, 42 U.S.C. § 12203(a)) (quotation omitted); see also La Grande, 370 F. App'x at 212. "The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management." La Grande, 370 F. App'x at 212.

On March 18, 2008, Plaintiff sent a letter to LMC management with the subject line "Harassment, Discrimination and Retirement / VOID RETALIATION," in which she complained that LMC employees created an "extremely hostile work environment" for her by communicating with individuals with whom Plaintiff had an acrimonious relationship outside of work, and by talking amongst themselves about Plaintiff's engagement to her fiancé, thereby involving themselves in Plaintiff's personal affairs. (See Compl. at 8-9.) Plaintiff separately stated:

> As far as discrimination is concerned, it has affected my getting the position in the Executive Office with Karen Lennon because she seemed by her own expression, very averse to my **[*21]** decisions, not that that mattered but it made her chose [sic] to not work professionally in dealing with me.

(Id. at 8.) Plaintiff repeatedly claimed that her co-workers' actions were "illegal in the work place." (Id. at 9.)

Plaintiff alleges that she was called into a meeting at 4:30 pm the same day she sent the letter. (Id. at 6.) At that meeting, Fred Jordan ("Jordan"), an LMC human resources employee, asked Plaintiff questions about her complaint letter, informed Plaintiff that her claims would be investigated, and told her to leave for the day. (Id.) Plaintiff alleges that "[t]he next day, March 19th [she] was told that [her] probation was terminated and not to return to work by the Office Manager." (Id.) On March 20, 2008, Jordan called Plaintiff and told her there had been no investigation into her claims but that "he interviewed some people who said they had no idea what [Plaintiff] was speaking about." (Id. at 7.)

Plaintiff alleges that she engaged in a protected activity

by filing an informal complaint with management in which she complained of a hostile work environment and discrimination that she believed to be illegal, and that she was terminated as a result of that complaint **[*22]** letter. Though the court has determined that the conduct Plaintiff complained of did not violate Title VII, Plaintiff has alleged facts which permit the conclusion that she had a good faith, though erroneous, belief that the conduct she complained of in her complaint letter violated the law. Consequently, Plaintiff's retaliation claim is legally sufficient to survive Defendant's motion to dismiss.

## III. CONCLUSION

Plaintiff has failed to allege a plausible claim to relief on her disparate treatment and hostile work environment claims. Moreover, the factual contentions underlying those claims are clearly baseless. Plaintiff has, however, sufficiently pleaded a claim for retaliation in violation of Title VII. Consequently, Defendant's motion to dismiss is DENIED as to Plaintiff's retaliation claim, and GRANTED as to all other claims.

SO ORDERED.

Dated: Brooklyn, New York

March 9, 2011

/s/ Nicholas Garaufis

NICHOLAS G. GARAUFIS

United States District Judge

---

End of Document



<span>+</span> Positive
As of: July 25, 2017 8:11 PM Z

# Hogans v. Dell Magazines/Penny Press

United States District Court for the Southern District of New York

March 18, 2008, Decided; March 18, 2008, Filed

07 Civ. 7721 (DLC)

**Reporter**
2008 U.S. Dist. LEXIS 20898 *; 2008 WL 719212

DEBRA DENISE HOGANS, Plaintiff, -v- DELL MAGAZINES/PENNY PRESS, Defendant.

**Subsequent History:** Affirmed by Hogans v. Dell Magazines/Penny Press, 2010 U.S. App. LEXIS 7990 (2d Cir., Apr. 19, 2010)

## Core Terms

terminated, motion to dismiss, discriminatory, allegations, documents

**Counsel:** **[*1]** Debra Denise Hogans, Plaintiff, Pro se, Brooklyn, New York.

For Defendant: Steven Eckhaus, Aimee Sato, McCarter & English, LLP, New York, New York.

**Judges:** DENISE COTE, District Judge.

**Opinion by:** DENISE COTE

## Opinion

*OPINION & ORDER*

DENISE COTE, District Judge:

Plaintiff Debra Denise Hogans, proceeding *pro se*, brought this employment discrimination action against her former employer, defendant Dell Magazines/Penny Press ("Dell"), claiming that defendant terminated her employment in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), and the Americans with Disabilities Act ("ADA"). Dell has moved to dismiss, contending that

Hogans has failed to state a claim upon which relief can be granted because she failed to file a charge with the Equal Employment Opportunity Commission ("EEOC") within the prescribed statute of limitations. For the following reasons, the motion to dismiss is granted.

BACKGROUND

The following facts are taken from the Complaint. [1] Hogans worked in Dell's production department for over fourteen years, until her employment was terminated on August 4, 2004. According to Hogans, she was told that the company was "[d]ownsizing." Evidently, she believes **[*2]** that this explanation was pretextual, as she claims that the termination of her employment was due to her national origin (which is unspecified in the complaint), age (fifty-three years at the time of her firing), and disability or perceived disability (knee problems, asthma, glaucoma, and osteoporosis). Along these lines, Hogans makes four specific allegations. First, she alleges that her younger, non-disabled co-worker, Evira Matos, was afforded preferential treatment because, although Hogans did "80% of the work in that

---

[1] Hogans initiated this action by filing a form Complaint for Employment Discrimination along with **[*3]** several supporting documents, including her submission to the EEOC; the EEOC's response to her claim; and her submission to the New York State Division of Human Rights. Under Federal Rule of Civil Procedure 12(b), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co* ., 62 F.3d 69, 72 (2d Cir. 1995) (*per curiam* (citation omitted); *see* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). The instant Complaint thus includes Hogans' form complaint and all attached documents.

department," her employment was terminated and Matos took over Hogans' duties. Second, Hogans claims that her "health problems were becoming bothersome to Dell Magazines/Penny Press." Third, she claims that she was targeted by her coworkers with offensive comments about her health and education, as well as offensive behavior, including her coworkers' going through her personal belongings without permission. Finally, Hogans states that on July 13, 2006, "at a boatride I met a new Dell employee and was told they never stopped profit sharing, bonuses or Christmas parties."

Hogans states that "the alleged discriminatory acts occurred on 8/4/04," the date her employment ended, and that the defendant "is not still committing these acts against me." Nonetheless, she waited nearly three years, until April 2007, to file a form complaint with the EEOC. By letter dated April 30, 2007, the EEOC responded to Hogans' complaint and informed her that, "[u]nder all three of the statutes you invoked, a charge to be timely filed, must be filed with the EEOC within 300 days from [*4] notification of the alleged discriminatory act." According to the EEOC, the clock on Hogans' discrimination claims began to run on the date her employment was terminated, and, therefore, her "charge is untimely filed and the EEOC consequently has no legal jurisdiction to conduct an investigation into this matter."

The instant action was commenced with Hogans' filing of a form complaint for employment discrimination on August 3, 2007. Dell moved to dismiss on January 16, 2008, [2] arguing that Hogans' complaint was untimely filed because of her failure to raise her charges with the EEOC within 300 days of the alleged discriminatory conduct. [3] On February 20, Hogans filed a form affirmation in opposition to defendant's motion. Her affirmation states only that she "had seniority and . . . was the only person downsized from the company," and that her "health problems were becoming bothersome

---

[2] There was substantial delay in service of the summons and complaint on Dell. Service was effectuated on November 29, 2007, and Dell executed and returned the [*5] acknowledgement of service on December 27.

[3] In connection with its motion to dismiss, Dell apprised Hogans of her rights as a *pro se* litigant opposing a Rule 12 motion supported by matters outside the pleadings. It is not immediately clear to what matters outside the pleadings Dell is referring. In any event, this Opinion relies solely on Hogans' complaint and the documents she filed along with it.

to" defendant. It makes no reference to the timeliness of this action, nor does it dispute any of the arguments made by defendant in its motion.

DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted). A court must apply a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). [*6] "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In deciding the motion, a court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citation omitted).

Before a plaintiff brings a Title VII, ADEA, or ADA suit in federal court, "the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-5); *see also* 29 U.S.C. §§ 626(d), 633(b) (setting out the procedural requirements for ADEA claims); 42 U.S.C. § 12117(a) (applying the procedural requirements of § 2000e-5 to ADA claims). This timeliness requirement "is analogous to a statute of limitations." *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 214 (2d Cir. 2006) [*7] (citation omitted). "It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct." *Flaherty v. Metromail Corp* ., 235 F.3d 133, 137 (2d Cir. 2000).

Hogans' complaint makes clear that each act of discrimination she alleges occurred on or before August

2008 U.S. Dist. LEXIS 20898, *7

4, 2004, the day her employment was terminated. Indeed, the injury she complains of is her termination, and so any discriminatory act must predate that event. She does not dispute that her complaint was filed with the EEOC well past the 300-day deadline, nor does she claim that the limitations period should be equitably tolled. Accordingly, the complaint is untimely and must be dismissed.

The only act Hogans identifies that postdates her firing is her discovery on July 13, 2006, that Dell "never stopped profit sharing, bonuses or Christmas parties." Hogans appears to offer this as evidence that Dell did not need to cut its workforce. In any event, this date does not affect the timeliness of Hogans' discrimination claim because by August 4, 2004, she "knew or had reason to know of the injury serving as the basis for [her] [*8] claim," *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999), thus triggering the running of the 300-day period. Anything she might have learned about her former employer's current practices on July 13, 2006 was irrelevant to the allegedly discriminatory acts leading up to the termination of her employment.

CONCLUSION

Defendant's January 16, 2008 motion to dismiss is granted. The Clerk of Court shall close the case.

SO ORDERED:

Dated: New York, New York

March 18, 2008

/s/ Denise Cote

DENISE COTE

United States District Judge

---

**End of Document**



Positive
As of: July 25, 2017 8:11 PM Z

# Robinson v. Purcell Constr. Corp.

United States Court of Appeals for the Second Circuit

April 25, 2016, Decided

No. 15-3365

## Reporter

647 Fed. Appx. 29 *; 2016 U.S. App. LEXIS 7627 **

MARY E. ROBINSON, Plaintiff-Appellant, -v.- PURCELL CONSTRUCTION CORPORATION, Defendant-Appellee.

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Subsequent History:** US Supreme Court certiorari denied by Robinson v. Purcell Constr. Corp., 2016 U.S. LEXIS 5828 (U.S., Oct. 3, 2016)

**Prior History:** [**1] Appeal from the United States District Court for the Northern District of New York (Suddaby, C.J.).

Robinson v. Purcell Constr. Corp., 2015 U.S. Dist. LEXIS 126445 (N.D.N.Y, Sept. 22, 2015)

## Core Terms

termination, amend, res judicata, occurrence

## Case Summary

### Overview

HOLDINGS: [1]-The district court properly dismissed a former employee's amended complaint against a former employer on the ground that res judicata barred her retaliation claims of failure to rehire because the circumstances surrounding the employee's termination were fully adjudicated in a seven-day trial; [2]-Whether the employee attempted to, or succeeded at, amending her complaint had no bearing on whether the claims she

desired to amend arose from the same transaction or occurrence because those already litigated and decided.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

**HN1**[] **Standards of Review, De Novo Review**
The court of appeals reviews de novo the dismissal of a plaintiff's claims based upon res judicata principles.

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

**HN2**[] **Preclusion of Judgments, Res Judicata**
A claim may be barred by res judicata if (1) the prior action involves a judgment on the merits, (2) whether the prior action involves the same parties or those in privity, and (3) whether the claims asserted in the action were, or could have been, asserted in the prior action. The third element is further analyzed under the "transactional test," which applies three inquiries: (1) whether the underlying facts are related in time, space, origin, or motivation, (2) whether the underlying facts "form a convenient trial unit, and (3) whether their

treatment as a unit conforms to the parties' expectations.

Civil Procedure > Pleading & Practice > Pleadings > Amendment of Pleadings

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

*HN3*[ ]  **Pleadings, Amendment of Pleadings**
When a plaintiff's motion to amend the complaint is denied and the plaintiff subsequently brings the amendments as a separate lawsuit, it is not the actual decision to deny leave to amend that forms the basis of the bar. In fact, the actual decision denying leave to amend is irrelevant to the claim preclusion analysis. Regardless of whether a plaintiff attempts to bring the additional claims in an initial suit, and regardless of whether plaintiff meets with success in that attempt, the res judicata bar is based on the requirement that the plaintiff must bring all claims at once against the same defendant relating to the same transaction or event.

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

*HN4*[ ]  **Preclusion of Judgments, Res Judicata**
The application of res judicata is not subject to equitable considerations.

**Counsel:** For PLAINTIFF-APPELLANT: A.J. BOSMAN, Bosman Law Firm, L.L.C, Canastota, NY.

FOR DEFENDANT-APPELLEE: THOMAS M. MEALIFFE (Joseph J. Ortego, Juan Luis Garcia, on the brief), Nixon Peabody LLP, Jericho, NY.

**Judges:** PRESENT: RALPH K. WINTER, RICHARD C. WESLEY, GERARD E. LYNCH, Circuit Judges.

# Opinion

[*29]  **SUMMARY ORDER**

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgment of the District Court is AFFIRMED.

Plaintiff Mary E. Robinson ("Plaintiff") appeals a decision

of the United States District Court for the Northern District of New York (Suddaby, *C.J.*) dismissing her amended complaint alleging employment discrimination and retaliation claims against Defendant Purcell Construction Company ("Defendant"). Plaintiff's claims arise from the August 1, 2008 termination of her employment by Defendant.[1]

[*30]  *HN2*[ ]  A claim may be barred by *res judicata* if (1) the prior action involves a [**2] judgment on the merits; (2) whether the prior action involves the same parties or those in privity; and (3) whether the claims asserted in the action were, or could have been, asserted in the prior action. *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000). The third element is further analyzed under the "transactional test" of the Restatement (Second) of Judgments, which applies three inquiries: (1) whether the underlying facts are "related in time, space, origin, or motivation;" (2) whether the underlying facts "form a convenient trial unit;" and (3) whether their "treatment as a unit conforms to the parties' expectations." *Channer v. Dep't of Homeland Sec.*, 527 F.3d 275, 280 (2d Cir. 2008); Restatement (Second) of Judgments § 24(2) (1982).

*HN3*[ ]  "[W]hen a plaintiff's motion to amend the complaint is denied and the plaintiff subsequently brings the amendments as a separate lawsuit, 'it is not the actual decision to deny leave to amend that forms the basis of the bar ... In fact, the actual decision denying leave to amend is irrelevant to the claim preclusion analysis.'" *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000) (quoting *Northern Assur. Co. of America v. Square D. Co.*, 201 F.3d 84, 88 (2d Cir. 2000)). Regardless of whether a plaintiff attempts to bring the additional claims in an initial suit, and regardless of whether plaintiff meets with success in that attempt, the *res judicata* bar "is based on the requirement that the plaintiff must bring all claims at once against [**3] the same defendant relating to the same transaction or event." *Northern Assur. Co.*, 201 F.3d at 88.

Plaintiff argues here that the District Court should not have ruled that *res judicata* bars her retaliation claims of failure to rehire in the instant case because these acts

---

[1] *HN1*[ ]  We review *de novo* the dismissal of a plaintiff's claims based upon *res judicata* principles. *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007). We assume the parties' familiarity with the facts and record below, which we reference only as necessary to explain our decision.

constituted a distinct and different transaction from that at issue in the previous litigation. Plaintiff argues that in her earlier action, "the transaction and occurrence at issue was Plaintiff's treatment and separation from employment on a particular day in August 2008, whereas the transaction and occurrence in the instant action involves conduct that occurred weeks or months later." Appellant's Br. 14-15 (internal quotation marks omitted)). Plaintiff adds that it is "unfair" to bar her claims because "prior to the trial testimony given by Defendant's officers, Plaintiff did not suspect or allege that the reason she was not 'returned' was due to her filing a complaint" with the New York State Division of Human Rights. Appellant's Br. 18.

There is no dispute that there has already been a final judgment on the merits regarding claims asserted against Defendant related to Plaintiff's 2008 termination, and thus the first two elements of claim preclusion [**4] are clearly met. With respect to the third element, Defendant persuasively argues that "Plaintiff's claims, on their face, reveal that they were or could have been asserted in the [earlier action] because they are based on the very same occurrences—her termination—and non-occurrences—her continued separation from employment—that were tried before a jury in the [earlier action]." Appellee's Br. 25.

We agree with Defendant that Plaintiff's separation from employment on August 1, 2008 "is the key factual component of her present claims." Appellee's Br. 25. Although Defendant's senior officers' testimony may not have been available to Plaintiff until the time of trial in February [*31] 2013, this testimony related to the same "transaction and occurrence" that was fully litigated in that trial, *i.e.,* Plaintiff's termination in August 2008. As of August 2008, Plaintiff's understanding was that her termination by Defendant was "permanent."[2] Regardless of whether her discharge is called a layoff, termination, firing, or failure to rehire, the fact remains that the circumstances surrounding Plaintiff's termination in August 2008 were fully adjudicated in a seven-day trial in February 2013.[3] She is thus [**5]

barred from bringing those claims again.

Our analysis is no different simply because the District Court denied Plaintiff's motion to amend to conform the pleadings [**6] to the proof, nor is it different because a panel of this Court previously suggested that Plaintiff's present failure-to-rehire theory was "in considerable tension with" her theory that she had been terminated rather than laid off. *Robinson v. Dibble*, 613 F. App'x 9, 13 (2d Cir. 2015) (summary order). Whether Plaintiff attempted to (or succeeded at) amending her complaint has no bearing on whether the claims she desired to amend arose from the same transaction or occurrence as those already litigated and decided. Similarly, Plaintiff's complaint that it is "unfair" to not allow her to bring these claims is unavailing because *HN4*[⬆] the application of *res judicata* is not subject to equitable considerations. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401, 101 S. Ct. 2424, 69 L. Ed. 2d 103 (1981).

We have considered all of Plaintiff's remaining arguments and find them to be without merit. Accordingly, we AFFIRM the judgment of the District Court.

---

End of Document

---

[2] Not only did Plaintiff plead and then testify to this at the February 2013 trial, but she may never have survived summary judgment on her initial discrimination and retaliation claims had she accepted that her termination was merely a seasonal layoff or regular reduction in workforce.

[3] Plaintiff concedes that "[i]t does not matter whether her discharge is called a lay-off, termination, firing, permanent lay-off, failure to rehire, or banishment." Reply Br. 10. She then

argues that "[w]hat matters is what motivated the permanent end to Plaintiff's work." Reply Br. 10. But this is precisely what was already litigated and adjudicated at trial in February 2013. As the District Court observed, "based on the facts [Plaintiff] knew before trial, or the facts that she reasonably should have known before trial, she could have pled the claim ... that she was *laid off and not recalled* as a result of complaining of discrimination in the *alternative* to her claim that she was *fired* on August 1, 2008, for complaining of discrimination." Special App'x 11.



🟢 Positive
As of: July 25, 2017 8:11 PM Z

# Smith v. Cuomo

United States District Court for the Eastern District of New York

September 30, 2007, Decided; September 30, 2007, Filed

06-CV-3181 (JS)(WDW)

**Reporter**

2007 U.S. Dist. LEXIS 97105 *

JONATHAN K. SMITH, a member of the Shinnecock Indian Nation, a/k/a SHINNECOCK SMOKE SHOP, residing and with his place of business on the Shinnecock Indian Nation Reservation, Plaintiff, - against - ANDREW M. CUOMO, in his official capacity as Attorney General of the State of New York, Defendant.

**Subsequent History:** Affirmed by Smith v. Cuomo, 2009 U.S. App. LEXIS 467 (2d Cir. N.Y., Jan. 12, 2009)

## Core Terms

Counts, Letters, tax law, Treaty, res judicata, state court, rights, allegations, speedy, lack of standing, transactions, prior action, merits, tribe, contends, parties, futile, lack of subject matter jurisdiction, preliminary injunction, motion to dismiss, requested relief, injunctive, reasons, factual allegations, res judicata effect, efficient remedy, instrumentality, redressed, requests, grounds

**Counsel:** [*1] For Plaintiff: Scott Michael Moore, Esq., Moore International Law Offices, P.C., New York, NY.

For Defendant: Ralph Pernick, Esq., Attorney General's Office, Mineola, NY.

**Judges:** Joanna Seybert, U.S.D.J.

**Opinion by:** Joanna Seybert

## Opinion

*MEMORANDUM AND ORDER*

SEYBERT, District Judge,

*INTRODUCTION*

On June 28, 2006, Plaintiff Jonathan K. Smith, a member of the Shinnecock Indian Nation, ("Plaintiff") commenced this action against Eliot Spitzer, [1] in his official capacity as Attorney General of the State of New York ("Defendant"). Presently pending before the Court are numerous motions, including (1) Defendant's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim, (2) Plaintiff's motion for a preliminary injunction, (3) Plaintiff's motion for leave to file a Third Amended Complaint, (4) Plaintiff's motion to consolidate the underlying action with *Smith v. Everson*, No. 06-CV-791, and (5) Plaintiff's request for a pre-motion conference. [2] For the reasons set forth

---

[1] Plaintiff initially commenced this action against Eliot Spitzer, in his official capacity as Attorney General of the State of New York. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, when Andrew M. Cuomo replaced Mr. Spitzer as Attorney General, Mr. Cuomo, in his official capacity, automatically substituted Mr. Spitzer as Defendant in this action. The Court directs that the caption be updated accordingly.

[2] After the motions were fully briefed, both parties filed numerous letters with the Court citing supplemental authority. The Court reviewed and considered all authority cited by the parties. To the extent that such authority is not binding on the Court or is irrelevant to the claims asserted (*e.g.*, a report from the Attorney General's Office on the alleged misuse of state aircraft, dated July 23, 2007), the Court does not discuss such

herein, Defendant's motion to dismiss is GRANTED, and Plaintiff's motion for leave to file a Third Amended Complaint is DENIED. Accordingly, Plaintiff's motions **[*2]** for a preliminary injunction, to consolidate, and for a pre-motion conference are rendered moot.

## BACKGROUND

Familiarity with the facts of this case are presumed. In the event the parties require a detailed refresher, they are directed to review the Order, dated January 16, 2007 ("January Order"), dismissing the Amended Complaint, **[*3]** granting Plaintiff leave to file a Second Amended Complaint, and denying Plaintiff's motion for a preliminary injunction. [3] The gravamen of Plaintiff's claims is that any attempt to enforce or threat to enforce certain New York State statutes violates Plaintiff's rights under various sections of the Constitution, federal laws, treaties, and general policies of the United States concerning Indians.

### I. Plaintiff's Article 78 Proceeding

On or about April 25, 2005, Plaintiff commenced an Article 78 proceeding in Supreme Court, Albany County, under index number 2494-05. Plaintiff commenced the Article 78 proceeding after he was contacted by Discover Network and Cardservice International concerning the February Letters. Through the Article 78 proceeding, Plaintiff sought to stay the enforcement of PHL § 1399-ii and sought a declaratory judgment that PHL § 1399-ii was invalid as applied to Plaintiff. Plaintiff's asserted right to this relief was based on the Fort Albany Treaty.

On June 22, 2005, Supreme Court Justice Nicholas A. Clemente dismissed Plaintiff's Article 78 proceeding. *See Smith v. Spitzer*, No. 2494-05 (N.Y. Sup. Ct. Albany County June 22, 2005). **[*4]** The dismissal was affirmed by the Appellate Division, Third Department. *See Smith v. Spitzer*, 28 A.D.3d 1047, 814 N.Y.S.2d 338 (App. Div. 2006).

In sum, Justice Clemente held that (1) Plaintiff's purported injury was not attributable to any government function or activity; therefore an Article 78 proceeding did not lie, (2) Plaintiff lacked standing to sue under the Fort Albany Treaty of 1664, and (3) Plaintiff failed to join the Shinnecock tribe as a necessary party. The Appellate Division agreed with the lower court and

_____

authority.

[3] Capitalized terms used but not defined herein are defined in the January Order.

added that Plaintiff's remaining arguments were either moot or, upon review, found to be without merit. (*Id.*)

### II. The Current Action

Plaintiff filed the Complaint on June 28, 2006 alleging three claims arising from the Initial Letters. On July 20, 2006, Plaintiff filed the First Amended Complaint to add a fourth count, which arises from the Gutlove Letter, dated June 28, 2006, the date on which the Complaint was filed. The January Order dismissed all four counts based on lack of standing. Specifically, Counts I-III, which are based on the Initial Letters, were dismissed because Plaintiff failed to allege that the injury claimed **[*5]** would be redressed by a favorable decision, and Count IV, which is based on the Gutlove Letter, was dismissed because Plaintiff failed to allege an actual or imminent injury.

Pursuant to the January Order, Plaintiff filed a Second Amended Complaint on January 24, 2007. The Second Amended Complaint is nearly identical, with respect to Counts I-IV, to the Amended Complaint and adds a fifth count. Once again, Plaintiff claims that by sending the Initial Letters (Counts I-III) and the Gutlove Letter (Count IV), Defendant violated (1) a treaty guarantee of free trade under the articles of The Fort Albany Treaty, 1664 (the "Fort Albany Treaty"), ("Articles between Col. Cartwright and the New York Indians," Documents Relative to the Colonial History of the State of New York, III, pp. 67-68); (2) the Contract Clause of the United States Constitution, art. I, s. 10 cl. 1; (3) the Indian Commerce Clause of the United States Constitution, art. I, s. 8, cl. 3, and 18 U.S.C. §§ 1151 et seq., specifically 18 U.S.C. § 1162 and 28 U.S.C. § 1360; (4) the policy of the Congress of the United States concerning Indians; and (5) the trustee relationship of the government of the United States as trustee **[*6]** and guardian of the Plaintiff as a result of his membership in the Shinnecock Indian Nation. The only additional allegation in the first four counts appears in paragraph 28. Namely, Plaintiff alleges that five weeks after Defendant sent the Gutlove Letter, Defendant's false allegations, pressure, and threats, caused Gutlove, under duress, to reduce shipment of PhillipMorrisUSA ("PhillipMorris") products to Plaintiff by 90% during the month of August 2006 and by an additional 35% from the first week in September 2006 to January 2007. (2d Am. Compl. P 28.) Count V, which also arises from the Gutlove Letter, is premised on the theory that Defendant violated, and continues to violate, the Interstate Commerce Clause. (*Id.* P 33.)

The Second Amended Complaint also differs from the

Amended Complaint in the relief it requests. Plaintiff continues to request declaratory and injunctive relief. [4] Specifically, Plaintiff seeks (1) a declaratory judgment that PHL § 1399-ii is "invalid, as applied to Plaintiff" and to transactions between Plaintiff and each of the Merchants, (2) a declaratory judgment that N.Y. Tax Law § 471-e is "invalid, as applied to Plaintiff" and to transactions between Plaintiff [*7] and Gutlove and PhillipMorris, (3) a declaratory judgment that N.Y. Tax Law § 471-e is not in effect, and (4) injunctive relief prohibiting the application of PHL § 1399-ii and N.Y. Tax Law § 471-e as to transactions between Plaintiff and each of the Merchants and Gutlove and PhillipMorris, respectively. (*Id.* PP 34-38.) In addition, Plaintiff requests that Defendant be required to (a) send written notice to each of the Merchants, Gutlove, and PhillipMorris withdrawing the prior letters (*i.e.*, the Initial Letters and the Gutlove Letter) and (b) refrain from sending any future letters threatening enforcement of PHL § 1399-ii and N.Y. Tax Law § 471-e as to transactions between Plaintiff and each of the Merchants and Gutlove and PhillipMorris, respectively. (*Id.* PP 35, 37, 39.) Defendant moves to dismiss the Second Amended Complaint and opposes Plaintiff's motions for a preliminary injunction, leave to file a Third Amended Complaint, and consolidation.

## DISCUSSION

### I. Defendant's Motion To Dismiss

The Defendant moves to dismiss the Second Amended Complaint [*8] on two grounds. First, Defendant moves to dismiss for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). Second, Defendant moves to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Usually the issue of jurisdiction must be resolved before this Court can address whether the Plaintiff has sufficiently stated his claims. *See Rhulen Agency, Inc. v. Alabama Ins. Guaranty Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (A "motion to dismiss for failure to state a claim may be decided only after finding subject matter jurisdiction.") (citations omitted). In this case, however, Defendant's arguments under Rule 12(b)(6) concerning *res judicata* are substantially intertwined with Plaintiff's Article III standing and, therefore, the two arguments will be discussed simultaneously.

