UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

MARIAH LOPEZ,

                                    Plaintiff,

        -against-

NEW YORK CITY, et al.,

                                Defendants.

------------------------------------------------------------------------x

**DECLARATION OF THOMAS B. ROBERTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

17 Civ. 3014 (VEC) (OTW)

        **THOMAS B. ROBERTS** declares, pursuant to 28 U.S.C. §1746, under penalty of perjury, that the following is true and correct:

        1.     I am an Assistant Corporation Counsel in the office of Zachary W. Carter, Corporation Counsel of the City of New York, attorney for Defendants New York City New York City Department of Homeless Services and New York City Human Resources Administration ("Municipal Defendants"). As such, I am familiar with the facts and circumstances of this action. I submit this declaration in opposition to Plaintiff's motion for a preliminary injunction, and for such other and further relief as the Court may deem just and proper.

        **PRELIMINARY STATEMENT**

        2.     Plaintiff brings this motion seeking a preliminary injunction ordering "DHS to find me immediate housing which does not force me into a shelter not originally designed for transgender identified individuals with severe disabilities; or in an SRO or similar placement by myself; not a dorm setting against my mental health providers advice." (Plaintiff's Order to Show Cause with T.R.O. in 100556/2018, which is Exhibit C to the Notice of Removal in 18 cv 4293, filed with this court on May 14, 2018).

3. The most recent action, initiated in State Court as 100556/2018 and removed as 18 cv 4293, is the fourth proceeding in which Plaintiff has challenged her placements by the New York City Department of Homeless Services ("DHS") within DHS' shelter system. The most recent action, 18 cv 4293, has been consolidated with the above captioned action and the complaint in 18 cv 4293 has been deemed a second amended complaint in the above captioned action. (Dkt # 78)

4. In her prior proceedings, Plaintiff has repeatedly sought to be reassigned to the Marsha's House shelter in the Bronx, where she was assigned during April and May 2017. Plaintiff has also challenged her placement in other shelters.

5. Since removing Plaintiff from Marsha's House on or about May 31, 2017, DHS has reassigned Plaintiff to two different women's shelters, first to the WIN West women's shelter in Manhattan. When Plaintiff refused that assignment, DHS reassigned Plaintiff to the women's shelter at the Park Slope Armory. The Park Slope Women's shelter, which has services that are appropriate for Plaintiff, is among the best operated and safest DHS shelters for single women, and DHS has made reasonable accommodations at the Park Slope Women's shelter for Plaintiff's disabilities. Plaintiff has also refused that assignment, and Plaintiff has not spent a night in the DHS shelter system since leaving Marsha's House near the end of May 2017, more than a year ago.

6. Since May 31, 2017, four justices or judges have heard Plaintiff's motions for a T.R.O. and each has denied the motions.

7. Justice Jaffe of the Supreme Court of New York, County of New York, denied Plaintiff's motion for temporary relief and dismissed Plaintiff's Article 78 proceeding in her June 14, 2017 decision and judgment that is attached as Exhibit 14 hereto in Lopez v. New York City

Department of Homeless Services & Project Renewal, 100632/2017. Plaintiff did not appeal this decision and judgment.

8. Justice Bannon of the Supreme Court of New York, County of New York, denied Plaintiff's motion for similar temporary relief on June 29, 2017 and dismissed Plaintiff's Article 78 proceeding in her October 3, 2017 order that is attached as Exhibit 21 hereto in Lopez v. New York City Department of Homeless Services, 100871/2017. Plaintiff did not appeal this order.

9. Your Honor has twice denied Plaintiff's motions for a T.R.O., on May 31, 2017 and again recently on March 30, 2018, and Judge Batts (who heard one of Plaintiff's emergency motions while Your Honor was unavailable) has denied it once. (Dkt # 32)

10. Most recently, Justice James E. d'Auguste of the Supreme Court of New York, County of New York, denied Plaintiff's motion for temporary relief in his May 11, 2018 decision that is attached as Exhibit 22 hereto in Lopez v. New York City Department of Homeless Services, et al, 100556/2018.

