# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

MARIAH LOPEZ

Index Num. 100556/2018

V

COMPLAINT

NYC DEPT OF HOMELESS SERVICES,
NYC HUMAN RESOURCES ADMINISTRATION,
PROJECT RENEWAL INC, QPS SECURITY INC, WIN INC,
CHRISTINE C. QUINN

---

## PARTIES

### Plaintiff



(1) I Mariah Lopez, am the plaintiff and a lifelong New Yorker. I began communicating with HRA/DHS, Project Renewal last April in order to be assessed for and receive safe housing/shelter and other services. I experienced pain, suffering and other measurable and documented damages as a result of the past and continued actions of the defendants.

### Defendants

(2) NYC DEPARTMENT OF HOMELESS SERVICES runs the NYC shelter system.

(3) NYC HUMAN RESOURCES ADMINISTRATION, operates closely with DHS and is designed provide social services and advocacy for NYC's most needy and vulnerable populations.

(4) PROJECT RENEWAL INC, operates a number of shelters under contract with NYC DHS;

(5) QPS SECURITY INC is contracted under Projection Renewal Inc and DHS to provide security services at multiple DHS shelters;

(6) WIN INC operates a number of shelters under contract with NYC DHS;

(7) CHRISTINE C. QUINN runs WIN Inc.

## COMPLAINT.

(8) NYC Department of Homeless Services is still (as of May 9th 2018) refusing to place me in shelter for Transgender individuals and; is attempting to house me in shelter designed for cisgender individuals (females) despite my repeated refusal to accept this placement based on my medical needs and doctors recommendations and, based on my gender identity and the protections I have as a private citizen who identifies as Transgender; Not just 'female'. DHS refusal to place me somewhere other than the Brooklyn Park Slope Armory Women's Shelter, is in contradiction to multiple local, state and federal laws, and the documented recommendations of multiple healthcare experts who are treating me or have treated me (under NYS law Trans individuals under a doctors care, with diagnosis of Gender Identity Disorder are entitled to Trans specific reasonable accommodations based on treatment outlined by their doctors. *Jean Doe v Bell, 2002)*

(9) In April 2017 I entered into conversations with NYC DHS GLBTQ Liaison Elana Redfield about my need for shelter as a personal as well as medical need. She and I began communicating after I reached out because I was homeless, in need of shelter through DHS HRA and I could not simply walk into a female intake shelter to receive services, as I have several conditions that

1

require (minimal) accommodations as per my treatment (need for a service animal; private room, not a dorm setting, minimal environmental triggers (such as dorm settings) or cisgender sex segregated facilities). I was homeless after just having lost an aunt to AIDS. I had been living with this aunt for some time, and was put into a housing crisis by her passing away.

(10) During this time I was also undergoing treatment for PTSD, major depression, anxiety and insomnia. I needed somewhere safe to live ( I needed housing) in order to minimize symptoms of my conditions (suffering), and to promote the effectiveness of the treatment I was receiving under doctors from Housing Works Inc. My housing was a part of my healthcare, essentially, since quiet, privacy and sleep were all a fundamental part of my treating doctors instructions and directives. My doctors made themselves available via phone if DHS/HRA administrators needed to confirm my needs and their recommendations. The team of staff/providers involved in my case at Housing Works, and later my personal surgeon who performed revision of my GRS, provided letters eventually, creating a collective criteria for what is and is not acceptable in terms of housing placements and accomodations.

(11) Elana Redfield has a unique awareness of my needs and my gender identity and expression since she was once my attorney; she worked at SRLP, and provided legal advice to me on multiple occasions as part of her work there.

12) After her and I began communicating about how to get me housing, she and I agreed that the only appropriate place within the DHS system would be a new shelter within the DHS system that was newly created to meet the needs of the Transgender population of DHS.

13) Elana Redfield then connected me to Kaedon Grinnell via email and phone as part of the initial screening process.

14) Kaedon Grinnell seemed very polite and appeared to be very interested in helping me. He claimed to know who I was (referring to my activism and connection to Marsha P Johnson, the person who the shelter was named for, pioneer of the Gay and Trans rights movements). He said he had looked me up, including viewing my social media pages. These pages contain images of me that are highly sexually charged.

15) Beginning last year in late April Project Renewal shelter director Kaedon Grinnell did make sexual advances towards me; with body language (an erect penis under his clothing which was clearly visible while in my presence, along with facial expressions and gestures such as licking his lips), and by initiating sexually charged conversation during a closed door interview he and I had before I entered in the DHS system.

16) He texted and called me on several occasions after hours, but before I was even in the DHS system. He also helped my organization secure an event space for a town hall last minute,

which was something completely outside his role as shelter director. Something of a personal favor to me. Which struck me as odd.

