# EXHIBIT C

# Exhibit 9

1

2    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK - CIVIL TERM - PART 12
3    -----------------------------------------------X
      In The Matter of the Application of
4    MARIAH LOPEZ,
                    Petitioner,      Index No.
5                                    100632/17

6         -against-

7    NEW YORK CITY DEPARTMENT HOMELESS SERVICES,

8                       Respondent.
      -----------------------------------------------X
9                     60 Centre Street
      ORDER TO SHOW CAUSE     New York, New York
10                    May 31, 2017

11

12    B E F O R E:

13         HONORABLE BARBARA JAFFE,

14                       SUPREME COURT JUSTICE

15    A P P E A R A N C E S:

16         MARIAH LOPEZ
         PRO SE

17

18         NEW YORK CITY LAW DEPARTMENT
         Attorneys For the Defendant
19         100 Church Street
         New York, New York 10007
20         BY: THOMAS B. ROBERTS, ESQ.

21

22         JACKSON LEWIS
         Attorneys For the Project Renewal
23         666 Third Avenue
         New York, New York 10172
24         BY: KEVIN CONNOLLY, ESQ.

25

26                    CHERYL-LEE LORIENT
                    SENIOR COURT REPORTER

2

Proceedings

1

2          THE COURT:   Good morning, everybody.

3          MR. CONNOLLY:   Good morning.

4          MR. ROBERTS:   Good morning.

5          THE COURT:   So, we have a new file here.

6   And, before we begin, Mr. Roberts, and your last name?

7          MR. CONNOLLY:   Kevin Connolly from Project

8   Renewal, your Honor.

9          THE COURT:   So, were you served with new

10  papers?

11         MR. CONNOLLY:   I don't know what new papers

12  you are referring to, your Honor.

13         MS. LOPEZ:   Your Honor, if you want a short

14  answer, the answer is no.  But, I have an explanation

15  that I would think would be reasonable when you --

16         THE COURT:   I always like a short answer.

17  That's good.  Okay.  No, I don't need an explanation

18  right now.  Mr. Roberts?

19         MR. ROBERTS:   So, I have not seen the papers

20  that were filed on Friday other than the order that

21  Judge Nervo signed.  So, I don't know what the

22  supporting papers were that went to that.  I do want to

23  alert the Court to procedural matters.

24         THE COURT:   Let's first get the housekeeping

25  out of the way.  Oh, to procedural matters?

26         MR. ROBERTS:   Yes, your Honor.

CL

3

```
 1                         Proceedings
 2              THE COURT:    Tell me.
 3              MR. ROBERTS:    So, first Ms. Lopez submitted
 4    papers in Federal Court before Judge Caproni yesterday.
 5    And, Judge Caproni has ordered us all to appear in
 6    front of her at noon today.  So, I just want to advise
 7    you of that.
 8              MS. LOPEZ:    I won't be seeking identical
 9    relief.   No problem.
10              MR. ROBERTS:    I think that --
11              MS. LOPEZ:    I said, I will not be seeking
12    identical relief.
13              MR. ROBERTS:    So, I read her papers, to
14    Judge Caproni, to seek identical relief.  But, anyway
15    maybe I misread them.
16              The other matter is that Ms. Lopez was
17    arrested on the, I believe the 24th and now has a
18    criminal case pending in the Bronx with a felony charge
19    and three misdemeanor charges according to the
20    public.doc.  I am very concerned.
21              I assume she has been appointed counsel by
22    Legal Aid or some such organization in the Bronx.  I
23    phoned and left a voicemail message with Legal Aid in
24    the Bronx -- I didn't talk to anybody on Friday
25    afternoon -- just saying, you know, that "Your client
26    has a civil proceeding going on that probably will
```

CL

4

1          Proceedings

2     enter into the same factual basis that your criminal

3     case is about.  And, I'm personally uncomfortable

4     talking to Ms. Lopez."

5          Now, because I think she's represented and

6     the matter, part of the suspension, involves the events

7     that resulted in her arrest, so I just alert you to

8     this kind of problem.

9          And, I don't want to -- I don't know whether

10    I'm Mirandizing her or what, but I'm not trying to

11    elicit from her testimony about those events, but I

12    think we'll have to confront them.  And, I think it is

13    a problem, because she is represented in the Bronx, but

14    not here.

