# EXHIBIT D

H5VPLOPH1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARIAH LOPEZ,

                    Plaintiff,

          v.                                17 CV 3014 (VEC)

NEW YORK CITY DEPARTMENT
HOMELESS SERVICES, ET AL.,

                    Defendants.

------------------------------x
                                       New York, N.Y.
                                       May 31, 2017
                                       12:01 p.m.

Before:

                    HON. VALERIE E. CAPRONI,

                                       District Judge

                         APPEARANCES

MARIAH LOPEZ, Pro Se


THE CITY OF NEW YORK LAW DEPARTMENT
     Attorneys for Defendants
THOMAS B. ROBERTS
KEVIN PATRICK CONNOLLY, JR.
     Assistant Corporation Counsel

NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES
TONIE BAEZ
     Assistant General Counsel, Office of Legal Affairs

ALSO PRESENT:  SUZANNE KAISER, Director of Property Management
               Project Renewal

H5VPLOPH1

1              (In open court)

2              (Case called)

3              MS. LOPEZ:  Good morning.  Mariah Lopez, pro se

4    plaintiff.

5              MS. BAEZ:  Tonie Baez, New York City Department of

6    Homeless Services.

7              MR. ROBERTS:  Thomas Roberts, Corporation Counsel for

8    the City of New York.

9              MR. CONNOLLY:  Kevin Connolly, Jackson Lewis for

10   Project Renewal.

11             MS. KAISER:  Suzanne Kaiser for Project Renewal.

12             THE COURT:  I'm sorry, give me your name again.

13             MS. BAEZ:  Tonie Baez, B-a-e-z.

14             THE COURT:  Okay.  Can we start with, let me ask the

15   City, Ms. Baez or Mr. Roberts, what happened today in New York

16   Supreme?

17             MR. ROBERTS:  So we had argument today in front of

18   Justice Jaffe and she lifted off the stay against transfer of

19   Ms. Lopez to a different facility, and there had been a

20   suspension that started on, I believe, the 24th for seven days.

21   That's expiring today, and we are going to give her a transfer

22   to a new facility, which I believe is the WIN West facility,

23   which is on 51st Street in Manhattan, in the theater district.

24             It's a shelter for -- a women's shelter that's got

25   currently two transgender people in it, and the main -- two

1  main advantages that we think are going to help Ms. Lopez is

2  that it's got significantly improved mental health services

3  over what Marsha's House had, which is the prior place in the

4  Bronx, and also, that the security service there is DHS, or

5  Department of Homeless Services police, rather than a private

6  security agency that Project Renewal had hired, and we're

7  hopeful to get more compliance.

8        Just procedurally so you know, there was an Article

9  78 -- after we were before you, Ms. Lopez started an Article 78

10  in the State Supreme Court challenging a decision to transfer

11  her that DHS had made.  When was that?  That was, I believe, on

12  the 10th of May, and Justice Jaffe enjoined us from

13  transferring her to a new facility.

14        THE COURT:  That's the same Article 78 that you had

15  the hearing today?

16        MR. ROBERTS:  That's correct, in the Article 78, and

17  then, as a TRO, we filed an answer, and I thought, if you would

18  like, I can serve the answer, which listed, with exhibits, all

19  the violations of rules and all the threats that Ms. Lopez has

20  made against staff at that facility.

21        THE COURT:  At the --

22        MR. ROBERTS:  At the Marsha's House in the Bronx.

23        THE COURT:  Okay.  Is that what was submitted to Judge

24  Jaffe?

25        MR. ROBERTS:  Correct.

H5VPLOPH1

1        THE COURT:  Okay.

2        MR. ROBERTS:  So we filed, this last week, with

3   Justice Jaffe, and then essentially she had scheduled already a

4   return on the 78 for this morning, but then also last

5   Wednesday, Ms. Lopez hit a security guard --

6        MS. LOPEZ:  Allegedly.

7        MS. BAEZ:  -- and got arrested.

8        THE COURT:  Do not do that, Ms. Lopez.

9        MS. LOPEZ:  I'm sorry.

10        THE COURT:  If you want to continue to represent

11   yourself, you've got to abide by the rules.  The rules say when

12   he's talking, you don't talk.  Understood?

13        MS. LOPEZ:  Yes.

14        MR. ROBERTS:  So she hit a security guard.  The police

15   came.  She resisted arrest.  She bit a police officer.  There

16   is now a felony charge and three misdemeanor charges, and in

17   the wake of that event last Wednesday evening, DHS suspended

18   her for seven days.  I advised Justice Jaffe of that on

19   Thursday, and then the suspension is now coming to an end and

20   we are reassigning her to a different shelter.  And we laid all

21   this out in front of Justice Jaffe this morning.

22        The argument, we do have here a whole series of

23   witnesses who could testify about this, they were at the

24   Supreme Court this morning.  Also, Justice Jaffe did not take

25   testimony this morning, just argument, but at the end of the

H5VPLOPH1

1   argument, she lifted the TRO on the transfer to a different

2   facility.

3               THE COURT:  Okay.  All right.  Ms. Lopez, what do you

4   want me to know?

5               MS. LOPEZ:  So, good morning, your Honor, or good

6   afternoon now.  So the first thing is that, I guess I'll stand

7   just for --

8               THE COURT:  That's normal.

9               MS. LOPEZ:  So first of all, I'd like to give your

10  Honor a petition that the other parties already have a copy of

11  signed by, at least 40 of the clients at Marsha's totally

12  contradicting the City's version of events.

13              And so, your Honor, I understand that I'm not an

14  attorney, but we are in a court, and the only way the City has

15  been able to prevail or even reach a higher favor by the

16  preponderance of the evidence by another judge is by lying and

17  exaggerating.  And so I'm going to ask, just like I asked Judge

18  Jaffe, and I also believe he misrepresented a little bit what

19  happened across the street --

20              THE COURT:  Hang on just a second.  Is there something

21  more to this?

22              MS. LOPEZ:  Yes.  So that petition is in support of

23  the -- I wrote a ten-page report because your Honor and Judge

24  Jaffe, the day she issued the TRO was clear.  Mariah, you may

25  be an activist, but you have to abide by at least reasonable

H5VPLOPH1

1    rules.

2           And so when I went back, in anticipation of the

3    upcoming court date and in furtherance of my activities as an

4    activist, I wrote a ten-page report that a city councilman has

5    now submitted to the Department of Investigations, and at least

6    four city council people have specifically told me that they

7    have read my report, and they are disturbed at the findings of

8    the report.

9           And so right now, here's what's happening.  Ever since

10   Ms. Baez and Mr. Roberts represented on the record here that

11   there were no beds at Marsha's the day your Honor issued the

12   TRO, I was -- I was concerned that they would do everything in

13   their power to get me out this specific facility for the

14   principle of it, retaliation, if you will.

15          And so when I went back to the facility, I wanted to

16   point out the only reason I allowed -- or with the TRO

17   dissolving and didn't try to get it to remain in effect is

18   because I was physically exhausted.  I had been running around

19   without sleep for weeks, and the attorneys that you got to help

20   me said, Mariah, you're there now and the dog doesn't seem to

21   be a problem.  I was just too physically tired to make the

22   court appearances that would have had the TRO remain in effect.

23          As soon as I got back to the facility, the staff

24   started to engage in a series of behaviors that let me know

25   they were trying to build a paper trail against me.  For

H5VPLOPH1

1    instance, I would physically see them following me around the

2    facility, different than they followed anybody else, and making

3    allegations against me that came to my attention that were

4    different.  And the key here is that "different than anybody

5    else."

6            Your Honor instructed me to not be a jerk.  Well, I'm

7    not a jerk, but there were instances, because of the person I

8    am, that I cannot ignore.  So, for example, I began to see the

9    cook staff underfeed some of the transgender client, very

10   serious allegations of sexual conduct by staff and clients.

11   All of this is in the report.  So right after an incident where

12   I got into a verbal confrontation with the cook staff, who I

13   actually witnessed underfeed someone, they attempted to use an

14   administrative transfer procedure to transfer me out, breaking

15   all types of inter-DHS rules, interdepartmental DHS rules, and

16   I believed violating my rights.  And so I went to Supreme Court

17   and got a TRO.  Right --

18           THE COURT:  Again, let me make sure that I understand.

19           MS. LOPEZ:  Yes.

20           THE COURT:  Did you agree that what you went to State

21   Court on was to prohibit your transfer out of Martha's House?

22           MS. LOPEZ:  Marsha's.

23           THE COURT:  Marsha's House.

24           MS. LOPEZ:  Marsha's House specifically, yes.

25           THE COURT:  Okay.  And the State Supreme Court delayed

H5VPLOPH1

1    it for a week or ten days?

2              MS. LOPEZ:  Or so, yes.

3              THE COURT:  And then this morning dissolved it?

4              MS. LOPEZ:  Yes, it was -- yes, it dissolved on its

5    own because it was limited to the OSC that I had filed and that

6    the judge had signed.

7              THE COURT:  But you were seeking to get it extended,

8    correct?

9              MS. LOPEZ:  Not necessarily, and I believe that that

10   was one of the things that I wanted to point out as a

11   misrepresentation.  I just want to finish the time I'm on, your

12   Honor, please.

13             THE COURT:  No, I want you to answer my question.

14   What was at issue before the State Supreme Court Justice Jaffe?

15             MS. LOPEZ:  A specific transfer to the WIN West

16   facility.

17             THE COURT:  You were trying to prohibit that, correct?

18             MS. LOPEZ:  Initially, yes.

19             THE COURT:  What do you mean "initially"?

20             MS. LOPEZ:  Because I had to -- so, your Honor,

21   something happened last week, the incident that he accused me

22   of, which I was going to get to in a second.  When I got out of

23   central booking and, again, I'd like to address that in a

24   second because he brought it up.  They handed me paperwork

25   saying that my services were suspended.

H5VPLOPH1

 1            Now, if your Honor will follow me, ever since we left

 2     this courthouse, they have been trying to get me out of

 3     Marsha's either peaceably, not having connection to any

 4     incident.  Literally, I got e-mails from the WIN West director

 5     saying, look at our wonderful facility; please leave Marsha's

 6     and come to our facility.  So when I got out of central booking

 7     and I got served with papers, it wasn't to go to WIN West.  It

 8     was putting me in the street all together.  It was, you have no

 9     services within the Department of Homeless Services.

10     Effectively putting me in the street over the weekend, and I'm

11     going to get to that in a second.

