# EXHIBIT K

Case 1:17-cv-03014-VEC-OTW   Document 107-11   Filed 10/05/18   Page 2 of 69

Anonymous v. Goddard Riverside Community Center, Inc., Not Reported in F.Supp....

1997 WL 475165

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Jenkins v. New York City Dept. of Homeless
Services, S.D.N.Y., July 7, 2009

1997 WL 475165
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

ANONYMOUS, Plaintiff,

v.

Goddard Riverside Community Center, Inc., d/b/
a Project Reachout, Diane Sonde, Margarita Lopez,
Bettye King, Katherine Falk, M.D., Defendants.

No. 96 CIV. 9198 (SAS).
|
July 18, 1997.

## Opinion

SCHEINDLIN.

**\*1** Plaintiff, who is proceeding anonymously, commenced this action on May 13, 1996, alleging violations of, *inter alia,* the Americans with Disabilities Act ("ADA"), the Fair Housing Act ("FHA"), and state law. Plaintiff has filed a Complaint and an Amended Complaint ("Amend.Comp."). Goodard Riverside Community Center ("GRCC"), Diane Sonde, Margarita Lopez, and Bettye King ("GRCC Defendants") now move pursuant to Fed.R.Civ.P. 12(c) for judgment on the pleadings. Dr. Katherine Falk moves pursuant to Rule 12(b)(6) to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted. Dr. Falk also seeks thae imposition of sanctions against Plaintiff's counsel pursuant to Rule 11, 28 U.S.C. § 1927, and the Court's inherent power to award costs and fees. Defendants' 12(b)(6) and 12(c) motions are granted. Dr. Falk's motion for sanctions is denied.

## Factual and Procedural Background

This action arises out of events relating to Plaintiff's participation, between January 30, 1995, and May 5, 1995, in Project Reachout, a federally funded residential treatment program for the mentally ill run by GRCC. *See* Amend.Comp. at ¶¶ 3, 5, 8, 10, 14, 17, 21, 60, and 71. As a participant in Project Reachout, Plaintiff attended a day program, received psychiatric treatment, and was provided with housing at Columbus Studios on West 83rd Street in Manhattan. *See id* at ¶¶ 3, 5, 8, 10, 14, and 21.

Plaintiff brings claims of (1) disability discrimination under the ADA; (2) disability discrimination under the Rehabilitation Act of 1973; (3) gender and disability discrimination under the FHA; (4) violations of the National Institutes of Health Revitalization Act of 1993; as well as (5) various state law claims.

On May 13, 1996, Plaintiff filed a Complaint in Supreme Court, New York County, commencing this action. *See* Declaration of Daniel Siff, Attorney for GRCC Defendants, at ¶ 2. By order dated July 24, 1996, and filed July 31, 1996, Justice Diane A. Lebedeff, Supreme Court, New York County granted Plaintiff's application to proceed anonymously and *in forma pauperis. See id.* On December 6, 1996, Defendants removed the action to this Court. [1] *See id.* at ¶ 4. At a status conference on January 2, 1997, I granted Plaintiff leave to amend her Complaint in order to cure various pleading deficiencies, *see id.,* and on January 10, 1997, Plaintiff filed an Amended Complaint. Dr. Falk filed a motion for sanctions on February 10, 1997, and a 12(b)(6) motion on March 26, 1997. On April 15, 1997, GRCC Defendants filed a 12(c) motion.

## II. Discussion

### Rule 12(b)(6) and Rule 12(c) Motions

When considering both a 12(c) motion for judgment on the pleadings and a 12(b)(6) motion to dismiss, the "court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). Neither a Rule 12(c) nor a Rule 12(b)(6) motion may be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 529 (2d Cir.1996) (citing *Conley v. Gibson,* 255 U.S. 41, 45–46 (1957)).

### 1. Americans with Disabilities Act Claim

**\*2** Plaintiff claims that Defendants discriminated against her based on her disabilities in violations of the ADA, 42 U.S.C. § 12101 et seq.

Anonymous v. Goddard Riverside Community Center, Inc., Not Reported in F.Supp....

1997 WL 475165

Title III of the ADA, which proscribes discrimination in public accommodations including "social service center establishment[s]," does not provide for a private cause of action for damages. *See* 42 U.S.C. § 12181 et seq. Rather, it provides persons who "[are] being" subjected to discrimination or who have reasonable grounds to believe that "[are] about to be subjected" to discrimination with the remedies and procedures set forth in 2000a–3 for its enforcement. *Id.* § 12188(a). Section 2000a–3, in turn, subjects those who have engaged or who are about to engage in prohibited discrimination to "a civil action for preventive relief" only. There is no provision in either 12188 or 2000a–3 for victims of past discrimination to sue for damages. *See* 42 U.S.C. §§ 12188 and 2000a–3; 28 CFR 36.501 (governing "Private Suits" under 42 USC § 12181 et seq.). Accordingly, Plaintiff, who alleges only past discrimination for which she seeks monetary damages, fails to state a claim upon which relief can be granted. Therefore, her ADA claim is dismissed.

#### 2. Rehabilitation Act Claim

Plaintiff claims that Defendants' disparate treatment of her as a "psychiatrically disabled" person and their failure to accommodate her physical disabilities violated the Rehabilitation Act of 1973. *See* Amend.Comp. at ¶¶ 71, 72, 74, and 75. Section 794 of the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving financial assistance." [2] 29 U.S.C. § 794.

##### a. Disparate Treatment

Plaintiff alleges that Defendants locked her out of her housing as punishment for refusing to enroll in an experimental treatment program, *see* Amend.Comp. at § 13, [3] and that

> [w]ith the exception of Project Reachout clients who are or are perceived as being psychologically disabled, GRCC does not require persons otherwise qualified to live in residences owned and/or managed by it to attend programs as a condition of residing [in] its housing ..., attempt to exercise

> discipline over its housing residents by locking them out of their residences, either temporarily or permanently, nor engage in self-help to force residents out of housing.

*Id.* at §§ 71 and 74. Plaintiff fails to allege, however, that GRCC's other housing residents are not "psychiatrically disabled." Because Plaintiff has not alleged that GRCC has treated "psychiatrically disabled" persons differently from persons who are not "psychiatrically disabled," her Rehabilitation Act claim is dismissed insofar as it is premised on Defendants' disparate treatment of her as a "psychiatrically disabled" person.

##### b. Failure to Reasonably Accommodate

**\*3** The Supreme Court has stated that the Rehabilitation Act requires that "otherwise qualified handicapped individuals must be provided with meaningful access to the benefits that the [governmental] grantee offers" and has further determined that "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Plaintiff alleges that Defendants failed to accommodate her physical disabilities by not providing her with van service to transport her belongings to her apartment at Columbus Studios and by failing to accommodate her special dietary needs. *See* Amend.Comp. at ¶¶ 62–65. Plaintiff has not alleged, however, that Defendants' failure to accommodate her physical disabilities resulted in her being denied any benefit of the treatment program. Accordingly, Plaintiff has failed to state a claim under the Rehabilitation Act. Therefore, Plaintiff's Rehabilitation Act claim is dismissed insofar as it is premised on Defendants' failure to accommodate her physical disabilities.

#### 3. Fair Housing Act Claims

Plaintiff brings several claims under the FHA. As there are alternative grounds for dismissal of these claims, I will assume for purposes of this motion, without deciding, that Plaintiff's occupancy of GRCC's Columbus Studios apartment constitutes a "rental of a dwelling" within the meaning of the FHA. [4]

##### a. Disability Discrimination Claims

Case 1:17-cv-03014-VEC-OTW Document 107-11 Filed 10/05/18 Page 4 of 69

Anonymous v. Goddard Riverside Community Center, Inc., Not Reported in F.Supp....

1997 WL 475165

Section 3604(f) of the FHA prohibits discrimination "against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person." 42 U.S.C. § 3604(f).

Plaintiff claims that GRCC's disparate treatment of her as a "psychiatrically disabled" person violated the FHA. *See* Amend.Comp. at ¶¶ 71–75. Because this claim is premised on the same allegations as her disparate treatment claim under the Rehabilitation Act, it is subject to the same deficiencies and is accordingly dismissed. In addition to disparate treatment, discrimination under the FHA may include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B). As noted above, Plaintiff alleges that Defendants failed to accommodate her physical disabilities by not providing her with van service to transport her belongings to her apartment at Columbus Studios and by failing to accommodate her special dietary needs. *See* Amend.Comp. at ¶¶ 61–65. Plaintiff has failed to allege, however, that Defendants were notified of any physical disability which would make it difficult for her to transport her belongings without the benefit of Project Reachout vans. Furthermore, although Plaintiff alleges that Defendants were on notice of her special dietary needs, *see* Amend.Comp. at ¶ 65, she has not alleged that Defendants' failure to accommodate these needs interfered in any way with her ability to use and enjoy her housing. Accordingly, Plaintiff's FHA claim premised on Defendants' failure to accommodate her physical disabilities is also dismissed.

### b. Gender Discrimination Claim

**\*4** Plaintiff complains that she was subjected to sexual harassment at Project Reachout which created a hostile environment violative of the FHA. Section 3604(b) of the FHA make it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of ... sex." 42 U.S.C. § 3604(b).

The Second Circuit has repeatedly recognized that Title VII (employment discrimination) cases are relevant to Title VIII (housing discrimination) cases by virtue of the fact that the "two statutes are part of a coordinated

scheme of federal civil rights laws enacted to end discrimination." *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d Cir.1988); *see United States v. Starrett City Associates,* 840 F.2d 1096, 1101 (2 Cir.1988); *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1037 (2d Cir.1979). In order to establish a hostile environment claim under Title VII, the harassment must consist of "more than a few isolated incidents," *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986), and "must be sufficiently severe and pervasive to ... create an abusive working environment," *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67 (1986)). Thus, in order to state a hostile environment claim under the FHA, a plaintiff must allege harassment that is sufficiently severe and pervasive to create an abusive housing environment. Although the Amended Complaint describes several incidents in which Project Reachout staff and clients made allegedly harassing remarks either directed at Plaintiff or in Plaintiff's presence, only one of these incidents took place at Columbus Studios, the housing component of the program. *See* Amend.Comp. at ¶¶ 30–58. Because a single incident of harassment cannot give rise to a hostile environment claim, Plaintiff's FHA gender discrimination claim is dismissed.

### 4. National Institute of Health Revitalization Act Claim

Plaintiff alleges that Defendants' efforts to force her to participate in a medical experiment without her consent violated the National Institute of Health Revitalization Act of 1933, Pub.L. No. 103–43. *See* Amend.Comp. at ¶ ¶ 77–78. This Act, which codifies procedures concerning research conducted or supported by the National Institutes of Health, does not provide for a private cause of action. Accordingly, Plaintiff's claim under the Act is dismissed.

### 5. State Law Claims

Plaintiff's Amended Complaint includes several state law claims over which this Court has supplemental jurisdiction. Pursuant to 28 U.S.C. § 1367, a "district court[ ] may decline to exercise supplemental jurisdiction over a claim .... if ... [it] has dismissed all claims over which it has original jurisdiction." As Plaintiff points to no circumstances that would justify the exercise of supplemental jurisdiction, it would be inappropriate to retain jurisdiction over the state law claims after

Case 1:17-cv-03014-VEC-OTW   Document 107-11   Filed 10/05/18   Page 5 of 69

Anonymous v. Goddard Riverside Community Center, Inc., Not Reported in F.Supp....

1997 WL 475165

dismissing the federal causes of action. Therefore, I decline to exercise jurisdiction over the remaining state law claims.

### B. Sanctions

**\*5** Dr. Falk seeks an award of costs and counsel fees pursuant to Fed.R.Civ.P. 11, 28 U.S.C. § 1927 and the Court's inherent power on the ground that "Plaintiff's counsel, by filing the Amended Complaint, has presented to this Court a pleading which sets forth legal contentions which are wholly frivolous, lack a basis in law, and do not amount to a reasonable argument for the extension, modification or reversal of existing law." Declaration of Andrew Laskin, Attorney for Katherine Falk, dated January 20, 1997, at ¶ 2.

The district court's power to impose sanctions, whether under Rule 11, § 1927, or pursuant to its inherent authority, is discretionary, *see* Fed.R.Civ.P. 11;[5] 28 U.S.C. § 1927; *see also Chambers v. NASCO, Inc.,* 501 U.S. 32 (1990) (discussing courts' inherent power to impose sanctions), and should be exercised with caution, *see Knipe v. Skinner,* 19 F.3d 72, 78 (2d Cir.1994) ("Rule 11 sanctions should be imposed with caution"); *Mone v. C.I.R.,* 774 F.2d 570, 574 (1985) (§ 1927 "should be construed narrowly and with great caution"); *Chambers v. NASCO, Inc.,* 501 U.S. at 43 (the inherent power of the federal courts "ought to be exercised with great caution"). Rule 11 authorizes sanctions for pleadings that are entirely frivolous or submitted "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," Fed.R.Civ.P. 11(b). Courts may also impose sanctions pursuant to their inherent authority to punish "conduct which abuses the judicial process." *Chambers v. NASCO, Inc.,* 501 U.S. at 44–45. Finally, § 1927 permits attorneys who engage in reasonable or vexatious litigation to be held personally liable for the excess costs and attorneys' fees their conduct causes. Imposition of sanctions pursuant to both § 1927 and the court's inherent authority requires "a clear showing of bad faith." *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986).

The record before me does not support an award of sanctions. While Plaintiff's Amended Complaint is, as discussed above, replete with pleading deficiencies, these deficiencies are not so egregious to be sanctionable. Nor is there any indication that the Amended Complaint was submitted for an improper purpose or that Plaintiff's

counsel has acted in bad faith. Accordingly, Dr. Falk's motion for sanction is denied.

### III. Conclusion

For the reasons stated above, Defendants' 12(b)(6) and 12(c) motions are granted. Dr. Falk's motion for sanctions is denied. Given that Plaintiff has submitted an Amended Complaint plagued by many of the deficiencies as her Original Complaint, despite being given an opportunity to amend in order to cure those deficiencies, Plaintiff's federal claims are dismissed with prejudice. Plaintiff's state law claims are remanded to state court. The Clerk is directed to close this case.

**SO ORDERED:**

1    It appears that Defendants did not timely remove. However, the requirement of 28 U.S.C. § 1446(a) that removal be effected within thirty days after the defendant receives a copy of the state court complaint or is served, whichever occurs first, is procedural, not jurisdictional. *See, Leininger v. Leininger,* 705 F.2d 727, 729 (5th Cir.1983). Accordingly, as Plaintiff has failed to object to the removal, the removal's untimeliness is not a ground for remand.

2    Plaintiff's Amended Complaint refers to 29 U.S.C. § 796 et seq. *See* Amend.Comp. at ¶ 76. Those sections of the Rehabilitation Act authorizes grants to develop centers for independent living and are totally inapplicable to Plaintiff's claims.

3    Some of the paragraphs in the Amended Complaint are misnumbered. Between paragraphs 15 and 16, there are two additional paragraphs 13 and 14. Plaintiff's allegation that Defendants locked her out of her housing as punishment for not enrolling in an experimental treatment program is set forth in the paragraph 13 that appears after paragraph 16.

4    Defendants do not dispute that the FHA applies to the residential component of Project Reachout. For purposes of the FHA, a "dwelling" is "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families." 42 U.S.C. § 3602(b). The FHA further provides that a "[f]amily includes a single individual." *Id.* § 3602(c). Accordingly, courts have applied the FHA to a group home for recovering alcoholics, *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725 (1995), a homeless shelter, *Turning Point v. City of Caldwell,*

74 F.3d 941 (9th Cir.1996), a group home for the mentally retarded, *Bangerter v. Orem City Corp.*, 46 F.3d 1491 (10th Cir.1995), a residential drug rehabilitation facility, *U.S. v. Southern Management Corp.*, 955 F.2d 914 (4th Cir.1992), a residential school for emotionally disturbed adolescents, *U.S. v. Massachusetts Indus. Finance Agency*, 910 F.Supp. 21 (D.Mass.1996), a shelter for homeless and battered women and families, *Woods v. Foster*, 884 F.Supp. 1169 (N.D.Ill.1994), an adult care facility for homeless persons with HIV, *Support Ministries for Persons with AIDS, Inc., v. Village of Waterford, NY*, 808 F.Supp. 120 (N.D.N.Y.1992), and a children's home, *United States V. Hughes Memorial Home*, 396 F.Supp. 544 (W.D.Va.1975). Under the FHA, "to rent includes to lease, sublease, or otherwise grant for a consideration the right to occupy premises not owned by the occupant." 42 U.S.C. § 3602(e). In an affidavit, in support of the GRCC Defendants' 12(c) motion, the director of GRCC States that GRCC receives federal funds to operating housing at Columbus Studios. *See* Affidavit of Bernard J. Wohl, dated March 31, 1997, at ¶ 7. For purposes of this motion, I will assume that these federal funds constitute consideration for plaintiff's housing.

5    Rule 11 was amended, effective December 1, 1993, so that the district court's power to impose sanctions is now considered discretionary rather than mandatory." *Knipe v. Skinner*, 19 F.3d 72, 78 (2d Cir.1994). If the court determines that Rule 11(b) has been violated, sanctions may be imposed pursuant to Rule 11(c), which reads as follows:

> (c)Sanctions: If after a reasonable opportunity to respond, the court determines that subdivision(b) has been violated, the court *may* ... impose an appropriate sanction on the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for its violation.
>
> Fed.R.Civ.P. 11(c) (emphasis added).

## All Citations

Not Reported in F.Supp., 1997 WL 475165

---

    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

⬦ Positive
As of: September 28, 2018 9:24 PM Z

## _Crawford v. Lutheran Med. Ctr._

United States District Court for the Eastern District of New York

March 9, 2011, Decided; March 14, 2011, Filed

08-CV-3429 (NGG) (LB)

**Reporter**
2011 U.S. Dist. LEXIS 26072 *; 2011 WL 887806

DORIS D. CRAWFORD, Plaintiff, -against- LUTHERAN
MEDICAL CENTER, Defendant.

## Core Terms

alleges, co-workers, hostile, abusive, work environment,
retaliation, fianc, hostile work environment, disparate
treatment, factual allegations, hostile work environment
claim, employees, harassment, quotation, ex-wife,
administrative assistant, plaintiff's claim, protected class,
discriminatory, communicating, complaining, delusional,
baseless, speaking, pleaded, notice, marry

**Counsel:** [*1] Doris D. Crawford, Plaintiff, Pro se,
Brooklyn, NY.

For Lutheran Medical Center, Defendant: Joan M.
Gilbride, LEAD ATTORNEY, Kaufman, Borgeest &
Ryan, New York, NY; Laura Baldwin Juffa, Kaufman
Borgeest & Ryan LLP, New York, NY.

**Judges:** NICHOLAS G. GARAUFIS, United States
District Judge.

**Opinion by:** NICHOLAS G. GARAUFIS

## Opinion

### MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, United States District
Judge.

Pro se Plaintiff Doris Crawford ("Crawford"), proceeding
_in forma pauperis_ under _28 U.S.C. § 1915_, brings this
Complaint (Docket Entry # 1) against her former
employer, Defendant Lutheran Medical Center ("LMC"),
alleging employment discrimination on the basis of race
in violation of Title VII of the Civil Rights Act of 1964,
codified at _42 U.S.C. §§ 2000e et seq._ LMC moves to

dismiss the action under _Federal Rules of Civil
Procedure 12(b)(6)_ and _8(a)(2)_. For the reasons set
forth below, the court grants Defendant's motion in part
and denies it in part.

### I. BACKGROUND

Plaintiff, an African-American woman, was employed by
LMC as an administrative assistant. (Compl. at 6-7.) [1]
She alleges that LMC violated Title VII by "[f]ail[ing] to
hire" her, "[t]erminat[ing] [her] employment," allowing or
fostering a "hostile work environment," [*2] and giving
her "[u]nequal terms and conditions of ☐ employment"
because of her race, and further alleges that LMC
retaliated against her when she complained about the
discrimination to which she was subjected. (_Id._ at 3.)

Plaintiff was "permanently" employed by LMC, though in
a probationary status, as an administrative assistant in
LMC's executive office beginning on February 11, 2008.
(_Id._ at 6.) An email attached to her Complaint indicates
that Plaintiff worked in some capacity at LMC prior to
that date. (_Id._ at 10.) Plaintiff's employment was
terminated on March 18, 2008. (_Id._ at 6.) Plaintiff alleges
that personal enemies of hers, who did not work at LMC
and were "known to [Plaintiff] through [her] religious
affiliation, . . . which is one of Jehovah's Witnesses,"
began conspiring against her with Plaintiff's co-workers
at LMC. (_Id._) Those personal enemies include Mr.
Rodney Jones ("Jones"), who Plaintiff alleges has been
"involved in crimes against [*3] [Plaintiff] for several
years now through harassment, stalking, and other
serious means being investigated"; and Ms. Dwani
Bush, Plaintiff's alleged fiancé's ex-wife, who Plaintiff
alleges "is stalking and harassing" her and her alleged
fiancé, a Mr. Kevin Bush. (_Id._)

---

[1] Plaintiff's Complaint is comprised of several documents filed
with the court together as a single document. For ease of
reference the court uses the pagination of the electronic case
filing system in referring to Plaintiff's Complaint.

Though Plaintiff states that she does not believe that any of her co-workers at LMC knew Jones or Dwani Bush, she nonetheless alleges that at least two of her co-workers began regularly and frequently communicating with them after Plaintiff started working at LMC. (Id. at 6-7.) Plaintiff alleges that she overheard LMC employee Christian Richardson ("Richardson") "constantly" speaking on the phone with Jones, and that Richardson took time off from work to "visibly] support" Dwani Bush by going to the place "where [Dwani Bush] was being forcibly removed and taken to jail for not leaving premises she'd been given notice prior to several weeks before to leave." (Id.) Plaintiff further alleges that Richardson assisted in Dwani Bush's release from jail, and used a web site to organize other LMC employees to help Dwani Bush. (Id.) She also alleges that LMC employee Thomas Gerardi ("Gerardi") "has taken Dwani Bush into his home [*4] since no one would take her in due to her actions." (Id.) Plaintiff further alleges that an LMC employee she worked for, Karen Lennon ("Lennon"), somehow had knowledge of Plaintiff's problems with Dwani Bush and was "very emotionally attached to the publicly known personal situation." (Id. at 7.)

Plaintiff alleges that LMC employees—primarily Lennon—opposed her decision to marry Kevin Bush because Plaintiff is African American and Kevin Bush's ex-wife, Dwani Bush, is "a young Spanish lady." (Id.) Plaintiff claims that LMC employees preferred Dwani Bush "simply because she is 'Spanish.'" (Id.) As evidence, Plaintiff alleges that "[t]hey made no bones about letting me know that by speaking words, not conversations in Spanish like 'hola,' 'adios' and other." (Id.) Plaintiff also alleges that "[e]ach day Karen [Lennon] and a particular doctor would have their daily conversations about it making it clear they wanted the 'Spanish girl' to be 'remarried' to [Kevin Bush]." (Id.) Plaintiff alleges that "Karen [Lennon] even made the statement that 'they're only fighting over some rings,' 'why don't she just suck it up and let it go' — that was in reference to [Plaintiff] leaving [her] fiancé [*5] to give him to the 'Spanish girl.'" [2] (Id.) In further support of her claim that LMC employees have a preference for Hispanics, Plaintiff attaches an email to her complaint in which an LMC employee relates a statement made by a third-party to that LMC employee suggesting that LMC

has a preference for hiring people with Hispanic last names. (See id. at 10.)

Plaintiff claims that because of the race-based preferences of LMC employees, specifically Lennon, Plaintiff was denied a permanent position as an executive administrative assistant because she is African American. (Id. at 7.) Plaintiff further claims that she was fired in retaliation for complaining about the hostile work environment that resulted from LMC employees becoming involved in her personal feud with Jones and Dwani Bush. (Id. at 6-7.)

## II. DISCUSSION

### A. Legal Standards

#### 1. Notice Pleading Standard

The purpose of a motion to dismiss for failure to state a claim under _Federal Rule of Civil Procedure 12(b)(6)_ is to test the legal sufficiency [*6] of a plaintiff's claims for relief. _Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007)_. In reviewing the complaint, the court accepts as true all allegations of fact, and draws all reasonable inferences from these allegations in favor of the plaintiff. _ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)_.

"[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." _Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)_ (quotation omitted). But while "the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest," _Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-75 (2d Cir. 2006)_ (quotation omitted), even a pro se complaint will be dismissed for failing to meet the notice pleading standard of _Rule 8(a)(2)_ if it does not contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." _Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)_ (quoting _Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)_). "A claim has facial plausibility when the plaintiff pleads factual content that [*7] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." _Iqbal, 129 S. Ct. at 1949_. "[M]ere 'labels and conclusions' or 'formulaic recitation[s]' of the elements of a cause of action will not do'; rather, the complaint's '[f]actual allegations must be enough to

---

[2] Plaintiff also alleges a litany of perceived slights and petty incivilities perpetrated by Lennon against her, which appear to bear no relation to her claims of race discrimination. (See Compl. at 7.)

raise a right to relief above the speculative level."' *Arista Records LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)* (quoting *Twombly, 550 U.S. at 555*). Though courts are required to accept a plaintiff's non-conclusory factual allegations as true, courts may nevertheless determine that the "fantastic [or] delusional" character of some factual allegations renders a plaintiff's claims to relief implausible. *See Samuel v. Bellvue Hospital Center, 366 F. App'x 206, 207 (2d Cir. 2010)* (finding that "in the context of the fantastic and delusional nature of the majority of his complaint, [the plaintiff] failed to allege sufficient facts to render plausible his conclusory assertion that the defendants discriminated against him on the basis of his membership in a protected class" under *Iqbal*); *see also Tyler v. Carter, 151 F.R.D. 537, 539-40 (S.D.N.Y. 1993)* (dismissing complaint containing [*8] fantastic and delusional claims sua sponte under *Rule 12(b)(6)*).

In deciding a motion to dismiss, the court may consider matters of which judicial notice may be taken, as well as documents extrinsic to the complaint where a plaintiff "relies heavily upon [the documents] terms and effect, [thus] rendering[ ] the document integral to the complaint." *Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)* (quotations omitted).

2. Pleading Standard under *In Forma Pauperis* Statute

The notice pleading standard of *Federal Rule of Civil Procedure 8(a)(2)* is not the only one that applies to Plaintiff's Complaint. Because Plaintiff is proceeding *in forma pauperis*, the court must dismiss the case if "at any time ☐ the court determines that the action or appeal is frivolous or malicious." *28 U.S.C. § 1915(e)(2)(B)(i)*. "[A] complaint, containing as it does both factual allegations and legal conclusions, is frivolous where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989)*. *Section 1915(e)(2)(B)(i)* "accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the [*9] veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." *Id. at 327*. This includes "claims describing fantastic or delusional scenarios, ☐ with which federal district judges are all too familiar." *Id. at 328*.

**B. Disparate Treatment Claim**

Plaintiff alleges that she applied for a position at LMC as an executive administrative assistant and was denied that position because she is African American. (Compl. at 7.) "To prevail on a Title VII disparate treatment claim, a plaintiff must ultimately prove that '(1) [she] is a member of a protected class; (2) [she] is competent to perform the job or is performing [her] duties satisfactorily; (3) [she] suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on [her] membership in the protected class."' *La Grande v. DeCrescente Distributing Co., Inc., 370 Fed. Appx. 206, 212 (2d Cir. 2010)* (quoting *Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005)*). At the pleading stage, however, Plaintiff need only allege facts sufficient to support the reasonable inference that Plaintiff [*10] suffered an adverse employment action because of her membership in a protected class. *See Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*; *Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868*.

In sum and substance, Plaintiff alleges that Lennon, an employee of LMC for whom Plaintiff worked, denied Plaintiff the position for which she applied because Lennon knew that Plaintiff was planning to marry Kevin Bush, and disapproved of Plaintiff's marriage because Lennon preferred that Kevin Bush remarry his ex-wife, Dwani Bush, "because [Dwani Bush] is 'Spanish.'" (Compl. at 7.) Plaintiff's disparate treatment claim, like Plaintiff's hostile work environment claim, hinges on Plaintiff's factual allegations that her co-workers became deeply embroiled in her personal life through the actions of Plaintiff's nemeses—Jones and Dwani Bush—and came to oppose Plaintiff because of Plaintiff's desire to marry Kevin Bush. Plaintiff believes that her co-workers preferred that Kevin Bush remarry Dwani Bush and not Plaintiff because they favor Hispanics over African Americans and Plaintiff is African American. Plaintiff alleges that her co-workers' preference for Hispanics resulted in her being denied the position of executive [*11] administrative assistant, and in a hostile work environment.

Although the court is obligated to assume the truth of all factual allegations in the Complaint, it reviews those allegations to determine whether they "plausibly suggest an entitlement to relief." *Iqbal, 129 S. Ct. 1937, 1951, 173 L. Ed. 2d 868*. Furthermore, for actions filed *in forma pauperis* the court is obligated to "dismiss those claims whose factual contentions are clearly baseless." *Neitzke, 490 U.S. at 327*.

2011 U.S. Dist. LEXIS 26072, *11

Plaintiff's own Complaint contains troubling indications that her allegations as to the existence of a conspiracy against her are Plaintiff's own delusional beliefs with no basis in fact or reality. Plaintiff never explains how she knew that her co-worker, Richardson, was speaking with Jones and Dwani Bush simply from overhearing his telephone conversations, or how she knew that Dwani Bush started living with her former supervisor, Thomas Gerardi. (Compl. at 6.) Indeed, Plaintiff admits that it is highly improbable that Richardson or Gerardi would know Jones or Dwani Bush, and states that she did not inform anyone of her personal problems with Jones and Bush. (Id.) In a letter to LMC management attached to her Complaint, Plaintiff [*12] stated that she found it "very strange" that Richardson was talking to Jones and Bush, writing that Jones and Bush "are not from New York and basically would be known only to others of us not having been raised here, gone to school here, worked here." (Id. at 9.) Plaintiff assumes that Richardson and Gerardi came into contact with Jones and Dwani Bush through Jones's efforts to "infiltrate☐ [her] work relations." (Id. at 6, 8.) Plaintiff states that Jones has persecuted her "for years" and "finds ways to connect with people [Plaintiff] work[s] with to create a hostile and volatile work environment for [Plaintiff]." (Id.)

Plaintiff's Complaint states that after she sent the letter complaining about the perceived conspiracy against her, an LMC human resources employee interviewed her co-workers about her allegations and told Plaintiff that the people he interviewed "said they had no idea what [Plaintiff] was speaking about." (Id. at 7.) Furthermore, in her letter to LMC executives, Plaintiff admits that Kevin Bush, the man Plaintiff claims is her fiancé, called an employee of LMC to complain that Plaintiff was making harassing phone calls to him from her telephone at work. (Id. at 8.) [*13] According to the letter to LMC management, Plaintiff stated that she had been instructed not to call Kevin Bush while at work, and that she had complied with that instruction. (Id.)

Considered together, Plaintiff's own factual allegations render her claims of disparate treatment implausible, and indicate that the factual predicate of that claim—i.e., the existence of a conspiracy against her—is clearly baseless. Under either Iqbal or 28 U.S.C. § 1915(e)(2)(B)(i), Plaintiff's disparate treatment claim must be dismissed.

## C. Hostile Work Environment Claim

Title VII prohibits employers from "discriminati[ng] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This prohibition on disparate treatment encompasses claims that an employer required "that an employee 'work in a discriminatorily hostile or abusive environment,' so long as the discriminatory conduct at issue is 'severe or pervasive enough to create an objectively hostile or abusive work environment.'" Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (quoting Harris v. Forklift Systems, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). [*14] To state a hostile work environment claim, a plaintiff must plead facts that tend to show that the complained of conduct: (1) is objectively severe or pervasive, that is, it creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates an environment that is discriminatorily hostile or abusive to the plaintiff because of the plaintiff's membership in a protected class. See Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007).

"[A] work environment's hostility should be assessed based on the 'totality of the circumstances.'" Id. (quoting Harris, 510 U.S. at 23). "Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'" Id. The Supreme Court and Second Circuit have repeatedly cautioned that 'Title VII does not establish a 'general civility code' for the American workplace." Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004) [*15] (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 201 (1998)). "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." Petrosino, 385 F.3d at 223.

Plaintiff contends that her work environment was "extremely hostile" to her because: her co-workers communicated and maintained relationships with people with whom she has an acrimonious relationship outside of work (Compl. at 6); Plaintiff's co-workers opposed her marriage to her fiancé because they supported her fiancé's ex-wife, and they discussed their opposition to Plaintiff's marriage behind her back (id. at 7); her co-workers used Spanish words in conversation, thus demonstrating their preference for those of Hispanic

Sarah Mawhinney

2011 U.S. Dist. LEXIS 26072, *15

origin (id.); and her co-workers, "predominantly Christian Richardson," directed unspecified "verbal taunts on a regular and daily basis" at Plaintiff, apparently as a result of Richardson's alleged friendship with Plaintiff's enemies (id. at 6). Furthermore, Plaintiff alleges that because Lennon knew and disapproved of Plaintiff's decision to marry Kevin Bush, Lennon chose not to work with Plaintiff [*16] professionally. (Id. at 8.)

