J1APLOPC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MARIAH LOPEZ,

4                    Plaintiff,

5             v.                          17 CV 03014 (VEC)(OTW)

6    PROJECT RENEWAL, ET AL.,

7                    Defendants.

8    ------------------------------x
                                         New York, N.Y.
9                                        January 10, 2019
                                         10:09 a.m.
10
     Before:
11
                        HON. WANG: ONA T. WANG,
12
                                         Magistrate Judge
13
                              APPEARANCES
14
     MARIAH LOPEZ, PRO SE
15

16   JACKSON LEWIS PC
          Attorneys for Defendant Project Renewal
17   BY:  RICHARD IAN GREENBERG

18   NEW YORK CITY LAW DEPARTMENT
          Attorneys for Defendant The City of New York
19   BY:  THOMAS B. ROBERTS

20   CLIFTON BUDD & DeMARIA, LLP
          Attorneys for Defendant QPS Security, Inc.
21   BY:  STEPHEN PAUL PISCHL

22   WILLKIE FARR & GALLAGHER, LLP
          Attorneys for Defendants WIN, Inc. and Christine Quinn
23   BY:  JILL GRANT
          CASIE ORELLAMA

24

25

J1APLOPC

```
 1              (In open court)

 2              (Case called)

 3         MS. LOPEZ:  Good morning.  Mariah Lopez, pro se

 4    plaintiff.

 5         MR. ROBERTS:  Thomas Roberts, Assistant Corporation

 6    Counsel for the municipal defendants.

 7         MR. GREENBERG:  Richard Greenberg, Jackson Lewis PC

 8    for Project Renewal.

 9         MR. PISCHL:  Stephen Pischl, Clifton Budd and DeMaria

10    for defendant Quality Protective Services Security.

11         MS. GRANT:  I'm Jill Grant and this is Casie Orellama

12    from Willkie Farr and Gallagher representing WIN and Christine

13    Quinn.

14         THE COURT:  All right.  Please be seated.  Good

15    morning.

16         MS. LOPEZ:  Good morning, your Honor.

17         THE COURT:  Okay.  You know what, I always forget to

18    do this, but I'm going to do this now.  At the end of the

19    proceeding, I always tell the parties to order the transcript

20    and share the costs.  In this case, I'm going to tell the

21    defendants, who have appeared to order the transcript, to share

22    the cost and provide a copy to Ms. Lopez after.  Okay?

23         We are here for a status conference.  I guess a few

24    things have happened.  Ms. Lopez, we are awaiting for Judge

25    Caproni to rule on the report and recommendation that I issued
```

J1APLOPC

```
1    shortly after your motion for TRO before the holidays.  So
2    that's not before me.  However, I believe that the objections
3    date had passed.  So if you intend to object, you should reach
4    out to Judge Caproni's chambers, I mean via the pro se office,
5    but, you know, if you need an extension, reach out as soon as
6    possible.  Okay?
7         All right.  Let's see.  I guess we need to -- and I
8    would like to just hear from the defendants procedurally where
9    we are.  I guess, from anybody who's representing the WIN and
10   Christine Quinn defendants, I understand there's a motion to
11   dismiss pending; is that right?  Can you give me the status on
12   that?
13        MS. GRANT:  Yes, your Honor.  We moved to dismiss on
14   behalf of WIN and Christine Quinn.  October 5th, I think, was
15   the date of our motion.  Ms. Lopez did not file opposition
16   papers and, therefore, the motion is just pending before Judge
17   Caproni.
18        THE COURT:  Okay.  Ms. Lopez, and you don't need to
19   stand up if it's more comfortable.  I understand if you're
20   sitting in the back row it's hard to be heard.
21        MS. LOPEZ:  Does that apply to me as well, your Honor.
22        THE COURT:  Sure.  You can stay seated.  You can stand
23   up, whatever you like.  Whatever makes you comfortable.
24        MS. LOPEZ:  So I'd like to just address my motion for
25   TRO, if I may, your Honor.
```

J1APLOPC

1          THE COURT:  Okay.  Just before you start, though,

2    recognize that it's out of my hands.  It's out of this.

3          MS. LOPEZ:  That's understandable.  So I'm pretty --

4    my question is directed at U.S. magistrate, but also just for

5    procedural clarity.  I'm pretty certain that because I alleged

6    issues of fact within the motion, that I'm entitled to a

7    hearing of some type to argue orally my motion.  I'm also

8    pretty sure, from my lose glancing at Judge Caproni's

9    instructions, that most serious matters -- I consider a request

10   for a TRO pretty serious -- go in front of her.  That's why the

11   motion is pending in front of her.

12         I don't believe it would be fair or adequate for this

13   Court to decide the motion without hearing facts first.  So I'm

14   sure it would please Judge Caproni, as well as the pro se

15   office, to try to streamline what would be the next few days of

16   me running in and out of court, trying to figure what I would

17   have to do to either trigger a hearing or to file an appeal

18   with the Second Circuit for the denial of a hearing, at least I

19   would get a writ of mandamus.

20         So I think it would be unfair, I'm going to say again,

21   for either the magistrate or Judge Caproni to rule on the

22   motion without giving plaintiff, especially a pro se plaintiff,

23   who is alleging in the motion some change in circumstance

24   substantially, to not be afforded a motion to prove or

25   disapprove any of the elements or facts asserted in the motion.

J1APLOPC

1   And I -- sure.  I was going to respond to Ms. Quinn.

2            THE COURT:  And, you know, understand, too, a report

3   and recommendation is just that.  So I have not ruled on the

4   motion at all.  That's just my recommendation.  Judge Caproni

5   may accept it.  She may not accept it.  But if you want the

6   ruling from Judge Caproni on whether you get oral argument,

7   whether you get a hearing, whether you want her to adopt the

8   recommendation or not, that is -- the procedural basis to do

9   that is by filing an objection before Judge Caproni.

10           Now, the time for that has passed.  You had two weeks.

11  So, you know, so that procedural process is out of here now,

12  and you really should reach out to Judge Caproni, again via the

13  pro se office and via your next filing, how you want to address

14  that.

15           MS. LOPEZ:  So the only reason the TRO was necessary

16  is because this Court is still mulling over a motion for

17  preliminary injunctive relief that was removed from the State

18  Court.

19           So before I address Ms. Quinn's counsel, any issues

20  she brought up in the status conference, I do want to state, as

21  a homeless person that is disabled, that I find it wholly

22  unacceptable for this Court to take the amount of time it has

23  taken to decide the motion.  Being given the opportunity to

24  have all these months being desperate and homeless, it occurred

25  to me that your Honor or Judge Caproni isn't potentially

J1APLOPC

1    viewing the issue of having a home the same way it views other

2    civil matters involving poor or indigent pro se litigants.

3            So I would like to put on the record, and to address

4    this Court, that I believe that this Court should view the

5    deprivation of basic human fundamental rights, such as housing,

6    akin to the deprivation of freedom.  So this Court, which

7    normally has a snail's pace in deciding the very complex issues

8    in front of it, knows when issues of incarceration or

9    potentially the health of an unconscious person is at stake, if

10   no one is going to move quick for those issues, I'd like to, as

11   a pro se individual that is disabled, that has been dependent

12   on the government and the courts court my entire life for

13   either sustenance or relief, I'd like to scold this Court for

14   even taking the amount of time it has taken to decide that

15   motion.  That motion was made in the utter desperation of

16   street homelessness.

17           I'm going to get to Ms. Quinn.  In this instance,

18   there was some stuff -- since your Honor brought it up -- I'd

19   like to put on the record, since I'll be running around in this

20   furlough or this government shutdown in the next couple of

21   days, having to navigate the Second Circuit.  Mr. Roberts has

22   made statements to other attorneys that my appearance, my

23   physical appearance, doesn't make it look like I'm in such a

24   desperate situation.  He said to an attorney, Susan Russell,

25   when contacted recently, well, she appears to look okay.

