```
              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                       Docket #1:17-cv-03014-
 LOPEZ, MARIAH,                     : VEC-OTW

                    Plaintiff,      :

   - against -                      :

 NEW YORK CITY DEPT. HOMELESS       : New York, New York
 SERVICES, et al,                     February 6, 2019
                    Defendants.     :
                                       CASE MANAGEMENT
------------------------------------ : CONFERENCE


                  PROCEEDINGS BEFORE
           THE HONORABLE JUDGE ONA T. WANG,
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          MARIAH LOPEZ, Pro Se
                        212-470-9687

For the Defendant       THE CITY OF NEW YORK LAW DEPARTMENT
New York City Dept.     BY:  THOMAS B. ROBERTS, ESQ.
of Homeless Services,   100 Church Street
et al.                  New York, New York 10007
                        212-356-1000

                        TONIE G. BAEZ, ESQ.
                        150 Greenwich Street, Floor 38
                        New York, New York 10007-5211
                        929-221-5597



Transcription Service:  Carole Ludwig, Transcription Services
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

APPEARANCES - CONTINUED:

```
For the Defendant        Jackson Lewis P.C.
Project Renewal:         By:  Richard I. Greenberg, Esq.
                         666 Third Avenue, 29th Floor
                         New York, New York 10017
                         212-545-4080


For the Defendant        CLIFTON BUDD & DEMARIA, LLP
Quality Protective       BY:  STEPHEN P. PISCHL, ESQ.
Services Security:       350 Fifth Avenue, Suite 6110
                         New York, New York 10118
                         212-687-7410
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-<br>Direct | Re-<br>Cross |
|---------|--------|-------|--------|-------|

None

**E X H I B I T S**

| Exhibit<br>Number | Description | ID | In | Voir<br>Dire |
|---------|-------------|-----|-----|------|

None

```
 1                        PROCEEDINGS                    4
```

 2              THE CLERK:  17-cv-3014, Lopez v. New York City

 3   Department of Homeless Services, et al.

 4              Counsel, please state your name for the record.

 5              MS. MARIAH LOPEZ:  Mariah Lopez, pro se litigant.

 6              MR. THOMAS ROBERTS:  Thomas Roberts, Assistant

 7   Corporation Counsel for the municipal defendants.

 8              MR. RICHARD GREENBERG:  Richard Greenberg, Jackson

 9   Lewis, P.C., for defendant Project Renewal.

10              MR. STEPHEN PISCHL:  Stephen Pischl, Clifton

11   Budd & DeMaria, Quality Protective Services, Inc.

12              MS. TONIE BAEZ:  Tonie Baez, attorney for

13   Department of Homeless Services.

14              MR. ROBERTS:  And then I'd just point out that

15   Susan Roque, who's with the Manhattan District Attorney's

16   Office, is also here and behind me, your Honor.

17              HONORABLE ONA T. WANG (THE COURT):   All right,

18   thank you for coming, Ms. Roque.  Please be seated.

19              Good afternoon, everybody.

20              Okay, so we are here for an additional case

21   management conference.  But I wanted to address Ms. Lopez's

22   emergency writ regarding her cell phones first, since

23   Ms. Roque is here.  And then that way, if we can take care

24   of that, then hopefully Ms. Roque doesn't have to stay for

25   the entire conference.

```
 1                          PROCEEDINGS                    5
 2              So I got your filing, Mr. Roberts.
 3              Ms. Lopez, have you seen a copy of the filing?
 4              So do we have any other information on what's
 5   going on here, or is there any information -- I'm
 6   addressing Mr. Roberts, and then potentially Ms. Roque, as
 7   well -- on Ms. Lopez's cell phones?
 8              MR. ROBERTS:  Well, I think I've given you the
 9   facts I know.  Do you have areas that you're -- further --
10              THE COURT:  So they're not under the control of
11   your clients?
12              MR. ROBERTS:  Correct.  It's --
13              THE COURT:  All right.  Okay.
14              MR. ROBERTS:  -- the phones are essentially -- as
15   I understand it, they're in the possession of the police
16   department.  The police department, when there's arrest
17   evidence does not dispose of things on its own initiative;
18   it only disposes of them at the instructions of the
19   district attorney's office.  The district attorney's
20   office has its own counsel.  Our office does not generally
21   represent them in civil matters or items like this.  And so
22   I'm not sure what more you want from me.
23              THE COURT:  Okay, so, Ms. Roque, I appreciate your
24   attending today.  I did want to say -- and this is for
25   Ms. Lopez's benefit, as well -- I am concerned that we
```

```
 1                        PROCEEDINGS                        6
 2  don't have -- that I don't have the jurisdiction to address
 3  this issue.  It's not really before me, but sort of because
 4  we had this conference scheduled, anyway, I was hoping to
 5  just get a little bit more information, just to understand,
 6  you know, what the process might be and, you know, what the
 7  general process is in returning property like that after an
 8  arrest has been made.
 9            MS. TONIE ROQUE:  Yes, your Honor.
10            THE COURT:  And I want to hear from Ms. Roque
11  first.
12            MS. ROQUE:  Thank you.  Our concern also is
13  since Ms. Lopez is -- I think she is represented by
14  counsel on this new arrest from January 31, 2019 --
15  actually, I apologize.  I didn't confirm that.  I guess
16  Ms. Lopez could confirm if she is represented by counsel.
17  So there, of course, is a concern that she discuss a
18  pending criminal matter at any forum other than the
19  criminal court.
20            So, your Honor, I guess what I could tell you is
21  is that there is a mechanism in place for her counsel in
22  the criminal matter to contact the prosecutor in our
23  office who's assigned this prosecution to work out the
24  release of property, generally speaking.  In this
25  particular instance, the two cell phones that Ms. Lopez
```

```
 1                         PROCEEDINGS                    7
 2   references in her writ were recovered by the arresting
 3   officer and vouchered as arrest evidence.  When something
 4   is vouchered by the NYPD as arrest evidence, that's what
 5   triggers our office's necessity to approve the release of
 6   the property.
 7            I have had an opportunity to briefly speak to
 8   the prosecutor who's assigned the criminal case.  His name
 9   is Carlos Benitez.  He's currently training in grand jury.
10   He has not, because this case is relatively new, he has
11   not had an opportunity to interview all the witnesses.
12   What he was able to inform you was that these two cell
13   phones are believed -- at least one of the cell phones is
14   believed to contain evidence that is evidence of the
15   crime.  And, again, your Honor, as far as the time frame,
16   we are normally entitled to keep that arrest evidence
17   until we're able to process it and decide what to do with
18   it.
19            Again, generally speaking, I spoke to the
20   individuals in my office who processes electronic
21   evidence, and there is -- I don't believe there would be
22   that long a wait for the processing of the cell phones,
23   but that's a decision that the prosecutor who evaluates
24   the evidence has to make.  And, again, Ms. Lopez's counsel
25   on that case could engage Mr. Benitez on that discussion.
```

```
 1                         PROCEEDINGS                    8
 2   But as we stand here today, I understand Ms. Lopez needs
 3   her cell phone.  She can't have it.  It's arrest evidence
 4   --
 5              THE COURT:  Can't have it right now.  Okay.
 6              MS. ROQUE:  And it has information that we need
 7   to execute a search warrant and obtain what's inside --
 8              MS. LOPEZ:  You're just running your mouth.
 9              MS. ROQUE:  No, I understand her impatience with
10   my addressing this, your Honor, but, your Honor, she
11   can't -- if she wants it short and sweet, she can't have
12   the cell phones at this time.
13              THE COURT:  Right.  Okay.  Ms. Lopez, before you
14   speak, because there is an open criminal matter, I want to
15   caution you because I don't want you to end up saying
16   things that might be used against you in the criminal
17   matter, etc.  Okay?
18              MS. LOPEZ:  Yes, your Honor.
19              THE COURT:  I know that you want to be heard, but
20   this is really something that should be addressed with
21   your criminal counsel in the criminal case.
22              MS. LOPEZ:  So I feel a lot of speaking down to.
23   And, like, I feel spoken down to.  Even how this exchange
24   just happened.  You don't have a child in the courtroom;
25   you have an adult pro se litigant.  So even the tone of
```

```
 1                              PROCEEDINGS                    9
 2   the representative from the DA's office, inappropriate.  I
 3   didn't need her -- your Honor could have addressed the
 4   defendant/plaintiff, and the defendant/plaintiff was the
 5   only one at my arraignment, and I could have let you know
 6   sort of facts that were germane --
 7              THE COURT:  Right.  One of the issues with
 8   this --
 9              MS. LOPEZ:  I'm not going to -- sorry, your
10   Honor -- I'm not going --
11              THE COURT:  One of the issues here is I really,
12   really cannot tread on the turf, as it were, of the state
13   court.  I'm very, very --
14              MS. LOPEZ:  You have not --
15              THE COURT:  -- cautious about that.  That's why I
16   didn't want to let you speak at first.  I understand your
17   frustration, but I cannot let this --
18              MS. LOPEZ:  So why would -- what you can't do
19   legally is open up a conversation and preclude the
20   plaintiff from addressing the Court.  You can't do that.
21              So what I'm going to do is address the Court
22   with relative facts.  And this woman isn't the be-all,
23   end-all of the justice system; I don't care what her sassy
24   tone said.
25              THE COURT:  Ms. Lopez --
```

```
 1                        PROCEEDINGS                10
 2            MS. LOPEZ:  Yes.
 3            THE COURT:  -- I heard Ms. Roque.  She was
 4  explaining to me the process and the time frame.  She came
 5  essentially as an accommodation; she did not need to show
 6  up.  Okay?  Because I essentially have no power to direct
 7  that anybody return your cell phones on any process at
 8  all.  But I was hoping to cut through some of that at
 9  least so that I can hear and understand what the issue is
10  and, you know, and -- like, she was not required to be
11  here in any sense of the word.  Okay?  I heard what she
12  was saying.  She was speaking to me and explaining to me.
13            I, unfortunately, I can't tell you how to feel
14  or how to respond when other people speak to you.  I
15  understand.  I sit up here, so I am talking down to
16  everybody, in a sense, okay?  But I need to run this
17  process, I need to run the case that's before me.  I need
18  to make sure that it proceeds efficiently and that if
19  there are other issues that need to be addressed, that
20  they're addressed in the proper forum, okay?
21            I took very seriously your emergency writ.
22  Okay?  And what I had been hoping to do by directing that
23  the City serve the DA's office with a copy of my order was
24  to see if there was any process under which it could, you
25  know -- how long is it going to take, right; how long can
```

```
 1                         PROCEEDINGS                 11
 2   you expect that, you know, before you get your phones
 3   back.  I was just trying to cut through that process.
 4           MS. LOPEZ:  And I was, too.  If I could just
 5   place -- Mr. Roberts started.  And then the attorney from
 6   the --
 7           THE COURT:  I told them to start.
 8           MS. LOPEZ:  I understand that.  And even if it's
 9   by the Court's direction, at least start this conference
10   sort of over from my end.
11           I just came from the Bronx, where the case --
12   and this is going to be about the phone argument in a
13   second -- and just bringing to your Honor's attention the
14   highly, highly irregular nature of this position taken by
15   the DA's office that there is some, you know,
16   groundbreaking arrest evidence that they need from the
17   phone.
18           So the allegation that had me ejected from
19   Marsha's had a cell phone at the center of it.  In fact, I
20   was accused, your Honor, of striking someone with that
21   phone.  The case against me has been dismissed or whatever
22   you'd like to call it as of 12:00 o'clock this afternoon.
23   And I point that case out just as one case involving
24   plaintiff's criminal record and the recent history and
25   even related to some of the parties in this matter and
```

```
 1                          PROCEEDINGS                    12

 2   related to a cell phone where a cell phone wasn't taken.

 3   I guess that's the Bronx, though.

 4            Since there is someone here from the New York

 5   County DA's office, I want to put on the record, too, your

 6   Honor, that just again -- and I appreciate you for taking

 7   my writ so seriously -- the reason I filed it was the

 8   exceptional circumstances.  I was arrested -- this case is

 9   done -- two years ago, maybe, for recording a -- by

10   accident, your Honor -- a video on the way out of criminal

11   court of a changed courtroom in the case of a trans murder

12   victim.  However, I was pursued by court officers and

13   arrested for taping that video.  And bail was set.  The

14   case made the paper.  Nobody took my phone then.

15            So the background information on the reasons

16   that the people are using for needing my phone I think are

17   frivolous.  I completely hear your Honor in that your

18   Honor believes this Court lacks jurisdiction to compel the

19   New York County DA's Office to do anything.  There is one

20   little bit of procedural due process stuff that I think

21   needs to be put on the record because plaintiff believes

22   that the second call initiated by the Court at plaintiff's

23   arraignment constituted a step in the due process

24   procedure that the people rely on usually as sufficient,

25   meaning when the judge called us back in front of her and
```