### A. Standard Of Review On Motion To Dismiss

#### 1. Rule 12(b)(1)

In considering a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the Court may consider affidavits and other materials beyond the pleadings to resolve jurisdictional questions. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 n.6 (2d Cir. 2001). [*9] Under Rule 12(b)(1), the Court will deem true the factual allegations contained in the complaint. *See Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997). When, however, there is a question involving federal jurisdiction, such jurisdiction must be shown affirmatively. *See Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (citing *Norton v. Larney*, 266 U.S. 511, 515, 45 S. Ct. 145, 69 L. Ed. 413 (1925)). Accordingly, the Court will not draw references favorable to the party asserting jurisdiction. *See id.*

#### 2. Rule 12(b)(6)

In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the Supreme Court disavowed the half-century old standard set forth in *Conley v. Gibson* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), (*overruled by Bell Atl. Corp.*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Holding that "*Conley's* 'no set of facts' language has been questioned, criticized, and explained away long enough," the [*10] Supreme Court expressly rejected the standard in favor of a requirement that the plaintiff plead enough facts "to state a claim for relief that is plausible on its face." *Bell Atl. Corp.*, 127 S. Ct. at 1969, 1974. The Court explained that the complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 1965. To be clear, *Bell Atlantic* does not require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is plausible on its face." *Id.* at 1974.

The Second Circuit has interpreted *Bell Atlantic* to require "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). Moreover, in applying this new standard, the district court must still accept the factual allegations set forth in the Complaint as true and

---

[4] The Second Amended Complaint, unlike the Amended Complaint; does not request relief related to N.Y. Tax Law § 1814 and N.Y. Penal Law § 20.00.

draw all reasonable inferences in favor of Plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005).

B. *Lack Of Subject Matter Jurisdiction*

Defendant **[*11]** asserts that this Court lacks subject matter jurisdiction over the instant action based on three independent reasons: (1) Plaintiff's lack of standing under Article III of the United States Constitution, (2) the principal of sovereign immunity embodied in the Eleventh Amendment, and (3) the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341. [5] Additionally, although not a jurisdictional challenge, Defendant argues that *res judicata* precludes Plaintiff from bringing this action.

This Court previously dismissed Counts I-IV for lack of standing. (January Order at 13.) Specifically, the Court found that (a) Plaintiff failed to allege that the injury claimed as a result of the Initial Letters (Counts I-III) would likely be redressed by a favorable decision and (b) Plaintiff failed to allege that he suffered an actual or imminent injury as a result of **[*12]** the Gutlove Letter (Count IV). Plaintiff contends that he has addressed the deficiencies identified in the January Order by adding additional requests for relief (Compl. PP 34-39) and alleging actual injury as a result of the Gutlove Letter. (*Id.* P 28.) Defendant disputes this contention and points to recent New York case law, which causes this Court to reconsider determinations made in the January Order. [6]

1. *Article III Standing*

To bring suit, Article III, Section 2 of the United States Constitution requires that a person have standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Article III limits the jurisdiction of federal courts to claims that are "cases" or "controversies," and standing is an essential element of the case-or-controversy requirement. U.S. CONST. art. III, § 2; *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 64, 117 S. Ct. 1055,

137 L. Ed. 2d 170 (1997). "The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction **[*13]** have 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions'." *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 72, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)).

In order to satisfy the standing requirement, a plaintiff must meet an "irreducible constitutional minimum", which requires

> (1) that the plaintiff have suffered an injury in fact - an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of - the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) **[*14]** (citing *Lujan*, 504 U.S. at 560-561).

a. *The Initial Letters - Counts I, II, And III*

The Court previously determined that Plaintiff satisfied the first two prongs of the standing inquiry with respect to Counts I-III but dismissed the action for failure to allege or offer any support to show that the requested relief would restore Plaintiff's relationships with the Merchants or that it would be likely to have such effect. (January Order at 10.) Specifically with respect to the second standing requirement - causal connection - the Court explained that

> Although Justice Clemente, and presumably the Appellate Division, had the benefit of reviewing the February Letters, this Court cannot ignore the fact that within several months after the Initial Letters were sent, the Merchants terminated their respective relationships with Plaintiff. Such facts indicate a fairly traceable link between the Initial Letters and the injury claimed.

January Order at 10.

---

[5] The Court finds Defendant's arguments regarding Eleventh Amendment sovereign immunity without merit based on the *Ex parte Young* exception. Because, however, the Court finds that it lacks subject matter jurisdiction based on Defendant's first and third arguments, it does not engage in a detailed analysis of the Eleventh Amendment and *Ex parte Young*.

[6] Revisiting a prior determination is entirely within the Court's discretion. *See Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001).

i. *Causal Connection And Res Judicata*

Based on new case law that has been brought to the Court's attention and prior case law that the Court apparently overlooked, it now reconsiders its determination regarding the causation requirement of standing.  **[*15]** As noted above and in the January Order, the state court held that Plaintiff lacked standing to bring the Article 78 proceeding. (January Order at 5.) Specifically, Justice Clemente held that there was no

> evidence which would indicate that the credit card companies acted on the basis of [the February Letters], particularly as [the February Letters] were written several months prior to the date upon which petitioner was allegedly contacted by the credit card companies. In fact, the purported injury suffered by petitioner is not attributable to any government function or activity, but rather appears to be the result of the credit card companies' 'longstanding policies that prohibit the use of their credit cards for illegal transactions.'

*Smith v. Spitzer*, No. 2494-05, slip op. at 4-5 (Sup. Ct. June 22, 2005) (citation omitted). The Appellate Division, in affirming the lower court's dismissal, further stated that "it cannot be said that petitioner suffered an injury attributable to respondent's actions." *Smith v. Spitzer*, 28 A.D.3d 1047, 1048, 814 N.Y.S.2d 338 (App. Div. 2006).

Plaintiff now comes before this Court, bringing an action against the same Defendant that he sued in state court,  **[*16]** making identical allegations. To be fair, Plaintiff alleges additional and subsequent facts in the Second Amended Complaint, which the Court will address in turn. The allegations made in the Article 78 proceedings concerning the February Letters, however, are the same factual allegations that are made in Counts I and II of the Second Amended Complaint, although Plaintiff now alleges that additional rights were violated by these same actions. In addition, Plaintiff requests the same type of relief that he sought in his Article 78 proceeding - injunctive and declaratory relief. In light of the foregoing, Defendant also urges this Court to accord the Article 78 proceeding *res judicata* effect.

Pursuant to 28 U.S.C. § 1738, federal. courts "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984). This rule holds true "even if there is jurisdiction to hear the merits of the claim, and

the claim is otherwise properly presented." *McKithen v. Brown*, 481 F.3d 89, 103 (2d Cir. 2007). As such,  **[*17]** the Court must look to New York law to determine whether *res judicata* applies.

The doctrine of *res judicata*, or claim preclusion, is based on the theory that "a valid final judgment bars future actions between the same parties on the same cause of action." *Parker v. Blauvelt Volunteer Fire Co., Inc.*, 93 N.Y.2d 343, 347, 712 N.E.2d 647, 690 N.Y.S.2d 478 (1999). Essentially, "it prevents a plaintiff from raising a claim that was or could have been raised in a prior suit." *McKithen*, 481 F.3d at 104. New York courts employ a "transactional approach" to claim preclusion. *Id.* In other words, "if claims arise out of the same 'factual grouping' they are deemed to be part of the same cause of action and the later claims will be barred without regard to whether it is based upon different legal theories or seeks different or additional relief." *Davidson v. Capuano*, 792 F.2d 275, 278 (2d Cir. 1986). Under New York law, claim preclusion bars a subsequent action if the Court finds that

> (1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have  **[*18]** been, raised in the prior action.

*Pike v. Freeman*, 266 F.3d 78, 91 (2d Cir. 2001) (internal quotation marks and citation omitted).

Plaintiff contends that Defendant's *res judicata* argument must fail for two reasons: (1) Article 78 proceedings are limited, summary-type proceedings and (2) the Article 78 proceeding was dismissed on procedural grounds; there was no adjudication on the merits. (Pl.'s Opp'n to Dismiss Am. Compl. 9.) Plaintiff's first argument need not detain the Court very long. There is no *per se* rule against giving Article 78 proceedings preclusive effect provided that the relief sought in the subsequent proceeding was available to the plaintiff in the prior action. *See Collard v. Inc. Village of Flower Hill*, 759 F.2d 205, 206-07 (2d Cir. 1985) (affirming dismissal of subsequent federal action on grounds of res judicata following an unsuccessful Article 78 proceeding); *Fulani v. MacKay*, No. 06-CV-3747, 2007 U.S. Dist. LEXIS 22415, at *19 (giving preclusive effect to a prior Article 78 proceedings that declined to declare a New York statute unconstitutional) (S.D.N.Y. March 29, 2007); *Bess v. Spitzer*, 459 F. Supp.2d 191, 199 (E.D.N.Y. 2006) (affording prior Article 78 proceeding  **[*19]** preclusive effect where plaintiff sought

injunction barring continued criminal prosecution). Here, Plaintiff requests the same type of relief that he sought in his Article 78 proceeding - injunctive and declaratory relief. Consequently, provided that the elements of *res judicata* are satisfied, an Article 78 proceeding may preclude a subsequent action.

Plaintiff's second argument, however, poses a more difficult question for the Court. Generally, "dismissal for lack of subject matter jurisdiction is not an adjudication of the merits, and hence has no res judicata effect." *St. Pierre v. Dyer*, 208 F.3d 394, 400 (2d Cir. 2000) (holding no preclusion where the prior action was dismissed for lack of Article III standing). As Defendant has brought to the Court's attention, however, when an action is dismissed for lack of standing and the litigant has failed to cure his lack of standing, New York courts afford the prior decision *res judicata* effect. *See Landau, P.C. v. LaRossa, Mitchell & Ross*, 41 A.D.3d 371, 372, 838 N.Y.S.2d 773 (App. Div. 2007); *see also Mrazek v. Suffolk County Bd. of Elections*, 630 F.2d 890, 898 n.10 ("We note only that the issue of [plaintiffs'] standing, by all accounts, **[*20]** has been determined adversely to them in the state courts and that decision is binding upon us under principles of res judicata."); *Tycon Tower I Inv. Ltd. P'ship v. John Burgee Architects*, No. 95-CV-6951, 1999 U.S. Dist. LEXIS 13305, at *26 (S.D.N.Y. Aug. 30, 1999) ("There is ample support for the legal conclusion that a prior decision on lack of standing has a res judicata effect as to that litigant."); *Pullman Group, LLC v. Prudential Ins. Co. of Am.*, 297 A.D.2d 578, 747 N.Y.S.2d 170 (App. Div. 2002) ("Since a dismissal premised on lack of standing is not a dismissal on the merits for res judicata purposes, plaintiff is not precluded from reasserting the same claims based on *newly conferred rights which cure the prior lack of capacity*.") (emphasis added); *Burns v. Egan*, 117 A.D.2d 38, 42, 501 N.Y.S.2d 742 (App. Div. 1986) ("Res judicata effect may be given to the narrow ground on which the earlier adjudication was premised.").

Although this Court may not necessarily agree with the rationale of the state court, it is bound to give the same preclusive effect to its decision as New York State courts would afford to such decision. *See Migra*, 465 U.S. at 81. Because Plaintiff's factual allegations **[*21]** regarding the cause of his injuries in Counts I and II are identical to the allegations made in his Article 78 proceeding - namely, that several months after receiving the February Letters, Cardservice International and Discover Network terminated their relationships with Plaintiff, Plaintiff has failed to cure his standing deficiency. (2d Am. Compl. PP 10-11, 15-16; *Smith*, No.

2494-05, slip op. at 4.) Accordingly, this Court is bound by the state court's decision, and Plaintiff is precluded from bringing claims that were or could have been raised in the Article 78 proceeding. *See McKithen*, 481 F.3d at 104.

Additionally, the state court went on to find that the Fort Albany Treaty did not bestow upon Plaintiff any rights as an individual tribal member and also stated that, "upon review," Plaintiff's remaining arguments were without merit. [7] *Spitzer*, 28 A.D.3d at 1048-49. Such a determination, although couched in terms of "standing," does not refer to Article III standing, but rather Plaintiff's standing under the Fort Albany Treaty - a determination on the merits. *See Motorola Corp. v. Uzan*, 388 F.3d 39, 55 (2d Cir. 2004) (explaining that a dismissal for lack of statutory standing under **[*22]** RICO is one on the merits rather than for lack of subject matter jurisdiction); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 129-30 (2d Cir. 2003) (holding that lack of statutory standing "is not jurisdictional in nature . . . but is rather an element of the merits addressed under a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim"); *see also Bess v. Spitzer*, 459 F. Supp. 2d 191, 200 (E.D.N.Y. 2006) (giving *res judicata* effect to a prior state-court decision where the state court discussed the merits of the case after finding no standing) (*citing Williams v. Ward*, 556 F.2d 1143, 1154 (2d Cir. 1977) (holding that alternative procedural and substantive grounds for dismissal did not "rob the substantive grounds of res judicata effect as to any identical claim")). As such, even if the Court were not bound by the state court's Article III standing determination, the state-court decision also addressed

_____

[7] Plaintiff submitted supplemental authority from the Ninth Circuit to support his contention that individual tribal members can enforce rights conferred to Indian tribes in treaties. *See United States v. Smiskin*, 487 F.3d 1260, 1272 (9th Cir. 2007). **[*23]** Besides the fact that *Smiskin* is not binding on this Court and that it involves a different treaty and different tribes than this case, the *Smiskin* court did not analyze whether the treaty at issue conferred rights on the individual tribal members or only the tribe. In fact, the Yakima Nation was an intervenor in the action. *Id.* Moreover, the *Smiskin* court relied heavily on a prior Ninth Circuit case interpreting the same treaty, in which the tribe was an intervening party. *See Cree v. Flores*, 157 F.3d 762, 764 (9th Cir. 1998). Moreover, in *Smiskin*, there was no prior action raising *res judicata* issues and no Article III standing issue. Although Plaintiff offers *Smiskin* as supplemental authority, *Smiskin* does not share many of the issues raised by the underlying action. Thus, the Court is unpersuaded that it should follow the holding in *Smiskin* rather than binding precedent.

the merits of Plaintiff's claim.

Since it is undisputed that the previous action involved the same parties as the underlying action, the Court now analyzes whether the claims set forth in the Second Amended Complaint were or could have been raised in the state court action.

> Whether or not the first judgment will have preclusive effect depends in **[*24]** part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first.

*Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 289 (internal quotation marks and citation omitted); *see also O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357, 429 N.E.2d 1158, 445 N.Y.S.2d 687 (1981) ("once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy"). To determine whether two actions arise from the same transaction or series of transactions, the Court "look[s] to whether the underlying facts are related in time, space, origin, or motivations, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Pike*, 266 F.3d at 91 (internal quotation marks omitted).

Defendant argues that Counts I, II, and III arise out of the same transaction or series of transactions and are based upon the same legal theories that were raised or could **[*25]** have been raised in Plaintiff's Article 78 proceeding. Plaintiff does not make any arguments with respect to whether the claims brought here were or could have been raised in the Article 78 proceeding; he simply contends that there was no adjudication on the merits.

The letters underpinning Counts I and II, which were the subject of the prior action, were sent within several months of the June letter, on which Count III is premised. Moreover, based on the allegations, the content of the June Letter was substantially similar to the February Letters and was sent by Defendant for the same reason. Accordingly, Count III involves the "same course of conduct" as Counts I and II and, therefore, clearly arises from the same series of transactions. *NLRB v. United Tech. Corp.*, 706 F.2d 1254, 1260 (*quoting Lawlor*, 349 U.S. at 327-28).

In the Article 78 proceeding, Plaintiff claimed that PHL § 1399-ii was invalid based on his guaranteed right to free trade pursuant to the Fort Albany Treaty. A theory he raises in Counts I-III of this action. Here, however, he also raises other legal theories - namely, that application of PHL § 1399-ii as against him and the transactions in which he enters is also **[*26]** barred by the Contract Clause, pre-emption of New York State's jurisdiction under the Indian Commerce Clause and various federal statutes, policy of the United States concerning Indians, and the trustee relationship between the United States and Plaintiff - all of which Defendant urges could have been raised in the prior action. Plaintiff offers no argument disputing the assertion that these theories could have been raised in his Article 78 proceeding. Clearly, constitutional challenges to state statutes may be brought in state court proceedings. *See Bess*, 459 F. Supp. 2d at 195 (involving a challenge to New York tax laws as unconstitutional brought in an Article 78 proceeding). All of the statutes, rights, and principles that Plaintiff now claims that Defendant violated, would have been violated at the time he brought the Article 78 proceeding. Additionally, as previously noted, Plaintiff sought the same relief in both actions and, therefore, this case does not involve a situation in which the relief now sought was not available to Plaintiff at the time of the prior proceeding. *See, e.g., Marvel Characters v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002).

Having determined that all the elements **[*27]** of claim preclusion under New York law are satisfied, the Court finds Plaintiff's claims, as set forth in Counts I, II, and III of the Second Amended Complaint, are precluded by the doctrine of *res judicata*. Accordingly, Defendant's motion to dismiss is GRANTED with respect to Counts I, II, and III.

### ii. *Redressability*

Furthermore, the Court still finds Plaintiff's allegations concerning redressability wanting. The Second Amended Complaint now seeks relief so that Plaintiff and each of the Merchants "may repair and restore their business relationships." (2d Am. Compl. P 35.) Namely, Plaintiff asks the Court to enjoin enforcement of PHL § 1399-ii as to transactions between Plaintiff and the Merchants and to require Defendants to send written notices to the Merchants withdrawing the Initial Letters and refrain from future letters similar to the Initial Letters. (*Id.*) Unlike the First Amended Complaint, where the Court was left to make assumptions and draw inferences, Plaintiff at least has alleged that the relief requested will allow Plaintiff and the Merchants to work

on repairing and restoring their relationships. Plaintiff still fails, however, to allege that the Merchants will or are **[*28]** likely to restore their relationships with Plaintiff. *See Bennett*, 520 U.S. at 167. As alleged, the restoration of such relationships remains speculative. Consequently, Plaintiff also lacks constitutional standing to bring Counts I, II, and III.

### b. *Gutlove Letter - Counts IV And V*

#### i. *Injury In Fact*

Pursuant to the January Order, Plaintiff's fourth count was dismissed for failure to allege an actual or imminent injury. (January Order at 11.) As previously noted, a plaintiff's injury must be "imminent, not conjectural or hypothetical." *Bennett*, 520 U.S. at 167. The Second Amended Complaint remedies this deficiency. Plaintiff alleges that the Gutlove Letter caused Gutlove, under duress, to reduce the shipment of PhillipMorris products to Plaintiff by 90% within approximately two months of the date of the letter. (2d Am. Compl. P 28.) Subsequently, shipment was reduced an additional 35%. (*Id.*) For the reasons discussed in Section II.A.I of the January Order, the Court finds such statements sufficient to allege an injury in fact - loss of business.

#### ii. *Causal Connection*

The Court questions, however, whether Plaintiff has sufficiently alleged a causal connection between the loss of business **[*29]** and the Gutlove Letter. Plaintiff alleges that, in the Gutlove Letter, Defendant wrongfully pressured and threatened Gutlove to "terminate its business relationship with Plaintiff by threatening liability under New York State law of the vendor continued to conduct business with Plaintiff." (2d Am. Compl. P 27.) Satisfaction of the causation requirement is belied by the fact that Gutlove continues to do business with Plaintiff, albeit at a reduced level. (*Id.* P 28.)

#### iii. *Redressability*

Furthermore, with respect to redressability, Plaintiff makes the same requests for relief with respect to Counts IV and V as he makes with respect to Counts I-III. [8] (*Id.* PP 36-37.) For the reasons discussed in Section I.B.1.a.ii, *supra*, Plaintiff failed to sufficiently allege that it would be likely that Gutlove and PhillipMorris would restore their relationships with

Plaintiff if afforded the relief requested.

Accordingly, Plaintiff lacks standing to assert the claims in Counts IV and V.

#### iv. *Res Judicata As To Counts IV And V*

Defendant also contends that Counts IV and **[*30]** V are barred by *res judicata* because they are premised on a claim that arises from the same factual grouping as the prior action, and Plaintiff could have raised the legal theories brought here in the prior litigation but failed to do so. The Gutlove Letter is dated June 28, 2006 and speaks to Plaintiff's violation of N.Y. Tax Law § 471-e, which, the letter states, went into effect on March 1, 2006. The Article 78 proceeding, which involved the application of PHL § 1399-ii as against Plaintiff, was commenced in April 2005. Moreover, the Supreme Court, Albany County, dismissed the action on June 22, 2005, and the Appellate Division affirmed on April 27, 2006. Although Defendant's motive in sending the Gutlove Letter may have been the same as that for sending the Initial Letters, it involves a law that was not even scheduled to become effective until one month prior to the Appellate Division's affirmance and a letter, the Gutlove Letter, that was not sent until approximately two months after the final decision. Under these circumstances, the Court finds that Plaintiff could not have brought claims concerning the Gutlove Letter in his Article 78 proceeding. Accordingly, such claims are **[*31]** not barred by *res judicata*.

### 2. *TIA* [9]

The Court also lacks jurisdiction over Counts IV and V based on the TIA. The TIA bars federal district courts from enjoining or restraining the collection of state taxes "where a plain, speedy, and efficient remedy may be had" in state court. 28 U.S.C. § 1341. The purpose of the TIA is to "limit drastically federal district court

---

[8] Count V, although new to the Second Amended Complaint, is based on the same facts as alleged with respect to Count IV - the Gutlove Letter.

---

[9] Defendant argues that both the TIA and the doctrine of comity, existing before enactment of the TIA in 1937, bar this Court from exercising jurisdiction. For purposes of this analysis, the principles associated with both the TIA and doctrine of comity appear to be similar. *See Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 116 n.8, 102 S. Ct. 177, 70 L. Ed. 2d 271 (1981) ("We discern no significant difference, for purposes of the principles recognized in this case, between remedies which are 'plain, adequate, and complete' as that phrase has been used in articulating the doctrine of equitable restraint, and those which are 'plain, speedy and efficient,' within the meaning of [the TIA]."). Accordingly, the Court refers only to the TIA in its analysis.

jurisdiction to interfere with so important a local concern [*32] as the collection of taxes." *California v. Grace Brethren Church*, 457 U.S. 393, 408-09, 102 S. Ct. 2498, 73 L. Ed. 2d 93 (1982). Defendant argues that the TIA bars this Court from exercising subject matter jurisdiction with respect to Counts IV and V, pursuant to which Plaintiff seeks this Court to enjoin application of N.Y. Tax Law § 471-e as against Plaintiff and declare the law "not in effect." Plaintiff opposes this argument based on three reasons: (1) Plaintiff does not seek to enjoin, suspend, or restrain the assessment or collection of a New York State tax; (2) a plain, speedy, and efficient remedy is not available in state court; and (3) the federal instrumentality doctrine.

a. *Relief Requested*

Plaintiff simply asserts that nowhere in the Second Amended Complaint does he request the Court to issue an injunction to restrain collection of taxes. (Pl.'s Opp'n to Dismiss 2d Am. Compl. 9.) Without any support or further explanation, the Court cannot agree. N.Y. Tax Law § 471-e requires that cigarettes purchased on an Indian reservation from persons who are not members of the tribe be taxed. Plaintiff clearly requests this Court (1) to issue a declaratory judgment that N.Y. Tax Law § 471-e [*33] is "invalid, as applied to Plaintiff and to transactions between Plaintiff and [Gutlove] and PhillipMorrisUSA," (2d Am. Compl. P 36.) (2) to enjoin "the enforcement of any provision of NY Tax Law § 471-e as to transactions between Plaintiff and [Gutlove] and PhillipMorrisUSA," (*Id.* P 37.A.) and (3) to declare that N.Y. Tax Law § 471-e "is not in effect." (*Id.* P 38.) If Plaintiff were to obtain the relief sought, New York State would be prohibited from collecting taxes on cigarettes that Plaintiff sells to non-Indians and individuals who are not members of the Shinnecock Indian Nation. Thus, the Court is not persuaded by Plaintiff's first conclusory argument.

b. *Plain, Speedy, And Efficient Remedy*

"Two conditions must exist before the TIA can be invoked[:]" (1) taxes and (2) the state remedies available to Plaintiff must be "plain, speedy and efficient." *Hattem v. Schwarzenegger*, 449 F.3d 423, 427 (2d Cir. 2006). Plaintiff contends that because Plaintiff's Article 78 proceeding was dismissed on procedural grounds, he does not have a plain, speedy and efficient remedy available to him in state court.

Defendant argues that simply because Plaintiff is unhappy with the outcome of his state-court [*34] action does not mean that such action was not an adequate

remedy for purposes of the TIA. As such, Defendant asserts that the Article 78 proceeding afforded Plaintiff a plain, speedy and efficient remedy, regardless of the outcome. Furthermore, Defendant argues that Plaintiff was denied relief based on a substantive ground - no standing under the Fort Albany Treaty - not purely procedural grounds.

As an initial matter, the Court notes that according to the Appellate Division's decision, Plaintiff's Article 78 proceeding challenged the application of PHL § 1399-ii as to Plaintiff; it did not involve enforcement of N.Y. Tax Law § 471-e. *Smith v. Spitzer*, 28 A.D.3d 1047, 814 N.Y.S.2d 338 (App. Div. 2006). The fact that Plaintiff's Article 78 proceeding challenging PHL § 1399-ii was dismissed based on lack of standing should have no impact on Plaintiff's ability to challenge enforcement of N.Y. Tax Law § 471-e in a plain, speedy and efficient proceeding.

In addition, Defendant cites *Day Wholesale, Inc. v. State of New York*, as further evidence that Plaintiff has an adequate remedy in state court. No. 2006-7668, slip op. (Sup. Ct. Erie County Jan. 2, 2007.) In *Day Wholesale*, the plaintiffs sought a temporary [*35] restraining order and preliminary injunction, by way of an order to show cause, restraining defendants from enforcing provisions of N.Y. Tax Law § 471-e. (*Id.* at 1.) The court granted the preliminary injunction, finding that N.Y. Tax Law § 471-e

> is not in effect because on March 1, 2006 and subsequent thereto there has not been any actions taken or rules and regulations issued that would be necessary to implement the provisions of this act. Moreover, even if the statute was deemed to be in effect, the statute cannot function as written, the most notable reason being that Indian tax exemption coupons do not exist.

*Id.* at 5. Plaintiff disputes Defendant's reliance on *Day Wholesale*, claiming that *Day Wholesale* only involved an attack on the validity of the statute on its face, while this action involves an assertion of Indian rights. The Court fails to see the distinction in this case.

Plaintiff contends that N.Y. Tax Law § 471-e is not in effect based on the same reasons asserted by plaintiffs in *Day Wholesale* - the rules, regulations and Indian tax exemption coupons were never issued. (2d Am. Comps. P 32.) Based on this conclusion, Plaintiff takes issue with the Gutlove Letter and Defendant's [*36] threat to enforce N.Y. Tax Law § 471-e and contends that Defendant violated numerous Constitutional provisions.

(*Id.* PP 29, 33.) While Plaintiff may claim violation of different rights than the plaintiffs in *Day Wholesale*, he seeks the same remedy based on the same reasons.

Plaintiff cites only to his state case to support his argument that he has no plain, speedy and efficient state remedy. Defendant, on the other hand, cites to cases that establish that a plaintiff may challenge the constitutionality of a New York State tax statute by seeking a declaratory judgment without having to exhaust administrative remedies. *See Empire State Bldg. Co. v. New York State Dep't of Taxation and Fin.*, 185 A.D.2d 201, 201-02, 586 N.Y.S.2d 597 (App. Div. 1992); *Two Twenty E. Ltd. P'ship v. New York State Dep't of Taxation and Fin.*, 185 A.D.2d 202, 586 N.Y.S.2d 596 (App. Div. 1992). In addition, the Supreme Court has recognized the availability of a declaratory judgement in New York State courts as a plain, speedy and efficient remedy under the TIA. *Tully v. Griffin, Inc.*, 429 U.S. 68, 75-76, 97 S. Ct. 219, 50 L. Ed. 2d 227 (1976).

Accordingly, the Court finds that Plaintiff has a "plain, speedy and [*37] efficient" remedy in the New York State courts to challenge application and enforcement of N.Y. Tax Law § 471-e.

c. *Federal Instrumentality Doctrine*

"There is a well-recognized exception to the Tax Injunction Act of 1937 where the United States sues to protect itself or its instrumentalities from state taxation." *United States v. County of Nassau*, 79 F. Supp. 2d 190, 192 (E.D.N.Y. 2000). This exception is commonly referred to as the federal instrumentality doctrine. The core issue in analyzing applicability of this doctrine is whether "the particular institution threatened with taxation is so closely related to governmental activity as to become tax immune." *Id.* (citations omitted).

Plaintiff contends that because the United States could have brought this action on behalf of Plaintiff as trustee, the federal instrumentality doctrine applies. The cases cited by Plaintiff were all brought by the United States itself or by an Indian tribe, in which it was "reasonably clear" that the United States could have brought the action itself. *See Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463, 96 S. Ct. 1634, 48 L. Ed. 2d 96 (1976) (finding it "reasonably clear" that the United States could [*38] have brought the action by itself or as a co-plaintiff); *Heckman v. United States*, 224 U.S. 413, 32 S. Ct. 424, 56 L. Ed. 820 (1912) ; *United States v. Rickert*, 188 U.S. 432, 23 S. Ct. 478, 47 L. Ed. 532 (1903).