11. The Municipal Defendants removed the case assigned to Justice d'Auguste on May 14, 2018, and the preliminary injunction motion that is presently before this Court is based upon the same papers that were before Justice d'Auguste.

12. In the present preliminary injunction motion, Plaintiff raises the same arguments and seeks essentially the same relief that has been repeatedly rejected.

13. Plaintiff again fails to demonstrate a likelihood of success on the merits, that she will be irreparably harmed, that the equities tip in her favor or any other requirement for the grant of preliminary relief. Far from seeking to preserve the status quo, Plaintiff seeks the ultimate relief and a change in the status.

14. Accordingly, the motion for a preliminary injunction should be denied.

**OVERVIEW OF THE SHELTER SYSTEM AND MARTHA'S HOUSE**

15. DHS operates a shelter system that provides housing for approximately 59,000 individuals. DHS generally classifies its shelter clients into three groups: families with children, adult families and single adults. During Plaintiff's most recent stay in DHS' shelter system, Plaintiff presented as a single adult, and consequently DHS has assigned her to shelters for single adults.

16. Most of DHS' shelters for single adults are operated by non-profit social service providers ("shelter operators") with which DHS contracts. The shelter operator and the shelter operator's employees run the shelter subject to requirements established by DHS. DHS determines which shelter to assign a particular client to, and DHS is responsible for transferring clients from one shelter to another. In contracted shelters, it is, however, the shelter operator's employees who have routine interactions with the clients in the shelters through the daily provision of shelter and social services.

17. DHS attempts to provide shelters appropriate to the needs of various sets of its clients, and in 2016 DHS contracted with Project Renewal, Inc., a non-profit shelter operator, to operate a shelter designed to house young clients, under age 30, who self-identify as lesbian, gay, bisexual, transgender or questioning ("LGBTQ"). The resulting shelter, known as Marsha's House, opened on February 15, 2017 and is located on East 185th Street in the Mount Eden neighborhood of the Bronx. It is the only DHS shelter specifically designated for LGBTQ individuals.

18. The clients who reside at Marsha's House have all requested to be placed there on a voluntary basis, and DHS has not made any involuntary placements to Marsha's

House. LGBTQ individuals reside in many other DHS shelters, and DHS endeavors to make all of its shelters accessible to LGBTQ individuals.

19. Marsha's House currently has beds for approximately 80 clients and is operated by Project Renewal, Inc. Marsha's House provides a variety of services to the clients living there, including meals. There are, however, only limited onsite mental health services provided at Marsha's House.

**PLAINTIFF'S HISTORY IN THE DHS SHELTER SYSTEM SINCE 2017**

20. Plaintiff returned to the DHS shelter system in April 2017 and requested to be placed in Marsha's House. Although Plaintiff exceeded the age parameters for assignment to Marsha's House, DHS, at its discretion, placed her in that shelter on or about Thursday April 20, 2017.

21. On April 20, 2017, representatives of Project Renewal, Inc. met with Plaintiff to explain the rules of the shelter and to obtain her agreement to comply with the rules and regulations of DHS and the shelter. Plaintiff acknowledged receipt of those rules and signed agreements to comply with the rules. Attached as Exhibit 1 hereto is a true and correct redacted copy of the rules that Plaintiff acknowledged receiving on April 20, 2017 and her agreements to comply with those rules signed on April 20, 2017.