17) Once at the facility (Marsha's Shelter) I experienced what I can only describe as a nightmare. Project Renewal staff did call me names such as faggot, a 'Man' and referred to me as 'he/it/him', and saying that I could not be an activist because I am a prostitute. Starting the last week of April last year, male Project Renewal staff under Kaedon Grinnell flirted with me, and asked questions about my genitals (lemme see what a sex change looks like"). I informed Kaedon Grinnell of these incidents. Out of fear of retaliation I reciprocated their advances and engaged in sexual intercourse with Project Renewal shelter staff.

18) Employees of the security company within the shelter, QPS, constantly harassed me verbally calling me him/he/it. Male QPS staff did bring myself and other shelter residents illegal drugs (including opiates, marijuana and cocaine), and did engage in prostitution and other sexual contact with shelter residents openly. A QPS staff named "Brandon" engaged in several relationships with male residents.

19) During my time at the shelter QPS employees openly harrassed and mistreated myself and other Transgender clients (usually Trans females), choosing to enforce strict security protocol for less passable Transgender residents or, outspoken individuals such as myself. I witnessed this discrimination first hand on numerous occasions. Some male QPS employees openly

4

engaged in gossip between themselves and other clients about medically/legally sensitive information about shelter clients openly (including HIV status and Hormone replacement/surgery status). Both male and female QPS staff engaged in threatening shelter residents with physical violence or systematic retaliation via shelter write-up or transfer or worse; arrest by QPS calling the NYPD and allowing them into the shelter. Many of the shelter residents are afraid of the police for one reason or another, and the threat of the police being called erroneously was a scare tactic often used by QPS staff. I am in touch with dozens of current and former shelter residents who will testify as witnesses to these actions and behavior by QPS staff.



20) Project Renewal staff also called me names such as faggot, transvestite, she-he, It, shim; and referred to me using inaccurate pronouns such as he/him on purpose. Staff at Project Renewal did threaten to physically assault me if I attempted to bring my service animal into the shelter as per the ADA. Other staff did engage in fabricating lies about me in an attempt to damage my reputation and character publicly (as I was using my Facebook vlog to document the misconduct of many staff, giving staff the motive to damage how I viewed in the public's eye). These lies were also intended to impede and damage my credibility as a victim (civilly or criminally) should I report these behaviors and actions to authorities or bring legal action.

21) These lies were spread verbally staff to staff, and through/within documents and communication between Project Renewal/QPS as well as with NYC DHS.

5

22. DHS used these lies as the basis to attempt to have me transferred from the one and only shelter for Transgender individuals within the DHS system, to a non transgender specific placement.

23. I have repeatedly maintained in writing, emails and through verbal assertions to the defendants that I identify as Transgender; a Transgender female. This is not the same as identifying as a "female", while existing as a Transgender person. Some individuals transition and choose to go "stealth" and shed their Trans identity, and some do not. This decision is linked to an individual's medical treatment. It is inappropriate and against the law for cisgender individuals to assume or operate as if surgery is a final or determining factor in legal status of trans individuals, or, that once an individual has surgery, they are no longer transgender. Legally DHS cannot force me into a 'non Transgender specific' shelter. Also, harassment on the basis of my identifying as a transgender female is prohibited under the law. In placing myself and other transgender individuals in cisgender shelters, the defendants are unable to eliminate harassment and conflict that is otherwise avoidable.

24. DHS attorneys stated that there was "no room" at the shelter as early as April 27th of 2017, even though I had slept there the previous night and there were more than a dozen beds available.

6

(25) This attempt to have me transferred revealed mechanizations of DHS, QPS and Project Renewal to have me transferred as a way of keeping mismanagement and potential crimes by Project Renewal and QPS staff under wraps.

(26) When confronted with photos taken seconds previously showing actual open beds at the shelter, DHS/Project Renewal soon relented and agreed that there was room, and I returned to the shelter. Staff soon began treating me different than other residents; DHS police were placed at the shelter to intimidate myself and other residents (which triggered my PTSD.

(27) One morning while I was staying at the shelter in May of 2017, a man approached and threatened myself, and four other Transgender residents of the shelter who were outside in front of the facility. He called us derogatory names based on our appearing to be transgender, and claimed he had a firearm, pointing to his waistband. This caused a physical altercation between the individual attacker and the group of Trans residents. DHS police responded by coming outside, blindly entering the commotion seemingly targeting the residents as the aggressors, and bringing the attacker (a person off of the street) inside the facility, unsearched!

(28) DHS police then aided the individual in leaving out a side entrance, once residents called the police and were insistent on pressing charges. DHS police presence at the facility was clearly not about creating a more safe environment, and their aiding the individual who threatened myself.