15          So, I'm not sure I have a solution, but I

16    thought you should be aware that this is the problem

17    that I am seeing right now.

18          MS. LOPEZ:   Your Honor, good morning.  So, I

19    just want to address several things, but because

20    Mr. Roberts stood up, the way he did, I think I will

21    get to the issue.  I was going to wait a little longer

22    to get to, housekeeping as you called it.

23          I believe, overall, the conduct of

24    Mr. Roberts is unethical and borderline outrageous.  I

25    believe everything he just put on the record, he's an

26    intelligent enough attorney, to have forethought or

CL

5

|     | Proceedings |
| --- | --- |
| 1   | |
| 2   | foreseen. |
| 3   | And, I believe that much of it, including |
| 4   | Project Renewal and the City's Law Department's urging |
| 5   | of the staff at the facility to press charges against |
| 6   | me was by design. |
| 7   | And, so, I want to say, in general, I'm |
| 8   | concerned not only about my criminal liability going |
| 9   | forward, but being denied fair access to this Court and |
| 10  | its procedures by counsel playing a game of trying to |
| 11  | outmaneuver a pro se layperson litigant. |
| 12  | I have a very simple solution, because I know |
| 13  | my way around the Court and Court procedure. How about |
| 14  | if I just agree on the record here that we are not |
| 15  | going to discuss any of the specific matters around the |
| 16  | arrest, because I'm a grown enough woman to understand |
| 17  | my own criminal liability. Let me absolve your fears. |
| 18  | Mr. Roberts is making excuses about not |
| 19  | wanting to interact with me, because -- those excuses |
| 20  | are unfounded -- I will have to deal with the potential |
| 21  | criminal liability. |
| 22  | You have done your duty by informing the |
| 23  | Court of your non-desire to have me to elicit criminal |
| 24  | facts. I believe that the instant matter that he is |
| 25  | referring to will come up in general terms, but my plan |
| 26  | is to make an argument that is broad and around the |

CL

6

Proceedings

1

2        pattern of behavior of the respondent.  So, I don't

3        have any requirement here in this Court today or later

4        to go into the specific details with Mr. Roberts

5        thereby somehow jeopardizing my only criminal liability

6        in the Bronx matter.

7                    I also want to point out, your Honor, that,

8        ever since Mr. Roberts asked me to concede to an

9        adjourn date across the street, in a separate matter,

10       and I refused, the last time we were here in person,

11       his conduct and behavior to me has been distant, to say

12       the least.

13                   And, again, it appears now, in hindsight,

14       that, what he was doing was by design.  He was

15       distancing hisself in not speaking to me including in

16       realtime as incidents unfolded that could have been

17       resolved without going to court.

18                   I informed Mr. Roberts, the day I was

19       arrested, that day, that there were serious, serious

20       safety concerns at the facility including outside

21       people entering the facility that he or other City

22       Council or even counsel for Project Renewal could

23       absolve or resolve excuse me and they did not.

24                   I would like to get to the matter here and

25       give you a little more background on what happened

26       since Thursday, only because it pertains to my filings

7

|   |   |
|---|---|
| 1 | Proceedings |
| 2 | on Friday. |
| 3 | And, I also just want to say that the Order |
| 4 | that I got, that your Honor granted, the TRO, I don't |
| 5 | remember if I was so specific in the relief that I |
| 6 | sought to name Wind West or exclusively name Wind West |
| 7 | as the facility that I didn't want to be transferred |
| 8 | to, however, the wording in that Order has allowed the |
| 9 | respondents to effectively suspend my services knowing |
| 10 | that the reliefs in this order was not specific enough |
| 11 | to help me.  And, I was helpless having to do sex work |
| 12 | since last week.  And, on that regard, I will have a |
| 13 | seat now and relax my argument. |
| 14 | Your Honor, one of the first days I came in |
| 15 | front of you, you sort of responded to me saying that |
| 16 | "I was doing sex work" in a stunned way, which is |
| 17 | understandable or it appeared to be. |
| 18 | I'm a woman who is a sex worker.  And only, |
| 19 | because of laws, local to New York, prostitution is |
| 20 | expressly illegal.  I do not have shame.  And, I |
| 21 | believe that they are relevant to this case. |
| 22 | If the respondents truly believe that when |
| 23 | I'm not in the shelter, I'm out of the system, and what |
| 24 | I'm doing is sex work, unless they don't believe that, |
| 25 | then that does play to their motivation in their |
| 26 | actions to suspend my services.  So, you knew I would |

CL

8

1                               Proceedings

2        be homeless.  They knew I would be doing sex work and

3        they did what they did anyway.