12            I believe overall the conduct of Mr. Roberts, Mr. Tom

13     Roberts, since we left here was -- has been inappropriate.

14     I'll give you an example.  So in Supreme Court, he asked me for

15     a change in one of the court dates in front of your Honor and

16     said that he needed my permission.  He needed to seek the

17     permission separately from the court, and I told him in Supreme

18     Court, outside of Judge Jaffe's chambers, that I was not going

19     to agree to that.

20            He huffed and he puffed.  He said he had another

21     engagement.  He might have even cursed under his breath, and

22     ever since then, it has been brought to my attention, because I

23     have witnessed this too.

24            In addition to the 33 clients that have signed that

25     paper, there are multiple staff that are willing to lose to

H5VPLOPH1

1        their job, if it comes to it, to come here and attest to the

2        fact that ever since I got back, the day or so after the TRO

3        from this court dissolved, the staff were instructed to, quote,

4        unquote, write me up for anything.

5                Now, your Honor, I think that me being a jerk, so to

6        speak, is different than my conduct being the same or minimal

7        in the terms of its disruption to the facility than any other

8        client.

9                THE COURT:  Let me ask you something.  What are you

10       asking me to do?  What relief do you want today?

11               MS. LOPEZ:  So, your Honor, only because -- so to go

12       back to Marsha's --

13               THE COURT:  No, no.  What relief do you want from me

14       today?

15               MS. LOPEZ:  To reissue the TRO.

16               THE COURT:  So you're seeking appropriate injunction

17       preventing you from being transferred out of Marsha's House?

18               MS. LOPEZ:  Yes, your Honor.

19               THE COURT:  Okay.  Isn't that exactly what was before

20       the Supreme Court justice today?

21               MS. LOPEZ:  So, yes, but your Honor --

22               THE COURT:  Stop.  Sit down.

23               Why isn't this res adjudicata?

24               MR. ROBERTS:  I think it probably is.  As you're

25       saying, we went through precisely this issue.  Conceivably,

H5VPLOPH1

1   there is some -- you know, this is not an Article 78

2   proceeding; so I'm not sure but --

3          THE COURT:  So the only.

4          MR. ROBERTS:  I think with the decision today was made

5   on precisely these issues.

6          MS. LOPEZ:  No.

7          THE COURT:  That is whether the transfer from one

8   location to another was in accord with City rules or State

9   rules, whatever rules govern this, correct?

10          MR. ROBERTS:  Well, I viewed it as that she had failed

11   to demonstrate the requirements for attaining preliminary

12   relief.  There was no irreparable harm.  She was not likely to

13   prevail on the merits.  That was the way that I phrased it

14   because I viewed it as a TRO and going through the preliminary

15   injunction phase.

16          THE COURT:  So at a minimum, there was a finding there

17   was no irreparable harm?

18          MR. ROBERTS:  She said she was lifting the stay.  She

19   did not make findings on the record, but she did say that I'm

20   lifting the stay.  And we advised her that we were coming to

21   you; so she was aware that we were coming here, but she was

22   lifting the stay.  And as I understood it, she requested us to

23   advise her, after we were done here, as to what the result

24   was --

25          MS. LOPEZ:  Exactly.

H5VPLOPH1

1          MR. ROBERTS:  -- here.

2          THE COURT:  Ms. Lopez, the next step is contempt.

3     Understood?

4          MS. LOPEZ:  Yes, your Honor.

5          THE COURT:  Okay.

6          MR. ROBERTS:  And then, just details, it's just to

7     correct one or two details.  I read the Justice Jaffe's order

8     before, it said pending the determination of this proceeding.

9     So I viewed her restraint to not have an expiration date but,

10    rather, was outstanding until the proceeding would be over,

11    which would be essentially when she would rule on the Article

12    78.  But she changed the order today and lifted the stay, is

13    procedurally what I understood her to do.

14         THE COURT:  Okay.

15         MR. ROBERTS:  It's just a slight difference than what

16    Ms. Lopez said, not material, but just a little correction.

17         THE COURT:  But given that she's a pro se litigant,

18    her claim, I guess, in front of me is slightly different, which

19    is, she's claiming that this is all retaliatory for having

20    initially obtained preliminary relief.

21         So accepting that that's a claim, a legally defensible

22    claim, would you like to be heard on whether there's

23    irreparable harm if the City or Project Renewal, I'm not sure

24    who's in control, action is not enjoined?  Because that would

25    be the standard that I'd have to look at as whether she's

H5VPLOPH1

1   likely to succeed on the merits, or whether she's likely to

2   suffer irreparable harm, et cetera.

3           MR. ROBERTS:  So for what it's worth, Project Renewal

4   requested the Department of Homeless Services to place the

5   suspension and to make the transfer, but it is the Department

6   of Homeless Services' decision to make those decisions.

7           THE COURT:  Got it.

8           MR. ROBERTS:  We made them, and as we explained in --

9   this is the answer that was submitted in the Article 78.  Along

10  with it are five affidavits, which explain -- as you may know,

11  the Article 78s often have affirmative statement of facts, and

12  there's a narrative there, and then there are affidavits.

13          There's an affidavit from the Department of Homeless

14  Services administrator, who made the transfer decision, and

15  then there's also an affidavit from the administrator who

16  supervises the WIN West center about how WIN West is

17  appropriate.  And WIN West, there's no irreparable harm going

18  to WIN West.  It is a small facility with extensive mental

19  health --

20          THE COURT:  Hang on a second.  All right.  No more.

21  You don't talk until I ask you to talk, please.  Okay.  Go

22  ahead.

23          MR. ROBERTS:  So I understand it to be a 68-bed

24  facility, which is --

25          THE COURT:  This is WIN West?

H5VPLOPH1

1          MR. ROBERTS:  In WIN West.  It's small.  It's on 51st

2     Street in the Theater District between 7th -- I think 8th and

3     9th Avenue; so it's a very convenient location.  It has DHS

4     security, and it has got this mental health capacity.  It also

5     has two -- at least, at the moment, two transgender clients,

6     and we understand -- we have the supervisor here, if necessary,

7     who will testify this is a safe, appropriate location.

8          So I see no harm at all to being transferred to a new

9     location.  As far as likelihood of success --

10          THE COURT:  They'll take the dog?

11          MR. ROBERTS:  They will take the dog.  Any DHS -- we

12     decided that the dog is a needed therapy animal.  It's an

13     appropriate accommodation.

14          THE COURT:  Okay.

15          MR. ROBERTS:  There's been no issue about having the

16     dog.  None of these decisions that are being challenged here

17     relate to the dog.  If you want, I have witnesses here who

18     would testify that the decisions about transferring and

19     suspending have to do with threats against clients, breaches of

20     rules and this arrest situation on the 23rd.

21          The dog has -- I won't say the dog has been perfect,

22     but the dog is not in any way behind any of this.  The dog has

23     been able to be accommodated and, indeed, while Ms. Lopez was

24     under arrest, the dog was maintained at the shelter --

25          THE COURT:  Okay.

H5VPLOPH1

1            MR. ROBERTS:  -- and was protected in the shelter
2    during that period of time.
3            THE COURT:  Okay.  So the City's position is there is
4    no irreparable harm from transfer from one facility to the
5    other?
6            MR. ROBERTS:  Yes, your Honor.
7            THE COURT:  Okay.  Would you like to be heard only on
8    irreparable harm.
9            MS. LOPEZ:  Yes.
10           THE COURT:  That's all I want to hear.
11           MS. LOPEZ:  Yes, your Honor.
12           THE COURT:  Okay.  You have the floor.
13           MS. LOPEZ:  I would posit that the circumstances
14   surrounding my potential for irreparable harm are the same, if
15   not worse, today than they were the day this Court issued the
16   TRO in the matter concerning the dog, but specifically placing
17   me at Marsha's for the reasons that I stated that day.
18           So I have here a witness from WIN West that, together
19   with the actual clients they keep referencing, are not only in
20   support of the fact that WIN West is inappropriate for most of
21   its clients because there is rampant abuse by the staff and
22   unchecked violence between the clients.  Two of the transgender
23   people that I have as witnesses, one of them here today was
24   recently physically assaulted at WIN West, and I have
25   personally viewed footage from WIN West showing this

H5VPLOPH1

1    transgender person being verbally assaulted by the clients

2    there.

3              My fear for irreparable harm, before I get to what

4    could happen to me, your Honor here twice had to sort of check

5    only my verbal outbursts.  I am not asking this Court to backup

6    the fact that someone can't control themselves and can walk

7    into court anytime, they may be put in a situation where they

8    cannot control themselves, and them not being able to control

9    themselves is enough to meet the standard for irreparable harm.

10             THE COURT:  No.

11             MS. LOPEZ:  However, when you --

12             THE COURT:  No, no, no.  You are missing the point.

13   The issue before me is what harm is going to come to you if I

14   do not intervene and stop the City from making the transfer?

15   So focus on that.

16             MS. LOPEZ:  WIN West is unsafe.  There have been

17   multiple instances --

18             THE COURT:  Okay.  You're saying that the location

19   they want to transfer you to is unsafe, it is less safe than

20   Marsha's Place?

21             MS. LOPEZ:  Yes, exactly, less safe than Marsha's

22   Place.  The clients there are not specifically transgender, and

23   there are clients that have had to leave and have filed police

24   reports because they were assaulted in their sleep.

25             THE COURT:  But your focus is WIN West is not safe,

H5VPLOPH1

1   correct?

2           MS. LOPEZ:  WIN West is not safe and --

3           THE COURT:  Any other objection to WIN West?  It's not

4   safe.

5           MS. LOPEZ:  And --

6           THE COURT:  It's not safe for anyone?  It's not safe

7   for transgender, which?

8           MS. LOPEZ:  Yes, both, your Honor.

9           THE COURT:  Okay.

10          MS. LOPEZ:  And considering the fact that I know

11  myself, I am more concerned that I would leave WIN West if

12  confronted by a physical altercation, and resort back to doing

13  sex work when the truth of the matter is the same two people

14  that were looking for me to harm me that I came to court to

15  prevent from finding me because I needed to go in the shelter,

16  those people are still there.

17          And, in fact, since I've been in front of this Court

18  last, the SVU detectives took me to identify one of the

19  individuals, and he was released from the lineup for whatever

20  procedural reason; so we have a person --

21          THE COURT:  You're getting way far afield.

22          MS. LOPEZ:  I'm afraid that the person would find me

23  and kill me if I voluntarily --

24          THE COURT:  Ms. Lopez, you sought publicity for this

25  case, which included where you were located.  So the notion

H5VPLOPH1                          Paone - Direct

1   that you're hiding out from people and you don't want them to

2   know where you are gets no traction in this Court.  So again,

3   let me try to keep you focused.

4           Your issue is you think WIN West is not safe for you,

5   correct?