Plaintiff's hostile work environment claim suffers from the same defect as her disparate treatment claim—i.e., that it is implausible and that the factual predicate is clearly baseless. However, this claim suffers from the additional defect that the Complaint fails to state a claim to relief on a hostile work environment theory. Even in view of the Second Circuit's admonition "against setting the bar too high in this context," Plaintiff's Complaint comes nowhere near to alleging the kind of conduct that a reasonable person could find to create a hostile or abusive work environment. Patane, 508 F.3d at 113 (quotation omitted). The actions of Plaintiff's coworkers, as alleged in the Complaint, amount to nothing more than impolite meddling in Plaintiff's personal life, not "'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" Id. (quoting Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)).

Moreover, Plaintiff's factual allegations are insufficient to support the inference that Plaintiff's work environment was hostile or abusive to Plaintiff because of her race. "To prevail [*17] on [a hostile work environment] claim under Title VII, a plaintiff must show not only that the working environment is pervasively hostile or abusive, but also that the conduct creating that atmosphere actually constituted discrimination because of race." Hicks v. Rubin, 6 F. App'x 70, 73 (2d Cir. 2001) (quotation and alterations omitted).

Reading the Complaint liberally, it is clear that the hostile work environment Plaintiff complains of in her Complaint and in her letter to LMC management was the product of her coworkers' alleged involvement in her personal affairs, and their communications with Plaintiff's personal enemies—not race discrimination. Only two of Plaintiff's allegations regarding the hostility of the work environment relate in some way to Plaintiff's race. First, Plaintiff alleges that Lennon declined to work with Plaintiff because Lennon preferred that Plaintiff's fiancé, Kevin Bush, stay with his ex-wife, Dwani Bush, instead of marrying Plaintiff because Lennon prefers Hispanics, and Dwani Bush is Hispanic and Plaintiff is African American. Second, Plaintiff alleges that her co-

workers at LMC occasionally used Spanish phrases, which she contends are evidence of her [*18] co-workers' racial preferences for her fiancé's ex-wife over Plaintiff. (Compl. at 7.) The bulk of Plaintiff's allegations regarding the hostility of her work environment have nothing to do with Plaintiff's race. The Complaint alleges that Plaintiff's acrimonious relationships with two outsiders "infiltrated [her] work relations" and led to the deterioration of her relationships with her fellow co-workers. (See id. at 8.) Assuming for the sake of argument that Plaintiff had actually alleged the existence of an objectively hostile work environment, Plaintiff's allegation that her work environment was hostile or abusive because of her race is simply implausible.

Plaintiff has failed to sufficiently plead a hostile work environment claim. Plaintiff has not pleaded the existence of discriminatory conduct that is objectively severe or pervasive such that a reasonable person could find it to be hostile or abusive. Furthermore, even if Plaintiff had pleaded facts that would be sufficient to permit a reasonable person to conclude that her work environment was objectively hostile or abusive, Plaintiff has failed to plead facts that would be sufficient to permit a plausible inference that her [*19] work environment was hostile because of Plaintiff's race.

**D. Retaliation Claim**

Plaintiff alleges that LMC retaliated against her for complaining about her discriminatory treatment to LMC management by terminating her employment. (Id. at 7.) "Title VII □ provides that 'it shall be an unlawful employment practice for an employer to discriminate against any employee because the employee has opposed any practice made an unlawful employment practice by' Title VII." La Grande v. DeCrescente Distributing Co., Inc., 370 F. App'x 206, 212 (2d Cir. 2010) (quoting 42 U.S.C. § 2000e-3(a)) (alterations omitted). "To state a claim for retaliation in violation of Title VII, a plaintiff must plead facts that would tend to show that: (1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there exists a causal connection between the protected activity and the adverse action." Patane, 508 F.3d at 115. "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as [she] can establish that [she] possessed a good faith, reasonable belief that the underlying [*20] challenged actions of the employer

violated the law." _Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)_ (applying anti-retaliation provision of Americans with Disabilities Act, _42 U.S.C. § 12203(a)_) (quotation omitted); see also _La Grande, 370 F. App'x at 212_. "The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management." _La Grande, 370 F. App'x at 212_.

On March 18, 2008, Plaintiff sent a letter to LMC management with the subject line "Harassment, Discrimination and Retirement / VOID RETALIATION," in which she complained that LMC employees created an "extremely hostile work environment" for her by communicating with individuals with whom Plaintiff had an acrimonious relationship outside of work, and by talking amongst themselves about Plaintiff's engagement to her fiancé, thereby involving themselves in Plaintiff's personal affairs. (See Compl. at 8-9.) Plaintiff separately stated:

> As far as discrimination is concerned, it has affected my getting the position in the Executive Office with Karen Lennon because she seemed by her own expression, very averse to my [*21] decisions, not that that mattered but it made her chose [sic] to not work professionally in dealing with me.

(Id. at 8.) Plaintiff repeatedly claimed that her co-workers' actions were "illegal in the work place." (Id. at 9.)

Plaintiff alleges that she was called into a meeting at 4:30 pm the same day she sent the letter. (Id. at 6.) At that meeting, Fred Jordan ("Jordan"), an LMC human resources employee, asked Plaintiff questions about her complaint letter, informed Plaintiff that her claims would be investigated, and told her to leave for the day. (Id.) Plaintiff alleges that "[t]he next day, March 19th [she] was told that [her] probation was terminated and not to return to work by the Office Manager." (Id.) On March 20, 2008, Jordan called Plaintiff and told her there had been no investigation into her claims but that "he interviewed some people who said they had no idea what [Plaintiff] was speaking about." (Id. at 7.)

Plaintiff alleges that she engaged in a protected activity by filing an informal complaint with management in which she complained of a hostile work environment and discrimination that she believed to be illegal, and that she was terminated as a result of that complaint [*22] letter. Though the court has determined that the

conduct Plaintiff complained of did not violate Title VII, Plaintiff has alleged facts which permit the conclusion that she had a good faith, though erroneous, belief that the conduct she complained of in her complaint letter violated the law. Consequently, Plaintiff's retaliation claim is legally sufficient to survive Defendant's motion to dismiss.

## III. CONCLUSION

Plaintiff has failed to allege a plausible claim to relief on her disparate treatment and hostile work environment claims. Moreover, the factual contentions underlying those claims are clearly baseless. Plaintiff has, however, sufficiently pleaded a claim for retaliation in violation of Title VII. Consequently, Defendant's motion to dismiss is DENIED as to Plaintiff's retaliation claim, and GRANTED as to all other claims.

SO ORDERED.

Dated: Brooklyn, New York

March 9, 2011

/s/ Nicholas Garaufis

NICHOLAS G. GARAUFIS

United States District Judge

---

2018 WL 2103206
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Augusto FERNANDES, Maria Fernandes,
ACF Family Holding Corp., Eteca Holding Inc.
and JCA Venture Holding Corp., Plaintiffs,

v.

David MORAN, Individually, and Frank
Rignola, Individually, Defendants.

2:17-cv-03430 (ADS)(SIL)
|
Signed 05/07/2018

**Attorneys and Law Firms**

The Coalition of Landlords, Homeowners & Merchants, Inc., 28 East Main Street, Babylon, NY 11702, By: Michael Cullen, Esq., Of Counsel, Counsel for the Plaintiffs.

Morris, Duffy, Alonso & Faley, 2 Rector Street, New York, NY 10006, By: Kenneth E. Pitcoff, Esq., Of Counsel, Counsel for the Defendants.

## MEMORANDUM OF DECISION & ORDER

ARTHUR D. SPATT, United States District Judge

**\*1** On June 7, 2017, Augusto Fernandes, Maria Fernandes (together, the "Fernandes's"), ACF Family Holding Corp ("ACF"), Eteca Holding Inc. ("Eteca") and JCA Venture Holding Corp ("JCA") (together, the "Corporate Plaintiffs") (all together, the "Plaintiffs"), commenced this action in this Court by notice of removal against two employees of the Town of Brookhaven, David Moran ("Moran"), and Frank Rignola ("Rignola") (together, the "Defendants") in their individual capacity. The Plaintiffs alleges causes of action under 42 U.S.C. §§ 1983, 1985, as well as state-law claims of breach of contract, tortious interference with contract, fraud in the inducement, abuse of process, *prima facie* tort, breach of the implied covenant of good faith, and violations of Judiciary Law § 487.

Presently before the Court is the Defendants' motion to dismiss, pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 12(b)(6), seeking to dismiss the complaint for failure to state a claim upon which relief may be granted.

For the following reasons, the Defendants' motion to dismiss is granted in its entirety.

## I. BACKGROUND

### A. THE FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the Plaintiffs' relatively short, bare-bones complaint, and for the purposes of the instant motion, they are construed in favor of the Plaintiff.

At all times relevant to this case, Rignola served as a Town Inspector of the Town of Brookhaven and Moran was a Assistant Town Attorney of the Town of Brookhaven.

The Corporate Plaintiffs owned the three properties at issue in this case: 73 Jamaica Avenue, Holtsville, NY, 43 Pinedale Avenue, Farmingville, NY and 66 Abner Drive, Farmingville, NY (the "Properties").

Prior to March of 2016, Inspector Rignola issued a series of Town Code violations as to the Properties. The Complaint does not specify any details as to the identity or nature of the alleged violations. At some further point, also prior to March of 2016, the Town of Brookhaven filed charges against the Corporate Plaintiffs based on the above-mentioned Town Code violations in the Suffolk County Sixth District Court. A judgment of $53,000 in fines was issued against the Corporate Plaintiffs. However, the Town of Brookhaven and the Corporate Plaintiffs entered into a court ordered agreement to sign satisfactions of judgment for the balance of the $53,000 in fines in return for a $6,000 payment with proof of receipt from the Corporate Plaintiffs. The Town of Brookhaven was represented in this negotiation by Moran in his capacity as Assistant Town Attorney.

The Plaintiffs allege that the Corporate Plaintiffs paid the $6,000 fine and signed a contract with a prospective buyer for the property located at 43 Pinedale Avenue, Farmingville, NY. With a judgment lien remaining against the Properties, the Corporate Plaintiffs could not close on the sale.

In March 2016, Larry Davis, an attorney for the Corporate Plaintiffs presented a receipt to the Town of Brookhaven for the payment of the $6,000. According to the complaint, Davis met with Moran and Rignola. The Plaintiffs allege that Moran refused to sign satisfactions of judgment on the Town of Brookhaven's behalf and that Rignola did not advise the town that the fines had been paid and that a satisfaction of judgment should be signed.

*2 The satisfactions of judgment were signed on December 20, 2016; Assistant Town Attorney Deirdre Cicciaro signed it on the Town of Brookhaven's behalf. As a result, the Corporate Plaintiffs were unable to sell the 43 Pinedale Avenue property, or any of the Properties, for a period of ten months.

## B. THE RELEVANT PROCEDURAL HISTORY

On or about January 6, 2017, the Plaintiffs filed the above-mentioned complaint in the Supreme Court of the State of New York, Suffolk County. The Defendants subsequently filed a notice of removal on June 7, 2017 removing the instant case to this Court. In response to a motion to compel, the Plaintiffs filed their complaint on October 6, 2017.

On November 17, 2017, the Defendants moved under Rule 12(b)(6) to dismiss the complaint, contending that the Plaintiffs' allegations, even if taken as true, fail to plausibly state claims upon which relief can be granted. The motion was fully briefed as of January 23, 2018.

## II. DISCUSSION

### A. STANDARD OF REVIEW: FED. R. CIV. P. 12(B)(6)

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiffs. *See, e.g., Trs. of Upstate N. Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016); *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Bold Elec., Inc. v. City of N.Y.*, 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free Sch. Dist.*, 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

Under the *Twombly* standard, the Court may only dismiss a complaint if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed. 2d 929 (2007). The Second Circuit has expounded that, after *Twombly*, the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L.Ed. 2d 868 (2009) ).

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to survive a motion to dismiss. FED. R. CIV. P. 8(a)(2). Under Rule 8, a complaint is not required to allege "detailed factual allegations." *Kendall v. Caliber Home Loans, Inc.*, 198 F. Supp. 3d 168, 170 (E.D.N.Y. 2016) (quoting *Twombly*, 550 U.S. at 555). "In ruling on a motion pursuant to FED. R. CIV. P. 12(b)(6), the duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (quoting *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) ). The Court "[is] not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

## B. CONSIDERATION OF MATERIALS OUTSIDE THE COMPLAINT

*3 The Defendants attach a copy of selected provisions of the Town of Brookhaven Town Code. *See* Declaration of Kenneth E. Pitcoff, Docket Entry ("DE") 12-2. As a preliminary matter, the Court must first address whether these materials may be properly considered by the Court for the purposes of adjudicating this motion.

"[F]ederal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings offered in conjunction with a Rule 12(b)(6) motion." *Giugliano v. F3 [2] Capital Partners, LLC,* No. 14-cv-7240, 2015 WL 5124796 (E.D.N.Y. Sept. 1, 2015) (Spatt, J.) (internal citation and quotation marks omitted); *accord Halebian v. Berv,* 644 F.3d 122, 131 n.7 (2d Cir. 2011) (noting the Second Circuit has recognized "exceptions to Rule 12(b)(6)'s general prohibition against considering materials outside the four corners of the complaint"). In adjudicating this motion, the Court is permitted to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in [the] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Envtl. Servs. v. Recycle Green Servs.,* 7 F. Supp. 3d 260, 270 (E.D.N.Y. 2014) (Spatt, J.) (quoting *In re Merrill Lynch & Co.,* 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd in part and vacated in part on other grounds sub nom. Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25 (2d Cir. 2005), *vacated on other grounds,* 547 U.S. 71, 126 S. Ct. 1503, 164 L.Ed. 2d 179 (2006) ); *accord Healthnow New York, Inc. v. Catholic Health Sys., Inc.,* No. 14-cv-986S, 2015 WL 5673123 (W.D.N.Y. Sept. 25,

2015); *Oberstein v. SunPower Corp.,* No. 07-cv-1155, 2010 WL 1705868, at *3 (E.D.N.Y. April 28, 2010).

Pursuant to FED R.EVID. 201(b)(2), "the court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The Town of Brookhaven's Town Code falls squarely in the purview of FED. R. EVID. 201(b)(2) and as such, may be properly considered by the Court on a motion to dismiss. *See, e.g., Manakos v. Town of Huntington,* No. 16-CV-5775, 2017 WL 2861719, at *8 (E.D.N.Y. July 5, 2017) (taking judicial notice of Huntington Town Code), *aff'd,* 715 Fed.Appx. 77 (2d Cir. 2018); *Norton v. Town of Islip,* 97 F. Supp. 3d 241, 253 (E.D.N.Y. 2015) (taking judicial notice of Islip Town Code) *aff'd,* 678 Fed.Appx. 17 (2d Cir. 2017);*Missere v. Gross,* 826 F. Supp. 2d 542, 553 (S.D.N.Y. 2011) (taking judicial notice of Cornwall-on-Hudson zoning code); *Casciani v. Nesbitt,* 659 F. Supp. 2d 427, 451 n.11 (W.D.N.Y. 2009) (taking judicial notice of Webster Town Code), *aff'd,* 392 Fed.Appx. 887 (2d Cir. 2010); *Nelson v. City of Rochester,* 492 F. Supp. 2d 282, 284 n.1 (W.D.N.Y. 2007) (taking judicial notice of the City of Rochester's Municipal Code). The Court therefore takes judicial notice of the relevant portions of the Town of Brookhaven's Town Code and will consider the relevant parts of it for the purposes of adjudicating this motion.

## C. PROSECUTORIAL IMMUNITY

*4 The Defendants argue that Moran and Rignola are entitled to prosecutorial immunity because the Plaintiffs seek to hold them personally liable for actions taken in prosecuting the underlying state action. The Plaintiffs contend that the Defendants were not acting in their roles as advocates but in their capacity as administrators. The Court finds that Moran is entitled to prosecutorial immunity with respect to the § 1983 claim.

In the Second Circuit, "[s]tate prosecutors are entitled to absolute immunity for [ ] conduct 'intimately associated with the judicial phase of the criminal process.' " *Hill v. City of N.Y.,* 45 F.3d 653, 660-61 (2d Cir. 1995) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S. Ct. 984, 47 L.Ed. 2d 128 (1976) ); *see also Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir. 2010).

To determine whether a government official is immune from suit, "the courts are to apply a 'functional approach,'

2018 WL 2103206

examining 'the nature of the function performed, not the identity of the actor or who performed it.' " *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S. Ct. 2606, 125 L.Ed. 2d 209 (1993) ). A government employee that is responsible for the filing of a criminal complaint is entitled to absolute immunity, *see Imbler*, 424 U.S. at 431, while the investigative functions typically performed by police officers or other law enforcement officers are not protected. *See, e.g., Kalina v. Fletcher*, 522 U.S. 118, 129-30, 118 S. Ct. 502, 139 L.Ed. 2d 471 (1997); *Burns v. Reed*, 500 U.S. 478, 493, 111 S. Ct. 1934, 114 L.Ed. 2d 547 (1991).

Prosecutorial immunity also applies to non-prosecutor government officials "when they are performing 'functions analogous to those of a prosecutor.' " *Cornejo*, 592 F.3d at 127 (quoting *Butz v. Economou*, 438 U.S. 478, 515, 98 S. Ct. 2894, 57 L.Ed. 2d 895 (1978) ). State and federal government officials who initiated noncriminal proceedings are also entitled to prosecutorial immunity. *Cornejo*, 592 F.3d at 127-28 (citing *Barrett v. United States*, 798 F.2d 565, 572 (2d Cir. 1986) ). In *Barrett*, the Second Circuit explained the factors that counseled in favor of granting prosecutorial immunity to such officials, including "[t]he controversial nature of the proceeding, the risk that a losing civil defendant will seek to retaliate by a suit attacking the propriety of the government attorney's conduct, and the existence of alternative safeguard against the attorney's misconduct (e.g., professional disciplinary proceedings, discovery and cross-examination)[.]" *Barrett*, 798 F.2d at 572. State and local attorneys who initiate civil proceedings on behalf of the government are thus entitled to prosecutorial immunity. *See, e.g., Roache v. Att'y Gen.'s Office*, No. 12-CV-1034, 2013 WL 5503151, at *13-14 (N.D.N.Y. Sept. 30, 2013).

Moran, an Assistant Town Attorney, represented the town in the negotiations with the Corporate Plaintiffs which resulted in a court ordered settlement agreement. The Plaintiffs seek to hold him responsible for allegedly delaying the enforcement of the settlement agreement by refusing to sign the satisfaction of judgment. This is analogous to *Pinaud*, where the Second Circuit ruled that prosecutors violated a plaintiff's constitutional rights by improperly seeking to increase bail; making false representations to induce the plaintiff into entering into a plea agreement; breaching the plea agreement;

manufacturing a charge; misrepresenting facts to the Bureau of Prisons; and unnecessarily transferring the plaintiff between jails. *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1149 (2d Cir. 1995). While the Court notes that the prosecutors in *Pinaud* were accused of conduct that was significantly more devious and harmful than in the instant case, the Second Circuit made it clear that actions or representations that breach a plea agreement are protected by prosecutorial immunity. *See, id.*

**\*5** Although the conduct-at-issue involves the alleged violation of a civil settlement agreement rather than a criminal plea agreement, the former conduct is as protected as the latter. The Court's primary consideration in determining the application of absolute immunity is whether the conduct is prosecutorial in nature, regardless of how "unethical, deviant, and violative of the [P]laintiffs' constitutional rights" the conduct may be. *Doe*, 81 F.3d at 1213. As long as the alleged acts were "components of the initiation and presentation of a prosecution," immunity applies. *Pinaud*, 52 F.3d at 1149. Moran's alleged violation of the court ordered settlement agreement is protected by prosecutorial immunity.

Rignola, on the other hand, is not entitled to prosecutorial immunity at this stage of the litigation. The Plaintiffs contend that Rignola "alleged" a series of Town Code violations, which resulted in charges filed by the Town of Brookhaven in the Suffolk County Sixth District Court. These charges ultimately culminated into the $6,000 court-ordered settlement. While the Plaintiffs plead that Rignola "alleged" the violations that led to the charges being filed, the complaint is vague as to who filed the charges on behalf of the Town of Brookhaven. While it would be reasonable to infer that Rignola was involved in the filing of the charges based on the same purported Town Code violations, it is unclear from the face of the complaint. At this point, the Court is unable to determine whether Rignola's role was merely investigative or also prosecutorial. Therefore, the Court declines to dismiss the claims against Rignola at this stage of the litigation based on prosecutorial immunity.

Accordingly, to the extent that the Defendants seek to dismiss the § 1983 claim against the Defendants on the grounds of prosecutorial immunity, the motion is granted with respect to Moran and denied with respect to Rignola.

## D. PERSONAL LIABILITY UNDER § 1983

Fernandes v. Moran, Slip Copy (2018)

2018 WL 2103206

The Defendants seek the dismissal of the Plaintiffs' § 1983 claim with respect to Rignola, due to his purported lack of personal involvement in the deprivation of the Plaintiffs' constitutional rights. The Plaintiffs contend that Rignola was personally involved, citing the Second Circuit's *Colon* factors. The Court finds that the Plaintiffs failed to allege Rignola's personal involvement.

To establish personal liability under § 1983, a plaintiff "must show by a preponderance of the evidence that the defendant was personally involved—that is, he directly participated—in the alleged constitutional deprivations." *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005); *Harris v. Westchester Cty. Dep't of Corr.*, No. 06 Civ. 2011, 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008) (holding that to find one personally liable under § 1983, a defendant must be "personally or directly involved in the violation, that is, that there was 'personal participation by one who ha[d] knowledge of the facts that rendered the conduct illegal.' " (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) ) ).

The Second Circuit defines direct participation as "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Gronowski*, 424 F.3d at 302 (quoting *Provost*, 262 F.3d at 155). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ); *see also Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995) (finding that there is "no *respondeat superior* liability in § 1983 cases").

*6 Personal involvement may be demonstrated using evidence that the defendant: (1) directly participated in the purported violation; (2) failed to remedy the violation after learning about it; (3) created a policy or custom under which the violation occurred; (4) was grossly negligence in supervising the subordinates who caused the condition or event; or (5) exhibited deliberate indifference by failing to act on information that indicated that the violation was happening. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In this case, the Plaintiffs have failed to allege that Rignola, a Town Inspector for the Town of Brookhaven, was "personally involved in the alleged

constitutional deprivation." The Plaintiffs contend that Rignola "alleged" several town code violations and those violations led to charges filed against the Corporate Plaintiffs by the Town of Brookhaven. Rignola also refused to advise the Town of Brookhaven that "the fines had been paid and that a satisfaction of judgment should be signed." This purportedly violated the "public trust inherent in [his] position." Nothing in the complaint indicates that Rignola was involved in the negotiation or signing of the court ordered agreement.

Rignola's involvement is limited to what amounts to refusing to sign a satisfaction of judgment and advising the town. However, the section of the Town Code that defines the duties and responsibilities of a Town Investigator is noticeably silent regarding satisfactions of judgment in any capacity. There is nothing in the Town Code that permits a Town Inspector to sign a satisfaction of judgment or advise the town that one should be signed by the appropriate parties.

Moreover, the vague allegation that Rignola "alleged" the Town Code violations that formed the basis of the charges that the Town of Brookhaven commenced against the Corporate Plaintiffs cannot constitute "personal involvement" for the purposes of § 1983. The Plaintiffs do not allege that their constitutional rights were violated by Rignola's allegations or the initiation of the complaint in the Suffolk County Sixth District Court. The Plaintiffs § 1983 claim is limited to a Fifth Amendment claim, a First Amendment claim, and an Eighth Amendment claim by "refusing to sign the satisfactions of judgment and refusing to advise the Town to sign the satisfaction of judgment." Compl. ¶ 42. As Town Inspector, Rignola was not authorized to sign satisfactions of judgment on behalf of the Town of Brookhaven.

Accordingly, to the extent that the Defendants seek to dismiss the § 1983 claims against the Rignola on the grounds of lack of personal involvement, the motion is granted.

## E. AS TO THE MERITS OF THE § 1983 CLAIMS

### 1. First Amendment Retaliation Claim
The Defendants contend that the Plaintiffs fails to establish a First Amendment retaliation claim against the Defendants. The Plaintiffs allege that the Defendants retaliated against them for "speaking out against

them over many years because of their constitutional violations." Compl. ¶ 43.

In order to allege a First Amendment retaliation claim under § 1983, a plaintiff must make a *prima facie* case of "retaliation." This is established by alleging that the state's action was "made *in retaliation* for his exercise of the constitutional right of free speech." *Greenwich Citizens Comm., Inc. v. Ctys. of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26, 32 (2d Cir. 1996) (emphasis in original) (citing *Perry v. Sindermann*, 408 U.S. 593, 598, 92 S. Ct. 2694, 33 L.Ed. 2d 570 (1972) ). A claim made by a private citizen, as opposed to a public one, must allege that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' action effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *see also Posr v. Court Officer Shield #207*, 180 F.3d 409, 418 (2d Cir. 1999); *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 692 (S.D.N.Y. 2004).

*7  "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L.Ed. 2d 1 (2002); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (same); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) ("a bald and uncorroborated allegation of retaliation might prove inadequate to withstand a motion to dismiss").

Here, the complaint purports to allege that the Defendants retaliated against the Plaintiffs due to Augusto Fernandes's decision to "speak[ ] out against [the Defendants] over many years because of their constitutional violations." Compl. ¶ 43. The Plaintiffs fail to allege anything more than conclusory allegations that the Defendants retaliated against them for speaking out "over many years." There are no details regarding any purported "constitutional violations" that took place over the years that would cause Augusto Fernandes to speak out nor is there any information about the speech itself. The Plaintiffs fail to sufficiently allege that the protected speech motivated the adverse conduct or that there was a chilling effect on the Plaintiffs' exercise of free speech. Therefore, even in the light most favorable

to the Plaintiffs and drawing all inferences in their favor, the First Amendment retaliation claims are merely conclusory.

The Plaintiffs separately fail to allege that there was a chilling effect on the exercise of free speech. One of the elements of a § 1983 claim, including a claim of First Amendment retaliation is that "some official action has caused the plaintiff to be deprived of his or her constitutional rights–in other words, there is an injury requirement to state the claim." *Williams v. Town of Greenburgh*, 535 F.3d 71, 78 (2d Cir. 2008) (quoting *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) ). "[P]laintiffs who allege a violation of their right to free speech must prove that official conduct actually deprived them of that right." *Williams*, 535 F.3d at 78 (citing *Colombo*, 310 F.3d at 117). "Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley*, 268 F.3d at 73.

A failure to allege that a plaintiff's First Amendment rights were "actually chilled," is fatal to his First Amendment retaliation claim. *Balaber-Strauss v. Town Vill. of Harrison*, 405 F. Supp. 2d 427, 433 (S.D.N.Y. 2005); *see also Laird v. Tatum*, 408 U.S. 1, 13-14, 92 S. Ct. 2318, 33 L.Ed. 2d 154 (1972); *Jones v. Maples*, No. 98 Civ. 7132, 2002 WL 287752, at *8 (S.D.N.Y. Feb. 26, 2002) ("a complaint which alleges only conclusory and speculative chilling of First Amendment rights should be dismissed." (citing *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) ) ).

In the instant case, the complaint is devoid of any allegations that this Court can construe as a chilling effect on the Plaintiffs' speech. The Plaintiffs allege that Augusto Fernandes spoke out against the Defendants, but never allege that Mr. Fernandes ceased to do so at any point. The allegation that the Defendants took action to retaliate against Mr. Fernandes for his speech still leaves an open question: did it work? Nowhere in the complaint does it allege that Mr. Fernandes stopped speaking out against the Defendants. Simply asserting, in a conclusory fashion, that the Defendants *intended* to chill the Plaintiffs' speech is insufficient. Without allegations "of even one example of a situation in which [Mr. Fernandes] desired to exercise [his] First Amendment rights but was chilled by defendants' alleged actions ... [the Plaintiffs'] First Amendment retaliation claim must

be dismissed." *Mangano v. Cambariere*, No. 04 Civ. 4980, 2007 WL 2846418, at *2 (S.D.N.Y. Sept. 27, 2007).

**\*8** The Plaintiffs' briefing papers shed no additional light on the matter. *See* DE 15 at 4-5. On the contrary, the Plaintiffs' claim in their memorandum of law that to state a claim, "a plaintiff must allege that the defendant engaged in actions that were designed to chill his or her First Amendment rights." *Id.* at 4 (internal citations omitted). While that may be true, it is an incomplete recitation of the proper First Amendment retaliation standard, as accurately outlined above. The Plaintiffs' failure to address this element of the claim in their complaint or briefing papers is fatal to their claim. *See, e.g., Kuck v. Danhar*, 600 F.3d 159, 168 (2d Cir. 2010) (upholding dismissal of First Amendment retaliation claim where "nothing in the complaint suggests that [plaintiff's] speech was 'actually chilled' "); *Rosendale v. Brusie*, No. 07-CV-8149, 2009 WL 778418, at *11 (S.D.N.Y. Mar. 25, 2009) ("Because the Complaint shows that Plaintiff continued to exercise his First Amendment rights despite Defendants' alleged retaliatory conduct, Plaintiff fails to allege actual chilling of his speech."), *aff'd*, 374 Fed.Appx. 195 (2d Cir. 2010); *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3978208, at *22 (E.D.N.Y. Aug. 21, 2008) ("[The plaintiff] does not refer to any evidence that his speech was actually chilled. ... [T]he Court has determined that [the plaintiff's] First Amendment claim fails as a matter of law[.]"); *Ford v. Reynolds*, 326 F. Supp. 2d 392, 403 (E.D.N.Y. 2004) ("Because Plaintiffs have failed to allege any actual chill or deterrence, this Court must conclude that [the plaintiffs] did not suffer the harm necessary to support their retaliation claim.").

Accordingly, the Plaintiffs' First Amendment retaliation claim is dismissed.

## 2. Takings Claim

The Takings Clause of the Fifth Amendment states that no "private property [shall] be taken for public use, without just compensation." U.S. CONST. amend. V. The Fifth Amendment is applicable to the states through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc., v. Beckwith*, 449 U.S. 155, 160, 101 S. Ct. 446, 66 L.Ed. 2d 358 (1980). It is "designed to bar [the] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 123-24, 98 S. Ct. 2646, 57 L.Ed. 2d 631 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 4 L.Ed. 2d 1554 (1960) ).

"To state a takings claim under section 1983, a plaintiff must show (1) a property interest; (2) that has been taken under the color of state law; (3) without just compensation." *Econ. Opportunity Comm'n of Nassau Cty. v. Cty. of Nassau, Inc.*, 47 F. Supp. 2d 353, 368 (E.D.N.Y. 1999) (Spatt, J.) (citing *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 452 (S.D.N.Y. 1998) ); *HBP Assocs. v. Marsh*, 893 F. Supp. 271, 277 (S.D.N.Y. 1995) (same). "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194, 105 S. Ct. 3108, 87 L.Ed. 2d 126 (1985).

The Fifth Amendment protects against two types of takings: physical and regulatory. *See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324-25, 122 S. Ct. 1465, 152 L.Ed. 2d 517 (2002); *Meriden Trust & Safe Deposit Co. v. FDIC*, 62 F.3d 449, 454 (2d Cir. 1995). A physical taking occurs when the government takes physical possession of a property interest. *See Tahoe–Sierra Pres. Council, Inc.*, 535 U.S. at 324-25. A regulatory taking arises when "state regulation goes too far and in essence 'effects a taking.' " *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006) (quoting *Meriden Trust & Safe Deposit Co.*, 62 F.3d at 454). The Plaintiffs have not specified the type of taking they are alleging in the complaint.

If a taking occurred, which the Court will assume for the purposes of this motion, it could only be characterized as a regulatory one, as the allegations "do[ ] not present the 'classic taking' in which the government directly appropriates private property for its own use." *See Buffalo Teachers Fed'n*, 464 F.3d at 365 (quoting *Eastern Enters. v. Apfel*, 524 U.S. 498, 522, 118 S. Ct. 2131, 141 L.Ed. 2d 451 (1998) ). In determining whether a state's action constitutes a regulatory taking, courts consider three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Id.* at 375 (internal citations omitted); *accord Cablevision Sys. Corp. v. F.C.C.*, 570 F.3d 83, 98-99 (2d Cir. 2009).

**\*9** The Court construes the complaint as an allegation of a regulatory taking by, in essence, denying the Plaintiffs the ability to sell the Properties, thereby leaving the property "economically idle." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S. Ct. 2886, 120 L.Ed. 2d 798 (1992); *see also Sadowsky v. New York*, 732 F.2d 312, 317 (2d Cir. 1984) ("it is clear that prohibition of the most profitable or beneficial use of a property will not necessitate a finding that a taking that occurred").