J1APLOPC

1          So getting back to my original principle and me

2    potentially filing a writ of mandamus with the Second Circuit

3    Court of Appeals simply regarding the lack of a decision on the

4    preliminary injunction, I think when this Court fails indigent

5    people, homeless people, people that are unconscious, that have

6    other people making decisions medically or otherwise for them,

7    it does a disservice to the overall justice system.

8          And I think that this Court should, for the precedent

9    of it, consider someone being homeless an absolute emergency,

10   and if there's anything about my appearance, your Honor, that

11   suggests that I am not as desperate as a homeless person that

12   may come in here with holes in their clothes or looking

13   haphazard, I think that is a matter of prejudice that doesn't

14   take into account that the assertions that I've made from the

15   very beginning is that I've learned to do sex work to survive,

16   and a part of doing sex work to survive is maintaining your

17   appearance.

18         Now, addressing Ms. Quinn, or excuse me, her counsel,

19   WIN's counsel, and the time that has a elapsed without me

20   making any objection to their motion, I want to say on the

21   record, even if this Court doesn't accept my opposition, that

22   from reading Ms. Quinn's counsel's papers, their argument

23   really doesn't make any sense because I make the minimal legal

24   allegations against Ms. Quinn and WIN West to support

25   litigation.

J1APLOPC

1          I assert that they failed to make reasonable

2     accommodation as an issue of fact, what is reasonable or what

3     my accommodations must be.  And I'd also say that Ms. Quinn's

4     comments to me on the phone violated multiple local, state and

5     federal statutes either regarding people with disabilities or

6     transgender people.  So -- and, your Honor, I'd like to

7     actually hand this letter up now for the Court.

8          Consistent with my being in treatment, since I only

9     got to this provider in November, November 13th, I have been

10    experiencing some of the most severe posttraumatic stress

11    disorder symptoms of my life.  I've said this before, but

12    things can get worse sometimes despite may outward appearance.

13    And so I'd be requesting an extension of time to respond to

14    Ms. Quinn's counsel's motion to dismiss.  Yes, has a

15    considerable amount of time elapsed since the deadline?  Yes,

16    it has.  However, my mental health and medical history, as well

17    as social sort of history maintained by the municipal

18    defendants have proven that I have been homeless for at least a

19    year, like literally.  So just in asking for more time to

20    respond --

21          THE COURT:  Okay.  Ms. Lopez, time out.  Time out.

22    Have you --

23          MS. LOPEZ:  Yes.

24          THE COURT:  -- provided --

25          MS. LOPEZ:  Yes.

J1APLOPC

```
 1            THE COURT:  -- this letter --

 2            MS. LOPEZ:  Yes.

 3            THE COURT:  -- the letter from the Center -- before

 4    saying "yes," let me finish my question.

 5            Have you provided this to defense counsel?  What do

 6    you propose to use this letter for?

 7            MS. LOPEZ:  So I handed it up today just because I

 8    believe it is procedurally appropriate.  If I hand any piece of

 9    document or material to opposing counsel for the case, you're

10    asking me why.  I handed it to the Court today just for good

11    measure.  What my intention of using it for, is that really

12    your --

13            THE COURT:  Well, because --

14            MS. LOPEZ:  Do you want to ask me that like that?

15            THE COURT:  -- usually -- and I have not read this

16    letter and I'm not going to read it right now because here's

17    what I'm saying.  Usually, when you proceed in litigation in

18    any court, there are rules and there are procedures to follow.

19    They can seem very hard to follow, and a lot of times they

20    don't make sense and they can seem very frustrating, especially

21    somebody who is doing it without a lawyer.

22            That said, those are rules that I, as a judge, am

23    obligated to follow.  I was talking to my daughter about this

24    recently but, you know, it's like, on the one hand, as an

25    activist, if you're an activist or you're trying to advocate
```

J1APLOPC

|  |  |
|---|---|
| 1 | for something else, as an advocate, you know, you may advocate |
| 2 | the rules should be changed or rules should not be followed in |
| 3 | this particular instance.  However, as the Court, I cannot do |
| 4 | that. |
| 5 | So I hear your frustration with the process.  I hear |
| 6 | your frustration with how long things are taking.  I am going |
| 7 | to try to move things along as quickly as I can.  That being |
| 8 | said, when there are multiple motions or cases being filed and |
| 9 | different things being filed, and I can't tell the reason why |
| 10 | they're being filed; meaning, does it relate to the motion to |
| 11 | dismiss against the WIN and Christine Quinn defendants?  Does |
| 12 | it relate to some discovery issue with the other defendants? |
| 13 | Does this relate to your objections on the report and |
| 14 | recommendations?  Does this relate to the motion to dismiss? |
| 15 | Or relate to your injunction?  Or all of the above or some of |
| 16 | the above? |
| 17 | All of that, actually, gums up the wheels of justice |
| 18 | because we need to figure out, and we need to make sure that we |
| 19 | look at everything that you present when it comes time to |
| 20 | decide a particular motion.  As to that, the issue that |
| 21 | usually, and most of the time, when a litigant files something |
| 22 | in court, it's filed on the docket, and it's given to the other |
| 23 | side so that they have an opportunity to respond to it and |
| 24 | consider it. |
| 25 | When you give something to the Court ex parte, which |

J1APLOPC

1    means you don't show it to the other side, there are other

2    issues that get involved.

3           MS. LOPEZ:  They have it.

4           THE COURT:  They have it?

5           MS. LOPEZ:  If this was the whole thing you were going

6    on about, I might have spoken too soon, your Honor, but I was

7    trying to save you that.  They have it.

8           THE COURT:  Okay.  They have it, okay.  But at the

9    same time, is it something that you want filed on the docket?

10          MS. LOPEZ:  Your Honor, I am pretty smart.  I have a

11   Mensa-level IQ.  I do know what I handed up, and if you would

12   have allowed me to finish, what I was going to say was....

13          THE COURT:  Go ahead.

14          MS. LOPEZ:  Speaking about gumming up the wheels of

15   justice, municipal defendants counsel and I had a conversation

16   as of five last night.  And I don't want to skip over it

17   because I was on something when I handed it up.  I might have

18   handed it out of order, but that letter is in furtherance of

19   resolving the case, to support my claims.  It serves multiple

20   functions.

21          I was handing it up because I felt that it, at this

22   point, inappropriate that all of defense counsel had it and the

23   Court did not have it.  And it is literally just written and

24   signed as of five-something yesterday; so it is brand new.  It

25   is germane to this conference because moving the case forward

J1APLOPC

 1    would and can potentially involve a settlement, a complex

 2    settlement.

 3            There are also arguments to be made in asking this

 4    Court to use its discretion in moving things along on the

 5    defendants' side related to even their own argument, your

 6    Honor.  Their own assertions are based on their nonexistent

 7    expertise in the mental health and medical needs of transgender

 8    people.  The entire basis of argument or arguments that have

 9    been made on the behalf of all defendants but specifically

10    Project Renewal and the municipal defendants, have been the

11    mental health, mental health, mental health.