2   the judge made a direct inquiry to the people as to the

3   evidentiary value of the phone and then the Court directed

4   the people to explore the earliest point at which they

5   could release the phone.

6            Whether it's this Court or the Second Circuit

7   that has jurisdiction, the New York County DA's Office is

8   not above reproach and the law in terms of depriving

9   people their property.  Their function to collect evidence

10  as per the police department's arrest process and

11  procedure is what it is.  However, when the Court second-

12  called the case at my arraignment specifically at the

13  request of defense counsel to address, your Honor, not

14  even just the phone, your Honor is well aware, because of

15  the facts of this case, that Department of Investigation,

16  at least in terms of the storyline of this case, is

17  involved.  And my defense attorney had to bring up to the

18  judge the highly irregular nature of the fact that the

19  temporary order of protection effectively cuts plaintiff

20  off from the Department of Investigation investigation

21  into Marsha's.

22            So what I believe is that the New York County

23  DA's Office is holding my phone longer than is required as

24  per its own procedures and as per the direction of the

25  Court.  And the Court, again stating on the record in open

PROCEEDINGS                    14

 1

 2   court, that as per the allegations and charges, the Court

 3   did not find any evidentiary value in keeping plaintiff's

 4   phone.

 5            The Department of Investigation employee that is

 6   accusing me of menacing her struck me during the

 7   encounter.  And so it is not only highly irregular that my

 8   phones were taken; it was highly irregular that a DOI

 9   employee would strike me at any point on a New York City

10   subway and then in a subsequent arrest at the agency

11   headquarters, where I was surrounded by police officers

12   and a camcorder somehow then plaintiff's property would be

13   deprived to plaintiff/defendant without what I believe to

14   be due process.

15            I do again appreciate your Honor considering my

16   writ.  And I, especially because of the light I've been

17   put in by the defendants, I don't want to seem like a,

18   excuse the colloquial term, your Honor, drama queen.  I

19   will say, however, that this court serves as a function of

20   the public interest, and it's through the courts that

21   society can function.  The members of the public, your

22   Honor, that are viewing or that are witnessing what's

23   going on, what the public here in New York has dubbed

24   Marsha-gate, they were as equally concerned at my arrest

25   and hearing that plaintiff's cell phone was taken because,

1

2   again, plaintiff was arrested in the last two years in

3   incidents that have since been resolved with cell phones

4   at the heart of those arrests, and never has

5   defendant/plaintiff's cell phones been confiscated.

6           So I don't want to run over while someone from

7   the New York County DA's Office is here, though, it should

8   be noted that I have been cooperative with that office.  I

9   speak to ADA Warren Murray from Trial Bureau 50 maybe

10  twice a week sometimes, at least once a week for the last

11  ten years, come this September.  And the only reason

12  that's important is that I made contact with that trial

13  bureau from the precinct while under arrest and

14  indicated -- just saying -- that Ms. Gromanski was also

15  recording, your Honor.

16          And so to me, again if this Court has already

17  conceded it has no jurisdiction, we're just getting facts

18  on the table here, it seems to me that any and all

19  evidence as to the actual incident that could be required

20  by the people to meet menacing, that evidence could have

21  been taken from Ms. Gromanski's phone and not from my

22  phone, depriving me of property when they don't need it.

23  And I believe that deprivation of the phone, when there is

24  another phone where they could get this information from,

25  the data from the incident, represents a deprivation of

1

2    property under the Constitution.  And that's not what

3    we're here for per se to hash out those Constitutional

4    questions, but I appreciate your Honor sort of opening

5    with addressing my writ.

6            I cannot imagine, though, how this case could go

7    forward without that phone, without both phones.  I will

8    maintain a respectful tone in either addressing this Court

9    or potentially trying to jointly address this Court and

10   the ADA's office not about the details of my case, just

11   about what's going on.  This case and the issues at the

12   center of it are two years old.  And we were just getting

13   to the point where we could potentially have good-faith

14   conversations, the parties -- the opposing parties and I

15   about settlement or even getting to a conclusion about

16   things.  It is going to become germane to these

17   proceedings, my cooperation with law enforcement.  So

18   ironically I'm going to be quiet now about all my work

19   with the Manhattan DA''s office, but that work has

20   included getting murder investigations reopened, including

21   Marsha's.

22            So I think what's happening is a disconnect

23   within the office between the assigned assistant and

24   possible people that have contact with me.  And I just

25   look to this Court's direction as to how to proceed.