Again, Plaintiff offers no support for his conclusory statement that the United States could have brought this action on behalf of Plaintiff. Plaintiff is an individual, not an Indian tribe, and he is not suing on behalf of an Indian tribe. The facts do not support a finding that Plaintiff's activity "is so Closely related to governmental activity as to become tax immune." *County of Nassau*, 79 F. Supp. 2d at 192. Consequently, the Court finds the federal instrumentality doctrine inapplicable. The TIA, therefore, is an additional bar to this Court's jurisdiction over Counts IV and V.

In sum, the Court lacks jurisdiction over Plaintiff's action and, therefore, Defendant's motion to dismiss is GRANTED.

II. *Leave To Amend*

Plaintiff seeks a fourth attempt to plead his case. Plaintiff requests leave to file a Third Amended Complaint solely to add a sixth cause of action asserting a new legal theory based on a United Nations' human rights treaty ratified by the United States in 1994, [*39] entitled the United Nations' International Convention on the Elimination of All Forms of Racial Discrimination. *See* International Convention on the Elimination of All Forms of Racial Discrimination, adopted by the U.N. General Assembly Dec. 21, 1965, 660 U.N.T.S. 195 (ratified by the United States June 24, 1994) ("CERD"). The premise of proposed Count VI is that Defendant, in failing to recognize and honor Plaintiff's treaty and other Indian rights, has engaged in racial discrimination based on Plaintiff's status as an aborigine Shinnecock Indian in violation of CERD. (Prop. 3d Am. Compl. P 35.) Plaintiff seeks the identical relief he sought in the Second Amended Complaint and, except as noted, the Third Amended Complaint is identical to the Second Amended Complaint, over which the Court found it lacked jurisdiction.

A. *Legal Standard*

Rule 15(a) provides that, where, as here, a responsive pleading has been served, a party may amend only by leave of Court. Fed. R. Civ. P. 15(a). In general, leave to amend should be freely granted, unless there is undue delay, bad faith, futility, or prejudice to the non-moving party, and the decision to grant or deny a motion to amend rests within the [*40] sound discretion of the district court. *See Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 603-04 (2d Cir. 2005); *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). Defendant opposes Plaintiff's motion for leave to amend based on grounds of futility, undue delay, and

prejudice to Defendant.

B. *Futility*

"A proposed amendment is futile when it fails to state a claim upon which relief can be granted." *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990). A determination of futility is governed by the same standards as a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). Under Rule 12(b)(6), the Court must accept as true all the factual allegations in the Complaint and draw all reasonable inferences in favor of Plaintiff. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989); *see also Bolt Elec. Inc. v. City of New York*, 53 F.3d 465, 469 (2d. Cir. 1995). As noted above, a court may dismiss an action, pursuant to Rule 12(b)(6), if the plaintiff failed to plead "enough facts to state a claim to relief that [*41] is plausible on its face." See *Bell Atlantic Corp.*, 127 S. Ct. at 1974; *see also Iqbal*, 490 F.3d at 157-58. "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp.*, 127 S. Ct. at 1965. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).

To the extent Plaintiff seeks to bring Count VI based on Defendant sending the Initial Letters, any amendment would be futile. As previously determined, Plaintiff is precluded from bringing any claims that were or could have been brought in the prior action. To the extent Plaintiff contends that Defendant violated his rights under CERD by sending the Initial Letters, Plaintiff is seeking identical relief based on the same set of facts under a new legal theory. *See O'Brien*, 54 N.Y.2d at 357 ("once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, *even if based upon different theories* or if seeking [*42] a different remedy") (emphasis added). The theory espoused in Count VI, however, was available to be raised at the time Plaintiff brought his Article 78 proceeding. The United States ratified CERD in 1994. That Plaintiff may not have learned of CERD until after the state-court action or not realized that it was an argument he could make is of no moment. The fact remains that CERD existed and could have been raised by Plaintiff in the prior action. Accordingly, Count VI, to the extent premised on the Initial Letters and actions underlying the Article 78 proceeding, is barred by *res judicata*.

To the extent Plaintiff alleges that his rights under CERD were violated as a result of Defendant sending the Gutlove Letter and other actions not connected to the prior action, *res judicata* does not preclude such a claim. Nonetheless, the Court finds amendment would be futile because it would lack jurisdiction over such claim. The relief requested in the proposed Third Amended Complaint is identical to the relief requested in the Second Amended Complaint. Having already determined that Plaintiff's proposed CERD claim would be precluded with respect to the facts and claims underlying Counts I-III, [*43] the Court turns to the relief requested in connection with Counts IV and V.

As set forth above, Plaintiff asks this Court to declare invalid, and enjoin enforcement of, N.Y. Tax Law § 471-e as against Plaintiff and his transactions with Gutlove and PhillipMorris and to declare such law not in effect. Plaintiff seeks the identical relief as a remedy to his proposed CERD claim. (Prop. 3d Am. Compl. PP 43, 44.) The Court previously determined, however, that it lacks jurisdiction to grant such relief under the TIA. Having already concluded that Plaintiff has a speedy, fair and efficient remedy in state court, although he may not like the outcome, and that the federal instrumentality doctrine does not apply, the Court would lack jurisdiction over the CERD claim to the extent Plaintiff seeks the Court to invalidate and enjoin enforcement of N.Y. Tax Law § 471-e.

Moreover, the Court finds amendment would be futile because the CERD does not provide a private right of action. Plaintiff argues that Article 6 of the CERD is clearly self-executing and, therefore, he does have a private right of action under the CERD.

> Self-executing treaties are those that immediately create rights and duties of private [*44] individuals which are enforceable and [are] to be enforced by domestic tribunals. Non-self-executing treaties require implementing action by the political branches of government or . . . are otherwise unsuitable for judicial application.

*Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 163 (2d Cir. 2003) (internal quotation marks and citations omitted). Article 6 of the CERD provides:

> States Parties shall assure to everyone within their jurisdiction effective protection and remedies, through the competent national tribunals and other State institutions, against any acts of racial discrimination which violate his human rights and fundamental freedoms contrary to this Convention,

as well as the right to seek from such tribunals just and adequate reparations . . .

CERD, Art. 6. This section states that the member countries "shall assure" that their citizens are afforded protection under the CERD. It does not, by itself, "immediately create rights and duties of private individuals." *Flores*, 414 F.3d at 233. Furthermore, as recognized by other courts in this Circuit, the United States, when ratifying the CERD, expressly declared that "the provisions of the Convention are not self-executing." *Hayden v. Pataki*, No. 00-CV-8586, 2004 U.S. Dist. LEXIS 10863, at *23 (S.D.N.Y. June 14, 2004) **[*45]** (*quoting United States v. Perez*, 2004 U.S. Dist. LEXIS 7500, at *52 (D. Conn. April 29, 2004) (*citing* U.S. Senate Resolution of Advice and Consent to Ratification of the CERD, 140 Cong. Rec. S7634-02 (June 24, 1994); U.S. Senate Resolution of Advice and Consent to Ratification of the ICCPR, 138 Cong. Rec. S4781, S4783 (daily ed. Apr. 2, 1992) (declaring that "the provisions of articles 1 through 27 of the Covenant are not self-executing."))); *see also Rotar v. Placer County Superior Court*, No. 07-CV-0044, 2007 U.S. Dist. LEXIS 28212, at *2-3 (E.D. Cal. April 16, 2007) (concurring with *Hayden* and *Perez*); *Johnson v. Quander*, 370 F. Supp. 2d 79, 101 (D.D.C. 2005) (same). Based on the foregoing, the Court finds that the CERD does not provide a private cause of action.

Because the Court agrees that any amendment to include a CERD claim would be futile, it does not address Defendant's other arguments. Plaintiff's motion for leave to file a Third Amended Complaint is DENIED.

III. *Remaining Requests*

In light of the foregoing, Plaintiff's motion for a preliminary injunction, to consolidate this case with *Smith v. Everson*, No. 06-CV-791, and for a pre-motion conference are rendered moot. The Court, **[*46]** however, notes its full agreement with the decision rendered by United States District Court Sandra J. Feuerstein on August 6, 2007 denying Plaintiff's motion to consolidate the underlying action with *Smith v. Everson*.

*CONCLUSION*

For the reasons stated herein, the Defendant's motion to dismiss the Second Amended Complaint is GRANTED. Plaintiff's motions (1) for a preliminary injunction, (2) for leave to amend, (3) to consolidate, and (4) for a pre-motion conference are DENIED. The Clerk of the Court is directed to mark this matter CLOSED.

SO ORDERED.

/s/ Joanna Seybert

Joanna Seybert, U.S.D.J.

Dated: September 30, 2007

Central Islip, New York

---

**End of Document**



ⓘ Cited
As of: July 25, 2017 8:11 PM Z

# Fulani v. Mackay

United States District Court for the Southern District of New York

March 29, 2007, Decided ; March 29, 2007, Filed

06 Civ. 3747 (GBD)

**Reporter**

2007 U.S. Dist. LEXIS 22415 *; 2007 WL 959308

LENORA B. FULANI, et al., Plaintiffs, -against- FRANK MACKAY, et al., Defendants.

## Core Terms

voting, parties, res judicata, disbanding, Rights, state court, state-court, citations, motion to dismiss, Election, damages, political party, complain, county committee, preclearance, injunction, counties, federal court, proceedings, weighted, color of state law, district court, declaring, necessary party, qualification, asserting, electoral, injuries, litigate, violates

**Counsel:** [*1] For Lenora B Fulani, Fred Newman, Robert Conroy, Gerald Everett, Steven Gallo, Bronx County Interim County Organization of the Independence Party, Kings County Interim County Organization of the Independence Party, Queens County Interim County Organization of the Independence Party, Brenda Levy, Jenifer Pepen, Donald Stephens, Plaintiffs: Gary N. Sinawski, LEAD ATTORNEY, Harry Kresky, LEAD ATTORNEY, Law Offices of Harry Kresky & Gary Sinawski, New York, NY.

For Naomi Azulay, Christina Fantauzzi, Nathalia John, Plaintiffs: Harry Kresky, LEAD ATTORNEY, Law Offices of Harry Kresky, New York, NY.

For Frank MacKay, Defendant: James Edward Long, LEAD ATTORNEY, Law Office of James E. Long, Albany, NY; Ruth M. Liebesman, Ruth M. Liebesman, Attorney-at-Law, New York, NY.

For Board of Elections in the City of New York, Defendant: Stephen Edward Kitzinger, LEAD ATTORNEY, New York City Law Depart, Office of the Corporation Counsel, New York, NY.

For New York State Board of Elections, Defendant: Patricia Lynn Murray, LEAD ATTORNEY, NYS Board of Elections, Albany, NY.

**Judges:** George B. Daniels, United States District Judge.

**Opinion by:** George B. Daniels

## Opinion

MEMORANDUM DECISION AND ORDER

[*2] GEORGE B. DANIELS, District Judge:

After being removed from their positions within New York's Independence Party by the State Committee of the Independence Party of the State of New York ("State Committee"), and after unsuccessfully seeking to nullify that removal in state court, plaintiffs commenced this action raising various federal statutory and Constitutional claims, again in an attempt to reverse the action taken against them by the State Committee. Plaintiffs also seek damages pursuant to 42 U.S.C. § 1983. Several of the defendants--Frank MacKay, Thomas Connolly, William Bogart, and the State Committee (collectively "Defendants")--moved to dismiss pursuant to Fed. R. Civ. P. 12(b). [1] The motion is granted.

## BACKGROUND

---

[1] Two other defendants--The State of New York Board of Elections and the Board of Elections of the City of New York-- did not join the motion to dismiss.

Plaintiffs are the Interim County Organizations ("ICOs") [*3] for Kings, Queens, and Bronx counties, the chairperson of each ICO, elected members of the State Committee and the New York County Committee of the Independence Party of the State of New York, and enrolled members of the State Independence Party in Kings, Queens, and Bronx counties (collectively "Plaintiffs"). Compl. PP 1-7. Defendant MacKay was the Chairperson of the State Independence Party, defendant Connolly was a Vice Chair of the party, and defendant Bogart was the Secretary of the State Committee and of the Executive Committee of the State Committee. Id. at PP 8-10.

In 2000, State Independence Party rules were amended to allow State Committee members, living in a county that was unable to constitute a county committee, [2] to form an ICO for that county. Id. at PP 37, 41. The ICO is essentially a sub-committee of the State Committee, with the same authority to issue local certificates of authorization and nomination as county committees. Id. at P 38. Another rule change provided that State Executive Committee members could be recalled without cause by a weighted vote of fifty-five percent (55%) of State Committee members. Id. at P 42. The weighted voting system [*4] allows a State Committee member to cast the number of votes that the party's gubernatorial candidate received, in the last election, in the assembly district that the State Committee member represents. Id. at P 16.

On September 8, 2005, plaintiff Fulani, and five others allied with her on the Executive Committee, were removed from the Executive Committee by a weighted vote of seventy-four percent (74%) to twenty-six percent (26%). Compl. P 82. Thereafter, on February 4, 2006, the Executive Committee adopted a resolution to disband the ICOs in Bronx, Kings, and Queens counties (the "Resolution"). Id. P 88; Affidavit of Robert Conroy, sworn to July 10, 2006 ("Conroy Aff.") Ex. B. The Resolution was allegedly passed because "the leadership of the Independence Party in the Counties of Kings, Queens, and the Bronx is and has refused to disassociate itself" from an organization operated by plaintiffs Fulani and Newman, "which has been [*5] exposed by the media as promoting anti-Semitic ideas and engaging in activities which have spurred criminal investigations." Compl. P 91; Conroy Aff. Ex. B. The State Committee passed the Resolution by a weighted vote of seventy-five percent (75%) to twenty-two percent

(22%). Compl. P 89. As a result, all political functions of the Independence Party within these three counties, including the authorization and/or nomination of candidates for public office, reverted to the State Executive Committee. [3] Id. at P 97. The Resolution was not precleared with the United States Department of Justice. Id. at P 99.

Plaintiffs responded by filing suit in New York Supreme Court, Kings County. Id. at P 102. The case was dismissed without prejudice because it was brought in the wrong form. Id. at P 103. Plaintiffs then recommenced the action as an Article 78 [*6] proceeding. Id. at P 104; N.Y. C.P.L.R. § 7801 et seq. On April 20, 2006, the New York Supreme Court held that the disbanding of the ICOs was a permissible act of party governance. Compl. P 104.

Following that adverse decision in the Article 78 proceeding, Plaintiffs commenced the instant case, claiming that: (1) the Resolution is null and void because it was never precleared pursuant to section 5 of the Voting Rights Act, 42 U.S.C. § 1973c; (2) the weighted voting method utilized by the State Committee violates the Equal Protection Clause of the 14th Amendment to the United States Constitution; (3) New York's system for constituting county committees violates the freedom of association guaranteed by the First and Fourteenth Amendments; and (4) the Resolution deprives members of the Independence Party in Bronx, Kings, and Queens counties of their freedom of association in violation of the First and Fourteenth Amendments. Compl. PP 109-114, 117-18, 121, 124-28. [4] Plaintiffs seek an injunction declaring that the Resolution is null and void, and reinstating the Bronx, Kings, and Queens county ICOs; an injunction declaring that [*7] section 2-104 of New York Election Law is unconstitutional; a judgment declaring that Plaintiffs' constitutional rights have been violated and an injunction against further violations; and damages, plus attorneys' fees and costs.

---

[3] Under party rules, the State Committee performs these functions for counties that cannot constitute a county committee and have not formed an ICO.

[4] Plaintiffs also moved for a preliminary injunction and an order declaring the Resolution null and void. Defendants filed motions opposing preliminary injunctive relief and moving to dismiss the Complaint for failure to state a claim. On August 16, 2006, arguments were held on the preliminary injunction and on Defendants' motion to dismiss, at which time this Court denied Plaintiffs' motion for a preliminary injunction.

---

[2] See N.Y. Election Law § 2-104 (1976).

Defendants argue, in support of their motion to dismiss, that Plaintiffs lack standing, that Plaintiffs failed to join necessary parties, that this Court lacks jurisdiction under the *Rooker-Feldman* doctrine, that Plaintiffs' claims are barred by res judicata, and that Plaintiffs have failed to state a claim for which relief can be granted. [5]

 **[*8]** In deciding Defendants' motion to dismiss, the Court must "accept as true the complaint's factual allegations and draw all inferences in [Plaintiffs'] favor." Cleveland v. Caplaw Enter., 448 F.3d 518, 521 (2d Cir. 2006) (citation and alterations omitted). Dismissal is only appropriate if "it appears beyond doubt that [Plaintiffs'] can prove no set of facts in support of [their] claim which would entitle [them] to relief." Field Day, LLC v. County of Suffolk, 463 F.3d 167, 192 (2d Cir. 2006) (citation omitted).

## MOTION TO DISMISS

### I. Standing

"'The irreducible constitutional minimum of standing contains three elements': (1) there must be an 'injury in fact,--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;' (2) there must be 'a causal connection between the injury and the conduct complained of;' and (3) 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Port Wash. Teachers' Ass'n v. Bd. of Educ., 478 F.3d 494, 2007 U.S. App. LEXIS 4262, 2007 WL 601612, *2 (2d Cir. Feb. 27, 2007) **[*9]** (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). Plaintiffs bear the burden of establishing these three elements. Id. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." Lujan, 504 U.S. at 561.

Here, Plaintiffs allege that their right to associate with each other has been infringed by the passage of the Resolution disbanding the three ICOs. They further allege that § 2-104 of New York Election Law unduly restricts the constituting of county committees and has prevented Plaintiffs from constituting committees in Bronx, Kings, and Queens Counties, in violation of their

freedom of association. Finally, Plaintiffs allege that the weighted voting system used by the State Committee and the Executive Committee to pass the Resolution disbanding the ICOs violates the Constitutional mandate of one person one vote. If true, Plaintiffs have identified concrete injuries that were actually suffered and not hypothetical or conjectural. Although Defendants claim that Plaintiffs have not suffered an actual injury because no plaintiff **[*10]** is a candidate for office, they fail to articulate why that is necessary for Plaintiffs to have standing in these circumstances.

### II. Joinder of Necessary Parties

Defendants argue that because Plaintiffs are seeking to invalidate § 2-104 of the New York Election Law, which would impact other political parties within the state, the other political parties are necessary parties to this action. Thus, Defendants maintain, Plaintiffs' failure to join these indispensable parties warrants dismissal of this claim.

A person is necessary and must be joined as a party to an action, pursuant to Rule 19, if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a) **[*11]** .

Here, Defendants do not claim that the other political parties in New York fit within either of the two categories of "necessary" parties. Rather, they merely assert that a judgment in Plaintiffs' favor might "affect" the other political parties. That the other political parties might be affected--even negatively affected--by a holding invalidating § 2-104, does not make them necessary parties. See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377, 387 (2d Cir. 2006) (stating that it is not enough, to be a necessary party under Rule 19(a), "for a third party to be adversely affected by the outcome of the litigation").

As the other political parties are not "necessary" parties under Rule 19(a), they cannot be "indispensable" parties, under Rule 19(b), requiring dismissal of this

---

[5] Originally, Defendants also moved to dismiss for insufficiency of process, lack of venue, and lack of subject matter jurisdiction, but those arguments were later withdrawn.

case absent their joinder. See id. at 389 ("If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b).") (citation omitted).

## III. Rooker-Feldman

"Under [the] Rooker-Feldman doctrine, federal district courts lack jurisdiction over suits that are, in substance, [*12] appeals from state-court judgments." Brody v. Village of Port Chester, No. 00 Civ. 7481, 2007 U.S. Dist. LEXIS 15746, 2007 WL 704002, *5 (S.D.N.Y. Mar. 07, 2007) (citations and internal quotation marks omitted). Up until recently, many courts, including within this Circuit, "applied the Rooker-Feldman doctrine expansively" so that it was "effectively coextensive with doctrines of claim and issue preclusion." Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005) (citations omitted). In Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005), however, the United States Supreme Court "pared back the Rooker-Feldman doctrine to its core." Hoblock, 422 F.3d at 85. As the Court in Exxon explained, application of the Rooker-Feldman doctrine is limited to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp., 544 U.S. at 284. Thus, if a federal-court plaintiff asserts an independent claim, [*13] even one that denies a legal conclusion reached in state court, "there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." Id. at 293 (citations omitted).

Following Exxon, the Second Circuit outlined four requirements for the application of Rooker-Feldman (1) "the federal-court plaintiff must have lost in state court"; (2) "the plaintiff must complain of injuries caused by a state-court judgment"; (3) "the plaintiff must invite district court review and rejection of that judgment"; and (4) "the state-court judgment must have been "rendered before the district court proceedings commenced." Hoblock, 422 F.3d at 85 (citation, alterations, and internal quotation marks omitted). The court then articulated the following formula to help guide the inquiry: "a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." Id. at 88. And more recently, the Second Circuit further explained [*14] that "[a] party

is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed prior in time to the state-court proceedings, and so could not have been 'caused by' those proceedings." McKithen v. Brown, 481 F.3d 89, 2007 U.S. App. LEXIS 5763, 2007 WL 744728, *6 (2d Cir. Mar. 13, 2007).

In this case, Plaintiffs complain of actions taken by Defendants in passing the Resolution disbanding the ICOs. These actions were not "produced by a state-court judgment"; rather, at most, the actions were ratified and left unpunished by the state court's decision finding that the passage of the Resolution was a valid act of party governance. Moreover, the alleged injuries that Plaintiffs say they suffered existed prior in time to the state court proceedings. In fact, it was Defendants' actions and the alleged injuries suffered that precipitated the filing of the state-court action. Therefore, Plaintiffs are not complaining of an injury caused by a state-court judgment and Rooker-Feldman does not apply.

## IV. Res Judicata

Defendants further contend that res judicata precludes Plaintiffs from asserting their [*15] claims here because they should have been raised in their state court Article 78 proceeding. "Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." McKoy v. Henderson, No. 05 Civ. 1535, 2007 U.S. Dist. LEXIS 15673, 2007 WL 678727, *6 (S.D.N.Y. Mar. 5, 2007) (quoting St. Pierre v. Dyer, 208 F.3d 394, 399 (2d Cir. 2000)). It is an affirmative defense [6] with the following three elements: "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Monahan v. New York City Dept. of Corr., 214 F.3d 275, 285 (2d Cir. 2000) (citations omitted). The second lawsuit must, however, also involve the same "'claim'--or 'nucleus of operative fact'-- as the first suit." Waldman v. Vill. of Kiryas Joel, 207 F.3d 105, 108 (2d Cir. 2000) (citations omitted). And to

_____

[6] Although res judicata is an affirmative defense, see Fed. R. Civ. P. 8(c), "it can be upheld on a Rule 12(b)(6) motion if it is clear from the face of the complaint that the plaintiff's claims are barred." Davey v. Dolan, 453 F.Supp.2d 749, 755 (S.D.N.Y. 2006) (citation omitted).

determine whether the two lawsuits involve the [*16] same transaction or claim, courts "look to whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations." Id. (citations and internal quotation marks omitted).

Initially, Plaintiffs argue that res judicata does not bar their claims because they reserved the right to raise their federal claims in accordance with England v. Louisiana State Bd. of Med. Exam'ns, 375 U.S. 411, 84 S. Ct. 461, 11 L. Ed. 2d 440 (1964). But Plaintiffs attempt at an England-type reservation is a misuse of that doctrine. An England reservation is [*17] appropriate only when plaintiffs initially choose a federal forum to litigate their claims, but the federal court abstains, pursuant to R.R. Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S. Ct. 643, 85 L. Ed. 971 (1941), and sends the case to state court for an interpretation of state law. Hickerson v. City of New York, 146 F.3d 99, 110-12 (2d Cir. 1998). The theory is that, in such situations, it would be unfair to require plaintiffs, who had chosen a federal forum, to then have a state court decide their federal claims. Id. (stating that plaintiffs cannot "be compelled, without [their] consent and through no fault of [their] own, to accept instead a state court's determination of those claims") (quoting England, 375 U.S. at 415) (emphasis in the original).

The doctrine has no applicability to situations where, as here, plaintiffs choose to first litigate in state court, then subsequently seek to litigate federal claims in federal court in a separate action. Id. at 111 (holding that "England applies only to litigants who have sought to proceed in federal court in the first instance, and not to litigants such as the instant [*18] plaintiffs who voluntarily chose to file suit in state court") (citations omitted).

As to whether res judicata precludes Plaintiffs' claims here, there is no dispute that the two lawsuits--Plaintiffs' Article 78 proceeding in state court and this lawsuit--involve the same claim or "nucleus of operative facts," as they both arise from the disbanding of the ICOs. That Plaintiffs might rely on different legal theories in each suit doesn't alter that conclusion. See, e.g., Waldman, 207 F.3d at 108 (stating that it is a "well-established rule that a plaintiff cannot avoid the effects of res judicata by 'splitting' his claim into various suits, based on different legal theories"); Coleman v. B.G. Sulzle, Inc., 402 F.Supp.2d 403, 419 (N.D.N.Y. 2005) (stating that "a party cannot avoid the effects of res judicata by splitting

her cause of action into separate grounds of recovery and then raising the separate grounds in successive lawsuits") (citation omitted). Moreover, the Article 78 proceeding resulted in a final adjudication on the merits--the Resolution was found to be a valid act of internal party governance--and the parties in both actions are the same. [*19] The only issue then is whether Plaintiffs' claims were, or could have been, raised in the Article 78 proceeding. Plaintiffs, of course, argue that their claims were not, and could not have been raised there.

Plaintiffs are barred from now seeking a judgment in federal court declaring that § 2-104 of the New York Election Law is unconstitutional. Although an Article 78 proceeding "is not the proper vehicle to test the general constitutionality of a statute, a claim regarding a statute's general constitutionality can be heard by the court holding the Article 78 proceeding by simply treating the proceeding as a declaratory judgment action." Parker v. Corbisiero, 825 F. Supp. 49, 55 (S.D.N.Y. 1993) (citations omitted); see also Wang v. Pataki, 396 F. Supp. 2d 446, 458 (S.D.N.Y. 2005) (stating that "[a]lthough a proceeding under article 78 is not the proper vehicle to test the constitutionality of legislative enactments, a court may, on request, convert such a claim to a request for a declaratory judgment, pursuant to CPLR 3001, and rule on the constitutional challenge") (citations and internal quotation marks omitted). Thus, because Plaintiffs could [*20] have requested that the Article 78 proceeding be converted to a declaratory judgment action to contest the constitutionality of § 2-104 but did not, res judicata prevents them from doing so here. See Wang, 396 F. Supp. 2d at 458-59; Parker, 825 F.Supp. at 55.

Nor can Plaintiffs litigate their claim seeking a declaration that their constitutional rights were violated, or now seek an injunction against future violations, as this claim also could have been raised in their Article 78 proceeding. See, e.g., Hellenic American Neighborhood Action Committee v. City of New York, 101 F.3d 877, 881 (2d Cir. 1996) ("[C]onstitutional issues can be decided in Article 78 proceedings."); Federico v. Bd. of Educ. of Pub. Sch. of Tarrytowns, 955 F. Supp. 194, 202 (S.D.N.Y. 1997) ("Constitutional issues . . . can be decided in Article 78 proceedings.").

Res judicata does not, however, preclude Plaintiffs from seeking damages pursuant to 42 U.S.C. § 1983. In an Article 78 proceeding, only damages that are "incidental to the primary relief sought" can properly be awarded. N.Y. C.P.L.R. § 7806 [*21] . And Damages pursuant to

Case 1:17-cv-03014-MKV-OTW   Document 51-2   Filed 08/03/17   Page 145 of 186

Cite # 6, Report # 8, Full Text, Page 6 of 8
2007 U.S. Dist. LEXIS 22415, *21

§ 1983 are not incidental to any relief that may be sought under Article 78, and can therefore not be awarded in an Article 78 proceeding. Davidson v. Capuano, 792 F.2d 275, 276 (2d Cir. 1985); see also Vargas v. City of New York, 377 F.3d 200, 205 (2d Cir. 2004) (stating that "a state court entertaining an Article 78 proceeding does not have the power to award the full measure of relief available in subsequent section 1983 litigation") (citations omitted). Thus, because Plaintiffs could not have been awarded the damages they seek on their § 1983 claim in the Article 78 proceeding, they are not precluded from asserting that claim now. See, e.g., Davidson, 729 F.2d at 276 (holding that res judicata did not bar claim for damages under § 1983 because plaintiff could not have obtained the relief he was seeking in his prior Article 78 proceeding); Parker v. Blauvelt Volunteer Fire Co., Inc., 93 N.Y.2d 343, 712 N.E.2d 647, 650, 690 N.Y.S.2d 478 (N.Y. 1999) (holding that Article 78 proceeding on the merits was not res judicata to § 1983 damages claim because such damages were not incidental to relief sought in **[*22]** the Article 78 proceeding).