22. Among other things, the rules (i) require clients to submit to passage through an x-ray machine at the entry to the shelter and prohibit clients from bringing alcohol and candles into the shelter (See page 2 of Exhibit 1, paragraph on "Entry Procedure/Locker Searches"), (ii) prohibit clients from bringing food into the shelter or taking food out of the dining room (See page 3 of Exhibit 1), and (iii) prohibit clients from entering the sleeping floors while intoxicated or verbally abusing staff or other clients in the shelter (See page 5 of Exhibit 1). The written agreements signed by Plaintiff also provide that "Clients cannot bring alcoholic

beverages ... into the shelter" and that "There is no fighting or use [of] abusive or threatening language. Harassment or intimidation of other residents or staff is strictly prohibited." The agreement also provides that candles and fire hazards are prohibited and that "sexual activity ... is not permitted in the shelter facility." (See page 9 of Exhibit 1)

23. Marsha's House was then in the process of opening and had not reached full capacity.

24. Immediately upon arrival, Plaintiff established a pattern of violating the rules of Marsha's House and of threatening the employees of Project Renewal, Inc.

25. On Tuesday April 25, 2017, Plaintiff filed the complaint in this federal action (Dkt No.2) alleging that DHS and Project Renewal, Inc. were violating the Americans with Disabilities Act ("ADA") in that Plaintiff has "impulse control disorder, PTSD and anxiety" and that she needed her dog due to these disabilities.

26. On Thursday April 27, 2017, Judge Caproni issued a Temporary Restraining Order that ordered DHS to permit Plaintiff to bring her dog to the shelter until Monday May 1, 2017. (Dkt. No. 8)

27. On Friday April 28, 2017, DHS determined that permitting Plaintiff to have her dog was a reasonable accommodation for her disability. Since then Plaintiff has been permitted to bring her dog into any DHS facility, and the parties to the federal action accordingly permitted the T.R.O. to dissolve. As noted by the Court on June 30, 2017, Plaintiff's ADA claim set forth in the original complaint is accordingly moot. See Dkt # 42, transcript of June 30, 2017 at page 2.

28. Despite having her dog, Plaintiff continued to threaten the staff at Marsha's House and to violate the shelter's and DHS' rules.

29. On Tuesday May 9, 2017, Project Renewal, Inc. requested that Plaintiff be suspended for three days due to her consistent breach of the shelter's rules. Attached as Exhibit 2 hereto is a true and correct copy of the May 9, 2017 Suspension Request Form submitted by Kaedon Grinnell, the Project Renewal Shelter Director.

30. On Wednesday May 10, 2017, Mr. Uetake, the DHS Program Administrator responsible for Marsha's House, decided to transfer Plaintiff to a shelter with greater mental health services and permanent DHS police, instead of private security guards. However, Mr. Uetake had not yet decided which shelter to transfer Plaintiff to.

31. At a meeting on May 10, 2017, at approximately 4:15 PM, Project Renewal's shelter director for Marsha's House gave Plaintiff a copy of the Client Notification of Transfer advising Plaintiff that she would be transferred to another shelter on May 11, 2017. Plaintiff refused to sign the form. Attached as Exhibit 3 hereto is a true and correct redacted copy of the May 10, 2017 Client Notification of Transfer.

32. DHS' Program Administrator for Marsha's House, Mr. Uetake, subsequently decided to transfer Plaintiff to the WIN West shelter, and Ms. Lopez was given notice of her new shelter assignment on May 11, 2017. Attached as Exhibit 4 hereto, is a true and correct copy of the May 11, 2017 Shelter Client Transfer Referral advising Plaintiff that she was being transferred to the WIN West shelter.

33. WIN West is a shelter for single adult females run by Women In Need, Inc. at 341 West 51st Street in Manhattan (between 8th and 9th avenues) with approximately 68 beds that has prior and ongoing experience with transgender clients. WIN West has extensive mental health services on site and DHS Police security.

## LITIGATION BEFORE JUSTICE JAFFE

34. On Friday May 12, 2017, Plaintiff commenced an Article 78 proceeding, Lopez v. DHS & Project Renewal, 100632/2017, challenging DHS' decision to reassign her from Marsha's House and asserting that the reassignment was illegal retaliation (i) for Plaintiff having brought the federal action under the ADA and (ii) for Plaintiff having objected to what Plaintiff believed to be discrimination against transgender clients of Marsha's House. Attached as Exhibit 5 hereto is a true and correct copy of Plaintiff's May 12, 2017 Request For Judicial Intervention, Order to Show Cause as endorsed by Justice Jaffe, and Notice of Petition in Lopez v. DHS & Project Renewal, 100632/2017.