7

29) For several weeks in early May of 2017 I experienced constant harassment and retaliation from Project Renewal staff, QPS staff and shelter director kaedon Grinnell (I had informed him I would be going public with his flirting and late night texts/calls when he threatened to have me transferred using an Administrative Transfer.

30) Eventually I was transferred from the facility, the only Transgender shelter in New York to "WIN West"; shelter run by former New York City Council woman and Speaker Christine Quinn, who I have known professionally for over decade.

31) Christine Quinn was a leading architect of New York's first legislation to protect Transgender individuals against private citizens or the government forcing individuals into gender segregated facilities, called "local law 3" (which added Transgender and gender fluid individuals to the NYC HUman Rights Law).

32) Unlike other amendments of it's kind, NYC (under HRC and the direction of then Mayor Bloomberg) took the unusual step of issuing guidelines to go along with local law 3 in order to expressly outline how the city should function post local law 3, using guidelines to educate the public and government entities alike. This law made clear NYC's acceptance, on a legal level, of more than just 'male' and 'female', as valid gender options with protection under the NYC Human Rights Law. The law addressed 'exclusion' policies, as much as it did forcibly imposing

8

gender roles or labels on individuals; and prohibits forcing people into one gender segregated facility, or the next, against their gender identity. These guidelines were created with input from Trans legal advocates and law makers.

33) The flip side of denying access to Trans people to gender segregated facilities, is refusing to acknowledge the uniqueness of being Transgender as the key reason Trans persons can refuse placement at sex segregated facilities designed for cisgender individuals. Most of NYC agencies (from ACS to DOC) have policies which mandate services and protections for Transgender identified individuals, and create specific beds and facilities apart from traditional 'cisgender, hetero' facilities to accommodate transgender individuals.

34) During at least two seperate phone call last June between Christine Quinn and myself, I expressed that I identified as Transgender, could not accept a placement at a cisgender female shelter, and so, the only facility appropriate for me was a Transgender specific facility.

35) I expressed to Christine Quinn she should stand up against DHS forcing Trans people into facilities originally designed for cis gender individuals. I explained that the issue DHS was facing was a lack of enough Trans shelter within DHS.

36) I believed she would do the right thing based on her previous public appearance and actions on trans issues (she cried during the public hearings while hearing public testimony from

9

Transgender New Yorkers who experienced abuse and discrimination based on gender-based stereotypes).

37) I encouraged her to follow the law as to my gender identity and expression (urging her to house me within her agency some place other than WIN West like an apartment, which WIN has access to), and she refused, stating to me in substance "...but you're a woman now right....isn't that what you want people to think? Isn't that what you and other fought so hard for?".

38) She was referring to 1. What she believed to be my gender based on gender stereotypes and; 2. my having had gender affirming surgery, when she said 'now' during our call (referring to my genitals and medical transition).

39) Her interpretation of gender identity, motivations for changing my body, and her knowledge of my history as an activist for Transgender rights lead her to a decision to participate in denying me protections under local law 3. It's like she was saying I am no longer transgender.

40) She was effectively refusing to acknowledge my gender identity as a Transgender woman. Creating an 'all or nothin" scenario for Trans individuals in DHS shelters. Either you can be in the closet among cis gender women, or live openly as transgender, and face constant questions, harassment and being the subject of gossip within the shelter.

10

41) I expressed my concerns with her ignoring the NYC Human Rights Law (along with other laws), and the fact that the facility in question was for "women" which means that local law 3 prohibits the forced placement of Trans identified individuals into it, as a gender segregated facility.

42) This shelter, and the shelter DHS tried to force me into next faile to accommodate my multiple disabilities.

43) DHS is fully aware of these disabilities and the recommendations of experts who have or are treating me, yet, they have chosen to ignore their recommendation.

44) In order to be operating in compliance with numerous laws and precedent, the solution is for DHS and WIN West to have enough Transgender specific beds to accommodate the projected number of Trans individuals with the shelter system; not for City lawyers or Christine Quinn to determine people's gender for them, to deny Trans people the option of not being forced into intimate settings with cis gender individuals.

45) Other Transgender individuals who have been placed at the same facility run by Christine Quinn or her agents, have come forward and provided proof that facilities under Quin's control were/are dangerous for Transgender residents, underscoring my argument that the law should not be ignored, and DHS needs to open new shelters for specifically for Transgender specifically for individuals. This proof includes video of a Transgender women being verbally

abused and later physically assaulted in the very shelter DHS and Quinn were attempting to place me at with the attackers making anti trans comments during the incident.

Denying a Transgender person their identity via refusing to acknowledging it as a determinant social factor in gender segregated places of public accommodation, is not consistent with the laws of NYC and State since Governor Cuomo issued an Executive Order adding Transgender people as a protective group under the NYS Human Rights Law.