4                    If your Honor would like, I said I could

5        explain what happened, not to the incident itself, but

6        how I ended up having the need to file a new motion

7        before this Court.

8                    MR. ROBERTS:   So, your Honor, I don't know

9        if you had, had a chance to read the answer that I

10       submitted.

11                   THE COURT:   I did.

12                   MR. ROBERTS:   So, there is a long history

13       now of Ms. Lopez defiantly violating rules and when

14       asked to comply with rules directly saying no, she

15       won't.  In going forward, they include sleeping with

16       other clients, having candles, bringing wine into the

17       facility and bringing food.  There is also a long

18       history of her threatening other employees of the

19       facility.

20                   We have here today -- if you want to have

21       witnesses, we have both the witness -- four of the five

22       people who signed affidavits.  The other client

23       facilitator, I think his name is Ogle (phonetic) -- I'm

24       forgetting his name.  He's not here, but the other four

25       are here and you can hear from them if you would like.

26                   But, on Wednesday, last week, I did, at the

CL

9

Proceedings

1

2      beginning of the day, when I was working on these

3      papers, receive a phone call from Ms. Lopez, which I

4      took to say, would I like to settle the case by

5      completely reorganizing the management of Project

6      Renewal.  I did not view that as a productive effort on

7      the day I was trying to file the papers.

8              Later that day, she got in multiple arguments

9      with staff, hit a staff member, the police came, the

10     police cuffed her, she resisted arrest, she bit a

11     police officer, they took her to the hospital.  They

12     took the police officer to the hospital.  That was when

13     your Order said she had to comply with the rules.  She

14     didn't.

15             She was then suspended.  I notified the Court

16     of the suspension on Thursday.  We now want -- the

17     suspension is expiring today.  We would like again to

18     place her.  We have transferred her to a new facility

19     she simply cannot go back to a facility that she is so

20     consistently disrupting and attacked the staff.

21             Like, I got to say, this facility, this

22     organization, Project Renewal, takes its security

23     seriously.  Two years ago the shelter's boss, the head,

24     the director of one of the shelters, was assassinated

25     by a client, was shot in the street by a client of the

26     shelter.  So, the proposition that the safety of the

CL

10

1                   Proceedings

2    employees is something that is not of concern should

3    really be put aside.  The safety is important.

4            And, as of Friday, Ms. Lopez came back to the

5    shelter and went to one of the directors and told him

6    that she thought she knew where he lived and she would

7    have his fucking head blown off.

8            This is totally unacceptable behavior and she

9    has to be transferred to a facility with better mental

10   health capacity, which is what we have done.  And, I

11   beg you to respect the professional judgment and look

12   at this entire history of disruption since day one that

13   Ms. Lopez has arrived.

14          I don't know why she's done this, but she's

15   disrupted everything about this facility which is

16   trying to get its legs under it.  It's only three

17   months old.  Please, let us transfer her.  That's all

18   that is at stake.

19          Today the suspension comes to an end.  Today

20   it is just a question of transfer.

21          MR. CONNOLLY:  Your Honor, I would briefly

22   like to explain my client's position.  My client,

23   Project Renewal, is non-for-profit agency that operates

24   shelters around the city.