6           MS. LOPEZ:  For me, yes.

7           THE COURT:  Okay.  What evidence would you like to

8   provide me?

9           MS. LOPEZ:  The witnesses.

10          THE COURT:  Okay.  Who's your witness?

11          MS. LOPEZ:  Destiny Paone.

12          THE COURT:  Ms. Paone, please come take the stand.

13  Remain standing.

14   DESTINY PAONE,

15       called as a witness by the Plaintiff,

16       having been duly sworn, testified as follows:

17          THE COURT:  Please have a seat.  State your name and

18  spell your name slowly for the record.

19          THE WITNESS:  My name is Destiny Paone, D-e-s-t-i-n-y,

20  last name Paone, P-a-o-n-e.

21          THE COURT:  Okay.  Ms. Lopez, she's your witness.

22  DIRECT EXAMINATION

23          THE COURT:  Stay where you are.

24          MS. LOPEZ:  No problem, your Honor.  Thank you.

25  BY MS. LOPEZ:

H5VPLOPH1                    Paone - Direct

1   Q.  Destiny --

2           THE COURT:  This is Ms. Paone.

3   Q.  Ms. Paone --

4           THE COURT:  Stand up, please.  There you go.

5   Q.  How long have you been in the shelter system?

6   A.  Since last July.

7   Q.  And how many facilities have you been in?

8   A.  About 13.

9   Q.  Were they all female facilities?

10  A.  Correct.

11  Q.  Are you transgender?

12  A.  Correct.

13  Q.  When did you get into WIN West?  When were you transferred

14  to WIN West?

15  A.  I got to WIN West like a little -- November, a little bit

16  before Thanksgiving 2016; so like around November --

17          THE COURT:  That's fine.

18  A.  Around November.

19          THE COURT:  Are you still there?

20          THE WITNESS:  No.

21          THE COURT:  Okay.  When did you leave?

22          THE WITNESS:  I got transferred around -- I forget,

23  but it was before I got to Marsha's.

24          THE COURT:  Before you got to what?

25          THE WITNESS:  Marsha's House.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H5VPLOPH1                    Paone - Direct

1           THE COURT:  Before Marsha's House.  So approximately,

2    when were you transferred out of WIN West?

3           THE WITNESS:  It was about -- I don't know exactly

4    when it was, but it was probably like -- I got to -- it was

5    probably a month before I got to Marsha's House.

6           THE COURT:  I don't know when you got to Marsha's

7    House; so you need to give me some sense of how long were you

8    at WIN West.

9           THE WITNESS:  How long was I there?  I was there for

10   like two months, three months.

11          THE COURT:  Two months.  So that means you probably

12   got transferred out in January or February.

13          THE WITNESS:  Yes.

14          THE COURT:  Okay.  What would you like to tell me

15   about WIN West?

16          THE WITNESS:  I've actually lived there for two

17   months, and I've been through a lot there, like a lot, a lot.

18          THE COURT:  Like what?

19          THE WITNESS:  I woke up at 6:30 in the morning with a

20   belt around my neck.

21          THE COURT:  Who put the belt around your neck?

22          THE WITNESS:  One of the clients put a belt around my

23   neck.  She also threw my phone across the room.  I also had

24   another client --

25          THE COURT:  Hold on a second.  Let's focus on that.

H5VPLOPH1                      Paone - Direct

1      What did you do?

2            THE WITNESS:  I told the people downstairs.  I called

3      the cops.

4            THE COURT:  What did they do?

5            THE WITNESS:  They said that if there was no witness

6      or marks that there was nothing they could do, but file a

7      report.

8            THE COURT:  You need to talk slower so the court

9      reporter can get it down.

10           They said there was nothing they could do because

11     there were no witnesses, but you could file a harassment

12     complaint, correct?

13           THE WITNESS:  Correct.

14           THE COURT:  Did you file a harassment complaint.

15           THE WITNESS:  Yes, I did.

16           THE COURT:  And what happened?

17           THE WITNESS:  I filed a harassment complaint, that's

18     it.  The lady proceed to make more threats towards me, and as

19     she made --

20           THE COURT:  This was another resident of WIN West?

21           THE WITNESS:  This is the same resident.

22           THE COURT:  Okay.  So it was a particular person that

23     you were having problems with?

24           THE WITNESS:  She wasn't -- she was one of many.

25           THE COURT:  Okay.  All right.  So that's one incident.

H5VPLOPH1                     Paone - Direct

1   What's the other incident?

2          THE WITNESS:  There was another girl, I remember her

3   name was Amanda, she would always like call me a man and why am

4   I here, why do I not go to a male shelter.  There was more than

5   just that.

6          THE COURT:  Okay.  And did you complain about that?

7          THE WITNESS:  Yeah, they actually told me that she's

8   allowed to say what she want out of her mouth because it's

9   freedom of speech, and I should be the bigger person and walk

10  away and ignore her.

11         THE COURT:  Okay.  Anything else?

12         THE WITNESS:  Not only that, I had threats.  People

13  made a lot of threats towards me.

14         THE COURT:  What type of threats?

15         THE WITNESS:  How they was gonna attack me when they

16  seen me outside.  The lady said don't be surprised if you wake

17  up with a slice in your pretty little face.

18         THE COURT:  And did anything ever happen?

19         THE WITNESS:  No, not at that point.  At that point, I

20  made another police report against her.

21         THE COURT:  Okay.  What did the police do?

22         THE WITNESS:  They filed a report and that was it.

23         THE COURT:  Okay.

24         THE WITNESS:  Well, they spoke to the girl, but that

25  was all they can really do about it.

H5VPLOPH1                    Paone - Direct

1            THE COURT:  Okay.

2            THE WITNESS:  So after that, they just filed the

3    report, and then soon after that, they just transferred me

4    because of all of that.

5            THE COURT:  Okay.  Do you have any other questions for

6    her?

7            MS. LOPEZ:  Yes.

8    BY MS. LOPEZ:

9    Q.  When you were at WIN West, did you stay out at night or

10   stay away from the facility, how often and why?

11   A.  I used to leave every other day, or sometimes maybe for a

12   week because I felt unsafe.  I just don't like the fact that

13   people in there they're allowed to say what they want to people

14   like me because it's freedom of speech, but I feel like it's

15   not right that a person can just say what they want out of

16   their mouths to me because I'm transgender.  And what they say

17   to me is like if I say something or I retaliate, I'm the one

18   who gets in more trouble because of who I am, but they don't

19   get into trouble because it's not right.

20           THE COURT:  Did you ever get into trouble for saying

21   something ugly to one of them?

22           THE WITNESS:  Yeah.

23           THE COURT:  Like what?

24           THE WITNESS:  One time I told her -- she said that --

25   she kept on calling me a man and a tranny and that I should

H5VPLOPH1                    Paone - Direct

1   have went to a male.  I told her if you keep going with your

2   mouth, you're going to make me mad and I'm going to smack the

3   shit out of you.

4               THE COURT:  Okay.  So that would be a threat of

5   violence.

6               THE WITNESS:  She threatened me too.

7               THE COURT:  What --

8               THE WITNESS:  She threatened me multiple times.  She

9   told me that she was going to get her husband to come beat me

10  up after I came outside multiple times, and that's what I told

11  them.  DHS heard her say it out of her mouth and did not do a

12  thing about it.

13              THE COURT:  Okay.  What did they do to you?

14              THE WITNESS:  They told me that I need to stop, that I

15  need to ignore her and be the bigger person, that it's life,

16  that this is -- since I picked to be like this, then I should

17  be able to be strong enough to handle the repercussions of what

18  people have to say to me, which is not right.

19              THE COURT:  But did they discipline you or throw you

20  out of the shelter?

21              THE WITNESS:  Not really.  They just made me leave.

22              THE COURT:  You chose to leave?

23              THE WITNESS:  No, they were like, we was downstairs in

24  the cafeteria and it happened in the cafeteria, they'll make

25  me -- they'll grab me out the cafeteria and bring me upstairs

H5VPLOPH1                    Paone - Cross

1   while I was eating and leave her down there supposedly to

2   diffuse the situation.

3          THE COURT:  Okay.  Do you have any other questions?

4   BY MS. LOPEZ:

5   Q.  What did you do when you left the facility?  Did you have

6   anywhere else to go?

7   A.  No, ma'am.  I used to go to --

8   Q.  Please be honest.

9   A.  I mean, my friend, I used to go to his house, where they

10  did sexual stuff and I used to go things there.

11         THE COURT:  Okay.  Any other questions?

12  Q.  If you were transferred -- do you live at Marsha's now?

13  A.  Yes, I do.

14  Q.  Have you lived there with me at the same time?

15  A.  Not at the beginning, no.

16  Q.  Is my behavior any different than many --

17         THE COURT:  We're not dealing with that.  We're

18  dealing only with --

19         MS. LOPEZ:  Only with WIN West.

20         THE COURT:  -- only with irreparable harm.

21         MS. LOPEZ:  Okay, your Honor.  Yes, your Honor, I

22  think -- I think, for Ms. Paone, that might be it, your Honor.

23         THE COURT:  Okay.  Would the City like to cross?

24  CROSS-EXAMINATION

25  BY MR. ROBERTS:

H5VPLOPH1                    Paone - Cross

1   Q.  So when you reported this incident with the -- around your

2   neck, did you receive any medical treatment?

3   A.  Only to the hospital.

4   Q.  And was there a police report filed?

5   A.  Yes, there was a police report.

6   Q.  And did DHS assist you in any way in filling out the --

7   A.  No, they didn't.

8   Q.  -- the police report?

9   A.  Nope.

10           MR. ROBERTS:  No further questions, your Honor.

11           THE COURT:  Okay.  You can step down.  Thank you.

12           MS. LOPEZ:  Yes, your Honor, in fact, that I --

13           THE COURT:  Oh, I'm sorry.  I forgot there was

14   another -- sorry, please.  My total apologies.  Mr. Connolly?

15           MR. CONNOLLY:  Nothing from us.

16           THE COURT:  Okay.  All right.  Thank you.

17           MS. LOPEZ:  Your Honor?

18           THE COURT:  Do you have another witness?

19           MS. LOPEZ:  I just wanted to ask her if she was happy

20   at Marsha's.