In order to successfully allege a Takings claim, "the plaintiffs must allege that they exhausted state procedures for obtaining just compensation." *Econ. Opportunity Comm'n of Nassau Cty.*, 47 F. Supp. 2d at 368 (quoting *Williamson Cty.*, 473 U.S. at 195). This is an issue of ripeness, a jurisdictional inquiry that prevents the Court from prematurely adjudicating untimely disagreements. *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08, 123 S. Ct. 2026, 2030, 155 L.Ed. 2d 1017 (2003) ("Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " (quoting *Abbot Labs v. Gardner*, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 18 L.Ed. 2d 681 (1967) ) ); *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 110 (2d Cir. 2009); *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 247 (2d Cir. 2005); *New York Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 326 (2d Cir. 2003); *Kittay v. Giuliani*, 112 F. Supp. 2d 342, 348 (S.D.N.Y. 2000) (holding that under Article III, in order for claims to be justiciable, "courts have long recognized that the controversy, as an initial matter, must be ripe" (citing *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999) ) ), *aff'd*, 252 F.3d 645 (2d Cir. 2001). It is a "constitutional prerequisite to the exercise of jurisdiction" by this Court. *Nutritional Health All. v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998). The Court "must presume that [it] cannot entertain [a plaintiff's] claims 'unless the contrary appears affirmatively from the record.' " *Murphy*, 402 F.3d at 347 (quoting *Renne v. Geary*, 501 U.S. 312, 316, 111 S. Ct. 2331, 115 L.Ed. 2d 288 (1991) ).

The Supreme Court ruled in *Williamson County* that where "a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Williamson Cty.*, 473 U.S. at 195; *see also Horne v. Dep't of Agric.*, 569 U.S. 513, 525-26, 133 S. Ct. 2053, 186 L.Ed. 2d 69 (2013) ("[A] Fifth Amendment claim is premature until it is clear that the Government has both taken property *and* denied just compensation.") (emphasis in original). The *Williamson County* Court laid out a two-part ripeness test where the plaintiff must "show that (1) the state regulatory entity has rendered a 'final decision' on the matter, and (2) the plaintiff has sought just compensation by means of an available state procedure." *Kurtz v. Verizon New York, Inc.*, 758 F.3d 506, 511-12 (2d Cir. 2014) (quoting *Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) ). This test applies to both physical and regulatory takings. *See Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 380 (2d Cir. 1995) ("*Williamson* [*County*] drew no distinction between physical and regulatory takings, and the rationale of that case ... demonstrates that any such distinction would be unjustified.").

**\*10** The Plaintiffs needed to "first seek compensation from the state if the state has a reasonable, certain and adequate provision for obtaining compensation." *Econ. Opportunity Comm'n of Nassau Cty.*, 47 F. Supp. 2d at 368. New York State has numerous remedies for just compensation claims which satisfy all the necessary constitutional requirements. *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 881 (2d Cir. 1996) (stating that Article 78 proceedings satisfy constitutional requirements); *Frooks*, 997 F. Supp. at 452 (noting that N.Y. E.D.P.L. is a satisfactory remedy under the constitution).

If a complaint fails to allege that compensation was denied after following the appropriate state procedures, such a claim cannot withstand a motion to dismiss. *New Holland Vill. Condo. v. DeStaso Enters. Ltd.*, 139 F. Supp. 2d 499, 504 (S.D.N.Y. 2001) ("[T]o withstand a motion to dismiss, an aggrieved plaintiff must allege, not only a taking, but that compensation was sought via state procedures and was denied." (citing *Williamson Cty.*, 471 U.S. at 195) ), *aff'd sub nom.*, *New Holland Vill. v. Destaso Enters. Ltd.*, 29 Fed.Appx. 760 (2d Cir. 2002). "Courts within the Second Circuit have uniformly dismissed Fifth Amendment takings claims at the pleadings stage when plaintiffs fail to sufficiently allege that they have availed themselves of such state procedures." *Viteritti v. Inc. Vill.*

*of Bayville*, 831 F. Supp. 2d 583, 591 (E.D.N.Y. 2011) (citing *Vandor, Inc. v. Militello*, 301 F.3d 37, 38-39 (2d Cir. 2002) ).

In this action, the Plaintiffs have not alleged exhaustion of the available New York State remedies that may have provided just compensation. In fact, the Plaintiffs have failed to plead that *any* efforts were made to obtain compensation by any potential New York State remedy. As such, the Plaintiffs failed to follow the proper procedures to obtain just compensation for the alleged taking.

Accordingly, the Plaintiffs' Takings claim is dismissed.

### 3. Remaining Federal Claims

The Plaintiffs' complaint contains sparse references to two remaining federal claims: (1) an Eighth Amendment Cruel & Unusual Punishment claim under § 1983; and (2) a § 1985 claim. Neither claim is addressed in the parties' briefs. As set forth below, both can be disposed of precipitously.

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. "[T]he Cruel and Unusual Punishments Clause circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes ...; second, it proscribes punishment grossly disproportionate to the severity of the crime ...; and third, it imposes substantive limits on what can be made criminal and punished as such.... We have recognized the last limitation as one to be applied sparingly. 'The primary purpose of the Cruel and Unusual Punishments Clause has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes[.]" *Ingraham v. Wright*, 430 U.S. 651, 667, 97 S. Ct. 1401, 51 L.Ed. 2d 711 (1977) (quoting *Powell v. Texas*, 392 U.S. 514, 531-32, 88 S. Ct. 2145, 20 L.Ed. 2d 1254 (1968) ). In order for the cruel and unusual punishments clause to be pertinent, the state must have previously made a formal adjudication of a plaintiff's guilt. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.17, 99 S. Ct. 1861, 60 L.Ed. 2d 447 (1979).

**\*11** The complaint has failed to allege that there has been a formal adjudication of guilt as to any of the Plaintiffs and what actions occurred at any point that

constitute cruel and unusual punishment. Consequently, the Plaintiffs' Eighth Amendment cruel and unusual punishment claim is dismissed.

The final federal cause of action referred to in the complaint is 42 U.S.C. § 1985. "In order to establish a cause of action under 42 U.S.C. § 1985, a plaintiff must show that a defendant conspired with another person to deprive the plaintiff, or a class of which plaintiff was a member, of equal protection of the laws or of equal privileges and immunities under the law." *Koch v. Mizra*, 869 F. Supp. 1031, 1038 (W.D.N.Y. 1994) (citing *Sorlucco v. New York City Police Dep't*, 888 F.2d 4, 8 (2d Cir. 1989) ). In order to survive a motion to dismiss, a complaint must allege that the conspiring defendants "sought, with discriminatory intent, to deprive the plaintiff of a right covered by the Constitution or other laws." *Id.* (citing *Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990) ).

In the case at bar, the Plaintiffs' vague references to § 1985 are limited to conclusory allegations of a conspiracy. *See* DE 10. This bare bones pleading fails to allege the requisite discriminatory intent. The complaint's allegation that "Defendants Mr. Moran and Mr. Rignola took their actions and inaction with the malicious intention to cause deprivations of constitutional rights and other injury to the plaintiffs[,]" DE 10 ¶ 48, is "couched in terms of conclusory allegations and fail[s] to demonstrate 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action' as required by § 1985[.]" *Temple of the Lost Sheep, Inc. v. Abrams*, 930 F.2d 178, 185 (2d Cir. 1991) (quoting *New York Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1358 (2d Cir. 1989) ).

As such, the Plaintiffs' § 1985 claim is dismissed.

### F. AS TO THE STATE LAW CLAIMS

In *United Mine Workers v. Gibbs*, the Supreme Court noted that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L.Ed. 2d 218 (1966). As this Court has determined that the Plaintiffs have failed to state a claim for their federal claims, the Court declines to exercise supplemental jurisdiction over the Plaintiffs' state law claims. See 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a

claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ..."); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994); *Castellano v. Bd. of Trs. of Police Officers' Variable Supplements Fund*, 937 F.2d 752, 758 (2d Cir. 1991).

### III. CONCLUSION

For the foregoing reasons, the Court dismisses the Plaintiffs' §§ 1983 and 1985 claims with prejudice, pursuant to Rule 12(b)(6). Accordingly, the state law claims are dismissed without prejudice. The Clerk of the Court is respectfully directed to close the case.

It is **SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 2103206

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

🏴 KeyCite Blue Flag – Appeal Notification
Appeal Filed by KHOLOST v. UNITED STATES DEPARTMENT
OF HO. 2nd Cir., August 13, 2018

2018 WL 3539814
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Eteri KHOLOST; Leonid Leontiev, Plaintiff,

v.

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, MULTIFAMILY
NORTHEAST REGION; RealPage, Inc., Defendants.

16-CV-6651 (AMD)(LB)
|
Signed 07/23/2018

**Attorneys and Law Firms**

Eteri Kholost, Brooklyn, NY, pro se.

Leonid Leontiev, Brooklyn, NY, pro se.

Edward K. Newman, United States Attorneys Office, Brooklyn, NY, Amanda Lyn Genovese, Troutman Sanders LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

ANN M. DONNELLY, United States District Judge

*1 The *pro se* plaintiffs bring this action pursuant to 42 U.S.C. § 1983 *in forma pauperis.* They allege that the United States Department of Housing and Urban Development ("HUD") and RealPage, Inc. ("RealPage") improperly rejected them for tenancy in Bensonhurst Housing for the Elderly HDFC, Inc. ("Bensonhurst Housing") in violation of their "right to Federally Subsidized Housing Program," the Fair Credit Reporting Act, and the Freedom of Information Act. HUD moves to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that (1) HUD has not waived sovereign immunity, and (2) the plaintiffs do not allege tortious conduct by a federal employee. RealPage moves to dismiss pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6) on the grounds that (1) RealPage is not subject to suit under either § 1983 or FOIA, and (2) the plaintiffs failed to allege sufficient

facts to state a claim under the FCRA. For the reasons discussed below, the defendants' motions are granted.

## BACKGROUND

In January 2009, the plaintiffs, Eteri Kholost and Leonid Leontiev, applied for an apartment at Bensonhurst Housing for the Elderly—a 71-unit rental building for low-income elderly—which receives funding from HUD under Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q (2012). (ECF No. 1 at 8; ECF No. 19-2.) On January 9, 2009, Bensonhurst Housing placed the plaintiffs on a waitlist. (ECF No. 1 at 8.) On April 5, 2016, the plaintiffs were interviewed at Bensonhurst Housing for an available apartment. (*See id.* at 11.)

On April 13, 2016, Danessa Gaston, a manager at Bensonhurst Housing, informed Kholost by letter that her application was rejected because she had failed a screening. (*Id.* at 12.) Gaston explained that "[w]hen we ran your credit report the credit bureau was unable to verify your social security number due to a fraud alert." (*Id.*) On the same day, Kholost and Leontiev received separate letters from Bensonhurst Housing informing them that their applications were denied due to a "Fraud alert." (*Id.* at 13, 14.) The company's "decision was based in whole or in part" on consumer reports from TransUnion and RealPage. (*Id.*) The letters advised that "Fraud Alert" could mean either that the plaintiffs had placed a fraud alert on their own credit files or that "there was some discrepancy in the information [the plaintiffs] provided at the time of application." (*Id.*)

The plaintiffs attempted to resolve the issue by submitting additional credit reports to Gaston by mail and in person. (*Id.* at 5, 35.) On May 3, 2016, the plaintiffs visited Gaston at her office. (*Id.* at 5.) According to the plaintiffs, Gaston "refused to hear us and when we politely insisted, she called the police. Two policemen came and could not understand why they were called." (*Id.*)

On June 28, 2016, the plaintiffs delivered a "complaint and all materials" to HUD. (*Id.*) On October 27, 2016, HUD responded by letter, informing the plaintiffs that Bensonhurst Housing had determined that it could not allow the plaintiffs into the housing facility because of Leontiev's threatening behavior during the May 3rd visit; according to the letter, "Ms. Gaston reported that law

enforcement was called after Mr. Leontiev's behavior became threatening," which "was confirmed by several witnesses." (*Id.* at 39.) Accordingly, Bensonhurst Housing would be "sending [the plaintiffs] a formal rejection letter." (*Id.*)

**\*2** On November 30, 2016, the plaintiffs filed a complaint against HUD and RealPage, pursuant to 42 U.S.C. § 1983, alleging violations of their "right to Federally Subsidized Housing Program," the Fair Credit Reporting Act, and the Freedom of Information Act. (*Id.* at 4.) The plaintiffs seek the following relief: (1) an apartment in Bensonhurst Housing, (2) the "violators to be punished," (3) and "relief which the Federal Court finds to be just and proper" since they "are in difficulty to estimate all losses of [their] budget ... caused ... by both defendants." (*Id.* at 6.)

On March 13, 2017, RealPage filed a motion to dismiss the complaint, pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim. (ECF No. 16.) The plaintiffs responded on April 4, 2017, (ECF No. 17), and RealPage replied on April 26, 2017, (ECF No. 20). On April 24, 2017, HUD filed a motion to dismiss pursuant to Rules 12(b)(1) and (6). (ECF No. 19.) The plaintiffs responded on May 3, 2017. (ECF No. 23.) On May 31, 2017, the plaintiffs filed a motion to amend their complaint, seeking to add a defendant. (ECF No. 25.) The Court denied the plaintiffs' motion pending the completion of a HUD investigation. On January 25, 2018, the plaintiffs filed a second motion to amend their complaint, again seeking to add a defendant. (ECF No. 26.) On April 18, 2018, the Court denied the plaintiffs' motion on the merits. (ECF No. 30.) By letter on May 17, 2018, the plaintiffs submitted a further "analysis" of HUD's motion to dismiss. (ECF No. 31.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 1915(e)(2)(B), a district court must dismiss an *in forma pauperis* action if it is satisfied that the action is "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."[1] At the pleadings stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 123 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S.

662 (2009) ). A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). *Pro se* complaints are held to less stringent standards than pleadings drafted by attorneys, and the Court is required to read the plaintiffs' *pro se* complaint liberally and interpret it to raise the strongest arguments it suggests. *Erickson v. Pardus*, 551 U.S. 89 (2007); *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 191-93 (2d Cir. 2008).

| 1 | On November 30, 2016, the plaintiffs filed applications to proceed *in forma pauperis*. (ECF Nos. 2 and 3). By Order dated December 9, 2016, the plaintiffs' applications were denied and they were directed to pay the required $400 filing fee. (ECF No. 5). The plaintiffs paid the filing fee on December 12, 2016. (ECF No. 7). On December 15, 2016, the plaintiffs filed letter motions seeking reconsideration of the Court's December 9, 2016 Order. (ECF Nos. 9 and 10). By Order dated February 16, 2017, the Court granted the plaintiffs' motions for reconsideration, and allowed them to proceed *in forma pauperis*. The Court also directed the Clerk of Court to return the plaintiffs' $400 filing fee. Thus, the plaintiffs are proceeding *in forma pauperis*. |

## DISCUSSION

### I. HUD

*A. Sovereign Immunity*

HUD argues that the plaintiffs' action is barred by the doctrine of sovereign immunity. I agree. HUD has not expressly waived sovereign immunity for its funding activities under 12 U.S.C. § 1701q.

**\*3** Suits against the United States and federal agencies require "a cause of action, subject matter jurisdiction, and a waiver of sovereign immunity." *Presidential Gardens Assoc. v. Sec'y of Hous. and Urban Dev.*, 175 F.3d 132, 139 (2d Cir. 1999) (citing *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ); *see also C.H. Sanders Co. v. BHAP Housing Dev. Fund Co.*, 903 F.2d 114, 117 (2d Cir. 1990) ("[A]n action against the sovereign is properly before the district court only if there [is] both a grant of subject matter jurisdiction and a valid waiver of sovereign immunity." (citations omitted) ). As a federal agency, HUD is immune from suit unless it unequivocally and

expressly waived immunity. *See Lane v. Pena*, 518 U.S. 187, 192 (1996).

HUD's funding of Bensonhurst Housing is pursuant to 12 U.S.C. § 1701q. HUD is immune from suit for its funding pursuant to Section 1701q because it has not expressly waived sovereign immunity. *See United Americans, Inc. v. N.B.C–U.S.A. Housing, Inc. Twenty Seven*, 400 F. Supp. 2d 59, 62 (D.D. C 2005) (Section 1702 does not waive sovereign immunity for claims under Section 1701q); *cf. Almeida v. U.S. Dep't of Hous. & Urban Dev.*, No. 08-CV-4582, 2009 WL 873125, at *3 (S.D.N.Y. Feb. 11, 2009) (Section 1702 does not waive sovereign immunity for claims under Section 1701z-11).

### B. 42 U.S.C § 1983 and Federal Tort Claims Act

HUD cannot be sued under § 1983 because it is a federal agency. *See Dotson v. Griesa*, 398 F.3d 158, 162 (2d Cir. 2005). Section 1983 applies only to individuals acting under the color of state law. *See* 42 U.S.C. § 1983. However, the Court liberally construes the plaintiffs' § 1983 claims against HUD as claims under the Federal Tort Claims Act. *See White v. Monarch Pharm., Inc.*, 346 Fed.Appx. 739, 741 (2d Cir. 2009).

The plaintiffs' FTCA claim fails because the plaintiffs have not exhausted their administrative remedies. To bring an FTCA claim, claimants must exhaust their administrative remedies by executing a Standard Form 95 or notifying HUD in writing of the incident, "accompanied by a claim for monetary damages in a certain sum." 28 C.F.R. § 14.2(a). The plaintiffs did write to HUD about Bensonhurst Housing's denial of their leasing application, but the plaintiffs did not include a claim for monetary damages. Accordingly, the plaintiffs have failed to exhaust their administrative remedies.

The plaintiffs' FTCA claim also fails because they have not alleged any tortious actions by a federal employee. The plaintiffs allege that Gaston improperly rejected their leasing application, but Gaston is employed by Bensonhurst Housing, a private company, not by HUD. Therefore, the plaintiffs fail to state a claim against HUD for Gaston's actions under the FTCA.[2] *See* 28 U.S.C. § 2762 (FTCA claims are "for money damages against the United States for injury ... caused by the negligent or wrongful act or omission of any employee of the agency while activing within the scope of his office

or employment"). The complaint's reference to HUD's conduct is to the October 29, 2016 letter that HUD sent to the plaintiffs, which the plaintiffs allege was a "trick of HUD's officials and that had nothing to do with the sense of our claim." This vague and conclusory allegation fails to state a claim under the FTCA.

[2]     Moreover, HUD is not responsible for the selection of tenants. According to HUD regulations, all management functions, including the selection of tenants and determining whether applicants meet disclosure and verification requirements, are the responsibility of the owner, Bensonhurst Housing. *See* 24 C.F.R. § 891.400(b); 24 C.F.R. § 891.410(c)(1).

## II. RealPage

### A. 42 U.S.C. § 1983

*4 The plaintiffs' claims against RealPage, a privately owned entity, must also be dismissed. A claim for relief under § 1983 must allege facts showing that the defendant acted under color of a state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Section 1983 "constrains only state conduct, not the 'acts of private persons or entities.' " *Hooda v. Brookhaven Nat. Lab.*, 659 F. Supp. 2d 382, 393 (E.D.N.Y. 2009) (quoting *Rendell–Baker v. Kohn*, 457 U.S. 830, 837 (1982) ); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted). A private actor may be liable under § 1983 only if there is a sufficiently " 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) ).

RealPage is a private entity, and the plaintiffs have not alleged that it was acting under color of state law or that there was otherwise state involvement related to their denial of housing claims. *See Reaves v. Dep't of Veterans Affairs*, No. 08-CV-1624, 2008 WL 2853255, at *2 (E.D.N.Y. July 22, 2008) (Section 1983 claim involving claim of unfair treatment with respect to public housing could not be brought against the Salvation Army because

a private organization and its staff members are not state actors); *see also Brown v. 2149-53 Pacific Street H.D.F.C., Inc.*, No. 11-CV-1164, 2011 WL 1463988, at *2 (E.D.N.Y. Apr. 15, 2011) (dismissing § 1983 claim because defendants are private actors and a private corporation, not state actors).

### B. Fair Credit Reporting Act

The plaintiffs also make claims against RealPage under the Fair Credit Reporting Act, but RealPage is not a "consumer reporting agency" subject to suit under the FCRA.

"The FCRA creates a private right of action against credit reporting agencies" for violations of the statute. *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 473 (2d Cir. 1995). A "consumer reporting agency" is a person who "regularly engages ... in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties...." 15 U.S.C. § 1681a(f). This function "involves more than receipt and retransmission of information." *DiGianni v. Stern's*, 26 F.3d 346, 349 (2d Cir. 1994) (internal quotations and citation omitted); *see also Ori v. Fifth Third Bank*, 603 F. Supp. 2d 1171, 1175 (E.D. Wis. 2009) ("Obtaining and forwarding information does not make an entity a [credit reporting agency].")

RealPage was merely the conduit between TransUnion and Bensonhurst Housing, not a credit reporting agency subject to suit under the FCRA. The mere receipt and retransmission of the TransUnion credit report does not make RealPage a credit reporting agency.

### III. No Right to Housing [3]

[3] The plaintiffs make a claim under the Freedom of Information Act, but do not allege how the defendants violated FOIA, or that the plaintiffs even made a FOIA request. "FOIA provides a cause of action only to a requester who has filed a FOIA request that has been denied." *Sorodsky v. U.S. Atty.*,

No. 12-CV-4420, 2012 WL 4891697, at *6 (E.D.N.Y. Oct. 11, 2012).

The plaintiffs claim that they were denied their constitutional right to affordable housing. This claim must be dismissed because "[n]either the United States Constitution nor any other federal law establishes a fundamental right to public housing or emergency shelter." *Mallgren v. John Doe Corp.*, No. 13-CV-1265, 2013 WL 1873319, at *4 (E.D.N.Y. May 2, 2013) (citing and quoting *Lindsey v. Normet*, 405 U.S. 56, 74 (1972) (finding no " 'constitutional guarantee of access to dwellings of a particular quality' "); *Acevedo v. Nassau County, New York*, 500 F.2d 1078, 1080-81 (2d Cir. 1974) ("finding no constitutional or statutory duty to provide low income housing"); *Fair Hous. In Huntington Comm. v. Town of Huntington, NY*, No. 02-CV-2787, 2005 WL 675838, at *8 (E.D.N.Y. Mar. 23, 2005) (" 'Unfortunately for Plaintiffs, there is no constitutional or statutory duty to provide low income housing, nor is there a constitutional guarantee of access to dwellings of a particular quality.' ") (quoting *Acevedo*, 500 F.2d at 1080-81) (internal quotation marks omitted) ).

### CONCLUSION

*5 For the reasons explained above, the plaintiffs' claims against HUD are barred by sovereign immunity; the plaintiffs' FTCA claim against HUD fails because the plaintiffs did not exhaust their administrative remedies and did not allege any tortious act by a federal employee; RealPage is not subject to suit under § 1983 or the FCRA; and the plaintiffs fail to state a claim under FOIA. Accordingly, HUD and RealPage's motions to dismiss are granted. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

### SO ORDERED.

### All Citations

Slip Copy, 2018 WL 3539814

---

© 2018 Thomson Reuters. No claim to original U.S Government Works.

2017 WL 4342203
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mariah LOPEZ, Plaintiff,
v.
The CITY OF NEW YORK and
Project Renewal, Inc., Defendants.

17 Civ. 3014 (VEC) (AJP)
|
Signed September 28, 2017

**Attorneys and Law Firms**

Mariah Lopez, Bronx, NY, pro se.

Richard Ian Greenberg, Jackson Lewis P.C., Kevin Patrick Connolly, Jr., Evan Robert Schnittman, Thomas B. Roberts, The City of New York Law Department, New York, NY, for Defendants.

## REPORT & RECOMMENDATION

Andrew J. Peck, United States Magistrate Judge

**\*1 To the Honorable Valerie E. Caproni, United States District Judge:**

Pro se plaintiff Mariah Lopez brings this Americans with Disabilities Act ("ADA") case against defendants New York City and Project Renewal, Inc. (Dkt. No. 2.) Presently before the Court are the City and Project Renewal's motions to dismiss Lopez's Amended Complaint under Federal Rules of Civil Procedure 12(b) (1) and 12(b)(6). (Dkt. Nos. 44, 49.) Lopez did not respond to the motions, despite receiving an extension until September 22, 2017 by which to do so. (Dkt. No. 57.) For the reasons set forth below, the City's motion should be **DENIED** in its entirety, and Project Renewal's motion should be **GRANTED IN PART**.

## FACTS

In 2016, the New York City Department of Homeless Services ("DHS") "contracted with Project Renewal, Inc., a non-profit shelter operator, to operate" Marsha's House, "a shelter designed to house young clients ... who self-identify as lesbian, gay, bisexual, transgender or questioning ('LGBTQ') .... It is the only DHS shelter specifically designated for LGBTQ individuals." (Dkt. No. 46: Roberts Aff. ¶ 6.) Lopez, a transgender woman (Dkt. No. 31 at 4), "returned to the DHS shelter system in April 2017 and requested to be placed in Marsha's House. Although [Lopez] exceeded the age parameters for assignment to Marsha's House, DHS, at its discretion, placed her in that shelter on ... April 20, 2017" (Roberts Aff. ¶ 9). However, "immediately upon arrival," Lopez allegedly "established a pattern of violating the rules of Marsha's House and of threatening the employees of Project Renewal, Inc." (Roberts Aff. ¶ 12.)

On April 25, 2017, Lopez filed this action against the City and Project Renewal, alleging violation of Titles II and III of the ADA. (See Dkt. No. 2: Compl. at 4-5.)[1] Lopez alleged that she is legally disabled and faced removal from Marsha's House because the City required Lopez "to 'prove' [her] dog is a 'service animal.' " (Compl. at 4.) Lopez's Complaint sought an order directing defendants to permit Lopez to remain in Marsha's House with her service dog. (Compl. at 5.)

1    Lopez's Complaint named DHS, not the City, as a defendant (Compl. at 1), but Judge Caproni "construe[d] the complaint as asserting claims against the City of New York, and direct[ed] the Clerk of Court to amend the caption of this action to replace DHS with the City of New York" (Dkt. No. 7: 4/26/17 Order at 2).

On the same date, April 25, 2017, Lopez filed a motion for temporary restraining order ("TRO") to prevent defendants from prohibiting her entry into Marsha's House. (Dkt. No. 3.) On April 27, 2017, Judge Caproni found that "[f]ailure to accommodate [Lopez] and the service animal would potentially cause [Lopez] to be without shelter," and thus "provisionally directed" defendants "to accommodate [Lopez] and her service animal at the 'Marsha's House' homeless shelter until 3:00 p.m. on May 1, 2017." (Dkt. No. 8: 4/27/17 TRO Order at 2.)

On May 1, 2017, Judge Caproni ordered Lopez to show cause why the TRO should not be dissolved, given that the City had agreed to permit Lopez to reside in Marsha's House or any other DHS facility with her "dog, without

regard to whether it is a service animal or emotional support animal." (Dkt. No. 11: 5/1/17 Order; see also Roberts Aff. ¶ 15.) Later that day, Lopez responded that she did "not oppose the dissolution of the Temporary Restraining Order entered on April 27, 2017 provided that (1) Defendants continue to accommodate Ms. Lopez by allowing her service animal to remain with her in the homeless shelter system and (2) she is not transferred or otherwise removed from Marsha's House because of her service animal." (Dkt. No. 14.) Lopez also "notifie[d] the Court of her intent to amend her Complaint to seek, in addition to injunctive relief, damages under, inter alia, the Americans with Disabilities Act." (Id.) Judge Caproni dissolved the TRO on May 2, 2017. (Dkt. No. 15: 5/2/17 Memo Endorsed Order.)

*2  "Despite having her dog," Lopez allegedly "continued to threaten the staff at Marsha's House and to violate the shelter's and DHS' rules," and on May 9, 2017, "Project Renewal, Inc. requested that [Lopez] be suspended for three days due to her bringing alcohol into the shelter." (Roberts Aff. ¶¶ 16-17.) On May 10, 2017, "Mr. Uetake, the DHS Program Administrator responsible for Marsha's House, decided to transfer [Lopez] to a shelter with greater mental health services and permanent DHS police," but "had not yet decided which shelter to transfer [Lopez] to." (Id. ¶ 18.) "Uetake[ ] subsequently decided to transfer [Lopez] to the WIN West shelter, and Ms. Lopez was given notice of her new shelter assignment on May 11, 2017." (Id. ¶ 20.) "WIN West is a shelter for single adult females ... that has prior and ongoing experience with transgender clients. WIN West has extensive mental health services on site and DHS Police security." (Id. ¶ 21.)

On May 11, 2017, Lopez filed a C.P.L.R. Article 78 petition and order to show cause in Supreme Court New York County against DHS and Project Renewal to "[r]estrain DHS and Project Renewal from carrying out an administrative transfer from 'Marsha's Place' Shelter." (Roberts Aff. Ex. 1: 5/11/17 Sup. Ct. Order to Show Cause at 1-2; see also Roberts Aff. ¶ 25.) Lopez alleged that the transfer was "retaliation for [her] lawsuit and TRO in Federal Court," and because Lopez "confront[ed] [Project Renewal's director] ... in a private meeting." (Roberts Aff. Ex. 1: 5/11/17 Sup. Ct. Verified Petition at 2.) Lopez further claimed that since filing her federal lawsuit and allowing the TRO to be dissolved, "staff at Marsha's Place have been treating [her] 'different' than other clients." (Id. at 1-2.) Lopez explained: "The

transfer came after an incident where I passionately objected to discrimination I witnessed by food service staff against Trans clients. The incident is simply an excuse to transfer me." (Id. at 2.) Lopez requested "[t]hat DHS and Project Renewal be barred from transferring [her] from Marsha's Place Shelter until [the state] Court determines if retaliation was the main reason behind the request for an 'Admin Transfer.' " (Id. at 3.)

Supreme Court Justice Jaffe heard oral argument on Lopez's Article 78 petition on May 12, 2017. (Roberts Aff. ¶ 26 & Ex. 2: 5/12/17 Sup. Ct. Oral Arg. Tr.) At the hearing, Lopez argued that WIN West was unsafe for transgender women, and claimed two transgender women had been assaulted there "within the last couple of months." (5/12/17 Sup. Ct. Oral Arg. Tr. at 3-4.) Justice Jaffe instructed DHS to provide Lopez with a bed at Marsha's House over the weekend, but reserved final ruling on Lopez's petition pending a further conference on May 15, 2017. (Id. at 30-33.)

At the May 15, 2017 conference, Lopez further argued that the transfer was a result of her "being the proverbial squeaky wheel and blowing the loudest whistle possible" regarding her alleged discriminatory treatment by DHS staff. (Roberts Aff. Ex. 3: 5/15/17 Sup. Ct. Oral Arg. Tr. at 5.) Justice Jaffe held: "Pending the determination of this proceeding, respondents are stayed from enforcing the transfer referral of [Lopez] to the Win West Shelter. Respondents to appear or answer on or before 5/24 .... This order is conditioned on [Lopez] complying with respondents' rules & regulations." (Roberts Aff. Ex. 1: 5/15/17 Sup. Ct. Order to Show Cause at 2; see also 5/15/17 Sup. Ct. Oral Arg. Tr. at 11, 19; Roberts Aff. ¶ 28.)

On May 24, 2017, Lopez allegedly "became involved in a variety of incidents at Marsha's House and hit a security guard at the shelter." (Roberts Aff. ¶ 29 & Exs. 4-5.) The same day, May 24, 2017, DHS suspended Lopez from Marsha's House for seven days, until May 31, 2017. (Roberts Aff. ¶ 30 & Ex. 6.)

On May 30, 2017, Lopez wrote an "emergency" letter to Judge Caproni, stating that she was "now homeless again, after DHS lost in a new State Court Article 78, after trying to use an 'Administrative Transfer' mechanism to move [Lopez] from Marsha's" House. (Dkt. No. 22 at 1.) Lopez wrote: "DHS officials and lawyers are doing everything in their power to retaliate against me via attempting

to use petty infractions in order to justify putting me out.... DHS and I are scheduled to be in Supreme (State) Court tomorrow concerning motions on the [state court] TRO I was granted" by Justice Jaffe. (Id. at 1, 3.) Lopez simultaneously filed a motion styled "Emergency Relief (to get back in shelter) Requested." (Dkt. No. 23.) Lopez asked Judge Caproni to "[i]ntervene to stop [DHS] from moving [her] from Marsha's Shelter, or suspending [her] services there, until this Court determines if the suspensions of services or transfers are retaliation for the TRO which this Court issued and [she] allowed to dissolve." (Id.) Judge Caproni set a hearing for May 31, 2017. (Dkt. No. 24: 5/30/17 Order.)

*3  On May 31, 2017, DHS, Project Renewal and Lopez appeared before Justice Jaffe, who heard argument on Lopez's Article 78 petition. (Roberts Aff. ¶ 33 & Ex. 9: 5/31/17 Sup. Ct. Oral Arg. Tr.) Counsel for DHS asked Justice Jaffe to lift the May 15, 2017 stay to permit DHS to transfer Lopez to the WIN West Shelter. (5/31/17 Sup. Ct. Oral Arg. Tr. at 19-20.) Lopez, on the other hand, sought to "amend the TRO to include that until this proceeding reaches its finality, that[ ] [DHS and Project Renewal] cannot suspend [her] services [at Marsha's House] without coming back, specifically, in front of this Court." (Id. at 20-21.) Lopez continued: "The only facility where a open and transgender person in the Department of Homeless Services that does not want to face harassment from either the outside community outing them as being trans ... or the people within, is Project Renewal Marsha's House." (Id. at 21.)