12            So just going back to what I know your Honor wants to

13    focus on where we've been in between and what the parties have

14    done to try to settle the case, I actually have notes here,

15    your Honor, to keep me on track.  So again, just, I was going

16    to ask this Court or ask this Court to consider extending

17    time -- I will put it in writing -- to respond to Ms. Quinn's

18    motion, if the Court needs.  I know they do not have to accept

19    my oral arguments at this time as to my opposing her motion,

20    but again, I'll put on the record that --

21            THE COURT:  Consider this oral argument, go for it.

22            MS. LOPEZ:  Then, it is my position that I factually

23    stated in both the original complaint and the complaint removed

24    by the municipal defendants, I factually stated enough to

25    sustain litigation against both Christine Quinn and WIN West,

J1APLOPC

```
1    and I would also like to say, your Honor, that, speaking of

2    transcripts, in one of the very first, if not the first

3    appearances before Judge Caproni, because I had been in

4    Marsha's Place at Project Renewal before we got to court; so

5    there was a period of time I was already there, the municipal

6    defendants and DHS begin mentioning WIN West as a potential for

7    me to be transferred out of Marsha's for a whole month and a

8    half, your Honor, before Judge Caproni lifted the TRO.

9             Because of that, it is my argument that they

10   participated in the official retaliation that came from

11   succeeding in the original TRO, and it will only be in

12   discovery, when I'm able to get the e-mails and communications

13   between the Department of Homeless Services, WIN officials and

14   potentially Christine Quinn herself, where I will be able to

15   demonstrate factually that not only are they liable for failing

16   to make reasonable accommodations and all those sort of bland

17   and generic claims, but that they also participated

18   mechanically, if you will, in the actual transfer and planning

19   process to get me out of Marsha's.

20            And also, again, this is where I get to tell all the

21   cisgender, non-transgender people in the room what offends me.

22   I'll leave it off with the allegations that I made against

23   Chris Quinn about her statements to me being offensive, aren't

24   you a woman?  Didn't you get a surgery for that?  I'm the only

25   one that gets to determine what is offensive or not under
```

J1APLOPC

1     state, federal -- state and local law.  And because of that,

2     I'd ask this Court to dismiss Christine Quinn's motion to

3     dismiss or rule against --

4                THE COURT:  Deny the motion.

5                MS. LOPEZ:  Deny the motion.  Excuse me.

6                I'm actually looking at my notes because I'd like to

7     keep on pace.  Okay.

8                THE COURT:  Are you shifting gears from the motion to

9     dismiss?

10                MS. LOPEZ:  I was going to announce that in one

11     second.  Yes.  I'm going to now direct where we have been in

12     terms of trying to reach a settlement between me and the

13     municipal defendants.

14                THE COURT:  I would like to just get back, just wind

15     up some things on the motion to dismiss.

16                MS. LOPEZ:  Yes, your Honor.

17                THE COURT:  I'm going to take a close look at the

18     transcript when it's prepared so that I can issue a report and

19     recommendation on the motion to dismiss as soon as I can.

20     However, I also wanted to give you an opportunity to -- if you

21     would like, I think I can extend the deadline for you to file

22     something written.

23                MS. LOPEZ:  Yes, your Honor.

24                THE COURT:  If you'd like to file something written to

25     supplement that.  I want to make sure that we at least take

J1APLOPC

1      care of that before you move on to another issue.

2                  MS. LOPEZ:  Are we setting a deadline or at the end?

3                  THE COURT:  Well, no, no, right now.  So on the motion

4      to dismiss, I'm going to construe this as your oral argument,

5      and I'm going to have to review the transcript very carefully

6      because you have said a lot and it's a lot to consider.

7                  MS. LOPEZ:  Sure.

8                  THE COURT:  If you would like to file a written

9      response, opposition to your motion to dismiss -- opposition to

10     WIN and Christine Quinn's motion to dismiss, how much time do

11     you need to do that?

12                 MS. LOPEZ:  A month, please, your Honor.

13                 THE COURT:  A month.  Okay.  So a month puts us at

14     February 10th, which is a Sunday; so I'm going to give you the

15     following week, February 15th.

16                 MS. LOPEZ:  Thank you, your Honor.

17                 THE COURT:  So, please, file -- any written opposition

18     is due February 15th, and if you would like your -- if you

19     believe that this letter from the Center is relevant and should

20     be considered, it still needs to be formally filed.  So I would

21     suggest that you file it with your opposition papers.  However,

22     having taken a quick look at it, it may have information that

23     you don't want publicly available to everybody.

24                 MS. LOPEZ:  I've thought about that.

25                 THE COURT:  So if you file a request for sealing or

J1APLOPC

1   redactions, that should take care of it.  Okay?

2               MS. LOPEZ:  Yes, your Honor.

3               THE COURT:  All right.  And then for the WIN and

4   Christine Quinn defendants, how much time would you need for

5   reply?

6               MS. GRANT:  Your Honor, we would request a month; so

7   March 15th.

8               THE COURT:  Okay.  March 15th happens to also be a

9   Friday; so let's reply due March 15th.

10              The other thing I'm going to do, because Ms. Lopez has

11  communicated to us the urgency of her claims, is that if

12  Ms. Lopez files her opposition before February 15th, you will

13  have considered your date moved to four weeks from the date of

14  her filing.

15              MS. GRANT:  Understood, your Honor.

16              THE COURT:  Okay.  So March 15th or four weeks from

17  filing of opposition, whichever comes first.  All right.  Yes?

18              MS. GRANT:  One last thing.  Just because Ms. Lopez

19  had made an oral argument on the record, I think we requested

20  oral argument on our motion; so when it's fully briefed, rather

21  than get into an oral argument on it today.

22              THE COURT:  Right.

23              MS. GRANT:  Since there hasn't been opposition papers

24  filed, we would just like to continue our request to have oral

25  argument.

J1APLOPC

1          THE COURT:  Okay.  All right.  Please, also consider

2     that if, after reviewing Ms. Lopez's opposition -- again, you

3     know, we're trying to get to quicker decisions on some of these

4     things.  Do reconsider, after you've had a chance to review the

5     transcript and review Ms. Lopez's opposition, whether you

6     really need to.

7          MS. GRANT:  I will consider that.

8          THE COURT:  And I'm not saying that in a bad way, but

9     I'm just saying, like in a way of moving it forward, are there

10    issues that you had not anticipated or could not respond to

11    adequately in your reply.  You're, of course, permitted to make

12    that request and continue that request.  However, if you think

13    that you can handle it by addressing Ms. Lopez's arguments that

14    she's raised now and in opposition, if you think that you can

15    adequately respond to them in writing, that would be probably

16    the quickest way to move this motion forward.

17         MS. GRANT:  Understood, your Honor.  I just didn't

18    want to waive any opportunity.

19         THE COURT:  You're not waiving any right.  I am not

20    going to construe waiver of anybody's rights today.  Okay?  I

21    think you can see that here.

22         MS. GRANT:  Absolutely.  And, of course, we would like

23    to -- I think we probably are well-skilled at responding in a

24    reply brief to any opposition arguments that Ms. Lopez has

25    made.

J1APLOPC

```
 1            THE COURT:  Right.  The more concise they there, the
 2    easier it is for me to get to a written report and
 3    recommendation, which then still needs to go to Judge Caproni
 4    with requisite objections on both sides.  So it's not -- I
 5    mean, we'll do the best we can, Ms. Lopez, but there is timing
 6    built in that just is -- it is what it is.
 7            Okay.  You were going to move on to...
 8            MS. LOPEZ:  And I just want to state on the record
 9    right now that I would like nothing more but for this
10    litigation to be done.  So plaintiff has moved with all due
11    diligence and reasonable speed to both communicate with the
12    municipal defendants and put forth what I deem to be a really
13    fair settlement demand or set of demands.
14            Here's what I'd like the Court to address, please.
15    I'd like to bring some complaints, maybe casually, maybe
16    formally, against the municipal defendants and counsel for the
17    municipal defendants.  Now, I have read up on how Court and
18    opposing counsel, and I don't have to state this factually I
19    just want to reiterate.
20            Opposing counsel is the government.  This is not a
21    situation where a pro se litigant is opposing a private
22    corporation or an entity that has obtained or acquired private
23    counsel.  Mr. Roberts is the government, and he should know how
24    to act accordingly when dealing with pro se litigants.  He has
25    effectively done two things that I think this Court should
```

J1APLOPC

address in terms of moving settlement or this case forward, and
I find them alarming.