PROCEEDINGS                    17

 1
 2   Whatever block of time passes from today until I get my
 3   phones will be time that plaintiff is deprived the
 4   opportunity to prepare further in this case for trial, for
 5   settlement negotiations.  So this case effectively stalls.
 6   And we're going to get to the matters in the joint -- I
 7   have filed a response to -- I just did it your Honor.  And
 8   I know you would have preferred me not to have to file it
 9   just before the proceeding, but the good people at the
10   DA's office have my phone, so it took a couple of days.
11            THE COURT:  All right.  So all of what you're
12   telling me about the issue with the phones and the issue
13   with the DOI complainant, it's not part of the complaint
14   before me.  And as you said, you know, this case has been
15   going on for two years.  It's probably not that productive
16   to try to amend your complaint to add this separate, you
17   know, arguable separate Constitutional violation.  I can't
18   give you legal advice, but if this is something -- you
19   know, it sounds like it's, you know, starting to build to
20   another complaint or another set of facts.  That's up to
21   you how you want to proceed with that.  My only hope is
22   that you actually get your phones back in some reasonable
23   time so that we can proceed with this case.
24            So I think what I'll say is, like, I'd like to
25   move onto the scheduling.  And rest assured, the fact that

```
 1                          PROCEEDINGS                    18
 2   you don't have your phones, I will allow for extra time in
 3   the schedule to deal with that.  Okay?  You're not going
 4   to be forced, for example, to file something or to do
 5   anything in this case where you need your phones and you
 6   don't have them.  Okay?  So rest assured I'm not going to
 7   let that happen.  I'm not going to make this case move if
 8   you don't have your phones and you feel that you need them
 9   in order to move forward.  Okay?
10            So --
11            MS. LOPEZ:  Okay.  I'm not necessarily okay, I
12   just want to say that's not okay for indigent pro se
13   litigants to be deprived of their property even if it is
14   not by an agency under the jurisdiction of this Court.
15   Your Honor has -- this Court has been effectively slowed
16   by what we cannot at this point factually prove was not a
17   concerted effort by DOI itself now to potentially cover up
18   a year of inaction by placing the plaintiff in the most
19   unfavorable light.  Those facts are germane to this case.
20   I want to go onto the conference, but this is going to be
21   relevant.  If plaintiff decides to file an appeal to the
22   Second Circuit, either regarding preliminary injunctive
23   relief -- (phone rings)
24            MS. LOPEZ:  Sorry, your Honor.
25            THE COURT:  Oh, so you have a third phone, or is
```

1

2  that -- is --

3          MS. LOPEZ:  Your Court's response seems like it

4  would be surprising if plaintiff was able to ascertain

5  [*sic*] another phone.  That doesn't mean --

6          THE COURT:  No, no, I'm just saying --

7          MS. LOPEZ:  -- that it has the same value --

8          THE COURT:  No, no.  I'm just saying that the

9  suggestion I had was so you got another phone, so you're

10 at least not completely without a phone, right?

11         MS. LOPEZ:  Yes, your Honor.

12         THE COURT:  Okay.  That was one of my concerns

13 when I got your emergency writ.  So at least there's that,

14 okay?

15         MS. LOPEZ:  Well, I had to turn a trick or see a

16 client as a -- I don't want to be hushed on the record.

17 The action --

18         THE COURT:  I'm not hushing you.

19         MS. LOPEZ:  The actions of the police department

20 left me in inclement weather without a phone or money.  So

21 as an indigent person without a phone, I did what people

22 like Marsha and Sylvia have taught trans women how to do,

23 and that is use what I had to get what I needed.  I don't

24 think it's acceptable, and I don't want to keep going in

25 circles, but somehow I feel that maybe because plaintiff

```
 1
 2  has ascertained another cheap android device, that
 3  everybody in the room sort of is just -- the concerns that
 4  plaintiff put forth are somehow mitigated or minimized in
 5  either the Court's or the opposing counsel's view, and I
 6  don't think that is fair or accurate, and --
 7            THE COURT:  Ms. Lopez, I did not say that.
 8            MS. LOPEZ:  No, you --
 9            THE COURT:  Okay?  One thing I will say -- and
10  you get one free shake with that -- is that if anybody has
11  an electronic device in my courtroom, it is silenced or it
12  is off, or it will be taken away.  Okay?
13            MS. LOPEZ:  Yes, your Honor.
14            THE COURT:  Don't let it happen again.
15            MS. LOPEZ:  Yes, your Honor.
16            THE COURT:  So I think, Ms. Roque, I think your
17  part in this is done.  I'm going to let you go because
18  we're now going to be talking about scheduling issues and
19  your briefing in the motion to dismiss and the initial
20  case management issues.  So but thank you for coming.
21            MS. ROQUE:  Thank you, your Honor.
22            MS. LOPEZ:  My criminal record is going to be a
23  part of these discussions.  I think she should stay.
24            THE COURT:  No, she does not need to stay.  She's
25  not a party, she's not a third party.  There's been no
```

```
 1                          PROCEEDINGS                    21
```

2  subpoena issued.  We do not need Ms. Roque here right now.

3          All right, Ms. Lopez, at the last conference I

4  had set a deadline for you of February 15 to file an

5  opposition papers to WIN and Ms. Quinn's motion to

6  dismiss.  Do you need more time in light of your phones

7  being taken?

8          MS. LOPEZ:  Can't even decide that right now,

9  can't even think about it.

10          THE COURT:  Why not?

11          MS. LOPEZ:  Because I don't have my devices.  And

12  you don't know what's on those devices in order for me to

13  respond.

14          THE COURT:  So you can't work on your -- so

15  effectively, you can't work on your motion to dismiss?

16          MS. LOPEZ:  And that was indicated in the writ,

17  that there were multiple filing deadlines that plaintiff

18  would be missing without access to said device.

19          THE COURT:  Okay.  So what we're going to do is

20  I'm going to stay the briefing on the motion to dismiss.

21  What that ends up doing, however, is it is going to slow

22  your case down.  I mean, there's nothing I can do about

23  it, right?

24          So what I'm going to ask you to do is submit a

25  status letter -- what's today?  Today's the 6th.  So

```
 1                        PROCEEDINGS                      22
 2   submit a status letter by the 15th on whether you've
 3   gotten your devices back.  Okay?
 4            MS. LOPEZ:  Plaintiff will make every attempt.
 5   But as plaintiff has indicated, plaintiff has limited word
 6   processing capabilities.
 7            THE COURT:  You can handwrite it and submit it to
 8   the pro se office for filing.  Okay?  That's all I need is
 9   a status letter.  You were able to handwrite your
10   emergency writ.  Okay?
11            MS. LOPEZ:  Yes, your Honor.
12            THE COURT:  If your phones are -- if you don't
13   have your devices back by the 15th, you know, still file a
14   status letter; but then the next job will be in another
15   two weeks you're to file another status letter until we
16   find out you get your phones back.  Okay?  And when you
17   get them back, we'll put you back on the motion briefing
18   schedule.  Okay?
19            MS. LOPEZ:  For when -- which response?
20            THE COURT:  For your opposition to their motion
21   to dismiss.
22            Now, the other issue with that is if during that
23   time you decide that you are able to file your opposition
24   and, you know, something's taking too long or you'd rather
25   move ahead with that, again, just say so in your status
```

```
                              PROCEEDINGS                    23
```

letter, and we'll put you back on a schedule.  Okay?  So

that's up to you, okay?  It's your choice how you want to

proceed with that.

            All right, so you said you had just filed your

26(f) report?

            MS. LOPEZ:  On what my first attempt at a version

was.

            THE COURT:  Okay.  It's not on the docket yet.

Do you have a hard copy with you?  If you can hand it up

to my deputy, he'll make a copy and then -- and bring it

back.

            MS. LOPEZ:  There you go.

            THE COURT:  I'm assuming that's your only copy,

right?  So --

            MS. LOPEZ:  Yes.

            THE COURT:  Okay.  And I'm assuming defendants

haven't seen it yet, either?

            MS. LOPEZ:  No, I gave --

            MR. ROBERTS:  No, I was given a copy earlier this

afternoon when I walked in.

            MS. LOPEZ:  I handed him one.

            THE COURT:  Okay.  So we're the only ones who need

another copy.

            MS. LOPEZ:  Another one, because one's in the

1
2  system on its way up.

3          THE COURT:  Yes, it's not showing up

4  electronically yet.  So, yes, you'll go make a copy.

5          Let's take a five-minute break, and we'll come

6  back.  Okay?

7          (Off/on the record)

8          THE COURT:  -- some settlement discussions going

9  before embarking on, you know, what will likely be a long

10  slog through discovery.

11          And so what I'm going to do right now is now that

12  I have both of your proposed 26(f) plans, I'm not going to

13  get you all started on discovery, partly because you don't

14  have your phones, Ms. Lopez.  So, you know, we're not going

15  to go that way.  But what I am going to do is I would like

16  to get the settlement discussion process started.  And what

17  I am going to do is I have an order that I'm going to sign

18  now.

19          Okay, so the first thing I'm going to do is I'm

20  going to stay the rest of the case while we pursue early

21  settlement discussions.  I have an order that I'm going to

22  sign right now directing the clerk of the court to find pro

23  bono counsel for you for purposes of settlement.  Okay?  I

24  don't know how long that process is going to take.