Finally, the Article 78 proceeding here was not res judicata as to Plaintiffs' Civil Rights Act claim. Defendants have the burden of establishing that the elements of res judicata--including that the claims in the subsequent action could have been raised in the prior proceeding--have been met. See, e.g., Wiesner v. Nardelli, No. 06 Civ. 3533, 2007 U.S. Dist. LEXIS 5801, 2007 WL 211083, *3 (S.D.N.Y. Jan. 27, 2007) ("The party asserting res judicata bears the burden of proving these elements."). Yet Defendants have offered nothing to persuade this Court that Plaintiffs could have raised their Voting Rights Act claim in state court, let alone an Article 78 proceeding, rather than in federal court. [7] **[*23]** In sum, res judicata prevents Plaintiffs from asserting all but their Voting Rights Act and section 1983 claims. [8]

---

[7] The Supreme Court has also noted the possibility that section 5 of the Voting Rights Act "grant[s] the federal courts exclusive jurisdiction over 'actions under' § 5 . . . ." Hathorn v. Lovorn, 457 U.S. 255, 267, 102 S. Ct. 2421, 72 L. Ed. 2d 824 (1982) (alteration omitted).

[8] Defendants also assert collateral estoppel, or issue preclusion, as an affirmative defense. Collateral estoppel precludes a federal court from deciding an issue if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." McKithen, 481 F.3d 89, 2007 U.S. App.

## V. Voting Rights Act

Defendants move to dismiss Plaintiff's Voting Rights Act claim, arguing that the disbanding of ICOs was not a voting change requiring preclearance under section 5 of that statute. [9] Section 5 of the Voting Rights Act prohibits a State or political subdivision from "enact[ing] or seek[ing] to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force **[*24]** or effect on November 1, 1964," without first submitting "such qualification, prerequisite, standard, practice, or procedure" to the United States Attorney General or the United States District Court for the District of Columbia for approval. 42 U.S.C. § 1973c(a). The purpose of this preclearance procedure is to ensure that the new voting qualification "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." Id.; see also Morse v. Republican Party of Virginia, 517 U.S. 186, 209-10, 116 S. Ct. 1186, 134 L. Ed. 2d 347 (1996) ("The purpose of preclearance is to prevent all attempts to implement discriminatory voting practices that change the status quo.").

**[*25]** The United States Supreme Court has articulated four categories of voting changes that require prior approval pursuant to section 5: (1) where the change involves the manner of voting; (2) where the change involves candidacy requirements and qualifications; (3) where the change concerns the composition of the electorate that may vote for candidates for a given office; and (4) where the change affects the creation or

---

LEXIS 5763, 2007 WL 744728 at *12 (citations omitted). Because none of the issues raised in this action were "actually and necessarily decided" in the Article 78 proceeding, however, collateral estoppel is not applicable here.

[9] That section states that "[a]ny action under this section shall be heard and determined by a court of three judges," the empaneling of a three-judge court must be done "in accordance with the provisions of section 2284 of Title 28." 42 U.S.C. § 1973c(a). Section 2284, in turn, provides the procedures to be followed "[u]pon the *request* for three judges . . . ." 28 U.S.C. § 2284(b)(1). Here, although the parties initially requested a three-judge court, that request was later withdrawn. Moreover, when the claims under this section are "'wholly insubstantial' and completely without merit, such as where the claims are frivolous, essentially fictitious, or determined by prior case law, a single judge may dismiss the claims without convening a three-judge court." Bone Shirt v. Hazeltine, 444 F. Supp. 2d 992, (D.S.D. 2005) (citations and italics omitted); see also Miller v. Daniels, 509 F. Supp. 400, 405 (S.D.N.Y. 1981).

abolition of an elective office. Presley v. Etowah County Comm'n, 502 U.S. 491, 502-03, 112 S. Ct. 820, 117 L. Ed. 2d 51 (1992); see also Warden v. Pataki, 12 F. Supp. 2d 325, 326 (S.D.N.Y. 1998) (three-judge panel) (citing Presley). In addition, with respect to the activities of a political party, the Attorney General has taken the view that such activities require section 5 preclearance "(a) [i]f the change relates to a public electoral function of the party and (b) if the party is acting under authority explicitly or implicitly granted by a covered jurisdiction or political subunit . . . ." 28 C.F.R. § 51.7.

Here, passage of the Resolution to disband the ICOs is not a voting change that falls within one of the four categories outlined above, [*26] or a change affecting voting that "relates to a public electoral function" of the Independence Party. Indeed, passage of the Resolution is not a change affecting voting at all. The Executive Committee did not alter the party's rules when it passed the Resolution-counties that cannot constitute a county committee can still form an ICO, ICOs are still organized in the same manner, and ICOs still perform the same functions as they did before the resolution. Cf. Fortune v. Kings County Democratic County Comm., 598 F. Supp. 761, 765 (E.D.N.Y. 1984) (holding that amendments to party's rules that expanded the voting constituency of the Executive Committee involved a public electoral function because the Executive Committee selected nominees for public office). The Resolution does not prevent members of the Independence Party in Kings, Queens, and Bronx counties from organizing ICOs, or from constituting a county committee. Rather, the Resolution merely disbanded the ICOs that were in place at the time, in accordance with party rules, because of an internal party dispute amongst different factions within the party. Plaintiffs offer no reasons why this action falls within any [*27] of the four types of changes identified by the Supreme Court, or involves a change affecting voting that "relates to a public electoral function." In fact, in their seventeen-page memorandum of law in opposition to Defendants' motion to dismiss, Plaintiffs' Voting Rights Act claim is not mentioned.

In passing the Resolution, the State Committee did not "enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" that had the purpose or effect of "denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c(a). As such, preclearance was not required. [10]

---

[10] At the May 24, 2006 hearing on Plaintiffs' motion for a

[*28] VI. Section 1983

Under § 1983, any person who, acting under color of State law, causes a citizen of the United States to be deprived of his or her rights, privileges, or immunities secured by the Constitution and laws of the United States, is liable to the injured party for damages or other appropriate relief. 42 U.S.C. § 1983. Because, by its terms, the statute requires action taken under color of State law, "liability attaches only when the constitutional deprivation is the result of state action." Pabon v. Wright, 459 F.3d 241, 249 (2d Cir. 2006).

The first step in determining whether state action occurred is to "identify[] the specific conduct of which the plaintiff complains." Tancredi v. Metropolitan Life Ins. Co., 316 F.3d 308, 312 (2d Cir. 2003) (citation omitted). And when, as here, the defendant is a private party, "the allegedly unconstitutional conduct must be 'fairly attributable' to the state." Id. (citation omitted); see also Campbell v. Bysiewicz, 242 F. Supp. 2d 164, 177 (D.Conn. 2003) (stating that "a private entity such as a political party becomes a state actor if it is endowed [*29] with powers under state law as it then acts 'under color of state law' for the purposes of 42 U.S.C. § 1983"). Thus, for private conduct to be considered state action, there must be "such a close nexus between the State and the challenged action" that the behavior "may be fairly treated as that of the State itself." Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) (citation omitted).

In this case, Plaintiffs specifically complain about the passage of the Resolution--which they contend violated their equal protection rights because it was passed using a weighted vote--and the resulting disbandment of the ICOs--which they contend violated their freedom of association. But passage of the Resolution and the disbanding of the ICOs, as Plaintiffs own allegations

---

preliminary injunction, the Court asked the parties whether they had sought the guidance of the Justice Department as to whether preclearance was required in this case. Tr. at 3-5. Later that day, the parties informed the Court, by letter, that the parties had a conference call that afternoon with a representative from the Justice Department who stated that the Justice Department would not weigh-in on the issue at that time. May 24, 2006 Letter from Harry Kresky. Since then, the Court has received no indication from the parties that the Justice Department has, or is going to, offer an opinion as to whether passage of the Resolution disbanding the ICOs required preclearance.

make evident, [11] were wholly internal party functions and are not in any way "fairly attributable to the state." See, e.g., Lindstedt v. Missouri Libertarian Party, 160 F.3d 1197, 1198 (8th Cir. 1998) (concluding that Libertarian Party was not acting under color of state law when it refused to refund the filing fee plaintiff [*30] paid to be placed on the ballot, or when it acted to expel him from his position within the Libertarian Party); Johnson v. Knowles, 113 F.3d 1114, 1120 (9th Cir. 1997) (holding that a Republican County Committee was not acting under color of state law when it voted to remove two of its members from the committee). In fact, as political parties are nothing more than "groups of like-minded individual voters," Morse, 517 U.S. at 241 (SCALIA, J. Dissenting), state intervention into a party's internal affairs is strongly proscribed by the limitations imposed by the Constitution. See California Democratic Party v. Jones, 530 U.S. 567, 573-74, 120 S. Ct. 2402, 147 L. Ed. 2d 502 (2000) (discussing the limits on state intervention into the internal activities of political parties).

 [*31] Because Defendants were not acting under color of state law when they passed the Resolution and disbanded the ICOs. Plaintiffs cannot state a claim for damages under § 1983.

Defendants' motion to dismiss is GRANTED.

Dated: New York, New York

March 29, 2007

SO ORDERED:

George B. Daniels

United States District Judge

---

End of Document

---

[11] For example, the complaint states that the ICOs were created by the passage of a new, State Independence Party rule in 2000, and that the disbanding of the ICOs in this case was done pursuant to another party rule, enacted in 2004, which granted the Executive Committee the authority to disband ICOs in certain situations. Compl. PP 36, 64. Moreover, in Plaintiffs' Article 78 proceeding in New York Supreme Court, the court held that the disbanding of the ICOs was a "permissible act of *party governance*." Id. at P 104.



No *Shepard's* Signal™
As of: July 25, 2017 8:11 PM Z

# Flynn v. Cohison

United States District Court for the Eastern District of New York

May 18, 2016, Decided; May 19, 2016, Filed

16 Civ. 2243 (BMC) (LB)

**Reporter**
2016 U.S. Dist. LEXIS 66011 *

JEREMIAH G. FLYNN, Plaintiff, - against - ROBYN COHISON; CATHOLIC CHARITIES; and MISS PEGIS, Defendants.

## Core Terms

disability, accommodation, apartment, amended complaint, landlord, alleges

**Counsel:** **[*1]** Jeremiah G. Flynn, Plaintiff, Pro se, Brooklyn, NY.

**Judges:** Brian M. Cogan, United States District Judge.

**Opinion by:** Brian M. Cogan

## Opinion

### MEMORANDUM DECISION AND ORDER

**COGAN**, District Judge.

Plaintiff Jeremiah G. Flynn, a tenant at a property owned and/or managed by Catholic Charities, brings this *pro se* action against defendants and alleges that they denied his request for an apartment located on a lower-floor as a reasonable accommodation for his cardiac condition. The Court grants plaintiff's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. For the reasons discussed below, the complaint is dismissed. See 28 U.S.C. § 1915(e)(2)(B). Plaintiff is granted 20 days leave to submit an amended complaint.

### BACKGROUND

The following facts are drawn from plaintiff's complaint and are taken as true for the purposes of this Order. Plaintiff resides in an apartment located at 800 Madison Street, in Brooklyn, New York, which is under the auspices of Catholic Charities. He alleges that he has repeatedly requested that defendants allow him to move to an apartment on a lower-floor. Plaintiff alleges that he suffers from two cardiac conditions and that the elevators in the building are frequently out of service. Plaintiff seeks monetary damages and injunctive **[*2]** relief in the form of an apartment on a lower-floor.

### DISCUSSION

#### A. Standard of Review

A complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). At the pleading stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 123 (2d Cir. 2010) (citing Iqbal, 556 U.S. at 678). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. In addition, a *pro se* complaint is liberally construed, see Ahlers v. Rabinowitz, 684 F.3d 53 (2d Cir. 2012), and interpreted to raise the strongest arguments that it suggests, see Graham v. Henderson, 89 F.3d 75 (2d Cir. 1996).

Under 28 U.S.C. § 1915(e)(2)(B), a Court is required to

dismiss a complaint, filed *in forma pauperis*, if the complaint "(i) is frivolous or malicious, (ii) fails to state a claim upon which relief may be granted, or (iii) seeks monetary relief from a defendant who is immune from such relief." An action is frivolous as a matter of law when, inter alia, it is based on an "indisputably meritless legal theory"—that is, when it "lacks an arguable basis in law ... or [when] a dispositive defense clearly exists [*3] on the face of the complaint." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998). However, a Court should generally not dismiss a *pro se* complaint without granting the plaintiff leave to amend if a valid claim could be stated. See Cuoco v. Moritsugu, 222 F.3d 99 (2d Cir. 2000).

Moreover, pursuant to Rule 8 of the Federal Rules of Civil Procedure, a plaintiff must provide a short, plain statement of claim against each defendant named so that they have adequate notice of the claims against them. Iqbal, 556 U.S. 678 (Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). A pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. Id. (internal citations and alterations omitted). Plaintiff must provide facts sufficient to allow each defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. See Simmons v. Abruzzo, 49 F.3d 83 (2d Cir. 1995). A court may dismiss a complaint that is "so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988).

**B. Reasonable Accommodation Under the FHA, the ADA and the Rehabilitation Act**

Although plaintiff fails to identify a basis for this Court's jurisdiction, the Court will liberally construe his complaint as asserting a possible cause of action under the [*4] Fair Housing Act ("FHA"), the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.[1] The

---

[1] The Court notes that to the extent that Catholic Charities is a private landlord, the ADA is not applicable, even if the premises are used for publicly subsidized housing. See Reid v. Zackenbaum, No. 05 CV 1569, 2005 U.S. Dist. LEXIS 17177, 2005 WL 1993394, at *4 (E.D.N.Y. Aug. 17, 2005) ("A residential facility, such as an apartment, is not a public accommodation under the ADA."). In addition, the Rehabilitation Act only applies to federally-funded programs. See Bryant v. N.Y. Educ. Dep't, 692 F.3d 202, 216 (2d Cir. 2012).

FHA, as amended by the Fair Housing Amendments Act in 1988, makes it illegal to discriminate in housing practices on the basis of a handicap "in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling." 42 U.S.C. § 3604(f)(2)(A); Williams v. N.Y.C. Hous. Auth., 879 F. Supp. 2d 328 (E.D.N.Y. 2012). The ADA is a comprehensive statute that "forbids discrimination against persons with disabilities in . . . public accommodations, which are covered by Title III," See Tennessee v. Lane, 541 U.S. 509, 516-17, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004). Section 504 of the Rehabilitation Act, in turn, "prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against otherwise qualified individuals with a disability." Disabled in Action v. Bd. of Elections in City of N.Y., 752 F.3d 189, 196 (2d Cir. 2014).

Claims of housing discrimination are evaluated under the burden-shifting framework [*5] of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Mancuso v. Douglas Elliman LLC, 808 F. Supp. 2d 606 (S.D.N.Y. 2011). Under this framework, plaintiffs must first establish a prima facie case of discrimination, and then the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision. Mitchell v. Shane, 350 F.3d 39 (2d Cir. 2003). "If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action." Id.

A tenant's request to move from an upper-floor apartment to a lower-floor apartment may be a cognizable request for a reasonable accommodation under the FHA, the ADA, and the Rehabilitation Act. See Logan v. Matveevskii, 57 F. Supp. 3d 234, 256 (S.D.N.Y. 2014). In order to make out a claim of discrimination based on a failure to accommodate, a plaintiff must allege that: (1) he suffers from a handicap as defined by the FHA, or a disability as defined by the ADA and the Rehabilitation Act; (2) the defendant knew or reasonably should have known of the plaintiff's handicap or disability; (3) accommodation of the handicap or disability may be necessary to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation." See id. at 256. Here, plaintiff fails to allege sufficient facts from which the Court can [*6] infer that he is a victim of disability discrimination and that the defendants failed to reasonably accommodate his requests to be moved to a lower floor.

**CONCLUSION**

Accordingly, plaintiff's complaint is dismissed. 28 U.S.C. § 1915(e)(2)(B). However, in light of this Court's duty to liberally construe *pro se* complaints, plaintiff is granted 20 days leave to file an amended complaint. Should plaintiff elect to file an amended complaint he must allege sufficient facts to show that he is disabled as defined under the FHA.[2] Moreover, plaintiff must state the approximate date that he first contacted his landlord to request that he be allowed to move to a lower floor. He should provide the approximate date that the landlord responded to his request, and the decision of the landlord. If available, plaintiff should annex copies of all correspondence that he sent to and received from the landlord.

The amended complaint must be captioned as **[*7]** a "Amended Complaint" and bear the same docket number as this Order. No summons shall issue at this time and all further proceedings shall be stayed for 20 days. If plaintiff fails to amend his complaint within 20 days as directed by this Order, judgment dismissing this action without prejudice shall be entered.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

**SO ORDERED**.

/s/(BMC)

U.S.D.J.

Dated: Brooklyn, New York

May 18, 2016

---

**End of Document**

---

[2] To demonstrate a disability under the FHA, a plaintiff must show: (1) "a physical or mental impairment which substantially limits one or more . . . major life activities"; (2) "a record of having such an impairment"; or (3) that he or she is "regarded as having such an impairment." 42 U.S.C. § 3602(h); Rodriguez v. Village Green Realty, Inc., 788 F.3d 31, 40 (2d Cir. 2015).



<span>⊕</span> Positive
As of: July 25, 2017 8:11 PM Z

# Williams v. New York City Hous. Auth.

United States District Court for the Southern District of New York

March 26, 2009, Decided; March 26, 2009, Filed

No 07 Civ. 7587 (RJS)

**Reporter**

2009 U.S. Dist. LEXIS 24888 *; 2009 WL 804137

IVY WILLIAMS, Plaintiff, VERSUS NEW YORK CITY HOUSING AUTHORITY and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Defendants.

**Subsequent History:** Affirmed by Williams v. New York City Hous. Auth., 2010 U.S. App. LEXIS 21332 (2d Cir. N.Y., Oct. 15, 2010)

## Core Terms

allegations, disability, conditions, motion to dismiss, Housing, accommodate, apartment, elevators, sovereign immunity, garbage, protected activity, proceedings, facilities, retaliation claim, pro se, retaliation, complaints, documents, agencies, eviction, lack of subject matter jurisdiction, reasonable accommodation, discriminatory, injunctive, provides, motions, public housing, time barred, dwelling, funding

**Counsel:** [*1] Ivy Williams, Plaintiff, Pro se.

For HUD, Defendant: Tomoko Onozawa, Assistant United States Attorney, New York, NY.

For NYCHA, Defendant: Samuel Veytsman, New York City Housing Authority, New York New York.

**Judges:** RICHARD J. SULLIVAN, United States District Judge.

**Opinion by:** RICHARD J. SULLIVAN

## Opinion

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

*Pro se* Plaintiff Ivy Williams brings this action against Defendants New York City Housing Authority ("NYCHA") and the United States Department of Housing and Urban Development ("HUD"), alleging causes of action under the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 701 *et seq*., the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act (the "FHAA"), 42 U.S.C. § 3601 *et seq*., and Title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12131 *et seq*.

Before the Court are Defendants' separate motions to dismiss. HUD moves to dismiss the Amended Complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, and both Defendants move to dismiss this action under Rule 12(b)(6) for failure to state a claim. For the reasons set forth below, Defendants' motions [*2] are granted.

I. BACKGROUND

A. Facts [1]

---

[1] The following facts are taken from the Amended Complaint and the documents attached thereto. *See Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470, 2009 U.S. Dist. LEXIS 17872, 2009 WL 585879, at *6 (S.D.N.Y. 2009). Plaintiff's factual allegations are assumed to be true and all reasonable inferences are drawn in her favor. *See Cleveland v. Caplaw Ents*., 448 F.3d 518, 521 (2d Cir. 2006).

Although the pages of the Amended Complaint are not numbered, the Court cites to the pages of the pleading according to the order in which they were submitted when it was filed. Moreover, the documents referred to herein were

The Frederick Douglass Houses (the "Frederick Douglass Complex" or "Complex") is a public housing development managed [*3] by NYCHA. In May 2003, Plaintiff was living in an apartment on the fifth floor of an apartment building within the Complex. (See Am. Compl. at 18.) On May 8, 2003, Plaintiff executed a form directed to the housing manager of the Complex, which indicated that she wished to be transferred to a different unit because she "need[ed] a larger apartment." Plaintiff was subsequently transferred to an apartment on the fourteenth floor of a building at 140 West 104th Street. (See id. at 16.)

The apartment to which Plaintiff was transferred is located over one of the garbage facilities at the Complex. (See id. at 3.) Plaintiff makes two primary sets of allegations regarding the conditions at the Complex. First, she alleges that the garbage facilities under her building are poorly maintained, which has led to hazardous conditions for all tenants and caused her to suffer injuries. (Id. at 2.) Second, Plaintiff alleges that she is disabled and that Defendants have failed to accommodate that disability by maintaining the elevator in her building. (Id. at 3.)

With respect to the garbage facilities at the Complex, Plaintiff alleges that they are not properly cleaned and serviced, that they are dangerously [*4] close to a children's playground, and that they have been improperly used to dispose of asbestos and other hazardous materials. (Id. at 5-6.) Documents submitted by Plaintiff indicate that she complained to NYCHA about maintenance of the garbage facilities at the Complex on November 12, 2003, July 1, 2004, and November 15, 2004.

Plaintiff alleges that these conditions have caused dead rats to accumulate in the vicinity of the playground, and that the residents at the Complex have been exposed to asbestos, lead, toxic contaminants, and other "cancer causing agents." (Id. at 5, 13, 28, 29.) Plaintiff further alleges that the smoke and carbon monoxide alarms in the apartment buildings are frequently set off by fumes from the waste, which generates noise and flashing lights that have caused her pain. (Id. at 27.)

included in the approximately thirty pages of unlabeled documents that Plaintiff appended to the Amended Complaint. "For purposes of a motion to dismiss," the Amended Complaint is deemed "to include any written instrument attached to it." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000). Because direct citations to these documents are infeasible given the format of the Amended Complaint, the Court refers to them descriptively.

In addition to the condition of the garbage disposal facilities, Plaintiff also alleges that the elevator in her building "has been under constant service." (Id. at 3; see also id. at 9.) Plaintiff alleges that this issue has been particularly problematic for her because she is unable to walk without assistance and cannot access her fourteenth-floor apartment by using the stairs. [*5] (Id. at 18.)

Plaintiff appended to her Amended Complaint two maintenance requests regarding the elevators, which she submitted to NYCHA on July 31, 2003 and May 13, 2004, respectively. Plaintiff also submitted with her pleading an April 16, 2007 letter that she received from NYCHA, which references an April 6, 2007 call by Plaintiff to New York City's "311" information service regarding the elevators. The letter states that "repairs [to the elevators] were completed the same day [as the call]. All elevators are inspected daily and repairs are completed by the maintenance staff as needed."

Plaintiff further alleges that, since she transferred apartments in May 2003, the living conditions at the Complex have progressively deteriorated, and that Defendants' ongoing failure to address these conditions reflects discriminatory animus. (Id. at 2; see also id. at 4.) Plaintiff alleges that, as a result of these deteriorating conditions, she has suffered from fatigue, headaches, diarrhea, loss of appetite, nausea, stomach cramps, allergies, asthma, joint pain, leg spasms, seizures, and lupus. (Id. at 4, 17-18.)

Medical records submitted by Plaintiff indicate that she has suffered from health problems [*6] while living at the Complex. Notes from Dr. Panagiotis Zenetos, which are dated March 15, 2006, state that Plaintiff "was hit [in] the head by a six foot steel door," and diagnose her with "lumbago cervical radiculopathy, vertigo, myofascial pain," and chronic pain syndrome. A March 5, 2007 report from Mount Sinai Hospital states that Plaintiff reported that she suffered from "chest tightness after exposure to garbage."

On January 12, 2007, NYCHA mailed Plaintiff a "Notice" that it was recommending that her tenancy be terminated, and directing her to appear before a Hearing Officer at NYCHA's Tenant Administrative Hearings Division on March 1, 2007. NYCHA's letter specified that the basis for the recommendation was Plaintiff's failure to provide updated information regarding her personal income, family income, and household size, which is used by NYCHA to determine Plaintiff's eligibility for public housing.

In a March 1, 2007 "Decision & Disposition," NYCHA Hearing Officer Stuart G. Laurence stated that Plaintiff failed to appear at the hearing and found that, "in the absence of any controverting evidence," NYCHA's charges regarding the termination of her tenancy were "sustained." [2] **[*7]**

B. Procedural History

Plaintiff's Complaint was received by this District's *Pro Se* Office on January 25, 2007. The Complaint named as Defendants NYCHA and HUD and sought unspecified relief. On August 27, 2007, the Honorable Kimba M. Wood, Chief District Judge, noted several deficiencies in Plaintiff's pleading and directed Plaintiff to file an Amended Complaint within 60 days (the "Amendment Order" (Doc. No. 3)). Specifically, Chief Judge Wood directed Plaintiff to: (1) "specify the nature of her disability," (2) "allege how the conditions of her apartment affected her disability," (3) "state how defendants failed to provide her with reasonable accommodation," and (4) "allege all steps she took to give defendants the opportunity **[*8]** to remedy the alleged problems associated with the apartment." (*Id.* at 4.) On October 30, 2007, Plaintiff responded to the Amendment Order by filing the Amended Complaint. (Doc. No. 4.)

This case was reassigned to the undersigned on January 14, 2008. (Doc. No. 4.) On April 17, 2008, Plaintiff sought a preliminary injunction and a temporary restraining order (1) enjoining Defendants from pursuing eviction proceedings against Plaintiff in New York City Housing Court, and (2) requiring Defendants to remove dead rats from the grounds of her apartment building. (*See* Doc. No. 9.) On May 2, 2008 and May 5, 2008, respectively, HUD and NYCHA opposed Plaintiff's application and sought leave to file motions to dismiss the Amended Complaint. On June 16, 2008, Plaintiff's application for injunctive relief was denied, and Defendants' requests to file motions to dismiss were granted. (Doc. No. 11.)

On August 8, 2008, HUD filed its motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal

Rules of Civil Procedure. (Doc. No. 13.) On August 14, 2008, NYCHA filed a separate motion to dismiss relying primarily on Rule 12(b)(6). (Doc. No. 16.) Plaintiff responded in opposition to both motions **[*9]** on September 9, 2008. (Doc. No. 19.)

On September 15, 2008, while Defendants' motions were pending, Plaintiff renewed her application for injunctive relief, seeking a preliminary injunction and temporary restraining order enjoining Defendants from "entering, evaluating, or interfering in plaintiff's affairs, causing any further derivative action or character slander obfuscation by defendants or subsidiary agencies until said decision by the court of federal district is administered." (Doc. No. 21.) The Court denied Plaintiff's second application for injunctive relief on October 7, 2008. (Doc. No. 24.)

II. DISCUSSION

Construing Plaintiff's allegations liberally, the Court deems the Amended Complaint to contain claims against NYCHA and HUD for failure to accommodate her disability and retaliation under Title II of the ADA, the FHAA, and the Rehabilitation Act. Both Defendants argue that all of the causes of action in the Amended Complaint must be dismissed. First, HUD argues that the Court lacks subject matter jurisdiction because it is entitled to sovereign immunity. Second, NYCHA argues that Plaintiff's claims are partially time barred. Third, both Defendants argue that Plaintiff has **[*10]** failed to state a claim under Rule 12(b)(6). For the reasons set forth below, Defendants' motions are granted.

A. Sovereign Immunity

HUD first argues that the Court lacks subject matter jurisdiction over Plaintiff's claims due to principles of sovereign immunity. For the reasons that follow, HUD's motion is granted as to Plaintiff's claims under the FHAA and Title II of the ADA, but denied as to Plaintiff's claims under the Rehabilitation Act.

1. Applicable Law

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of showing that subject matter jurisdiction exists over the complaint. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

---

[2] These documents relating to the eviction proceedings against Plaintiff were attached to the Amended Complaint. However, the record is silent as to Plaintiff's current status as a resident of the Frederick Douglass Complex. Documents submitted by Plaintiff in this action in connection with her applications for injunctive relief indicated that these eviction proceedings were ongoing and that Plaintiff had not been evicted from her apartment as of October 1, 2008.