35. Justice Jaffe heard oral argument from Plaintiff and from counsel for DHS on May 12, 2017. Plaintiff contended that the WIN West shelter was not a reasonable accommodation for her because it was not safe for transgender women. Attached as Exhibit 6 hereto is a true and correct copy of the transcript of the argument on May 12, 2017. See pages 3, 4, 11 & 19. Plaintiff also contended that DHS had transferred her because she had witnessed and objected to what she believed was discrimination at Marsha's House. Id. at page 16. At the end of the argument Justice Jaffe orally instructed DHS to permit Plaintiff to return to Marsha's House for the weekend and instructed the parties to return on Monday May 15, 2017.

36. Justice Jaffe heard further oral argument from Plaintiff and from counsel for DHS on Monday May 15, 2017. Attached as Exhibit 7 hereto is a true and correct copy of the transcript of the argument on May 15, 2017.

37. At the end of that argument, Justice Jaffe ordered DHS to permit Plaintiff to return to Marsha's House. Specifically, Justice Jaffe ordered: "Pending the determination of this proceeding, respondents are stayed from enforcing the transfer referral of petitioner to the Win

West Shelter. Respondents to appear or answer on or before 5/24 before 5 pm. This order is conditioned on petitioner complying with respondents' rules & regulations. Respondents' employees are likewise directed to comply with the pertinent laws & rules of the facility." See endorsement to OTSC in Exhibit 5 hereto.

38. Plaintiff failed to comply with Justice Jaffe's requirement that Plaintiff comply with DHS' and Marsha's House's rules and regulations. Specifically, on Wednesday May 24, 2017, Plaintiff became involved in a variety of incidents at Marsha's House and hit a security guard at the shelter. The New York City Police were called, the police arrested Plaintiff and reportedly, during the arrest, Plaintiff bit one of the arresting officers. Attached as Exhibit 8 hereto is a true and correct copy of the incident reports concerning Plaintiff's actions on May 24, 2017. Attached as Exhibit 9 hereto is a true and correct copy of the New York Unified Court System, Case Details, dated June 13, 2018, concerning the criminal proceeding brought against Plaintiff arising from this incident.

39. As a result of this incident, DHS suspended Plaintiff on May 24 from the shelter system for seven days, until May 31, 2017. Attached as Exhibit 10 hereto is a true and correct copy of the DHS Suspension Request Form dated May 24, 2017.

40. Also on May 24, 2017, DHS filed its answer and supporting affidavits to the Verified Petition in Lopez v. DHS & Project Renewal, 100632/2017, the Article 78 proceeding before Justice Jaffe.

41. On the evening of Friday May 26, 2017, Plaintiff returned to Marsha's House and threatened to kill one of the staff, telling the staff member "I showed your picture to everyone in Fort Green Brooklyn." "I'm going to have my cousins come and blow your fucking

head off." "I hate your fucking ass I'm going to get you killed." Attached as Exhibit 11 hereto is a true and correct copy of the incident reports concerning Plaintiff's actions on May 26, 2017.

42. On May 31, 2017, the parties appeared before Justice Jaffe, who heard further argument concerning the Article 78 proceeding. Attached as Exhibit 12 hereto is a true and correct copy of the transcript of the May 31, 2017 argument before Justice Jaffe. After hearing argument, Justice Jaffe determined that Plaintiff had failed to establish irreparable injury if she were transferred from Marsha's House, lifted her prior stay, permitted DHS to transfer Plaintiff to the WIN West shelter, and took the merits of the Article 78 proceeding under advisement. In her June 14, 2017 decision and judgment, Justice Jaffe explained her lifting of the stay as follows: "absent a sufficient showing that immediate and irreparable injury would result if DHS were not restrained from transferring petitioner to WIN West, I lifted the stay …." Attached as Exhibit 14 hereto is a true and correct copy of Justice Jaffe's June 14, 2017 decision and judgment, see page 6 thereto.