46) Refusal to protect and accommodate Trans individuals in NYC DHS run shelters is a violation of the Americans with Disabilities Act (referred to as the ADA) 2. Fair Housing Act (referred to as the FHA) 3. Title VI of the 1964 Civil Rights Act (referred to as Title VI) 4. Section 504 of the Rehabilitation Act (referred to as Section 504).

47) Medical Needs; undue stressed caused by lack of accommodations and harassment by defendants.

48) I entered the NYC shelter system because I was experiencing personal crises. As per several legal disabilities I suffer from (including PTSD, GID ADHD) I was in need of a calm environment where I could have a refuge from avoidable triggers, sex work for survival; lack of sleep and balanced nutrition, all while accompanied by my service animal. I was in treatment, prescribed medication as a part of treating my symptoms, but medication is only one component of treatment. The defendants have all ignored the recommendations of my medical providers as to

my needs as well as what will trigger my conditions (resulting in avoidable symptoms like hyper-vigilance, flashbacks, aggression, insomnia).

(49) Ignoring the documented recommendations of at least three providers (surgeon, psychiatrist, social worker) in addition to my requests as a disabled person to reasonable accommodations for my multiple conditions and disabilities, represents a failure to provide me with reasonable accommodations for my disabilities.

(50) Beginning in April of last year the Defendants (DHS, Project Renewal QPS Christine Quinn WIN) engaged in actions which caused me considerable psychological stress and triggered the worst PTSD symptoms I have ever experienced. My PTSD is triggered in part by discrimination based of my Transgender identity and the harassment that comes with it or; or the legal conflict which can arise when cisgender government or non profit administrators stand in opposition to the medical treatment prescribed by doctors. I have experienced the NYC Law Department opposition to my gender identity and medical treatment since I was a child. All of this back and forth is triggering for me.

(51) Other actions by the defendants, such as male staff making sexual advances towards me, and our engaging in sexual intercourcse (staff and myself); other staff harrassing me with terms such as faggot or him.

52) The defendants have ignored that my symptoms are made worse by their actions, such as anxiety, aggression and insomnia. All of my conditions were made worse by the prospect of needing to hide my Trans identity in a "female" shelter, or face constant questions about makeup and/or Transgender genitals from cisgendered shelter residents ("can I see your surgery?"). The refusal to place (or refuse to place) me according to my gender identity (and so with my doctors recommendations) all represent failures in providing reasonable accommodations for my disabilities.

## Claims

Among others violations of the law;

53) These actions are in violation of the NYC Human Rights Law, as well as the State Human Rights Law, under Disability, Sex Sexual Orientation and Transgender related protections.

54) These actions violate my rights under the Americans with Disabilities Act.

55) These actions violate my rights under the Fair Housing Act (referred to as the FHA).

56) These actions violate my rights under Title VI of the 1964 Civil Rights Act (referred to as Title VI)

4. Section 504 of the Rehabilitation Act.

 57) These actions also violate the rights guaranteed to me under the First and Fourteenth Amendments of the United States Constitution.

Prayer for Relief

Because the actions of the defendant caused me to be homeless, mental and physical injury, deprived me protections against discrimination based on my transgender identity and against sex based discrimination;

1. I ask this court to award punitive monetary damages in the amount of $10,000,000 for the above conduct (which the defendants had full knowledge of, and for which there is overwhelming evidence to support as fact). This conduct represents violations of multiple local state and federal laws. I have lost a year of my life to homelessness, PTSD symptoms; my education and future have been derailed (as I would have enrolled back in college last fall, if my housing was stable) and I fear that my public image may have been damaged beyond repair by untrue rumors spread by the defendants and by the humiliation caused by being stigmatized as homeless as I refuse placement at a cisgender shelter. I may have permanent psychological scars from the past years events as well. The actions and abuses of the Defendants in particular, cause me horrible flashbacks and nightmares.

2. I also ask that this court rule that the defendant's refusal to follow the specific recommendations of my medical providers to be failure to provide reasonable accommodations for my multiple disabilities, under local, state and federal law.

3. Additionally I ask that this court issue an order compelling the DHS place me within the DHS system at a shelter or SRO, which follows the recommendations of my treating doctors (including mental health experts) and surgeons.

4. Accordingly, I move for this court to issue an order directing DHS to immediately begin the process of assessing the fastest way that shelters designed specifically transgender individuals and populations can be created (just as ACS, DOC and other city agencies have done);

5. Lastly I ask this court to issue an order barring DHS from placing individuals in facilities which are not consistent with their legal gender identity, and which violate laws meant to protect against sex based discrimination (including discrimination against transgender individuals).

I pray for this, and any additional damages or relief which the court it deems just and appropriate.

Respectfully Submitted,

Mariah Lopez

PLAINTIFF