25          In this instance, Marsha's House is a shelter

26   specifically designed to provide food, housing, shelter

11

|  |  |
|---|---|
| 1 | Proceedings |
| 2 | to the LBGT community. |
| 3 | My client has been trying to do the best that |
| 4 | they can to provide these services to those that are in |
| 5 | need.  However, since Ms. Lopez has become a resident |
| 6 | of this facility, she's repeatedly violated the shelter |
| 7 | rules. |
| 8 | In addition to, you know, the numerous |
| 9 | violations such as, you know, missing curfew on a |
| 10 | regular basis, sneaking wine into the building, she's |
| 11 | threaten and harassed not only the staff of Project |
| 12 | Renewal, but also other residents. |
| 13 | Numerous staff members and other residents |
| 14 | have come forward and stated that they do not feel |
| 15 | comfortable living there anymore.  And, they do not |
| 16 | feel safe. |
| 17 | In fact, numerous staff members have, |
| 18 | actually said that they won't come to work with her in |
| 19 | the building, because they just don't feel safe. |
| 20 | As Mr. Roberts just said, we take this matter |
| 21 | especially seriously, because not too long ago the |
| 22 | shelter director for Project Renewal was murdered on |
| 23 | her way to her car leaving the shelter.  You know with |
| 24 | the constant threats that Ms. Lopez has made -- and |
| 25 | it's outlined in the affidavit that Caton Grinnal |
| 26 | (phonetic) provided, who's also the shelter director of |

CL

1                          Proceedings                        12

2         Project Renewal, which is the very same position of our

3         prior employee who was murdered.  That affidavit

4         specifically outlines with the constant threats, morale

5         is very low.

6              You know, the very same employees that

7         Project Renewal relies upon to keep the shelter

8         operating and to provide the services that people like

9         Ms. Lopez need, don't feel comfortable coming to work.

10        And, we can't continue to operate the facility, you

11        know, with this going on.

12              You know, so based upon the continued pattern

13        of misconduct, we submitted our suspension request on

14        the City.  Now, it was the City's decision to transfer

15        her.  It is the City's decision that's at issue.  But,

16        we stand by the information that we provided the City

17        for them to make their decision.

18              THE COURT:  All right.

19              MR. CONNOLLY:   We think it would be best for

20        all parties, Ms. Lopez included, to have her

21        transferred to another facility.  Like he said, we are

22        a new shelter.  And, morale is very low.  We have

23        employees that are willing to testify right now.

24              THE COURT:  I heard you the first time.  I

25        understand.

26              MS. LOPEZ:   Your Honor, I have yet to see

CL

1                              Proceedings                    13

2          any of the affidavits.  And, I think we discussed, the

3          day that your Honor granted the TRO officially, that,

4          if we are going to have issues -- if we are going to be

5          deciding evidentiary issues, including testimony from

6          anybody trying to place testimony against me, that

7          we'll -- then, we should have a hearing.  I would be

8          asking for a hearing.

9                    THE COURT:   What about that, Mr. Roberts?

10                   MR. ROBERTS:   What about what?  The hearing?

11         I have witnesses prepared.  I do have -- I wanted to

12         submit to the Court two documents that are the incident

13         reports in which -- that I just eluded to, where

14         Ms. Lopez asked about the address of one of the staff

15         members, Mr. Barley and then came back on Friday and

16         told him that quote I showed your picture to everyone

17         in Fort Greene.  I'm going to have my cousin's come and

18         blow your fucking head off.

19                   THE COURT:   Mr. Roberts, do we need a

20         hearing here?

21                   MR. ROBERTS:   I don't think you do need a

22         hearing, your Honor.

23                   MR. CONNOLLY:   I don't think so.

24                   THE COURT:   Why is that?

25                   MR. ROBERTS:   The transfer has been ample

26         evidence.  The transfer is in no way harmful.  There

                                   CL

14

1                          Proceedings

2       has been no showing of irreparable harm.  There has

3       been no showing of likelihood of success in the merits

4       and there is no need for a hearing.  And, the transfer

5       could go forward.

6                    If your Honor would like a hearing, we have

7       do have witnesses who can testify.  But, I would like

8       the record to include these two documents, if I could,

9       that have not been -- that post date the answer, so --

10                   THE COURT:   They post date the answer?

11                   MR. ROBERTS:   The one of them predates the

12      answer, because it was really irrelevant, but --

13                   THE COURT:   Ms. Lopez?

14                   MS. LOPEZ:   I will wait until --

15                   THE COURT:   I see these?

16                   MS. LOPEZ:   Yeah.  I wasn't -- I actually

17      have something else.  I have a petition.

18                   THE COURT:   Show it to Mr. Roberts before

19      you give it to me.