21           THE COURT:  This is not about happy.

22           MS. LOPEZ:  So about WIN West, there were two other --

23           THE COURT:  Do you have another witness?

24           MS. LOPEZ:  I do I have.

25           THE COURT:  Okay.  Call your next witness.

H5VPLOPH1                    Paone - Cross

1          MS. LOPEZ:  I don't physically have them.  They are

2     there at WIN West, and they are witnesses pertinent to this

3     because they are actively trying to be transferred from WIN

4     West for the same issues, and they are transgender.  And one of

5     them is the person that gave me my first hormone injection and

6     has known me for years.  She also has SRS, and I believe she is

7     totally --

8          THE COURT:  Ms. Lopez, so your answer is --

9          MS. LOPEZ:  I would like to call -- sorry, your Honor.

10          THE COURT:  You have a witness.

11          MS. LOPEZ:  Yes, ma'am.

12          THE COURT:  They're not here right now, correct?

13          MS. LOPEZ:  Correct -- no, your Honor.

14          THE COURT:  Is that the only other witness that you

15     have is this person that is currently not here?

16          MS. LOPEZ:  No, there are other witnesses that are

17     ex-clients of WIN West that are actually at Marsha's as well,

18     and I'd like the opportunity to call them as well.

19          THE COURT:  Are they going to essentially provide the

20     same testimony as Ms. Paone just provided?

21          MS. LOPEZ:  I don't know how your Honor is

22     categorizing the same type.  Two of them are not transgender,

23     and I think that would serve a purpose to demonstrate the

24     overall problems at WIN West.  So at minimum -- the other young

25     lady's name is Destiny, as well, but she is not transgender.

H5VPLOPH1                        Paone - Cross

1              THE COURT:  So tell me the names of the people you

2      want to call on the issue of --

3              MS. LOPEZ:  Your Honor, may I check with them for the

4      last name of the other client?

5              THE COURT:  Yes.

6              (Pause)

7              MS. LOPEZ:  Sorry, your Honor.

8              THE COURT:  While they're doing that, Mr. Roberts, do

9      you want to file the response that you filed in New York

10     Supreme in this case?

11             MR. ROBERTS:  Yes, your Honor.

12             THE COURT:  Okay.  I'll accept it for filing, if I can

13     have the paper copy, but you need to file it on ECF as well.

14             MR. ROBERTS:  Fine.

15             THE COURT:  Okay.

16             MR. ROBERTS:  I'll do that this afternoon.

17             THE COURT:  That's fine.  If we can take the paper

18     copy now, that would be helpful.

19             MR. ROBERTS:  And I would like also to offer two other

20     documents that Justice Jaffe accepted today, which are two

21     incident reports, where Ms. Lopez went to -- that are not in

22     the answer -- that went to one of the staff and asked her, the

23     staff member, to identify the address of an operations officer

24     named Barkley.

25             And then Ms. Lopez came back this last Friday and

H5VPLOPH1                    Paone - Cross

1   confronted Barkley and said:  I showed your picture to everyone

2   at Fort Greene.  I'm going to have my cousins come and blow

3   your fucking head off.  I'd like -- those were accepted by

4   Justice Jaffe and I'd like them in the court record.

5           THE COURT:  I'll accept them.  Mr. Roberts, I'll tell

6   you the same thing.  I really just want to focus on irreparable

7   harm.  Is there irreparable harm of moving her from Marsha's

8   House to WIN West?

9           MR. ROBERTS:  We have a witness here who is the DHS

10  supervisor over WIN West who could testify.

11          THE COURT:  So here's --

12          MS. LOPEZ:  I just was like --

13          THE COURT:  Relax, okay?  Tell me who your other

14  witnesses are.

15          MS. LOPEZ:  Destiny Davis is the name of the person I

16  referenced that is a witness physically at Marsha's now that

17  resided once at WIN West, and I do not know the legal full --

18          THE COURT:  Okay.  Is she available this afternoon?

19          MS. LOPEZ:  Your Honor, I have no chance to check.  I

20  will try.  I believe that she would be.

21          THE COURT:  Okay.

22          MS. LOPEZ:  The other is Akasha Barker.

23          THE COURT:  How do you spell that?

24          MS. LOPEZ:  A-k-a-s-h-a, B-a-r-k-e-r.

25          THE COURT:  Okay.  Who is Ms. Barker?

H5VPLOPH1                    Paone - Cross

1          MS. LOPEZ:  She is a trans woman that I've known for

2     over 20 years that currently resides at WIN West.

3          THE COURT:  Okay.  Those are your two witnesses?

4          MS. LOPEZ:  Yes, your Honor.  I'd like -- I wasn't

5     aware that today we'd be having a hearing, and there are some

6     other people.  I just need a brief, brief, brief recess to try

7     to organize my thoughts to name the witnesses that I'd like to

8     produce for the Court.

9          THE COURT:  All right.  Here's my situation.  I've got

10    to stop at 1:00.  I'm tied up until about 2:30.  My proposal,

11    rather than wasting 20 minutes, would be to have the City call

12    their witness, and then we'll break for lunch, come back at

13    2:30.  You should have your witnesses here at that point, and

14    we'll go from there.

15         MS. LOPEZ:  May I?

16         THE COURT:  No.  Do you have any objection to

17    proceeding with the City's witness?

18         MS. LOPEZ:  No, but --

19         THE COURT:  Okay.  Mr. Roberts?  Do you have any

20    objection to proceeding in that fashion?

21         MR. ROBERTS:  No, your Honor.

22         THE COURT:  Okay.  Call your witness.

23         MR. ROBERTS:  Mr. Hargrove.

24         THE COURT:  Hargrove?

25         MR. ROBERTS:  No, I mispronounced.

H5VPLOPH1                     HARGROW - Direct

1              THE WITNESS:  It's Hargrow, H-a-r-g-r-o-w.

2              THE COURT:  What's your first name?

3              THE WITNESS:  Paul.

4              THE COURT:  Paul, Mr. Hargrow.

5      PAUL HARGROW,

6          called as a witness by the Defendants,

7          having been duly sworn, testified as follows:

8              THE COURT:  All right, Mr. Roberts?

9    DIRECT EXAMINATION

10   BY MR. ROBERTS:

11   Q.  Mr. Hargrow, where are you employed currently?

12   A.  The Department of Homeless Services.

13   Q.  What do you do for them?

14   A.  I'm the program administrator for a number of shelters.

15   Q.  And is the WIN West shelter one of the shelters that you

16   administer?

17   A.  It is.

18   Q.  How long have you held that position?

19   A.  I've had that position since February of 2017.

20   Q.  And before that, what was your employment?

21   A.  I was working at Saint Mary's Center, which was providing

22   services to mentally ill, HIV, and substance abuse in Harlem.

23              THE COURT:  So that was also a DHS facility?

24              THE WITNESS:  No, it was not.

25              THE COURT:  It was not.  Private?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

H5VPLOPH1                           HARGROW - Direct

1          THE WITNESS:  Private, yes.

2          THE COURT:  Okay.

3     BY MR. ROBERTS:

4     Q.  Can you explain how you go about supervising and

5     administering the WIN West center?

6     A.  Okay.  The City gives us a portfolio of shelters, and WIN

7     West is one of those shelters that I manage or supervise.  It

8     is a 70-bed mental health facility for women.  It has

9     psychotherapy and clinical services on site, and a number of

10    the sites that I supervise are for mental health clients.

11         THE COURT:  What's your educational background?

12         THE WITNESS:  I'm a clinical social worker.

13         THE COURT:  Okay.

14    Q.  Is the WIN West center supposed to submit any incident

15    reports to you?

16    A.  Whenever there is an incident, the WIN West site staff is

17    supposed to write up an incident and submit it to me, and

18    through CARES they write it up and submit it through the CARES

19    system.

20         THE COURT:  What's CARES? C-A-R-E-S?

21         THE WITNESS:  C-A-R-E-S, which is a software system

22    that collects data for all of the clients.

23    Q.  And since you have been administering the WIN West center,

24    have there been any incidents concerning transgender clients at

25    that facility?

H5VPLOPH1                    HARGROW - Direct

1   A.   There have been no incidences since I've been

2   administering, since I've been managing the facility, and I

3   even went back and looked at the history, and I could not find

4   any incidences of transgender clients being assaulted or

5   anything like that.

6   Q.   So have there been incidents of assaults since you've been

7   there with regard to other clients or non-transgender, other

8   ones?

9   A.   None that rose to a level of where someone needed to be

10  suspended.  I mean, there have been arguments, but there have

11  not been assaults that were reported.

12  Q.   When you say you went back with the records, did that

13  include looking for non-transgender clients?

14  A.   Yes.

15  Q.   And how far back did you look?

16  A.   I went back to the beginning of the year, January.

17  Q.   January of 2017?

18  A.   2017, yes, I'm sorry.

19  Q.   Do you have an opinion as to the safety of the WIN West

20  center relative to the other shelters that you supervise?

21  A.   WIN West is relatively safe.  It's in the theater district.

22  It's on 51st street between 8th and 9th Avenue.  There are a

23  number of theaters, there's restaurants, there's bars and

24  clubs.  I mean, it's a bustling atmosphere.  I don't see any

25  safety issues or concerns with 51st Street.

H5VPLOPH1                    HARGROW - Direct

1        THE COURT:  No, I'm sorry.  I didn't think his

2   question was relating to the area, but more to actually within

3   the facility.

4        THE WITNESS:  Oh, within the facility they have DHS

5   police on site.  They have security 24 hours a day, and it's --

6   in relation to the other sites that I supervise, they have more

7   security than some of the other sites, which do not have DHS

8   police on site.

9   Q.  Do you have the ability to compare the number of incidents

10  at WIN West versus other shelters that you're responsible for?

11  A.  Yes.  WIN West had two Priority 1 incidences since January

12  of this year, and both incidences, one was, I think the press

13  came on site, and that's something that the shelter is required

14  to report; and the other one was a hot water issue.  So

15  whenever there's no hot water or the elevator goes down, that's

16  something that the shelter is required to report.  So those

17  were the two incidences that happened since January, which fell

18  under Priority 1, which is a major incident.

19        I have another site, Susan's Place, which is in the

20  Bronx, also mentally ill women, they've had about ten

21  incidences, a death and -- I mean, Priority 1 incidences, a

22  death and assaults and fights and that sort of thing.  But in

23  terms of WIN West, there hasn't been a lot of major incidences.

24  Q.  Can you make a little clear what is Priority 1, and is

25  there a Priority 2 and 3?

H5VPLOPH1                    HARGROW - Cross

1   A.   Okay.  Priority 1 is a major something that happens, if

2   someone gets arrested, if a death takes place, if there's an

3   assault with an injury, then that's considered a Priority 1.

4          A Priority 2 might be an argument or a theft.  Someone

5   storms out and/or knocks something over, a destruction of

6   property, that might be a Priority 2.

7   Q.   Now, is the WIN West center required to advise you of

8   incidents?

9   A.   They have to report all incidences.

10  Q.   Levels 1, 2 and 3?

11  A.   1, 2 and 3, yes.

12  Q.   And so do you have an opinion as to whether the WIN West

13  would be a safe location for Ms. Lopez to reside?