When Lopez was asked what relief she was seeking "in Federal Court today," Lopez stated that she "didn't expressly ask for relief the same way" in her filings with Judge Caproni, but if Justice Jaffe "granted a TRO that [Lopez] ask[ed] for, it would make the issue across the street moot." (Id. at 22, 24.) Justice Jaffe stated: "Judge Caproni can just do whatever she wants. I'm lifting the stay against the transfer based on the record before me and the balancing of the equities here. But, I will issue a decision on the Article 78 and decide whether or not there will be a hearing." (Id. at 24-25; see also Roberts Aff. ¶ 34 ("Justice Jaffe lifted her prior stay, permitted DHS to transfer [Lopez] to a shelter other than Marsha's House, including the WIN West shelter, and took the merits of the Article 78 proceeding under advisement.").)

The same day, May 31, 2017, "[i]mmediately after concluding the appearance before Justice Jaffe ..., the parties appeared before Judge Caproni" regarding Lopez's May 30, 2017 emergency federal court filings in which Lopez sought to prevent her transfer from Marsha's House. (Roberts Aff. ¶ 35; Dkt. No. 40: 5/31/17 Oral Arg. Tr.) Judge Caproni and Lopez had the following colloquy:

THE COURT: .... What relief do you want from me today?

MS. LOPEZ: To reissue the TRO.

THE COURT: So you're seeking appropriate injunction preventing you from being transferred out of Marsha's House?

MS. LOPEZ: Yes, your Honor.

THE COURT: Okay. Isn't that exactly what was before the Supreme Court justice today?

MS. LOPEZ: So, yes, but your Honor—

THE COURT: Stop. Sit down. Why isn't this res adjudicata?

(5/31/17 Oral Arg. Tr. at 10.)

After counsel for the City argued that Justice Jaffe's "decision today was made on precisely these issues" (id. at 11), Judge Caproni remarked that Lopez's "claim, I guess, in front of me is slightly different, which is, she's claiming that this is all retaliatory for having initially obtained preliminary relief" (id. at 12; see also id. at 58 ("THE COURT: .... I am reading her papers that were filed yesterday, and I am viewing them in the light most favorable to the pro se litigant, is that she is seeking a temporary restraining order against a transfer on the grounds that the transfer is retaliatory. That's her claim.")). Judge Caproni stated that "[t]he only issue before me is whether [Lopez] will suffer irreparable injury if ... moved ... from Marsha's House to WIN West." (Id. at 60.) Judge Caproni denied Lopez's request for emergency relief, holding that Lopez "ha[d] not demonstrated that she will suffer irreparable harm in the absence of preliminary relief." (Id. at 65.)

After the May 31, 2017 proceedings before Justice Jaffe and Judge Caproni, DHS transferred Lopez to the WIN West shelter. (Roberts Aff. ¶ 37.)

On June 14, 2017, Justice Jaffe issued a decision and judgment in Lopez's Article 78 proceeding. (Roberts Aff. Ex. 10: 6/14/17 Sup. Ct. Order.) Justice Jaffe wrote that Lopez "alleges that the transfer [from Marsha's House] constitutes a retaliatory measure against her for having obtained an order from the Southern District of New York enjoining respondents from refusing the entry of her service dog into Marsha's Place." (Id. at 1.) Lopez thus sought "an order directing [DHS] to 'reverse its decision to approve Project Renewal's request to transfer [her] from Marsha's Place Shelter (for transgender people).' " (Id., quoting Lopez's 5/11/17 Notice of Verified Petition at 1.)[2]

[2]    Justice Jaffe stated in her decision that "[o]n May 26, 2017, [Lopez] brought a new order to show cause and petition, seeking an order compelling DHS to permit her to return to Marsha's Place." (6/14/17 Sup. Ct. Order at 4.) Justice Jaffe further noted: "Another justice of this court denied [Lopez's] request for a stay, and scheduled the application to be heard by me on May 31, 2017." (Id. at 4-5.) The May 26, 2017 filings do not appear in the record. However, at the May 31, 2017 conference, Justice Jaffe "lifted the stay and marked as fully submitted [Lopez's] motion for a preliminary injunction and her petition." (Id. at 6.) It therefore appears that Justice Jaffe treated those subsequent filings as a supplement to Lopez's initial petition filed on May 11, 2017. (See pages 3-4 above.) Moreover, Justice Jaffe referenced these "new papers" at the May 31, 2017 conference that were not served on defendants beforehand and in any event do not appear to have substantively altered Lopez's claims based on the ensuing discussion and Justice Jaffe's June 14, 2017 decision. (See 5/31/17 Sup. Ct. Oral Arg. Tr. at 2.) Neither defendant argues that the May 26, 2017 filings have any bearing on the instant motions. (See generally Dkt. Nos. 45, 50.)

*4  In her analysis, Justice Jaffe wrote that "[a]lthough [Lopez] seeks a preliminary injunction, she ultimately requests that [Justice Jaffe] review the determination of an agency," i.e., DHS, and thus Lopez was required to exhaust her administrative remedies before seeking court intervention. (6/14/17 Sup. Ct. Order at 7.) Lopez, however, "offer[ed] no reason to believe that an effort to obtain a fair hearing [before DHS] would be futile, or that a hearing would be other than fair." (Id. at 7-8, citation omitted.) Moreover, Justice Jaffe held that "notwithstanding [Lopez's] report of hearing from two ... recent victims [of assault] at WIN West, her fear of

being assaulted there is nonetheless speculative and does not constitute irreparable injury." (Id. at 8.) Justice Jaffe further held that even if Lopez had exhausted her administrative remedies, given DHS' "broad discretion and the speculative nature of [Lopez's] fears, [Lopez] fail[ed] to demonstrate, respectively, a likelihood of success on the merits and irreparable injury" to warrant a preliminary injunction. (Id. at 9.) Justice Jaffe accordingly denied Lopez's Article 78 petition in its entirety and dismissed the proceeding. (Id. at 10.)

On June 15, 2017, Lopez filed another motion for temporary restraining order in this Court, claiming that DHS had placed her in a facility that could not reasonably accommodate her disabilities, and "the decision for DHS to move [her] from Marsha's was retaliatory." (Dkt. No. 31 at 1.) Lopez demanded the following relief: "DHS to place me back at Marsha's until this Court reviews whether I will be harmed by a placement other than Marsha's," and "DHS to reserve a bed a[t] Marsha's until the conclusion of my ADA case in front of this court, or until I have found permanent housing...." (Dkt. No. 31 at 7.) On the same day, June 15, 2017, the Part One Judge denied the motion because it was not clear what irreparable harm Lopez sought to avoid. (Dkt. No. 32: 6/15/17 Order at 2.)

On June 30, 2017, Judge Caproni held a conference to obtain clarification regarding Lopez's June 15, 2017 filing. (Dkt. No. 42: 6/30/17 Conf. Tr.) Judge Caproni observed that Lopez's claims had "shifted from the original complaint," and Lopez's "original complaint is now moot" because her service animal was accepted into the DHS shelter system. (Id. at 2; see also id. at 8 ("THE COURT: .... The dog is accommodated. That's moot. That claim is dismissed.").) Lopez clarified that the two claims raised in her June 15, 2017 motion were: (1) Lopez's removal from Marsha's House was retaliatory, and (2) the only reasonable accommodation for Lopez's disabilities is placement at Marsha's House. (Id. at 2-3.) On July 5, 2017, Judge Caproni ruled that Lopez's June 15, 2017 motion would be construed as an amended complaint. (Dkt. No. 39: 7/5/17 Order.)

The City and Project Renewal presently move to dismiss Lopez's Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. Nos. 44, 49.) Specifically, the City alleges that Lopez's claims are barred by res judicata or collateral estoppel. (Dkt. No. 45: City

Br. at 11-17.) Project Renewal alleges that Lopez's claims are barred by res judicata (Dkt. No. 50: Project Renewal Br. at 9-12), and also that Lopez fails to state a claim under the ADA (id. at 12-16).

## ANALYSIS

## I. LEGAL STANDARDS GOVERNING MOTIONS TO DISMISS

### A. The Standard Pursuant to Fed. R. Civ. P. 12(b)(6)

### 1. The Twombly-Iqbal "Plausibility" Standard

In the Twombly and Iqbal decisions in 2007 and 2009, the Supreme Court significantly clarified the standard for a motion to dismiss, as follows:

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in Twombly, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

**\*5** To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

Two working principles underlie our decision in Twombly. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—" the pleader is entitled to relief."

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Ashcroft v. Iqbal, 556 U.S. 662, 677-79, 129 S. Ct. 1937, 1949-50 (2009) (citations omitted & emphasis added, quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556-57, 570, 127 S. Ct. 1955, 1965-66, 1974 (2007) (retiring the Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957), pleading standard that required denying a Rule 12(b)(6) motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief")). [3]

[3]   Accord, e.g., Affinity LLC v. GfK Mediamark Research & Intelligence, LLC, 547 Fed.Appx. 54, 55-56 (2d Cir. 2013); Massena v. Bronstein, 545 Fed.Appx. 53, 55 (2d Cir. 2013); Cancel v. Home Depot, 488 Fed.Appx. 520, 520 (2d Cir. 2012); Spataro v. Glenwood Supply, 479 Fed.Appx. 403, 404 (2d Cir. 2012); Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010), cert. denied, 562 U.S. 1168, 131 S. Ct. 901 (2011); Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009); Scerba v. Allied Pilots Ass'n, 13 Civ. 3694, 2013 WL 6481583 at *6-7 (S.D.N.Y. Dec. 10, 2013) (Peck, M.J.), aff'd, 589 Fed.Appx. 554 (2d Cir. 2014), cert. denied, 135 S. Ct. 2313 (2015); Florio v. Canty, 954 F. Supp. 2d 227, 229-30

(S.D.N.Y. 2013) (Peck, M.J.) (citing cases); Mahoney v. Sony Music Entm't, 12 Civ. 5045, 2013 WL 491526 at *4-5 (S.D.N.Y. Feb. 11, 2013) (Peck, M.J.); Toto, Inc. v. Sony Music Entm't, 12 Civ. 1434, 2012 WL 6136365 at *5 (S.D.N.Y. Dec. 11, 2012) (Peck, M.J.), R. & R. adopted, 2013 WL 163826 (S.D.N.Y. Jan. 15, 2013).

**\*6** Even after Twombly and Iqbal, the Court's role in deciding a motion to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Bison Capital Corp. v. ATP Oil & Gas Corp., 10 Civ. 0714, 2010 WL 2697121 at *5 (S.D.N.Y. June 24, 2010) (Peck, M.J.) (quotations omitted), R. & R. adopted, 2010 WL 3733927 (S.D.N.Y. Sept. 16, 2010).[4]

4 Accord, e.g., Florio v. Canty, 954 F. Supp. 2d at 230-31; Tasini v. AOL, Inc., 851 F. Supp. 2d 734, 737 (S.D.N.Y.) ("The Court's function on a motion to dismiss is 'not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.' "), aff'd, 505 Fed.Appx. 45 (2d Cir. 2012); Saunders v. Coughlin, 92 Civ. 4289, 1994 WL 88108 at *2 (S.D.N.Y. Mar. 15, 1994) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)).

"A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (per curiam) (citation omitted). Courts accordingly must " 'liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest.' " McLeod v. Jewish Guild for the Blind, 864 F.3d 154, 156 (2d Cir. 2017). " '[T]he failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.' Rather, '[f]actual allegations alone are what matters.' That principle carries particular force where a pro se litigant is involved." Id. at 158 (citations & fn. omitted).

## 2. Consideration of Documents Outside The Pleadings

A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading. Thus, in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the complaint." Vassilatos v. Ceram Tech Int'l, Ltd., 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y. May 19, 1993) (citing Kopec v. Coughlin, 922

F.2d 152, 154-55 (2d Cir. 1991)).[5] The Court, however, may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference. E.g., ATSI Comm'cns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) ("Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference....").[6]

5 Accord, e.g., Grant v. Cty. of Erie, 542 Fed.Appx. 21, 23 & n.1 (2d Cir. 2013); Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006); Aniero Concrete Co. v. N.Y.C. Constr. Auth., 94 Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June 27, 2000); Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 97 Civ. 5499, 2000 WL 264295 at *12 (S.D.N.Y. Mar. 9, 2000) ("When reviewing the pleadings on a motion to dismiss pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein.").
 When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed. R. Civ. P. 56. See Fed. R. Civ. P. 12(b); Friedl v. City of N.Y., 210 F.3d 79, 83 (2d Cir. 2000); Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988).

6 See also, e.g., Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001) (citing Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991), cert. denied, 503 U.S. 960, 112 S. Ct. 1561 (1992)); Paulemon v. Tobin, 30 F.3d 307, 308-09 (2d Cir. 1994); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Florio v. Canty, 954 F. Supp. 2d 227, 231-32 (S.D.N.Y. 2013) (Peck, M.J.); In re Lehman Bros. Sec. & ERISA Litig., 903 F. Supp. 2d 152, 168-69 (S.D.N.Y. 2012) (quoting ATSI Comm'cns, Inc. v. Shaar Fund, Ltd., 493 F.3d at 98); Drum Major Music Entm't Inc. v. Young Money

Entm't, LLC, 11 Civ. 1980, 2012 WL 423350 at *2 (S.D.N.Y. Feb. 7, 2012); Maniolos v. United States, 741 F. Supp. 2d 555, 560 (S.D.N.Y. 2010) (Peck, M.J.), aff'd, 469 Fed.Appx. 56 (2d Cir. 2012).

**\*7** "However, before materials outside the record may become the basis for a dismissal, several conditions must be met. For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." Faulkner v. Beer, 463 F.3d at 134 (citations omitted).

"A court may consider a res judicata defense on a Rule 12(b)(6) motion to dismiss when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice." TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 498 (2d Cir. 2014); accord, e.g., Wendt v. BondFactor Co., 16 Civ. 7751, 2017 WL 3309733 at *4 (S.D.N.Y. Aug. 2, 2017); O'Callaghan v. City of N.Y., 16 Civ. 1139, 2016 WL 7177509 at *4 (S.D.N.Y. Dec. 8, 2016); Nash v. Bd. of Educ. of City of N.Y., 99 Civ. 9611, 2016 WL 5867449 at *4 (S.D.N.Y. Sept. 22, 2016) ("In considering these preclusion arguments, the Court may take judicial notice of [plaintiff's] Amended Petition in his second Article 78 proceeding and the New York State Supreme Court's ruling in that proceeding.").

"A court may apply collateral estoppel to dismiss claims on a 12(b)(6) motion." Manhattan Review LLC v. Yun, 16 Civ. 0102, 2017 WL 1330334 at *4 (S.D.N.Y. Apr. 10, 2017), R. & R. adopted, 2017 WL 3034350 (S.D.N.Y. July 17, 2017). " '[W]hen a motion to dismiss is premised on the doctrine of collateral estoppel, a court is permitted to take judicial notice of and consider the complaints and the record generated in both actions without having to convert the motion to dismiss into a summary judgment motion.' " MMA Consultants I, Inc. v. Republic of Peru, 15 Civ. 5551, 2017 WL 1235005 at *6 (S.D.N.Y. Mar. 24, 2017).

## II. DEFENDANTS HAVE NOT SHOWN THAT RES JUDICATA OR COLLATERAL ESTOPPEL APPLIES

### A. Res Judicata Legal Standards

"The doctrine of res judicata provides that once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." Rackowski v. Araya, No. 522005, 152 A.D.3d 834, 2017 WL 2870421 at *1 (3d Dep't July 6, 2017) (quotations omitted). [7] " 'The rule applies not only to claims actually litigated but also to claims that could have been raised in the prior litigation.' " Young-Szlapak v. Young, 151 A.D.3d 1646, 1646, ——— N.Y.S.3d ——— (4th Dep't 2017). [8] "However, '[w]here a dismissal does not involve a determination on the merits, the doctrine of res judicata does not apply.' " Cortazar v. Tomasino, 150 A.D.3d 668, 670, 54 N.Y.S.3d 89, 92 (2d Dep't 2017).

7    "When 'determin[ing] the effect of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the rendering state.' " Giannone v. York Tape & Label, Inc., 548 F.3d 191, 192-93 (2d Cir. 2008); accord, e.g., Houck v. U.S. Bank, N.A., No. 16-CV-3660, 2017 WL 1735252 at *1 (2d Cir. May 3, 2017) ("Our precedents require us to apply the preclusion law of the rendering state."); Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) ("We apply federal law in determining the preclusive effect of a federal judgment, and New York law in determining the preclusive effect of a New York State court judgment." (citations omitted)). In any event, "there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel." Marvel Characters, Inc. v. Simon, 310 F.3d at 286.

8    See also, e.g., Brown Media Corp. v. K&L Gates, LLP, 854 F.3d 150, 157 (2d Cir. 2017) ("The doctrine of res judicata, or claim preclusion, holds that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." (quotations omitted)); Outdoors Clothing Corp. v. Schneider, No. 2015-05854, 2017 WL 3496248 at *2 (2d Dep't Aug. 16, 2017) ("Pursuant to the doctrine of res judicata, a valid final judgment bars future actions between the same parties on the same cause of action.... Thus, '[t]he doctrine is applicable ... to issues which were or could have been raised in the prior proceeding.' "); Chapman v. Faustin, 150 A.D.3d 647, 647, 55 N.Y.S.3d 219, 220 (1st Dep't 2017) (" '[W]here a plaintiff in a later action brings a claim for damages that could have

been presented in a prior ... proceeding against the same party, based upon the same harm and arising out of the same or related facts, the claim is barred by res judicata.' ").

**\*8** Thus, "[w]hen alternative theories are available to recover what is essentially the same relief for harm arising out of the same or related facts such as would constitute a single 'factual grouping,' the circumstance that the theories involve materially different elements of proof will not justify presenting the claim by two different actions." O'Brien v. City of Syracuse, 54 N.Y.2d 353, 357-58, 445 N.Y.S.2d 687, 689 (1981) (citation & fn. omitted).[9] "[W]hat 'factual grouping' constitutes a 'transaction' or 'series of transactions' depends on how 'the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether ... their treatment as a unit conforms to the parties' expectations or business understanding or usage.' " Smith v. Russell Sage Coll., 54 N.Y.2d at 192-93, 445 N.Y.S.2d at 71; accord, e.g., Wendt v. BondFactor Co., 16 Civ. 7751, 2017 WL 3309733 at \*6 (S.D.N.Y. Aug. 2, 2017).

[9]      Accord, e.g., Smith v. Russell Sage Coll., 54 N.Y.2d 185, 192, 445 N.Y.S.2d 68, 71 (1981) ("[I]n deciding res judicata issues, we have moved to a more pragmatic test, which sees a claim or cause of action as coterminous with the transaction regardless of the number of substantive theories or variant forms of relief ... available to the plaintiff.... [E]ven if there are variations in the facts alleged, or different relief is sought, the separately stated causes of action may nevertheless be grounded on the same gravamen of the wrong upon which the action is brought." (quotations omitted)).

## B. Collateral Estoppel Legal Standards

"Under the doctrine of collateral estoppel, ... [a] plaintiff should not be allowed ... to raise any of the issues he unsuccessfully litigated in his prior CPLR article 78 proceeding." Parker v. Blauvelt Volunteer Fire Co., 93 N.Y.2d 343, 349, 690 N.Y.S.2d 478, 482 (1999). The doctrine of collateral estoppel, or issue preclusion, accordingly applies when the following four conditions are met:

> "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and decided, (3) there was a full and fair opportunity to litigate in the

prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits."

Conason v. Megan Holding, LLC, 25 N.Y.3d 1, 17, 6 N.Y.S.3d 206, 215 (2015); accord, e.g., FC Notes SVC, LLC v. United Gen. Title Ins. Co., 146 A.D.3d 935, 936, 46 N.Y.S.3d 159, 160 (2d Dep't 2017).[10] "[T]he burden rests upon the proponent of collateral estoppel to demonstrate the identicality and decisiveness of the issue, while the burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in [the] prior action or proceeding." Highlands Ctr., LLC v. Home Depot U.S.A., Inc., 149 A.D.3d 919, 921, 53 N.Y.S.3d 321, 324 (2d Dep't 2017) (quotations omitted); accord, e.g., Corvetti v. Town of Lake Pleasant, 146 A.D.3d 1118, 1121, 46 N.Y.S.3d 679, 683 (3d Dep't 2017).

[10]      See also, e.g., Parker v. Blauvelt Volunteer Fire Co., 93 N.Y.2d at 349, 690 N.Y.S.2d at 482-83 ("The doctrine applies if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action."); London Leasing Ltd. P'ship v. Div. of Hous. & Cmty. Renewal, No. 2015-08660, 2017 WL 3496255 at \*2 (2d Dep't Aug. 16, 2017) (" 'Collateral estoppel, or issue preclusion, precludes a party from relitigating in a subsequent action or proceeding an issue that was raised in a prior action or proceeding and decided against that party' or those in privity.").

## C. Application To Article 78 Proceedings

**\*9** "Article 78 proceedings are 'used to challenge action (or inaction) by agencies and officers of state and local government.' " Sheffield v. Sheriff of Rockland Cty. Sheriff Dep't, 393 Fed.Appx. 808, 812 (2d Cir. 2010); see also C.P.L.R. §§ 7801, 7803. Res judicata and collateral estoppel are applicable, in certain circumstances, to bar relitigation of claims or issues decided in Article 78 proceedings. See, e.g., Dutrow v. N.Y.S. Gaming Comm'n, 607 Fed.Appx. 56, 57 n.1 (2d Cir. 2015) ("[C]ollateral estoppel bars relitigation of issues decided in Article 78 proceedings."); Ehrlich v. Inc. Vill. of Sea Cliff, 95 A.D.3d 1068, 1069, 945 N.Y.S.2d 98, 100 (2d Dep't 2012) ("As 'it is clear that the relief sought [by these causes of] action is essentially the same as that sought in the article 78 proceeding previously determined adversely

to the plaintiff[s], and that the claims arise out of the same or related facts', the Supreme Court properly granted ... defendants' motion ... dismissing the ... causes of action as barred by the doctrine of res judicata." (citation omitted)).

## D. Defendants Have Not Shown That Res Judicata Or Collateral Estoppel Applies

Defendants argue that Justice Jaffe adjudicated Lopez's Article 78 petition "on the merits" and thus res judicata applies to bar Lopez's present claims. (Dkt. No. 45: City Br. at 13 ("Justice Jaffe's decision and judgment are an adjudication on the merits entitled to res judicata effect."); Dkt. No. 50: Project Renewal Br. at 10 ("Plaintiff's Article 78 proceeding involved an adjudication on the merits, as evidenced by Justice Jaffe's decision.").) Defendants further argue that collateral estoppel applies because issues identical to those in this case were "actually litigated and decided" by Justice Jaffe in the Article 78 proceeding. (City Br. at 16; Project Renewal Br. at 12 n.2.)

Defendants are incorrect on both fronts. As to res judicata, Justice Jaffe, presented with Lopez's verified petition and accompanying order to show cause, ruled that: (1) Lopez did not exhaust her administrative remedies with DHS; and (2) no preliminary injunction was warranted because Lopez did not demonstrate, among other things, "a likelihood of success on the merits." (Dkt. No. 46: Roberts Aff. Ex. 10: 6/14/17 Sup. Ct. Order at 7-9; see pages 7-9 above.) Neither the failure to exhaust [11] nor the denial of a preliminary injunction [12] operated as a final decision on the merits, even though the former resulted in the dismissal of Lopez's petition. [13] As to collateral estoppel, Justice Jaffe decided whether to grant Lopez a preliminary injunction considering her "likelihood of success on the merits" (6/14/17 Sup. Ct. Order at 9), not whether DHS' actions were, in fact, retaliatory or WIN West was an unreasonable accommodation. Cf. Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.... A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on

the merits." (citations omitted)). [14] Defendants have not shown that res judicata or collateral estoppel applies here.

11    See, e.g., 33 Seminary LLC v. City of Binghamton, No. 11-CV-1300, 2012 WL 12888394 at *13 (N.D.N.Y. Apr. 19, 2012) ("A state court dismissal for failure to exhaust administrative remedies is presumed to be without prejudice, and therefore, it can have no res judicata effect."); Hall v. N.Y. Hosp., 99 Civ. 10554, 2000 WL 222858 at *1 (S.D.N.Y. Feb. 25, 2000) (same); Lamar Outdoor Advert., Inc. v. City Planning Comm'n of Syracuse, 296 A.D.2d 841, 842, 744 N.Y.S.2d 283, 284 (4th Dep't 2002) ("Because that [Article 78] proceeding was dismissed based upon petitioner's failure to obtain personal jurisdiction ..., the dismissal is not the equivalent of a final disposition on the merits and the doctrine of res judicata does not apply."); Town of Caroga v. Herms, 20 Misc. 3d 1130, 872 N.Y.S.2d 693, 693 (Sup. Ct. Fulton Cty. 2008) (table) ("It is well-established in the law that a prior decision must be 'on the merits' before it can be given res judicata effect.... [T]he failure by a petitioner to exhaust their administrative remedies forecloses their ability to raise an issue in court. A court dismissing an Article 78 petition on the basis of failure to exhaust administrative remedies therefore does not reach the merits of the case." (citations omitted)), aff'd, 62 A.D.3d 1121, 878 N.Y.S.2d 834 (3d Dep't 2009).

12    See, e.g., Town of Concord v. Duwe, 4 N.Y.3d 870, 875, 799 N.Y.S.2d 167, 170 (2005) ("[M]ere denial of the motion for a preliminary injunction did not constitute the law of the case or an adjudication on the merits."); Van Wagner Advert. Corp. v. S & M Enters., 67 N.Y.2d 186, 190 n.1, 501 N.Y.S.2d 628, 630 n.1 (1986) ("[D]enial of a motion for a preliminary injunction does not 'constitute the law of the case or an adjudication on the merits.' "); 360 W. 11th LLC v. ACG Credit Co., 46 A.D.3d 367, 367, 847 N.Y.S.2d 198, 198 (1st Dep't 2007) ("[T]he purpose of a preliminary injunction is to maintain the status quo pending a hearing on the merits, rather than to determine the parties' ultimate rights."); Peterson v. Corbin, 275 A.D.2d 35, 40, 713 N.Y.S.2d 361, 365 (2d Dep't 2000) ("[A] preliminary injunction is a provisional remedy and a decision concerning a preliminary injunction does not become the law of the case, nor would it constitute an adjudication on the merits so as to preclude reconsideration of that issue at a trial on the merits.").

13    Justice Jaffe did not state, and defendants do not argue, that Lopez cannot exhaust her administrative remedies. See, e.g., Witchard v. Montefiore Med. Ctr., 05 Civ. 5957, 2006 WL 2773870 at *7 (S.D.N.Y. Sept. 26, 2006) ("[A] dismissal is considered to be on the merits where it is no longer possible to properly exhaust administrative remedies.").

14    See also, e.g., FC Notes SVC, LLC v. United Gen. Title Ins. Co., 146 A.D.3d 935, 936, 46 N.Y.S.3d 159, 160 (2d Dep't 2017) ("The instant action is not barred by the doctrine of collateral estoppel since the dismissal of the prior action for failure to state a cause of action did not involve a determination on the merits."); Zinter Handling, Inc. v. Britton, 46 A.D.3d 998, 1000, 847 N.Y.S.2d 271, 273-74 (3d Dep't 2007) ("Here, plaintiff asserts that defendants' failed attempt to obtain an injunction against enforcement of the covenant in the prior litigation collaterally estops defendants from now contesting the enforceability of the covenant. We disagree. Supreme Court's denial of defendants' request for a preliminary injunction was premised on its conclusion that defendants' submissions failed to adequately establish the three elements necessary for the issuance of a preliminary injunction. Since the issue of enforceability of the covenant was not specifically decided by Supreme Court in conjunction with the denial of the preliminary injunction, the doctrine of collateral estoppel has no application."(citation omitted)); Tortura v. Sullivan Papain Block McGrath & Cannavo, P.C., 41 A.D.3d 584, 585, 837 N.Y.S.2d 333, 334 (2d Dep't 2007) ("[T]his action is not barred by the doctrine of res judicata or the doctrine of collateral estoppel since the dismissal of the prior action did not involve a determination on the merits and the issues were not actually litigated therein." (citation omitted)); James v. Bernhard, 34 Misc. 3d 1242, 950 N.Y.S.2d 608, 608 (Sup. Ct. N.Y. Cty. 2012) (table) ("[B]lack letter law accords no collateral estoppel effect to preliminary injunction orders.... A preliminary injunction order is an interim order issued without discovery or an evidentiary hearing and therefore does not constitute the 'full and fair opportunity' to litigate the issues, let alone the required adjudication and decision on the merits. Thus, the grant or denial of a preliminary injunction has no collateral estoppel effect.").

**\*10**  Because the only basis for the City's motion to dismiss was res judicata and collateral estoppel (City Br. at 11-17), the City's motion to dismiss (Dkt. No. 44) should

be DENIED. Project Renewal's motion to dismiss on this ground (Dkt. No. 49) also should be DENIED.

## III. LOPEZ'S FAILURE TO ACCOMMODATE AND TITLE II ADA CLAIMS AGAINST PROJECT RENEWAL SHOULD BE DISMISSED

### A. Discrimination In Public Services And Accommodations Under The ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). Title III of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

A plaintiff may establish a violation of Titles II and III by proving: "(1) that she is a 'qualified individual' with a disability; (2) that the defendants are subject to [the ADA]; and (3) that she was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [her] disabilit[y].' " Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 85 (2d Cir. 2004); accord, e.g., B.C. v. Mount Vernon Sch. Dist., 837 F.3d 152, 158 (2d Cir. 2016). An ADA "plaintiff may base her discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." Davis v. Shah, 821 F.3d 231, 260 (2d Cir. 2016) (Title II); accord, e.g., B.C. v. Mount Vernon Sch. Dist., 837 F.3d at 158 ("Exclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation.") (Title II); see also, e.g., Wright v. N.Y.S. Dep't of Corr., 831 F.3d 64, 77 (2d Cir. 2016) ("The House Committee on Education and Labor's report on the ADA ... stat[ed] 'that the forms of discrimination prohibited by [Title II are] identical to those set out in the applicable provisions of titles I and III of this legislation.' "); Mary Jo C. v. N.Y.S. & Local Ret. Sys., 707 F.3d 144, 159 n.6 (2d Cir.) ("Courts have read the requirements of Title II and Title III as being

consistent with each other...."), cert. dismissed, 133 S. Ct. 2823 (2013).

### B. Lopez's Amended Complaint and Project Renewal's Arguments

Lopez's initial complaint under ADA Titles II and III focused on the removal of her service animal from Marsha's House (see Dkt. No. 2: Compl. at 5), which was mooted by defendants' stipulation permitting the animal in any DHS facility (see page 9 above). Lopez alleges in her Amended Complaint that "DHS refusal to block Project Renewals request to transfer [her] from Marsha's house was a violation of [her] rights to be 'reasonably accommodated' under local, state and federal law." (Dkt. No. 31: Am. Compl. at 6.) According to Lopez, neither WIN West, nor any other DHS facility save Marsha's House, constitutes a reasonable accommodation under the ADA. (Id. at 3 ("ALL other DHS facilities besides Marsha's are ... not reasonable accommodations for my" disabilities.).) Specifically, Lopez alleges that "DHS has placed [her] at facilities which cannot reasonably accommodate [her] medical disabilities, PTSD, and Gender Identity Disorder." (Id. at 1.) Lopez alleges that she will be "forced to 'hide' [her] trans-identity, and needs" at these non-LGBTQ facilities for fear of harassment. (Id. at 3, 5.) Lopez further alleges that "the decision for DHS to move [her] from Marsha's was retaliatory," caused in part by Lopez's "whistleblowing at Marsha's House." (Id. at 1-2.)

*11 Project Renewal argues that Lopez's ADA failure to accommodate and retaliation claims should be dismissed on the following grounds: (1) Lopez fails to name Project Renewal as a defendant (Dkt. No. 50: Project Renewal Br. at 13); (2) Lopez fails to state a failure to accommodate claim because the Amended Complaint contains no allegations "that Project Renewal had knowledge of her disability, [or] that Project Renewal had any decision-making authority with respect to [Lopez's] shelter placement" (id.); (3) Lopez fails to state a retaliation claim "because she does not allege that she engaged in a protected activity," nor does she "allege that Project Renewal subjected her to an adverse action" (id. at 14-15); and (4) Project Renewal is not a public entity covered by Title II of the ADA (id. at 15-16).