He has, essentially, to me it looked like on purpose,
failed to relay one of the elements of a settlement demand I
made, the most important, to his client, wasting, your Honor,
three months.  So I spoke to Mr. Roberts -- maybe I'm
exaggerating, maybe it's two and a half.  I approached or
called Mr. Roberts, had a conversation with Mr. Roberts and put
forth a settlement stipulation, demand of a certain monetary
amount and certain other factors.

Weeks went by.  When I finally spoke to Mr. Roberts,
after reading the municipal defendants' response to my oral
request and what I thought was Mr. Roberts relaying my
settlement demands, he literally said:  Oh, you were serious
about the money?  Oh, I didn't tell my clients.  Let me go back
to my clients.  And then, your Honor, he never responds at all
in writing.

Now, I'm going to get to the second sort of complaint,
which may sort of underscore what his response will be for why
he doesn't speak to me -- oh, she's difficult -- but, your
Honor, you don't have to speak to me to send me a response.
And it is ethically and legally inappropriate for him,
representing the government, for him -- they could laugh off my
demands.

I put forth a hundred thousand dollars for my pain and

J1APLOPC

suffering and a number of other things, just so your Honor
knows.  I asked for $100,000, or to start there, for a
city-wide education campaign about service animals, especially
in buildings or places frequented by poor people or homeless
people, and lifetime veterinary care for my dog.

His response was almost as if he didn't hear what I
said and, your Honor, they're allowed -- opposing counsel is
allowed to act like they didn't hear me, but by Mr. Roberts'
own admission:  Oh, I didn't tell my clients that; I didn't
think you were serious.  Admitting that he had heard my demands
or stipulation and that was months and months and months ago.

And to top all that off, your Honor, Mr. Roberts has
demonstrated to me that he won't take my calls, but he'll take
the calls of lawyers associated with me.  So I'm going to
address something your Honor just brought up about stuff being
on the record and not on the record.  I don't want to sound
like I'm tap dancing around something, but there is an issue of
a criminal nature out of Kings County, where I was the victim
and Mr. Roberts --

THE COURT:  Does that relate to the subpoenas that you
had issued?

MS. LOPEZ:  Yes, your Honor.  And Mr. Roberts was
contacted by a senior assistant district attorney in human
trafficking.  He took her calls, your Honor, had a nice long
conversation with her about my case, and even admitted sort of

J1APLOPC

1    registering a recommendation from that same ADA that I was

2    potentially in danger and for a recommendation, whether

3    registering it as fact, but this assistant district attorney

4    said to him that I shouldn't be housed in a dorm, which is an

5    element of this case, potentially moving a settlement forward,

6    the point is he will speak to attorneys and not me.

7            If this Court is so inclined to help the municipal

8    defendants and a settlement to become fruitful, maybe I'll make

9    another oral argument here in front of you this morning, your

10   Honor.  Pro se plaintiff requests counsel to be assigned

11   because I'm indigent and poor and the government won't

12   communicate with me in good faith.  Perhaps in the interest of

13   justice and moving everything along, maybe this Court would

14   appointment an attorney.  And if this Court is not willing to

15   do so, I ask this Court to please admonish the government for

16   not openly communicating with the plaintiff.

17           If Mr. Roberts says to me:  Mariah, we'll not take

18   your calls, only e-mail me, I will e-mail him.  And I'm

19   wrapping it up.  Based on our last oral conversation, your

20   Honor, before yesterday, I was waiting for a response to him

21   bringing his client my stipulation of a cash settlement that

22   was over two months ago.  And, again, just to bring it all

23   home, he has spoken to multiple attorneys or people that called

24   him on my behalf.  He just won't answer my calls.

25           THE COURT:  Okay.  There's a lot in there.  So I'm

J1APLOPC

 1   going to try to unpack it.

 2              MS. LOPEZ:  I know.

 3              THE COURT:  That's going to take some time too.  As to

 4   the attorney appointment, you did previously have a pro bono

 5   attorney, or did you not?  Never?

 6              MS. LOPEZ:  No.  At first, Judge Caproni asked an

 7   attorney to stand up on the very first oral argument to my

 8   motion for a TRO on April 27th, my birthday, two years ago.

 9              THE COURT:  Okay.  And then what happened?

10              MS. LOPEZ:  The Court was no longer inclined to either

11   appoint an attorney or to ask one to stand up with me.  And I

12   actually have to say on the record that I think that has mucked

13   things up.  It would have moved this case along with more

14   diligent speed had this Court --

15              THE COURT:  I agree.  I agree, but I'm going to take a

16   look at the docket because I thought that there was -- I don't

17   know if that was a limited appointment or if it was --

18              MS. LOPEZ:  It was limited.

19              THE COURT:  -- or if the attorney had withdrawn.

20              (Pause)

21              Okay.  So all right.  So it looks like, right, that

22   the limited appearance was for the initial hearing.  So

23   there's, I guess, a couple of things we could do, and one is

24   whether you would be seeking pro bono representation for the

25   rest of the case, you know, for all purposes, or for the

J1APLOPC

1    limited purpose of settlement.

2               It will be easier to get a lawyer for the limited

3    purpose of settlement discussions, but I think, in either case,

4    if you get a pro bono attorney representative who can work with

5    you and, you know, that might also help move things along.  I

6    am not familiar right now with the resources available or the

7    ability to find pro bono counsel, particularly on short notice,

8    because it's just there's a huge press for that.  And I'm not

9    saying we'll -- After this conference is adjourned, we'll take

10   a look and we may issue an order, or I might make some phone

11   calls and try to see what the landscape is.

12              MS. LOPEZ:  Just to put on the record --

13              THE COURT:  Yes.

14              MS. LOPEZ:  -- I have made every attempt to identify

15   pro bono counsel.  There are two attorneys, they both practice

16   in this court, that have been willing to take up settlement

17   talks.  I want to be very clear that I am fully lucid about

18   what is happening, and it would be easier for all the parties

19   to settle.  Right?  That's probably the case in all litigation.

20              Anthony Cecutti and Rose Weber are both able to

21   practice here and familiar to the court.  However, they are

22   both -- they have been, because they are practicing litigating

23   attorneys, on trial.  Mr. Cecutti has indicated -- I will say

24   on the record, and Mr. Roberts or if anybody else is taking his

25   phone number, it's 917-741-1837.

J1APLOPC

1          Mr. Cecutti has a unique familiarity with my mental

2     health history and my just personal history, and he's in good

3     standing with the city and this court.  What he said to me was

4     he wasn't familiar enough with ADA-type cases, that he wasn't

5     comfortable jumping in.  That was two months ago.  But he did

6     indicate he was interested if I could get a second-chair

7     attorney that was simply familiar with the procedure or loss

8     surrounding the type of claims that I was making, Anthony would

9     be happy to be the face of the settlement and to move me

10    forward.

11          THE COURT:  Okay.

12          MS. LOPEZ:  I just want to mention, in the interest of

13    justice and moving it along.  In the same vein of Mr. Roberts,

14    the government, municipal defendants being contacted by

15    attorneys at the Kings County District Attorneys Office about

16    settlement, your Honor -- again, the whole reason I'm here,

17    trying to reach a settlement -- the Speaker's office for the

18    City Council has already reached out to the City Law

19    Department, and specifically advocated for a settlement at

20    least regarding a private single room housing situation, your

21    Honor.

22          So there are multiple other governmental arms that are

23    encouraging or pressuring the municipal defendants to settle,

24    at least again, about the basic, fundamental right of a safe

25    place to live with four walls.  And it appears that just for

J1APLOPC

some odd reason, the municipal defendants are resistant to the

constant recommendations of other wings of the New York City

government.  All right.