25  Sometimes it takes a while; sometimes it can happen pretty

```
 1
 2  quickly.
 3         Since you're going to be sending me status letters
 4  about the status of your phones, anyway, in the next two
 5  weeks or so, I'll just -- I'll wait to see what happens
 6  with regard to this order.  And then once we get counsel on
 7  board for you, we'll start the process of trying to set up
 8  a settlement conference.  Okay?
 9         MS. LOPEZ:  So, I have to, obviously, submit to
10  any of the Court's orders and direction.  I don't
11  necessarily personally think it's okay -- and I'll explain
12  why -- I don't want to get on a soapbox again.  But I think
13  effectively what happens is the case has been slowed to a
14  halt, and some of the misdeeds of multiple defendants get
15  to sort of be swept under the rug because this Court, which
16  could have appointed pro bono counsel for settlement talks
17  months ago, right before discovery, the first court date
18  since plaintiff served incriminating photos on opposing
19  counsel, we're just going to get all quiet and slow again,
20  in plaintiff's view.  I just -- I'm not okay with that.
21         I was happy at the speed at which the case was
22  going.  If the only thing that seems to be keeping up this
23  proceeding, your Honor, is my lack of phones and how that
24  is germane to this, I can guarantee that plaintiff has
25  every intention of appealing this whole phone thing as high
```

1
2       as the United States court system allows within the next

3       couple of days.

4                THE COURT:  Okay.

5                MS. LOPEZ:  So I will submit to your order.  I

6       want to put on the record, though, that I don't think this

7       Court is serving any public interest by letting some of the

8       very serious allegations, which, your Honor -- I think I

9       kept notes for this -- they represent allegations against

10      protected classes of people, vulnerable protected classes

11      of people.  And I don't think this Court should allow the

12      municipal defendants or any of the contractor defendants to

13      sort of get away by not having their dirty laundry aired in

14      a public federal court, get away with the bad acts that

15      occurred in --

16               THE COURT:  Okay, Ms. Lopez, I'm going to

17      interrupt you for a second.  Earlier in this conference you

18      said that you were not prepared or not able to litigate

19      your case because your phones had been taken away and you

20      would not be able to proceed until you got them back.  If

21      that's not actually the case, because now it sounds like

22      you want the case to be going full steam, even though you

23      haven't gotten your phones back.  So which one is it?  I

24      need to know.

25               MS. LOPEZ:  Oh, I'm sorry.  It's just -- I think

```
 1                        PROCEEDINGS                    27

 2   discovery should be ordered, regardless.  I think your

 3   Honor opined as to my ability to look through paper, which

 4   is not connected to having an electronic device.  And I

 5   think plaintiff is entitled for discovery to go forward,

 6   even if within a limited context so plaintiff, who has

 7   limited resources to begin with can begin reviewing some of

 8   the requested discovery material.  But, of course, I submit

 9   to --

10            THE COURT:  Okay.  All right.  So what I'm going

11   to do is --

12            MR. ROBERTS:  Your Honor, can I just -- before you

13   agree to that, it seems to me you're suggesting --

14            THE COURT:  I haven't agreed to anything.  I just

15   said what I'm going to do is -- and then I didn't get to

16   finish.

17            MR. ROBERTS:  Okay.  But I wanted to make sure you

18   didn't say that you were going to agree to that without

19   hearing from us first, if you could, just for a second.

20            I'll say that the last time we were before you,

21   Ms. Lopez gave me and DHS an additional document from a

22   medical provider.  We have been considering that document

23   quite seriously to advance settlement.  And I think, with

24   appointment of counsel, there might -- the possibility of

25   some sort of settlement is worth exploring.  I don't know
```

```
 1                        PROCEEDINGS                    28
 2  whether Ms. Lopez agrees, but I think it's worth exploring
 3  at this point.
 4            I would request, we would like to have our, DHS's
 5  medical people be able to talk directly to the medical
 6  provider who provided this letter to us to explore issues
 7  about what that medical provider thinks might be
 8  appropriate for Ms. Lopez within our system.  To do that --
 9            THE COURT:  Okay.  So for a housing situation that
10  would be appropriate for Ms. Lopez, given her needs.
11            MR. ROBERTS:  Right.  And to do that, we would
12  like her to sign a HIPAA release allowing us, for the
13  limited purpose of just allowing us to talk to her -- and
14  I've forgotten the name of the provider that you gave us,
15  but it's on the letter from a month ago -- to have us to be
16  able to talk with that person through a HIPAA release.  And
17  I think that will -- might materially advance the
18  possibility of settlement.  So that's why I'm bothering
19  mentioning it now.
20            THE COURT:  Okay.
21            MR. ROBERTS:  And I just do think -- I think
22  that -- I don't make any guarantees, but I think there
23  is -- it was not a waste of time to explore settlement in
24  that regard.
25            THE COURT:  Okay, Ms. Lopez, you wanted to speak?
```

PROCEEDINGS                    29

 1

 2            MS. LOPEZ:  So your Honor was recently asked or

 3   directed, asked, by Judge Caproni to get involved, so your

 4   Honor may not be as familiar, at least without the

 5   transcripts in front of you, with the beginning proceedings

 6   in this case.  Your Honor, Mr. Roberts and the municipal

 7   defendants are stalling.  And I will also say -- I've

 8   pointed out repeatedly -- that I think I'm the only

 9   transgender person in the room, and I'm certainly the only

10   transgender activist in the room.

11            THE COURT:  I am also the only Asian person in the

12   room.  Go on.

13            MS. LOPEZ:  Well, I didn't finish the --

14            THE COURT:  Actually, I'm not -- Megan's here.

15   Sorry.

16            MS. LOPEZ:  And I'm Asian-Pacific Islander, so I

17   would --

18            THE COURT:  All right.  So I'm not, then.  Okay.

19            MS. LOPEZ:  -- constitute as Asian, as well.

20            And I understand the jest in that previous

21   comment.  I don't think there is anything funny or even

22   mildly -- just mild in what the municipal defendants are

23   asking for.  And I'll explain why.  From the very, very

24   beginning of my placement at Marsha's and because you're

25   handling all pretrial stuff everything I'm about to explain

1

2   to you is totally germane to discovery.

3            THE COURT:  Okay.

4            MS. LOPEZ:  So at the time I was entering the

5   shelter system, my initial idea was to have the Department

6   of Homeless Services and DHS representatives speak with the

7   exact types of providers -- I know he's referring to my

8   provider at the center -- but the exact types of providers

9   that he's trying to -- that the defendants are trying to

10  have access to now.  And I would argue that it is setting a

11  dangerous precedent to allow the municipal defendants to

12  have at my clinician, when my clinician, unless he's

13  disputing whether or not I wrote the letter.  Ms. Wahdi's

14  credentials speak for themselves, and there absolutely is

15  nothing to be gleaned, your Honor, by an extensive new

16  conversation with a provider.

17           My original provider, Dr. Pierre Arti, provided

18  the municipal defendants with a letter and other

19  documentation that proves my medical conditions -- that,

20  you know, in 2017, and those medical conditions have not

21  changed.  I am now seeing a therapist, as opposed to seeing

22  a medical doctor for medication, but there is

23  absolutely -- and if Mr. Roberts disagrees, I'd ask the

24  Court to ask him to present just as an example one of the

25  questions he'd like to ask my doctor.

```
 1                         PROCEEDINGS                    31
 2              I don't want to be vulgar, your Honor, but there's
 3    two issues related to my housing.  One has to do with the
 4    dilation, if your Court will excuse, and the other has to
 5    do with needing certain sensory deprivation at certain
 6    points because of my PTSD, i.e., a private room.  My neo-
 7    vagina was created in 2009, and it's not since changed.
 8    The directions for the maintenance of the vaginal space
 9    were submitted, your Honor, by my actual surgeon, who's
10    since retired.  So there's the purely medical instructions
11    for post-operative, lifelong care, which Ms. Wahdi actually
12    refers to in the letter.
13              There's absolutely nothing else Mr. Roberts could
14    glean from -- or any of the defendants' counsel could glean
15    from speaking to Ms. Wahdi, who is herself transgender;
16    who, because she works for the Center, maintains a position
17    that sort of trans people get to decide and determine where
18    they're placed, anyway.  I don't think she'd be happy with
19    being questioned whether -- you know, or being dragged into
20    this, whether or not I even signed a release and I have no
21    intention.  Unless, again, the municipal defendants'
22    position is I either made up the letter or there's
23    something about my medical condition that is not in the
24    records or that has changed, there is absolutely no reason
25    why they can't get the answers.  I mean, it's four walls
```

1

2   and privacy to dilate.  It's not complicated.  And I think

3   they're wasting time.

4           Again, I've had -- experienced my whole life, your

5   Honor, this is what happens in cases -- and this case could

6   become landmark.  If your Honor allows the municipal

7   defendants to go down the line of two years in a civil

8   case, when similar arguments were made earlier and

9   dismissed, one opposing counsel gets to sort of bring up

10  the complicated trans medical history of the plaintiff

11  and -- excuse me -- and drag it into the proceedings.  It

12  has nothing to do -- speaking to Ms. Wahdi is not going to

13  change what she wrote on the letter.