Under the doctrine of sovereign immunity, the United States is completely immune from suit unless it consents to be sued. *Hercules Inc. v. United States*, 516 U.S. 417, 422, 116 S. Ct. 981, 134 L. Ed. 2d 47 (1996); *United States v. Testan*, 424 U.S. 392, 399, 96 S. Ct. 948, 47 L. Ed. 2d 114 (1976). Thus, the government's consent to be sued is a jurisdictional **[*11]** requirement of an action against the United States, its agencies, and federal officers acting in their official capacities. *See United States v. Sherwood*, 312 U.S. 584, 586-87, 61 S. Ct. 767, 85 L. Ed. 1058 (1941); *Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005).

"A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 197, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996). "For a suit against the United States or its agencies to survive a motion to dismiss, the plaintiff must identify a specific statute that waives the sovereign immunity of the government for that type of claim." *Spinale v. United States*, No. 03 Civ. 1704 (KMW) (JCF), 2004 U.S. Dist. LEXIS 238, 2004 WL 50873, at *6 (S.D.N.Y. Jan. 9, 2004).

2. Analysis

The Court lacks subject matter jurisdiction over Plaintiff's claims against HUD under the FHAA and ADA. The FHAA does not provide for a private cause of action against HUD. *See, e.g., Weisberg v. Leon*, No. 96 Civ. 2661 (HB), 1999 U.S. Dist. LEXIS 19603, 1999 WL 1216663, at *2(S.D.N.Y. Dec. 20, 1999); *Marinoff v. U.S. Dep't of Housing & Urban Dev.*, 892 F. Supp. 493, 496 (S.D.N.Y. 1995); *see also Godwin v. Sec'y of Housing & Urban Dev.*, 360 U.S. App. D.C. 15, 356 F.3d 310, 312 (D.C. Cir. 2004). Similarly, agencies of the federal government, **[*12]** such as HUD, may not be sued under Title II of the ADA. *See Cellular Phone Taskforce v. FCC*, 217 F.3d 72 (2d Cir. 2000); *Kee v. Hasty*, No. 01 Civ. 2123 (KMW) (DF), 2004 U.S. Dist. LEXIS 6385, 2004 WL 807071, at *25 n.21 (S.D.N.Y. Apr. 14, 2004). Accordingly, the Court lacks subject matter jurisdiction over Plaintiff's claims against HUD under the FHAA and ADA.

However, construing the claims in the Amended Complaint liberally in light of Plaintiff's *pro se* status, HUD is not entitled to sovereign immunity with respect to Plaintiff's Rehabilitation Act claims. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of a disability "under any program . . . conducted by any Executive agency." 29 U.S.C. § 794(a). The Act provides for the same "remedies . . . set forth in title VI

of the Civil Rights Act of 1964 . . . to any person aggrieved by any act or failure to act by any . . . *Federal provider of [Federal] assistance* under [section 504]." *Id.* § 794a(a)(2) (emphasis added).

"HUD is the federal *funding agency* overseeing the Section 8 housing program." *Bennett v. New York City Housing Auth.*, 248 F. Supp. 2d 166, 168 (E.D.N.Y. 2002) (emphasis added). Specifically, through the Section 8 program, **[*13]** HUD distributes funds to local public housing agencies, such as NYCHA, in order to help low-income families rent apartments. *Id.* (citing 42 U.S.C. § 1437f(o) and 24 C.F.R. § 982.1(a)-(b)); *see also* 42 U.S.C. § 12131(1)(B) (defining "public housing agency"). Plaintiff named HUD as a Defendant in its capacity as a provider of funding to NYCHA in the Section 8 program. (*See* Am. Compl. at 28.) The Rehabilitation Act expressly provides for suits based on alleged "violations [of the Rehabilitation Act] committed by *federal funding agencies acting as such* -- that is, by 'Federal provider[s].'" *Lane*, 518 U.S. at 191-92 (quoting 29 U.S.C. § 794a(a)(2)) (emphasis added). This statutory language is sufficient to constitute an "unequivocal[]" waiver of HUD's sovereign immunity under these circumstances. *Id.* at 192. Accordingly, HUD is not entitled to sovereign immunity with respect to Plaintiff's claims under the Rehabilitation Act.

B. Timeliness

NYCHA argues that at least some of Plaintiff's allegations are untimely and cannot form the basis for actionable claims of disability discrimination. For the reasons set forth below, the Court agrees, and concludes that Plaintiff's claims are partially **[*14]** time barred.

1. Applicable Law

The statute of limitations for private causes of action under the FHAA is two years. 42 U.S.C. § 3613(a)(1)(A). Claims under section 504 of the Rehabilitation Act and Title II of the ADA are governed by the applicable state statute of limitations for personal injury actions. *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221-22 (2d Cir. 2003) (discussing the Rehabilitation Act); *Gardner v. Wansart*, No. 05 Civ. 3351 (SHS), 2006 U.S. Dist. LEXIS 69491, 2006 WL 2742043, at *3 (S.D.N.Y. Sept. 26, 2006) (discussing Title II of the ADA). "In New York, personal injury claims must be filed within three years from the time the cause of action accrued." *Curto v. Edmundson*, 392 F.3d 502, 504 (2d Cir. 2004) (citing N.Y. C.P.L.R. 215(5)).

## 2. Analysis

Allegedly discriminatory acts are "not actionable if time barred, even when they are related to acts allegedly in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Plaintiff is deemed to have commenced this action on January 25, 2007, the day on which her initial Complaint was received in the *Pro Se* Office of this District. Thus, with respect to Plaintiff's FHAA claims, discrete acts alleged to have occurred prior **[*15]** to January 25, 2005 are no longer actionable. Similarly, acts alleged to have occurred prior to January 25, 2004 cannot serve as the basis for Plaintiff's claims under the ADA and the Rehabilitation Act. Therefore, to the extent Plaintiff's claims are based on her May 2003 transfer to the fourteenth-floor apartment at the Complex, those claims are time barred because the transfer occurred more than three years before this action was commenced. Similarly, any claims based on Plaintiff's complaints to NYCHA about the conditions at the Complex on July 31, 2003 and November 12, 2003 are time barred. Accordingly, NYCHA's motion to partially dismiss Plaintiff's claims as untimely is granted.

## C. Plaintiff's Remaining Claims

Lastly, NYCHA and HUD move to dismiss Plaintiff's remaining claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motions are granted.

## 1. Standard of Review

For a complaint to withstand a motion to dismiss under Rule 12(b)(6), a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The Court must accept as true all **[*16]** factual allegations in the Amended Complaint, and draw all reasonable inferences in Plaintiff's favor. *Shah v. Meeker*, 435 F.3d 244, 248 (2d Cir. 2006); *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999). Additionally, because "most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency than . . . when reviewing a complaint submitted by counsel." *Lerman v. Bd. of Elections*, 232 F.3d 135, 140 (2d Cir. 2000).

"Although the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice. To survive dismissal, the plaintiff must provide the grounds upon which his [or her] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 131 (2d Cir. 2007). Indeed, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (quoting *Gebhardt v. Allspect, Inc.*, 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000)).

## 2. **[*17]** HUD

As stated above, *see supra* Section II.A.2, HUD is entitled to sovereign immunity in connection with Plaintiff's claims under the ADA and FHAA, but is subject to suit under the Rehabilitation Act to the extent it is named as a "federal funding agenc[y] acting as such." *Lane*, 518 U.S. at 193. However, in the Amendment Order, Chief Judge Wood observed that Plaintiff's original pleading "offer[ed] no allegations against defendant HUD." (Amendment Order at 4.) Plaintiff has not cured that deficiency in the Amended Complaint.

Indeed, the Amended Complaint contains no factual allegations to support an inference that HUD has discriminated against her in any way. Therefore, with respect to Plaintiff's claims against HUD, the Amended Complaint does not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Accordingly, because Plaintiff "ha[s] not nudged" her claims against HUD "across the line from conceivable to plausible," *id.* at 570, Plaintiff's claims against HUD under the Rehabilitation Act are dismissed.

## 3. NYCHA

Remaining are Plaintiff's claims against NYCHA under the ADA, [3] the FHAA, [4] and the Rehabilitation Act. [5]

---

[3] Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity." 42 U.S.C. § 12132. It is undisputed that NYCHA constitutes a "public entity" under the ADA and is therefore subject to suit under Title II. *See id.* § 12131(1)(B).

[4] The FHAA prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of . . . rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person." 42

Under each statute, there are three available [*18] theories for demonstrating discrimination on the basis of a disability: disparate impact, disparate treatment, and failure to accommodate. *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003). The Amended Complaint can only be interpreted to invoke the third method of pleading illegal discrimination. [6]

In the Amendment Order, Chief Judge Wood noted that Plaintiff had failed to state a claim under any of these theories, indicated that a "liberal reading of her complaint suggest[ed] that Plaintiff may be able to state

---

U.S.C. § 3604(f)(2)(A).

[5] Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his [*19] or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . . ." 29 U.S.C. § 794(a). It is undisputed that NYCHA is subject to suit under section 504 of the Rehabilitation Act because it is a "public housing agency," which receives monetary assistance from HUD to operate and develop low-income housing. 42 U.S.C. § 1437a(b)(6).

[6] The Amended Complaint contains no allegations of affirmative acts by NYCHA that are alleged to have been discriminatory in nature. Rather, the Amended Complaint suggests that NYCHA's *failure to act -- i.e.*, its failure to maintain the garbage facilities and elevators at the Complex -- permits an inference of discrimination. Such conclusory allegations are insufficient to sustain a discriminatory treatment claim. *See Cardew v. New York State Dep't of Corr. Servs.*, No. 01 Civ. 3669 (BSJ), 2004 U.S. Dist. LEXIS 7670, 2004 WL 943575, at *7 (S.D.N.Y. Apr. 3, 2004) (holding that a conclusory allegation regarding discriminatory animus is insufficient to state a claim for disability discrimination); *cf. Desouza v. PWV Acquisitions LLC*, No. 05 Civ. 4565 (RWS), 2005 U.S. Dist. LEXIS 29695, 2005 WL 3159705, at *2 (S.D.N.Y. Nov. 28, 2005) [*20] (dismissing Title VII claim where the complaint contained "conclusory allegations of discrimination without specifics"). With respect to disparate impact, Plaintiff has not made allegations regarding a facially neutral policy by NYCHA, and she has not alleged the existence of a "causal connection" between NYCHA's alleged failure to properly maintain the Complex and any allegedly discriminatory effect experienced by "persons of a particular type." *Tsombanidis*, 352 F.3d at 575; *see also id.* at 576 ("Although there may be cases where statistics are not necessary, there must be some analytical mechanism to determine disproportionate impact."). Therefore, the Court addresses Plaintiff's allegations regarding NYCHA's conduct under the "failure to accommodate" theory of disability discrimination.

a claim of failure to make a reasonable accommodation," and directed Plaintiff to file an Amended Complaint adding as much specificity as possible to her allegations of discrimination. [*21] (Amendment Order at 3-4.) In response, Plaintiff filed an Amended Complaint alleging that she suffers from a disability relating to her ability to walk, and relying primarily on the theory that NYCHA failed to accommodate that disability. In addition, the Amended Complaint also alleges that Plaintiff has been retaliated against by NYCHA because of her complaints about the conditions at the Complex. (*See* Am. Compl. at 12, 15.)

i. Failure to Accommodate

Plaintiff alleges that NYCHA's failure to properly maintain the elevators in her building constituted a failure to accommodate her disability.

a. Applicable Law

"[T]he standards for discrimination against the disabled are interpreted similarly in the Rehabilitation Act, ADA, and FHAA . . . ." *Blatch ex rel. Clay v. Hernandez*, 360 F. Supp. 2d 595, 630 (S.D.N.Y. 2005). Each statute requires that governmental entities such as NYCHA provide reasonable accommodations in order to permit disabled persons "equal opportunity to use and enjoy a dwelling." *Tsombanidis*, 352 F.3d at 578 (discussing reasonable accommodation claims under the FHAA and ADA) (citing 42 U.S.C. § 12131(2) and 42 U.S.C. § 3604(f)(3)(B)); *Menes v. City Univ. of New York*, 578 F. Supp. 2d 598, 617 (S.D.N.Y. 2008) [*22] (discussing reasonable accommodation claims under the Rehabilitation Act and ADA).

There are four elements to a discrimination claim based on a failure to accommodate theory:

> (1) [the plaintiff] suffers from a handicap [or disability]; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap may be necessary to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation.

*Freeland v. Sisao LLC*, No. 07 Civ. 3741 (CPS) (SMG), 2008 U.S. Dist. LEXIS 26184, 2008 WL 906746, at *3 (E.D.N.Y. Apr. 1, 2008) (discussing the Rehabilitation Act).

b. Analysis

Plaintiff has adequately alleged that her difficulty

2009 U.S. Dist. LEXIS 24888, *22

walking amounts to a "disability" within the meaning of these statutes. *See* 42 U.S.C. § 12102(2); *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002); *Blatch*, 360 F. Supp. 2d at 630.

However, the Amended Complaint does not suggest any basis for inferring that, prior to the commencement of this litigation, NYCHA either "knew or should have known" of Plaintiff's alleged disability. Indeed, Plaintiff does not allege that she notified NYCHA of any disability that denied her access to her dwelling. **[*23]** "[W]ithout adequate knowledge of her medical condition," NYCHA was "not in a position to even offer, let alone refuse, a reasonable accommodation to plaintiff." *Thompson v. City of New York*, No. 98 Civ. 4725 (GBD), 2002 U.S. Dist. LEXIS 23675, 2002 WL 31760219, at *9 (S.D.N.Y. Dec. 9, 2002). Put simply, Plaintiff's Amended Complaint fails to allege sufficient facts to support a claim that NYCHA discriminated against her by failing to accommodate her disability. Accordingly, NYCHA's motion to dismiss is granted as to Plaintiff's disability discrimination claims.

ii. Retaliation

Plaintiff also alleges that NYCHA retaliated against her for complaining about the conditions at the Frederick Douglass Complex by commencing "civil court" proceedings against her, "harass[ing]" her in connection with those proceedings, and subjecting her to other unspecified "repurcussion[s]." (Am. Compl. at 12, 15.)

a. Applicable Law

The FHAA renders it unlawful to "coerce, intimidate, or threaten, or interfere with any person . . . on account of his having exercised or enjoyed . . . any right granted or protected" under the FHAA. 42 U.S.C. § 3617. "The ADA and Rehabilitation Act include similar prohibitions" against retaliation. *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 54 **[*24]** (citing 42 U.S.C. § 12203(b) and 29 U.S.C. § 791(g)).

To make out a valid claim of retaliation, Plaintiff must allege that: (1) she engaged in a protected activity; (2) NYCHA knew of that activity; (3) NYCHA subsequently subjected her to an adverse action; and (4) there was a causal connection between the alleged adverse action and her protected activity. *Marks v. Bldg. Mgmt. Co.*, No. 99 Civ. 5733 (THK), 2002 U.S. Dist. LEXIS 7506, 2002 WL 764473, at *9 (S.D.N.Y. Apr. 26, 2002); *see also Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (discussing the elements of an

ADA retaliation claim); *Sands v. Runyon*, 28 F.3d 1323, 1331 (2d Cir. 1994) (discussing the elements of a retaliation claim under the Rehabilitation Act).

b. Analysis

Plaintiff cannot make out a retaliation claim based on her complaints to NYCHA about the condition of the garbage facilities at the Complex or the maintenance of the elevators because these complaints were not "protected activities." Plaintiff's allegations, as well as the April 16, 2007 NYCHA letter to Plaintiff that is attached to her pleading, indicate that her complaints to NYCHA pertained to the *general conditions* at the Complex. Such acts were not "protected activities" **[*25]** for the purpose of establishing a retaliation claim in connection with allegations of disability discrimination. *See* 42 U.S.C. § 12203 (prohibiting retaliation against an individual who has "participated in any manner *in an investigation, proceeding, or hearing*" under the ADA (emphasis added)); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (defining "protected activity" as "action taken to protest or oppose statutorily prohibited discrimination"); *Stable v. Kelly Towers Assocs.*, No. 05 Civ. 3132 (GBD), 2007 U.S. Dist. LEXIS 1975, 2007 WL 80866, at *2 (S.D.N.Y. Jan. 10, 2007). Therefore, these general complaints cannot serve as the basis for a retaliation claim because they were not "protected activities" under the statutes at issue.

Rather, the first instance in which Plaintiff engaged in a "protected activity" was when she commenced this action on January 25, 2007. NYCHA, as a Defendant, received notice of this activity by April 1, 2007, when Plaintiff effected service of the summons and original Complaint (Doc. No. 8). *See Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418, 432 (S.D.N.Y. 2005); *Marks*, 2002 U.S. Dist. LEXIS 7506, 2002 WL 764473, at *10. Nevertheless, Plaintiff has not alleged that NYCHA *"subsequently* subjected **[*26]** her to an adverse action . . . ." *Marks*, 2002 U.S. Dist. LEXIS 7506, 2002 WL 764473, at *9 (emphasis added). In fact, the "civil court" proceedings regarding Plaintiff's eviction were initiated *prior* to the commencement of this action. Specifically, according to a letter from NYCHA to Plaintiff, which is attached to the Amended Complaint, NYCHA initiated the eviction proceedings on January 12, 2007. Plaintiff's initial pleading was delivered to this District's *Pro Se* Office on January 25, 2007. Therefore, because NYCHA began its effort to evict Plaintiff prior to the time at which Plaintiff engaged in "protected activity" relating to her alleged disability by commencing this action,

NYCHA's initiation of those housing proceedings cannot serve as the basis for a retaliation claim. Accordingly, NYCHA's motion to dismiss Plaintiff's retaliation claim is granted.

III. CONCLUSION

Plaintiff's allegations, if true, are serious, and they may support claims under New York State law relating to the habitability of the Frederick Douglass Complex. *See, e.g., Jamaica Recycling Corp. v. City of New York*, 12 Misc. 3d 276, 816 N.Y.S.2d 282, 284 (N.Y. Sup. Ct. 2006) ("'It is beyond question that garbage, with its noxious odors, its decay, and the **[*27]** vermin it attracts, is a deleterious substance which is unhealthy and an *actual or potential nuisance* with obvious hazards.'" (quoting *New York Coalition of Recycling Enters. v City of New York*, 158 Misc. 2d 1, 598 N.Y.S.2d 649 (N.Y. Sup. Ct.1992)) (emphasis added). Moreover, it is plainly in the interest of all the parties to this litigation to work together to improve Plaintiff's living conditions, as well as the general conditions at the Frederick Douglass Complex. [7]

However, "claims arising from deficient housing conditions do not involve a uniquely federal interest since 'the area[] of landlord-tenant law ? has typically been the province of state courts and legislatures.'" *Rivera v. Phipps Houses Servs., Inc.*, No. 01 Civ. 2324 (HB), 2001 U.S. Dist. LEXIS 8939, 2001 WL 740779, at *3 n.3 (S.D.N.Y. June 29, 2001) (quoting *Conille v. Sec'y of HUD*, 840 F.2d 105 (1st Cir. 1988)). **[*28]** In light of the allegations in the Amended Complaint, if NYCHA and HUD are unable to address Plaintiff's concerns, the proper fora for Plaintiff's legal claims appear to be the New York State courts, including the Housing Part of the New York City Civil Courts. *See, e.g.*, N.Y. Civ. Ct. Act § 110(a) (establishing a New York City Housing Court); N.Y. Real Prop. Law § 235-b (defining the warranty of habitability).

In sum, Plaintiff has failed to state a claim upon which relief may be granted by *this* Court. For the foregoing reasons, Defendants' respective motions to dismiss Plaintiff's claims are granted. The Clerk of the Court is

respectfully directed to terminate the motions docketed as document numbers 13 and 16, and to close this case.

**SO ORDERED**.

/s/ Richard J. Sullivan

RICHARD J.SULLIVAN

United States District Judge

Dated: March 26, 2009

New York, New York

---

End of Document

---

[7] Indeed, recent reports suggest that the elevators in the City's public housing developments have caused numerous injuries and a great deal of human suffering, and that the litigation costs to NYCHA associated with these problems are staggering. *See* Manny Fernandez and Ray Rivera, *Records Show a High Cost for Faulty Elevators*, N.Y. Times, Mar. 18, 2009, at AI.



⚠ Caution
As of: July 25, 2017 8:11 PM Z

# Marks v. BLDG Mgmt. Co.

United States District Court for the Southern District of New York

April 26, 2002, Decided ; April 26, 2002, Filed

99 Civ. 5733 (THK)

**Reporter**
2002 U.S. Dist. LEXIS 7506 *

PHYLLIS MARKS, Plaintiff, -against- BLDG
MANAGEMENT CO., INC., d/b/a WEMBLY
MANAGEMENT CO., IG SECOND GENERATION
PARTNERS, L.P., I BLDG CO., INC., and LLOYD
GOLDMAN, Defendants.

**Subsequent History:** Affirmed by Marks v. Bldg Mgmt.
Co., 56 Fed. Appx. 62, 2003 U.S. App. LEXIS 19775
(2003)

**Disposition:** **[*1]** Defendants' motion for judgment as a
matter of law on Plaintiff's failure to accommodate claim
and Plaintiff's retaliation claim granted.

## Core Terms

accommodation, apartment, roommate, Defendants',
disability, retaliation, notices, Housing, retaliation claim,
damages, lawsuit, reasons, adverse action, matter of
law, retaliatory, tenant, handicap, rights, cure, no
evidence, terminate, cases, spend, landlord, cold,
reasonable accommodation, rent-controlled, eviction,
occupied, Village

## Case Summary

### Procedural Posture
Plaintiff tenant sued defendants landlord pursuant to the
Fair Housing Act (FHA), 42 U.S.C.S. § 3601 et seq.,
and related state law claims alleging discrimination
against her due to her illness, refusal to grant
reasonable accommodation, and retaliation. The matter
went before a jury which returned a verdict in favor of
the tenant. The landlord moved for judgment as a matter

of law pursuant to Fed. R. Civ. P. 50(b).

### Overview
The tenant resided in a rent-controlled apartment and
had roommates. The tenant was diagnosed with had
Acquired Immune Deficiency Syndrome and began
going to Florida during the winter months. The landlord
commenced an eviction proceeding against the tenant
based on her illegal subletting of her apartment. The
tenant took the landlord to court and a jury found in
favor of the landlord. The tenant then requested that the
landlord accommodate her and allow her to retain a
roommate in the apartment during her absence. The
landlord denied the request. The tenant continued to
travel to Florida during the winter months, and to
maintain a year-round roommate. The landlord served
the tenant with a notice to cure, which was followed by a
notice to terminate. The court held that the tenant's
request for a roommate had nothing to do with her
sickness and had everything to do with her pocketbook
such that the landlord could not be required to
accommodate her under the FHA. The tenant failed to
establish that she was actually the victim of any
injurious action and the record did not show that the
denial had any chilling effect on her willingness to assert
her rights under the FHA.

### Outcome
The motion for judgment as a matter of law on the
failure to accommodate claim and the retaliation claim
was granted.

## LexisNexis® Headnotes

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

**HN1**[↓] **Trials, Judgment as Matter of Law**
Fed. R. Civ. P. 50 provides that a court may render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Fed. R. Civ. P. 50(a)(1).

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

**HN2**[↓] **Trials, Judgment as Matter of Law**
A party seeking judgment as a matter of law must first make its motion before the case is submitted to the jury. Fed. R. Civ. P. 50(a)(2). If the motion is denied, Fed. R. Civ. P. 50(b) permits the moving party to renew its motion after a verdict is rendered.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

**HN3**[↓] **Trials, Judgment as Matter of Law**
In deciding a Fed. R. Civ. P. 50(b) motion, a court is required to consider the evidence in the light most favorable to the non-moving party and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor. A court may not assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Thus, although a court should review all of the evidence in the record, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, a court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

**HN4**[↓] **Trials, Judgment as Matter of Law**
A party seeking judgment as a matter of law bears a heavy burden. A court may not grant a Fed. R. Civ. P. 50 motion unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and

conjecture; or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Evidence > Weight & Sufficiency

**HN5**[↓] **Trials, Judgment as Matter of Law**
Judgment as a matter of law may not be granted unless, viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable persons could have reached.

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > General Overview

Civil Rights Law > ... > Fair Housing Rights > Protected Classes > Disability Discrimination

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act

Civil Rights Law > ... > Fair Housing Rights > Prohibited Conduct > Leasing & Sales

**HN6**[↓] **Housing & Public Buildings, Fair Housing**
The Fair Housing Act, 42 U.S.C.S. § 3601 et seq., makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling because of that person's disability. 42 U.S.C.S. § 3604(f)(2).

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public

Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act

***HN7***[⬇] **Housing & Public Buildings, Fair Housing**
Under the Fair Housing Act, 42 U.S.C.S. § 3601 et seq., discrimination includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C.S. § 3604(f)(3)(B). Although a defendant may be required to incur "reasonable costs" to accommodate a plaintiff's handicap, he is not required to provide any accommodation that poses an undue hardship or a substantial burden.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

***HN8***[⬇] **Trials, Judgment as Matter of Law**
Ordinarily, the failure to raise an argument at trial bars a party from raising that argument in a Fed. R. Civ. P. 50(b) motion. However, where the nonmoving party fails to object to a Fed. R. Civ. P. 50(b) motion on the grounds of waiver, the objection itself is deemed waived.

Real Property Law > Landlord & Tenant > Lease Agreements > Residential Leases

***HN9***[⬇] **Lease Agreements, Residential Leases**
See N.Y. Real Prop. Law § 235-f(3).

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act

Public Health & Welfare Law > Social Services > Disabled & Elderly Persons > General

Overview

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Fair Housing Rights > Prohibited Conduct > Leasing & Sales

***HN10***[⬇] **Housing & Public Buildings, Fair Housing**
With regard to the Fair Housing Act, 42 U.S.C.S. § 3601 et seq., the United States Court of Appeals for the Second Circuit holds that it is fundamental that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps. Ordinarily, the duty to make reasonable accommodations is framed by the nature of the particular handicap.

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act

***HN11***[⬇] **Housing & Public Buildings, Fair Housing**
The United States Court of Appeals for the Second Circuit holds that the Fair Housing Act, 42 U.S.C.S. § 3601 et seq., does not require reasonable accommodations for poor people who happen to be disabled whenever a neutral policy has an adverse impact on all poor people.

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > General Overview

Real Property Law > Financing > Federal Programs > Federal Housing Administration

Civil Rights Law > ... > Fair Housing Rights > Protected Classes > Disability Discrimination

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act

Civil Rights Law > ... > Fair Housing Rights > Prohibited Conduct > Leasing & Sales

***HN12***[⬇] **Housing & Public Buildings, Fair Housing**
With regard to the Fair Housing Act (FHA), 42 U.S.C.S. § 3601 et seq., the "economic accommodation" cases stand for the more general proposition that an accommodation is not "necessary" to afford a disabled person access to equal housing opportunity when the accommodation sought does not directly ameliorate an effect of the disability. In other words, the FHA does not require defendants to waive generally applicable policies when such policies negatively affect disabled individuals for reasons unrelated to their disability.

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act

Real Property Law > Financing > Federal Programs > Federal Housing Administration

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > General Overview

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Fair Housing Rights > Prohibited Conduct > Leasing & Sales

Public Health & Welfare Law > Housing & Public Buildings > General Overview

***HN13***[⬇] **Housing & Public Buildings, Fair Housing**
The Fair Housing Act (FHA), 42 U.S.C.S. § 3601 et seq., renders it unlawful to coerce, intimidate, threaten, or interfere with any person on account of his having exercised or enjoyed any right granted or protected under the FHA. 42 U.S.C.S. § 3617; 24 C.F.R. § 100.400(c)(5), which states that 42 U.S.C.S. § 3617

prohibits, retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the FHA.

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act

Real Property Law > Financing > Federal Programs > Federal Housing Administration

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Fair Housing Rights > Prohibited Conduct > Leasing & Sales

Labor & Employment Law > ... > Retaliation > Statutory Application > Rehabilitation Act

***HN14***[⬇] **Housing & Public Buildings, Fair Housing**
To prevail on a claim of retaliation under the Fair Housing Act (FHA), 42 U.S.C.S. § 3601 et seq., a plaintiff is required to prove that (1) she engaged in activity protected under the FHA; (2) defendants were aware of that activity; (3) defendants subsequently subjected her to an adverse action; and (4) there was a causal connection between this adverse action and her protected activity.

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act

Civil Rights Law > ... > Fair Housing Rights > Prohibited Conduct > Leasing & Sales

**HN15**[⬆]  **Housing & Public Buildings, Fair Housing**
With regard to the Fair Housing Act, 42 U.S.C.S. § 3601 et seq., a meritorious claim under 42 U.S.C.S. § 3604 is not a prerequisite to a retaliation claim under 42 U.S.C.S. § 3617. A reading of 42 U.S.C.S. § 3617 as dependent on a violation of the enumerated sections would render § 3617 superfluous. Indeed, such a reading would lead to precisely the result condemned by the United States Court of Appeals for the Second Circuit which rendered 42 U.S.C.S. §§ 3617 and 3604 duplicative of each other.