**EMERGENCY MOTIONS IN FEDERAL COURT AND SUBSEQUENT PROCEEDINGS**

43. Immediately after concluding the appearance before Justice Jaffe on May 31, 2017, the parties appeared before Judge Caproni in the federal case on an emergency motion that Plaintiff had filed on May 30, 2017 seeking an order enjoining Defendants from moving Plaintiff from Marsha's House. (Dkt Nos. 22 & 23)

44. Judge Caproni heard arguments and took testimony on the emergency motion on May 31, 2017. Plaintiff continued to contend that the WIN West shelter was not a reasonable accommodation for her because it was not safe for transgender women and called a witness to support that contention. Judge Caproni heard the testimony, ruled that Plaintiff had not demonstrated irreparable harm if she were transferred to the WIN West shelter, and denied Plaintiff the preliminary relief she requested.

45. In the wake of these two May 31 proceedings, DHS transferred Plaintiff to the WIN West shelter.

46. Plaintiff never spent a night at the WIN West shelter. At the end of the hearing before Judge Caproni, Plaintiff asserted that she viewed the neighborhood in which the WIN West shelter is located, the Theater District, to be a trigger for her PTSD because she had been sexually abused in that neighborhood when she was a child.

47. DHS subsequently took this assertion into account, and in an effort to find Plaintiff a shelter she would accept, DHS offered her a bed at four other women's shelters with mental health services. Plaintiff rejected them all. Attached as Exhibit 13 hereto is a true and correct copy of the June 7, 2017 email chain between Plaintiff and Assistant Corporation Counsel Evan Schnittman concerning such placements.

48. In the wake of Plaintiff's refusal to accept shelter at WIN West, DHS assigned her to the Park Slope Women's shelter at the Park Slope Armory, a safe location far from the Theater District with significant mental health services provided in part by Housing Works Healthcare, which is the same mental health provider Plaintiff was then using.

49. The Park Slope Women's shelter has beds for approximately 100 women, is safe, and accommodates transgender women.

50. Plaintiff has refused this assignment and has never spent a night at the Park Slope Women's shelter. DHS, however, continues to assign plaintiff to the Park Slope Women's shelter.

51. DHS also continues to offer Plaintiff assistance in securing permanent housing and remains willing to refer Plaintiff to permanent housing resources. Whether or not Plaintiff enters a DHS shelter, DHS continues to be willing to assist her with applying for

benefits and permanent housing, for which she qualifies, and making referrals for interviews with prospective landlords or housing programs. DHS cannot place Plaintiff directly into permanent housing because the process of obtaining permanent housing requires an interview of the applicant and approval by the landlord and/or program. DHS, however, continues to be willing to facilitate the process with Plaintiff's cooperation.

52. On June 14, 2017, Justice Jaffe issued a decision and judgment in Lopez v. DHS & Project Renewal, 100632/2017, denying the Article 78 petition in its entirety and dismissing the proceeding. See Exhibit 14 hereto at page 1.

53. On June 15, 2017, Plaintiff then filed an additional Emergency Request for T.R.O. in this action (Dkt. Nos. 31), which this Court deemed an amended complaint. (Dkt. No. 39).

54. In the Emergency Request for T.R.O./Amended Complaint, Plaintiff asserted that "I believe the decision for DHS to move me from Marsha's was retaliatory and DHS refusal to temporarily place me back at Marsha's is a failure to make 'reasonable' accommodations for my disabilities. The refusal by DHS to place me at the only facility that can provide the accommodations I need is motivated by caprice and the desire to silence my whistle blowing at Marsha's House." (Dkt. No. 31 at pages 1-2).