20                   MS. LOPEZ:   No, I was going to reference it

21      until I had the actual requisite copies, your Honor.  I

22      have a -- I would like to go in order.  So, I

23      apologize.  Most of -- I got Mr. Roberts response on

24      the day I was released from --

25                   THE COURT:   You mean the answer?

26                   MS. LOPEZ:   The answer.  My apologies.  The

CL

15

Proceedings

answer, the day I got out of Central Bookings. The
fact that Mr. Roberts, as an officer of the Court, knew
that I had just been released from custody and I was
effectively homeless -- he is an attorney for the City,
he has access to my records, he knows where I can and
cannot go, so he served -- I got the answer the day I
was made homeless.

                    (Petitioner talks to dog.)

          Actually, she just reminded me of something.
And, the City as well as Project Renewal in most of
their actions have taken into no account the fact that
moving means so much.  It impacts my service animal, a
completely healthy well rounded -- well, she has
allergies -- well conditioned animal, who is certified
and safe, from City Animal Care and Control.  I will
pause it again.

          First of all, there were many inaccuracies in
the Project Renewal's response, what they put on the
record.  That's why I am insisting on a hearing.

          First off, the incident report that he just
handed up, the shelter director is not a shelter
director.  His name is Mr. Barley.  I'm aware of the
allegations.  And, he is a staff member that has
received more complaints about physical aggression and
there is footage of him openly intoxicated while on

CL

1                              Proceedings                    16

2          duty that I would happily present in a hearing that was

3          taped by many of the clients.

4                    MR. CONNOLLY:   For the record, your Honor --

5                    MS. LOPEZ:   I didn't interrupt you.

6                    THE COURT:   Don't do that.

7                    MS. LOPEZ:   I didn't interrupt you.  He's

8          not a shelter director.  If you are going to have a

9          hearing to hear what he has to say, then your Honor, I

10         would get you a copy of this petition, but every

11         signature in this petition represents a human, living

12         person, who is poor and could not get on the train this

13         morning to get here, that signed a petition in support

14         of the changes I'm trying to bring about.

15                    And, I will address the fact that your Honor

16         instructed me not to -- sort of keep my head down and

17         to comply by all the rules when I got there.  But,

18         since the TRO was granted, I started organizing, in a

19         civilized way, which is, I think, the most concerning

20         to the City attorneys.  I believe that the ten page

21         report that I wrote is telling and disturbing for more

22         than one reason.

23                    Project Renewal and City has represented over

24         and over and over, your Honor, "This is a new facility.

25         This is a new facility."  There's no person in New York

26         that is more experienced at opening new facilities than

                                    CL

Proceedings                                          17

1

2    me.   Joel A. V. Giuliani, I'm Joel A.   Jean Dole v. I'm

3    Jean Dole, Mariah Lopez V. Malory, I'm Mariah Lopez.

4    Every single bed in social services that exists today,

5    that did not exist before 1998, I had a direct hand in

6    the opening of those programs.   There are witnesses

7    from the department of -- from Administration for

8    Children Services including their commissioner, deputy

9    commissioner, that are willing to come in and provide

10   testimony only to the limited fact that I'm an expert

11   for new programs geared for young people.   Now, I'm

12   just referencing these people.   I'm going to sit down

13   in a second, your Honor.

14         But, everything that the City and Project

15   Renewal presents to the Court, every document, every

16   bit of it, has been from staff and people that either

17   have a conflict of interest, because they are now

18   subjects of departmental investigation, investigation

19   that I started last week.

20         And, just for background, the individual that

21   accused me of something on Wednesday is being reviewed

22   by the Bronx District Attorney's Office for a potential

23   crime in potentially offering material good in exchange

24   for a person not providing information to the police

25   about an aggravated harassment.

26         So, all I would be asking is this.   The

CL

18

Proceedings

1

2    answer only speaks to actions before the TRO was

3    granted.  That much I did get a chance to see in the --

4    you know, through the fog of getting out of Central

5    Bookings.  So, I did see the answer.

6           I couldn't respond, your Honor, to every

7    single thing they said, like, I didn't sneak wine.

8    There was a little souvenir bottle from a baby shower I

9    went to that I forgot was in my bag.  That's the wine

10    they are referencing.  I could speak to the fact that

11    there are candles burning in most of the staff offices,

12    but when I tried to light a candle in my room for

13    religious purposes, which I comply and put out, they

14    are making the biggest deal of.