14  A.   Yes, I think WIN West would be safe, a safe location.

15          MR. ROBERTS:  No further questions, your Honor.

16          THE COURT:  Okay.  Ms. Lopez.

17  CROSS-EXAMINATION

18  BY MS. LOPEZ:

19  Q.   Hello.

20  A.   Hello.

21  Q.   So was it you that sent me an e-mail over last week

22  introducing yourself?

23  A.   Yes.

24  Q.   Are you aware of my mental health history?

25  A.   No.

H5VPLOPH1                    HARGROW - Cross

1   Q.  Are you aware of the fact -- so there are uniformed police

2   officers throughout WIN West?

3   A.  DHS police at the entryway, yes.

4   Q.  Sure.  Would you consider me mentally ill?

5            THE COURT:  Objection.

6            MS. LOPEZ:  Oh.

7            THE COURT:  That's not what --

8            MS. LOPEZ:  Well, I'm asking about the facility and

9   the services they provide.

10           THE COURT:  What his personal knowledge of your mental

11  health is not the issue.  The issue is -- you can ask him about

12  the services, what services do they provide.

13           MS. LOPEZ:  I will.

14  BY MS. LOPEZ:

15  Q.  So you're not aware of my mental health history?

16           THE COURT:  He didn't answer one way or the other.

17           MS. LOPEZ:  No, I think he said no.

18  A.  I didn't answer.

19  Q.  Are you aware of my mental health history?

20  A.  I'm not.

21           MR. ROBERTS:  Objection.

22           THE COURT:  Sustained.  Okay.

23  Q.  So --

24           THE COURT:  Do you want to know about the services

25  that they provide?

H5VPLOPH1                        HARGROW - Cross

1          MS. LOPEZ:  I'd like an opportunity to ask him

2     questions the way Mr. Roberts did, germane to what we're trying

3     to find out.

4          THE COURT:  I'm trying to keep you on germane

5     questions.

6          MS. LOPEZ:  I understand that, your Honor.  My

7     apologies.

8  Q.  So would there be any reason -- do you believe Ms. Paone is

9     lying?  Do you believe that the --

10         MR. ROBERTS:  Objection.

11         THE COURT:  Sustained.

12 Q.  The incident that she --

13         THE COURT:  That's not appropriate cross.  Okay?  If

14    you want to develop what services they have, ask him about the

15    services.  Okay?  So Ms. Paone's time frame was such that it

16    could well be before the period that he checked.

17 Q.  Are there ways -- is there any potential for an incident, a

18    Level 1 incident, to go unreported by the staff to the

19    administration?

20 A.  Not if there was an arrest, a hospitalization or -- she

21    said she made a report; so that type of report would not go

22    unrecorded.  That type of incident would not go unrecorded.

23 Q.  So --

24         THE COURT:  A spat between residents could go

25    unreported?

H5VPLOPH1                    HARGROW - Cross

1           THE WITNESS:  Yes.

2   Q.  Would you consider a belt around Ms. Paone's neck a spat?

3   A.  No.

4   Q.  I'm just trying to find out the inconsistency in what I

5   know to be an active 61 number with the NYPD for the complaint

6   she filed and why the system --

7           MR. ROBERTS:  Objection.

8           THE COURT:  Again, there's no inconsistency because

9   the time frame is such --

10          MS. LOPEZ:  He said that he went back and looked, your

11  Honor.

12          THE COURT:  Until January, but she said she was only

13  there a couple of months.  She came in November and left; so

14  it's not inconsistent.  Please try to develop facts that are

15  relevant to your claim of irreparable injury.

16  BY MS. LOPEZ:

17  Q.  Do you believe that -- do you have any belief that I would

18  actually enroll in the services at WIN West?  Is there a

19  requirement for the clients to participate in the psychotherapy

20  there?

21  A.  Well, there's a requirement to participate with your case

22  manager, to develop a treatment plan so that you could move

23  forward with services.

24  Q.  So if somebody came in to WIN West with a treatment plan

25  from outside, from competent providers, and they wanted nothing

H5VPLOPH1                    HARGROW - Cross

1   to do with the mental health aspect of service provision there,

2   and they wanted to just meet with their case manager for case

3   management services related to housing and housing transfer,

4   would that person be considered uncooperative?

5   A.  Probably.

6   Q.  So if people, transgender people in specific treatment for

7   gender identity disorder go into WIN West, do you have

8   providers with experience, documented, certified experience in

9   dealing with gender identity disorder or posttraumatic stress

10  disorder, specific documented certified experience?

11  A.  Yes.

12  Q.  What type of people?

13  A.  There's a psychiatric nurse practitioner on site that's --

14  and a number of clinical social workers on site, and there's a

15  psychiatrist that sees clients.

16  Q.  Of all the people you mentioned, do any of them have

17  demonstrable experience in dealing with gender identity

18  disorder or specifically patients that have already undergone

19  the last phases of their surgery?

20          And, your Honor, that is a specific last stage in

21  mental health treatment for people that are trans.

22  Q.  So of any of the people that you mentioned, are any of

23  those mental health experts familiar with the last phase of

24  treatment that comes after a person has already received

25  surgery and is supposed to live stealthfully, I think you are

H5VPLOPH1                    HARGROW - Cross

1   familiar with?

2          MR. CONNOLLY:  Objection to the question.  I don't

3   even know what she's asking.

4          THE COURT:  I think I know what she's asking.  Do you

5   understand the question?

6          THE WITNESS:  Yes.

7   A.  Three.

8   Q.  And are you familiar with --

9          THE COURT:  I'm sorry.  I heard you say that there was

10  a psychiatric nurse practitioner on site, a psychiatrist on

11  site, what was the other?

12         THE WITNESS:  A number of -- like four clinical social

13  workers.

14         THE COURT:  Clinical social workers.

15  Q.  And if you don't mind, I apologize, can you go through them

16  naming or at least identifying their titles and what you

17  believe or know to be their past experience dealing with

18  transgender people?

19  A.  Sure.  So the director, her name is Diana Santos.  She's

20  a --

21         THE COURT:  Hold on.  Diana?

22         THE WITNESS:  Santos.

23         THE COURT:  D-i-a-n-a, Santos, S-a-n-t-o-s?

24         THE WITNESS:  Yes.

25  A.  She's a licensed clinical social worker.  She has

H5VPLOPH1                    HARGROW - Cross

1   experience dealing with transgender, people with transgender --

2   I'm sorry, the phrase you used, I want -- I don't want to --

3   Q.  With gender identity disorder?

4   A.  Yes.

5   Q.  Where does that experience come from?

6   A.  She has years of experience dealing with mentally ill women

7   and --

8           THE COURT:  I think the question is, does she have

9   specific experience dealing with gender identity disorder.

10  A.  Well, she's a clinician.  So she's had clients that she

11  dealt with on a regular basis.

12  Q.  Do you consider the treatment and the area of mental health

13  treatment specific to transgender people a specialized area?

14  A.  Yes.

15  Q.  So besides general experience as a practitioner for women,

16  in general, this person has no direct, demonstrable, certified

17  experience dealing with transgender people specifically in her

18  work habits before?

19          THE COURT:  I'm sorry, that question --

20          MS. LOPEZ:  I just basically want to know if the

21  person has history specifically with trans or your opinion is

22  we're grouped together.

23          THE COURT:  Hang on.  Stop.  Okay.  We're going to

24  have to stop because, as I said, I have a hard stop.

25          Over the lunch break can you find out more

H5VPLOPH1                    HARGROW - Cross

1    specifically what the experience of your staff are dealing

2    specifically with transgender people and gender identity

3    disorder.

4              THE WITNESS:  Okay.  No problem.

5              THE COURT:  Okay.  2:30.  Have whatever witnesses you

6    intend to call here because I intend to resolve this issue

7    today.

8              MS. LOPEZ:  Your Honor, what if finances keep people

9    from being here because they are homeless and unable to get

10   here and indigent?

11             THE COURT:  I'm going to rule on the record I've got.

12   That's all I can do.

13             MS. LOPEZ:  Going forward as a pro se litigant that is

14   indigent and disabled, is there any way going forward when I

15   need to produce witnesses and they are willing to come but they

16   are under sort of the control or -- they could be given

17   MetroCards by the --

18             THE COURT:  We're not getting into that today.  You're

19   requesting emergency relief; so I'm only dealing with the

20   emergency relief.

21             MS. LOPEZ:  Yes, your Honor.

22             THE COURT:  In terms of the long-time case, we can

23   deal with that in the fullness of time.

24             MS. LOPEZ:  Yes, your Honor.  Thank you.

25             THE COURT:  Okay.  See you all at 2:30.

H5VPLOPH1                    HARGROW - Cross

1            MS. LOPEZ:  See you at 2:30, your Honor.

2            (Luncheon recess)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H5V3LOP2

A F T E R N O O N   S E S S I O N

2:30 P.M.

THE COURT:  We're missing the star.  We'll wait.  Any idea if she's downstairs?

THE MARSHAL:  Your Honor, she's in the building.

THE COURT:  Great.

(Pause)

THE COURT:  You're late.

MS. LOPEZ:  I apologize.

THE COURT:  You've got to get here on time.

Okay, Mr. Hargrove.  Come back.  You're still on the stand.

MR. CONNOLLY:  May I speak very briefly?

THE COURT:  You may.

MR. CONNOLLY:  We may have a res judicata issue.  This morning the whole purpose of the appearance was for Judge Jaffe to rule on her request to enjoin the transfer.  Judge Jaffe was presented with all the papers and all the facts, the reasoning behind the transfer, and she even stated on the record she was balancing the equities of everything and ultimately decided to lift the transfer.  So I feel like --

THE COURT:  To lift the stay?

MR. CONNOLLY:  I'm sorry, lift the stay and state that Ms. Lopez can be transferred.  So I think we're kind of repeating that whole process here.  When we all submitted our

H5V3LOP2

1    papers, we had a hearing before Judge Jaffe, and she got to

2    hear everyone's case.

3              THE COURT:  You may be right.  I have not had

4    sufficient time to research it, and you're up against a pro se

5    litigant and we've got the witnesses here.  I'm going to at

6    least complete hearing testimony on the issue of irreparable

7    injury.

8              MR. CONNOLLY:  Thank you.  Before we close today, I

9    would just like the opportunity to explain why Project Renewal

10   would like Ms. Lopez to be transferred.

11             THE COURT:  I'm going to give you every opportunity.

12             MR. CONNOLLY:  Thank you.

13             THE COURT:  Let me give everybody fair warning I have

14   a call that I have to participate in at 3:30.  It will probably

15   take 10 or 15 minutes so we'll break at that point.