### 1. Lopez's Failure To Name Project Renewal As A Defendant Does Not Merit Dismissal

Project Renewal correctly notes that it is not named as a defendant in Lopez's Amended Complaint. (Dkt. No. 50: Project Renewal Br. at 13; see Dkt. No. 31: Am. Compl. at 1.) Project Renewal, however, was named in Lopez's initial complaint. (Dkt. No. 2: Compl. at 1.) Judge Caproni deemed Lopez's June 15, 2017 filing to constitute an amended complaint, even though it was styled "Letter re: Emergency request for TRO" (Am. Compl. at 1), to benefit not harm Lopez. There is no indication that Lopez desired to dismiss Project Renewal from this lawsuit, and Project Renewal does not argue that it has been prejudiced by this technical pleading failure. Lopez should be given an opportunity to amend the case caption to comply with Federal Rule of Civil Procedure 10. Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties...."); see also, e.g., Shariff v. United States, No. 15-3357-cv, 2017 WL 1493674 at *1 (2d Cir. Apr. 26, 2017) ("We conclude that the district court erred in dismissing [plaintiff's] complaint based on infirmities in the caption....Rule 10 is, of course, subject to the command 'never to exalt form over substance.' Indeed, we 'excuse technical pleading irregularities as long as they neither undermine the purpose of notice pleading nor prejudice the adverse party.' ... [O]ur flexible construction of pro se pleadings leads us to conclude that [plaintiff] must be given further opportunity to conform the caption with Rule 10's requirements." (citations omitted)).

Project Renewal's motion to dismiss due to the deficient case caption should be DENIED, but Lopez should amend the caption accordingly. (Indeed, to avoid any further confusion, Lopez should file a formal "Second Amended Complaint.")

### 2. Lopez Has Not Alleged A Failure to Accommodate Claim Against Project Renewal

Project Renewal argues that Lopez's failure to accommodate claim should be dismissed because Lopez makes no allegations that Project Renewal knew of her disability or had any decisionmaking authority with respect to her shelter placement. (Dkt. No. 50: Project Renewal Br. at 13-14.)

"Discrimination in violation of the ADA includes, inter alia, not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." Sheng v. M&TBank Corp., 848 F.3d 78, 86 (2d Cir. 2017) (quotations omitted). "Title III of the [ADA] requires

without exception that any 'policies, practices, or procedures' of a public accommodation be reasonably modified for disabled 'individuals' as necessary to afford access unless doing so would fundamentally alter what is offered." PGA Tour, Inc. v. Martin, 532 U.S. 661, 688, 121 S. Ct. 1879, 1896 (2001) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii) ("[D]iscrimination [under Title III of the ADA] includes ... failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.")). [15]

[15]   Although Project Renewal argues that it is not subject to Title II of the ADA (see page 31 below), it makes no such argument regarding Title III, and instead only challenges whether Lopez has pled a prima facie case of discrimination. (See Project Renewal Br. at 13-14.) Title III bars discrimination in "place[s] of public accommodation." 42 U.S.C. § 12182(a). Thus, "[i]n order to state a claim for violation of Title III, ... a plaintiff must 'establish that ... the defendants own, lease, or operate a place of public accommodation.' " Krist v. Kolombos Rest. Inc., 688 F.3d 89, 94-95 (2d Cir. 2012) (reciting text of 42 U.S.C. § 12182(a)). Various "private entities are considered public accommodations ... if the operations of such entities affect commerce," including "homeless shelter[s] ... or other social service center establishment[s]." 42 U.S.C. § 12181(7)(K); see also 28 C.F.R. § 36.104. Drawing all reasonable inferences in Lopez's favor on this motion, the Court finds that Project Renewal falls within the ambit of Title III, see, e.g., PGA Tour, Inc. v. Martin, 532 U.S. at 676-77, 121 S. Ct. at 1890 ("The phrase 'public accommodation' ... 'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the nondisabled." (fns. omitted)), although as to the City, the homeless shelter system falls under Title II.

**\*12** To establish an ADA failure to accommodate claim in this context, a plaintiff must allege that: "(1) he suffers from ... a disability as defined by the ADA ...; (2) the defendant knew or reasonably should have known of the plaintiff[']s ... disability; (3) accommodation of

the ... disability may be necessary to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation." Flynn v. Cohison, No. 16 Civ. 2243, 2016 WL 2946173 at \*2 (E.D.N.Y. May 19, 2016); accord, e.g., Williams v. N.Y.C. Hous. Auth., 07 Civ. 7587, 2009 WL 804137 at \*7 (S.D.N.Y. Mar. 26, 2009), aff'd, 408 Fed.Appx. 389 (2d Cir. 2010). [16] Project Renewal only challenges the second and fourth elements. (See Project Renewal Br. at 13-14.)

[16]   See also, e.g., Ibrahim v. Pena, 16 Civ. 7774, 2017 WL 3601246 at \*2 (S.D.N.Y. Aug. 21, 2017) (Caproni, D.J.) ("To state a failure-to-accommodate claim, the plaintiff must allege facts showing '(1) that she is disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against her by denying her a full and equal opportunity to enjoy the services defendants provide.' ").

As Project Renewal argues, Lopez's allegations in the Amended Complaint focus almost entirely on DHS. (Dkt. No. 31: Am. Compl. at 1-2 ("DHS has placed me at facilities which cannot reasonably accommodate my medical disabilities"; "the decision for DHS to move me from Marsha's was retaliatory"; "DHS refusal to temporarily place me back at Marsha's is a failure to make 'reasonable' accommodations for my disabilities"); id. at 4 ("DHS decision to 'force' me into a 'female' facility is a violation of New York City and State law"); id. at 6 ("DHS has no facilities beside Marsha's which can accommodate my needs"); id. at 7 ("I am asking the Court to ... order[ ] ... DHS to place me back at Marsha's").) Lopez's sole allegations that mention Project Renewal state: "DHS refusal to block Project Renewals request to transfer me from Marsha's House was a violation of my rights to be 'reasonably accommodated' under local, state and federal law. (Demanding Project Renewal staff prove their allegations while I'm still at Marsha's is not unreasonable)." (Id. at 6.)

These scattered references to Project Renewal do not suggest that it rejected Lopez's request for a reasonable accommodation or otherwise failed to accommodate her disabilities. Lopez's accommodation claim instead focuses on DHS' actions and the failings of the DHS shelter system, over which Project Renewal is not alleged to have any control. (See Am. Compl. at 3 ("ALL other DHS facilities besides Marsha's are ... not reasonable

accommodations for my" disabilities.).) If DHS refuses to reinstate Lopez at Marsha's House, and allegedly none of DHS' other facilities accommodate Lopez's disabilities, it would seem that this claim is properly directed at DHS, not Project Renewal, as evidenced by Lopez's allegations.

On the other hand, Lopez's allegations suggest that Project Renewal caused her transfer from Marsha's House, thus denying Lopez her preferred accommodation, i.e., to remain at that facility. Lopez claims that her transfer was precipitated by Project Renewal's allegations that Lopez broke the shelter's rules and threatened its staff. (See Am Compl. at 6 ("Demanding Project Renewal staff prove their allegations while I'm still at Marsha's is not unreasonable"); see also pages 4-5 above.) Lopez does not claim, however, that her alleged outbursts were triggered by her disabilities (see Roberts Aff. Ex. 10: 6/14/17 Sup. Ct. Order. at 9-10 ("To the extent that [Lopez's] conduct may be characterized as civil disobedience, ... she is herself to blame for the consequences of her conduct")), such that she requires a reasonable accommodation (counseling services, for example) to comply with Marsha's House rules and thus permit her continued residence there.[17] To the contrary, Lopez argues that Marsha's House itself is a reasonable accommodation. And, because none of the other shelters, allegedly controlled solely by DHS, would accommodate her disabilities, Lopez claims she is entitled to a permanent residency at Marsha's House— no matter the circumstances. That is not a reasonable accommodation as a matter of law and would result in an impermissible "heads I win tails you lose" outcome in Lopez's favor: Project Renewal never could transfer Lopez because a transfer anywhere else would constitute an unreasonable accommodation, yet Lopez would be free to disregard the shelter's rules with impunity. See, e.g., Wright v. N.Y.S. Dep't of Corr., 831 F.3d 64, 76 (2d Cir. 2016) ("[T]he plaintiff 'bears the initial burdens of both production and persuasion as to the existence of an accommodation' that is 'facial[ly] reasonable.' ").

17    Compare Roe v. Hous. Auth. of City of Boulder, 909 F. Supp. 814, 816-17 (D. Colo. 1995) (Defendant "served [plaintiff] with a '30 Day Notice of Intent to Terminate Tenancy' .... [Defendant] seeks to evict [plaintiff] based, in large part, on his abusive and threatening behavior.... [Plaintiff] contends that each allegation of the Notice implicates a symptom of either his mental disability or his hearing impairment.... [Plaintiff] alleges that the

symptoms and related behavior associated with each of his conditions are controllable and readily accommodated.").

*13  Project Renewal's motion to dismiss Lopez's failure to accommodate claim should be GRANTED. However, Lopez should be given leave to file a "Second Amended Complaint" if she can allege a facially reasonable accommodation that Project Renewal failed to provide.

### 3. Lopez Has Plausibly Alleged A Retaliation Claim Against Project Renewal

Project Renewal argues that Lopez's retaliation claim fails because she does not allege that she engaged in a protected activity or was subjected to an adverse action as a result. (Dkt. No. 50: Project Renewal Br. at 14-15.)

In addition to its anti-discrimination provisions, the ADA contains an anti-retaliation provision: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). A prima facie case of retaliation under the ADA requires a showing that: " '(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action.' " Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 148 (2d Cir. 2002); accord, e.g., Ibrahim v. Pena, 16 Civ. 7774, 2017 WL 3601246 at *3 (S.D.N.Y. Aug. 21, 2017) (Caproni, D.J.). "A plaintiff's burden at this prima facie stage is de minimis." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

Lopez has alleged a plausible retaliation claim against Project Renewal. Lopez filed this action against DHS and Project Renewal under ADA Titles II and III on April 25, 2017 (see page 2 above)—an ADA protected activity of which Project Renewal was aware as a named defendant.[18] On May 31, 2017, Justice Jaffe lifted her previous stay and DHS transferred Lopez from Marsha's House to WIN West. (See page 6 above.) Lopez alleges that Project Renewal allegedly "request[ed] to transfer [Lopez] from Marsha's House" and DHS failed to "block" that request. (See page 22 above.) Lopez's allegations, read

liberally, suggest that Project Renewal's request was the proximate cause of DHS' transfer decision, even if DHS had the ultimate decisionmaking authority to effectuate a transfer. [19] Borrowing from ADA employment cases, "[t]he Second Circuit has construed 'adverse employment action' to be broader for retaliation claims than for discrimination claims. In the context of an ADA retaliation claim, an adverse employment action is an action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.' " Bien-Aime v. Equity Residential, 15 Civ. 1485, 2017 WL 696695 at *7 (S.D.N.Y. Feb. 22, 2017) (Caproni, D.J.) (citations omitted). Project Renewal's request to DHS to remove Lopez from Marsha's House—allegedly the sole LGBTQ facility within the DHS system (Dkt. No. 31: Am. Compl. at 6 ("only one GLBTQ facility exists"); Dkt. No. 46: Roberts Aff. ¶ 6 (Marsha's House "is the only DHS shelter specifically designated for LGBTQ individuals")) —could dissuade a reasonable person in Lopez's position from pursuing a discrimination claim. [20] Finally, "a close temporal relationship between a plaintiff's participation in protected activity and [a defendant's] adverse actions can be sufficient to establish causation." Treglia v. Town of Manlius, 313 F.3d at 720. [21] The one-month gap between the filing of Lopez's ADA complaint and her transfer from Marsha's House (actually less because the TRO stayed in effect for much of that period) supports an inference of causation at this phase of the litigation. [22]

[18] See, e.g., Deehberry v. N.Y.C. Fire Dep't, 124 F. Supp. 3d 131, 154 (E.D.N.Y. 2015) ("Plaintiff's engagement in a federal lawsuit ... constitute[s] a 'protected activity.' "); Gaines v. N.Y.C. Transit Auth., 528 F. Supp. 2d 135, 149 (E.D.N.Y. 2007) ("Plaintiff engaged in protected activity under the ADA when he filed ... [a] lawsuit against the" defendant.), aff'd, 353 Fed.Appx. 509 (2d Cir. 2009), cert. denied, 560 U.S. 979, 130 S. Ct. 3411 (2010).

[19] Cf. Gierlinger v. Gleason, 160 F.3d 858, 872-73 (2d Cir. 1998) (Plaintiff "was of course also required to prove that her termination was proximately caused by [defendant's] retaliatory conduct. But since [plaintiff's] claim was not that [defendant] personally made the decision to terminate her but rather that he made retaliation-based decisions and recommendations that led to her termination, the proximate cause determination was governed by ordinary principles of causation.... [T]he jury could find the necessary causation if it concluded that the

retaliatory actions by [defendant] proximately led to the ultimate decision."); Jong-Fwu v. Overseas Shipholding Grp., Inc., 00 Civ. 9682, 2002 WL 1929490 at *7 (S.D.N.Y. Aug. 21, 2002) ("Plaintiff's claim of retaliatory discharge under Section 1981 against defendant ... can survive a motion for summary judgment only on a showing of 'some affirmative link to causally connect the actor with the discriminatory action.' ... [Defendant] recommended to his supervisor that [plaintiff's] position be eliminated.... This is sufficient to constitute personal involvement in the decision to terminate [plaintiff's] employment." (citation omitted)).

[20] See, e.g., Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) ("[C]onsidering the perspective of a reasonable employee ... bespeaks an objective standard. The standard may be objective, but '[c]ontext matters.' " 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.' " Therefore, 'an act that would be immaterial in some situations is material in others.' For example, '[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.' " (citations omitted)).

[21] Accord, e.g., Graham v. Macy's, Inc., 14 Civ. 3192, 2016 WL 354897 at *9 (S.D.N.Y. Jan. 28, 2016) ("Such a causal connection may be inferred from temporal proximity."), aff'd, 675 Fed.Appx. 81 (2d Cir. 2017).

[22] See, e.g., Nagle v. Marron, 663 F.3d 100, 111 (2d Cir. 2011) ("While we have not 'drawn a bright line' defining the maximum time period that can give rise to an inference of causation, six weeks fits comfortably within any line we might draw." (citation omitted)); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) ("Although the plaintiff filed her complaint with the EEOC on February 4, 1994, the complaint was not served on [defendant] until the beginning of April 1994. She was suspended later that month. This time span is short enough to permit a jury to infer a causal connection."); Saber v. N.Y.S. Dep't of Fin. Servs., 15 Civ. 5944, 2017 WL 985889 at *13 (S.D.N.Y. Mar. 10, 2017) ("The passage of approximately one month between the protected activity and the retaliation may give rise to an inference of causation.").

**\*14** Project Renewal's motion to dismiss Lopez's ADA retaliation claim should be <u>DENIED</u>.

### 4. Lopez Has Not Alleged That Project Renewal Is A "Public Entity" Covered by Title II of the ADA

Project Renewal argues that Lopez's claims under Title II of the ADA should be dismissed because it is not a "public entity." (Dkt. No. 50: Project Renewal Br. at 15-16.)

Title II provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, ... be denied the benefits of the services ... <u>of a public entity</u>, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). As used in Title II, the term "public entity" is defined as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States; and (C) ... any commuter authority." 42 U.S.C. § 12131(1); accord, e.g., <u>Pierce</u> v. <u>Fordham Univ., Inc.</u>, No. 16-2078-cv, 2017 WL 2589378 at \*2 (2d Cir. June 15, 2017) ("Title II [of the ADA] applies only to state and local governments, their instrumentalities, and commuter authorities.").

Project Renewal is not a "State or local government" or a "commuter authority," nor does it appear to be a government "department, agency, ... or other instrumentality." The Second Circuit has held that the phrase "instrumentality of a State" "suggests that to be an instrumentality, an entity must somehow belong to the government or have been created by it," and "is thus a creature of the municipality or state whose ends it serves." <u>Green</u> v. <u>City of N.Y.</u>, 465 F.3d 65, 79 (2d Cir. 2006). In <u>Green</u>, the Second Circuit held that "[a] private hospital performing services pursuant to a contract with a municipality even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity. Instead it is a parallel private entity." <u>Id.</u>; accord, e.g., <u>Phillips</u> v. <u>Tiona</u>, 508 Fed.Appx. 737, 748 (10th Cir. 2013) (" 'A private contractor does not ... become liable under Title II [of the ADA] merely by contracting with the State to provide governmental service, essential or otherwise. Numerous courts have agreed with this analysis." (citation omitted, citing cases)). Neither Lopez's initial nor Amended Complaint allege that Project Renewal is a "public entity," let alone contain any allegations regarding Project Renewal's relationship to DHS or the City. (See generally

Dkt. No. 2: Compl.; Dkt. No. 31: Am. Compl.) [23] Lopez has not plausibly alleged that Project Renewal is subject to Title II of the ADA. <u>Powell</u> v. <u>Nat'l Bd. of Med. Examiners</u>, 364 F.3d 79, 85 (2d Cir. 2004) ("[F]or a plaintiff to establish a <u>prima facie</u> violation ..., she must demonstrate ... that the defendants are subject to" the ADA.).

[23]   According to the City's brief, Project Renewal is a private contractor. (See Dkt. No. 45: City Br. at 2 ("[I]n 2016 DHS contracted with Project Renewal, Inc., a non-profit shelter operator, to operate" Marsha's House.).)

Project Renewal's motion to dismiss the claims against it under Title II of the ADA should be GRANTED.

### CONCLUSION [24]

[24]   If Lopez requires copies of any of the cases reported only in Westlaw, she should request copies from defense counsel. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.

**\*15** For the reasons set forth above, the Court should rule as follows:

(1) the City's motion to dismiss (Dkt. No. 44) should be <u>DENIED</u> in its entirety;

(2) Project Renewal's motion to dismiss (Dkt. No. 49) should be <u>DENIED</u>, except <u>GRANTED</u> as to Lopez's failure to accommodate claim and any claims under Title II of the ADA; and

(3) Lopez should be granted leave to file a Second Amended Complaint to name Project Renewal as a defendant and to add facts to support her Title III failure to accommodate claim against Project Renewal.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Valerie E. Caproni, 40 Foley Square, Room 240, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Caproni (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 Fed.Appx. 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

**All Citations**

Slip Copy, 2017 WL 4342203

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4863368

2012 WL 4863368
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

Barry SIMON, Plaintiff,
v.

CITY OF NEW YORK, Anthony Blanding, Obafemi
Imotep, N.Y.P.D. P.O. Hasnat (9131), N.Y.P.D. P.O.
Leon (1579), Michael A. Cardozo, Thomas Kidera,
Lesly Williams, Department of Housing Preservation
Development MDR# 312793, Defendants.

No. 12–CV–1596 (CBA).
|
Oct. 11, 2012.

**Attorneys and Law Firms**

Barry Simon, Brooklyn, NY, pro se.

*MEMORANDUM AND ORDER*

AMON, Chief Judge.

*\*1 On March 30, 2012, plaintiff Barry Simon, appearing *pro se,* filed a complaint against defendants. On April 4, 2012, Simon filed an amended complaint. Simon seeks damages and injunctive relief. The Court grants Simon's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915(a). The amended complaint is dismissed as set forth below.

*Background*

The Court takes judicial notice that Simon has already filed an action against several of the same defendants. *See Simon v. Kidera,* No. 11–CV–6161 (CBA) (filed Dec. 20, 2011). By Order dated January 4, 2012 (the "January 2012 Order"), the Court dismissed the claims against the Department of Housing and Preservation Development (HPD), Thomas Kidera, Lesly Williams, Anthony Blanding and Obafemi Imotep. *See id.,* slip op. at 2–4. The false arrest claim against Police Officer Aquino was allowed to proceed. See *id.,* slip op. at 5– 6. In this action, Simon sues the same defendants who

were dismissed in the prior action and includes additional defendants: the City of New York,[1] Police Officer Hasnat, Police Officer Leon and Michael A. Cardozo, the Corporation Counsel for the City of New York.

[1]   Simon's amended complaint uses the caption "Simon v. City of New York et al" and cites "the City of New York et al." under the subheading "Defendants." Am. Compl. at ECF p. 1–2. However, it does not actually list an address for the City in its list of named defendants. Liberally construing plaintiff's complaint, the Court reads the amended complaint as including the City as a named defendant.

The amended complaint in the instant action raises the following new factual allegations: (1) that Simon and defendant Anthony Blanding entered into a "properly executed {rent stabilized} lease involving Apartment # 6 of 83 East 18 th Street, Brooklyn, New York 11226" ("the apartment"); (2) that on February 24, 2011, Simon notified defendant Blanding that he "had obtained proof that the apartment was rent stabilized and that [he] wished to receive a copy of the lease agreement," but that Blanding refused Simon's request at defendant Obafemi Imotep's direction; (3) that in March and late July/August 2011, Simon filed lawsuits in housing court complaining that the apartment had a faulty mailbox and that Blanding and Imotep were tampering with his mail; (4) that on April 6, 2011, defendant Police Officers Hasnat and Leon arrived at the apartment at Imotep's request and "demanded that [Simon] present written proof that [he] lived at that address or else leave immediately;" (5) that on August 15, 2011, "Corporation Counsel claimed that the City of New York actually owned the premises in question and that Obamfemi Imotep was under lease agreement (rather than 'the landlord/owner' as he claimed to be)" and denied that Simon was a legal tenant of the apartment; and (6) that in July or August of 2011, Imotep filed a holdover petition against Simon, which was dismissed without prejudice to renewal on March 12, 2012 due to Imotep's failure to appear. Am. Compl. at ECF p. 4–6. The remaining claims were raised in the earlier action.

Simon again claims violations of due process under the Fourteenth Amendment and contends that he is entitled to damages pursuant to New York City's Rent Stabilization Laws. Simon also makes conclusory allegations that the City of New York conspired with defendants to "harass, retaliate and discriminate against [him] for exercising [his] constitutional rights to make good faith complaints ...."

2012 WL 4863368

Am. Compl. at ECF p. 7. Simon seeks damages under the Americans with Disabilities Act and "a restraining order of protection against each of the defendants to prohibit them from interfering with [his] future ability to enjoy the rent stabilized housing privileges owed to a disable[d] tenant." *Id.*

### *Standard of Review*

**\*2** In reviewing Simon's amended complaint, the Court is mindful that "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers ." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted). Consequently, "we must liberally construe [Simon's] pleadings, and must interpret his complaint to raise the strongest arguments it suggests." *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007). This is particularly the case where "the *pro se* plaintiff alleges that her civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008). Nevertheless, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will be considered "plausible on its face" "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Pursuant to the *in forma pauperis* statute, the Court must dismiss a complaint if it determines that the action "(i) is frivolous or malicious, (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Finally, if the Court "determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed.R.Civ.P. 12(h)(3).

### *Discussion*

### I. Claims Against Department of Housing Preservation Development ("HPD")

As explained in the January 2012 Order, Section 396 of the New York City Charter forecloses lawsuits against New York City departments and agencies such as the HPD,

as distinct from the City itself. *See* Jan. 12 Order at 3; *Ximines v. George Wingate High Sch.,* 516 F.3d 156, 160 (2d Cir.2008). All claims against HPD MDR # 312793 are therefore dismissed.

### II. Claims for Constitutional Violations

Simon raises several constitutional claims, which the Court construes as brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983. Simon expressly alleges that defendants violated his due process rights under the Fourteenth Amendment. Am. Compl. ECF p. 3, 7. Simon further alleges unspecified constitutional violations by Officers Hasnat and Leon with respect to the events of April 6, 2011. Finally, Simon alleges that all defendants were part of a conspiracy to "harass, retaliate, and discriminate" against him. The Court construes this as arising under 42 U.S.C. §§ 1983 or 1985.

### A. Section 1983 Claims Against Private Parties Blanding and Imotep

For the same reasons set forth in the January 12 Order, Simon's claims for constitutional violations under Section 1983 against Blanding and Imotep must be dismissed pursuant to § 1915(e)(2)(B). Simon's allegations of a nexus between the private defendants and the City are vague and conclusory and fail to demonstrate that the actions of the defendants should be treated as state action. *See* Jan. 2012 Order; 42 U.S.C. § 1983.

### B. Section 1983 Claims Against Cardozo, Kidera, and Williams

**\*3** For the same reasons set forth with respect to defendants Thomas Kidera and Lesly Williams in the January 2012 Order, Simon fails to state a Section 1983 claim against defendants Michael A. Cardozo, Thomas Kidera and Lesly Williams, who are state actors, because he fails to provide facts to support a federal claim against these individuals.

As a prerequisite to a damage award under Section 1983, a plaintiff must allege the defendant's direct or personal involvement in the alleged constitutional deprivation. *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006). Here, Simon does not make any allegations that defendants Cardozo, Kidera or Williams deprived him of his civil rights. Indeed, not once in his Statement of Claim or Prayer for Relief does plaintiff even mention Cardozo

2012 WL 4863368

or Kidera, and the only reference to Williams is that she "compiled and completed" Corporation Counsel's verified answer to Simon's August 2011 complaint in housing court. *See* Am. Compl. ECF p. 4–7. As is clear from a review of the exhibits annexed to Simon's amended complaint, Cardozo, Kidera, and Williams are involved in this matter only to the extent that they defended Simon's housing court actions against the City in their roles as the Corporation Counsel, Special Assistant Corporation Counsel, and an employee of HPD, respectively.

To the extent Simon names defendant Cardozo based solely on his supervisory role as the Corporation Counsel for the City of New York, the United States Supreme Court has held that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," and rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Iqbal*, 556 U.S. at 676–77. Since the claim against this supervisor defendant, as presently stated, can be supported only on the basis of *respondeat superior* or vicarious liability doctrines, which are not applicable to Section 1983 actions, the amended complaint is dismissed against Cardozo for failure to state a claim under § 1915(e)(2)(B). As Simon has again failed to allege that either Kidera or Williams personally engaged in any violation of his civil rights, his Section 1983 claims against these defendants are also dismissed under § 1915(e)(2)(B).

### C. Section 1983 Claims Against Officers Hasnat and Leon

Simon's claims against Police Officers Hasnat and Leon concern events alleged to have occurred on April 6, 2011, when he was asked to produce proof of his tenancy. The Court again construes this claim as brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983. Nevertheless, the Court finds that Simon has not alleged facts rising to the level of a constitutional violation. Simon does not allege that he was falsely arrested, nor does he allege that the defendant officers forced Simon to vacate the premises of the apartment when he could not produce written proof of lawful residency. Nor do the facts alleged in Simon's amended complaint support a claim of excessive force. Although Simon alleges that the officers were "extremely verbally aggressive," he alleges no injury resulting from the encounter of April 6. He has stated no claim actionable

under Section 1983. *See Justice v. McGovern*, No. 11–cv–5076, 2012 WL 2155275, at *3 (E.D.N.Y. Jun.12, 2012) ("Courts in the Second Circuit have consistently held that mere threats, verbal harassment or profanity, without any injury or damage, are not actionable under Section 1983") (internal quotation marks omitted). Simon's Section 1983 claims against Officers Hasnat and Leon are dismissed for failing to state a claim under § 1915(e)(2)(B).

### D. Section 1983 Claims Against the City of New York

*4 Municipalities such as the City of New York can be liable under Section 1983 only if a plaintiff can show that a municipal policy or custom caused a deprivation of his or her constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As addressed above, Simon has failed to adequately allege any violation of his constitutional rights. Even if he had, plaintiff has not alleged any City policy or custom upon which to base a finding of municipal liability. Simon's Section 1983 claims against the City are dismissed for failure to state a claim.

### E. Conspiracy Claim Under Section 1983

To state a claim that private parties were engaged in a conspiracy with state actors under Section 1983, a plaintiff must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello*, 292 F.3d at 324–25. Complaints that contain "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." *Id.* Simon has alleged no facts suggesting the existence of an agreement—express or tacit—between Inotep and Blanding and *any* state actor. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir.2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators"; *see also Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir.2003). Plaintiff's claims that defendants conspired to harass, retaliate, and discriminate against him are "unsupported, speculative, and conclusory." *Bo ddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir.1997). As such, any claim for Section 1983 conspiracy fails.

*F. Conspiracy Claims Under Section 1985*

Granting Simon's amended complaint the liberal reading required, his conspiracy claims may also be construed as brought under 42 U.S.C. § 1985.

Section 1985(2) contains two separate clauses. The first makes it unlawful for "two or more persons ... [to] conspire to deter, by force, intimidation, or threat, any party ... in any court of the *United States* from attending such court." 42 U.S.C. § 1985(2) (emphasis added). The second clause makes it unlawful for "two or more persons [to] conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any *State* ... with *intent to deny to any citizen the equal protection of the laws ...*" *Id.* (emphasis added). The first clause expressly involves conspiracies to obstruct justice in federal courts, while the second clause involves conspiracies to obstruct justice in state courts. Unlike the first clause, which "outlaws *all* interference with any person's attempt to attend federal court," *Keating v. Carey,* 706 F.2d 377, 385 (2d Cir.1983), the second clause explicitly requires that conspirators' actions "be motivated by an intent to deprive their victims of equal protection of the laws." This requirement has been interpreted to mean that plaintiff must allege discriminatory "racial, ethnic, or class-based animus" motivating the conspirators' action. *Zemsky v. City of New York,* 821 F.2d 148, 151 & n. 4 (2d Cir.1987) (citing *Kush v. Rutledge,* 460 U.S. 719, 722–24, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983)).

**\*5** To the extent that Simon argues that defendants conspired to interfere with his "constitutional right to make good faith complaints" in housing court, a division of the New York City Civil Court, only the second clause applies, and so Simon must allege discriminatory intent. Although Simon offers no facts regarding his alleged disability, he provides a copy of a notice of change in payment of his Supplemental Security Income in the annexed exhibits to his amended complaint, and so the Court will assume that he is in fact disabled. Nevertheless, despite conclusory assertions that defendants "discriminate[d] against" him, Simon has made absolutely no claim that any of the defendants discriminated against him *because of* his disability, his race, or otherwise. Rather, the very reason Simon offers for this alleged discrimination is that defendants were retaliating against him for previously bringing his housing complaints. Am. Compl. ECF p. 7. The annexed exhibits reveal that the housing court proceedings commenced

by Simon involved mailbox repair, mail tampering, and rent overcharge and do not appear to relate to Simon's disability. Retaliation for such complaints does not suffice to establish class-based discriminatory intent. *See Poles v. Brooklyn Comty. Housing & Serv.,* No. 10–cv–1733, 2010 WL 1992544, at \*2 (E.D.N.Y. May 14, 2010) (retaliatory motivation not discriminatory animus); *see also Fox v. County of Yates,* No. 10–cv–6020, 2010 WL 4616665 at \*4 n. 4 (W.D.N.Y. Nov.12, 2010) (status as whistleblower not a protected class under Section 1985). Therefore, not only has Simon failed to provide any allegation of a conspiratorial agreement, he has failed to allege that defendants harbored discriminatory intent.

Section 1985(3) similarly prohibits a conspiracy between two or more persons to deprive another of the equal protection of the laws, or of equal privileges and immunities under the laws. *Estes–El v. Dianoulin,* No. 06–cv–2528, 2012 WL 1340805, at \*6 (E.D.N.Y. Apr.18, 2012) (citing *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993)). As under the second clause of 1985(2), the "equal protection" language requires that the conspiracy was motivated by a class-based discriminatory animus. *Mian,* 7 F.3d at 1087; *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). As Simon has failed to allege that any defendant harbored an intent to discriminate, his conspiracy claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

**IV. Housing Claims**

*A. Federal Housing Discrimination Claims*

The Fair Housing Act ("FHA"), as amended by the Fair Housing Amendment Act, makes it illegal "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of a handicap of that person." 42 U.S.C. § 3604(f)(2)(A). Title II of the Americans with Disabilities Act ("ADA") prohibits public entities such as the City from denying government programs or services to, or otherwise discriminating against "qualified individual[s] with a disability ... by reason of such disability." 42 U.S.C. § 12132. Title III of the ADA prohibits discrimination "on the basis of disability" by private individuals who own, lease, or operate a place of public accommodation. 42 U.S.C. § 12182. Finally, the Rehabilitation Act of 1973, a predecessor to the ADA, provides that "[n]o otherwise

qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

**\*6** For purposes of the instant complaint, the FHA, ADA, and Rehabilitation Act impose similar standards with respect to disability discrimination, and so the Court will analyze them in tandem. *See, e.g., Smith v. N.Y.C. Hous. Auth.,* 410 F. App'x 404, 406 (2d Cir.2011). A plaintiff can base a claim of disability discrimination on "any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Brief v. Albert Einstein Coll. of Med.,* 423 F. App'x 88, 90 (2d Cir.2011) (quoting *Fulton v. Goord,* 591 F.3d 37 (2d Cir.2009); *Smith,* 410 F. App'x at 406. Simon need not claim intentional discrimination to state a claim under "disparate impact" or "failure to accommodate" theories. *See Krist v. Kolombos Rest. Inc.,* No. 11–cv–1263, 688 F.3d 89, 2012 WL 3002598, at \*5 (2d Cir. Jul.24, 2012) (failure to accommodate); *Smith,* 410 F. App'x at 406 (disparate impact). Nevertheless, he must do so under a disparate treatment theory, *Smith,* 410 F. App'x at 406, and must plead that defendants at least knew of his disability under a "failure to accommodate" theory. *See Masjid Al–Tawheed, Inc. v. Town of Putney,* 336 F. App'x 60, 62 (2d Cir.2009); *Sinisgallo v. Town of Islip Hous. Auth.,* No. 12–cv–1733, 2012 WL 1888140, at \*28 (E.D.N.Y. May 23, 2012). Moreover, to state a prima facie housing discrimination claim under any of these statutes, a plaintiff must show "that he was qualified for an available benefit and was denied that benefit." *Johnson v. Levy,* 812 F.Supp.2d 167, 180 (E.D.N.Y.2011).