THE COURT:  Okay.  I also wasn't -- I mean, I haven't

heard -- you know, obviously, I haven't heard from the

municipal defendants about settlement discussions, and I do

think that whether -- I think it was better, obviously, if

Ms. Lopez was able to get pro bono counsel at least for

settlement discussions or up to having settlement discussions,

you know, to have a settlement conference to see where we can

get things.

But separate and apart from that, I'm just going to go

on about my -- you know, sort of the way that I think about

pro se cases, and how they should be litigated.  And I say this

to, you know, counsel representing private entities, who are

acting as defendants in pro se cases, is I believe, and I hold

very firmly in this courtroom and in the litigation as a whole,

that litigants are to treat each other with respect, and that

that involves and includes -- a basic level of respect includes

understanding your adversary and understanding what types of

remarks and ways of dealing with somebody are likely to push

you backwards as opposed to forwards.

I'm not necessarily saying that anybody on defense

side has done anything actionable, although Ms. Lopez might

disagree, but I'm not saying that.  But what I'm saying is that

J1APLOPC

1    I think we all have seen from the litigation of this case that

2    Ms. Lopez would probably not appreciate things said as --

3    perhaps said as a joke or would not appreciate not feeling

4    taken seriously.  I think that's a very common thread in many

5    pro se cases and cases involving pro se litigants.

6            And, you know, one of the fundamental rights I think

7    we have in Federal Court is that everybody does have a right to

8    be heard, and part of that, the way I interpret it, is that not

9    only do you have to give them the right to be heard, every

10   litigant a right to be heard, but they need to feel heard and

11   especially if we're thinking about settling a case.

12           That said, I'm wondering if it might make sense for us

13   to set a date.  I don't think it's appropriate right now,

14   particularly on the record, on the record and the transcript

15   that defendants are paying for to get too heavily about who

16   said what about what aspects of settlement.  Again, Ms. Lopez,

17   I think it would be better if there could be counsel for you

18   to --

19           MS. LOPEZ:  I agree.

20           THE COURT:  -- to try to work out some of these

21   things.  I will say, though, that settlements are voluntary.

22   They involve both sides being willing to come and speak

23   candidly, but also willing to consider certain things about

24   their positions and really consider candidly whether certain --

25   you know, some things are non-negotiable, right?

J1APLOPC

1          Like, I understand that one of the things that you

2     consider completely non-negotiable is the nature of your

3     housing situation, but then other things might be more

4     negotiable.  And that is, before we have a productive

5     settlement conference, whether you have counsel or not, you

6     know, some of that assessment needs to be done before we get in

7     because, otherwise, it will degenerate into somebody saying,

8     look, this is completely unreasonable.

9          If I am managing a settlement conference, I do not

10    have the power to order anybody to really do anything, as a

11    judge.  I can make recommendations.  We can talk about certain

12    aspects of potential settlements, certain components, but

13    that's not like -- I can't make anybody do anything, right?

14          MS. LOPEZ:  That's right.

15          THE COURT:  And another factor to consider with that

16    is also when you're dealing with municipal defendants, and I

17    say this in civil rights cases all the time, that, you know,

18    the attorneys that you face are the face of the defendants, but

19    there are layers and layers and layers of other people who

20    are -- who may constrain and direct the people who you're

21    seeing in ways that, you know, they have limited control over.

22          MS. LOPEZ:  May I?

23          THE COURT:  Yes.

24          MS. LOPEZ:  And I'm going to stand for this for the

25    reason you actually brought up a really good point, your Honor.

J1APLOPC

```
1    I actually can, it's been argued actually I was just in front
2    of another federal judge weeks ago, who noted the uniqueness of
3    my legal history and background with the City of New York.  And
4    I'd like to address the practice and procedure of how the city
5    settles the cases based on firsthand experience.
6            And now, I will sort of just, ad nauseam, go on about
7    the three landmark cases that I have under my belt.  And the
8    reason I bring them up, your Honor, is because all of those
9    cases have involved very intimate settlement back and forth
10   with the City of New York, and I was lucky enough to have the
11   types of lawyers, like Karen Friedman, who runs Lawyers for
12   Children; Lou Sartori, who now heads pro bono for Legal Aid,
13   and others as my personal attorney in those cases.
14           And because I am familiar, your Honor, with the
15   settlement process of the city, I'd like to point out the
16   anomaly or the anomalous nature in which this case is being
17   settled.  So when I sued ACS, your Honor, or when I sued
18   Department of Corrections, it is never the actual agents
19   themselves that are involved in the controversies that decide
20   the settlement.  A lot of the controversy, or many of the
21   controversies at the cent of this case stem from actions taken,
22   if I can, you know, sort of be figurative, at Beaver Street
23   last year, at Maiden Lane, and many of those same exact either
24   DHS bureaucrats or attorneys for the city, air quotes -- and
25   like your Honor says, Mr. Roberts is only a face -- those
```

J1APLOPC

1   attorneys are -- let me put this right.

2          Mr. Roberts has indicated to me that certain staff

3   that are not attorneys are no longer with Department of

4   Homeless Services, as a way to sort of solicit me back.  Oh,

5   you should just come back to the shelter.  Let us re-evaluate

6   your needs, he sort of says, to paraphrase.  Don't worry, the

7   doctor is no longer there.  But when I asked him who it is he

8   is passing on my settlement requests to, your Honor, this is

9   what struck me, he said DHS.

10          Now, what that means to me, isn't Corp. Counsel, isn't

11   city lawyers.  It says to me that people like Paul Hargrow or

12   even Project Renewal-connected DHS administrators are making a

13   decision about the outcome of this case.  And, your Honor, some

14   of the elements that I allege, some of the assertions I make

15   have criminal liability to them.  I cannot imagine it ethical

16   or reasonable, especially to the members of City Council who

17   sort of serve as a check for the City Law Department are

18   concerned, none of their staff agree, that the same

19   administrators that are involved in the controversy are an

20   extension of opposing counsel or helping to decide elements --

21   I mean, it's just wholly inappropriate.

22          And then, your Honor, I'll sit down.  But then he got

23   snippy.  I don't think it's inappropriate when I said to him:

24   Well, when you say you're passing along my marks or there's

25   other people deciding, do you mean the same group of people

1    that decided last year?  And when I hand you these tidbits of

2    change in circumstances or my life, or even -- I will hand this

3    to the Court eventually -- proof of not only my civil claims or

4    evidence of making those claims out, but potential criminal

5    acts, Mr. Roberts and an insulated group of individuals at the

6    City Law Department, are seeming to keep this case and the

7    outcome under wraps.

8            I find that highly irregular, and I will go back to

9    what I opened with, this Court and the municipal defendants is

10   talking about someone that has been written about in the

11   New York Law Journal and other journals multiple times.  I am

12   very familiar with not only litigating but the process of

13   settlement.  I will point out the most, what I think, important

14   settlement of all the landmark cases, and two of them I won

15   outright, was Joel A. v. Giuliani.

16           And without that settlement, your Honor, none of the

17   beds that exist today for foster youths that are queer would

18   exist.  That settlement was a federal settlement.  It only

19   happened -- I'm pointing this out because, your Honor, the city

20   didn't have to settle in that case, but there were parallels in

21   both the circumstances, the city failing to provide enough beds

22   for a certain population, your Honor.  In this instance, in

23   Joel A., the city ACS failed entirely to recognize gay kids as

24   a population, and so didn't have enough beds.

25           The Marisol settlement, your Honor, there was a case

J1APLOPC

called -- I'm sure you're familiar with Marisol -- prohibited

the class from going forward, but the City Law Department,

realizing, oh, shucks, we do have a problem here, there are

kids being abused and there is a need, they came to the table

and negotiated, your Honor, in good faith a full two years

before the settlement would have allowed the class of

plaintiffs to move forward.  So that was in 1999, and I was 14

years old.