14          If he has any questions about my medical

15  treatment, he can ask it here in court or I would ask the

16  Court -- you can even ask Ms. Wahdi to appear.  I'd ask her

17  to appear in open court.  What I'm not okay with is a phone

18  conversation between the municipal defendants and my

19  providers.  All of them have come back to me after those

20  conversations and implied that less than favorable things

21  were said by the municipal defendants, giving the people on

22  the other side, so Mr. Pierre Arti and others, the

23  impression that Mr. Roberts and others weren't even

24  interested in hearing what was actually recommended by the

25  provider really gleaming the arguments of the provider to

PROCEEDINGS                          33

1

2    try to form an opposition to those arguments.  And I don't

3    think that they are trying to seek information in good

4    faith.

5               THE COURT:  Okay.  At risk of sounding like I'm

6    talking down to you, Ms. Lopez -- I'm really trying not

7    to -- I'm really trying to find a way to resolve this case

8    with the least amount of -- I don't want to use the word

9    "trauma," but, you know, every case conference, every, you

10   know, exchange of documents in discovery, there are

11   allegations by you that the defendants are doing something

12   wrong.  Okay?  Each time when you raise things like that, I

13   as the judge and as the Court managing discovery, I have to

14   look at each one very seriously and consider whether

15   defendants are acting in good faith or not good faith.

16              What that has the effect of doing, though, is

17   distracting me from the process that I'd like to see, which

18   is to try to get you what you need.  And to paraphrase or

19   to quote the Rolling Stones, you can't always get what you

20   want, but hopefully we can get you what you need.  Okay?

21   That's what I'm looking at; that's how I am listening to

22   what is being said in this courtroom is through this lens.

23              I appreciate that you have been through a lot in

24   your life, a lot that relates to your transgender status.

25   I cannot even begin to understand what your experience is

and has been, and I'm not going to try because I think that

would be -- that would be patronizing.  However, I have

also experienced some minor forms of, you know, what I felt

like was, you know, discussions not in good faith and being

treated as less than I felt like I should be treated.  And

I know that that sucks, and I know that that can color a

lot of how one looks at life.  Okay?  I keep that top of

mind every time I see you.  Okay?  I want you to remember

that.  Okay?  Whenever you're in court, I am really trying

my best to try to understand and internalize what you're

going through.  Okay?

What I heard from Mr. Roberts is that in order for

them to prepare for fulsome settlement talks, for

potentially productive settlement talks is that they would

like to have some way to understand what it is that you

medically need.  Right?  Because that is part of the ADA

and other alleged violations that they would like to try to

address if there's going to be a settlement proposal.

Now, the other part of settlement discussions --

and Mr. Roberts was very clear; he said this would only be

for purposes of settlement.  The other part of settlement

discussions is that they're confidential, and they cannot

be used outside -- you know, they don't involve a court

finding of anything.  I just try to get you all to find

1
2   some common ground that is acceptable.  Okay?

3           But what the federal rules and the framework of

4   settlement discussions are is that the information that's

5   exchanged in the context of settlement discussions will not

6   and cannot -- and I will not allow it to be used to prove

7   liability or disprove liability if the case doesn't settle

8   and it goes on for litigation.  Okay?

9           So the point about settlement is to find a

10  practical solution, but in the context where if it's

11  confidential, maybe people will be able to feel a little

12  more comfortable about, you know, taking a  position that

13  they might not feel comfortable taking in open court.

14  That's why when you  said you'd like to have, you know, if

15  you wanted Ms. Wahdi to speak, you wanted it to be in open

16  court, you know, that -- my concern is that sometimes when

17  people need to speak in open court -- you're the exception,

18  but sometimes when people need to speak in open court, they

19  self-censor because they don't want, you know, something to

20  be construed or used against them later.  You know, most

21  people are not as open as you are.

22          I notice Mr. Roberts is standing up.  So what do

23  you have to say?

24          MR. ROBERTS:  Your Honor, I've apparently misled

25  you.  The way the -- Ms. Lopez provided us further medical

1

2    information last month.

3            THE COURT:  Okay.

4            MR. ROBERTS:  We view that as a new request for

5    reasonable accommodation.  There will be a decision issued

6    by DHS concerning what we view as a new request for

7    reasonable accommodation.  That decision will stand on its

8    own, if there is an Article 70(a) proceeding or whatever

9    may come from that.  We would like, as part of that

10   decision process, and also, I think it will be helpful in

11   the settlement negotiations of this matter, but we would

12   like to have our -- it would not be me; it would be our

13   team that evaluates reasonable request requests speak with

14   Ms. Wahdi.  And that may go to educate and be included in

15   the decision of DHS for this reasonable accommodation.

16           I'm sorry if I gave the impression that the

17   exclusive reason for the inquiry was settlement.  I think

18   it will help the settlement of this, but there's this other

19   proceeding.  And it might well, if they talk to Ms. Wahdi,

20   I assume that that information would go into DHS's decision

21   on this reasonable request application.  So I wanted to

22   explain what -- how we view it, which is a little different

23   than what I'd led you to understand.

24           THE COURT:  Okay.  So is that the normal process?

25   And, I mean, I -- you know, my concern is what I'm hearing

1

2  from Ms. Lopez -- not to put words in your mouth, but I'm

3  also just trying to first circuit a little bit -- is that,

4  you know, part of this is that she has expressed

5  frustration with the DHS process.  Right?  So I guess my

6  question is is there any way for DHS to construe the new

7  information -- "new," I mean, I think Ms. Lopez is saying

8  she doesn't believe it's new, but let's assume for --

9          MS. LOPEZ:  Up-to-date or revised.

10          THE COURT:  Okay.  Updated information.  Is there

11  a way for DHS to go through its process of treating that as

12  a request for reasonable accommodation that would not

13  require this additional step of further communications with

14  Ms. Wahdi?

15          MR. ROBERTS:  Well, if it doesn't happen, then it

16  doesn't happen.  But as I understand it, it is quite common

17  for the DHS people to -- a medical person says, "Here's X,"

18  and then they talk and they talk to the medical person

19  about what are the different facilities that we have and

20  try to see whether the medical person feels that the

21  facilities -- that some of the things that are an option

22  from us meet -- the medical person feels like yes, that

23  would work.

24          And so the letter is sort of a description of

25  medical condition and, as I understand it, our people would

1
2   be talking about that but also talking about the different
3   types of facilities within our system and would any of them
4   work.  And if the answer is that none of them would work or
5   that, yes, there is one that works, I don't know, that's
6   beyond me.  But as I understand it, it's quite common for
7   these folks who evaluate the request for reasonable
8   accommodations to reach out to try to understand precisely
9   what is needed.
10          And, you know, as far as this is an allegation of
11  delay, but I mean for the last year I have been advising
12  Ms. Lopez reapply, just submit more medical information.
13  She finally did it when we were before you a month ago, but
14  it took a really long time.  And I'm sort of saying just,
15  you know, you applied well over a year ago, you lost, start
16  it up again; it will be reconsidered.  It took months and
17  months and months before she submitted a new document to
18  us.  And we're evaluating it.
19          THE COURT:  Okay.  Would it be more productive,
20  then, and would it be possible, Ms. Lopez, if we were to
21  proceed with settlement discussions potentially with
22  Ms. Wahdi participating or available?  Because it seems
23  that if we were to try to settle this case, that that might
24  be part of it, right, figuring out whether there are
25  certain facilities or living arrangements that might work.

```
 1                        PROCEEDINGS                    39
 2  But, you know, it sounds like we'd need to have some sort
 3  of feedback from Ms. Wahdi in order to get some resolution.
 4           MR. ROBERTS:  Maybe this should wait until after
 5  counsel's appointed and when that kind of question gets
 6  presented to whoever is representing Ms. Lopez at the
 7  settlement.
 8           And maybe I should have raised this whole HIPAA
 9  issue after the lawyer was appointed, but I just wanted to
10  alert you that we think it would advance our understanding.
11  And although Ms. Lopez doesn't agree, it's been my
12  experience that if both sides understand the other side's
13  position better and have more information, it often leads to
14  settlements.  That's the way you get the settlement is to
15  actually understand --
16           THE COURT:  Okay.  Okay.  Ms. Lopez --
17           MR. ROBERTS:  -- and keeping is in the dark I
18  don't think --
19           THE COURT:  Okay.  All right.  I hear you.  I hear
20  you loud and clear.
21           Ms. Lopez, what did you want to say?
22           MS. LOPEZ:  So I just want to say -- say a couple
23  of things.  And I just -- there's points that I just have to
24  get out.  I'm going to reflect slightly on my medical
25  conditions, and this might even help the Court move these
```