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Real Property Law > Financing > Federal Programs > Federal Housing Administration

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > General Overview

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act

Civil Rights Law > ... > Fair Housing Rights > Prohibited Conduct > Leasing & Sales

Public Health & Welfare Law > Housing & Public Buildings > General Overview

**HN16**[⬆]  **Housing & Public Buildings, Fair Housing**
The filing of a lawsuit under the Fair Housing Act (FHA), 42 U.S.C.S. § 3601 et seq., constitutes "protected activity." 24 C.F.R. § 100.400(c)(5), which states that 42 U.S.C.S. § 3617 forbids retaliation because a party has made a complaint under the FHA.

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Contractual Relations &

Housing > Fair Housing Rights > Fair Housing Amendments Act

Civil Rights Law > ... > Fair Housing Rights > Prohibited Conduct > Leasing & Sales

**HN17**[⬆]  **Housing & Public Buildings, Fair Housing**
The Fair Housing Act, 42 U.S.C.S. § 3601 et seq., does not prohibit retaliatory motives, without more; rather, the aggrieved party must show that she suffered an adverse action based on such motives. Under the terms of 42 U.S.C.S. § 3617, the retaliatory adverse action must coerce, intimidate, threaten, or interfere with the party. Though many of the reported cases under 42 U.S.C.S. § 3617 involve allegations of force or violence, such a showing is not necessary to prove a violation. The plain language of the statute supports this application, as do numerous cases upholding claims based on wide-ranging conduct in opposition to protected activity.

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Amendments Act

Civil Rights Law > ... > Fair Housing Rights > Prohibited Conduct > Leasing & Sales

**HN18**[⬆]  **Housing & Public Buildings, Fair Housing**
Under the Fair Housing Act, 42 U.S.C.S. § 3601 et seq., a defendant's exercise of right not to renew contract could constitute retaliation if designed to coerce and intimidate a plaintiff into changing or ceasing its protected advocacy.

Business & Corporate Compliance > ... > Public Health & Welfare Law > Housing & Public Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Contractual Relations & Housing > Fair Housing Rights > Fair Housing

Amendments Act

Civil Rights Law > ... > Fair Housing
Rights > Prohibited Conduct > Leasing & Sales

***HN19***[⬇] **Housing & Public Buildings, Fair Housing**
Under the Fair Housing Act, 42 U.S.C.S. § 3601 et seq.,
a 42 U.S.C.S. § 3617 retaliation claim requires a
showing of "adverse action".

Business & Corporate Compliance > ... > Public
Health & Welfare Law > Housing & Public
Buildings > Fair Housing

Civil Rights Law > ... > Contractual Relations &
Housing > Fair Housing Rights > Fair Housing Act

Civil Rights Law > ... > Contractual Relations &
Housing > Fair Housing Rights > Fair Housing
Amendments Act

Civil Rights Law > ... > Fair Housing
Rights > Prohibited Conduct > Leasing & Sales

***HN20***[⬇] **Housing & Public Buildings, Fair Housing**
With regard to the Fair Housing Act, 42 U.S.C.S. § 3601
et seq., a plaintiff's claim of retaliation must fail where
there is no showing that the alleged violation had any
actual effect on him.

**Counsel:** For PHYLLIS MARKS, plaintiff: Michael
O'Neill, New York, NY.

For BLDG. MANAGEMENT CO., INC., IG SECOND
GENERATION PARTNERS, L.P., I BLDG. CO., INC.,
LLOYD GOLDMAN, defendants: Jeffrey K. Van Etten,
Kral, Clerkin, Redmond, Ryan, Perry & Girvan, New
York, NY.

For BLDG. MANAGEMENT CO., INC., IG SECOND
GENERATION PARTNERS, L.P., I BLDG. CO., INC.,
LLOYD GOLDMAN, counter-claimants: Jeffrey K. Van
Etten, Kral, Clerkin, Redmond, Ryan, Perry & Girvan,
New York, NY.

For PHYLLIS MARKS, counter-defendant: Michael
O'Neill, New York, NY.

**Judges:** THEODORE H. KATZ, UNITED STATES
MAGISTRATE JUDGE.

**Opinion by:** THEODORE H. KATZ

# Opinion

**MEMORANDUM OPINION AND ORDER**

**THEODORE H. KATZ, UNITED STATES
MAGISTRATE JUDGE.**

Plaintiff brought this action under the Fair Housing Act
and Fair Housing Amendments Act (collectively, "Fair
Housing Act" or "FHA"), 42 U.S.C. § 3601 et seq., and
related New York laws, claiming that Defendants, who
manage and own the building in which she lives (1)
discriminated against her by serving her **[*2]** with
notices to cure and to terminate because she had
Acquired Immune Deficiency Syndrome ("AIDS"); (2)
improperly refused her request for a reasonable
accommodation; and (3) retaliated against her for
bringing an earlier lawsuit by refusing her
accommodation request and by serving her with the
notices to cure and to terminate. A jury trial in this action
commenced on December 4, 2000. Before the jury
began its deliberations, Plaintiff withdrew her claim that
Defendants' serving of the notices to cure and to
terminate was discriminatory, thereby leaving only the
accommodation and retaliation claims in the action.
Following a two-day trial, the jury found that Defendants
had violated the FHA and related state laws by denying
Plaintiff her requested accommodation, and by doing so
in retaliation for her prior lawsuit against them. The jury
also found, however, that Defendants' serving Plaintiff
with notices to cure and to terminate was not retaliatory.
The jury awarded Plaintiff $ 50,000 in compensatory
damages and $ 250,000 in punitive damages.

Now before the Court is Defendants' motion, brought
pursuant to Federal Rule of Civil Procedure 50(b), for
judgment as a matter of law on the **[*3]** jury's findings of
liability as well as its damages awards. For the reasons
that follow, Defendants' motion is granted.

BACKGROUND

At the time of trial Plaintiff Phyllis Marks had resided in a
rent-controlled apartment at 166 Second Avenue in New
York City for approximately thirty-eight years. (Trial
Transcript ("Tr.") at 98.) Defendant Lloyd Goldman is the
president of and a shareholder in Defendant BLDG
Management Company, Inc., which manages the
property at 116 Second Avenue. (Id. at 242-43.) Mr.
Goldman also has interests in Defendant companies IG
Second Generation Partners, L.P., and L. BLDG
Company, Inc., which have ownership interests in the

116 Second Avenue property. (Id. at 242.) During the thirty-eight years in which Plaintiff has lived in Defendants' building, she has had roommates for "practically all" of that time. (Id. at 99.)

In 1986, Plaintiff was diagnosed with AIDS, and, in 1991, was diagnosed with AIDS-related non-Hodgkins lymphoma. [1] (Id. at 98.) Beginning in 1992, Plaintiff began going to Florida during the winter months because the warmer weather was beneficial to her health. (Id. at 99-101, 173-74.) During this time, Plaintiff continued [*4] her practice of having a roommate, and the roommate occupied the apartment year-round -- that is, regardless of whether Plaintiff was in New York or in Florida.

In May 1996, Defendants commenced an eviction proceeding against Plaintiff based on her alleged illegal subletting of her apartment. (Id. at 104, 308-09.) In response, Plaintiff filed suit against Defendants in this Court, alleging that the proceedings were brought because of her disability of AIDS, in violation of the FHA and related state laws. In August 1997, a jury found that Defendants did not discriminate against Plaintiff in their attempts to evict her. [2] Subsequently, in October 1997, the parties stipulated to a discontinuance of the state eviction action. (Id. at 109.)

 [*5] By a letter dated November 3, 1997, Plaintiff, through her attorney Michael O'Neill, wrote to Bella Sezer, Defendants' managing agent for the 116 Second Avenue property. (Id. at 111, 191; Plaintiff's Exhibit ("Pl. Ex.") 1.) The letter informed Defendants that Plaintiff "suffers from AIDS," and that "for health reasons she prefers to spend the cold months in a warmer climate, Florida." (Pl. Ex. 1.) Mr. O'Neill also stated that Plaintiff was aware that Defendants had "a policy of accommodating the special needs of tenants who have medical conditions which require them to be absent from their apartments." (Id.) Mr. O'Neill further stated:

> Pursuant to this policy, and pursuant to the Americans With Disabilities Act, I am requesting that you accommodate the needs of Ms. Marks in the following respects:
>
> . That you permit her to be absent from her apartment, more or less continuously, from the onset of cold weather in New York until the

onset of warm weather in Spring, without jeopardizing her leasehold rights; and

> . That you permit Ms. Marks to allow a friend or roommate to occupy her apartment while she is not in New York, without jeopardizing her leasehold rights. [*6]

(Id.) The letter stated that Plaintiff intended to maintain the apartment at 166 Second Avenue as her primary residence, and that she had no intention of relinquishing or abandoning her leasehold rights in the apartment, or of assigning, subletting, or otherwise granting tenancy rights to any roommate who occupied the apartment in her absence. (Id.) Attached to the correspondence was a letter from Plaintiff's doctor, Robert K. Gale, stating that Plaintiff was under treatment for "AIDS and related conditions"; that "it would be beneficial to Ms. Marks to spend the cold weather in Florida"; and that "any accommodation that can be granted would be beneficial to her health." (Id.)

Defendants, through their attorney Lawrence P. Wolf, denied Plaintiff's request by a letter dated November 12, 1997. (Pl. Ex. 3.) In this letter, Mr. Wolf denied having knowledge of any policy of accommodating the needs of tenants with long-term illnesses requiring them to be absent from their apartments, and stated that the information Plaintiff had provided did not establish that it was necessary for her to spend part of the year in Florida. Mr. Wolf informed Plaintiff that if she intended [*7] to have a roommate in the New York apartment while she was in Florida, she would be doing so "at her own risk." Mr. Wolf also wrote,

> Without seeming to be callous, the owner wishes to inform you that the owner is not able to ascertain from the letter of Dr. Gayle what Ms. Marks' current condition is. Furthermore, your client has already put my client through an enormous amount of unnecessary expenses based on your frivolous [sic] claim made in Federal Court which was recently dismissed.

(Id.) After this letter was sent, Plaintiff continued to travel to Florida during the winter months, and to maintain a year-round roommate. (Tr. at 112.)

In May 1999, Defendants served Plaintiff with a notice to cure, which stated that Plaintiff was in violation of the obligations of her rent controlled tenancy, and ordered her to cure the violation by removing any unauthorized occupant. (Pl. Ex. 5.) The notice to cure was followed by a notice to terminate approximately one month later,

---

[1] Defendants have not disputed that Plaintiff's diagnosis of AIDS renders her a disabled person within the meaning of the FHA and related state laws.

[2] The trial was held before the Honorable Harold Baer, United States District Judge. (Def. Ex. I.)

which informed Plaintiff that her tenancy would be terminated on July 31, 1999. (Pl. Ex. 4.)[3]

[*8] Plaintiff commenced the instant action on July 15, 1999. As noted above, at the close of trial Plaintiff withdrew her claim that Defendants had discriminated against her because she had AIDS. [4] Further, the jury rejected the claim that the 1999 issuance of the notices to cure and to terminate were in retaliation for Plaintiff's 1996 lawsuit, which ended in 1997. The jury found, however, that the 1997 denial of Plaintiff's request to allow her roommate to remain in her apartment when she was in Florida violated the FHA, both as a denial of an accommodation of Plaintiff's handicap, and as a retaliation for her previous lawsuit. The jury awarded Plaintiff $ 50,000 in compensatory damages and $ 250,000 in punitive damages.

DISCUSSION

I. Rule 50(b) Legal Standards

HN1[⬆] Federal Rule of Civil Procedure 50 provides that a court may render judgment as a matter of law when "a party [*9] has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue . . . ." Fed. R. Civ. P. 50(a)(1). HN2[⬆] A party seeking judgment as a matter of law must first make its motion before the case is submitted to the jury. See Fed. R. Civ. P. 50(a)(2). If the motion is denied, Rule 50(b) permits the moving party to renew its motion after a verdict is rendered. See Fed. R. Civ. P. 50(b).

HN3[⬆] In deciding a Rule 50(b) motion, a court is required to "consider the evidence in the light most favorable to the [non-moving party] and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor." Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001)(quoting Smith v. Lightning Bold Prods., 861 F.2d 363, 367 (2d Cir. 1988)(internal quotation marks omitted)); see also Nat'l Communications Ass'n, Inc. v. AT&T Corp., 238 F.3d

124, 127 (2d Cir. 2001). A court may not "assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." Tolbert, 242 F.3d at 70 [*10] (citation omitted); see also Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998). Thus, although a court should "review all of the evidence in the record," it "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150-51, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000). "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. (citation and internal quotation marks omitted).

HN4[⬆] A party seeking judgment as a matter of law bears a heavy burden. A court may not grant a Rule 50 motion unless

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

[*11] Burke v. Spartanics Ltd., 252 F.3d 131, 136 (2d Cir. 2001)(quoting Galdieri-Ambrosini, 136 F.3d at 289 (internal quotation marks and brackets omitted)); see also DiSanto v. McGraw-Hill, Inc., 220 F.3d 61, 64 (2d Cir. 2000); Fowler v. New York Transit Auth., 2001 U.S. Dist. LEXIS 762, No. 96 Civ. 6796 (JGK), 2001 WL 83228, at *1 (S.D.N.Y. Jan. 31, 2001). In other words, HN5[⬆] judgment as a matter of law may not be granted unless, "viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995)(citations and internal quotation marks omitted); see also Simms v. Village of Albion, 115 F.3d 1098, 1110 (2d Cir. 1997).

II. Defendants' Motion

A. Plaintiff's Failure to Accommodate Claim

HN6[⬆] The FHA makes it unlawful "to discriminate against any person in the terms, conditions, or privileges

---

[3] Specifically, the notice alleged that Plaintiff was either subletting her apartment without consent of her landlord, in violation of N.Y. Real Prop. Law § 226(b), or permitting individuals to remain in the apartment when she herself was not occupying the apartment, in violation of N.Y. Real Prop. Law § 235-f. (Pl. Ex. 5.)

[4] Indeed, there was no evidence adduced at trial that suggested a discriminatory animus against Plaintiff on account of her illness.

of sale or rental of a dwelling" because of that [*12] person's disability. 42 U.S.C. § 3604(f)(2). *HN7*[↑] Under the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Although a defendant may be required to incur "reasonable costs" to accommodate a plaintiff's handicap, he is not required to provide any accommodation that poses an "undue hardship or a substantial burden." Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 300 (2d Cir. 1998)(quoting Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 335 (2d Cir. 1995)(internal quotations marks and emphasis omitted)).

Plaintiff's failure to accommodate claim arises out of her attorney's 1997 letter request that Plaintiff be permitted to maintain a roommate in her apartment while she was away. Defendants argue that they are entitled to judgment as a matter of law on this claim for several reasons. As a threshold matter, Defendants assert that Plaintiff's request to leave a roommate in her apartment while she [*13] was in Florida did not constitute a request for an "accommodation" within the meaning of the FHA. [5] [*14] Defendants claim that because

---

[5] The Court notes that Defendants have raised this argument for the first time in their post-judgment Rule 50 motion. When Defendants made their motion for judgment as a matter of law at the close of the evidence, the only defects they alleged with any specificity regarding Plaintiff's failure to accommodate claim were: (1) that Plaintiff did not submit sufficient medical proof to establish that the requested accommodation was necessary; and (2) that the evidence established that Defendants did not act unreasonably in denying Plaintiff's request. (Tr. at 363-65.) Defendants gave no indication that they also questioned the legitimacy of Plaintiff's request not as a factual matter, but as a matter of law.

*HN8*[↑] Ordinarily, the failure to raise an argument at trial bars a party from raising that argument in a Rule 50(b) motion. See Mason v. City of New York, 949 F. Supp. 1068, 1073 (S.D.N.Y. 1996)(citing Lambert v. Genesee Hosp., 10 F.3d 46, 53-54 (2d Cir. 1993). However, where the nonmoving party fails to object to a Rule 50(b) motion on the grounds of waiver, the objection itself is deemed waived. See Gibeau v. Nellis, 18 F.3d 107, 109 (2d Cir. 1994); Williams v. Runyon, 130 F.3d 568, 572 (3d Cir. 1997)(noting that six circuits have so held); see also 9 James Wm. Moore et al., Moore's Federal Practice § 50.43[3][e] (3d ed. 2000).

Here, Plaintiff has not objected to Defendants' motion on the ground that certain arguments were not properly preserved.

---

Plaintiff's need for a roommate was in no way related to her disability, but was, admittedly, a way of defraying costs, Defendants' failure to accommodate that need did not violate the FHA. Relying on the Second Circuit's opinion in Salute, Defendants claim that the FHA does not require them to provide Plaintiff with what was essentially an economic accommodation. Defendants further argue that since Plaintiff's request was to be absent from the dwelling, it was by definition not related to her "use and enjoyment" of the apartment. Finally, Defendants claim that granting Plaintiff's request would have posed an undue burden on them, and therefore was not "reasonable," even if it could be deemed an accommodation. Defendants offer a number of reasons why this is so. However, because the Court agrees with Defendants as to the threshold issue -- viz., that Plaintiff's request was not an "accommodation" under the FHA -- it is unnecessary to elaborate on Defendants' contentions as to its reasonableness. [6]

Plaintiff argues that Defendants fundamentally misconstrue the nature of her requested accommodation. Plaintiff contends that under New York law, every residential tenant has the right to share her residence with one other person, as long as the tenant maintains the apartment as her primary residence. Thus, according to Plaintiff, her "use and enjoyment of her apartment undeniably included the right, guaranteed by law, to permit another person to occupy the apartment." (Plaintiff's Memorandum of Law in Opposition to Defendants' Post-Trial Motions ("Pl. Mem.") at 7.) Accordingly, Plaintiff asserts that she was not requesting permission to have a roommate, since this was already something guaranteed to her, purportedly by New York Real Property Law § 235-f. [7] [*16] Rather, taking it as a given that she would

---

Moreover, because Defendants' argument is legal, not factual, the Court's present consideration of it for the first time does not trigger the concerns underlying the specificity requirement of Rule 50(b) -- namely, that the plaintiff be given the opportunity to cure any alleged deficiencies in his proof before the case is submitted to the jury. See Lambert, 10 F.3d at 54. Accordingly, the Court will address Defendants' argument on its merits.

[6] It is undisputed that Defendants would have permitted Plaintiff to spend the winters in Florida, provided she did not leave a roommate in the apartment. (Tr. at 248-49.)

[7] *HN9*[↑] New York Real Property Law § 235-f(3) provides, "Any lease or rental agreement for residential premises entered into by one tenant shall be construed to permit occupancy by the tenant, immediate family of the tenant, one additional occupant, and dependent children of the occupant

continue to exercise her right to have a year-round roommate, Plaintiff characterizes her request as one for permission to **[*15]** leave her apartment during the cold months of the year. Plaintiff's need for an accommodation resulted from Defendants' internal policy of prohibiting tenants who were absent from their apartments for any appreciable length of time from maintaining roommates during their absence. Because Plaintiff's disability-related need to go to Florida for half the year (while incidentally maintaining a roommate in New York) clashed with Defendant's "Roommate Rule," Plaintiff required a waiver of this policy. [8] Plaintiff thus contends that it is irrelevant whether or not her wish to have a roommate was related to her disability; what matters is whether her disability required her to leave New York during the cold months, and whether a waiver of Defendants' Roommate Rule was necessary for her to have an equal opportunity to use and enjoy the apartment. Plaintiff argues that it was, since without a waiver she would have had to forgo her right to have a roommate, or risk eviction.

Whatever its merits in the abstract, Plaintiff's view of what the FHA requires has been rendered untenable by recent Second Circuit **[*17]** precedent, as well as by the weight of other judicial authority interpreting the law. In Salute, the Second Circuit foreclosed the availability under the FHA of accommodations that do not directly address an individual's disability, as opposed to addressing economic or other hardships that may stem from that disability. The plaintiffs in Salute, who were undisputedly disabled within the meaning of the law, received rental subsidies through the Section 8 housing

---

provided that the tenant or the tenant's spouse occupies the premises as his primary residence."

[8] Plaintiff also claims that the Roommate Rule "arguably" violates state law, and that the accommodation she sought was merely that Defendants follow state law. (Pl. Mem. at 7 n.2.) This argument is fundamentally flawed: by definition, accommodating an individual's disability entails something more than just following generally applicable law. See United States v. Salvation Army, 1999 U.S. Dist. LEXIS 14861, No. 96 Civ. 2415(WHP), 1999 WL 756199, at *10 (S.D.N.Y. Sept. 24, 1999) ("[A] reasonable accommodation generally presupposes an otherwise valid policy to which a defendant is asked to make an affirmative change or exception.") As discussed below, if Defendants' policy deprived Plaintiff of rights she enjoyed under New York Real Property Law, she need only have gone to Housing Court to seek relief from that policy. The issue in this case, however, is Defendants' obligations to Plaintiff under the reasonable accommodation provision of the FHA, not under New York housing law.

program administered by HUD. See Salute, 136 F.3d at 296. The plaintiffs sought to lease apartments from the defendant, but were turned down because of the defendant's policy of refusing to rent to Section 8 recipients. [9] See id. The Court rejected plaintiffs' argument that because their poverty and hence, their need for Section 8 vouchers -- resulted from their being disabled, the landlord's participation in the Section 8 program should be deemed an "accommodation" within the meaning of the statute. *HN10*[↑] The Court stated, "We think it is fundamental that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps." Id. at 301. **[*18]** Citing cases involving deaf persons' need for a hearing dog, an MS sufferer's need for a parking space, and a deaf person's need for a sign-language interpreter, the Court remarked, "Ordinarily, the duty to make reasonable accommodations is framed by the nature of the particular handicap." Id. (citations omitted).

In another example, which provides an instructive contrast to the instant case, the Salute Court noted the frequency of cases involving developers' requests for variances of zoning ordinances to permit the construction of group housing for disabled persons. Summarizing these cases, the Court stated, "The duty to accommodate is shaped by the handicap, such as the need of people with certain handicaps to live together in order to share support personnel and to reinforce each other's efforts in creating and maintaining a home." Id. at 302.

The Court contrasted such disability-related **[*19]** accommodations with the accommodation requested by the plaintiffs in the case before it, who were the victims of "economic discrimination of a kind that is practiced without regard to handicap." Id. In the Court's words:

> What stands between these plaintiffs and the apartments at Stratford Greens is a shortage of money, and nothing else. In this respect, impecunious people with disabilities stand on the same footing as everyone else. Thus, the accommodation sought by plaintiffs is not "necessary" to afford handicapped persons "equal opportunity" to use and enjoy a dwelling.

Id. (citations and emphasis omitted). In other words, the *HN11*[↑] Court held, the FHA does not require reasonable accommodations for poor people who

---

[9] Landlords' participation in the Section 8 program is voluntary. See id. at 301.

happen to be disabled whenever a neutral policy has an adverse impact on all poor people. See id.

Other courts have similarly refused to require accommodations aimed at alleviating financial hardships rather than overcoming obstacles particular to disability. See  Hemisphere Bldg. Co. v. Village of Richton Park, 171 F.3d 437, 439-40 (7th Cir. 1999)(refusing to require village to waive neutral zoning ordinance to accommodate "the interest [*20] of handicapped people in being able to obtain housing suitable for their special needs at the lowest possible price"); Brandt v. Village of Chebanse, 82 F.3d 172, 174 (7th Cir. 1996) (FHA does not "require [] municipalities to eliminate rules that increase the expense of housing for all persons equally"); Means v. Dayton, 111 F. Supp. 2d 969, 978 (S. D. Ohio 2000)(granting summary judgment where plaintiff argued only that zoning requirement caused group home to incur expenses, and presented no evidence that waiver of such requirement was necessary for residents' use and enjoyment of home); Schanz v. Village Apartments, 998 F. Supp. 784, 792 (E. D. Mich. 1998)(holding that FHA does not require landlord to accept financial guarantor agreement on behalf of disabled plaintiff unable to meet landlord's credit and income requirements; "[plaintiff's] handicap is not preventing him from renting an apartment") (emphasis added); cf. United States v. California Mobile Home Park Mgmt. Co., 107 F.3d 1374, 1381 (9th Cir. 1997)(holding that no reasonable jury could find for plaintiff where plaintiff did not show that waiver [*21] of parking fees for home healthcare provider was necessary to afford plaintiff an equal opportunity to use and enjoy her dwelling). [10]

HN12[↑] These "economic accommodation" cases, including Salute, stand for the more general proposition that an accommodation is not "necessary" to afford a disabled person access to equal housing opportunity when the accommodation sought does not directly ameliorate an effect of the disability. [*22]  In other words, the FHA does not require defendants to waive

generally applicable policies when such policies negatively affect disabled individuals for reasons unrelated to their disability. Numerous cases in addition to those already cited have affirmed this basic principle. See, e.g.,  Bryant Woods Inn, Inc. v. Howard County, 124 F.3d 597, 604 (4th Cir. 1997); Bronk v. Ineichen, 54 F.3d 425, 428-29 (7th Cir. 1995); Advocacy and Res. Ctr. v. Town of Chazy, 62 F. Supp. 2d 686, 689-90 (N.D.N.Y. 1999); United States v. Salvation Army, 1999 U.S. Dist. LEXIS 14861, No. 96 Civ. 2415(WHP), 1999 WL 756199, at *10 (S.D.N.Y. Sept. 24, 1999); Anonymous v. Goddard Riverside Cmty. Ctr., Inc., 1997 U.S. Dist. LEXIS 9724, No. 96 Civ. 9198 (SAS), 1997 WL 475165, at *3 (S.D.N.Y. July 18, 1997); Gavin v. Spring Ridge Conservancy, Inc., 934 F. Supp. 685, 688 (D. Md. 1995).

Plaintiff's request to leave a roommate in her apartment during her stays in Florida runs directly counter to this precept. Plaintiff presented no evidence that having a roommate while she was away (or even while she was not) was necessary in any way to assist her in dealing with her AIDS-related [*23] medical condition, or even that it mitigated in any way the difficulties associated with her illness. Plaintiff offered no evidence that having a roommate was necessary, for example, to assist in her medical care, or "to reinforce [her] efforts in creating and maintaining a home." Salute at 302. Plaintiff's testimony about the benefits of having a roommate concerned almost exclusively the roommate's financial contributions. (Tr. at 103-04, 131.) Simply put, Plaintiff's request for a roommate had nothing to do with her sickness and, from all that appears, everything to do with her pocketbook; under Salute, Defendants cannot be required to accommodate the latter. [11]

The only other reason Plaintiff offered (albeit in passing) for having a roommate was that having someone else in the apartment had, in the past, provided companionship. (Tr. [*24] at 103.) However, Plaintiff presented no evidence as to how this purpose could be served while she was in Florida. Even more significantly, she offered no evidence linking the need for companionship to anything having to do with her illness. The absence of such evidence is fatal to her claim.

Plaintiff attempts to circumvent the requirement that the accommodation address the disability by claiming that the accommodation she sought was simply permission

---

[10] In an earlier opinion in same case, the Ninth Circuit had rejected the argument that under no circumstances could a defendant be required to waive generally applicable fees. See United States v. California Mobile Home Park Mgmt. Co., 29 F.3d 1413, 1418 (9th Cir. 1994). The later opinion, issued after trial, found that the plaintiff had not proved an essential element of her case, namely, that the defendant's generally applicable parking fees did in fact cause a denial of her use and enjoyment of her housing. See  California Mobile Home II, 107 F.3d at 1381.

---

[11] In any event, Plaintiff never even claimed that without a roommate she could not afford to go to Florida or would be forced to relinquish her New York apartment.

to spend time in Florida. Plaintiff asserts that she was not requesting the right to have a roommate, because, she claims, she already had that right under New York law. Thus, Plaintiff argues, she had no obligation to demonstrate a connection between having a roommate and accommodating her AIDS disability. Under Plaintiff's view, the question for the jury was not whether or not she needed a roommate because of her AIDS, but whether her AIDS required her to avoid cold weather. Because Plaintiff put forth sufficient evidence that it did -- which Defendants neither contradicted nor impeached at trial -- Plaintiff asserts that this Court must accept the jury's implicit finding that the accommodation she sought was necessary.