55. In the Emergency Request for T.R.O./Amended Complaint, Plaintiff demanded the following relief: "DHS to place me back at Marsha's until this Court reviews whether I will be harmed by a placement other than Marsha's. DHS to reserve a bed at Marsha's until the conclusion of my ADA case in front of this Court or until I have found permanent housing, since Marsha's is the only trans shelter which has single bed rooms." (Dkt. No. 31 at page 7).

56. Judge Batts denied the requested TRO on June 15, 2017. (Dkt. No. 32)

**FURTHER PROCEEDINGS IN STATE COURT**

57. After Justice Jaffe's decision and judgment and Judge Batts' ruling, Plaintiff continued her effort to have DHS reassign her to Marsha's House. On or about June 7, 2017, DHS received a letter from Dr. Harold M. Reed, Plaintiff's surgeon, which letter says that Plaintiff "needs to maintain the patency of her neo-vagina with dilations for 15 minutes 3 times a day. This cannot easily be done standing or sitting. She needs to be able to have the privacy of lying down during these times, as well as water soluble lubricant such as KY jelly." (Attached as Exhibit 15 hereto and Dkt. No. 31 at page12).

58. On June 20, 2017, Dr. Pierre Arty, a psychiatrist with Housing Works Healthcare, provided DHS with a letter recommending that Plaintiff be reassigned to Marsha's House or be provided SRO housing. Attached as Exhibit 16 hereto is a true and correct copy of Dr. Arty's June 20, 2017 letter.

59. DHS treated Dr. Reed and Dr. Arty's letters as requests for reasonable accommodations on behalf of Plaintiff.

60. DHS' Medical Director, Fabienne Laraque, MD, MPH, evaluated these letters and spoke with Dr. Reed and Dr. Arty by phone. In their conversation, Dr. Arty acknowledged that he did not have prior knowledge of the conditions in DHS shelters, that he believed DHS had offered Plaintiff reasonable shelter options, and that he did not have knowledge of Plaintiff's conduct at Marsha's House.

61. With Dr. Laraque's participation and approval, on June 26, 2017 DHS issued a "Reasonable Accommodation Request Determination" in response to Dr. Reed and Dr. Arty's

letters. Attached as Exhibit 17 hereto is a true and correct copy of the June 26, 2017 Reasonable Accommodation Request Determination.

62. In that determination, DHS denied Plaintiff's request for a private room in a shelter as a habitation but granted Plaintiff access to a private room with a place to lie down and a locking door at the Park Slope Women's shelter when Plaintiff needed to perform her dilation. DHS denied Plaintiff's request to return to Marsha's House as unreasonable due to the prior safety incidents and the risk Plaintiff presented to the health and safety of other shelter residents and staff at Marsha's House. DHS continued Plaintiff's assignment to the Park Slope Women's shelter, and DHS noted that the experienced mental health professionals at the Park Slope Women's shelter were competent to treat PTSD. DHS also assured Plaintiff of its willingness to assist her in finding permanent housing as soon as possible.

63. The determination concluded with a statement explaining the administrative appeal procedure available to Plaintiff if she disagreed with the determination.

64. Plaintiff did not file an administrative appeal, and instead on June 27, 2017 she filed a new Article 78 proceeding in New York County challenging DHS' June 26, 2017 Reasonable Accommodation Request Determination. Lopez v. New York City Department of Homeless Services, 100871/2017, which was assigned to Justice Bannon.

65. On June 29, 2017, Plaintiff amended her Order to Show Cause by adding an additional letter dated June 29, 2017 from Sarah Acker, ANP-BC, Nurse Practitioner (and Exhibit E to the Verified Petition). Ms. Acker disputed that the accommodation DHS was making for Plaintiff to dilate was sufficient. Attached as Exhibit 18 hereto is a true and correct copy of the Amended Order to Show Cause with T.R.O., Request for Judicial Intervention and Verified Petition in Lopez v. New York City Department of Homeless Services, 100871/2017.