15           Every bit of their testimony that he has

16    provided or information he just provided is an

17    exaggeration, your Honor.  I have nowhere else safe to

18    go.  And, besides the fact that I believe that through

19    an evidentiary hearing, I will just -- I would totally

20    pull the rug out from all of their allegations.

21    Besides that, I'm a disabled person with a medical

22    psychiatric disability.

23           Every single allegation they have made are

24    ones that do not endanger other clients and that the

25    majority of the clients that live there, the people

26    this facility was built for, actually, have signed the

CL

19

1                          Proceedings

2        petition, specifically, to get Caton Grinnal out of the

3        facility, but expressly, to you, I think he said it, to

4        overhaul the administration of the facility.  So,

5        again, I'm going to sit down.  There isn't anybody

6        that's better to have that starting facility.  Just

7        starting a facility isn't grounds to just act

8        inappropriately.

9                  THE COURT:    Thank you.  Mr. Roberts, where

10       are we with the --

11                 MS. LOPEZ:    Response phase.

12                 THE COURT:    -- with the TRO and the stay?

13       Where are we, again?

14                 MR. ROBERTS:    You granted --

15                 THE COURT:    You transferred her out of

16       Marsha's House, because of these events, these alleged

17       events, right?

18                 MR. ROBERTS:    She was suspended.

19                 THE COURT:    She was suspended, fine.

20                 MR. ROBERTS:    Which is indeed different.

21                 THE COURT:    Right.

22                 MR. ROBERTS:    Now, the transfer -- she has

23       not been served with a transfer order, but we are

24       prepared to do that today, based on the assaults and

25       the history and the assaults from last Thursday.

26                 THE COURT:    What is it that you want me to

                               CL

20

1                              Proceedings

2      do?

3                     MR. ROBERTS:   What I want you to do is lift

4      to the extent there is -- I want you to lift the stay

5      against the transfer to the Wind Center.   The Wind

6      Center was -- there is one other facility that they are

7      contemplating, but the Wind Center we think is the

8      better facility.   But, there is also a facility in

9      Brooklyn called Magnolia House which has a bed, which

10     has psychiatric facilities and mental health facilities

11     we think are appropriate and needed.

12                    THE COURT:   Okay.  Thank you.  You answered

13     my question.   What is it that you want in a nutshell?

14                    MS. LOPEZ:   Your Honor, I'm going to move

15     that my TRO remain in effect and, that, I move that it

16     be modified to include -- to remove any specific

17     facility so that it allows -- it doesn't allow them,

18     procedurally, to transfer me anywhere.  So, Wind

19     West -- with the order as it stands, your Honor, it

20     just says they can't transfer me to Wind West.  I want

21     to point that out too in my trying to point out the

22     mechanizations of Mr. Roberts.

23                    The suspension of my service is different.

24     And, so, what I would be moving is to amend -- if I

25     have to do it on papers, I will do that -- to amend the

26     TRO to include that until this proceeding reaches its

21

Proceedings

1

2  finality, that, they cannot suspend my services without

3  coming back, specifically, in front of this Court.

4  Something similar to how Judges in Criminal Court write

5  in limited orders of protections "Make those orders

6  subject to Family Court."

7        What's happening right now, which is normal

8  litigation, it has to do with where I sleep and live.

9  And, if the respondents are going to make decisions

10  after hours or ex parte or without the Court's

11  knowledge directly or review, I believe that those

12  actions will harm me.  I also think, your Honor, that

13  the TRO should remain in effect, because I do face

14  irreparable harm if I am moved.

15        Every single facility -- I'm just sitting

16  here hearing Mr. Roberts and counsel for Project

17  Renewal mention facilities that I have a line of

18  witnesses, that are trans, since the last proceeding to

19  say, "Oh, hell no, that's where they stick us when they

20  want us out of their hair" or "We have enumerable

21  problems there with the other clients."  I pause it

22  again.  The only facility where a open and transgender

23  person in the Department of Homeless Services that does

24  not want to face harassment from either the outside

25  community outing them as being trans or you know or the

26  people within, is Project Renewal Marsha's House.

22

1                           Proceedings

2                   I believe that what's happening at this point

3          is they are trying to move to dissolve the TRO, your

4          Honor, so they can sort of go about their normal

5          business.