16             Mr. Hargrove, please come back.

17             MS. LOPEZ:  Your Honor, just one thing on the record.

18   Actually because of my belief that I will be irreparably harmed

19   and the -- will you take her outside -- and the stakes today.

20   I am asking your Honor to please reconsider my request, the

21   stakes are so high that those witnesses would make or break my

22   trying to establish irreparable harm.  One of them was an

23   ex-client of the facility, and I also have expert witnesses

24   about my need for mental health service that are beyond the

25   knowledge of this witness.

H5V3LOP2                          Hargrove - direct

1           So I would be asking again for an opportunity, even

2     though I did request immediate relief, I don't want to get

3     ruled against simply because I have no way to physically

4     produce witnesses in such a short time.

5           THE COURT:  Here's the problem, Ms. Lopez.  I either

6     have to rule against you or I have to rule for you, because

7     you're being transferred.  The Supreme Court justice has lifted

8     the stay.  So unless I tell them not, you're going to move

9     today, correct?

10          MS. LOPEZ:  Sure.  I understand.

11          THE COURT:  So I've got to rule one way or the other.

12          MS. LOPEZ:  Thank you for reminding me.  Judge Jaffe

13    did not have all the papers in front of you today.

14          THE COURT:  That's not the issue.

15          MS. LOPEZ:  Okay.

16          THE COURT:  Okay?  I have said I'm not going to

17    resolve this case on res judicata grounds at this stage.  You

18    have to learn to quit arguing when things are going your way.

19          MS. LOPEZ:  Yes, your Honor.

20          THE COURT:  Okay.  Mr. Hargrove, before lunch,

21    Ms. Lopez was asking you about your specific expertise of the

22    psychiatric staff.  So could you fill me in.

23          Hang on a second.  Here's the thing about emotional

24    support dogs and support dogs.

25          MS. LOPEZ:  I can get her under control.  I had no

H5V3LOP2                    Hargrove - direct

1   chance between the entry access and the screening.  If you give

2   me one second.

3          THE COURT:  We're proceeding.

4          MS. LOPEZ:  Someone will bring her and I will put her

5   under control here.

6          THE COURT:  No.

7          MS. LOPEZ:  What would your Honor like to do to

8   proceed?

9          THE COURT:  Is she under control?

10         MS. LOPEZ:  She's -- okay.

11         THE COURT:  Okay.  What's the specific expertise of

12  your psychiatric staff relative to treating transgender

13  patients?

14         THE WITNESS:  So, there is a nurse practitioner, a

15  psychiatric nurse practitioner, licensed clinical social

16  worker, and two licensed clinical social workers that all have

17  experience working with transgender and diverse populations,

18  and all have master's of social work.  And the nurse

19  practitioner, she has --

20         THE COURT:  Can you give me any more beyond sort of

21  "they have experience," can you give me any particulars?

22         THE WITNESS:  No.  Beyond that, they're just

23  clinicians.  They're clinicians with experience working with a

24  variety of populations.

25         THE COURT:  Have you confirmed, this is my question.

H5V3LOP2                         Hargrove - direct

1   That's why I asked you to do it at lunch.  Have you confirmed

2   that these people specifically have experience dealing with the

3   transgender population, with transgender patients?  Just

4   telling me that they're experienced people isn't answering the

5   question that Ms. Lopez asked.

6           THE WITNESS:  Well, Ms. Santos says -- who is the

7   director, she said that yes, her -- she and the nurse

8   practitioner and the social worker all have experience dealing

9   with transgender clients.  They have them as patients, they

10  have them in group settings and --

11          THE COURT:  That was the question.  Thank you.  Okay,

12  Ms. Lopez.

13  BY MS. LOPEZ:

14  Q.  Is it your understanding that besides the experience that

15  you just articulated, do they have any academic certification

16  by any university or any other accredited educational

17  establishment giving them expertise in either gender-related

18  mental health disorders or, again, academic credentials related

19  to trans or gender identities disorder specific mental health

20  treatment?

21  A.  They are all certified clinical social workers.  Which you

22  have to be certified by the state in order to be a clinician.

23          THE COURT:  So they're generalists.

24          MS. LOPEZ:  Generalists.

25  Q.  Because you are the director of a facility that purports to

H5V3LOP2                        Hargrove - direct

1   service transgender women amongst their population --

2           MR. ROBERTS:  Objection.  He's not testified he is the

3   director.

4           THE COURT:  Okay.

5           MS. LOPEZ:  Excuse me.

6   Q.  Because you are a program administrator for the Department

7   of Homeless Services that supervises as part of your portfolio

8   a facility that has a high propensity or high population per

9   capita of transgender clients, are you aware of the Harry

10  Benjamin International Gender Dysphoria Association?

11          MR. ROBERTS:  Objection.

12          THE COURT:  Sustained.

13  Q.  What types of trans-related -- trans-specific therapeutic

14  services do your providers provide, the mental health

15  providers?

16  A.  They provide one-on-one counseling, therapy, they provide

17  art therapy, music therapy, they have a psycho-education group

18  that they have daily.

19  Q.  If a transgender individual from your facility reported

20  that clients from the facility were telling their medical,

21  meaning their being transgender, their medical business to

22  people outside of the facility, are there mechanisms that DHS

23  or WIN West have to stem or address clients of WIN West

24  exposing people's transgender identity to people outside the

25  facility?

H5V3LOP2                         Hargrove - direct

1            MR. ROBERTS:  Objection.

2            THE COURT:  Do you understand the question?

3    Q.  If a transgender person complains that she feels unsafe

4    because clients of the facility are telling community residents

5    and people that are not clients that they are transgender, in

6    furtherance of either a conflict or to highlight the fact that

7    a transgender person is in a, quote unquote, woman's facility,

8    is there a way to deal with the clients that are potentially

9    harassing or exposing the medical information of the clients

10   there?

11   A.  Yes.  We would probably have a conference with the client.

12   And if it was reported as like harassment, then it's possible

13   that the client who was exposing the transgender's identity

14   outside of the shelter might be transferred.

15   Q.  Sure.

16            MS. LOPEZ:  Sorry, your Honor.  I'm trying to keep my

17   actual verbiage short.

18   Q.  What would you say would benefit me the most clinically,

19   therapeutically, in terms of services that are at WIN West,

20   that isn't at Marsha's?

21            MR. CONNOLLY:  Objection.

22            THE COURT:  Sustained.

23   Q.  If I were to be assaulted within or any other person client

24   were assaulted within the WIN West facility, and the NYPD

25   weren't able to act, how quick could your facility act to

H5V3LOP2                          Hargrove - direct

1   either resolve the situation or transfer either parties if

2   anyone is complaining about a safety-related harassment

3   concern?

4            MR. CONNOLLY:  Objection.

5            THE COURT:  Sustained to the form of the question.

6   But generally, what do you do if there is a physical

7   altercation between residents?

8            THE WITNESS:  Safety transfers happen instantly or

9   daily.  I mean, so if --

10           THE COURT:  But are there -- I think you told me there

11  are DHS police officers, uniformed police officers there,

12  correct?

13           THE WITNESS:  Yes.

14           THE COURT:  Do they have peace officer status?

15           THE WITNESS:  Yes.

16           MS. LOPEZ:  Thank you, your Honor.

17  Q.  So, if I were to go to WIN West, and I did not want to see

18  your mental health professionals and refused outright, I would

19  be, and I know asked and answered already, just trying to pick

20  up, I would be viewed as uncooperative?

21  A.  I need to correct that.  I'm sorry.

22           THE COURT:  Okay.  What would happen if she declined

23  mental health services?

24           THE WITNESS:  So, you're able to decline mental health

25  services, but we would want you to sit down with a case manager

H5V3LOP2                         Hargrove - direct

1   to work on the housing issue.  But you could bring in your own

2   psychiatric or psychosocial assessment and provide it to WIN

3   West.

4   Q.  If my current psychiatrist or mental health professional

5   were to provide documentation to DHS administration and WIN

6   West administrations that in their expert opinion, this

7   facility could be a trigger for my post-traumatic stress

8   disorder, and the facility itself and proximity to where I was

9   raised and abused on 61st Street and Amsterdam, if I were to

10  provide such a letter, what would happen to trigger a transfer

11  in the immediate from WIN West?

12          MR. CONNOLLY:  Objection.  Calls for speculation.

13          THE COURT:  Sustained.

14  Q.  So, were you aware as --

15          THE COURT:  You're getting too far afield.

16          MS. LOPEZ:  Okay.

17  Q.  So, out of the transgender people that were transferred out

18  of WIN West, had any of them made similar allegations to

19  Ms. Payons that people were harassing them and did any of them

20  request for transfer?

21  A.  Not to my knowledge.

22  Q.  Not to your knowledge.  So, when a person has medical

23  documentation that may support the facility being harmful to

24  them for whatever reason, a transfer would be facilitated by

25  DHS themselves, correct?

H5V3LOP2                         Hargrove - cross

1           MR. CONNOLLY:  Objection.

2           THE COURT:  Sustained.

3           MS. LOPEZ:  Okay.  Well, your Honor, I apologize for

4    wasting people's time as a pro se litigant, and I would

5    reiterate the fact that not only am I asking for an adjournment

6    to ask for additional witnesses, even if it's for after

7    3 o'clock after the conference, I guess I rest with him as the

8    director.

9           THE COURT:  I'm not sure what you're asking relative

10   to timing.  Again, as we discussed five minutes ago, you have

11   asked for emergency relief.  If I do nothing, that is if I

12   grant your wish for more time, that means the state of legal

13   play is that there is no order in place.

14          MS. LOPEZ:  Yes, your Honor.

15          THE COURT:  So what do you prefer?  For us to proceed

16   or not proceed?

17          MS. LOPEZ:  I do, your Honor.  I wish to proceed.

18          THE COURT:  That's what I thought.  Any further

19   questions for this witness?

20   BY MR. ROBERTS:

21   Q.  Mr. Hargrove, are you aware of the mental health -- you've

22   been asked questions about the capacity of the mental health

23   professionals at the WIN West Center.

24   A.  Yes.

25   Q.  Are you aware of the capacity of the mental health

H5V3LOP2                         Hargrove - cross

1    professionals if any exist at Marsha's House?

2    A.   I don't think they have the same level of mental health

3    services at Marsha's House that they do at WIN West.

4    Q.   I want you to explain again if you could if Ms. Lopez came

5    with a plan of mental health treatment from outside

6    professionals, mental health professionals, what would the WIN

7    West Center do with that information?

8    A.   Okay.  We would use that in conjunction with the case

9    manager's information that's collected.  And it would be used

10   towards housing, to get her placed in a permanent housing

11   facility.