Even assuming that Simon has adequately alleged that he is disabled, that he is "qualified" as defined by the various statutes, and that he is legally entitled to inhabit the apartment at the rent-stabilized rate he claims,[2] he nevertheless has failed to make out a claim for discrimination under any of these statutes. Simon alleges that Blanding and Imotep overcharged him for rent, that Imotep brought court proceedings against him for holding over his tenancy and for rent arrears, and that Blanding and Imotep refused to provide a copy of his lease. However, plaintiff has failed to allege that either Blanding or Imotep even knew of his disability, let alone that they intentionally discriminated against him because

of his disability. He thus cannot recover against either private defendant on disparate treatment or failure to accommodate grounds.

2    *See Sinisgallo v. Town of Islip Hous. Auth.,* No. 12–cv–1733, 2012 WL 1888140, at \*26 (E.D.N.Y. May 23, 2012) ("As a general matter, in most cases, individuals who meet the definition of disability for purposes of receiving SSI or SSDI benefits also qualify as disabled under the federal disability statutes." (citing *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 797, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999)).

To the extent plaintiff is claiming housing discrimination against the City, he has not alleged any facially neutral policy or practice with a discriminatory effect, and so has not stated a claim under a disparate impact theory. *See Tsombanidis v. West Haven Fire Dep't,* 352 F.3d 565, 574–75 (2d Cir.2003). Moreover, he has failed to allege any facts whatsoever suggesting that the City denied him any benefit or accommodation to which he was entitled because of his disability, or that he ever even requested a disability accommodation. Indeed, the exhibits reveal that the City actually accommodated plaintiff's requests to repair his mailbox despite denying his legal tenancy. As plaintiff has failed to allege any basis for recovery under the Fair Housing Act, the ADA, or the Rehabilitation Act, these claims against defendants are dismissed for failure to state a claim.

### B. Claims for Violation of Rent Stabilization Laws and Failure to Acknowledge Tenancy

**\*7** Simon alleges that Imotep, Blanding, and the HPD have failed to abide by rent stabilization laws or acknowledge his tenancy; however, these are matters of state housing law. "Federal courts do not have subject-matter jurisdiction over landlord-tenant matters ." *Rosquist v. St. Marks Realty Assoc., LLC,* No. 08–cv–2764, 2008 WL 2965435, at \*2 (E.D.N.Y. Aug.1, 2008) (citing cases); *see also Southerland v. N.Y.C. Hous. Auth.,* No. 10–cv–5243, 2011 WL 73387, \*2 (E.D.N.Y. Jan.7, 2011) (rule applies even where City is the landlord). As the Court has dismissed all of Simon's federal claims, it declines to exercise supplemental jurisdiction over claims relating to the disposition of the lawful landlord/owner of the apartment, Simon's tenancy, or any rent overcharge.

### Conclusion

The amended complaint, filed *in forma pauperis*, is dismissed as against all defendants for failure to state a claim. 28 U.S.C. § 1915(e)(2)(B). The Court is mindful that Simon already received an opportunity to amend his complaint in the 11–cv–6161 action with respect to defendants Kidera, Williams, Blanding, and Imotep, but failed to do so. Simon's amended complaint has not given this Court "any indication that a valid claim might be stated" against any defendant, *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999), and so the Court declines to grant leave to amend. Simon's request for a "restraining order of protection" is denied. Any state law claims are dismissed without prejudice. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 4863368

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1811423
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Pierre TAYLOR, Plaintiff,

v.

John E. POTTER, Postmaster General, Defendant.

No. 99 Civ. 4941(AJP).
|
Aug. 16, 2004.

*OPINION AND ORDER*

PECK, Chief Magistrate J.

**\*1** Plaintiff Pierre Taylor brings this Title VII action against the United States Postal Service ("U.S.P.S." or the "Postal Service") claiming that he was suspended three times and allegedly denied lunch breaks and overtime due to racial discrimination and retaliation. (Dkt. No. 2: Compl.) Taylor is now represented by a special guardian ad litem for purposes of this litigation, who in turn is represented by counsel. (Dkt. No. 70: 9/10/03 Order.) Presently before the Court is the U.S.P.S.'s summary judgment motion. For the reasons stated below, the motion (Dkt. No. 82) is *GRANTED* .

*FACTS*

Pierre Taylor began working full-time for the Postal Service in 1981. (Dkt. Nos. 90 & 83: Taylor & Potter 56.1 Stmts. ¶ 1; Dkt. No. 87: Normand Aff. Ex. B: Taylor Dep. at 22, 24.) From 1991 to 1998, Taylor worked at the Bowling Green Station Post Office in New York City as a distribution clerk responsible for dispatching, which includes receiving, loading, and unloading trucks. (Taylor & Potter 56.1 Stmts. ¶¶ 2–3; Taylor Dep. at 33–35.)

*The June 18, 1997 Incident and Taylor's Suspension*
On June 18, 1997, Taylor was assigned to work the night shift at the Bowling Green Station. (Taylor & Potter 56.1 Stmts. ¶ 4; Taylor Dep. at 140.) At the start of that shift, no regular supervisor was present. (Taylor & Potter 56.1 Stmts. ¶ 5; Taylor Dep. at 69.)

When Robin Carretta, a letter carrier at Bowling Green Station, arrived for work around 10 p.m. on June 18, she was telephoned by either a station manager or a supervisor who informed her that she was the acting supervisor until another supervisor arrived at around 5:00 or 6:00 a.m. the next morning. (Taylor & Potter 56.1 Stmts. ¶ 6; Normand Aff. Ex. H: Carretta Dep. at 18, 22–23.) This was the first time Carretta had been an acting supervisor at Bowling Green Station. (Taylor 56.1 Stmt. ¶ 6; Carretta Dep. at 24.) Taylor did not know that Carretta was asked to serve as an acting supervisor. (Taylor 56.1 Stmt. ¶ 6; *see also* Taylor Dep. at 69: "No one was in charge.... There were no supervisors there.")

Taylor "clocked in" for work at 11:07 p.m., clocked out at 12:33 a.m., and went outside. [1] (Taylor & Potter 56.1 Stmts. ¶¶ 7–8; Taylor Dep. at 68; Kalman Aff. Ex. K.) Taylor went outside "waiting for a supervisor to arrive to inform the supervisor that he was ill and unable to work." (Taylor 56.1 Stmt. ¶ 11; Taylor Dep. at 68.) While Taylor was outside, sanitation workers and postal police rang the doorbell in the basement dispatch area. (Taylor & Potter 56.1 Stmts. ¶ 9; Carretta Dep. at 22, 25, 27, 35.) Carretta had expected Taylor to open the door, and she paged Taylor several times over the intercom. (Taylor & Potter 56.1 Stmts. ¶ 10; Carretta Dep. at 22, 35.) Because Taylor did not open the door, Carretta had to leave the work floor and go downstairs to do so. (Taylor & Potter 56.1 Stmts. ¶ 12.)

[1]    Taylor does not dispute the time at which he clocked in, but as to all "clock rings" references, responds that Taylor's guardian and its counsel "cannot fully understand the information contained in said 'clock rings' documents and requires further discovery in order to understand said documents." (Taylor 56.1 Stmt. ¶ 7 & n. 1 .) The Postal Service maintains that it "provided the Guardian's counsel with a time conversion table, a pay period charge, and annotated sample clock rings, as well as definitions of the principal codes contained in the clock rings. (Dkt. No. 95: Potter Reply Br. at 13 n. 12, citing Dkt. No. 94: Normand Supp. Aff. ¶ 18 & Ex. K.) The U.S.P.S. contends that it also "offered on more than one occasion to provide, upon written request, definitions of any codes or abbreviations contained in the clock rings." (Potter Reply Br. at 13 n.12, citing Normand Supp. Aff. ¶¶ 16–19 & Ex. L.) The U.S.P.S. further notes that its summary judgment papers included a

Taylor v. Potter, Not Reported in F.Supp.2d (2004)

2004 WL 1811423

"Clock Ring Key" that explained the various clock ring codes. (Potter Reply Br. at 13 n. 12, citing Dkt. No. 85: Kalman Aff. ¶ 12 & Ex. I.) In any event, the Court notes that Taylor's discovery period had long-since ended before the guardian was appointed, and the Court refused the guardian's request to broadly reopen discovery. (*See* pages 18–19 below.)

When Taylor eventually came back inside, he and Caretta "got into a verbal dispute." (Taylor & Potter 56.1 Stmts. ¶ 13; Carretta Dep. at 28–29; Taylor Dep. at 77–79.) Carretta states that during the dispute she asked Taylor "why" he was absent from his work station, although Taylor states that Carretta asked "where" he was. (Taylor & Potter 56.1 Stmt. ¶ 14; Carretta Dep. at 28–29; Taylor Dep. at 77–79.) According to Taylor, when he entered the building, Carretta approached him, yelling, " 'Taylor, where the fuck you been? I been looking all over for your fucking ass. I been paging you for 40 minutes. I'm not doing your motherfucking job. Go downstairs. I'm taking you off the clock for 40 minutes." (Taylor 56.1 Stmt. ¶ 14; Taylor Dep. at 78.) Taylor asked Carretta "[w]ho died and left her in charge," said that he did not have to listen to her, and might have called her "stupid." (Taylor & Potter 56.1 Stmts. ¶¶ 15–16; Taylor Dep. at 78–79.) Taylor got upset and raised his voice—according to Taylor, so Carretta could hear him over her own yelling. (Taylor & Potter 56.1 Stmts. ¶ 18; Taylor Dep. at 78.) While standing four or five feet away from Carretta, Taylor also "very possibl[y]" used profanity when speaking to a co-worker, Alan Negron, about Caretta, who heard his comments to Negron. (Taylor & Potter 56.1 Stmts. ¶ 16; Taylor Dep. at 79, 95, 101–03; Dkt. No. 87: Normand Aff. Ex. V: Negron Stmt.) Taylor admits that he might have talked with his hands or put his hands on his head during the dispute. (Taylor & Potter 56.1 Stmts. ¶ 17; Taylor Dep. at 80–81.)

*2 Carretta called the postal police because of the dispute. (Taylor & Potter 56.1 Stmts. ¶ 20; Taylor Dep. at 78.) When the postal police—two of whom were African American—arrived, Carretta told them that she was acting supervisor and asked that they remove Taylor because he was " 'menacing her after she questioned why he was away from his work station for 45 minutes." ' (Taylor & Potter 56.1 Stmts. ¶¶ 20–21; Dkt. No. 84: Eichenauer Aff. Ex. A: 6/18/97 Incident Rpt.) The postal police took statements from Carretta, Taylor, and another Bowling Green Station employee, Richard Lewis. (Taylor & Potter 56.1 Stmts. ¶ 22; Eichenauer Aff. ¶ 9 & Exs. B–D.)

Carretta's written statement reported that Taylor "made threatening gestures, yelled and cursed at her, and repeatedly ignored her request to return to his work station." (Taylor & Potter 56.1 Stmt. ¶ 23; Eichenauer Aff. Ex. B: Carretta Stmt.) Lewis' statement corroborates Carretta's account that Taylor "got upset and started to shout at Carretta," but also notes that Lewis did not witness the entire dispute. (Taylor & Potter 56.1 Stmts. ¶ 24; Eichenauer Aff. Ex. C: Lewis Stmt.) Taylor told the postal police that he " 'never stated anything to Robin [Carretta] except that no one to [his] knowledge ... put her in charge." ' (Taylor & Potter 56.1 Stmts. ¶ 26; Eichenauer Aff. Ex. D: Taylor Stmt.; Taylor Dep. at 115.) Around 2:30 a.m., after taking the statements, the postal police escorted Taylor out of Bowling Green Station and told him "not to return until [the following day] when the regular [s]upervisor was on duty." ' (Taylor & Potter 56.1 Stmts. ¶¶ 27–28; Eichenauer Aff. Ex. A: Carretta Stmt.; Taylor Dep. at 113.) Carretta did not refer to Taylor's race in any way during the incident. (Taylor & Potter 56.1 Stmts. ¶ 41; Taylor Dep. at 134; Carretta Dep. at 88.)

Antonio Juan, a regular supervisor, began his shift at around 2:30 a.m. (Taylor & Potter 56.1 Stmts. ¶ 29; Dkt. No. 85: Kalman Aff. Ex. K: 6/8/97 Shift Summ.) Juan was a new supervisor who had never supervised, met or spoken to Taylor. (Taylor & Potter 56.1 Stmts. ¶¶ 30–31; Taylor Dep. at 105–06, 141–42.) Juan issued Taylor "a retroactive notice," in which the Bowling Green Station manager Ronald Hart concurred, stating that Taylor was "suspended emergently without pay on 6/18/97, from 0250 to 0750 (balance of tour)." ' (Taylor & Potter 56.1 Stmts. ¶ 32, 34; Normand Aff. Ex. J: 6/18/97 Emergency Suspension Notice; Taylor Dep. at 146.) The suspension notice reads:

> You engaged in an act of misconduct and it would be disruptive to day-to-day postal operations for you to remain in a duty status.
>
> It appeared that your retention in an active duty status may have resulted in damages to government property or might have been detrimental to the interest of the government or injurious to you, your fellow workers, or the general public.

You have the right to file a grievance under the Grievance Arbitration Procedure ... (Normand Aff. Ex. J: 6/18/97 Emergency Suspension Notice; Taylor & Potter 56.1 Stmts. ¶¶ 32–34.) Taylor refused to sign for receipt of

Taylor v. Potter, Not Reported in F.Supp.2d (2004)

2004 WL 1811423

the Emergency Suspension Notice. (Normand Aff. Ex. J: 6/18/97 Emergency Suspension Notice at 2.) Taylor returned to work the following night and was given overtime hours on that date to make up for the time lost. (Taylor & Potter 56 .1 Stmts. ¶ 35.)

*3 On June 19, 1997, Juan issued Taylor a "Notice of Suspension of 14 Days or Less," which stated:

You are hereby notified that you will be suspended for a period of 7 calendar days beginning on 9/6/97. You are to return to duty on 9/13/97. The reasons for this suspension are:

Charge # 1—Acting in an unsafe manner.

Charge # 2—Creating a disturbance on the workfloor.

At approximately 0130 hours you were asked by Robin Carretta where you had been for the last 40 minutes. She had been paging you because you were missing from the Dispatch Area and the Private Sanitation Co. and the Postal Police were trying to obtain entrance to the Station and you were not there to admit them. She then had to go to the deck and admit them. You responded to Ms. Carretta to mind her fucking business, that she was only a fucking clerk and you were advancing towards her raising your arms and hands and cursing at her.

Carrier Lewis heard this conversation and stated that you were very upset and [were] shouting at Ms. Carretta. He also states that she was requesting you to please return to your work area. Ms. Carretta warned you that if you didn't stop yelling and cursing that she was going to call the Postal Police and you responded "I don't give a fuck when you do; you're nothing but a stupid clerk."

The Postal Service has zero tolerance for acts of this kind and we will not ever have any of our employees abused by another co-worker.

You have a right to file a claim for Unemployment Insurance (after the effective date of this action) ... You have a right to file a grievance under the General/ Arbitration procedure ...

(Normand Aff. Ex. K: 6/19/97 Notice of Suspension; Taylor 56.1 Stmts. ¶¶ 36–37, 39.) Juan's description of the incident is in agreement with Carretta's version of events.[2] (Taylor & Potter 56.1 Stmts. ¶ 39; Norman

Aff. Ex. K: 6/19/97 Notice of Suspension of 14 Days or Less; Eichenauer Aff. Exs. B–C.) The manager of the Wall Street Post Office, Kenneth Rodin, who is black, concurred in the Notice of Suspension. (Taylor & Potter 56.1 Stmts. ¶ 38; Normand Aff. Ex. F: Thompson Dep. at 52; Taylor Dep. at 146–47.) Taylor refused to sign for receipt of the notice of suspension. (Normand Aff. Ex. K: 6/19/97 Notice of Suspension of 14 Days or Less, at 2.)

2      While Potter's 56.1 statement states that in the Notice of Suspension "Juan *credited* Carretta's version of the incident on June 18, 1997" (Potter 56.1 Stmt. ¶ 39), Taylor "disputes that there is evidence that Mr. Juan *credited* Ms. Carretta's version" but "does not dispute that the Notice of Discipline *essentially adopts* Ms. Carretta's version of the incident" (Taylor 56.1 Stmt. ¶ 39, emphasis added). The Court finds this to be a distinction without a difference and certainly not a genuine issue of material fact sufficient to impede summary judgment.

Taylor does not dispute that Juan "was the supervisor who formally issued and signed the Notice of Suspension," but "submits that this disciplinary notice was issued at the instigation of Bowling Green Station Supervisor Gerald McCall ... based on racially discriminatory and retaliatory motives." (Taylor 56.1 Stmt. ¶ 36; *see also* pages 14–16 below.) Although Taylor testified at his deposition that he believed Juan did not know that the statements in the notice of suspension were false, particularly because Juan had never supervised Taylor before and therefore had no reason to lie (Potter 56.1 Stmt. ¶ 40; Taylor Dep. at 105–06), Taylor's counsel "disputes that Mr. Taylor is competent to testify as to whether Mr. Juan knew the statements were untrue or whether Mr. Juan would have reason to lie." (Taylor 56.1 Stmt. ¶ 40.)

*4 Prior to the June 18, 1997 incident, Taylor had filed EEOC complaints against Postal Service supervisors including Gerald McCall (*see* pages 14–15 below) in May 1986, February 1994, June 1996, and October 1996. (Dkt. No. 86: Sturman Aff. 5 & Ex. A; *see* Taylor & Potter 56.1 Stmts. ¶ 43.) None of these complaints involved Carretta or Juan. (Taylor & Potter 56.1 Stmts. ¶ 42.)

It is undisputed that Taylor was permitted to work overtime after the incident, including 6.65 overtime hours on June 19, 1997. (Potter 56.1 Stmts. ¶¶ 35, 44; Taylor Dep. at 161; Kalman Aff. Ex. J: Taylor Clock Rings Summ.) On at least one occasion after June 18, Taylor

Taylor v. Potter, Not Reported in F.Supp.2d (2004)

2004 WL 1811423

declined to work overtime hours. (Taylor & Potter 56.1 Stmts. ¶ 45.) The amount of overtime Taylor worked after the incident is disputed (Taylor 56.1 Stmt. ¶ 44), but Taylor does not specify how many hours of overtime he allegedly was denied. (*See* Dkt. No. 92: Taylor Br. at 29.)

Taylor disputes Potter's statement that Taylor "received a lunch break on each shift that he worked between June 18, 1997 and February 5, 1998" and that his lunch breaks averaged 30.24 minutes long. (Potter 56.1 Stmt. ¶ 46, Kalman Aff. Ex. J: Taylor Clock Rings Summ.) Taylor alleges that he was "regularly denied lunch breaks" during this period. (Taylor 56.1 Stmt. ¶¶ 46, 47; Taylor Dep. at 184–85.)

*Taylor's Unapproved September Absence and the October 9, 1997 Notice of Removal*
On September 17, 1997, Taylor was admitted to the emergency psychiatric unit of Kings County Hospital Center.[3] (Taylor & Potter 56.1 Stmts. ¶ 48; Normand Aff. Ex. W: 9/21/97 Psychiatric Eval.; Taylor Dep. at 255.) Taylor was absent from work without approved leave from September 22 to October 9, 1997. (Taylor & Potter 56.1 Stmts. ¶ 49; Taylor Dep. at 255; Normand Aff. Ex. N: 10/9/97 Notice of Removal; Kalman Aff. Ex. J: Taylor Clock Rings Summ.) The Postal Service claims that it "did not know when or if [Taylor] would be returning to work.[4] (Potter 56.1 Stmt. 50.)

[3]    Taylor has a history of mental illness dating back to 1978, including hearing "voices," and has been hospitalized for psychiatric care on several occasions. (Taylor Dep. at 396–405; Dkt. 88: Potter Br. at 10.) One of the voices Taylor heard after he was released from Kings County Hospital Center was supervisor "McCall harassing me, waking me up, disappearing." (Taylor Dep. at 414; Potter Br. at 11.) According to social worker Janet Rose, who the Crisis Intervention Center referred Taylor to after his hospitalization (Taylor 56.1 Stmt. ¶ 58), Taylor's psychosis included saying "that he feels that his boss and the people at his job were talking to and about him from the television ... Primarily telling him he was dead." (Normand Aff. Ex. G: Rose Dep at 10–11.)

[4]    The Postal Service concedes that it was notified on or about September 21, 1997 that Taylor was hospitalized. (Potter Br. at 11; Taylor Dep. at 255–57.)

On September 25, 1997, Postal Service supervisor Nicholas Ochlan sent Taylor a "NY Form P2–72 notice." (Taylor & Potter 56.1 Stmts. ¶ 51; Normand Aff. Ex. L: 9/25/97 P2–72 notice.) The P2–72 notice "directed [Taylor] to report for duty at once or submit satisfactory evidence substantiating the cause of his absence." (Taylor & Potter 56.1 Stmts. ¶ 53; Normand Aff. Ex. L.) The notice stated that if Taylor's absence was due to illness, he must " 'submit a signed and dated medical certificate immediately on a doctor's letterhead indicating medical facts sufficient to support the period of incapacity, [the] date [Taylor could] return to duty, and whether [Taylor was] able to return to full duty." ' (Taylor & Potter 56.1 Stmts. ¶ 54; Normand Aff. Ex. L.) The notice "specifically warned that " '[f]ailure to comply with the foregoing will result in disciplinary action being issued to remove you from the Postal Service." ' (Taylor & Potter 56.1 Stmts. ¶ 55; Normand Aff. Ex. L.)

*5 More than two weeks after issuing the P2–72 notice, Ochlan issued a notice of removal dated October 9, 1997. (Taylor & Potter 56.1 Stmts. ¶ 58; Normand Aff. Ex. M: 10/9/97 Notice of Removal.) Taylor had not reported to work for more than two weeks, had not provided any medical evidence to substantiate his absence. (Taylor & Potter 56.1 Stmts. ¶¶ 57, 61; Normand Aff. Ex. L: P2–72 Notice; Normand Aff. Ex. M: 10/9/97 Notice of Removal; Normand Aff. Ex. Z: 10/10/97 Rose Letter.) The notice of removal charges that Taylor was "continuously absent from his scheduled tour of duty without permission beginning on September 22, 1997" and "fail[ed] to comply with the P2–72 notice to submit satisfactory documentation of his absence." (Taylor & Potter 56.1 Stmts. ¶ 59; Normand Aff. Ex. M: 10/9/97 Notice of Removal.) Taylor's seven-day suspension dated June 19, 1997 was considered as part of the discipline decision. (Taylor & Potter 56.1 Stmts. ¶ 60; Normand Aff. Ex. M: 10/9/97 Notice of Removal.)

Taylor concedes that he received the P2–72 notice and that he understood that he was required to provide medical evidence that his absence was due to illness. (Taylor & Potter 56.1 Stmts. ¶ 56; Taylor Dep. at 264, 271.) Taylor argues, however, that although the notice of removal is dated October 9, 1997, shop steward Shirley Thompson did not sign it until October 14, 1997. (Taylor 56.1 Stmt. ¶ 58; Normand Aff. Ex. M: 10/9/97 Notice of Removal at 2.) Between October 9 and October 14, Taylor asked Kings County Hospital social worker Janet Rose to provide a

2004 WL 1811423

"doctor's note" to explain his absence. (Taylor 56.1 Stmt. ¶ 58; Rose Dep. at 22.) In an October 10, 1997 letter on Kings County Hospital letterhead, Rose wrote that Taylor "was 'being seen in the Crisis Intervention Center since 9/24/97 to present' and that '[i]t is recommended that he does not return to work until after his re-evaluation in 3 weeks.' " (Taylor 56.1 Stmt. ¶ 58; Taylor & Potter 56.1 Stmts. ¶ 63; Cogan Aff. Ex. Q: 10/10/97 Rose Letter.) It is undisputed that Rose's letter "was not signed by a physician, nor did it contain any medical facts or diagnosis." (Taylor & Potter 56.1 Stmts. ¶ 63.) Taylor hand-delivered Rose's letter to the Postal Service on October 14, 1997. (Taylor & Potter 56.1 Stmts. ¶ 62; Taylor 56.1 Stmt. ¶ 58; Dkt. 88: Potter Br. at 23 n. 13.) Taylor did not submit any other documentation about his absence. (Taylor & Potter 56.1 Stmts. ¶ 62; Taylor Dep. at 258–59, 272–73.)

In addition, although Taylor is a veteran (Dkt. No. 90: Taylor 56 .1 Stmt., Add'l Relevant Facts ¶ 25; Taylor Dep. at 18), the notice of removal classified Taylor's discipline as within the province of the "Non–Veteran Bargaining Unit." (Taylor 56.1 Stmt., Add'l Relevant Facts ¶ 24; Cogan Aff. Ex. O: 10/9/97 Notice of Removal.) McCall admitted that stations generally have records indicating which employees are veterans and that the supervisor administering discipline is responsible for determining whether an employee is a veteran. (Taylor 56.1 Stmt., Add'l Relevant Facts ¶ 26; Dkt. No. 87: Normand Aff. Ex. I: McCall Dep. at 106–07.) Taylor testified that he informed Ochlan and McCall that he was a veteran when he received the notice of removal, and that they "did nothing to correct the situation." (Taylor 56.1 Stmt., Add'l Relevant Facts ¶¶ 27, 34; Taylor Dep. at 254.) Thompson testified she was not aware that Taylor was a veteran and that Taylor never complained about his categorization as a non-veteran on the notice of removal. (Potter Reply Br. at 10 n. 9; Thompson Dep. at 67, 70–72.)

*6 Thompson, Taylor's shop steward, filed a grievance on Taylor's behalf regarding the notice of removal. (Taylor & Potter 56.1 Stmts. ¶ 64; Normand Aff. Ex. O: 10/25/97 Grievance Step 1 Summ.; Thompson Dep. at 64–65, 67–68.) Thompson requested that the disciplinary proceedings be delayed because she had been unable to reach Taylor, but her request was denied. (Taylor 56.1 Stmt. Add'l Relevant Facts ¶ 28–29; Cogan Aff. Ex. C: Thompson Dep. at 67.) Thompson settled the grievance with Ochlan by accepting a fourteen-day suspension on

Taylor's behalf in lieu of removal.[5] (Taylor & Potter 56.1 Stmts. ¶ 65; Normand Aff. Ex. O: 10/25/97 Grievance Step 1 Summ.; Taylor 56.1 Stmt. Add'l Relevant Facts ¶ 29; Thompson Dep. at 64–65, 67–68.)[6]

[5]    Taylor did not name Ochlan in any EEO complaint. (Taylor & Potter 56.1 Stmts. ¶ 66; Taylor Dep. at 341–42.)

[6]    Taylor attempted to file an EEO complaint regarding the circumstances of his removal for continuous unapproved absence but was required instead to amend the one he had already initiated. (Taylor 56.1 Stmt. Add'l Relevant Facts ¶ 31; Taylor Dep. at 173–74, 289–93.)

### Taylor's Tardiness and January 28, 1998 Notice of Removal

It is undisputed that when Taylor returned to work at the Bowling Green Station on November 17, 1997, he was "tardy." (Taylor & Potter 56.1 Stmts. ¶¶ 67–68; Kalman Aff. Ex. J: Taylor Clock Rings Summ.) On December 11, 1997, Taylor was thirty-two minutes late for work, because he fell asleep on the train. (Taylor & Potter 56.1 Stmts. ¶ 69; Normand Aff. Ex. AA: 12/11/97 Request for or Notification of Absence.) On January 5, 1998, Taylor was twenty-six minutes late, claiming a delay in public transportation. (Taylor & Potter 56.1 Stmts. ¶ 70; Normand Aff. Ex. BB: 1/5/98 Request for or Notification of Absence.) On January 13, 1998, Taylor was two hours and fifteen minutes late, claiming his medication caused him to oversleep. (Taylor & Potter 56.1 Stmts. ¶ 71; Normand Aff. Ex. CC: 1/13/98 Request for or Notification of Absence.)[7]

[7]    Taylor was hospitalized again on January 15, 1998 for six days, resulting in an eight-day absence from work. (Dkt. No. 88: Potter Br. at 14; Normand Aff. Ex. DD: 1/20/98 Dept. of Veterans Affairs Memo; Kalman Aff. Ex. J: Taylor Clock Rings Summ.) Taylor worked again from January 27 through February 4, 1998, and was readmitted to the hospital on February 16, 1998 for about thirty days. (Potter Br. at 14; Norman Aff. Ex. EE: 3/13/97 Dept. of Veterans Affairs Memo.) Taylor subsequently retired and receives a disability pension from the Postal Service. (Potter Br. at 14; Taylor Dep. at 14.)

On January 21, 1998, Ochlan issued Taylor a second notice of removal on grounds of "excessive

tardiness." (Taylor & Potter 56.1 Stmts. ¶¶ 72–73; Normand Aff. Ex. P: 1/21/98 Notice of Removal; McCall Dep. at 135.) Like the October 1997 notice of removal, the January 21, 1998 notice of removal provided that Taylor should receive "Non–Veteran Bargaining Unit" treatment. (Taylor 56.1 Stmt. Add'l Relevant Facts ¶ 33; Normand Aff. Ex. P: 1/21/98 Notice of Removal.)

Taylor argues that the second notice of removal was issued "out of retaliatory animus on the part of both Messrs. McCall and Ochlan, against whom Mr. Taylor had engaged in protected EEO activity after being suspended for continuous A.W.O.L. despite the Rose Letter submitted to Mr. McCall by Mr. Taylor on or before October 14, 1997." (Taylor 56.1 Stmt. ¶ 73; Cogan Aff. Ex. R: 12/10/97 Info. for Precompl. Counseling form; Taylor Dep. at 173–74, 289–93.)

Thompson filed a grievance on Taylor's behalf regarding the January 21, 1998 notice of removal. (Taylor & Potter 56.1 Stmts. ¶ 75; Normand Aff. Ex. Q: 1/29/98 Grievance Step 1 Summ.) Once again, Thompson settled the grievance with Ochlan by reducing the notice of removal to a fourteen-day suspension. (Taylor & Potter 56.1 Stmts. ¶ 76; Normand Aff. Ex. Q: 1/29/98 Grievance Step 1 Summ.) According to Taylor, supervisor Gerald McCall attended the Step 1 meeting and "coerced Mr. Taylor to accept another two-week suspension by telling him that he would be removed if he did not accept the deal," and that he agreed as a result." (Taylor 56.1 Stmt. ¶ 76; Taylor Dep. at 314.)

*Taylor's Allegations about McCall*
*7 Taylor alleges that Bowling Green Station supervisor Gerald McCall was "well known" for his "racial animus." (Taylor 56.1 Stmt. Add'l Relevant Facts ¶ 1; Dkt. No. 91: Cogan Aff. Ex. A: Lewis Dep. at 58; Cogan Ex. B: Taylor Dep. at 349, 379; Cogan Ex. C: Thompson Dep. at 111–12.)

In October 1996, Taylor filed an EEO complaint against McCall charging that McCall discriminated against Taylor based on his race by denying Taylor lunch breaks. (Taylor 56.1 Stmt., Add'l Relevant Facts ¶ 1; Cogan Aff. Ex. E: Anderson Aff. Ex. 10: Prior Protected EEO Activity.) McCall was aware of Taylor's complaint. (Normand Aff. Ex. I: McCall Dep. at 100.)

Taylor alleges that when McCall arrived at Bowling Green Station on June 19, 1997 and learned of Taylor's dispute with Carretta the prior day, McCall "attempted to solicit false statements from several of Mr. Taylor's co-workers, including Alan Negron ..., Michelle Gambrell and Patricia Mitchell, indicating that management had, prior to the June 18, 1997 verbal exchange, told all Bowling Green Station employees that, in the absence of any regular supervisors, Ms. Carretta was in charge." (Taylor 56.1 Stmt. Add'l Relevant Facts ¶ 11; Taylor Dep. at 118–19.) McCall also asked Negron, who witnessed the entire incident, for his account. (Taylor 56.1 Stmt. Add'l Relevant Facts ¶ 12; Cogan Aff. Ex. I: Negron Dep. at 20–24.) According to Negron's written statement of events, when he and Taylor re-entered the building and reached the work floor

> Carretta started yelling and cursing at Mr. Taylor.... Mr. Taylor told her that he did not have to listen to her because she is not in charge.... Ms. Carretta demanded Mr. Taylor return to his work area, this time telling Mr. Taylor that she was going to call the Postal Police. I told Taylor not to argue with Ms. Carretta. Mr. Taylor turned to me and said I do not have to fucken [sic] listen to her. Then she said I am not afraid of him that she will call the Postal Police. At no time did I hear Mr. Taylor yell or curse at Ms. Carretta.