          I'm almost 34.  So I'm very familiar with the

settlement process, and my only hope of droning on was that

this Court be completely familiar with not only my position in

the circumstance, but be in a position to guide these

proceedings forward without wasting anymore time.  I do think

it's irregular how the city has been negotiating a settlement

in this case, and I'd ask this Court to potentially look into

it.

          THE COURT:  And for the documents that you just

indicated that you were going to hand up --

          MS. LOPEZ:  They have already.

          THE COURT:  Okay.  It's much more efficient to file

them.

          MS. LOPEZ:  File them.  Yes, your Honor.  Yes, your

Honor.

          THE COURT:  Because I don't even let my staff --

          MS. LOPEZ:  Yes, your Honor.

J1APLOPC

 1              THE COURT:  -- like give me original documents

 2   because --

 3              MS. LOPEZ:  Yes, your Honor.

 4              THE COURT:  -- because I might lose them --

 5              MS. LOPEZ:  Yes, your Honor.

 6              THE COURT:  -- and that's too important.

 7              MS. LOPEZ:  Yes, your Honor.

 8              THE COURT:  Okay?  So it's much better if they're

 9   filed.

10              MS. LOPEZ:  Yes, your Honor.

11              THE COURT:  If I lose my copies, I know where I can

12   get another one.

13              MS. LOPEZ:  Yes, your Honor.

14              THE COURT:  All right?  All right.  So we should

15   probably set -- Okay.  So from the defendants, from the

16   municipal defendants, those of you in the front row, I guess,

17   or related municipal.

18              MR. ROBERTS:  I'm here only for the municipal

19   defendants.

20              THE COURT:  Okay.  Are there any motions pending, or

21   is Ms. Lopez's case against your group, against your clients,

22   where are we with that now?  I mean, are we sort of supposed to

23   be in discovery or --

24              MR. ROBERTS:  Discovery has not yet begun.  As

25   Ms. Lopez said, there was a preliminary injunction motion that

J1APLOPC

1   was fully briefed.  That's been before Judge Caproni now since

2   the middle of last year.  Then there was this renewed emergency

3   motion for TRO that you've made your report and recommendation.

4   So there are sort of essentially two preliminary injunction

5   issues before Judge Caproni.

6              We have never had -- because of -- we, the defendants

7   sitting at the table here, have filed answers to the second

8   amended -- what was deemed, I think it was deemed the second

9   amended complaint was the complaint that had been filed in

10  state court and then removed.  We filed answers.  The counsel

11  for WIN and Ms. Quinn, in the back row, have made a motion to

12  dismiss.

13             THE COURT:  Right.

14             MR. ROBERTS:  As I understand the normal procedure,

15  when the motion to dismiss is done, then we'll have a

16  preliminary conference and set a discovery schedule.  That has

17  not yet happened.

18             THE COURT:  We can set a schedule as to your

19  defendants, though, because you've answered, right?  And then

20  the other issue is whether there should be discovery -- whether

21  discovery should proceed as to the WIN and Quinn defendants.

22  But let's, for those of you sitting in the front row, right

23  now, discovery could proceed, right?

24             MS. LOPEZ:  Yes.

25             MR. ROBERTS:  If your Honor orders a discovery

J1APLOPC

 1 │ schedule, discovery -- if it were not for the motion to

 2 │ dismiss, I assume we would have had a preliminary conference

 3 │ and a discovery schedule would have gone forward.

 4 │         THE COURT:  Let's treat this as a preliminary,

 5 │ preliminary conference because normally when we have a

 6 │ preliminary conference, you know, the parties have conferred

 7 │ and filed their 26F report.  So what I'm going to do here is

 8 │ I'm going to do something a little bit differently.  So for the

 9 │ defendants who have answered, I'd like you to -- I have to look

10 │ up my own individual practices and see what the timing is here.

11 │         MS. LOPEZ:  Your Honor, I was going to make a motion

12 │ for expedited discovery under rule 26 anyway.  I was waiting

13 │ for him to bring it up; so I'm going to now make an oral

14 │ argument to expedited discovery considering --

15 │         THE COURT:  We're going to --

16 │         MS. LOPEZ:  Just putting it on the record.

17 │         THE COURT:  You don't even need to make your motion

18 │ because we're going to quickly.

19 │         MS. LOPEZ:  I just wanted to put it on the record.

20 │         THE COURT:  We're going to move you as quickly as

21 │ possible.

22 │         MS. LOPEZ:  Okay.

23 │         THE COURT:  Okay?  Let's see.  Okay.  So what we'll do

24 │ is we'll have another sort of case management status

25 │ conference.  We'll set that date as soon as we can.

J1APLOPC

1          I'm looking that in my individual practices, I allow

2     the parties to submit separate case reports and proposed case

3     management plans.  However, I'm going to let you decide.  I'm

4     going to ask you to think about this.  In normally represented

5     cases, the parties' lawyers are to meet and confer and prepare

6     a joint 26F, you know, have a 26F conference and prepare a

7     joint report.

8          Since you've been already talking, had some settlement

9     discussions already, I'm going to ask both of you -- and only

10    if both of you say yes will I have you do this -- is do you

11    think it would be helpful to crystalize the issues to at least

12    try to work on a joint 26F report, or do you think it would be

13    better to prepare separate reports?

14         My concern is -- and you'll see each other's separate

15    reports before the conference.  It's just that I'm wondering if

16    it might make sense for you all, since you have some history

17    already, to talk to each other, and if you can't reach

18    agreement on some of the language that needs to go in each

19    section of the joint 26F report, then you break it out into,

20    you know, plaintiff says X, defendant's position is Y, which

21    I've also seen happen.

22         It might be a little bit easier when we have our

23    status conference than to have two completely different reports

24    that have been drafted without at least you all having some

25    conversations with each other.

J1APLOPC

1              MS. LOPEZ:  I'm okay with that, and I'll just say on

2    the record that I would -- I'm optimistically awaiting the

3    Court's decision as to whether or not to appoint counsel for

4    settlement talks.  So if that were to occur, all of this talk

5    of me engaging in 26F discovery report matters would be moot

6    and non-existent, but I am not opposed to it and I'm willing to

7    work with it.

8              THE COURT:  I'm going to do my best to see what

9    resources there are to try to find you pro bono counsel.  I

10   can't --

11             MS. LOPEZ:  I understand.

12             THE COURT:  I'm new on the bench; so I'm not so

13   familiar with what I can and can't do.

14             MS. LOPEZ:  I think they prefer --

15             THE COURT:  And just sit here and be like, if I could,

16   I would make one magically appear for you because I think it

17   would be the best for everybody in this case.  I'm just not

18   sure what I can do.

19             MS. LOPEZ:  That's fine.

20             THE COURT:  I'm going to have to, after this

21   conference, do a little research on my own to see how we can

22   move this case forward.

23             As to defense counsel, what are your thoughts on

24   trying to prepare a joint report?

25             MR. ROBERTS:  That's fine, your Honor.  I suspect

J1APLOPC

1     we'll wind up with separate sections in one letter.

2             THE COURT:  Yes, that's also fine because at least

3     you'll have talked, and you'll know what the other side's

4     issues are.

5             All right.  So that joint, hopefully and

6     optimistically, 26F report is due one week before the next

7     status conference.  We're going to set a date for the status

8     conference right now.  So let's look at the first week of

9     February, which is the soonest I have availability.  Okay.  So

10    we can do February 6th in the afternoon or February 7th in the

11    morning.

12            MS. LOPEZ:  Either is fine for the plaintiff, your

13    Honor.

14            THE COURT:  Okay.

15            MR. PISCHL:  I'd prefer the 6th, if that's okay.

16            THE COURT:  Does the 6th work for all defendants?  All

17    right.  So Wednesday, February 6th at 2:00 p.m.