 1
 2  proceedings forward.
 3          What you just witnessed, I won't use the street
 4  colloquial term, but there are two letters, B and S.  The
 5  reason why I'm going to stand to respect the Court, I
 6  keep --
 7          THE COURT:  Okay, you can sit, if you'd like.
 8  It's up to you.
 9          MS. LOPEZ:  I keep referring to the previous cases
10  that I've filed that I either reference as landmarks or
11  that have these issues at the heart of them, I have sat in
12  either this position, next to a law guardian or influential
13  firms.  In all of the cases for which my lawyers eventually
14  prevailed against the opposition of the City, and they
15  always take a ridiculous BS position that overcomplicates
16  the medical treatment of transgender people.  And, your
17  Honor, there has been a change, and this Court has the
18  ability to enforce state law, as well.
19          The -- by the way, me and the dog, me and my dog,
20  Chico, were in the chamber when the senate voted on gender -
21  - the law I'm referencing that's been passed since we've
22  been before the Court last -- part of that law speaks to the
23  self-determination of transgender people.  And I don't want
24  to drone on, but you know what, this case will end up
25  landmarked whether I am not happy in settlement and we

```
 1                          PROCEEDINGS                    41
 2   proceed to trial and I'm not happy and it goes to the
 3   appellate division that way.  But this case will mean
 4   something.  And Article 3 judges are some of the smartest
 5   people, I'd like to say, on the planet.  Clearly, your Honor
 6   has the experience enough to know by the assertions of the
 7   municipal defendants that there really isn't much more they
 8   could glean from speaking with Ms. Wahdi than they don't
 9   already have on the record.
10            And it is the exact same posturing that
11   Mr. Roberts just exhibited before the Court that frustrates
12   the plaintiff so.  I come to the table with -- and I always
13   have -- whether that is the proverbial table in court in
14   front of Judge Caproni the first time or even days before
15   that, before we ever went to court, where I sort of gave DHS
16   everything I possibly had on my medical history.  And at
17   every point, unless they're forced to do something, they
18   take a similar position:  "We need more, your Honor.  It's
19   not enough, your Honor.  We're not really sure, your Honor.
20   We don't really have experts ourselves; we want our experts
21   to compare the notes with the actual experts."  It's just a
22   stall tactic, and again, I do not think -- I think that this
23   Court should exercise its discretion and probe Mr. Roberts
24   further as to the exact questions he wants Ms. Wahdi to
25   answer.
```

```
 1                        PROCEEDINGS                    42
 2              I met with Ms. Wahdi yesterday, your Honor.  I
 3    know what Ms. Wahdi is going to recommend, because she wrote
 4    it not long ago.  And I even met with her -- I was on the
 5    way to Ms. Wahdi the date of the alleged incident, you know,
 6    alleged in the arrest that happened on the 31st.  I've been
 7    going to therapy regularly with Ms. Wahdi.  There is nothing
 8    that speaking with her could provide.  And, again, I'm sure
 9    the Court is getting a little fatigued at even this back-
10    and-forth over this issue.
11              Plaintiff is not trying to stall at all.
12    Plaintiff's --
13              THE COURT:  I understand.  I'm not trying --
14              MS. LOPEZ:  -- medical conditions have been the
15    same.
16              THE COURT:  I am not trying to stall, either,
17    okay?  What I am seeing right now in my whopping 11 months
18    of experience on the bench is that getting you what you
19    need, Ms. Lopez, the quickest way to that is to try to have
20    a settlement conference.  Okay?  And that's why I signed
21    the order to try to get you some pro bono counsel for a
22    settlement conference.  All right?
23              If you are -- would like discovery to not be
24    stayed during this time, what I will do is I will take a
25    look at the competing 26(f) reports, and I will issue a
```

```
 1                          PROCEEDINGS                    43
 2   separate order regarding discovery.  Okay?  But I will tell
 3   you right now that any order I issue on discovery is likely
 4   not going to make either of you incur much in the way of
 5   costs, whether it's, you know, time expended or anything
 6   else or having to file things, until we try to settle this
 7   matter.  I mean, that's going to be the quickest way to
 8   getting you what you need.
 9            MS. LOPEZ:  I think this Court has also, your
10   Honor, I think everyone has to take into account it might
11   not be housing.  I feel like also this -- I feel -- I said
12   "I feel" just before your -- that maybe this Court and the
13   opposing counsel, you guys think that you're just going to
14   house me and I'll be done.  Let me make clear if the
15   defendants were to switch their position right now and
16   suddenly go, "Oh, we suddenly can read, and we think that
17   your recommendations of your provider are that you get a
18   single room," that means that they messed up for the last
19   two years.  So they'll have to pay me, regardless.  So --
20            THE COURT:  Is that in your complaint?
21            MS. LOPEZ:  Just -- I'm not even -- my original
22   complaint --
23            THE COURT:  Is the request --
24            MS. LOPEZ:  Yeah -- I'm sorry.
25            THE COURT:  Is the request for additional other
```

```
 1                        PROCEEDINGS                    44
 2  relief in your complaint?
 3           MS. LOPEZ:  So in my most recent TRO filing I
 4  imply that the preliminary relief relates to housing and
 5  that there are issues beyond it that will become moot if
 6  housing were addressed.  So it is articulated, and I have
 7  indicated -- I think we've already discussed on the record
 8  the fact that what has stalled even communications and the
 9  proceedings is Mr. Roberts' selective amnesia about my
10  request for --
11           THE COURT:  Okay, please do not characterize the
12  other side.
13           MS. LOPEZ:  Yes, your Honor.
14           THE COURT:  You don't have counsel, so you get
15  quite a bit of leeway in what you get to say here, but I
16  will not have you characterizing the other side in a
17  disparaging manner.  Okay?
18           MS. LOPEZ:  Yes, your Honor.  Then, since you
19  brought it up, though, Mr. Roberts doesn't dispute the fact
20  that we had a conversation one way where I put forth the
21  request for him to bring to his client a monetary amount
22  that would have settled this case and that three weeks
23  later he literally chuckled -- and I'll remind this Court
24  of my propensity to record calls, whether I have my phones
25  or not, it's an issue of fact --
```

```
 1                        PROCEEDINGS                    45

 2              THE COURT:  And I admonished them at the last

 3   conference about that.  So in my eyes, in the Court's eyes,

 4   that issue is past.  The next issue is everybody treats

 5   each other with civility.

 6              MS. LOPEZ:  Absolutely.

 7              THE COURT:  Okay?  With civility and respect.  And

 8   that goes for you, as well.  Okay?

 9              MS. LOPEZ:  Housing, all I'm getting to mean it is

10   that I feel like, especially as we approach discovery and

11   as the Court takes the exceptional step that's appreciated

12   by plaintiff to assign pro bono counsel for the limited

13   purpose of settlement discussions, it's almost as if

14   parties and the Court are believing that I'm going to go

15   away without the potential for exploring monetary damages.

16   They wouldn't need to speak to Kylie Wahdi if they were

17   discussing in good faith what my pain and suffering have

18   been for the last couple of years.  There is no legal way

19   to examine what they're even proposing as the next steps,

20   that is, putting me in a DHS shelter in accordance with the

21   recommendations of my provider and then it not be gleaned

22   that I somehow suffered, since not having those

23   accommodations originally.

24              So I, too, would like this case to be headed to

25   being done or as fast as going to trial so we can decide
```

1

2  issues of fact and law as possible.  But plaintiff's needs

3  are not only housing.  And plaintiff maintains in the

4  allegations that, you know, maybe I'm sort of taking care

5  of myself right now.  That is part of the damages.  So the

6  issue of housing would become moot if I get called to start

7  my job before housing, which is indicated in the TRO.  For

8  a number of reasons.  So as long as we're clear about

9  details so we don't waste any more time, I think a monetary

10 settlement is fair and justified based on plaintiff's

11 conditions.

12         And if we're really going to discuss it, you know,

13 I have to have additional abdominal surgery now for the

14 lack of dilation I've been able to maintain over the last

15 two years.  Whether that surgery is covered under my health

16 insurance or not, thanks to my case, *Lopez v. Mattingly*, is

17 irrelevant.  I will suffer pain, the risk of death.  My

18 doctor, Harold Reid, my surgeon, shortly before he

19 retired -- I think the date of his letter was June 7 or 6,

20 2017 -- he submitted very clear instructions for post-

21 operative dilation, which has essentially been what

22 triggered most of the controversy aside from not having

23 four walls after the transfer was effected to WIN

24 West -- and I will say again, fresh from the Bronx, that it

25 has to matter.  It must matter that I have not been found

PROCEEDINGS                          47

1

2   guilty on any of the allegations that the municipal

3   defendants put forward in terms of my character and why it

4   was okay within the promulgated regulations for them to

5   transfer me based on allegations.  So I've incurred

6   damages.

7            I'm not the bad, bad girl I was on paper two years

8   ago.  I think it is really unfair to trans people, the

9   issues at the heart of this case, myself as we're in the

10  middle of Black History Month -- and I do identify as a

11  black person -- that we just disregard my history of

12  fighting for trans rights and sort of setting the bar and

13  getting to call what those shots are, along with other

14  activists.  This is simple.