Plaintiff's [*25] arguments are unpersuasive. Despite Plaintiff's efforts to characterize her request as simply entailing her traveling to Florida during the cold months, the plain, uncontroverted, unavoidable fact is that Plaintiff also requested to leave a roommate in the apartment in her absence. It was this request, and not a mere request to spend time out of New York, that Defendants failed to accommodate. [12] [*27] The Court agrees with Plaintiff that whether or not Plaintiff's disability required her to spend winters in Florida was a question for the jury, and that Plaintiff presented sufficient evidence on this issue for the jury to find in her favor on this score. [13] However, the question before the Court is whether or not the jury could also have

---

[12] The parties hotly contest whether Defendants' denial of Plaintiff's request violated New York law. As noted, however, the merits of this dispute are irrelevant to the issue before this Court, which is what the Fair Housing Act, not New York property law, requires. Whether or not Defendants' refusal of Plaintiff's request for a roommate deprived her of a right she enjoyed under New York law, the proper forum for Plaintiff to vindicate any such right was New York state court. Indeed, the statute under which Plaintiff claimed the right to a roommate expressly provides a cause of action for injunctive relief and damages for violations of its provisions. See N.Y. Real Prop. Law § 235-f(9).

[13] Defendants have not contested Plaintiff's asserted rationale for going to Florida (Def. Reply at 13), and, as noted, did not oppose the simple fact of her spending long periods of time in Florida. Thus, no issue concerning the medical necessity of her trips is before the Court. It is worth noting, however, that the evidence on this score was equivocal at best. Apart from Plaintiff's own testimony concerning her doctors' advice, the only evidence concerning her alleged "need" to travel to Florida was a note from one of her doctors stating that "it would be beneficial to Ms. Marks to spend the cold weather [sic] in Florida." (Pl. Ex. 2.)

reasonably found that Plaintiff's disability required her to leave a roommate in her New York apartment. Indeed, this would be a different case had Plaintiff simply been denied the opportunity to travel to Florida, without having requested to leave a roommate in New York. In such a case, the denial of Plaintiff's request to temporarily vacate her apartment to travel to Florida for medical reasons would have harmed her for reasons particular to her disability [*26] - that is, by depriving someone with AIDS of the benefits of warm weather. In this case, however, the Roommate Rule harmed Plaintiff in the same way it did everyone else - by making it more expensive to leave the apartment for half the year by disallowing stay-behind roommates to defray costs. Plaintiff thus stood on the same footing as a healthy tenant who liked to spend winters in Florida playing golf. Both enjoyed an equal opportunity to make the trip; neither had a disability-related need to leave someone in his or her New York apartment. Accommodating Plaintiff's request to waive the Roommate Rule would thus have done more than simply afford her an equal opportunity to use and enjoy her apartment, it would have granted her a special subsidy unavailable to nondisabled tenants. This the law does not require. Because Plaintiff has failed to show how her accommodation request addressed a hardship created by her disability, her claim must fail as a matter of law.

## B. Plaintiff's Retaliation Claim

The jury also found that Defendants' denial of Plaintiff's requested accommodation constituted unlawful retaliation against Plaintiff for having brought her prior FHA lawsuit against them Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's retaliation claim on several grounds. First, Defendants argue that because their refusal to grant Plaintiff's request for a roommate while she was [*28] in Florida did not deny Plaintiff any right to which she was entitled, Plaintiff's retaliation claim based on the same conduct must fail as a matter of law. Second, Defendants argue that Plaintiff failed to meet the plain-language statutory requirement of 42 U.S.C. § 3617, because there is no evidence that Defendants "coerced, intimidated, threatened, or interfered" with Plaintiff's use and enjoyment of her apartment. Finally, Defendants argue that the evidence was insufficient to establish a causal connection between Defendants' denial of Plaintiff's accommodation request and Plaintiff's prior lawsuit.

*HN13*[⬆] The FHA renders it unlawful to "coerce, intimidate, threaten, or interfere with any person . . . on account of his having exercised or enjoyed . . . any right

granted or protected" under the FHA. 42 U.S.C. § 3617; see also 24 C.F.R. § 100.400(c)(5)(§ 3617 prohibits, inter alia, "retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act"). **HN14**[⬆] To prevail on a claim of retaliation under the FHA, a [*29] plaintiff is required to prove that (1) she engaged in activity protected under the FHA; (2) defendants were aware of that activity; (3) defendants subsequently subjected her to an adverse action; and (4) there was a causal connection between this adverse action and her protected activity. See Broome v. Biondi, 17 F. Supp. 2d 211, 218-19 (S.D.N.Y. 1997); San Pedro Hotel Co. v. City of Los Angeles, 159 F.3d 470, 477 (9th Cir. 1998); see also Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000) (discussing the elements of an ADA retaliation claim); Sands v. Runyon, 28 F.3d 1323, 1331 (2d Cir. 1994)(Rehabilitation Act); Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988)(Title VII), cited in Biondi, 17 F. Supp. 2d at 219.

Defendants claim that since they were not legally required to grant Plaintiff's roommate accommodation request under 42 U.S.C. § 3617, their denial cannot subject them to liability for retaliation under 42 U.S.C. § 3617, as a matter of law. Defendants argue, quoting [*30] the Seventh Circuit, that "where the conduct that allegedly violated section 3617 is the same conduct that allegedly violated section 3604(a) and was engaged in by the same party, the validity of the section 3617 claim depends upon whether the [conduct] violated section 3604(a)." South-Suburban Housing Ctr. v. Greater S. Suburban Bd. of Realtors, 935 F.2d 868, 886 (7th Cir. 1991)(citation and internal quotation marks omitted); see also Gavin, 934 F. Supp. at 685 ("The lack of any merit in plaintiff's principal claim [alleging failure to accommodate] bars a § 3617 claim based on the same charge of discrimination.") (also cited by Defendants). A Second Circuit case, not cited by Defendants, similarly rejected a § 3617 claim of "interference" that was based on the same conduct that had been found not to violate § 3604(a). See Frazier v. Rominger, 27 F.3d 828, 834 (2d Cir. 1994). In Frazier, the plaintiffs claimed that defendants had refused to rent to them on account of race, in violation of § 3604(a), as well as on account of one of the plaintiff's having questioned the landlord as to his potential racial bias, allegedly [*31] in violation of § 3617. The Court ruled that because asking the landlord about his potential racial motivation was not a "right granted or protected by section 3603, 3604, 3605, or 3606," the landlord's act of

"interference" allegedly prompted by the questioning was not actionable under § 3617. See id. at 834. The Court noted that without viable allegations concerning the predicate exercise of a protected right, there could be no cause of action under § 3617 for "interference" with such a right. Without such a predicate, the plaintiffs' claim of "interference" under § 3617, which was based solely on the denial of rental housing, was duplicative of their claim for discriminatory denial of housing under § 3604(a). In such a case, the Court stated, the plaintiff's sole remedy is under § 3604(a). See id.

However, neither the Frazier case, nor those cited by Defendants, presented the scenario here. That is, none of those cases involved a claim of retaliation based on the plaintiff's having engaged in indisputably protected activity. In Frazier, the Court rejected the plaintiffs' allegation that they engaged in such activity, see id. at 834; [*32] in South-Suburban Housing and Gavin, the plaintiffs did not even make such an allegation, see South-Suburban Housing, 935 F.2d at 868; Gavin, 934 F. Supp. at 687. Thus, none of the cases addressed whether an action that does not violate § 3604 nonetheless may, if taken in retaliation for exercising a right granted under the substantive provisions of the FHA, violate § 3617. Put another way, the conduct complained of by Plaintiff under § 3617 is not really the "same conduct" complained of under § 3604(f), inasmuch as the former involves additional facts that support an inference of retaliatory animus.

This conclusion is consistent with the opinions of numerous courts, including several in this Circuit, that have found that **HN15**[⬆] a meritorious claim under § 3604 is not a prerequisite to a retaliation claim under § 3617. See, e.g., Ohana v. 180 Prospect Place Realty Corp., 996 F. Supp. 238, 242 (E.D.N.Y. 1998) (so concluding after thorough review of statutory language of FHA and interpretative caselaw); Puglisi v. Underhill Park Taxpayer Ass'n, 947 F. Supp. 673, 696 (S.D.N.Y. 1996); New York ex rel. Abrams v. Merlino, 694 F. Supp. 1101, 1103-04 (S.D.N.Y. 1988); [*33] Stackhouse v. DeSitter, 620 F. Supp. 208, 210 (N.D. Ill. 1985). This Court agrees that "reading § 3617 as dependent on a violation of the enumerated sections would render § 3617 superfluous." Stackhouse, 620 F. Supp. at 210, quoted in Ohana, 996 F. Supp. at 242. Indeed, such a reading would lead to precisely the result condemned by the Second Circuit in Frazier: rendering § 3617 and § 3604 duplicative of each other.

Here, Defendants have not disputed that Plaintiff's **HN16**[⬆] filing of a lawsuit under the FHA constitutes

"protected activity." See 24 C.F.R. § 100.400(c)(5) (§ 3617 forbids retaliation because party has "made a complaint . . . under the Fair Housing Act"). [14] Thus, the record contains a sufficient predicate upon which Plaintiff's retaliation claim may be based, a fact that distinguishes this case from those discussed above in which no such predicate was established. Accordingly, this Court finds that the fact that Plaintiff failed to establish a violation of her right, under § 3604, to reasonable accommodation of her disability, does not immunize Defendants from liability under § 3617. **[*34]**

The Court therefore must determine whether a reasonable jury could have found in Plaintiff's favor with respect to the remaining elements of her retaliation claim. Specifically, the Court must decide whether the jury reasonably could have found that Defendants' denial of Plaintiff's request constituted an "adverse action," and, if so, whether it reasonably could have found a causal connection between such adverse action and the filing of Plaintiff's lawsuit.

As for the latter, Plaintiff adduced sufficient evidence at trial to support a jury's finding a causal connection between the lawsuit and the denial of her request for a roommate. There is no way around the fact that Mr. Wolf's November 12, 1997 letter denying Plaintiff's request, despite offering other reasons for the denial, states, "Furthermore, your client has already put my client through an enormous amount of unnecessary expenses [*35] based upon your frivolous [sic] claim made in Federal Court which was recently dismissed." (Pl. Ex. 3.) This letter was written just months after the termination of Plaintiff's lawsuit. Moreover, Mr. Goldman agreed that one of the reasons Mr. Wolf denied Plaintiff's request was the expenses incurred by Defendants as a result of the litigation. (Tr. at 252-53.) Though at trial Defendants offered legitimate business reasons for the denial, the conflicting evidence in the record entitled the jury to reject those explanations and find that Defendants acted for improper reasons. [15]

---

[14] Nor, obviously, do Defendants deny knowledge of that lawsuit, given that they were the defendants in that case too.

[15] Similarly, Defendants plausibly argue that if they intended to retaliate against Plaintiff for her lawsuit, which they won, they could have sought costs against her, and they could have continued their eviction proceedings against her in state court, which the jury in the federal lawsuit had found not to be discriminatory. Defendants did neither. Nevertheless, it is not the Court's province in this context to weigh the evidence or to substitute its views for the findings of the jury on whether Defendants acted with a retaliatory motive.

**[*36]** The more difficult question is whether Defendants "acted adversely" at all. **HN17** The FHA does not prohibit retaliatory motives, without more; rather, the aggrieved party must show that she suffered an adverse action based on such motives. Under the terms of § 3617, the retaliatory adverse action must "coerce, intimidate, threaten, or interfere with" the party. 42 U.S.C. § 3617; see Walker v. City of Lakewood, 272 F.3d 1114, 1128 (9th Cir. 2001). Though many of the reported cases under § 3617 involve allegations of force or violence, see, e.g., Bryant v. Polston, 2000 U.S. Dist. LEXIS 16368, No. IP 00-1064- C-T/G, 2000 WL 1670938, at *3 (S.D. Ind. 2000)(collecting cases), such a showing is not necessary to prove a violation, see Walker, 272 F.3d at 1128. The plain language of the statute supports this application, as do numerous cases upholding claims based on wide-ranging conduct in opposition to protected activity. See, e.g., Walker, 272 F.3d at 1126 (failure to renew contract of nonprofit agency); Biondi, 17 F. Supp. 2d at 218 (denial of plaintiff tenant's application to sublet her apartment, issuance of **[*37]** notice of default, and filing of lawsuits against plaintiff); Potomac Group Home Corp. v. Montgomery County, 823 F. Supp. 1285 (D. Md. 1993)(surprise inspection, program review, and orders to correct deficiencies). As discussed, conduct not proscribed by § 3604 may still violate § 3617. In addition, the Ninth Circuit has held that even an otherwise voluntary decision, such as whether to renew a contract, may run afoul of § 3617 if made because of retaliatory motives. See Walker, 272 F.3d at 1126 (quoting, inter alia, Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)("Even though he could have been discharged for no reason whatever, . . . he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made [for retaliatory reasons.]")).

On the other hand, other courts have recognized limits to what conduct § 3617 properly forbids. See, e.g., Michigan Prot. and Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 348 (6th Cir. 1994)(rejecting claim of "interference" based on defendants' engaging in economic competition with plaintiffs); **[*38]** Sporn v. Ocean Colony Condo, Ass'n, 173 F. Supp. 2d 244, 252 (D.N.J. 2001)(holding that "shunning," even if in response to HUD complaints, did not rise to the level of conduct prohibited by § 3617); United States v. Weisz, 914 F. Supp. 1050, 1054-55 (S.D.N.Y. 1996)(dismissing claim based on neighbors' offensive behavior where complained-of conduct did not permit inference of discriminatory or retaliatory animus). As one court has put it, the complained-of conduct must "in some way or

another implicate[] the concerns expressed by Congress in the FHA." Weisz, 914 F. Supp. at 1054.

In this case, there was sufficient evidence to support a jury finding that Defendants had an internal policy of permitting tenants with long-term illnesses to leave another person in the apartment while the prime tenant was away, as long as certain conditions were met. Defendants' assertions that this policy applied only to rent-stabilized tenants, and not rent-controlled tenants such as Plaintiff, were not supported by consistent evidence at trial. It is undisputed that in 1995, Ms. Sezer informed Plaintiff that Defendants had a policy, for tenants with [*39] long-term illnesses, to consider their requests to be away from their apartments for extended periods of time, while leaving a roommate in the apartment. Ms. Sezer testified, "We would ask them to have a letter sent from their doctor and depending on the contents of it and a review with our attorney we would enter into an agreement and we would allow another person to remain on the premises while the tenant is away." (Tr. at 196-97.) In response to Defendants' counsel's questioning, Ms. Sezer stated that although she was not aware of this in 1995, the policy she discussed with Plaintiff at that time applied only to rent-stabilized, and not to rent-controlled, tenants. (Id. at 199-200.) However, upon further questioning by Plaintiff's counsel, Ms. Sezer testified that the policy did not differentiate between rent-controlled and rent-stabilized tenants, but pertained to all tenants who were ill. [16] (Id. at 212, 217-18.) Ms.

---

[16] Ms. Sezer testified as follows:

Q: So she [Plaintiff] only asked for what you said the company had a policy of doing, correct?

A: Correct.

Q: And we just cleared up that the policy has nothing to do with rent-stabilized or rent-controlled tenants; it just has to do with sick tenants, right?

A: Right.

(Tr. at 212.)

Q: Now you testified that you had one policy that deals with subleasing, right?

A: Right.

Q: And that you have another policy that deals with sick tenants; ill tenants; correct?

A: It basically applies to both. Stabilized tenants are allowed to sublet.

Q: Okay. But you also testified that the company has a

Sezer also testified that the accommodation Plaintiff was requesting was "exactly what the policy provides." (Id. at 217-18.) In addition to Ms. Sezer's testimony, Mr. Wolf testified that there was no statutory requirement that a rent-controlled tenant [*40] had to be physically occupying her apartment during the entire time that a roommate was present in the apartment. (Id. at 346-47.) Based on the foregoing, a reasonable juror could have concluded that Defendants had a policy that would have permitted them to accommodate Plaintiff's request.

[*41]   Furthermore, this Court disagrees with Defendants that a landlord's refusal, for retaliatory reasons, to provide a tenant with a voluntary benefit regularly provided to other tenants can never constitute an "adverse action" in violation of § 3617. In certain circumstances, the denial of such benefits might well discourage tenants from exercising their rights under the FHA, the very evil § 3617 is designed to prevent. See Walker, 272 F.3d at 1128 (holding that **HN18**[⬆] defendant's exercise of right not to renew contract could constitute retaliation if "designed to coerce and intimidate [Plaintiff] into changing or ceasing" its protected advocacy).

Nevertheless, the Court agrees with Defendants that no such evil has occurred in this case, as Plaintiff has shown no injury whatsoever as a result of Defendants' retaliatory refusal of her request. Indeed, Plaintiff presented no evidence that she was even aware of the refusal. Mr. Wolf's November 12, 1997 denial of Plaintiff's request (made by Mr. O'Neill, her attorney, by letter dated November 3, 1997) was sent to Mr. O'Neill. Plaintiff testified that she did not remember seeing Mr. Wolf's letter, or even being told by Mr. [*42] O'Neill that her request was denied. (Tr. at 131, 152-53.) Moreover, Plaintiff offered no evidence of any negative impact that the letter had on her. On the contrary, Plaintiff testified that after the letter was sent, she went to Florida for the winter that year, as well as the winter of the following year, leaving a roommate in the apartment during each period. (Tr. at 112.) Thus, the Court finds no evidence in the record of an adverse action of "sufficient magnitude to permit a finding of intimidation, coercion, threats or

---

policy for tenants who are ill.

A: Right.

Q: Rent-stabilized, rent-controlled, it doesn't matter; correct?

A: Correct.

(Id. at 217.)

interference." Sporn, 173 F. Supp. 2d at 252. After Mr. Wolf's November 1997 letter was sent to Mr. O'Neill, Defendants took no other potentially "adverse action" against Plaintiff until 1999, when, under different circumstances from those existing in 1997, they served her with notices to cure and to terminate -- notices the jury found not to be retaliatory.

In light of this record, the Court must conclude that Plaintiff has failed to establish an essential element of a claim of retaliation, as she has not shown that she was actually the victim of any injurious action. See Biondi, 17 F. Supp. 2d at 218-19 *HN19*[⬆] (§ 3617 retaliation [*43] claim requires showing of "adverse action"); San Pedro, 159 F.3d at 477 (§ 3617 retaliation claim must include assertion that plaintiff "suffered some resulting damage"). This basic principle -- that in order for an alleged adverse action to constitute unlawful retaliation, the action must have some materially adverse effect on the plaintiff -- has been affirmed by numerous courts in a variety of contexts. See, e.g., Weeks v. New York Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001)(no adverse action to support Title VII retaliation claim where the plaintiff did not describe the alleged action's "effect or ramifications, [or] how or why the effect would be serious"); Torres v. Pisano, 116 F.3d 625, 640 (2d Cir. 1997)(holding that employer's isolated request that employee drop EEOC complaint was not unlawful retaliation under Title VII because plaintiff refused request, and did not suffer any negative consequences as a result of such refusal); Ali v. Szabo, 81 F. Supp. 2d 447, 467 (S.D.N.Y. 2000)(dismissing prisoner's retaliation claim where prisoner did not allege any injury as a result of defendant's action); Mishk v. DeStefano, 5 F. Supp. 2d 194, 202 (S.D.N.Y. 1998) [*44] (dismissing First Amendment retaliation claim against employer for lack of evidence of any negative impact of alleged retaliatory transfer); Fluent v. Salamanca Indian Lease Auth., 847 F. Supp. 1046, 1056 (W.D.N.Y. 1994)("There has been no harm resulting from the alleged retaliation. In the absence of any injury, there can be no claim."); cf. Leibovitz v. New York City Transit Auth., 252 F.3d 179, 190 (2d Cir. 2001)(holding that employee who was not even aware of sexual harassment of coworkers while it was ongoing, failed to show that such harassment caused her to suffer hostile work environment).

Moreover, the record does not show, or even suggest, that the denial had any chilling effect on Plaintiff's willingness to assert her rights under the FHA. Indeed, Plaintiff's filing of the instant suit, raising substantially similar claims as her previous case, indicates just the opposite. Under the circumstances, the Court takes guidance from First Amendment caselaw holding that *HN20*[⬆] a plaintiff's claim of retaliation must fail where there is no showing that the alleged violation had any actual effect on him. "Where a party can show no change in his behavior, [*45] he has quite plainly shown no chilling of his First Amendment right to free speech." Curley v. Village of Suffern, 268 F.3d 65, 75 (2d Cir. 2001); see also Spear v. Town of W. Hartford, 954 F.2d 63, 67 (2d Cir. 1992)(dismissing claim where plaintiff continued writing critical editorials just as he had before the alleged retaliatory action against him). In Davis v. Village Park II Realty Co., 578 F.2d 461 (2d Cir. 1978), in which the plaintiff alleged that the defendants attempted to evict her in retaliation for her protest activities, the Second Circuit stated: "Insofar as Davis' cause of action is based not upon an actual loss of her apartment but upon a chill of her First Amendment rights, she must prove that she was actually chilled in the exercise of her rights. If she was not, then she may not recover on this basis." Id. at 464.

The lesson for the instant case is clear. Plaintiff neither suffered actual interference with her use and enjoyment of her apartment, nor was she "actually chilled" in the exercise of her rights under the Fair Housing Act. In these circumstances, no reasonable jury could find that Plaintiff [*46] suffered an adverse action in retaliation for having engaged in protected activity. Given the a complete lack of evidence supporting the verdict, this Court must conclude that "the jury's findings could only have been the result of sheer surmise and conjecture." Burke, 252 F.3d at 136. [17] Accordingly, the verdict must

---

[17] The Court's conclusion is bolstered by, but not dependent on, the fact that Plaintiff did not present any evidence of damages flowing from the denial of her accommodation request. Plaintiff's only evidence of actual damages was her brief testimony concerning the emotional distress she suffered after receiving the 1999 notices to cure and to terminate. (Tr. at 122-23.) Plaintiff tacitly concedes that she suffered no harm from the 1997 letter, but argues that the damages she incurred after the 1999 notices were the direct and proximate result of the 1997 letter, because "had [Defendants] granted Plaintiff's request for an accommodation they would not have issued the 1999 eviction notices." (Pl. Mem. at 21.) This is wholly unconvincing. It seems clear that whatever injury may have occurred as the result of the 1999 notices cannot be legally attributed to the 1997 letter. Not only did the jury expressly find the 1999 notices not to violate Plaintiff's rights, but there is nothing in the record to suggest any direct causal link between the denial of Plaintiff's 1997 request and the Defendants' issuance, eighteen months later, of the notices -- which,

2002 U.S. Dist. LEXIS 7506, *46

be reversed.

**[*47]** CONCLUSION

For the foregoing reasons, Defendants' motion for judgment as a matter of law on Plaintiff's failure to accommodate claim and Plaintiff's retaliation claim is hereby granted. The Clerk of the Court shall be directed to enter Judgment in favor of Defendants.

SO ORDERED.

Theodore H. Katz

United States Magistrate Judge

Dated: April 26, 2002

New York, New York

---

---

moreover, address distinct issues. Given such a complete absence of evidence, the $ 50,000 awarded to Plaintiff was clearly unwarranted -- as any award of compensatory damages would have been.

However, given the Court's decision on liability, the issue of damages is moot. Plaintiff cannot even establish entitlement to nominal damages, otherwise available under the FHA where the plaintiff shows a violation but no compensable harm, see LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 431 (2d Cir. 1995), as here there has been no violation. See Diesel v. Town of Lewisboro, 232 F.3d 92, 109 (2d Cir. 2000)("Absent liability, damages -- nominal, compensatory or punitive -- are unavailable."); Monsky v. Moraghan, 47 F. Supp. 2d 280, 284-85 & n.3 (D. Conn. 1999) (distinguishing unlawful retaliation that results in no compensable injury, entitling plaintiff to nominal damages, from conduct motivated by retaliation that results in no injury at all, requiring dismissal of claim).



ⓘ Cited
As of: July 25, 2017 8:11 PM Z

# Stable v. Kelly Towers Assocs.

United States District Court for the Southern District of New York

January 9, 2007, Decided ; January 10, 2007, Filed

05 CV 3132 (GBD)

**Reporter**

2007 U.S. Dist. LEXIS 1975 *; 2007 WL 80866

JOSE STABLE, Plaintiff, -against- KELLY TOWERS
ASSOCIATES, ED BALDNUCCI, RICHARD CONTE,
STEVEN CONTE, THE BRONX HOUSING COURT OF
1118 GRAND CONCOURSE, THE FIRM OF GUTMAN,
MINTZ, BAKER & SONNENFELDT, THE
MAINTENANCE SUPERVISORS AND DEPARTMENT
OF 2475 SOUTHERN BLVD., UNITED STATES
DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT, and ANTHONY WALLS, Defendants.

## Core Terms

second amended complaint, Housing, allegations,
pleadings

**Counsel:** **[*1]** Jose Stable, Plaintiff, Pro se, Bronx, NY.

Ulysses Stable, Plaintiff, Pro se, Bronx, NY.

**Judges:** GEORGE B. DANIELS, United States District
Judge.

**Opinion by:** GEORGE B. DANIELS

## Opinion

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, District Judge:

*Pro se* plaintiff commenced this action asserting
violations of the Fair Housing Act ("FHA"), 42 U.S.C. §
3601 *et seq.,* which prohibits housing discrimination on
the basis of race, color, religion, sex, handicap, familial
status or national origin. Defendants Ed Baldnucci and

the Firm of Gutman, Mintz, Baker & Sonnenfeldt are
moving, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss
the second amended complaint for failure to state a
claim upon which relief may be granted. [1] Additionally,
defendant United States Department of Housing and
Urban Development ("HUD"), whom plaintiff named as a
defendant in the second amended complaint,
notwithstanding a prior order dismissing all claims
against HUD, is moving to dismiss the complaint for
failure to state a cognizable claim and for lack of
jurisdiction.

 **[*2]** Plaintiff, who is proceeding *in forma pauperis,* has
not filed any opposition to the motions. [2] Although the
remaining defendants have not answered or moved with
regard to the second amended complaint, dismissal of
the complaints is nevertheless warranted as to all
defendants because the complaints fails to state a
legally sufficient FHA claim against any of them. [3] See,
28 U.S.C. § 1915(e)(2)(B)(ii) (In proceedings *in forma
pauperis,* "the court shall dismiss the case at any time if
the court determines that the action . . . fails to state a
claim on which relief may be granted[.]"). Moreover, the
pleadings are woefully deficient and cannot be rectified

---

[1] Plaintiff attached his amended complaint to the second
amended complaint and request that both documents be
considered in unison. In determining the legal sufficiency of
the pleadings, the Court will deem the second amended
complaint to have incorporated the pleadings set forth in the
amended complaint.

[2] HUD has advised the Court that, well after plaintiff's time to
respond to the motions had expired, he was arrest and
charged with the murder of his twelve year old, autistic son.

[3] There is no indication that defendants Anthony Wall and The
Maintenance Supervisors and Department of 2475 Southern
Blvd. were ever served in this action.

by affording plaintiff yet another opportunity to amend.

[*3]  In an order dated March 23, 2005, Judge Michael B. Mukasey "liberally construed plaintiff's allegations as arising under the Fair Housing Act . . . and directed him to amend his complaint to state how the FHA was violated." Stable v. Kelly Towers, 03 CV 3132, slip op. at 1 (S.D.N.Y. July 5, 2005). By order dated July 5, 2005, Judge Mukasey found that plaintiff failed to comply with his previous order by not pleading with the requisite specificity. Plaintiff was granted leave to file a second amended complaint. However, Judge Mukasey precluded plaintiff from naming HUD and the Bronx Housing Court as defendants in the second amended complaint. "All claims brought against the Bronx Housing Court [were] dismissed because [plaintiff] fail[ed] to demonstrate how this defendant is a proper defendant in an FHA action and how it could discriminate against him in housing." Id. at 2. The claims against HUD were dismissed on the grounds that there is no private right of action against HUD for failure to investigate claims of discrimination. The claims premised on HUD's alleged involvement in discriminatory acts were also dismissed for failure to state a claim on which relief may [*4] be granted. Id.

In examining the legal sufficiency of a complaint, under Fed.R.Civ.P. 12(b)(6), the Court must accept the factual allegations as true and draw all reasonable inferences in plaintiff's favor. Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 89-90 (2d Cir. 2004) (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 194 (2d Cir. 2003)). Since plaintiff is proceeding pro se, his pleadings are to be liberally construed and interpreted in such a manner as to raise the strongest argument they suggest. Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). This is especially true with regard to a pro se complaint asserting civil rights violations. Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003). In discrimination cases, the pleadings requirements "'are very lenient, even de minimis.'" Id. (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998)). A complaint may not be dismissed unless it appears beyond doubt, that even [*5] when liberally construing the complaint, plaintiff can present no set of facts entitling him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); Courtenay Communications Corp. v. Hall, 334 F.3d 210, 213 (2d Cir. 2003) (citation omitted). Despite liberally construing the pleadings and affording plaintiff the benefit of all reasonable inferences, the second amended complaint fails to state a cognizable

claim under the FHA. [4]

Plaintiff is seeking to have the claims against defendants HUD and the Bronx Housing Court restored. (2nd Am. Compl. at p. 16). Beyond the fact that Judge Mukasey precluded plaintiff from renaming these parties as defendants in this action, the amended pleadings do not overcome the legal grounds [*6] which necessitated the dismissal of these claims in the first instance. Accordingly, plaintiff's request to restore the action against HUD and the Bronx Housing Court is denied. All such claims remain dismissed.