66. Also on June 29, 2017, the parties appeared before the Honorable Nancy Bannon to argue whether Plaintiff's application for a T.R.O. should be granted. After argument, Justice Bannon denied the application for a stay, required DHS to answer the Verified Petition on or before July 20, 2017 and made the Order to Show Cause returnable on July 27, 2017. See endorsement to Exhibit 18. Subsequently, Justice Bannon extended the return date to July 31, 2017.

67. Dr. Laraque reviewed Ms. Acker's letter, and with Dr. Laraque's agreement, DHS continues to adhere to its June 26, 2017 determination. Dr. Laraque discounts Ms. Acker's letter because, among other things, Ms. Acker makes assertions that are not supported by Dr. Reed's letter or Dr. Laraque's conversation with Dr. Reed. Specifically, Dr. Reed made no assertion that Ms. Lopez needed to have erotic thoughts to dilate or that Ms. Lopez could not sleep in a congregate room.

68. On July 20, 2017, DHS filed its Verified Answer and the affirmation of Dr. Laraque in Lopez v. New York City Department of Homeless Services, 100871/2017. Attached as Exhibit 19 hereto is a true and correct copy of the July 20 Verified Answer without exhibits. Attached as Exhibit 20 hereto is a true and correct copy of Dr. Laraque's affirmation.

69. In the Verified Answer, DHS contends, among other things, that at the Park Slope Women's shelter, DHS will provide Plaintiff with access to a medical examination room with an examining table upon which Plaintiff can lie down in private, lock the door, and safely perform her dilation. In the Verified Answer, DHS also contends that Plaintiff's request for a single room to sleep in at a DHS shelter is not reasonable.

70. Plaintiff did not oppose the DHS's answer or appear before Justice Bannon to argue the case, and Justice Bannon dismissed Plaintiff's Article 78 proceeding in her October 3,

2017 order that is attached as Exhibit 21 hereto in <u>Lopez v. New York City Department of Homeless Services</u>, 100871/2017.

## FURTHER PROCEEDINGS IN FEDERAL AND STATE COURT

71. In August 2017, The Municipal Defendant and Project Renewal filed motions to dismiss, primarily based upon the res judicata effect of Justice Jaffee's decision. (Dkt # 44 & 49). Those motions were denied in full or in part on March 15, 2017. (Dkt # 67), and Plaintiff responded by filing another motion for a TRO on or about March 29, 2018, which the Court denied again because Plaintiff failed to demonstrate that she is at risk of irreparable injury. (Dkt # 71)

72. Plaintiff then most recently filed a fourth case challenging her shelter placement, which was assigned to Justice James E. d'Auguste of the Supreme Court of New York, County of New York, <u>Lopez v. New York City Department of Homeless Services, et al</u>, 100556/2018. Justice d'Auguste heard argument on May 11, 2018 and denied Plaintiff's motion for temporary relief. His May 11, 2018 decision is attached as Exhibit 22 hereto.

73. The Municipal Defendants removed the case assigned to Justice d'Auguste on May 14, 2018, and the preliminary injunction motion that is presently before this Court is based upon the same papers that were before Justice d'Auguste.

74. In the present preliminary injunction motion, Plaintiff raises the same arguments and seeks essentially the same relief that has been repeatedly rejected.

75. Plaintiff's latest motion for a Preliminary Injunction adds nothing new and merely repeats the contentions that have already been addressed by multiple courts on multiple occasions. Plaintiff continues to fail to demonstrate that she will be irreparably injured if she is not granted a preliminary injunction.

**WHEREFORE**, Municipal Defendants respectfully request that Plaintiff's motion for a preliminary injunction be denied.

Dated: New York, New York
June 15, 2018

THOMAS B. ROBERTS
Assistant Corporation Counsel