6                   I brought my case in front of this Court,

7          because their normal goings on, isn't an everyday

8          business.  It is impacting me to the point where I

9          might be harmed by going in the street.

10                  THE COURT:   Okay.  What are you seeking in

11         Federal Court today?

12                  MS. LOPEZ:   I'm, actually, going to seek,

13         your Honor --

14                  THE COURT:   What are you seeking?

15                  MS. LOPEZ:   I'm seeking a relief.  But, let

16         me explain.  There might be monetary --

17                  THE COURT:   What relief?

18                  MS. LOPEZ:   Your Honor, I'm not an attorney.

19         Let me explain.

20                  THE COURT:   What was your application to the

21         Judge?

22                  MS. LOPEZ:   I didn't ask -- in my rushing

23         yesterday, in my haste, I merely informed the Judge of

24         what was going on.  And, I then asked that he might

25         look at the papers, that they review it.  I didn't

26         expressly ask for relief the same way.  I'm aware that

23

Proceedings

1

2      I would be coming here today.

3              THE COURT:   Thank you.  And, you have no

4      knowledge of which --

5              MS. LOPEZ:   I have the papers.

6              MR. CONNOLLY:   I believe it was the same

7      relief requested here.

8              THE COURT:   Okay.  What about I don't decide

9      anything right now, wait until you see Judge Caproni,

10     then come back here in the afternoon, how about that,

11     and report to me?  Or better yet, better yet, you don't

12     have to come back.  You can make a call and advise

13     Mr. Casper what happened in Federal Court just for my

14     edification and I will issue a decision on the stay

15     today.

16             MR. CONNOLLY:   Your Honor, the only thing I

17     will say is, you have both sides papers and the --

18             THE COURT:   I don't have the Federal Court

19     papers.

20             MR. CONNOLLY:   No, there was no case in

21     Federal Court.  It was just a letter Ms. Lopez

22     submitted yesterday.

23             THE COURT:   I don't have that.

24             MR. CONNOLLY:   No, I mean, for this instant

25     matter.  In other words, if you are well versed with

26     the facts, your Honor --

CL

24

Proceedings

1

2         THE COURT:   I know.   It depends.   If I were

3    to render a decision and then Judge Caproni could do

4    something -- you know, I just don't see how that might

5    be a good thing.

6         MS. LOPEZ:   Your Honor, I'm here too.   I'm

7    an adult.   If you granted a TRO that I'm asking for, it

8    would make the issue across the street moot.

9         THE COURT:   Of course, it would.   But, I'm

10   not doing that right now.

11        MS. LOPEZ:   Okay.   So, your Honor, what I'm

12   attempting to do more than anything is get the Judge to

13   maybe inform them, without ordering them, that, the dog

14   and the placement -- because, all of what we're doing

15   was already said across the street.

16       If you are asking me what I'm doing, the

17   Judge in her ruling, in order to dissolve, insisted

18   that this facility was the safest place, that, they are

19   making all the same arguments absent some new

20   allegations.   So, what I'm going to try to do is if the

21   judge would instruct them that this is the best place

22   without ordering them --

23        THE COURT:   This is what I'm going to do

24   then.   And, Judge Caproni can just do whatever she

25   wants.   I'm lifting the stay against the transfer based

26   on the record before me and the balancing of the

CL

```
 1                         Proceedings                    25

 2      equities here.  But, I will issue a decision on the

 3      Article 78 and decide whether or not there will be a

 4      hearing.  I'm not saying there will be a hearing yet.

 5      There might be a hearing.  I will put in my decision

 6      whether there will be a hearing.  That's it.

 7                  MS. LOPEZ:   Your Honor, can I just --

 8                  THE COURT:   That's my decision, Ms. Lopez.

 9                  MS. LOPEZ:   Okay.

10                  THE COURT:   Thank you very much.

11                  MR. ROBERTS:   Thank you, your Honor.

12                     REPORTER'S CERTIFICATION

13              I hereby certify that the foregoing is a

14      true and accurate transcript of the

15      proceedings.

16

17              (Not certified unless signed in blue ink.)

18

19              _Cheryl-Lee Lorient_

20                  Cheryl-Lee Lorient
                    Senior Court Reporter

21

22

23

24

25

26
```