12           THE COURT:  That's the goal?  The goal is to get

13   people out of these shelters and into permanent housing?

14           THE WITNESS:  Yes.

15           THE COURT:  Okay.

16   Q.   Is that, would WIN West treat that information differently

17   than any other of the shelters in the DHS system?

18   A.   No, they would not.

19   Q.   So in fact WIN West would treat the information the exact

20   same way as Marsha's House would treat information from outside

21   mental health professionals?

22   A.   Yes.

23           MR. ROBERTS:  No further questions.

24           THE COURT:  Okay.

25           MS. LOPEZ:  One more.

H5V3LOP2                         Hargrove - redirect

1            THE COURT:  One more.

2   BY MS. LOPEZ:

3   Q.  Is it your testimony that the additional mental health

4   services such as psychotherapy, but music and art therapy, are

5   those the therapeutic services that you're referencing?  And

6   please name more, if there are, that make the difference in

7   what you believe would be my better stay at WIN West so are

8   services --

9            THE COURT:  Hang on a second.  We are not arguing -- I

10  can't decide what is the better place for you.  You are trying

11  to enjoin the city from pursuing the normal process which at

12  this point is to move you.  You're arguing that the move is

13  retaliatory.  In order to enjoin it, among other things, I have

14  to find that you would be irreparably harmed if I don't step

15  in.  I chose that because that seemed like one that we could

16  probably resolve today.  So, whether it's the best placement

17  for you or not is not an issue before this Court.

18            MS. LOPEZ:  Okay.

19            THE COURT:  It will never be an issue before this

20  Court.

21            MS. LOPEZ:  Yes, your Honor.

22            THE COURT:  Okay.  Do you have any other questions for

23  this witness?

24            MS. LOPEZ:  Yes.

25  BY MS. LOPEZ:

H5V3LOP2

1   Q.  If I were brought to the facility today, and verbally

2   harassed within the first few hours, either questioned about my

3   gender -- actually.  Scratch that slightly.  Same question.  If

4   I was questioned about my gender, like, do you have certain

5   male parts, and I reported that to staff, would that be

6   alarming enough, questions about my genitals and what they look

7   like, would that be enough to trigger a safety transfer or

8   review based on me feeling harassed and afraid?

9           MR. ROBERTS:  Objection.

10          THE COURT:  Sustained.

11          MS. LOPEZ:  Okay.  That's it, your Honor.

12          THE COURT:  Okay.  Thank you.  You can step down.

13          THE WITNESS:  Thank you.

14          (Witness excused)

15          THE COURT:  Do you have any witnesses that you want to

16  call, any further witnesses?

17          MS. LOPEZ:  No.  I'd like to inform the Court that --

18  no.  The witnesses were unavailable just by 2:30 and I wasn't

19  aware we would be going anywhere after that or would have the

20  opportunity so, not now, your Honor.  I do not.  I would just

21  like to say that I believe that --

22          THE COURT:  Hang on a second.  If you want to sum up

23  I'll give you an opportunity.  Do the defendants have any

24  witnesses you want to call?

25          MR. CONNOLLY:  Can we have two minutes to confer?

H5V3LOP2

1          THE COURT:  Yes.

2          (Pause)

3          MR. CONNOLLY:  Can we step outside for two seconds,

4    your Honor?

5          THE COURT:  Please.

6          (Pause)

7          MR. CONNOLLY:  Your Honor, I just want to clarify a

8    few things for the record.  First would be that a lot was made

9    about the psychiatric staff that WIN West has.

10          THE COURT:  Can you make a proffer of what Marsha's

11   House has.

12          MR. CONNOLLY:  Yes.  WIN West has staff on site five

13   days a week.  Marsha's House has two separate providers that

14   are each there one day a week.  So it's far less of a

15   psychiatric staff than that's available at WIN West.

16   Additionally, Ms. Lopez made a lot about the training that I

17   guess the WIN West staff has regarding specific transgender

18   issues.  I would just say that the staff at Marsha's House

19   doesn't really have anyone with that specific training.  The

20   clinical staff, the medical staff, to the extent those sort of

21   certifications exist.

22          THE COURT:  So you're saying the clinical staff at

23   Marsha's House is also not specific to transgender?

24          MR. CONNOLLY:  Similar to what was said about WIN West

25   staff.  They're just there with far less frequency than the

H5V3LOP2

1    staff at WIN West is.

2              THE COURT:  Okay.

3              MR. CONNOLLY:  I just want to reiterate that as far as

4    Project Renewal is concerned, the whole hearing seems to be

5    about whether WIN West is the right fit for Ms. Lopez.

6              THE COURT:  It's actually not.  As I said to her, this

7    is not an issue of what is the best fit.  That's not within my

8    jurisdiction.  Maybe I didn't make this as clear as I should

9    have first thing this morning.  I am reading her papers that

10   were filed yesterday, and I am viewing them in the light most

11   favorable to the pro se litigant, is that she is seeking a

12   temporary restraining order against a transfer on the grounds

13   that the transfer is retaliatory.  That's her claim.

14             Again, my thought was that we could go to the step of

15   is there irreparable harm here, assuming that gets resolved

16   against her, I don't have to get to each of the four steps of

17   what's required for a temporary restraining order, including a

18   lot of the issues that I gather Justice Jaffe grappled with

19   this morning in terms of probability of success on the merits,

20   how does the balance of hardships tips, all of that.  That's

21   why I started with irreparable injury, because that struck me

22   as perhaps the shortest distance between two points, based on

23   what I thought this was all about.

24             MR. CONNOLLY:  Okay.

25             THE COURT:  Okay?  So whether Marsha's House or WIN

H5V3LOP2

1    West, or some third location, is from some sort of a

2    philosophical perspective the best location for this plaintiff,

3    is simply not within my -- that's not my job.  I can't decide

4    that.  I don't have the expertise to decide that.  There is not

5    a legal right as far as I know, either a Constitutional right

6    or a statutory right, to be in the best location for a

7    particular person.

8              MR. CONNOLLY:  Okay.

9              THE COURT:  Okay.

10             MR. CONNOLLY:  Thank you, your Honor.

11             THE COURT:  Project Renewal runs Marsha's House; is

12   that correct?

13             MR. CONNOLLY:  Yes, we do, your Honor.  Nothing

14   further, your Honor.  Thank you.

15             THE COURT:  How about you?

16             MR. ROBERTS:  The city rests at this point also, your

17   Honor.

18             THE COURT:  Okay.  Ms. Lopez?

19             MS. LOPEZ:  May I call a witness that was made

20   available by Project Renewal?

21             THE COURT:  Someone that just walked in?

22             MS. LOPEZ:  That's here in the room.

23             THE COURT:  To call someone from Project Renewal?

24             MS. LOPEZ:  Yes.  The director.

25             THE COURT:  Is this relevant to irreparable injury?

H5V3LOP2

1          MS. LOPEZ:  And the issue about retaliation.

2          THE COURT:  We're not trying retaliation right now,

3     Ms. Lopez.

4          MS. LOPEZ:  Irreparable harm.

5          THE COURT:  This is just irreparable harm.

6          MR. CONNOLLY:  I'm going to object.

7          THE COURT:  There is nothing to object to yet.  I'll

8     give you the same advice I gave her.  Quit while you are ahead.

9     Why do you want to call someone from Project Renewal relative

10    to irreparable injury?

11         MS. LOPEZ:  I was going to seek to establish that

12    Project Renewal has information about what would happen to me

13    socially, what my choices would be, like, checking out of the

14    shelter, first-hand information about that if I'm not at

15    Marsha's.

16         THE COURT:  Look, you're an adult.  If you make

17    decisions that are contrary to your best interest, the Court

18    can't step into that.  That's your decision.  You are an adult

19    who is more than competent of making decisions in terms of what

20    you think is in your best interest.

21         The only issue before me is whether you will suffer

22    irreparable injury if you are moved as a matter of homeless

23    services from Marsha's House to WIN West.  That's the only

24    issue for me.

25         MS. LOPEZ:  Sure.

H5V3LOP2

1          THE COURT:  Would you like -- no more witnesses?

2          MS. LOPEZ:  I would just like to be heard for summing

3   up.

4          THE COURT:  You have the floor.

5          MS. LOPEZ:  I do not believe, your Honor, anything has

6   changed since your Honor issued the first TRO that is relevant

7   to me being irreparably harmed by being moved.  I believe that

8   even the day in court where your Honor asked where else would

9   she go and could she be irreparably harmed if she was sent

10  there, nothing has changed except the name of a facility.

11          If anything is actually changed in the environment or

12  atmosphere in New York is it is more charged with fear around

13  the transgender person that was recently killed in a DHS

14  shelter.  I believe that the pattern of paperwork accrued or

15  put together by the defendants for relatively minor infractions

16  are an attempt to have a second bite at the apple, so to speak,

17  and get me out of Marsha's using a back door remedy.

18          THE COURT:  That's your retaliation claim.  I

19  understand that claim and you're going to have discovery and

20  you're going to be able to litigate the issue of whether the

21  transfer is retaliatory.

22          MS. LOPEZ:  I am genuinely afraid that I would be

23  triggered both into major depression at WIN West, as well as

24  the potential need to physically defend myself against either a

25  bombardment of inappropriate questions regarding my genitalia

H5V3LOP2

1  or people physically violating myself or my animal.  I am also

2  afraid if I was put into a situation that I need to defend

3  myself, that my dog could be injured or harmed as a result of

4  that.

5          THE COURT:  I understand that you are alarmed and

6  upset about this possibility.

7          MS. LOPEZ:  Sure.  So, I believe whatever rationale

8  the Court relied on the first time --

9          THE COURT:  That was a very different circumstance.

10          MS. LOPEZ:  Okay.  Well, then, your Honor, as a pro se

11  litigant who literally has been separated from my physical

12  belongings including any paperwork I would have had to prepare

13  for today, I don't really know what else to do but to allege

14  that based on the witnesses I couldn't provide today because of

15  the short timing, I have no way to establish that both the

16  retaliation is happening and that nothing is actually changed,

17  even though your Honor just underscored that there was a

18  totally different scenario, I don't really understand how so

19  much --

20          THE COURT:  I can tell you why.  Because the city at

21  that point did not have a specific location that they were

22  suggesting.

23          MS. LOPEZ:  They did, your Honor.  They suggested

24  Broadway.  They did, your Honor.  They did and they actually

25  made an argument similar to what they're doing now in terms of

H5V3LOP2

1    the Broadway location.  Your Honor, absent there having been

2    transgender people there very recently, there is no way, no

3    huge difference in how the city described this new and amazing

4    place on Broadway in Brooklyn, your Honor.  They're doing

5    anything they can to get me out of this facility.