(Cogan Aff. Ex. J: Negron Stmt.) Taylor alleges that because of McCall's prejudice, Negron's version of events "was not considered—or was inexplicably rejected—when the disciplinary notice was issued." (Taylor 56.1 Stmt. Add'l Relevant Facts ¶ 15.)

After Taylor was disciplined for the June 18 incident (*see* pages 5–7 above), Taylor initiated a second EEO complaint against McCall on June 25, 1997. (Taylor 56.1 Stmt., Add'l Relevant Facts ¶ 16; Cogan Aff. Ex. L: 6/25/97 Info. for Precompl. Counseling form.) On this form, Taylor stated that "McCall effectuated a mean, cold, malicious attemp[t] to get [Taylor] fired" and that since June 23, 1997, "McCall has been very very mean to" Taylor. (Taylor 56.1 Stmt., Add'l Relevant Facts ¶ 17; Cogan Aff. Ex. L: 6/25/97 Info. for Precompl.

Counseling form.) Taylor filed a formal EEO Complaint on September 6, 1997, charging McCall and Juan with discrimination in connection with the June 18, 1997 incident and retaliation based on his earlier EEO complaint against McCall. (Taylor 56.1 Stmt. Add'l Relevant Facts ¶ 18; Cogan Aff. Ex. M: 9/6/97 EEOC Compl.)

**\*8** Shop steward Thompson testified that McCall was effectively "the supervisor in charge of all the supervisors, so everything going on he got into." (Taylor 56.1 Stmt. Add'l Relevant Facts ¶¶ 2–3; Thompson Dep. at 20, 34–35.) According to Bowling Green Station employee Richard Lewis, "[a]nybody that works there" was aware of McCall's "derogatory and racist statements on the floor especially towards Blacks. Calling us 'worthless pieces of shit.' " (Normand Aff. Ex. D: Lewis Dep. at 58.) Lewis conceded that McCall would use derogatory terms like this for anyone he did not like, regardless of race. (Lewis Dep. at 58.) According to Thompson, a black female, if she went "into Bowling Green [Station] right now, if we have twenty black and Hispanic employees, I could get eighteen of them to sign a statement saying that [McCall] is a racist." (Normand Aff. Ex. F: Thompson Dep. at 111–12.) As an example, Thompson stated that if two white people were having a conversation at the station, McCall would come over and join the conversation, but if Thompson and another minority employee were talking, when McCall walked over "the first thing he would say was, 'You are not working. Why are you talking?' And the reason he would say it to me is because I am black. Point blank." (Thompson Dep. at 112.)

Nevertheless, Thompson testified that the suspensions and notices of removal were not issued to Taylor due to his race. (Thompson Dep. at 112.) Rather, "there [are] rules for attendance [and] for lateness, and they basically follow the guidelines and the rules. I am not saying that someone else could have had more [instances of lateness or absence] than [Taylor] and wasn't bothered or issued some discipline. But basically they do adhere to the rules and guidelines." (Thompson Dep. at 112–13.) Based on Thompson's experience, she stated that the disciplines Taylor received "are within the guidelines." (Thompson Dep. at 113.)

*Procedural Background*
Taylor filed this suit in July 1999. (Dkt. No. 2: Compl.) During discovery, the Postal Service became aware of

Taylor's mental illness (when Taylor at his deposition said that he was hearing voices) and moved under Fed.R.Civ.P. 17(c) for appointment of a guardian ad litem for Taylor. *See Taylor v. Potter,* No. 02–6049, 56 Fed. Appx. 48, 48, 2003 WL 430521 at \*1 (2d Cir. Feb. 21, 2003). At a hearing, this Court asked Taylor whether he wanted a guardian, Taylor stated that he did, and the Court suggested that Taylor apply to the New York state court for appointment of a general guardian, adjourning this case for six months for that purpose. *Id.* In June 2001, Taylor informed the Court that his sister Melissa Taylor had been appointed his guardian and submitted an order from Kings County Supreme Court appearing to state that Taylor consented to his sister's appointment as guardian and that the state court *required* her to obtain counsel. *Id.* After several adjournments to allow Taylor's sister more time to obtain counsel, the Court granted a final adjournment for Ms. Taylor to obtain counsel. *Id.* (*See also* Dkt. No. 44: 11/20/01 Order.) On November 27, 2001, Ms. Taylor filed a motion " 'to re-establish and re-acknowledge [Taylor's] legal right to proceed' " pro se, asserting that her brother no longer needed a guardian, but she did not provide any evidence that the state court had changed her status as Taylor's guardian or the requirement that she retain counsel. *Taylor v. Potter,* 2003 WL 430521 at \*1. On January 11, 2002, this Court dismissed Taylor's complaint with prejudice for failure to obtain counsel. *Id.* at \*2. (*See also* Dkt. No. 48: 1/9/02 Order.) This Court explained that a guardian generally cannot represent her ward without legal representation (and specifically could not in this case because of the state court order), that Ms. Taylor had a considerable amount of time to obtain counsel and had been warned that failure to obtain counsel would result in dismissal. *Taylor v. Potter,* 2003 WL 430521 at \*2. Taylor appealed to the Second Circuit. *Id.*

**\*9** Ms. Taylor's status as her brother's guardian became suspect during oral argument, and the U.S.P.S. subsequently advised the Second Circuit that "according to the chambers of New York Supreme Court Judge before whom Ms. Taylor appeared, the judge never signed the proposed order appointing Ms. Taylor as [Taylor's] guardian, and, moreover, the signature on the order submitted by [Taylor] was not the signature of the judge." *Id.* The U.S.P.S. also learned that Ms. Taylor had moved in the state court to withdraw her guardianship position. *Id.*

Taylor v. Potter, Not Reported in F.Supp.2d (2004)
2004 WL 1811423

On February 21, 2003, the Second Circuit remanded the action "to determine whether [Taylor] has, in fact, been adjudicated incompetent by the state court; whether any person has been appointed to serve as his guardian; and whether that guardianship appointment remains in force." *Taylor v. Potter,* 2003 WL 430521 at *2.

In accordance with the Second Circuit's mandate, after a report from the government's psychiatrist, on September 10, 2003 this Court appointed Thomas W. Pippert, Esq., a partner at the law firm of Patterson, Belknap, Webb & Tyler, to serve as special guardian at litem for Taylor for purposes of this litigation only. (Dkt. No. 70: 9/10/03 Order.) David Ichel, a partner at the law firm of Simpson Thacher & Bartlett LLP, was appointed as counsel to the guardian (and thereby indirectly as counsel for Taylor). (*Id.*) Both the guardian and counsel have agreed to take this matter on a pro bono basis (for which the Court is grateful).[8]

[8]    The Court thanks Mr. Pippert and Mr. Ichel and their law firms for accepting this pro bono assignment and for the high quality of the papers that they submitted on Taylor's behalf.

At the time the issue of Taylor's competence to proceed arose (at the last session of his deposition when he said he was hearing voices), discovery was closed except for the conclusion of Taylor's deposition. Counsel for the guardian sought to reopen discovery. (Dkt.Nos.73–76.) The Court denied a general reopening of discovery but allowed certain very limited discovery by the guardian's counsel. (*See* Dkt. Nos. 77, 79.) The pending summary judgment motion was filed thereafter (Dkt.Nos.82–88), and was fully briefed as of May 2004 (*see* Dkt. Nos. 94–96.)[9]

[9]    The parties had consented to disposition of this action by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 18: 5/10/00 Consent to Proceed Form.)

## ANALYSIS

## I. LEGAL PRINCIPLES GOVERNING TITLE VII CASES[10]

[10]    For additional cases authored by this Judge discussing the legal principles governing employment discrimination cases in language substantially similar

to that in this entire section of this Opinion, *see, e.g., Dodson v. CBS Broadcasting, Inc.,* 02 Civ. 9270, 2004 WL 1336231 at *15–21 (S.D.N.Y. June 15, 2004) (Peck, M.J.); *Slaitane v. Sbarro,* 03 Civ. 5503, 03 Civ. 5504, 2004 WL 1202315 at *7–12 (S.D.N.Y. June 2, 2004) (Peck, M.J.); *Diaz v. Weill Med. Ctr. of Cornell Univ.,* 02 Civ. 7380, 2004 WL 285947 at *13–17 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.); *Virtue v. Citizen Advice Bureau,* 01 Civ. 4594, 2002 WL 1880731 at *8–13 (S.D.N.Y. Aug. 15, 2002) (Peck, M.J.); *Brown v. Cushman & Wakefield, Inc.,* 01 Civ. 6637, 2002 WL 1751269 at *12–13, 20–22 (S.D.N.Y. July 29, 2002) (Peck, M.J.), *report & rec. adopted,* 235 F.Supp.2d 291 (S.D.N.Y.2002) (Berman, D.J.); *Kennebrew v. New York Hous. Auth.,* 01 Civ. 1654, 2002 WL 265120 at *6–10 (S.D.N.Y. Feb. 26, 2002) (Peck, M.J.); *Williams v. NYC Dep't of Sanitation,* 00 Civ. 7371, 2001 WL 1154627 at *8–12 (S.D.N.Y. Sept. 28, 2001) (Peck, M.J.); *Gonzalez v. New York City Transit Auth.,* 00 Civ. 4293, 2001 WL 492448 at *6, 10 (S.D.N.Y. May 9, 2001) (Peck, M.J.); *Economou v. Caldera,* 99 Civ. 12117, 2000 WL 1844773 at *12 (S.D.N.Y. Dec. 18, 2000) (Peck, M.J.); *Cabian v. New York City,* 99 Civ. 10533, 2000 WL 1782744 at *7, 11 (S.D.N.Y. Dec. 6, 2000) (Peck, M.J.), *aff'd,* No. 01-7575, 23 Fed. Appx. 82, 2002 WL 4594 (2d Cir. Dec. 21, 2001); *Austin v. Ford Models, Inc.,* 95 Civ. 3731, 2000 WL 1752966 at *6, 8 (S.D.N.Y. Nov. 29, 2000) (Peck, M.J.), *aff'd,* No. 01-7030, 22 Fed. Appx. 76, 2001 WL 1562070 (2d Cir. Dec. 4, 2001), *cert. denied,* 537 U.S. 848, 123 S.Ct. 189 (2002); *Johns–Davila v. City of New York,* 99 Civ. 1885, 2000 WL 1725418 at *3 (S.D.N.Y. Nov. 20, 2000) (Peck, M.J.); *Weber v. Parfums Givenchy, Inc.,* 49 F.Supp.2d 343, 352, 354 (S.D.N.Y.1999) (Wood, D.J. & Peck, M.J.); *Douglas v. Victor Capital Group,* 21 F.Supp.2d 379, 387 (S.D.N.Y.1998) (Stein, D.J. & Peck, M.J.); *Hernandez v. New York City Law Dep't Corp. Counsel,* 94 Civ. 9042, 1997 WL 27047 at *6, 12 (S.D.N.Y. Jan. 23, 1997) (Peck, M.J.).

### A. Summary Judgment Standards in Employment Discrimination Cases

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477

2004 WL 1811423

U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000), *cert. denied*, 124 S.Ct. 53 (2003); *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir.1991).

**\*10** The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment—here, defendant. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. at 1356; *see also, e.g., Weinstock v. Columbia Univ.*, 224 F.3d at 41 (at summary judgment, "[t]he time has come ... to put up or shut up' ") (citation omitted).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513.[11] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM*, 43 F.3d at 37.

[11]   *See also, e.g., Feingold v. New York*, 366 F.3d 138, 148 (2d Cir.2004); *Chambers v. TRM*, 43 F.3d at 36; *Gallo v. Prudential*, 22 F.3d at 1223.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. at 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510 (citation omitted); *see also, e.g., Knight v. United States Fire Ins. Co.*, 804 F.2d at 11–12.

**\*11** When a case turns on the intent of one party, as employment discrimination claims often do, a "trial court must be cautious about granting summary judgment." *Gallo v. Prudential*, 22 F.3d at 1224.[12] Because the employer rarely leaves direct evidence of its discriminatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions. *E.g., Gallo v. Prudential*, 22 F.3d at 1224. "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir.1998) (citations omitted). Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer. *E.g., Budde v. H & K Distrib. Co.*, No. 99-9449, 216 F.3d 1071 (table), 2000 WL 900204 at \*1 (2d Cir. June 29, 2000); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir.1997); *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir.1995). In other words,

Taylor v. Potter, Not Reported in F.Supp.2d (2004)

2004 WL 1811423

to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ.,* 131 F.3d at 312; *see, e.g., Schnabel v. Abramson,* 232 F.3d 83, 90–91 (2d Cir.2000); *Weinstock v. Columbia Univ.,* 224 F.3d at 42 (The question on summary judgment is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough ... to disbelieve the employer, the factfinder must also believe the plaintiff's explanation of intentional discrimination.") (internal quotations & alterations omitted); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge" ').[13] Indeed, the Second Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." ' *Weinstock v. Columbia Univ.,* 224 F.3d at 41.

[12]   *Accord, e.g., Feingold v. New York,* 366 F.3d at 149; *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) ("in an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment"); *McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir.1997) ( "caution must be exercised in granting summary judgment where motive is genuinely in issue"); *Cardoza v. Healthfirst Inc.,* 98 Civ. 3050, 1999 WL 782546 at *1–2 (S.D.N.Y. Sept. 30, 1999); *see also, e.g., Chambers v. TRM,* 43 F.3d at 40.

[13]   *See also, e.g., Budde v. H & K Distrib. Co.,* 2000 WL 900204 at *1; *Scaria v. Rubin,* 94 Civ. 3333, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), *aff'd,* 117 F.3d 652, 654 (2d Cir.1997).

### B. *Legal Principles Governing Title VII Actions*

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex,* or national origin." 42 U.S.C. §§ 2000e–2(a)(1) (emphasis added).

**\*12**  Under the familiar *McDonnell Douglas* burden-shifting analysis, the plaintiff has the burden at the outset of "proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U .S. 248, 252–53, 101 S.Ct. 1089, 1093 (1981); *see, e.g., Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 2106 (2000); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 (1973).[14] Establishment of a prima facie case " 'in effect creates a presumption that the employer unlawfully discriminated against the employee." ' *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 506, 113 S.Ct. at 2747 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094).[15]

[14]   *See also, e.g., Raytheon Co. v. Hernandez,* 124 S.Ct. 513, 517 n. 3 (2003); *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 310, 116 S.Ct. 1307, 1309 (1996); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2746–47 (1993); *Mandell v. County of Suffolk,* 316 F.3d 368, 377–78 (2d Cir.2003); *Mario v. P & C Food Mkts., Inc.,* 313 F.3d 758, 767 (2d Cir.2002); *Collins v. New York City Transit Auth.,* 305 F.3d 113, 118 (2d Cir.2002); *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000); *Austin v. Ford Models, Inc.,* 149 F.3d 148, 152 (2d Cir.1998), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

[15]   *See also, e.g., Mandell v. County of Suffolk,* 316 F.3d at 380; *Mario v. P & C Food Mkts., Inc.,* 313 F.3d at 767; *Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997).

Once a plaintiff claiming employment discrimination establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision. *E.g., Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. at 142–43, 120 S.Ct. at 2106; *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824.[16] The burden on the defendant at this phase is one of production rather than persuasion. *E.g., Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. at 142, 120 S.Ct. at 2106.[17]

Taylor v. Potter, Not Reported in F.Supp.2d (2004)

2004 WL 1811423

16      *See also, e.g., Raytheon Co. v. Hernandez,* 124 S.Ct. at
        517 n. 3; *O'Connor v. Consolidated Coin,* 517 U.S. at
        310, 116 S.Ct. at 1309; *St. Mary's Honor Ctr. v. Hicks,*
        509 U.S. at 506–07, 113 S.Ct. at 2747; *Texas Dep't of
        Cmty. Affairs v. Burdine,* 450 U.S. at 253–54, 101 S.Ct.
        at 1093–94; *Feingold v. New York,* 366 F.3d 138, 152
        (2d Cir.2004); *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d
        Cir.2003); *Mandell v. County of Suffolk,* 316 F.3d at
        380; *Mario v. P & C Food Mkts., Inc.,* 313 F.3d at 767;
        *Schnabel v. Abramson,* 232 F.3d at 88; *Weinstock v.
        Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000); *Austin
        v. Ford Models, Inc.,* 149 F.3d at 152; *Stein v. Trustees
        of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997);
        *Scaria v. Rubin,* 117 F.3d at 654; *Chambers v. TRM,*
        43 F.3d at 38.

17      *See also, e.g., St. Mary's Honor Ctr. v. Hicks,* 509 U.S.
        at 507, 113 S.Ct. at 2747; *Texas Dep't of Cmty. Affairs
        v. Burdine,* 450 U.S. at 257, 101 S.Ct. at 1096; *Terry v.
        Ashcroft,* 336 F.2d at 144 n. 17; *Austin v. Ford Models,
        Inc.,* 149 F.3d at 153; *Scaria v. Rubin,* 117 F.3d at 654.

"Although intermediate evidentiary burdens shift back
and forth under [the *McDonnell Douglas* ] framework,
'[t]he ultimate burden of persuading the trier of fact
that the defendant intentionally discriminated against the
plaintiff remains at all times with the plaintiff.' " *Reeves
v. Sanderson Plumbing Prods., Inc.,* 530 U.S. at 143, 120
S.Ct. at 2106.

If the defendant articulates a non-discriminatory reason,
the *McDonnell Douglas* burden-shifting framework drops
out of the picture. *E.g., Reeves v. Sanderson Plumbing
Prods., Inc.,* 530 U.S. at 142–43, 120 S.Ct. at 2106. [18]
"Moreover, although the presumption of discrimination
'drops out of the picture' once the defendant meets its
burden of production, ... the trier of fact may still consider
the evidence establishing the plaintiff's prima facie case
'and inferences properly drawn therefrom ... on the issue
of whether the defendant's explanation is pretextual.' "
*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. at 143,
120 S.Ct. at 2106 (quoting *Texas Dep't of Cmty. Affairs v.
Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10).

18      *See also, e.g., Raytheon Co. v. Hernandez,* 124 S.Ct. at
        517 n. 3; *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at
        510, 113 S.Ct. at 2749; *Texas Dep't of Cmty. Affairs
        v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94;
        *Feingold v. New York,* 366 F.3d at 152; *Mandell v.
        County of Suffolk,* 316 F.3d at 380–81; *Mario v. P
        & C Food Mkts., Inc.,* 313 F.3d at 767; *Weinstock v.

*Columbia Univ.,* 224 F.3d at 42; *Scaria v. Rubin,* 117
F.3d at 654.

The Supreme Court in 2000 clarified the standard at this
stage of the *McDonnell Douglas* analysis:

> [I]n *St. Mary's Honor Center* .... we held that the
> factfinder's rejection of the employer's legitimate,
> nondiscriminatory reason for its action does not *compel*
> judgment for the plaintiff. The ultimate question
> is whether the employer intentionally discriminated,
> and proof that "the employer's proffered reason
> is unpersuasive, or even obviously contrived, does
> not necessarily establish that the plaintiff's proffered
> reason ... is correct." In other words, "[i]t is not
> enough ... to *dis* believe the employer; the factfinder
> must *believe* the plaintiff's explanation of intentional
> discrimination."

> **\*13** In reaching this conclusion, however, we reasoned
> that it is *permissible* for the trier of fact to infer the
> ultimate fact of discrimination from the falsity of the
> employer's explanation....

> Proof that the defendant's explanation is unworthy
> of credence is simply one form of circumstantial
> evidence that is probative of intentional discrimination,
> and it may be quite persuasive. In appropriate
> circumstances, the trier of fact can reasonably infer
> from the falsity of the explanation that the employer
> is dissembling to cover up a discriminatory purpose.
> Such an inference is consistent with the general
> principle of evidence law that the factfinder is entitled
> to consider a party's dishonesty about a material
> fact as "affirmative evidence of guilt." Moreover,
> once the employer's justification has been eliminated,
> discrimination may well be the most likely alternative
> explanation, especially since the employer is in the best
> position to put forth the actual reason for its decision.
> Thus, *a plaintiff's prima facie case, combined with
> sufficient evidence to find that the employer's asserted
> justification is false, may permit the trier of fact to
> conclude that the employer unlawfully discriminated.*

> *This is not to say that such a showing by the plaintiff
> will always be adequate to sustain a jury's finding
> of liability.* Certainly there will be instances where,
> although the plaintiff has established a prima facie case
> and set forth sufficient evidence to reject the defendant's
> explanation, no rational factfinder could conclude
> that the action was discriminatory. For instance, an

Taylor v. Potter, Not Reported in F.Supp.2d (2004)

2004 WL 1811423

employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50 [or Rule 56], and we have reiterated that trial courts should not " 'treat discrimination differently from other ultimate questions of fact." '

*Whether judgment as a matter of law [or summary judgment] is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.*

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 146–49, 120 S.Ct. at 2108–09 (emphasis added & citations omitted).

After *Reeves*, the Second Circuit has made clear that merely proving a prima facie case and disproving the employer's explanation for its conduct at the third step of the *McDonnell Douglas* analysis will not preclude summary judgment in all cases; rather, a case-by-case analysis is necessary:

*14 In examining the impact of *Reeves* on our precedents, we conclude that *Reeves* prevents courts from imposing a *per se* rule requiring *in all instances* that a [Title VII] claimant offer more than a prima facie case and evidence of pretext.... But the converse is not true; following *Reeves, we decline to hold that no [Title VII] defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext. Rather, we hold that the Supreme Court's decision in Reeves clearly mandates a case-by-case approach*, with a court examining the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."

Schnabel v. Abramson, 232 F.3d at 90 (emphasis added). [19]

19

See also, e.g., Feingold v. New York, 366 F.3d at 152; Roge v. NYP Holdings, Inc., 257 F.3d 164, 167–68 (2d Cir.2001); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469–70 (2d Cir.), cert. denied, 534 U.S. 993, 122 S.Ct. 460 (2001); James v. New York Racing Ass'n, 233 F.3d 149, 156–57 (2d Cir.2000); Weinstock v. Columbia Univ., 224 F.3d at 42 ("In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."); Aksamit v. 772 Park Avenue Corp., 00 Civ. 5520, 2003 WL 22283813 at *6 (S.D.N.Y. Oct. 2, 2003) ("[A] plaintiff's establishment of a prima facie case and rebuttal of a nondiscriminatory reason for the adverse action do not save the plaintiff from summary judgment when there is insufficient evidence of discrimination."); Weiser v. Forest Pharm., Inc., 99 Civ. 1809, 2001 WL 293951 at *7-8 (S.D.N.Y. Mar. 26, 2001); Tanay v. Saint Barnabas Hosp., 99 Civ. 9215, 2001 WL 262695 at *4 (S.D.N.Y. Mar. 15, 2001); Bennett v. Watson, Wyatt & Co., 136 F.Supp.2d 236, 245 (S.D.N.Y.), reconsideration denied, 156 F.Supp.2d 270 (S.D.N.Y. May 18, 2001), aff'd in part, appeal dismissed on other grounds, No. 01–7772, 51 Fed. Appx. 55, 2002 WL 31628399 (2d Cir. Nov. 21, 2002); Connell v. Consolidated Edison Co., 109 F.Supp.2d 202, 207–08 (S.D.N.Y.2000) (Chin, D.J.) ("The key is whether there is sufficient evidence in the record—whether it consists of just the prima facie case and proof of pretext alone or those items together with additional evidence—to support an inference of discrimination.").

Indeed, the Second Circuit and District Court decisions within the Circuit continue to grant summary judgment to defendants in appropriate cases at the final *McDonnell Douglas* step, even after *Reeves*. [20]

20

E.g., Molin v. Shapiro, No. 03–7045, 73 Fed. Appx. 511, 512, 2003 WL 22056217 at *1 (2d Cir. Sept. 4, 2003); Silverman v. City of New York, No. 02–9048, 64 Fed. Appx. 799, 801, 2003 WL 1970472 at *1 (2d Cir. Apr. 23, 2003); Tarshis v. Riese Org., No. 02–7570, 66 Fed. Appx. 238, 240, 2003 WL 1600154 at *1-2 (2d Cir. Mar. 27, 2003); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d at 470; James v. New York Racing Ass'n, 233 F.3d at 157; Slatky v. Healthfirst, Inc., 02 Civ. 5182, 2003 WL 22705123 at *6 (S.D.N.Y. Nov. 17, 2003); Kulkarni v. City Univ. of New York, 01 Civ. 10628, 2002 WL 31886639 at *9 (S.D.N.Y. Dec. 27, 2002); Williams v. NYC Dep't of Sanitation, 2001 WL 1154627 at *12-19; Gonzalez v. New York

*City Transit Auth.,* 2001 WL 492448 at \*12; *Weiser v. Forest Pharm., Inc.,* 2001 WL 293951 at \*8; *Tunay v. Saint Barnabas Hosp.,* 2001 WL 262695 at \*9; *Bennett v. Watson, Wyatt & Co.,* 136 F.Supp.2d at 249–50; *Cobian v. New York City,* 2000 WL 1782744 at \*13; *Austin v. Ford Models, Inc.,* 2000 WL 1752966 at \*12–15; *Trezza v. Dilenschneider Group,* 99 Civ. 0185, 2000 WL 1702029 at \*5–6 (S.D.N.Y. Nov. 14, 2000); *Faldetta v. Lockheed Martin Corp.,* 98 Civ. 2614, 2000 WL 1682759 at \*8–11 (S.D.N.Y. Nov. 9, 2000); *Chudnovsky v. Prudential Sec., Inc.,* 98 Civ. 7753, 2000 WL 1576876 at \*8 (S.D.N.Y. Oct. 23, 2000), *aff'd,* No. 00–9531, 51 Fed. Appx. 901, 2002 WL 31664452 (2d Cir. Nov. 20, 2002); *Cousins v. Howell Corp.,* 113 F.Supp.2d 262, 268–69 (D.Conn.2000); *Ekwegbalu v. Central Parking Sys.,* 97 Civ. 9477, 2000 WL 1371335 at \*3–4 (S.D.N.Y. Sept. 22, 2000); *Connell v. Consolidated Edison Co.,* 109 F.Supp. at 208–11; *Lenhoff v. Getty,* 97 Civ. 9458, 2000 WL 977900 at \*5–6 (S.D.N.Y. July 17, 2000); *Campbell v. Alliance Nat'l Inc.,* 107 F.Supp.2d 234, 251 & n. 12 (S.D.N.Y.2000).

## II. *TAYLOR HAS NOT PROVED DISCRIMINATION BY SUPERVISOR McCALL* [21]

[21]     As noted in defendant's reply brief, Taylor's opposition does not address his Title VII claims as to the June 18, 1997 emergency suspension, hostile environment, or unfair work assignments. (*See* Dkt. No. 95: Potter Reply Br. at 1 n. 1, citing Taylor Br. at 17–22, 31–35.) The Court agrees that the Postal Service is entitled to summary judgment on these claims. *See, e.g., Diaz v. Weill Med. Ctr. of Cornell Univ.,* 02 Civ. 7380, 2004 WL 285947 at \*20 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.) ( & cases cited therein).

The Court assumes *arguendo,* without deciding, that as to all his claims of discrimination/retaliation, Taylor has made out a prima facie case. *See, e.g., Dodson v. CBS Broadcasting Inc.,* 02 Civ. 9270, 2004 WL 1336231 \*20 (S.D.N.Y. June 15, 2004) (Peck, M.J.); *Economou v. Caldera,* 99 Civ. 12117, 2000 WL 1844773 at \*28 (S.D.N.Y. Dec. 18, 2000) (Peck, M.J.).

At the second *McDonnell Douglas* step, the Postal Service has articulated legitimate, non-discriminatory reasons for the suspensions: With respect to the June 1997 seven day suspension, Taylor's verbal altercation with acting supervisor Carretta (*see* pages 2–8 above); with respect to the October 1997 Notice of Removal and fourteen day suspension, Taylor's absence and failure to provide appropriate medical documentation (*see* pages 8–12 above

and 43–46 below); and with respect to the January 28, 1998 Notice of Removal and two week suspension, Taylor's conceded lateness on three occasions (*see* pages 12–13 above and 46–48 below).

The issue before the Court on this summary judgment motion thus is whether Taylor has met his burden of showing pretext and unlawful discrimination at the third *McDonnell Douglas* step.

The "central basis" of Taylor's discrimination/retaliation claims is that supervisor Gerald McCall was a racist (and retaliator) who operated behind the scenes to cause other supervisors to discriminate against Taylor. (Dkt. No. 92: Taylor Br. at 1–5, 16–21; *see also, e.g.,* Taylor Br. at 103–04, 131–33.) As Taylor's counsel explained:

> The central basis for [all of] Mr. Taylor's claims is that Gerald McCall ..., a supervisor at Bowling Green Station, exerted his power and influence over the other supervisors behind the scenes in order to inflict these suspensions on Mr. Taylor.... There is evidence ... that Mr. McCall was well known at the Bowling Green Station for making racist remarks, and he made them directly to Mr. Taylor on occasion.

\*15 (Taylor Br. at 1; *see also, e.g.,* Taylor Br. at 2: "McCall was the real discriminator [who] operated behind the scenes to discriminate against Mr. Taylor in connection with these disciplines.")

Because Taylor's claims essentially rise or fall on the "central basis" of McCall's alleged involvement and bias, the Court first examines that issue, and then turns to additional issues as to each of the three suspensions.

Taylor testified that he never heard McCall—or any other supervisor—refer to his race, except for one instance. (Dkt. No. 87: Normand Aff. Ex. B: Taylor Dep. at 378–79.) In that one instance, McCall held a meeting to discuss a problem he had with Taylor's job performance, and told Taylor that it "is going to be fair" because he had Taylor's "brother" at the meeting, referring to another black employee. (Taylor Dep. at 379.) Taylor admitted, however, that he himself referred at work to

African American males as "brothers." (Taylor Dep. at 379.) Even if the term "brother" is interpreted as a racial epithet, the Court does not find that McCall's isolated, one-time use of the term in this context to be evidence of discrimination. [22] E.g., *Wilton v. City & Cty. of San Francisco*, No. 94–15116, 60 F.3d 836 (table), 1995 WL 398845 at *3 (9th Cir. July 7, 1995) ("Although [manager's] comments were crass ..., they were isolated, and are insufficient to establish a hostile work environment. The one racial comment, [manager's] use of the word 'brother' at some time over a year before the altercation, is not enough to create sufficient specific evidence to survive summary judgment. Stray remarks are insufficient to establish discrimination."); *see, e.g., Viruet v. Citizen Advice Bureau*, 01 Civ. 4594, 2002 WL 1880731 at *15 (S.D.N.Y. Aug. 15, 2002) (Peck, M.J.) ("Isolated incidents of discriminatory comments or conduct [are] not sufficient to establish a hostile work environment.") (citing cases); *Adeniji v. Administration for Children Servs.*, 43 F.Supp.2d 407, 413 (S.D.N.Y.1999) ("As Magistrate Judge Peck correctly points out, it is well-settled that one racial remark, or even sporadic remarks, are not sufficient to establish a hostile work environment."), *aff'd*, No. 99–7561, 201 F.3d 430 (table), 1999 WL 1070027 (2d Cir. Nov. 18, 1999). [23]

[22]  The Court does not mean by this ruling that it would not be a problem if a white supervisor used other words about or to blacks that some blacks use among themselves—e.g., the Court has heard one black call another the "N word," but would find that use of that word by a white to a black employee was a racist remark.

[23]  *See also, e.g., Atterberry v. Ikon Office Solutions, Inc.*, No. Civ. 302CV1490, 2003 WL 22937719 at *8 (D.Conn. Dec. 10, 2003) (Plaintiff failed to raise an inference of discrimination with only two alleged statements not bolstered by any other evidence of racial animus.) ( & cases cited therein); *Pagan v. New York State Div. of Parole*, 98 Civ. 5840, 2003 WL 22723013 at *6 (S.D.N.Y. Nov. 18, 2003) ("Even if [defendant] called [plaintiff] a 'fat Puerto Rican' twice rather than once, the series of [four] disparaging remarks attributed to him clearly does not amount to the sort of 'extremely serious' behavior required to give rise to a hostile work environment under Title VII.") ( & cases cited therein); *Rinsler v. Sony Pictures Entm't, Inc.*, 02 Civ. 4096, 2003 WL 22015434 at *6 (S.D.N.Y. Aug. 25, 2003) (Single, stray remark, unsupported by any other evidence of discriminatory

animus, did not create an inference of discrimination.) ( & cases cited therein); *Manessis v. New York City Dep't of Transp.*, 02 Civ. 359, 2003 WL 289960 at *6 (S.D.N.Y. Feb. 10, 2003) ("Single incidents, unless very serious, generally do not satisfy the necessary requirement of severity or pervasiveness."), *aff'd*, No. 03–7208, 2004 WL 206316 (2d Cir. Feb. 3, 2004).