18            MS. GRANT:  Sorry, your Honor.  I just want to

19    clarify.  Is this just for the --

20            THE COURT:  This is just the initial case management

21    conference.  For the WIN and Quinn defendants, you're welcome

22    to attend, if you want to, but I don't think we're going to be

23    making any rulings or dealing with any of those issues.

24            MS. GRANT:  So the defendants who have answered, and

25    otherwise for the WIN defendants, discovery will be stayed

J1APLOPC

1    until our motion is decided?

2            THE COURT:  I'm not going necessarily going to let --

3    discovery is not automatically stayed.  There is a lot of paper

4    to get through.  I need to take another look at the motions and

5    things like that.  In the first instance, however, as of right

6    now, you're not required to attend on February 6th.  I may take

7    a look at, while I'm doing my looking into, you know, whether I

8    can find Ms. Lopez some pro bono counsel for purposes of

9    settlement, whether we want to think we want to move to a

10   settlement, whether it might make sense to have somebody from

11   the WIN and Quinn defendants attend anyway.  But if that

12   happens, we'll issue an order as soon as we can.  Okay?  I aim

13   to try to get that moving sooner rather than later.

14           MS. LOPEZ:  A couple of things about WIN and

15   discovery --

16           MR. ROBERTS:  Your Honor --

17           THE COURT:  No.  You started talking first, you talk.

18           MS. LOPEZ:  Because Mr. Roberts, or it's my factual

19   assertion that the municipal defendants mentioned WIN as a

20   potential transfer option during the first ever oral argument,

21   I would like to ask that as soon as I file my written

22   opposition to WIN's motion to dismiss and they have responded,

23   I'd like the Court to consider extending discovery to WIN

24   because it would be impossible for me to make my -- or to go

25   forward without having discovery, since they were a part of

J1APLOPC

1    sort of the conversation in open court.

2           And also, it's my assertion that Christine Quinn and

3    DHS administrators were working with Mr. Roberts and DSS

4    administrators at least a month before I was transferred; so

5    I'd like access -- I'd like discovery to extend to WIN once the

6    formality of my paperwork is in and they've formally responded.

7           THE COURT:  Okay.  Sometimes what we do is because

8    they filed a motion to dismiss, and there's at least a

9    possibility that they could get dismissed completely from the

10   action, so usually, you know we don't necessarily want to

11   impose a heavy discovery burden on them if it turns out they're

12   going to be out.  That's the argument that they would make to

13   say this is why discovery should be made.

14          I hear you loud and clear about the conversations.  So

15   sometimes what is done, and we may consider it this way, is to

16   consider whether you might be able to get that same information

17   from the defendants who have already answered.

18          MS. LOPEZ:  Yes, your Honor.

19          THE COURT:  And then that way -- or at least the

20   beginnings of that and then, you know, we can assess the next

21   step.

22          MS. LOPEZ:  I understand and recognize clearly that I

23   won't be able to get Christine Quinn's phone records from any

24   of the other defendants, and because some of my allegations

25   pertain to communications between both of us and even who

J1APLOPC

1    initiated which call, I'd eventually be asking for Christine

2    Quinn's work cell phone records.

3         THE COURT:  Okay.  But these are conversations that

4    you had with Ms. Quinn?

5         MS. LOPEZ:  Yes, on her direct cell phone to my direct

6    cell phone.

7         THE COURT:  Okay.  And nobody else was present or

8    anything else?

9         MS. LOPEZ:  There were people present when I spoke

10   with her at certain points.  There were multiple conversations,

11   your Honor, at least three.

12        THE COURT:  Okay.  But you have your own phone

13   records, right?

14        MS. LOPEZ:  Yes.

15        THE COURT:  So as for whether Ms. Quinn initiated the

16   call or you did --

17        MS. LOPEZ:  I can prove that.

18        THE COURT:  Right.  So, right?  And then you were on

19   the conversation with Ms. Quinn?  So you can make sworn

20   statements about -- you would be a witness to those

21   conversations.

22        MS. LOPEZ:  That would only pertain to my allegations

23   about harassment and not retaliation and mechanizations that I

24   had been working with DHS for a whole month before that

25   conversation.

J1APLOPC

1           THE COURT:  Right, but DHS, those are some of the

2     defendants?

3           MS. LOPEZ:  If I'm able to ascertain who Ms. Quinn was

4     in contact with or if, I will file this, or communicate that

5     discovery request.

6           THE COURT:  Yes, some of that may be -- some of that

7     may be --

8           MS. LOPEZ:  Available.

9           THE COURT:  -- obtainable from the defendants who have

10    already answered.

11          MS. LOPEZ:  Gotcha.

12          THE COURT:  The purpose here is just if you can get

13    it -- if you have different ways, let's get it the quickest way

14    and the easiest way first.  And then --

15          MS. LOPEZ:  Yes, your Honor.

16          THE COURT:  -- if it's not enough, then we will look

17    at other options.

18          MS. LOPEZ:  Yes, your Honor.

19          THE COURT:  Just try to get to it as simply and as

20    quickly as we can.

21          MS. LOPEZ:  Yes, your Honor.

22          MR. ROBERTS:  Your Honor, if I can be heard?

23          THE COURT:  Yes.

24          MR. ROBERTS:  I just want to alert Ms. Lopez that one

25    of the initial discovery portions that we're going to want is a

J1APLOPC

1    list of all of her medical treatment treaters and HIPAA

2    releases because her medical condition is a central issue in

3    the case.

4                THE COURT:  Okay.

5                MR. ROBERTS:  And I just want to alert her of that

6    because we, at times, particularly with pro se's, have had

7    difficulty at times in obtaining HIPAA releases.

8                MS. LOPEZ:  I will address that by saying, No. 1 -- so

9    he brought it up.  I really don't mean to go on forever, but my

10   entire medical history is not any of his business.  What he

11   needs, he has.

12               It is not my position as a trans advocate, but even as

13   a pro se litigant, that the Department of Homeless Services

14   would need the entirety of someone's medical background.

15   Indeed, the ADA doesn't even require it for them to make sort

16   of reasonable accommodations.  So I'm just going to put on the

17   record there is zero resistance in transparency.

18               The entirety or the magnitude of my entire medical

19   history is irrelevant to him.  I want to also put on the record

20   that one of the original medical recommendations as for my

21   needing a single room came from the surgeon that performed my

22   sex change operation, and he has since retired.

23               He has a letter from that -- the municipal defendants

24   have a letter signed by Dr. Harold Reed indicating my need to

25   dilate.  The medical -- the letter that I handed up today gives

J1APLOPC

1   them all other information and refers to that treatment, and

2   really, I just don't want to have to go back and forth with

3   this.

4            Mr. Roberts, if there is anything else you are going

5   to be requesting, because it is so sensitive and your Honor

6   already pointed out the sensitivity, I ask that you make that

7   request here open, or at least avail to it here in open court

8   so I can potentially object to it here, now, and we don't have

9   to waste anymore time.

10           THE COURT:  That's what you'll talk about first when

11   you're preparing your 26F report.

12           MS. LOPEZ:  Got it.  Okay.  Yes, your Honor.

13           THE COURT:  And then we'll talk about it again at the

14   next status conference, but this also highlights -- you're

15   making the exact same argument that the WIN and Quinn

16   defendants might make about discovery of them.  Right?  You're

17   saying, well, you already have a lot of this stuff.  You might

18   not need everything --

19           MS. LOPEZ:  Okay.

20           THE COURT:  -- or you may already have, for example,

21   some of the dilation evidence.  You have -- you know you might

22   be able to get from somebody who's currently practicing, rather

23   than having to go to the surgeon who's now retired.