15           THE COURT:  Well, okay, you know what, Ms. Lopez,

16  one of the things you brought up about being an activist,

17  though, and, you know, this case being potentially a

18  landmark decision is that maybe settlement isn't the right

19  approach.  Because if -- because, you know, settlement

20  usually resolves the -- I mean, if a case settles, it

21  resolves the case.  And it's -- you know, your litigation

22  will be done.  However, if what you're really trying -- if

23  part of what you're trying to do is effect this impact

24  litigation, right, and be a vanguard and a symbol for

25  others who come after you -- and, admittedly, you're

```
 1                        PROCEEDINGS                    48
 2   probably the first to bring a case like this -- you know,
 3   then maybe settlement isn't appropriate.  But that's
 4   ultimately your choice.  Right?  You don't get it both
 5   ways.
 6            MS. LOPEZ:  Absolutely.
 7            THE COURT:  And if that's the case, then I'm a
 8   little bit concerned about the potential of, the
 9   possibility of settling this case.  I mean, I'd like to try
10   to see it happen, but one thing with settlement is, as I
11   said before, you don't always get what you want.  And most
12   people don't get what they want, but they get something
13   that's acceptable to them because they have to have
14   accepted it, right?  But that doesn't come without a cost,
15   which may mean, you know, giving up the potential for a
16   larger monetary award if you had taken it to trial.  But,
17   you know, the flip side of that is you could take it to
18   trial and not win anything.  You know, so I mean those are
19   obviously the trade-offs.
20            But what I'm hearing from you now is that, you
21   know, this case is bigger than just you.  Right?  It
22   concerns transgender rights --
23            MS. LOPEZ:  And homeless people's rights.
24            THE COURT:  And homeless people is -- you know,
25   I'll enter this order, but one of the issues in the order,
```

1
2   one of the points in the order here says that you have 14
3   days to object to this appointment of counsel.  And if that
4   happens, then it's out.  Okay?  And then we're going
5   forward with litigation.  But then we still also have the
6   issue with your phones and whether you can prepare your
7   responses to the motion to dismiss or otherwise litigate
8   this case without your phones.  I mean, hopefully you'll
9   get them back soon and that won't be an issue, but you
10  know, keep the Court posted on that.  All right?
11          So, I mean, that -- this is all a lot, really, for
12  you to think about as the plaintiff how you want to go
13  forward with this case.  I'd like to see settlement
14  discussions because I think they could be helpful.  That
15  said and, you know, your appointed counsel will probably
16  have the same kind of conversation with you, but in
17  private, that, you know, you're not going to get everything
18  that -- neither side gets everything that they want in a
19  settlement, right?  So --
20          MS. LOPEZ:  Sure.
21          Your Honor, I mentioned this to Mr. Roberts,
22  trying to discuss settlement during the break, and he got
23  very flustered.  But I've done everything I can to sort of
24  improve my skills.  I'm even reading a book by a Harvard
25  grad who is an expert in negotiations to try to come to

1

2   the table in good faith.  So I'm going to say on the

3   record here everything that I have put forth so far is

4   reasonable.  It is consistent with the facts -- my

5   requests are consistent with the facts of this case.

6            I refer back to *Joel A. v. Giuliani* constantly

7   in this case -- or I have several times.  There's a

8   reason, not just because I'm the lead plaintiff, but the

9   settlement was interesting, your Honor.  And from the

10   beginning I have been trying to effectuate a similar

11   stipulated or a settlement that is similar to that one.

12   In that case, your Honor, nobody got exactly what they

13   wanted, but the entire child welfare system across the

14   country, some say, because as goes New York as goes the

15   rest of the country, changed.  And so I don't know how

16   familiar your Honor is with those stipulations, but it was

17   $15,000 per each plaintiff, which is not a lot, but the

18   overhaul of the entire child welfare system for LGBT kids

19   in care.  I'm not asking for something so far-reaching,

20   but my suggested settlement stipulations have always been

21   positive and productive, and the City's position against

22   them has just certainly always been sort of unreasonable.

23            As an example, the City Department of Homeless

24   Services has one facility right now for transgender

25   people.  If this Court or the municipal defendants

```
 1                           PROCEEDINGS                    51
 2   believes that they're going to maintain only one facility
 3   for the rest of perpetuity, then this plaintiff is just on
 4   the losing side of things.  They will open other
 5   facilities.
 6           Just like in the case I won, Lopez v. Mattingly,
 7   they just wanted to win, your Honor.  They just
 8   didn't -- and I don't want to come off as paranoid, but
 9   they just didn't want me to win.  They were bent on making
10   sure I aged out of foster care.  And the First Department,
11   you know, decided the case once I was out of care, so the
12   jurisdiction was lost, and no court could -- and then, you
13   know, they just literally opened the floodgates for every
14   person that comes behind me to get whatever they need.  I
15   think it has to be relevant in this court supervising
16   settlement negotiations that there might be some -- I
17   don't want to call it bad blood, and I don't want to seem
18   paranoid, but I don't think this Court believes or any
19   other personnel of this court believes that my name
20   doesn't cause a certain level of heightened discussion
21   within the city law department.
22           And I think that, as you'll see in plaintiff's
23   competing memoranda around proceeding with discovery, just
24   the people's positions just -- I mean, excuse the
25   people -- the defendants' positions are just, they're just
```

1

2  ridiculous.  "Will consider putting her in housing," which

3  is what their job is.  That's not a settlement, your

4  Honor.  That's sort of this Court working towards either

5  relief or really just -- I mean, a settlement I guess

6  would describe it if cases just went away or this case was

7  withdrawn.  But just giving me someplace to live, your

8  Honor, that's like setting the bar really low for either a

9  settlement or even the obligations that the -- they're

10  like, "Oh, we're going to -- we might house you safely

11  now."  It's not a favor, it's not a privilege to be

12  housed.

13        My arguments in this case is that they deprived

14  me of housing, which is a basic fundamental human right,

15  and that deprivation has caused me irreparable harm.  I

16  have a scar on my forehead now.  If they want to dispute

17  that I didn't have to do sex work, I didn't have to do

18  those things, then that will be a fact-finding task for

19  potentially later.  I do want to avoid that.

20        And I have discussed this with Mr. Roberts

21  outside court, and so I'm going to bring it up here, to

22  circle back to *Joel A.* again, but as your Honor is aware,

23  the legislature just passed a law that would require

24  victims of adult -- adult victims of child sex abuse to

25  come forward.  There is an extensive record in ACS -- and

I have told Mr. Roberts this -- these are the records he

should have been asking for, more than my medical records

relating to me being transgender -- there are claims that

I would have against the City when the governor signs the

law that I'm willing to release in good-faith settlement

talks here.

         I'll say it in open court now:  They will owe me

millions of dollars, because I know what happened to me

before I aged out.  And even the head of Lawyers for

Children, Karen Freedman, who they were my law guardian

till I aged out of care at 22, they said they will reach

out to the municipal defendants not only to say -- you

know, to just back me up like she's not -- she's not

pulling this out now to try to leverage.  In her

settlement negotiations she has maintained sexual abuse

that has been beyond the jurisdiction of any court or

justice, you know, her entire young adult life.  And so

Mr. Roberts had even indicated in the affirmative; I will

bring those concerns or your settlement stipulation to my

clients.  He's not responded.

         So I'm in a situation now, your Honor, where I

could go away quietly into a shelter via settling this

case and letting them speak to Kylie Wahdi quickly and

still have the municipal defendants get away with not

PROCEEDINGS                                54

housing me.  I could hope that this Court appoints pro

bono counsel and we reach settlement that maybe splits it

in two and I get housing immediate and there are ongoing

talks about what may be fair later.  But I really would

ask this Court to just urge the municipal defendants to

actually take what I am saying seriously about trying to

measure all of the moving parts of my claims because I

gave Mr. Roberts a docket number late last year for a case

that I had refiled -- or a motion -- excuse me -- that I

had filed, your Honor, in the *Joel A.* case.  And the Court

denied my motion or dismissed it without prejudice but

made certain assertions in its ruling that led me to

believe this is just an issue of fact.  The Court didn't

seem to be impressed or moved that maybe I was *Joel A.* but

indicating like maybe Joel would actually have standing.

And I brought issues up, your Honor, about abuses that

took place post the *Joel A.* settlement.  And I had no leg

to stand on last year, and now I do.

          So I would like to enter good-faith discussions

that would potentially and quietly, your Honor --

quietly -- I've already indicated that to Mr. Roberts.

You know, a lot of people accuse me of being news hungry.