The claims for religious discrimination based upon allegations that a maintenance worker commented that plaintiff is a Muslim, and the reporting of a fire hazard by an unidentified individual were previously rejected by Judge Mukasey as being insufficient to state a FHA claim. Plaintiff now additionally alleges that it was plaintiff's burning of incense in the hallway, as part of his religious practices, that led a neighbor and/or building manager to report a fire hazard and that the maintenance worker made subsequent references to his prior alleged remark. Such allegations fail to cure the legal deficiency of his religious discrimination claims. Furthermore, plaintiff's allegations, regarding incidences that occurred during the litigation of an action against him for non-payment of rent, do not give rise to a FHA claim.

Plaintiff also alleges that he was retaliated against after the content of a letter he wrote to HUD opposing proposed rent increases was made available to [*7] the owner and superintendent of his building. To state a claim for retaliation for exercising one's rights under the FHA, plaintiff must allege that he engaged in a protected activity. "Protected activity under the FHA refers to 'action taken to protest or oppose statutorily prohibited discrimination.'" Miller v. Bd. of Managers of Whispering Pines at Colonial Wood Condo. II, 457 F.Supp.2d 126, 131 (E.D.N.Y. 2006) (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000)). Lodging a complaint with HUD objecting to rent increases does not constitute a "protected activity" as it unrelated to a FHA discriminatory housing proceeding. 24 C.F.R. § 100.400(c)(5) (Prohibiting "[r]etaliating against any person because that person has made a complaint,

_____

[4] To the extent that the second amended complaint can be construed as asserting state law claims for defamation, assault, fraud, harassment and intentional infliction of emotional harm, the Court declines to exercise supplemental jurisdiction over such claims.

testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act.").

Accordingly, the dismissal of the second amended complaint is granted as to all defendants. The Clerk of the Court is directed to close this case. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not **[*8]** be taken in good faith. Coppedge v. United States, 369 U.S. 438, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

Dated: New York, New York

January 9, 2007

SO ORDERED:

GEORGE B. DANIELS

United States District Judge

---

**End of Document**



No *Shepard's* Signal™
As of: July 25, 2017 8:11 PM Z

# Spavone v. Transitional Servs. of N.Y. Supportive Hous. Program

United States District Court for the Eastern District of New York

May 12, 2016, Decided; May 12, 2016, Filed

16-CV-1219 (MKB)

**Reporter**
2016 U.S. Dist. LEXIS 63005 *

STEVEN SPAVONE, Plaintiff, v. TRANSITIONAL SERVICES OF NEW YORK SUPPORTIVE HOUSING PROGRAM (TSI), CHANEL TAZZA, Division Director TSI Supportive Housing, BARBARA COHEN, Program Director TSI Supportive Housing, SIMON ROBSON, Supervisor/Director TSI Supportive Housing, and SEERAJ LATCHMAN, Defendants.

**Notice:** NOT FOR PUBLICATION

## Core Terms

disability, housing, alleges, harassment, conditions, entity, national origin, hostile, internal quotation marks, reasonable accommodation, discriminatory, accommodation, discriminated, dwelling, public accommodation, amended complaint, Amendments, violations, services, asserts, public entity, state action, regulation, handicap, disability discrimination, private entity, individuals, Apartments, programs, funding

**Counsel:** **[*1]** Steven Spavone, Plaintiff, Pro se, South Richmond Hill, NY.

**Judges:** MARGO K. BRODIE, United States District Judge.

**Opinion by:** MARGO K. BRODIE

## Opinion

### MEMORANDUM & ORDER

MARGO K. BRODIE, United States District Judge:

On March 7, 2016, Plaintiff Steven Spavone, proceeding *pro se*, filed this action against Defendants Transitional Services of New York Supportive Housing Program ("TSI"), Chanel Tazza, Division Director TSI Supportive Housing, Barbara Cohen, Program Director TSI Supportive Housing, Simon Robson, Supervisor/Director TSI Supportive Housing, and Seeraj Latchman. Plaintiff alleges violations of his rights under the Eighth and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. § 1983,[1] and disability, race and national origin discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604 *et seq.* (the "FHA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (the "ADA").[2] (Compl., Docket Entry No. 1.[3]) Plaintiff seeks compensatory and punitive monetary damages and injunctive relief. (*Id.* at 7-9.) The Court grants Plaintiff's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915(a). For the reasons set forth below, the Court dismisses the Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Plaintiff is granted leave to file an amended complaint within thirty (30) days of the date of this Memorandum and Order.

### I. Background

The following facts are taken from the Complaint and

---

[1] The Court construes **[*2]** Plaintiff's claims for violations of the Eighth and Fourteenth Amendments of the United States Constitution as being asserted pursuant to 42 U.S.C. § 1983.

[2] Plaintiff also asserts that Defendants' conduct violates other unspecified "State and Local regulations/law." (Compl. 3.)

[3] Because the Complaint is not consecutively paginated, the Court's citations refer to the page number assigned by the Electronic Document Filing System.

are accepted as true. Plaintiff resides at 101-66 125th Street, Queens, NY, a property owned by Defendant Latchman, "under supervision of" TSI, a non-profit mental health agency. (Compl. 3.) Plaintiff's Supplemental Security Income and Social Security Disability Insurance benefits are used to "supply living quarters/accommodations" to him as part of TSI's supportive housing program and mental health program. (*Id.*) Plaintiff asserts that TSI and Latchman receive additional federal and local funding "to supply apartments and reasonable accommodations to individuals with a disability." (*Id.*) Plaintiff alleges that he is disabled and, although he does not specify his disability, references his post-traumatic stress disorder symptoms and use of mental health programming. (*Id.* at 3, 5.)

Plaintiff **[*3]** alleges that Latchman has failed to provide adequate heat at Plaintiff's residence and has failed to provide "proper fire exit information and access" and a "qualified super/repairman." (*Id.* at 3.) Plaintiff further alleges that Latchman has been cited for violations for needed repairs and dangerous conditions in Plaintiff's apartment and in common spaces in the building, but Latchman "refuses to initiate repairs." (*Id.* at 5.) Plaintiff states that he has made complaints about the conditions to Latchman and TSI, as well as to New York City agencies including the "Mayor's office for persons with disabilities and 311 New York City emergency services associated with [Housing Preservation and Development]," but Latchman has failed to correct the "dangerous prevailing conditions." (*Id.*)

According to Plaintiff, Latchman has also "harassed" Plaintiff and "used racist slurs and discriminatory remarks" as to Plaintiff's national origin, referring to Plaintiff as "white American trash" and "white garbage." (*Id.* at 5.) Plaintiff alleges that Latchman's harassment has caused him "excess stress," which "exacerbated [his] mental health conditions while affecting [his] general health." (*Id.*)

## II. Discussion

### a. Standard of Review [*4]

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of*

*Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. In reviewing a *pro se* complaint, the court must be mindful that a plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980) (internal quotation marks omitted); *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (same); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (noting that even after *Twombly*, the court "remain[s] obligated to construe a *pro se* complaint liberally"). Nevertheless, the Court is required to dismiss *sua sponte* an *in forma pauperis* action if the Court determines it "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007).

### b. Plaintiff fails to state a federal claim pursuant to 42 U.S.C. § 1983

Liberally construing the Complaint, Plaintiff attempts to allege claims for violations of the Eighth and Fourteenth Amendments, pursuant **[*5]** to 42 U.S.C. § 1983. (Compl. 5, 7.)

### i. Eighth Amendment claim

Plaintiff asserts that Defendants have violated the Eighth Amendment because their "deliberate indifference" is shown "through conditions created and allowed by [] Defendants." (*Id.* at 7.)

"Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977); *see also Shenk v. Cattaraugus Cty.*, 305 F. App'x 751, 752 (2d Cir. 2009) (first citing *Ingraham*, 430 U.S. at 667-68; and then citing *United States v. Dien*, 598 F.2d 743, 745 (2d. Cir. 1979)); *Camacho v. City of N.Y. Office of Child Support*, No. 05-CV-2002, 2006 U.S. Dist. LEXIS 65626, 2006 WL 2642195, at *1 (S.D.N.Y. Sept. 14, 2006) ("The Eighth Amendment operates to protect individuals who have been convicted from cruel and unusual punishment in connection with their convictions." (citing *Graham v. Connor*, 490 U.S. 386, 393, 109 S. Ct. 1865,

104 L. Ed. 2d 443 (1989))). Because the Eighth Amendment's prohibition against cruel and unusual punishment applies only to convicted prisoners and Plaintiff has not alleged that he has been convicted or imprisoned, he fails to state a claim for violations of the Eighth Amendment. Plaintiff's claim pursuant to the Eighth Amendment is therefore dismissed.

### ii. Fourteenth Amendment claim

Plaintiff alleges that his Fourteenth Amendment rights have been "knowingly and willingly violated" and that he has "been denied fair and equal protection" by being "discriminated [against] based on race, National origin, and disability." (Compl. 7.) Plaintiff asserts that Latchman's harassing statements and the conditions of his housing are discriminatory, violate the Fourteenth Amendment, and "fail[] to provide [him **[*6]** with] equal protection of the [l]aws." (*See id.* at 3, 5.) Plaintiff further asserts that the TSI Defendants are responsible for Latchman's treatment of Plaintiff because TSI is responsible for providing Plaintiff with safe housing. (*See id.* at 5.) The Court construes Plaintiff as asserting a claim pursuant to the Fourteenth Amendment's Equal Protection Clause against all Defendants.

To state an claim under section 1983 for violations of the Equal Protection Clause based on selective enforcement, Plaintiff must show that (1) "compared with others similarly situated, [the plaintiff] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure [the plaintiff]." *Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 554 F. App'x 32, 35 (2d Cir. 2014) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)); *see Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011) (noting that in order to satisfactorily state a selective enforcement claim, the court must determine, based on the allegations in the operative complaint, whether it is plausible that a reasonable jury could ultimately conclude that the plaintiff is similarly situated to an alleged comparator).

### 1. State action

A claim for relief pursuant to 42 U.S.C. § 1983 must allege facts showing that the challenged conduct was **[*7]** "committed by a person acting under color of state law." 42 U.S.C. § 1983. Section 1983 "constrains

only state conduct, not the 'acts of private persons or entities.'" *Hooda v. Brookhaven Nat. Lab.*, 659 F. Supp. 2d 382, 393 (E.D.N.Y. 2009) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 837, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982)); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999) ("[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful.") (internal quotation marks and citation omitted); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1972). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted) (quoting *United States v. Int'l. Bhd. of Teamsters*, 941 F.2d 1292, 1295 (2d Cir. 1991)). The Fourteenth Amendment does not protect against private conduct, "no matter how unfair that conduct may be." *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192, 109 S. Ct. 454, 102 L. Ed. 2d 469 (1988) ("As a general matter the protections of the Fourteenth Amendment do not extend to 'private conduct abridging individual rights.'" (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961))).

The conduct of a nominally private entity may be attributed to the state, satisfying the state action requirement, if:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint **[*8]** activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (alterations in original) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001)); *see Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013) ("The question is whether the private actor's conduct has sufficiently received the imprimatur of the State so as to render it an action of the State for purposes of § 1983." (citation and internal

quotation marks omitted)). Each of the three avenues requires a fact-specific inquiry into the challenged conduct and, in order to find state action, a court must determine that the specific actions of which a plaintiff complains can be fairly deemed those of the state. *See Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 265 (2d Cir. 2014) (examining public function test, noting that the function performed by the private entity must have historically been "an exclusive prerogative" of the state (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 159, 98 S. Ct. 1729, 56 L. Ed. 2d 185 (1978))); *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491-92 (2d Cir. 2009) (examining joint action test and noting that state action cannot be premised solely on subjection to state regulation, funding, licensing or even state creation); *Lynch v. Southampton Animal Shelter Found. Inc.*, 971 F. Supp. 2d 340, 349-50 (E.D.N.Y. 2013) (examining compulsion test).

Under the close nexus or joint action test, the requisite nexus between the State and the challenged **[*9]** conduct exists "where a private actor has operated as a willful participant in joint activity with the State or its agents, or acts together with state officials or with significant state aid." *Abdullahi*, 562 F.3d at 188 (citations and internal quotation marks omitted); *Barrett v. Harwood*, 189 F.3d 297, 304 (2d Cir. 1999) ("A private person — not a government official — acts under color of state law for purposes of § 1983 when 'he has acted together with or has obtained significant aid from state officials' . . . ." (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982))). "[A] private entity does not become a state actor for purposes of § 1983 merely on the basis of 'the private entity's creation, funding, licensing, or regulation by the government.'" *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003)). It is also not sufficient "to plead state involvement in some activity of the institution alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action." *Sybalski*, 546 F.3d at 258 (citations and internal quotation marks omitted).

Plaintiff has not alleged facts from which the Court can infer that any of the Defendants are state actors under any of these tests. Plaintiff alleges that his housing is supported by public funding provided to TSI and, indirectly, to Latchman. **[*10]** (Compl. 3.) These allegations are insufficient to show that Defendants acted with a sufficient "close nexus" to the state to support a section 1983 claim. *See Moose Lodge No.*

*107*, 407 U.S. at 173 ("The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever."). Plaintiff's allegations are also insufficient because Plaintiff fails to allege any state involvement in the precise conduct on which Plaintiff's claims are based, namely, Latchman's harassment of Plaintiff and the substandard quality of Plaintiff's housing. *See Hollander v. Copacabana Nightclub*, 624 F.3d 30, 34 (2d Cir. 2010) (holding that allegedly discriminatory nightclub admissions policy was too attenuated from state regulation of alcohol sales and issuance of liquor licenses to satisfy state action requirement); *Young*, 152 F. Supp. 2d at 364 ("[T]he crucial relationship for a finding of state action is between the governmental entity and the *action* taken by the private entity, not between the governmental entity and the private *actor*."). Plaintiff's section 1983 claims are therefore dismissed as against all Defendants.

**c. Plaintiff fails to state a claim for discrimination [*11] pursuant to the FHA**

Plaintiff seeks to assert disability, race and national origin discrimination claims pursuant to the FHA. (Compl. 3, 5.) The FHA makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because race, color, religion, sex, familial status, national origin or handicap." 42 U.S.C. § 3604(a); *see also Tex. Dept. of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. __, __, 135 S. Ct. 2507, 2516, 192 L. Ed. 2d 514 (2015) (explaining that the FHA initially made it unlawful "to discriminate in the sale or rental of any housing . . . on the basis of race, creed, color, or national origin"); *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 44 (2d Cir. 2015) (citing Section 3604(a) of the FHA). It also prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling." 42 U.S.C. § 3604(b). "[T]he FHA forbids those practices that make housing unavailable to persons on a discriminatory basis as well as discriminatory terms and conditions with respect to housing that is provided." *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 88 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema NA*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). To establish discrimination under the FHA, plaintiffs "have

three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003) (quoting **[*12]** *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002)). The Court addresses Plaintiff's disability claim separately from his race and national origin claims.

### i. Disability discrimination

Plaintiff appears to assert that Defendants have intentionally discriminated against him based on a disability and have failed to reasonably accommodate his disability. Plaintiff asserts that, because Defendants are "under contract with a public agency to provide safe housing and reasonable accommodations to [] Plaintiff" and because that housing is publically funded, Defendants are "liable to all provisions provided," under the FHA. (Compl. 3.) Plaintiff further alleges that Defendants have failed to "provide safe housing and reasonable accommodations to a qualified person with a disability." (*Id.*)

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). The FHA defines "handicap" to include a "mental impairment which substantially limits one or more of [a] person's major life activities." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 152 (2d Cir. 2014) (quoting 42 U.S.C. § 3602(h)(1)). Pursuant to HUD regulations, "[m]ajor life activities" impacted by a handicap are defined as "functions such as caring for one's self, performing manual **[*13]** tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Id.* (quoting 24 C.F.R. § 100.201(a)(2)). The FHA requires "that covered entities make reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or to participate in programs run by such entities." *Taylor v. Harbour Pointe Homeowners Ass'n*, 690 F.3d 44, 49 (2d Cir. 2012) (internal quotation marks omitted) (citing *City of Middletown*, 294 F.3d at 45).

To prove intentional disability discrimination under the FHA, "a plaintiff must establish: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs, or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Forziano v.*

*Indep. Grp. Home Living Program, Inc.*, 613 F. App'x 15, 17 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003)).

To allege an FHA claim of disability discrimination based on a defendant's failure to provide reasonable accommodation,

> a plaintiff must show (1) that the plaintiff or a person who would live with the plaintiff had a handicap within the meaning of [the FHA]; (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to afford the handicapped **[*14]** person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation.

*Olsen*, 759 F.3d at 156; see *also Tsombanidis*, 352 F.3d at 578 (stating that a plaintiff must "first provide the governmental entity an opportunity" to provide an accommodation, such that the governmental entity "knows what a plaintiff seeks prior incurring liability for failing to affirmatively grant a reasonable accommodation"); *Bentley v. Peace and Quiet Realty 2 LLC*, 367 F. Supp. 2d 341, 345 (E.D.N.Y. 2005) (discussing elements of a reasonable accommodation claim). Plaintiffs have the burden of showing that "but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." *Tsombanidis*, 352 F.3d at 578.

Plaintiff does not allege any facts to show that any Defendants intentionally discriminated against Plaintiff based on his disability or failed to reasonably accommodate his disability. First, Plaintiff does not specify the nature of his disability. Second, Plaintiff fails to allege a connection between his disability and the poor housing conditions and harassment by his landlord, Latchman. Such a connection is necessary in order to state a claim of intentional discrimination, as Plaintiff must allege that the **[*15]** discrimination is "due to his disability." *See Forziano*, 613 F. App'x at 17. Third, Plaintiff fails to allege that he sought a reasonable accommodation for his disability and that it was denied to him, which is necessary in order to state a failure-to-accommodate claim. *See Olsen*, 759 F.3d at 156. Plaintiff's allegations are insufficient to state a claim for intentional disability discrimination or failure to accommodate pursuant to the FHA against any

Defendants, and his FHA claim for disability discrimination is therefore dismissed.

### ii. Race and national origin discrimination

Plaintiff seeks to assert a claim for violations of the FHA based on race and national origin discrimination. (Compl. 7.) Plaintiff alleges that Latchman used "racist slurs" and made discriminatory remarks based on Plaintiff's race and national origin. (*Id.*)

The FHA provides that it is unlawful "[t]o refuse to sell or rent, . . . or otherwise make unavailable or deny, a dwelling to any person because of race . . . or national origin." 42 U.S.C. § 3604(a). It also prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling." *Id.* § 3604(b).

Courts in this Circuit have construed **[*16]** section 3604(b) of the FHA to prohibit the creation of a "hostile environment" by individuals who have control or authority over the "terms, conditions, or privileges of sale or rental of a dwelling," similar to the prohibition imposed by Title VII against the creation of a hostile work environment.[4] *Cain v. Rambert*, No. 13-CV-5807, 2014 U.S. Dist. LEXIS 74188, 2014 WL 2440596, at *4 (E.D.N.Y. May 30, 2014); *see Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420, 428-29 (E.D.N.Y. 2015) ("[T]he district[] courts in this Circuit have recognized a hostile housing environment claim against a landlord under the FHA only where the landlord 'created' the conditions of harassment, rather than was merely notified about it and failed to take corrective action."); *Glover v. Jones*, 522 F. Supp. 2d 496, 503 (W.D.N.Y. 2007) ("Sexual harassment claims are

---

[4] Although nearly **[*17]** all of the courts in this Circuit that have recognized a cause of action for the creation of a hostile housing environment have done so with regard to allegations of sexual harassment, at least one court has recognized such a cause of action based on membership in another protected class, family status. *See Khalil v. Farash Corp.*, 260 F. Supp. 2d 582, 583-589 (W.D.N.Y. 2003) (denying the defendant's motion for summary judgment on the plaintiff's claim that, *inter alia*, the defendant, a management company that managed the plaintiff's housing complex, created a "hostile living environment for families with children" by promulgating and enforcing rules that disfavored families with children); *see also Khalil v. Farash Corp.*, 277 F. App'x 81, 84 (2d Cir. 2008) (assuming, without deciding, that a plaintiff may state an FHA claim of discrimination against families with children based on a hostile housing environment theory).

cognizable under the FHA . . . . With regard to hostile environment discrimination, 'the legal standard for sexual harassment claims under the FHA has been analogized in the Second Circuit to the standard pertaining to hostile work environment claims under Title VII.'" (alteration omitted) (quoting *Rich v. Lubin*, No. 02-CV-6786, 2004 U.S. Dist. LEXIS 9091, 2004 WL 1124662, at *4 (S.D.N.Y. May 20, 2004)); *Anonymous v. Goddard Riverside Cmty. Ctr., Inc.*, No. 96-CV-9198, 1997 U.S. Dist. LEXIS 9724, 1997 WL 475165, at *4 (S.D.N.Y. July 18, 1997) ("The Second Circuit has repeatedly recognized that Title VII (employment discrimination) cases are relevant to Title VIII (housing discrimination) cases by virtue of the fact that the 'two statutes are part of a coordinated scheme of federal civil rights laws enacted to end discrimination.'" (quoting *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir. 1988))).

A plaintiff seeking to state a hostile housing environment claim must allege that (1) "she was subjected to harassment that was sufficiently pervasive and severe so as to create a hostile [housing] environment," *Rich*, 2004 U.S. Dist. LEXIS 9091, 2004 WL 1124662, at *4, (2) the harassment was because of the plaintiff's membership in a protected class, *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (Title VII), and (3) "a basis exists for imputing the allegedly harassing conduct to the defendants," **[*18]** *Rich*, 2004 U.S. Dist. LEXIS 9091, 2004 WL 1124662, at *4. As with any claim asserted pursuant to the FHA, a plaintiff must also show a relationship between the discriminatory conduct and housing. *See People of State of N.Y. by Abrams v. Merlino*, 694 F. Supp. 1101, 1104 (S.D.N.Y. 1988) ("[P]laintiffs, to succeed, must demonstrate . . . a relationship between the harassment and housing.").

The Complaint does not state a claim for hostile housing environment against any of the Defendants based on race or national origin harassment. Plaintiff asserts that Latchman has "harassed" him and "used racist slurs and discriminatory remarks," such as "white American trash" and "white garbage," concerning Plaintiff's national origin. (Compl. 5.) However, Plaintiff provides no allegations that connect Latchman's alleged racial harassment to Plaintiff's housing conditions. Therefore, the Court dismisses Plaintiff's FHA claim for race or national origin discrimination.

### d. Plaintiff fails to state a claim for discrimination under the ADA

Plaintiff appears to allege claims for disability discrimination pursuant to the ADA. Plaintiff alleges that he is disabled and, although he does not specify his disability, references his post-traumatic stress disorder symptoms and use of mental health programming. (Compl. at 3, 5.) According to Plaintiff, Latchman's [*19] harassment has caused Plaintiff stress and "exacerbated [his] mental health conditions while affecting [his] general health." (*Id.* at 5.)

### i. Plaintiff's residence is not a public accommodation

The ADA prohibits discrimination against any individual on the basis of disability "by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182. "The phrase public accommodation is defined in terms of 12 extensive categories, which the legislative history indicates should be construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676-77, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001) (citations and internal quotation marks omitted). Public accommodations include "an inn, hotel, motel, or other place of lodging," 42 U.S.C. § 12181(7), but "do not include purely residential facilities." *Roberts v. Royal Atl. Corp.*, No. 03-CV-2494, 2012 U.S. Dist. LEXIS 150858, 2012 WL 4849138, at *5 (E.D.N.Y. Oct. 5, 2012); *see Rappo v. 94-11 59th Ave. Corp.*, No. 11-CV-4371, 2011 U.S. Dist. LEXIS 133867, 2011 WL 5873025, at *2 (E.D.N.Y. Nov. 21, 2011) (The ADA "does not apply to private residential complexes, even if the premises are used for publicly subsidized housing."); *Reid v. Zackenbaum*, No. 05-CV-1569, 2005 U.S. Dist. LEXIS 17177, 2005 WL 1993394, at *4 (E.D.N.Y. Aug.17, 2005) ("A residential facility, such as an apartment, is not a public accommodation under the ADA."); *Johnson v. Laura Dawn Apartments, LLC*, 2012 U.S. Dist. LEXIS 1907, 2012 WL 33040 at *1 n.1 (E.D. Cal.2012) ("The leasing office of an apartment complex is a place of public accommodation, despite the fact that the apartments themselves are not subject [*20] to the ADA"); *No Barriers, Inc. v. BRH Texas GP, L.L.C.*, No. 01-CV-0344, 2001 U.S. Dist. LEXIS 15493, 2001 WL 896924, at *3 (N.D. Tex. Aug. 2, 2001) ("[D]istrict courts . . . consistently deny[] that solely residential facilities are public accommodations . . . ." (collecting cases)). Because Plaintiff's place of residence, even if publically subsidized, is not a public accommodation subject to the ADA, Plaintiff's allegation of discrimination fails to state an ADA claim as to Latchman.

### ii. Defendants are not public entities

The ADA also "provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 152-53 (2d Cir. 2013) (quoting *United States v. Georgia*, 546 U.S. 151, 153, 126 S. Ct. 877, 163 L. Ed. 2d 650 (2006)); *Gentile v. Town of Huntington*, 288 F. Supp. 2d 316, 322 (E.D.N.Y. 2003) (The ADA "provides disabled individuals redress for discrimination by a 'public entity.'" (citation omitted)). "In order to establish a violation under the ADA, [] plaintiffs must demonstrate that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' [*21] disabilities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). The ADA defines "public entity to include any State or local government and any department, agency, . . . or other instrumentality of a State." *Georgia*, 546 U.S. at 154 (internal quotation marks omitted) (quoting 42 U.S.C. § 12131); *see Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 337 (E.D.N.Y. 2012) ("A housing authority is a 'public entity' covered by Title II of the ADA."). A suit brought against an individual acting in his or her official capacity will be considered a suit against a "public entity." *Henrietta D.*, 331 F.3d at 272. Although Plaintiff alleges that TSI receives public funding, he does not allege that TSI is a government agency or a housing authority and, therefore, fails to state a public services ADA claim. Accordingly, the Court dismisses Plaintiff's ADA claims as to all Defendants.

### e. State law claims

Plaintiff appears to also assert state law landlord and tenant claims to remedy the conditions in his residence. Plaintiff repeatedly references that the conditions in his residence, including a lack of heat and a proper fire exit, are in violation of unspecified state and local laws. (*See* Compl. 3.) Because Plaintiff has not stated a claim under any federal law, the Court declines to determine whether it has jurisdiction over his state law claims because the Court grants Plaintiff [*22] leave to amend his federal claims. The Court notes that, if Plaintiff fails to file an amended complaint, the Court has no jurisdiction over landlord-tenant matters, which sound in

2016 U.S. Dist. LEXIS 63005, *22

state law. *See Galland v. Margules*, No. 05-CV-5639, 2005 U.S. Dist. LEXIS 17125, 2005 WL 1981568, at *1 (S.D.N.Y. Aug. 17, 2005) (noting that federal courts do not have federal question subject matter jurisdiction over state residential landlord-tenant matters), *aff'd*, 191 F. App'x 23 (2d Cir. 2006); *see also Rosen v. N. Shore Towers Apartments, Inc.*, No. 11-CV-0752, 2011 U.S. Dist. LEXIS 68412, 2011 WL 2550733, at *4 (E.D.N.Y. Jun. 27, 2011) (noting that courts in this Circuit "routinely dismiss for lack of subject matter jurisdiction" claims concerning eviction (collecting cases)).

**f. Leave to amend**

In light of Plaintiff's *pro se* status, the Court grants Plaintiff leave to replead the Complaint to correct the deficiencies noted above. If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the Court must grant leave to amend the Complaint. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Any amended complaint must be filed within thirty (30) days of the date of this Memorandum and Order. The amended complaint must be captioned "Amended Complaint" and bear the same docket number as this Memorandum and Order. No summons shall issue at this time, and all further proceedings shall be stayed until Plaintiff has complied with this order. If Plaintiff fails to file an amended complaint **[*23]** within thirty (30) days, the instant action shall be dismissed without prejudice.

**III. Conclusion**

For the foregoing reasons, the Complaint is dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B). Plaintiff is granted thirty (30) days' leave to file an amended complaint in accordance with this Memorandum and Order. If Plaintiff fails to file an amended complaint within thirty (30) days, the Court shall dismiss this Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

SO ORDERED:

/s/ MKB

MARGO K. BRODIE

United States District Judge

Dated: May 12, 2016

Brooklyn, New York

---

*End of Document*