6              THE COURT:  Again, you keep wanting to talk about the

7    merits.  This is only on the issue of whether you are entitled

8    to a temporary restraining order.  I would encourage you to go

9    down and talk to the pro se clinic.  You may want to make a

10   motion for preliminary injunction that is brought on by motion.

11   That's a different issue.  This is literally what happens to

12   you tonight.

13             MS. LOPEZ:  And --

14             THE COURT:  Is there irreparable injury if you are

15   moved to WIN West.

16             MS. LOPEZ:  Yes, I believe me being --

17             THE COURT:  I know you believe that.  Okay.  Anything

18   further?

19             MS. LOPEZ:  No, your Honor.

20             THE COURT:  Anything further?

21             MS. LOPEZ:  No, your Honor.

22             THE COURT:  City?

23             MR. ROBERTS:  So, your Honor, just I don't think there

24   has been a demonstration of irreparable injury.  The facility

25   that we want to move her to is a safe and appropriate facility

1   with significantly improved mental health capacities.  The most

2   that's been shown was that approximately five or six months ago

3   there was one incident.  There are incidents, unfortunately,

4   from client on client in our shelters with some regularity.

5   And there is absolutely no showing that Marsha's House is going

6   to be a problem.  I would really plead with Ms. Lopez to go to

7   Marsha's House with --

8              THE COURT:  WIN West.

9              MR. ROBERTS:  Excuse me.  To WIN West with an open

10  mind, and I think that things may well get better.  The

11  proposition that this is an injury, there is just no evidence

12  for it.

13             THE COURT:  Okay.  Mr. Connolly.

14             MR. CONNOLLY:  Nothing further, your Honor.

15             THE COURT:  Okay.  The Court is prepared to rule on

16  this issue, and my ruling is limited to the issue of whether

17  the plaintiff has demonstrated that she is entitled to

18  temporary relief.

19             So, in order to get a temporary restraining order

20  under settled Second Circuit law, the plaintiff has the burden

21  to show that she's likely to succeed on the merits, that she's

22  likely to suffer irreparable harm in the absence of preliminary

23  relief, that the balance of equities tips in her favor, and

24  that an injunction or temporary restraining order is in the

25  public interest.

H5V3LOP2

         In this case, in this particular case, I find that

Ms. Lopez founders on the second one.  She has not demonstrated

that she will suffer irreparable harm in the absence of

preliminary relief.  So your request for immediate relief is

denied.

         I would join Mr. Roberts' statement to you that I

recommend that you go to WIN West with an open mind.  You can

roll your eyes at me all you want, Ms. Lopez.  That's my

recommendation to you.  As of right now you've got two judges

who have looked at all the information.

         MS. LOPEZ:  They did not, your Honor.

         THE COURT:  If you interrupt me again, you're going to

be removed.  You've persuaded neither one of us that you are

entitled to preliminary relief to a temporary restraining

order, so the city is free to do what the city believes is

appropriate.

         Your lawsuit pending in front of me is continuing to

pend in front of me.  Although, the Article 78 is also pending

in front of New York Supreme.  I recommend that the defendant

does a little legal research whether at the end of the day,

that ruling will be collateral estoppel or res judicata as to

this lawsuit, which in part the initial lawsuit was

discrimination on the grounds of disability for failure to

admit her dog.  That's sort of moot with whatever damage claim

would exist for the day and a half or whatever that was at

1   issue initially.  And then this I am viewing as a claim of

2   retaliation.  So it is an ADA retaliation claim based on the

3   original lawsuit.  So I'm not sure that the Article 78 will

4   constitute res judicata.  But there may be some collateral

5   estoppel aspects to it.  I don't know.  I don't know if we had

6   to -- do we have a conference scheduled in this?  I think we do

7   have an initial pretrial conference, correct?

8           MS. LOPEZ:  And is there a way, your Honor, to have

9   that conference moved up?

10          THE COURT:  I don't know when it is.

11          MS. LOPEZ:  Your Honor, may I --

12          THE COURT:  June 30.  No, it can't be moved up.

13          MS. LOPEZ:  It was moved without my consent.

14          THE COURT:  Okay.  That happens sometimes.

15          MS. LOPEZ:  I just want to put on the record that I

16  seem to have a problem with the fact that me presenting as a

17  pro se litigant isn't sort of the end of my inability to

18  effectively represent myself here.  My inability to represent

19  myself is linked to fact that the defendants have been sort of

20  upending my life, including my physical paperwork and my

21  ability to prepare for court or even communicate with this

22  court intentionally.  And I will let them know on the record

23  that by tomorrow I will be furnishing them with a letter from a

24  psychiatrist saying I cannot stay at the WIN West facility, and

25  I will be asking for a reasonable accommodation under the ADA

H5V3LOP2

 1    to be transferred back to Marsha's.  So we'll sort of legally
 2    be circling the drain.
 3            And I am also aware, your Honor, that Judge Jaffe did
 4    not have the entire record you have.  In fact you and Judge
 5    Jaffe had two separate sets of paperwork.  The petition I had
 6    across the street with the names of all the clients she did not
 7    have because I didn't have copies for her.  And she had the
 8    report but she didn't have the petition connected to the report
 9    from a majority of the clients.  I believe that weighing the
10    preponderance of the evidence then, considering there were
11    dozens of people on in that petition, would have swayed her.  I
12    just think --
13            THE COURT:  I'm not sure what that petition even was.
14    But it really didn't -- at best that goes to the merits.  It
15    does not go to the issue of irreparable injury.
16            MS. LOPEZ:  You're right.  And your Honor has
17    something to do.  Let me say part of this whole situation is me
18    not being able to prepare properly and the city knowing this.
19            THE COURT:  Madam, you were the one who brought on
20    this action for immediate relief.  The petition -- the
21    petition -- please don't interrupt me.  The petition you filed
22    yesterday asked for immediate relief.  The soonest I could see
23    you was today.  I accommodated your request.
24            MS. LOPEZ:  You did, your Honor.
25            THE COURT:  If that was not what you wanted, let me

H5V3LOP2

1     advise you if you don't want to be promptly brought to court --

2               MS. LOPEZ:  Sure.

3               THE COURT:  -- don't ask for immediate relief.

4               MS. LOPEZ:  I understand.

5               THE COURT:  There are lots of things you can do in a

6     courtroom that do not involve immediate relief.

7               MS. LOPEZ:  I wasn't aware of that, your Honor.

8               THE COURT:  Okay.  That's one of the problems with

9     proceeding as a pro se.  You have the pro se clinic.  If you're

10    nice to them, I am confident they will be nice to you and can

11    provide you advice with how to proceed.

12              MS. LOPEZ:  Okay.

13              THE COURT:  The initial pretrial conference will be on

14    June 30, that's the point when we'll talk about whether the

15    city is going to move to dismiss, what they're going to do, how

16    we're going to proceed in this case, whether there is going to

17    be discovery, whether there is not going to be discovery.  All

18    of that will be discussed at the initial pretrial conference.

19              MS. LOPEZ:  Sure.  I just want to make you aware I

20    will be seeking immediate relief again very soon, and I will be

21    better prepared again with witnesses and experts that I wasn't

22    able to provide today.  And I will be able to establish that I

23    will be irreparably harmed, and I will not be taking my bed at

24    WIN West because I am afraid of being harassed and outed as

25    being trans as I walk around the facility.

H5V3LOP2

1          THE COURT:  Ms. Lopez, I would suggest if you quit

2     telling everybody you're trans, no one will know it.

3          MS. LOPEZ:  But your Honor just spoke that I have

4     notoriety as a public figure.  My name has been in the papers

5     that --

6          THE COURT:  Not everybody knows you.

7          MS. LOPEZ:  Your Honor, can I just -- that's a very

8     valid thing.  This facility though has sort of been readying

9     itself for me for the last month.  And I happen to know

10    specifically that the residents are aware that there is a

11    transgender person going to a single bedroom, which are

12    limited, with a dog coming soon.  And they are aware of what I

13    look like because when the story made the paper, they

14    circulated the paper and the story within WIN West.  So there

15    isn't a way for me to go into this facility and them not know

16    that I am transgender.

17         THE COURT:  Okay.  Well, I'm sorry to hear that.  But

18    I'm confident that you will survive it if you choose to.  If

19    you choose not to go, it's really a moot point because you're

20    not going.  So that's your -- let me make one thing clear.

21         MS. LOPEZ:  The neighborhood is dangerous.

22         THE COURT:  That is your decision.

23         MS. LOPEZ:  A trigger to cause me to degrade mentally.

24         THE COURT:  The neighborhood is not dangerous.

25         MS. LOPEZ:  If I was abused several blocks away it is

H5V3LOP2

1    a trigger.  My starting in foster care, your Honor, me being

2    placed close by there I do think a mental health expert will be

3    able to as an expert say if she's physically avoided a part of

4    Manhattan island for 20-something years, literally avoided this

5    part of the island for 20-some-odd years, as a part of her

6    condition, her hypervigilance and being placed there will

7    remind her not only of childhood trauma.  This is why I wanted

8    a chance to present a trans-specific expert.  When you are

9    transgender, the simple thought or recollection of your

10   childhood can sometimes be traumatizing if you live that

11   childhood out as the opposite gender that you thought you were

12   or needed to be.

13           THE COURT:  Make that dog quiet.

14           MS. LOPEZ:  Yes, ma'am.  So --

15           THE COURT:  I appreciate, Ms. Lopez, I completely

16   appreciate your honestly felt belief, but you are not an

17   expert.  I'm not accepting your statements as the statements of

18   and expert.

19           MS. LOPEZ:  I understand that.

20           THE COURT:  This is simply not the appropriate time.

21           MS. LOPEZ:  Got it.

22           THE COURT:  So, anything further from the defendants?

23           MR. ROBERTS:  No, your Honor.

24           MR. CONNOLLY:  No your Honor.

25           THE COURT:  Ms. Lopez, you don't get to leave until I

H5V3LOP2

1    say.

2           MS. LOPEZ:  I was just trying to get her out of here.

3    My apologies.

4           THE COURT:  Nothing further from the defendants?

5           MR. CONNOLLY:  No, your Honor.

6           THE COURT:  I'll see you all on the 30th.  That dog is

7    not acting like a service dog.

8           MS. LOPEZ:  She knows I'm upset, your Honor.  She's

9    doing what she's trained to do.

10          THE COURT:  Tell her to be quiet.

11          MS. LOPEZ:  The judge said to be quiet.

12          THE COURT:  Thank you all.

13                            oOo

14

15

16

17

18

19

20

21

22

23

24

25