Aside from Taylor's testimony above, the only other admissible evidence concerning McCall's racial animus proffered by Taylor are the depositions of Thompson and Lewis regarding McCall's "reputation" at the Bowling Green Station as a racist. (*See* pages 15–16 above.) Thompson testified to her belief that if she surveyed twenty black and Hispanic Bowling Green station employees, she "could get eighteen of them to sign a statement saying that [McCall] is a racist." (Dkt. No. 87: Normand Aff. Ex. F: Thompson Dep. at 111–12.) As an example of McCall's behavior, Thompson stated that if two white people were having a conversation at the station, McCall would come over and join the conversation, but if Thompson and another minority employee were talking, when McCall walked over "the first thing he would say was, 'You are not working. Why are you talking?' And the reason he would say it to me is because I am black. Point blank." (Thompson Dep. at 112.) It appears that Thompson was using that as a hypothetical example, instead of describing something that actually had occurred. That is too vague to be considered by the Court as an actual example of discriminatory conduct. Moreover, and importantly, even Thompson—Taylor's shop steward—admitted that Taylor was not disciplined due to his race, but rather the disciplinary actions were "within the guidelines."

**\*16** Lewis testified that "[a]nybody that works there" was aware of McCall's "derogatory and racist statements on the floor especially towards Blacks. Calling us 'worthless pieces of shit.'" (Normand Aff. Ex. D: Lewis Dep. at 58.) Taylor similarly testified to McCall's calling black employees a "useless piece of shit." (Taylor Dep. at 383–89.) Both Lewis and Taylor conceded, however, that McCall directed his "piece of shit" comments not only to minorities, but to Caucasian employees he disliked. (Lewis Dep. at 58; Taylor Dep. at 384–85; *see also* pages 15–16 above.) Indeed, the Court notes that in his EEO precomplaint counseling form, Taylor said that McCall had been "very very mean" to Taylor. (Taylor 56.1 Stmt., Add'l Relevant Facts ¶ 17; Cogan Aff. Ex. L: 6/25/97 Info. for Precompl. Counseling Form.)

Taylor v. Potter, Not Reported in F.Supp.2d (2004)
_____
2004 WL 1811423

While inappropriate, McCall's derogatory comments (or being "very very mean") made without distinction to employees' race are not actionable under Title VII. *See, e.g., Bickerstaff v. Vassar College,* 196 F.3d 435, 452 (2d Cir.1999) ( "While [superior's] alleged comments may be rude and derogatory, Title VII is not a 'general civility code.' ") (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 1002 (1998)), *cert. denied,* 530 U.S. 1242, 120 S.Ct. 2688 (2000); *Williams v. NYC Dep't of Sanitation,* 00 Civ. 7371, 2001 WL 1154627 at *15 (S.D.N.Y. Sept. 28, 2001) (Peck, M .J.) ("Of course, 'unfair' treatment or personal animosity is not actionable, only discriminatory treatment is."); *Gonzalez v. New York City Transit Auth.,* 00 Civ. 4293, 2001 WL 492448 at *14 (S.D.N.Y. May 9, 2001) (Peck, M.J.) (Plaintiff's "own allegations expressly claim that any disparate treatment was due, not to discrimination, but to personal and professional animosity."); *Gorley v. MetroNorth,* 99 Civ. 3240, 2000 WL 1876909 at *7 (S.D.N .Y. Dec. 22, 2000) ("Even if [plaintiff's supervisor] did harbor personal animosity against plaintiff ... Title VII provides relief only for racial discrimination, not fickleness."), *aff'd,* No. 01–7100, 29 Fed. Appx. 764, 2002 WL 355909 (2d Cir. Mar. 6, 2002); *Gibson v. Brown,* No. 97–CV–3026, 1999 WL 1129052 at *12 (E.D.N.Y. Oct. 19, 1999) (" 'Personal animosity is not the equivalent of ... discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a ... discrimination case by accusation.' "), *aff'd,* No. 99–6346, 242 F.3d 365 (table), 2000 WL 1843914 (2d Cir. Dec. 14, 2000); *Baber v. Runyon,* 97 Civ. 4798, 1998 WL 912065 at *7 (S.D.N.Y. Dec. 30, 1998) ("Personal animosity is not actionable discrimination."); *see also, e.g., Booker v. Federal Reserve Bank,* 01 Civ. 2290, 01 Civ. 2291, 2003 WL 1213148 at *13 (S.D.N.Y. Mar. 17, 2003) (Plaintiff provided insufficient evidence of discrimination in his evaluation and shift change where, *inter alia,* "both Caucasian and African–American officers received evaluations that were more critical than before" and "[t]he Bank rescheduled the shifts of both Booker and [a co-worker], who is Caucasian."); *Hill v. Textron Auto. Interiors, Inc.,* 160 F.Supp.2d 179, 186 (D.N.H.2001) ("As to the references to [plaintiff] as 'brother,' [plaintiff] testified in his deposition that the term 'brother' was used by fellow employees to refer to him as well as white co-workers.... Thus, there is no evidence that it was used in a derogatory, discriminatory, or offensive manner.").

*17 Even assuming *arguendo* that Taylor's evidence shows that McCall was racially biased (which it does not), Taylor has shown no link to his suspensions. McCall did not complete (or sign as approver) any of the Notice of Suspension or Termination forms. (*See* pages 5–6, 9–10, 13 above.) While shop steward Thompson testified that McCall was effectively "the supervisor in charge of all the supervisors") (Taylor 56.1 Stmt., Add'l Relevant Facts ¶¶ 2–3; Thompson Dep. at 20, 34–35), Taylor presented no direct evidence that McCall was involved in the filing of any of the three disciplinary notices at issue. Rather, Taylor points to "circumstantial evidence that Mr. McCall was the driving force behind the decision to suspend Mr. Taylor" for seven days as a result of the June 1997 Carretta incident. (Dkt. No. 92: Taylor Br. at 2–3.) That "circumstantial evidence" is based on Taylor's testimony about what co-workers allegedly told him. Specifically, Taylor testified that Mr. Negron, Ms. Gambrell and other postal employees told him that McCall tried to get them to give statements that management had told everyone that in the event no supervisor was present, Caretta would be in charge. (Dkt. No. 87: Normand Aff. Ex. B: Taylor Dep. at 116–21; *see also* Taylor Br. at 7–8 & n. 4, 18.) Taylor argues that McCall's efforts to "develop a false 'case' for suspending Mr. Taylor" could allow a fact-finder to conclude he "directed Mr. Juan to issue the disciplinary notice to Mr. Taylor, and did so out of racial animus." (Taylor Br. at 19.)

Not only are there logic jumps in this argument, but there is no *admissible* evidence that these events took place—Taylor's testimony about what other employees allegedly told him is inadmissible hearsay. *See, e.g., Howley v. Town of Stratford,* 217 F.3d 141, 155 (2d Cir.2000) (In Title VII action, "assertions made by [plaintiff] only on her information and belief, for example, would not be admissible through her at trial, for testimony as to facts must generally be based on the witness's personal knowledge. Nor would testimony by [plaintiff] that other firefighters told her of certain statements by [her supervisor] likely be admissible to prove that [her supervisor] actually made such statements, for her testimony offered for that purpose would be hearsay."); *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999) (In ADA action, plaintiff's "statement as to what he 'was told' was hearsay that would not be admissible at trial. Since [plaintiff] provided no sworn statement from [the declarant], he failed to

adduce any evidence sufficient to create a genuine issue to be tried ..."); *Gambrell v. National R.R. Passenger Corp.,* 01 Civ. 6433, 2003 WL 282182 at *7 (S.D.N.Y. Feb. 3, 2003) (Plaintiff in ADEA case alleging disparate treatment failed to make out a prima facie case where he learned about another worker's wrongdoing and discipline from other employees and plaintiff's testimony about the co-worker was therefore "inadmissible hearsay."); *Cooper v. John D. Brush & Co.,* 242 F.Supp.2d 261, 270 (W.D.N.Y.2003) (Plaintiff in Title VII case failed to provide admissible evidence of supervisor's racist comments where "the only racial epithet of which plaintiff is aware is an alleged comment reported to him by another co-worker" and "plaintiff has not provided an affidavit from the co-worker who allegedly heard this statement."); *Medina v. New York City Dep't of Parks & Recreation,* 01 Civ. 7847, 2002 WL 31812681 at *5 (S.D.N .Y. Dec. 12, 2002) (Plaintiff's "own deposition testimony that a woman in the payroll department named Denise told her that African Americans are paid less than 'their positions require' ... is inadmissible hearsay. A party resisting a motion for summary judgment must present admissible evidence in opposition to the motion.") (citing *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d at 160).

**\*18** Contrary to Taylor's position (Dkt. No. 92: Taylor Br. at 8 n. 4; Dkt. No. 96: Taylor 5/13/04 Letter to Court at 2), Taylor's co-workers' statements do not fall within Federal Rule of Evidence 801(d)(2)(D)'s exception for statements made within the scope of the co-worker's employment. [24] *Compare, e.g., Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1238 & n. 1 (2d Cir.1995) (Plaintiff's testimony that her supervisor told her that he was ordered to fire her by his supervisor who, he said, wanted a man in the job, was "admissible under Fed.R.Civ.P. 801(d)(2)(D) as a statement by an employee 'concerning a matter within the scope of ... employment.' "); *Lipton v. County of Orange,* 315 F.Supp.2d 434, 448–50 (S.D.N.Y. Apr. 14, 2004) (In prisoner retaliatory transfer case, statements were related to corrections officers' duties and admissible under Fed.R.Civ.P. 801(d)(2)(D) to show decisionmaker's intent where declarant and fellow correction officers had a " 'significant role in the ... decision at issue' because they clearly were acting within the scope of their employment ... in executing the order of" the corrections administrator; although they did not make "the transfer decision, their participation was instrumental in its execution and their statements are

admissible against the [employer] under Rule 801(d)(2)(D).").

24      A statement is not hearsay if ... offered against a party and is ... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Ev. 801(d)(2)(D).

As Judge Kaplan has explained:

The Second Circuit has not specifically addressed the precise issue whether a statement by a co-worker relating the alleged statement of a supervisor with decision-making authority concerns a matter within the scope of the co-worker's employment, although [*Howley v. Town of Stratford,* 217 F.3d 141, 155 (2d Cir.2000) ] held *sub silentio* that it does not. Other circuits to reach the issue, however, uniformly have determined that such statements are not within the scope of employment when the declarant neither is the plaintiff's supervisor nor has a significant role in the employment decision at issue. This approach dovetails with the more general principle, recognized in the Second Circuit, that statements regarding employment matters *are* within the scope of the declarant's employment if the declarant was "an advisor or other significant participant in the decision-making process that is the subject matter of the statement." Both are consistent with the hornbook notion that "not everything that relates to one's job falls within the scope of one's ... employment" and that the statement at issue must be "related to the declarant's duties."

*Evans v. Port Auth.,* 192 F.Supp.2d 247, 263–64 (S.D.N.Y. Apr. 5, 2002) (fns. citing cases omitted).

Here, Negron, Gambrell and the other unnamed co-workers were not supervisors or significant participants in the decisions to issue the Notices and suspensions. (*See* pages 4–6, 9–10, 13–14 above.) Because Taylor's co-worker's statements are not within the scope of the co-workers' employment, Taylor's own testimony as to his co-worker's statements is inadmissible hearsay. *See, e.g., Patterson v. County of Oneida,* 375 F.3d 206, 219, 223 (2d Cir.2004) ( "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." Plaintiff proffered insufficient

evidence of discrimination including a witness's statement that was inadmissible hearsay because "there was no submission of affidavits ... by those affiants repeating or adopting their prior statements."); *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 131 n. 12 (2d Cir.2004) (District Court deciding summary judgment motion was free to disregard hearsay in affidavits because it would be inadmissible at trial.); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir.2000) ("Of course, while second-hand comments may be relevant [to a hostile work environment claim], a district court deciding a summary judgment motion must be provided with admissible evidence demonstrating the truth of the non-movant's assertions."); *Ozenne v. University of Conn. Health Care*, 292 F.Supp.2d 425, 434 (D.Conn.2003) ("At her deposition, plaintiff stated that she learned of [her manager's] interference with her evaluations from [a third party].... However, [the third party] did not submit an affidavit in support of plaintiff's claims. The court cannot consider hearsay statements in opposition to a motion for summary judgment.") (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d at 160); *Peterson v. Washington Cty. Dep't of Pub. Works*, No. 1:00CV1092, 2002 WL 32344505 at *4 n. 6 (N.D.N.Y. Dec. 19, 2002) (If plaintiff learned of supervisor's statements from another individual who heard them, "Plaintiff may not rely on such inadmissible hearsay to defeat summary judgment. Of course, the testimony of the individual(s) who allegedly heard [the supervisor's] statements would be admissible, as those statements would not be offered for the truth of the matters asserted therein but only for the fact that [the supervisor] made them. Plaintiff, however, points to no affidavits, deposition testimony, or other admissible evidence by such individuals.") (citations omitted to cases including *Howley v. Town of Stratford*, 217 F.3d at 155).

**\*19** Thus, the "central basis" of Taylor's claims—that McCall was a racist who caused other supervisors to discipline Taylor—fails on two grounds: the evidence that McCall is racist (as opposed to equally "mean" to those he disliked, regardless of race) is virtually non-existent and, more importantly, Taylor's proffered "circumstantial evidence" of McCall's alleged his involvement in the disciplines is inadmissible hearsay. Without that causal link, Taylor's discrimination claims based on McCall fail.

The Court now turns to Taylor's retaliation (and remaining discrimination claims) as to each of the three specific disciplinary actions.

## III. *TAYLOR HAS NOT PROVED DISCRIMINATION OR RETALIATION AS TO THE JUNE 1997, OCTOBER 1997 OR JANUARY 1998 DISCIPLINARY ACTIONS*

### A. *The June 1997 Seven–Day Suspension*

Taylor does not claim that Carretta or Juan discriminated against him. (*See* pages 7, 14–16 above.) The Court already has discussed and rejected Taylor's claim that McCall discriminated against him. (*See* Point II above.) The Court will address Taylor's claim that the June 1997 seven day suspension was in retaliation for his prior EEO complaints. (Dkt. No. 92: Taylor Br. at 20–22.)

Title VII retaliation claims also are governed by the *McDonnell Douglas* burden-shifting analysis. *See, e.g., Feingold v. New York*, 366 F.3d 138, 157 (2d Cir.2004); *Moss v. Enlarged City Sch. Dist.*, No. 03–7342, 81 Fed. Appx. 389, 390, 2003 WL 22849963 at *1 (2d Cir. Dec. 2, 2003); *O'Hara v. Memorial Sloan-Kettering Cancer Ctr.*, No. 03–7049, 79 Fed. Appx. 471, 473, 2003 WL 22469710 at *2 (2d Cir. Oct. 31, 2003); *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir.2003); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 79–81 (2d Cir.2001); *Slattery v. Swiss Reins, America Corp.*, 248 F.3d 87, 94 (2d Cir.), *cert. denied*, 534 U.S. 951, 122 S.Ct. 348 (2001); *Raniola v. Bratton*, 243 F.3d 610, 624–25 (2d Cir.2001); *Sotolongo v. New York City Transit Auth.*, No. 99–9195, 216 F.3d 1073 (table), 2000 WL 777958 at *2–3 (2d Cir. June 15, 2000); *Dodson v. CBS*, 02 Civ. 9270, 2004 WL 1336231 at *24 (S.D.N.Y. June 15, 2004) (Peck, M.J.).[25]

---

[25]     *See also, e.g., Diaz v. Weill Med. Ctr. of Cornell Univ.*, 02 Civ. 7380, 2004 WL 285947 at *21 & n. 29 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.); *Kennebrew v. New York Hous. Auth.*, 01 Civ. 1654, 2002 WL 265120 at *17 (S.D.N.Y. Feb. 26, 2002) (Peck, M.J.); *Williams v. NYC Dep't of Sanitation*, 00 Civ. 7371, 2001 WL 1154627 at *19–20 (S.D.N.Y. Sept. 28, 2001) (Peck, M.J.); *Gonzalez v. New York City Transit Auth.*, 00 Civ. 4293, 2001 WL 492448 at *18 (S.D.N.Y. May 9, 2000) (Peck, M.J.); *Economou v. Caldera*, 99 Civ. 12117, 2000 WL 1844773 at *25 (S.D.N.Y. Dec. 18, 2000) (Peck, M.J.); *Adeniji v. Administration for Children Servs.*, 43 F.Supp.2d 407, 428 (S.D.N.Y.1999) (Wood, D.J. & Peck, M.J.), *aff'd*, No. 99–7561, 201 F.3d 430 (table), 1999 WL 1070027 (2d Cir. Nov. 18, 1999).

Under Title VII, it is unlawful for an employer to "retaliate" by discriminating against an employee because the employee engaged in protected activity, that is, "has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). [26]

[26]    *Accord, e.g., Dodson v. CBS Broadcasting, Inc.,* 2004 WL 1336231 at *24; *Diaz v. Weill Med. Ctr. of Cornell Univ.,* 2004 WL 285947 at *21; *see, e.g., Terry v. Ashcroft,* 336 F.3d 128, 140 (2d Cir.2003); *Minott v. Port Auth.,* 116 F.Supp.2d 513, 520, 524 (S.D.N.Y.2000) ("Title VII defines protected activities as (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an employee's participation in any Title VII investigation or proceeding."); *see also, e.g., Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988) ("The objective of [the section prohibiting retaliation] is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice.").

"In order to make out a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence (i) participation in a protected activity known to the defendant; (ii) an employment action disadvantaging the plaintiff; and (iii) a causal connection between the protected activity and the adverse employment action." *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257 (1998). [27]

[27]    *Accord, e.g., Feingold v. New York,* 366 F.3d at 156; *Terry v. Ashcroft,* 336 F.3d at 141; *Jenkins v. Board of Educ.,* No. 02-7479, 64 Fed. Appx. 801, 804, 2003 WL 1970492 at *2 (2d Cir. Apr. 28, 2003); *Mack v. Otis Elevator Co.,* 326 F.3d 116, 129 (2d Cir.), *cert. denied,* 124 S.Ct. 562 (2003); *Holtz v. Rockefeller & Co.,* 258 F.3d at 79; *Slattery v. Swiss Reins. America Corp.,* 248 F.3d at 94; *Gregory v. Daly,* 243 F.3d 687, 700 (2d Cir.2001); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996); *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993), *cert. denied,* 522 U.S. 1004, 118 S.Ct. 578 (1997); *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 64 (2d Cir.1992); *see also, e.g., Dodson v. CBS Broadcasting, Inc.,* 2004 WL 1336231 at *24;

*Diaz v. Weill Med. Ctr. of Cornell Univ.,* 2004 WL 285947 at *21; *Kennebrew v. New York Hous. Auth.,* 2002 WL 265120 at *17; *Gonzalez v. New York City Transit Auth.,* 2001 WL 492448 at *18; *Cobian v. New York City,* 99 Civ. 10533, 2000 WL 1782744 at *16 (S.D.N.Y. Dec. 6, 2000) (Peck, M.J.) ( & cases cited therein), *aff'd,* No. 01-7575, 2002 WL 4594 at *1 (2d Cir. Dec. 21, 2001); *Adeniji v. Administration for Children Servs.,* 43 F.Supp.2d at 419.

**\*20** The Second Circuit "has consistently held that proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000); *see also, e.g., Feingold v. New York,* 366 F.3d at 156-157 ("[T]he requirement that [plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two.") (citing cases); *Terry v. Ashcroft,* 336 F.3d at 152; *Raniola v. Bratton,* 243 F.3d at 625; *Dodson v. CBS Broadcasting, Inc.,* 2004 WL 1336231 at *24; *Nonnenmann v. City of New York,* 02 Civ. 10131, 2004 WL 1119648 at *22 (S.D.N.Y. May 20, 2004) (Peck, M.J.) (" 'Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.' ") (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999)).

First, none of Taylor's prior complaints involved Juan or Carretta and neither individual had ever supervised Taylor before June 18, 1997. (Taylor Dep. at 105-06, 141-42; *see also* pages 2, 5, 7-8 above.) Second, although Taylor's most recent EEO complaint involved McCall, that complaint was filed in October 1996—approximately eight months before the June 18, 1997 incident and his subsequent suspension. (Dkt. No. 86: Sturman Aff. 5 & Att.; Taylor & Potter 56.1 Stmts. ¶ 43; *see also* page 14 above.) The Court finds that this eight-month gap is insufficient to establish a causal connection between Taylor's EEO complaint and his seven-day suspension after the June 18, 1997 incident. *See, e.g., Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74, 121 S.Ct. 1508, 1511 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient

evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' "); *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554–555 & n. 5 (2d Cir.2001) (The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.") (collecting cases); *see also, e.g., Dodson v. CBS Broadcasting, Inc.,* 2004 WL 1336231 at \*23 n. 27 ("[T]he eight months between [plaintiff's] complaint to [his supervisor] and his termination is not the 'very close' proximity sufficient to raise an inference of causality."); *Diaz v. Weill Med. Ctr. of Cornell Univ.,* 2004 WL 285947 at \*22 & n. 31 (finding no causation where six months elapsed between plaintiff's DHR complaint and her termination) ( & cases cited therein).

**\*21** Thus, as to the June 1997 seven day suspension, Taylor has not shown discrimination or retaliation. The Postal Service is entitled to summary judgment on Taylor's claims as to this incident.

### B. *The October 1997 Notice of Removal*
"Taylor concedes that he did not attend work from September 22, 1997 to October 9, 1997 due to his hospitalization and subsequent treatment." (Dkt. No. 92: Taylor Br. at 23; *see* pages 9–10 above.) Taylor argues that he did submit medical documentation to substantiate his absence: a letter from Janet Rose, his social worker. (Taylor Br. at 23; *see* pages 10–11 above.) The U.S.P.S. argues the Notice of Removal was issued on October 9, 1997, a day before the Rose Letter was written. (Dkt. No. 88: Potter Br. at 23.) Shop Steward Thompson acknowledged receipt of the Rose Letter on October 14, 1997. (*See* page 10 above.) The Post Office admits that Taylor had delivered the Rose Letter as of October 14, 1997. (*See* page 11 above.)

Taylor argues that McCall made "a crucial admission" during his deposition when he stated that "he would normally give an employee who submitted insufficient medical documentation additional time to submit any necessary additional documentation." (Taylor Br. at 24, citing McCall Dep. at 131.) However, Taylor himself testified that McCall did not reject the Rose letter and refuse to give Taylor additional time. (Dkt. No. 95: Potter Reply Br. at 9 n. 8, citing Taylor Dep. at 262–63.) Rather, upon receiving the Rose Letter on October 14, McCall

sent Taylor to the medical unit for an evaluation. (Potter Reply Br. at 9 n. 8, citing Taylor Dep. at 262–64.)

Taylor argues that the fact that Taylor filed an EEO complaint in September 1997 and received the notice of removal in October 1997 is a sufficient causal connection to raise an inference of retaliation. (Taylor Br. at 24–25.) The Postal Service's uncontradicted evidence of Taylor's absence, however, removes any such inference from the case, and Taylor has not presented any other evidence of retaliatory intent or retaliation. *See, e.g., Curtis v. Citibank N.A.,* No. 02–7141, 70 Fed. Appx. 20, 22–23, 2003 WL 21511832 at \*2 (2d Cir. June 27, 2003) (Upholding summary judgment for defendant. "The plaintiff's primary evidence of retaliation is the proximity in time of their discrimination complaints and the adverse actions. Although it is true that a discrimination claim may be supported with only circumstantial evidence, [defendant] presents an abundance of well-documented non-discriminatory explanations for the adverse actions, and the plaintiffs concede the facts underlying these explanations."); *Shabazz–Allah v. Guard Mgmt. Serv.,* No. 99–7371, 201 F.3d 432 (table), 1999 WL 1012402 at \*1 (2d Cir. Oct. 20, 1999) (Defendant "presented uncontradicted evidence of [plaintiff's] tardiness, unexcused absences from work and violations of company policy that establish a nondiscriminatory motive for discharge. Because [plaintiff] failed to rebut or contradict this evidence, he failed to establish a prima facie case and summary judgment was therefore proper."); *Mack v. United States Postal Serv.,* No. 92–CV–0068, 1998 WL 546624 at \*4 (E.D.N.Y. Aug. 26, 1998) ("The U.S.P.S. has presented ample evidence that [plaintiff] was suspended for legitimate, non-discriminatory reasons. The U.S.P.S. has included in its submissions various letters sent to [plaintiff] informing him that he was required to either return to work or submit medical documentation to explain his absence, and that if he failed to do so, disciplinary action would be taken. This rebuts the presumption of discrimination, which therefore drops from the case."), *aff'd,* No. 98–6242, 181 F.3d 83 (table), 1999 WL 314157 (2d Cir. May 14, 1999), *cert. denied,* 528 U.S. 914, 120 S.Ct. 267 (1999); *see also, e.g., Porter v. New York Univ. School of Law,* 99 Civ. 4693, 2003 WL 22004841 at \*11 (S.D.N.Y. Aug. 25, 2003) (Plaintiff was terminated after approximately one month during which he "did not appear at work, explain his absence, or provide any new documentation to substantiate his claim for medical leave. Prolonged unexcused absence

from work is obviously a legitimate, nondiscriminatory reason for termination.").

**\*22** Taylor also highlights the fact that the October 1997 notice of removal (and January 1998 notice of removal) incorrectly list Taylor as having "Non–Veteran Bargaining Unit Status" (*see* pages 11, 13 above) and Taylor alleges that "[t]he Post Office's failure to treat Mr. Taylor as a veteran during this disciplinary process is further evidence that the proffered reason for the discipline was pretextual and that, in fact, it was issued out of discriminatory and/or retaliatory animus." (Taylor Br. at 26.) Taylor fails to explain how he was prejudiced by the mis-categorization. (*See* Potter Br. at 25–26 n. 14.) The mis-categorization had no impact on Taylor's grievance, as veteran status affects grievance appeal rights, while Taylor's grievances were settled and never appealed. (Potter Br. at 25 n. 14.)

The Court finds that in light of Taylor's unapproved absence since September 22, 1997, the Post Office issued its October 9, 1997 notice of removal for a legitimate, non-discriminatory, non-retaliatory reason. The Postal Service is entitled to summary judgment on this claim.

### C. *The January 1998 Notice of Removal*

Taylor claims that the January 21, 1998 notice of removal was issued "out of retaliatory animus on the part of both Messrs. McCall and Ochlan, against whom Mr. Taylor had engaged in protected EEO activity after being suspended for continuous A.W.O.L. despite the Rose Letter submitted to Mr. McCall by Mr. Taylor on or before October 14, 1997." (Taylor 56.1 Stmt. ¶ 73; Cogan Aff. Ex. R: 12/10/97 Info. for Precompl. Counseling form; Taylor Dep. at 173–74, 289–93.) Taylor's counsel concedes that "Mr. Taylor cannot, without further discovery, establish a prima facie case of discrimination in connection with the January 1998 Discipline." (Dkt. No. 92: Taylor Br. at 27 n. 1.)

Specifically, Taylor argues that the January 21, 1998 notice of removal was in retaliation for Taylor's filing of an "Information for Precomplaint Counseling" form that he submitted in an effort to file an additional EEO complaint against Ochlan and McCall for his October 1997 suspension. (*See* pages 12–13 & n. 6 above.) Although the gap between Taylor's filing of this form and his notice of removal is somewhat close—approximately six weeks—Taylor's undisputed lateness alone is a sufficient

reason for his removal and successfully rebuts Taylor's claim of pretext. *See, e.g., Curtis v. Citibank N.A.,* No. 02–7141, 70 Fed. Appx. 20, 22–23, 2003 WL 21511832 at \*2 (2d Cir. June 27, 2003); *Shabazz–Allah v. Guard Mgmt. Serv.,* No. 99–7371, 201 F.3d 432 (table), 1999 WL 1012402 (2d Cir. Oct. 20, 1999); *McDonald v. Maimonides Med. Ctr.,* No. CV–99–6849, 2002 WL 257818 at \*5 (E.D.N.Y. Jan. 3, 2002) (Plaintiff "fails to show that [defendant's] legally sufficient, non-discriminatory reason for her termination—her persistent tardiness—is merely a pretext. The evidence is clear, and undisputed, that [plaintiff] was frequently late for work, that she was disciplined for lateness and for her failure to follow her work schedule on four separate occasions, and that she received two written warnings and two suspensions.... [Plaintiff] offers no evidence to show that she was not persistently tardy; rather, she concedes this fact. Nor does she show that any other employee with a similarly egregious record of lateness was not terminated.") (citations omitted); *Bennett v. Watson Wyatt & Co.,* 136 F.Supp.2d 236, 246 (S.D.N.Y.2001) (Plaintiff did not make out a prima facie discrimination case because his chronic lateness " 'rendered him unqualified' 'for the position. "Furthermore, plaintiff's lateness is a legitimate, nondiscriminatory reason for his discharge ."); *Hermida v. Postmaster General,* 93 Civ. 6564, 1995 WL 622461 at \*2 (S.D.N.Y. Oct. 24, 1995) (Where employee "admit[ted] to being excessively late, walking off the workfloor and creating work disturbances," Postal Service met its burden of articulating a legitimate, non-discriminatory reason to discharge plaintiff. "[W]here, as here, an employer substantially establishes legitimate, nondiscriminatory reasons for an employee's discharge, the employee's 'task of proving pretext' is 'rendered more difficult ." ').[28] Taylor has failed to show that his January 1998 notice of removal and fourteen day suspension was retaliatory. The Postal Service is therefore entitled to summary judgment on this claim.

[28]  After Taylor filed a grievance, shop steward Shirley Thompson helped Taylor to settle the grievance with a fourteen-day suspension. (*See* page 12 above.) While Taylor alleges that McCall "coerced" or "insisted" that he take the fourteen-day suspension in lieu of removal (Taylor Br. at 28; *see* page 13 above), there is no evidence to suggest that this was anything but good advice.

### D. *Taylor's Claims That He Was Denied Overtime And Lunch Breaks*

**\*23** Taylor also claims that he was denied opportunities to work overtime after June 18, 1997. (Dkt. No. 92: Taylor Br. at 29–30.) As to the lunch breaks, the Postal Service's summary of Taylor's clock rings show that Taylor received a lunch break of approximately thirty minutes on each shift that he worked. Taylor claims that he would only "get his lunch in between the trips," i.e., the four trucks that arrived for him to receive, unload, and load. (Taylor Dep. at 446, 449). Even assuming that dividing an employee's lunch break into several shorter breaks is an adverse employment action, Taylor offers only unsubstantiated allegations and conclusory assertions that management, specifically McCall and Juan, would have his time sheet reflect that he took a lunch break when he had not in fact taken lunch. (Taylor Dep. at 184–85, 445.)

In response to the Postal Service clock ring evidence showing Taylor's lunch breaks, Taylor argues that "[e]vidence calling into question the credibility of the non-moving party's evidence is not appropriate at the summary judgment stage where all evidence must be viewed in a light most favorable to the moving party." (Taylor Br. at 30 n. 14.) However, the Court is not making a credibility determination, deeming one side's evidence more reliable than the other's. Rather, left to weight the Post Office's evidence rebutting Taylor's claims against Taylor's bare assertion that the records are inaccurate, Taylor's claim must fail. *E.g., Budde v. H & K Distrib. Co.*, No. 99–9449, 216 F.3d 1071 (table), 2000 WL 900204 at \*1 (2d Cir. June 29, 2000) (When an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer.) ( & cases cited at pages 22–23 above).

Similarly, Taylor provides no evidence that he was offered fewer opportunities to work overtime after June 18, 1997

or was offered fewer opportunities than other similarly situated employees. *See, e.g., Richerson v. Niagara Mohawk Power Corp.*, No. 99–CV–0643, 2001 WL 877478 at \*4 (W.D.N.Y. July 30, 2001) ("With regard to being denied the opportunity to work overtime, nowhere in plaintiff's papers is it indicated which similarly situated but less senior employees in her department received more favorable treatment ."); *Harris v. New York City Dep't of Homeless Servs. Eligibility Investigation Unit*, 97 Civ. 0432, 1998 WL 205334 at \*7 (S.D.N.Y. Apr. 28, 1998) ("[T]here is absolutely no evidence to support plaintiff's claim that he was given fewer overtime assignments than other Clerical Associates as a result of race and gender discrimination.... Plaintiff has failed to produce any proof that he was denied overtime at all, much less that this was a result of unlawful discrimination."), *aff'd*, No. 98–7721, 181 F.3d 82 (table), 1999 WL 314158 (2d Cir. May 14, 1999).

**\*24** Finally, even if the Court were to find that Taylor presented evidence that he was denied lunch or overtime, there is absolutely no evidence that it was the result of unlawful discrimination or retaliation (as opposed to, say, personality conflicts). The Postal Service is entitled to summary judgment on this claim.

### CONCLUSION

For the reasons stated above, the Postal Service's motion for summary judgment (Dkt. No. 82) is granted and Taylor's claims are dismissed. The Clerk of Court is to enter judgment for defendant dismissing Taylor's complaint.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1811423