24           Those are all the kinds of conversations that you will

25   be having.  You know, but one aspect of that is that the

J1APLOPC

```
 1   clearest way, because and I'm not -- even in represented

 2   litigation, is to get certain HIPAA releases that would be sent

 3   to particular doctors or medical facilities and the like.  And

 4   it would be up to the parties, if they can agree, and to the

 5   Court if you can't, to see whether limits should be placed on

 6   that.

 7          However, in the first instance, it's a release so you

 8   can get the entirety of the files from that particular provider

 9   so that there's a full picture, there isn't something withheld

10   as to the treatment for that particular issue or with that

11   particular doctor.  And all of that will be under a very strict

12   confidentiality -- in this case, there will be a

13   confidentiality and protective order in place so that none of

14   that will be disclosed to the public.  Okay?  This is strictly

15   for use in this litigation.

16          MS. LOPEZ:  Yes, your Honor.

17          THE COURT:  Okay?

18          MS. LOPEZ:  Yes, your Honor.

19          THE COURT:  Anything else right now?

20          MR. GREENBERG:  No, your Honor.

21          THE COURT:  Okay.

22          MS. LOPEZ:  I'm wondering if the shutdown could

23   potentially affect the Second Circuit and if this Court has any

24   directive procedurally, as to the public, as to what --

25          THE COURT:  We're dealing the best we can.  The courts
```

J1APLOPC

1      are deemed essential.

2                  MS. LOPEZ:  Okay.

3                  THE COURT:  Are deemed essential; so we will be open.

4      In what capacity we'll be open after January 18th remains to be

5      seen.  It's actually a pretty terrible situation because many,

6      many, many of the people who work in this courthouse live

7      paycheck to paycheck.  It is -- you know, being required to

8      work without pay because we're deemed essential also means that

9      people can't go out and find other work that can bring in cash

10     to pay the bills.

11                 MS. LOPEZ:  I'm quite familiar with the gap economy.

12                 THE COURT:  This is what we are laboring under.  The

13     situation changes day-to-day.  The judiciary runs out of money

14     on the 18th.  It's my understanding that the court security

15     officers and the marshals are already working without pay and

16     that there are probably other people in this courthouse who are

17     already working without pay.

18                 MS. LOPEZ:  Isn't that awful.

19                 THE COURT:  And so we should all be mindful that,

20     right now, the service aspect of public service and government

21     service is very strong in this courthouse.  Okay?

22                 MS. LOPEZ:  Thank you.

23                 THE COURT:  But we'll do the best we can.  I plan to

24     be here and working, whether it's with pay or without pay.

25     I'll be here.  My staff will be here.  We'll do the best we

J1APLOPC

1    can.

2              MS. LOPEZ:  Thank you, your Honor.

3              THE COURT:  Yes, there's going to be -- adjustments

4    are being made day-to-day.

5              MS. LOPEZ:  Sure.  Thank you.

6              THE COURT:  Thank you for acknowledging that.

7              MS. LOPEZ:  I'll check the website from day-to-day.

8              THE COURT:  Yes, I think that's the best place for

9    information.

10             MS. LOPEZ:  Last procedural thing?

11             THE COURT:  Yes.

12             MS. LOPEZ:  May I request an order allowing me to

13   bring one electronic device when I attend status conferences?

14             THE COURT:  Yes.  For scheduling purposes, we'll --

15             MS. LOPEZ:  Thank you.  So how do I let them know?

16             THE COURT:  Mr. Light will print out the order for

17   you.

18             MS. LOPEZ:  Thank you, your Honor.

19             THE COURT:  And you can complete it.  Okay?

20             All right.  Anything else?  Oh, and I guess there's

21   the issue of the subpoenas.  Is that something we can deal with

22   at the status conference?

23             MS. LOPEZ:  It might come up in the middle, and I was

24   going to try to not bring it up, but I certainly will be

25   exercising my subpoena power.  Just to be clear why I'm doing

J1APLOPC

it, I'm not just wielding it.  I believe the documents that I

have requested are germane to my argument about irreparable

harm, and I'll just state here openly on the record.

         The argument that Mr. Roberts and the city is going to

make against not providing some of the information from the

criminal wing of New York City government is nonsensical

because it involves information that, by design, is public

because it will be used in a bail argument against a person.

         So essentially, I have asked them to turn over

information relating to the criminal history of another person,

or to provide an officer that can attest to that.  They want to

keep his name specifically private, that's their business.

However, his criminal record, by design, your Honor, we have,

as a society, function with rap sheets because there are lots

of people that have access to criminal history.

         And the municipal defendants couldn't stand up and

oppose a subpoena on grounds that the information is

confidential because, by design, the ADA I'm subpoenaing would

have to say under oath that she will be making a bail argument

within hours of this person's arrest, publicly stating this

information to try to maintain his incarceration.

         So the issue of subpoenas will come up.  I really

would rather not have to fight with them, but it is my hope --

Mr. Roberts is aware of the generality of the information I'm

trying to get.  I wanted to lay it in front of him.  Hopefully,

J1APLOPC

1   the municipal defendants and I will reach a settlement that

2   would make that moot, but if we don't, I am totally entitled,

3   under the law, to try to demonstrate irreparable harm.  If

4   there is an individual that poses that danger or another

5   government agency that holds that information, I'm entitled to

6   it for these proceedings.

7           THE COURT:  I hear you.  This should be something that

8   you should speak to Mr. Roberts about.  Generally --

9           MR. ROBERTS:  Your Honor --

10          THE COURT:  -- speaking --

11          MR. ROBERTS:  If I could be heard for just a moment?

12          THE COURT:  Okay.  I was going to say that, generally

13  speaking, subpoenas like this are premature, but go ahead,

14  Mr. Roberts.

15          MR. ROBERTS:  I have advised Ms. Lopez that I do not

16  represent the Brooklyn DA.  The Brooklyn DA receives the

17  subpoena.  The Brooklyn DA will do whatever the Brooklyn DA

18  does.

19          THE COURT:  It's their job to respond.

20          MR. ROBERTS:  I don't represent them.  If the Police

21  Department is subpoenaed, whatever they do, they generally

22  handle subpoenas served on them.  If they come to me, I'll do

23  something.  But I am not taking any position with regard to

24  these subpoenas other than they haven't been properly served.

25  They are now moot because they were for --

J1APLOPC

1          MS. LOPEZ:  Absolutely.

2          MR. ROBERTS:  -- right today before Judge Caproni.

3    They've never been served.  I don't think you need to rule on

4    them, but if they're properly served, they will be addressed by

5    who ever has them.

6          MS. LOPEZ:  I didn't serve them because of our

7    subsequent conversation, and you're right.  But I do find it

8    curious, since you brought it up, that the one that you cited

9    to send to the magistrate wasn't the subpoena directed at

10   Alana, who was an agent of your agency.  You chose to point out

11   to the Court in your on-paper tantrum.

12         THE COURT:  I got both of them.

13         MS. LOPEZ:  Well --

14         THE COURT:  I got a copy of them.

15         MS. LOPEZ:  Linda Weinman.  The one I saw was a copy

16   of the subpoena sent to an ADA in Brooklyn.  He seems far more

17   concerned with that one, and that's the only --

18         THE COURT:  I have five.

19         MS. LOPEZ:  The only one I saw in an e-mail that came

20   up when I pulled it up, or at least the header, and I apologize

21   and I retract that, your Honor.

22         THE COURT:  It was five.

23         MS. LOPEZ:  Five was the number that I --

24         THE COURT:  I have all five.

25         MS. LOPEZ:  Thank you, your Honor.

J1APLOPC

1          THE COURT:  All right.  Anything else?

2          MR. ROBERTS:  No, your Honor.

3          THE COURT:  Okay.  This matter is adjourned.  We'll

4  see you in February, in two weeks.  Thank you very much, and as

5  I said at the beginning, defendants to order the transcript.

6  Share the costs, provide a copy to Ms. Lopez.  Thank you.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25