I would happily sign a stipulation in good faith if the

municipal defendants were to come forward and offer some

1
2    type of monetary settlement for the awful nightmarish
3    experience I had in foster care and also sort of tying the
4    settlement from that case with this case, and we could all
5    be done with everything, and I could happily take up my
6    job at the ACS, too, and go about my business.
7            But I just -- I don't think -- no interest of
8    justice is served by drawing this out, and no interest of
9    justice is served by not having the municipal defendants
10   really take into account like she was Joel.  And if I can
11   remember, I signed that, your Honor, when I was 14.  I
12   didn't leave care until I was 22.  I was in male
13   facilities until I was 17.  If they think that I wasn't
14   sexually assaulted as a girl in male facilities by staff
15   and other clients, that is not a rational or reasonable
16   position by the municipal defendants.  And that is why a
17   sort of communication breakdown.
18           I would like to prove every assertion I've
19   presented to them or connect them, your Honor, with
20   officers of the court like, you know, who's more respected
21   than the head of Lawyers for Children in terms of -- or
22   just human advocacy.  They're some of the best people on
23   earth.  And as of yesterday Karen said -- just looking at
24   this, just -- I explained this to Mr. Roberts, too, if
25   Mr. Roberts wants medical records related to my stay and

PROCEEDINGS                                      56

 1
 2  care, it's going to nip him in the you-know-what because
 3  they have cleared, your Honor -- cleared -- entire agency-
 4  operated boarding homes for me when I was 17 or 18.  That
 5  means taking 12 residents that were male and said, "No,
 6  you can't be here  She's here.  She has to be by herself."
 7  Staffed the entire facility like 12 people were there,
 8  stocked it like 12 people were there.  These were the
 9  exceptional conditions and accommodations made by
10  Commissioner Mattingly, Commissioner Bell.
11          There's nothing that he's going to get from any
12  of the medical records, the municipal defendants, that are
13  going to support any of their positions refusing me
14  accommodations, that are going to support the fact that
15  I've not accumulated damages, or support the fact, your
16  Honor, that there isn't something to asking his client to
17  come to the table.
18          I know this Court is familiar with DMX, the
19  rapper.  DMX was in the same facility that I was in.  And
20  this Court, in his criminal proceeding, allowed him to
21  submit audio evidence by way of his music to speak to some
22  of his abuses and trauma as a child.  Those abuses and
23  trauma were referring to the Children's Village in Dobbs
24  Ferry, New York, your Honor.  The quicker municipal
25  defendants come to the table in good faith, the quicker I

1                          PROCEEDINGS                    57

2    find some type of agreement that makes it so I go quietly

3    into the sunset with my money and I don't start organizing

4    other adults under the age of 50 to come after the City of

5    New York.  I have male, literally ex-clients or members of

6    ACS as we speak sort of saying to me, "Mariah, what do we

7    do?  There's this new law."  So I've said all this to

8    him -- I feel like we're going in circles now -- but I am

9    doing everything I can in good faith to try to say, "Look,

10   these are the ingredients we all have to work with.  Can

11   we make something collectively that is productive?"

12   Opening new facilities, your Honor, educating the City

13   about service animals, I don't think those things are hard

14   for the City to accomplish.

15             THE COURT:  Okay.  All right.  I'm going to enter

16   this order appointing your pro bono counsel or attempting

17   to locate pro bono counsel to be appointed for the

18   purposes of settlement.  I'm going to take a look at the

19   26(f) reports, the competing 26(f) reports, and there may

20   be an order issued regarding discovery, as well.  Until

21   such an order issues, discovery is stayed.  Okay?  Because

22   I'd really like us to focus our efforts and our energy on

23   settlement.  And I look forward to your status letters

24   about the situation with your phones and when you may be

25   ready to respond to the motion to dismiss for the

```
 1                        PROCEEDINGS                    58
 2   Christine Quinn and the WIN defendants.
 3            MS. LOPEZ:  Could you please ask or may the Court
 4   order a transcript of the April 27 proceeding in front of
 5   Judge Caproni to be provided?  I realize that I have
 6   transcripts from most other significant proceedings, but I
 7   don't have the transcript from the very first.
 8            THE COURT:  Okay, from the April 27.  Let me look
 9   and see if it's on PACER because if that's the case, then
10   that will be very easy.
11            MS. LOPEZ:  I don't believe it was there,
12   actually.
13            THE COURT:  Okay.  You don't see a transcript
14   from the 27th?
15            MS. LOPEZ:  And, your Honor, I had indicated that
16   Anthony Secudi had, in a phone conversation we had -- he's
17   an attorney admitted and able to practice in front of this
18   court -- he had indicated that he would not be opposed to,
19   because he has an extensive familiarity with my medical
20   history, potentially come forward and help with settlement
21   stuff; but as Anthony said, I don't know -- I'm not
22   necessarily sure I know about this area of the law, I
23   don't know if anyone does considering the idea might be to
24   think outside the box.  So if the Court is inclined, I'm
25   sure it knows how to reach Anthony, but --
```

```
 1                        PROCEEDINGS                    59
 2              THE COURT:  We don't reach out.  If he's willing
 3    to appear as your pro bono counsel, he can file a notice
 4    of appearance if he's admitted to the SDNY.
 5              MS. LOPEZ:  Okay.
 6              THE COURT:  But the Court doesn't go out and call
 7    counsel for that purpose.  Okay?
 8              MS. LOPEZ:  All right.
 9              THE COURT:  All right, and so I will -- we'll
10    take a look at the -- you said it was April 27th?
11              MS. LOPEZ:  Yes, your Honor.
12              THE COURT:  Okay, I'll try to see where that is.
13              Anything else, Mr. Roberts?  Or are you standing
14    up in anticipation of us being done?
15              MR. ROBERTS:  Well, I just -- I just say if we're
16    not going to have the HIPAA release for Ms. Wahdi, I don't
17    see there'll be any delay.  If it were signed today, the
18    calls would be made in the next week or two.  I don't know
19    what questions they're going to ask.  They're professional
20    questions.
21              THE COURT:  We're not going to address that right
22    now, okay?
23              MR. ROBERTS:  Okay.  I just --
24              THE COURT:  I understand.  I understand.
25              MR. ROBERTS:  If it comes up with the lawyer, it
```

1
2    will -- when the lawyer's appointed, it will just slow

3    things down.  And there's been a lot of discussion --

4              THE COURT:  I understand.  We'll cross that

5    bridge when we come to it.  Okay?

6              MR. ROBERTS:  Okay.

7              THE COURT:  I get that you're trying to

8    facilitate this on your end and to try to prep.  I do

9    appreciate that.  Unfortunately, I think there is --

10             MR. ROBERTS:  Okay.

11             THE COURT:  -- as you heard, considerable

12   resistance.  I'd like to try to get the parties in a frame

13   of mind to be thinking about settlement rather than being

14   angry with each other.  So --

15             MS. LOPEZ:  If he -- if Mr. Roberts stated on the

16   record right now the several questions that he wanted to

17   ask, I'd sign the release right now.

18             THE COURT:  Okay.  All right.  Then here's what

19   I'll do.  I'll give you --

20             MR. ROBERTS:  I'm not --

21             THE COURT:  No, no, no, Mr. Roberts, stop.  Okay?

22   You're both getting the things that you need in this

23   hearing, okay?  And you're actually working against

24   yourselves by trying to interrupt me and making additional

25   arguments.  Okay?

```
 1                      PROCEEDINGS                    61
 2              Mr. Roberts, if you would like to proceed or
 3    pursue the issue of the HIPAA releases, please treat this
 4    as almost as, you know, written questions for deposition,
 5    okay?  I would have you -- what's the best way to get them
 6    to you, Ms. Lopez?
 7              MS. LOPEZ:  The HIPAA --
 8              THE COURT:  No, no, no.  The questions.  Because
 9    I'd like to see them, too, but I'm not sure if we want
10    them filed on the docket or if they should just be --
11              MS. LOPEZ:  I can access email.
12              THE COURT:  Okay.  And he has your email address?
13              MS. LOPEZ:  And I'm actually set to call.  So I'm
14    supposed to call Ms. Wahdi when we leave to schedule
15    another appointment that was just supposed to be scheduled
16    for tomorrow.  So --
17              THE COURT:  All right.  All right.
18              So, Mr. Roberts, by the 13th, if you can email as
19    if this were a deposition on written questions.  I
20    understand we're kind of getting a little out there, but
21    the types of questions or the questions that, you know,
22    that DHS would want to ask Ms. Wahdi, email those to
23    Ms. Lopez and copy, cc the court's email address, okay, by
24    the 13th.
25              MR. ROBERTS:  Your email address --
```

```
  1                        PROCEEDINGS                    62

  2            THE COURT:  The court's -- my chamber's email

  3   address --

  4            MR. ROBERTS:  Your chamber's email address.

  5            THE COURT:  -- that's in our individual practices

  6   on or before the 13th.  Okay?

  7            If you don't and you decide that you don't need

  8   to pursue or don't want to pursue the HIPAA releases at

  9   this time, just file something on the docket by the 13th

 10   saying that that's what you decided to do and therefore

 11   you didn't send the questions to Ms. Lopez.  Okay?  And

 12   then we'll take it from there.  All right?

 13            MR. ROBERTS:  Thank you.

 14            THE COURT:  All right.  Thank you.

 15            MS. LOPEZ:  Oh, for the phone.  Do I have to get

 16   one of these each time, even though it's ironic that we're

 17   talking about a phone?  Do I need to --

 18            THE COURT:  Oh, one last thing.  Defendants,,

 19   order a transcript from today and split the cost among the

 20   defendants, provide a copy to Ms. Lopez.  And the

 21   electronic device order will -- yes, Mr. Light will take

 22   care of that with you.

 23            MS. LOPEZ:  Thank you.

 24            (Whereupon, the matter is adjourned.)

 25
```

63

<u>C E R T I F I C A T E</u>

     I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Lopez v. New York City Dept. Homeless Services, et al, Docket #17-cv-03014-VEC-OTW, was prepared using digital transcription software and is a true and accurate record of the proceedings.




Signature_____

               Carole Ludwig

Date:   March 2, 2019