1

Mariah Lopez, Pro Se Litigant

RECEIVED
SDNY PRO SE OFFICE

2019 MAR 29    PM 3: 56

March 29th 2019

Hon Ona T Wang

United States Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312
Court Rm 20D

Re: Case Num 17 CV 3014
      Case Num 19 CV 2582

**Status Letter from Plaintiff to the Court; Request for the Court to lift Stay on Discovery,**
**updating the Court to several recent relevant events. The filing of 19 CV 2582, SDNY**

Dear Magistrate Wang,

Plaintiff is submitting this letter to update the Court concerning recent events relating to parties
in the case, as well as to ask the Court to lift its Stay of Discovery proceedings (issued on
2/6/19), and to direct parties to resume Discovery, even as all parties and the Court wait for the
clerk to identify potential Pro bono counsel for the Plaintiff for the limited purposes of settlement.

This morning I met with Attorney David M. White Director of the Conflict Management Program,
and based on this interaction Plaintiff has declined the program's assistance.

Relating to Discovery, Plaintiff now has access to the cell phone with material needed to engage
in Discovery and prepare for trial in this case. This Court's ruling to appoint Pro bono counsel for
settlement talks, does not stay the case in general; and Plaintiff is unaware of the Clerk will
continue looking for Counsel for the Plaintiff. Even so, the choice to accept assistance, is
ultimately the Plaintiffs.

The clerk potentially finding counsel for the Plaintiff, as well as the Plaintiff accepting said
counsel's advice or representation, are not guaranteed.

However, Plaintiff rights of Due Process and Discovery, are guaranteed, as per the Constitution and Federal law.

There is no reason that Discovery shouldn't continue. Lifting the Stay would be the interest of justice, and, save time and resources on all sides, either within the context of settling the case or, in bringing it to a full trial posture.

Either way all sides need to have access to said Discovery material to aid settlement talks (if a settlement remains viable). Once all the "ingredients" are on the table, a fair settlement should be easy to reach. All of the "ingredients" are not on the table yet, so to speak.

The Defendants in this case are the government, and there is a level of public-transparency to be gained by this Court furthering and supervising Discovery, in addition to the procedural necessity. This transparency --especially relating to allegations of mistreatment of vulnerable homeless individuals-- would benefit the public good. The Defendants (the government) should not be able to keep their dirty laundry private within the context of settlement talks, or, because of a court issued Stay on Discovery. Plaintiff reminds the Court, respectfully, that said Stay was issued after, and linked to, a highly irregular arrest of the Plaintiff and subsequent confiscation of a device, central to these proceedings.

Mr Roberts and the Law Department seem to be benefiting from the recent Stay, in unintended ways; justifiably withholding, or sitting on information relevant to this case and its core allegations, including wrongdoing by DHS staff or its subcontractors. Plaintiff believes the Defendants are seeking to keep this information out of the Plaintiffs hands, or even from public view. Plaintiff personally knows of several ex staffers who have reached out to Mr Roberts regarding their willingness to testify to the fact that I was targeted by staff and administration at Marsha's; and that there indeed was a "plot" to have me transferred, unrelated to Plaintiff's so called behavior.

Specifically, in recent weeks Mr Roberts was contacted by a former staff member from Marsha's named Troy Miller, who made it clear to Mr Roberts during this call that he was directed to target Plaintiff for rule breaking and other infractions, in a manner inconsistent with how rules were enforced when it came to other clients. Mr Miller said that he and other staff at Marsha's were instructed to single out Plaintiff by Project Renewal and QPS administrative staff; this 'targeting' morphed into retaliation, once Plaintiff filed the original ADA related case in front of Judge Caproni. After winning the TRO, AND the Stay in NYS Supreme Court (blocking a transfer to WIN West), the "targeting" got worse.

This staff member, Mr Miller making contact with Mr Roberts, should have been a game changer in this case.

The likelihood that Plaintiff will succeed on most claims on the merits is getting stronger by the day. Therefor, the Municipal Defendants should stop resisting Plaintiff's settlement demands.

Regardless, there is a vast amount of material to be requested and reviewed by all parties, and since Plaintiff is Pro se, it would make sense to resume the Court supervised exchange of material within Discovery, sooner than later and to suss out any challenges by parties.

Plaintiff would also like to bring to the Court's attention a case relevant to this one, unfolding almost in real-time.

Approximately one month ago Plaintiff was contacted by a Trans woman who was mentioned in previous proceedings relating to this case, yet not heard from by this court; a Trans woman who previously lived at WIN West, named Akasha Barker. Ms Barker was (in her words) "brainwashed", "forced out" (of WIN), and "pressured" by DHS and WIN combined  to take accept a transfer from WIN, to an inappropriate placement under the supervision of the Municipal Defendants (HRA, not DHS). This occurred in mid 2017.

Within the last month or so Ms Barker contacted Plaintiff stating that the placement which WIN rushed her to accept is/was dangerous, and that she is/was in fear for her safety. The placement Ms Barker was in made no sense to the Plaintiff; a shared space with a Gay man?

Plaintiff believes the Defendants orchestrated said transfer (from WIN, in 2017) so they (Mr Roberts) can  assert in this case, that they--WIN and the Municipal Defendants-- have successfully housed multiple 'Trans women'. The Defendants have indeed made such arguments in defending this case.

Back to Ms Barker: For reasons still unclear, in 2017 this Trans woman was placed at a 'Supportive Housing' placement, with her roommate being a Gay male individual.

The tension between this Trans woman and her roommate recently reached the point of physical abuse and harassment; of Ms Barker by this roommate.

This is what caused this Trans woman to reach out to me recently; she was willing to be homeless in order to get away from her roommate. So, Plaintiff activated an emergency protocol under the auspices of Plaintiff's non profit, STARR, and Plaintiff's staff engaged with Ms Barker, getting appropriate releases signed, and reaching out to the City on her behalf.

Plaintiff also contacted Mr Roberts, making him aware of her situation and her needs.

Next, Plaintiff asked attorney Carmen Giordano to step in and help with the Ms Barker's case. He agreed and sent a Notice to Cure to the City and/or it's agents based on his conversation with Ms Barker. He soon left for a prel-scheduled vacation and, the Defendants took no steps to provide Ms Barker with appropriate housing, causing her to become homeless.

Defendants are still refusing to find a more suitable placement for this Ms Barker (who has unique medical needs, just like Plaintiff in this case).

She cannot go to Marsha's because of DHS's arbitrary age limit of 30 years if age for entry into Marsha's.

This Trans woman is desperate, fears for her safety and her health (since she is unable to fully adhere to medical regimens (taking her heart medication, and adhering to her post op dilation responsibilities.

Ms Barker is in no way to blame for the situation in which she finds hersy. By her own words, Ms Barker was afraid to speak out against WIN in 2017, lest she remain at WIN, and not get her "own place", an apartment placement outside of the shelter. She reports being threatened with a transfer to an even worse placement, if she refused to accept the transfer. It is apparent to Ms Barker now, that she was played by WIN administrators, who wanted to keep Ms Barker and Plaintiff in this case, apart.

Ms Barker is currently facing near identical set of circumstances to Plaintiff: she is homeless and forced to turn to survival sex work to house herself; considers herself Transgender; has multiple documented medical/mental health reasons which require her to be housed in a private room while at a shelter run by the Defendants.

Ms Barker asserts that placement for her, as a post op Trans individuals, inhibits access to and compliance with medical treatment, and limits her free expression as a Trans individual. Just like Plaintiff in this matter, Ms Barker reports having to to 'play' and act Cisgender... having to hide her Trans identity, in order to avoid harassment while in Cisgender, gender segregated settings. Plaintiff joins Ms Barker in asserting that DHD failures violate the ADA (both Ms Barker and Plaintiff have PTSD, which is aggravated by a dorm placement), as well as rights afforded to her under the 1st and 14th Amendment, as well as 'new' rights under the recently enacted GENDA.

Mr Roberts and Ms Grant are aware of the woman's situation and allegations.

Now that Ms Barker is also homeless, Trans; Post Op, and requires the accommodation of a single room occupancy, perhaps Class Certification would be appropriate.

Ms Barker has filed a civil case in the SDNY, 19 CV 2582, due to the actions and failures of the Defendants.

In addition to her complaint Plaintiff Ms Barker has filed a request TRO, and at a conference for said TRO, the Court seemed to be entertaining the idea of granting the Plaintiff some form of relief; possibly a TRO requiring a single room.

Mr Roberts, when asked by the Court in Ms Barker's case, admitted that both lawsuits, and the claims within are virtually identical.

She cannot go to Marsha's because of DHS's arbitrary age limit of 30 years if age for entry into Marsha's.

This Trans woman is desperate, fears for her safety and her health (since she is unable to fully adhere to medical regimens (taking her heart medication, and adhering to her post op dilation responsibilities.

Ms Barker is in no way to blame for the situation in which she finds hersy. By her own words, Ms Barker was afraid to speak out against WIN in 2017, lest she remain at WIN, and not get her "own place", an apartment placement outside of the shelter. She reports being threatened with a transfer to an even worse placement, if she refused to accept the transfer. It is apparent to Ms Barker now, that she was played by WIN administrators, who wanted to keep Ms Barker and Plaintiff in this case, apart.

Ms Barker is currently facing near identical set of circumstances to Plaintiff: she is homeless and forced to turn to survival sex work to house herself; considers herself Transgender; has multiple documented medical/mental health reasons which require her to be housed in a private room while at a shelter run by the Defendants.

Ms Barker asserts that placement for her, as a post op Trans individuals, inhibits access to and compliance with medical treatment, and limits her free expression as a Trans individual. Just like Plaintiff in this matter, Ms Barker reports having to to 'play' and act Cisgender... having to hide her Trans identity, in order to avoid harassment while in Cisgender, gender segregated settings. Plaintiff joins Ms Barker in asserting that DHD failures violate the ADA (both Ms Barker and Plaintiff have PTSD, which is aggravated by a dorm placement), as well as rights afforded to her under the 1st and 14th Amendment, as well as 'new' rights under the recently enacted GENDA.

Mr Roberts and Ms Grant are aware of the woman's situation and allegations.

Now that Ms Barker is also homeless, Trans; Post Op, and requires the accommodation of a single room occupancy, perhaps Class Certification would be appropriate.

Ms Barker has filed a civil case in the SDNY, 19 CV 2582, due to the actions and failures of the Defendants.

In addition to her complaint Plaintiff Ms Barker has filed a request TRO, and at a conference for said TRO, the Court seemed to be entertaining the idea of granting the Plaintiff some form of relief; possibly a TRO requiring a single room.

Mr Roberts, when asked by the Court in Ms Barker's case, admitted that both lawsuits, and the claims within are virtually identical.

The City needs to engage more heartely, in settlement negotiations. The Law Department's stubbornness is akin to that of lawyers defending segregation or oppressing Queer Youth in foster care; both scenarios are real and recent. Both are examples of lawyers for the government, standing on the wrong side of history and civil rights.

Everything is  pointing to a settlement being ideal.

The person (Troy Miller's) phone call and potential testimony creates considerable liability for the Municipal Defendants, as his statements and testimony support Plaintiffs entire case and allegations. Also, Ms Barker's lawsuit creates an interesting conundrum for the Court's and the Defendants.

Given that Plaintiff and Seton Hall attorneys won't  be working together towards ssettlement Plaintiff need to continue preparing for trial, settlement, or a potential appeal to the Second Circuit, if this Court's does not rule soonnon Plaintiff's request for a TRO, from December!

Plaintiff also requests that the Court address the Municipal Defendant's refusal to negotiate, with Plaintiff, in good faith.

To Plaintiff's knowledge, there is no Federal or State law that allows Mr Roberts and the City of New York to cease good faith negotiations with, simply because the Plaintiff is Pro SE and, because the court has saw a benefit in potentially appointing counsel.

This is not a criminal case, the Defendants need to engage in settlement talks and the longer the City takes to house the Plaintiff or settle, the larger to amount that the Plaintiff is seeking will become. This is simple math, basic law, and common sense.

Likewise, the longer Discovery takes, the longer any trial or settlement talks will take to complete, or bare fruit.

Mr Roberts and his clients should not be allowed to force the taxpayers to foot the bill for extended, unfounded stubbornness and delayed Discovery due to the City Law Department's poor decisions and lack of strategy.

Mr Roberts has still NOT responded with a number amount as to the monetary settlement demands made by the Plaintiff, going on five months.

Sadly, the situation unfolding with Ms Barker also points to the needs for good-faith settlement talks; policy reform within DHS, and a pattern of practice on the part of the City. Ms Barker's case also increases the likelihood that Plaintiff would prove successful on the merits of the case, if the case were to go to trial.

Plaintiff appreciates the Court's time and attention in this matter.

Respectfully Submitted

Mariah Lopez
Pro Se Litigant

 **GIORDANO LAW OFFICES PLLC**

March 5, 2019

<u>**VIA EMAIL**</u>
McAlpin, Yvonne
<u>ymcalpin@svwsjmc.org</u>

## <u>NOTICE TO CURE</u>

**Re:**   **Akasha Barker**

Dear Ms. McAlpin:

My office has been retained by Ms. Barker regarding the ongoing problems and damages she has endured since being placed in your living facility. First and foremost, your facility managers have mistakenly, and rather outrageously, housed a biological male with Ms. Barker, a transgender female. As a result, Ms. Barker has been subjected to ongoing sexual harassment, threats of violence, and unwanted advances. Additionally, Ms. Barker has enumerated several problems, including loss and destruction of her personal property, due to lack of security in your facility. Unless these problems are addressed immediately, we will consider all appropriate courses of action, including litigation. Kindly contact our office to discuss further. If we do not hear from you, we will proceed accordingly.

GIORDANO LAW OFFICES, PLLC

By: Carmen Jack Giordano

cc. Akasha Barker, <u>enlightendpossibilities@gmail.com</u>

RECEIVED
SDNY PRO SE OFFICE
2019 APR 4: 54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Fill in above the full name of each plaintiff or petitioner.

Akasha Barker

-against-

New York City, Dept Homeless
Services, HRA

Case No. _____ CV _____

Fill in above the full name of each defendant or
respondent.

Motion for Emergency TRO

~~DECLARATION~~

Briefly explain above the purpose of the declaration, for example, "in Opposition to Defendant's
Motion for Summary Judgment."

I, Akasha Barker , declare under penalty of perjury that the

following facts are true and correct:

In the space below, describe any facts that are relevant to the motion or that respond to a court
order. You may also refer to and attach any relevant documents.

I am currently being forced to turn to
Prostition, plus am street homeless, because
DHS is refusing to provide me with housing
consistent w/ my needs. I believe
DHS is also refusing to house me ing AB

Rev. 6/30/16

a single room because it would be inconsistent w/ its position in the case "Lopez v NYC DHS et al, CV 3014).

#AB. NYC DHS refusing to place me according to my needs, could kill me.

I also suffer from congestive heart failure and being stressed (PTSD, anxiety, physical exhaustion from being homeless) is increasing my risk of massive heart attack and death. My first heart attack was 4/15 and received Jamaica Hospital. #AB in June 2016 I suffered a second heart attack and was saved at mount sinai. I have not been street homeless since early 2017 and I am afraid that this time, homelessness is going to kill me

* I also believe that being homeless and unable to dilate my neo vagina, could result in it closing

---

Attach additional pages and documents if necessary.

Signature

Executed on (date)

_Akasha Banker_
Name

_Street Homeless_
Address

_917 496 6312_
Telephone Number (if available)

Prison Identification # (if incarcerated)

City            State       Zip Code

_enlightenedpossibilities@gmail.com_
E-mail Address (if available)

Page 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Write the full name of each plaintiff.

Akasha Tonia Barker

-against-

The City of New York, DHS, HRA

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

_____CV_____
(Include case number if one has been assigned)

**COMPLAINT**

Do you want a jury trial?
☑ Yes   ☐ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

RECEIVED
SDNY PRO SE OFFICE
2019 MAR 21  PM 4:54

## I.  BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑  **Federal Question**

☐  **Diversity of Citizenship**

## A.  If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

The Americans w/ Disabilities Act, and the 1st and 14th Amendments of the US Constitution, as well as the Fair Housing Act and multiple other Federal laws and statutes relating to people w/ disabilities

## B.  If you checked Diversity of Citizenship

### 1.  Citizenship of the parties

Of what State is each party a citizen?

The plaintiff, __Akasha Basker__, is a citizen of the State of
        (Plaintiff's name)

__New York__
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _City of New York, DHS, HRA_, is a citizen of the State of
(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

_Akasha_                                    _Barker_
First Name              Middle Initial       Last Name

_Street Home/PSS_
Street Address

_New York_                     _NY_
County, City                    State                    Zip Code

_917 496 6312_                  _enlightendpossibilities@gmail.com_
Telephone Number                Email Address (if available)

**B.  Defendant Information**

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:          *The City of New York*
_____
First Name                     Last Name

_____
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____
County, City               State               Zip Code

Defendant 2:          NYC Department of Homeless Services
_____
First Name                     Last Name

_____
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____
County, City               State               Zip Code

Defendant 3:          NYC Human Resources Administration
_____
First Name                     Last Name

_____
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____
County, City               State               Zip Code

Page 4

Defendant 4:

_____
First Name                        Last Name

_____
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____
County, City                      State          Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: _New York City_

Date(s) of occurrence: _May /17 — present_

### FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

I am a Transgender woman w/ many medical conditions which require privacy — so that I may be in compliance w/ my obligations as a Transgender patient.

My conditions include PTSD and anxiety. Ever since I entered the DHS Shelter system, they deprived me the privacy — w/ a single room — and an "B" individual sleeping space needed to reduce my medical symptoms and promote overall health. My conditions technically make me disabled under the ADA — Trans related "PTSD"

and Anxiety. While at WIN west womans shelter I asked for a single room for my Trans related disabilities and needs, WIN staff refused. I experienced mistreatment and deprivation of my rights while at WIN. Eventually I was transfered when I complained about conditions. I have been being abused at the "New" placemat for almost two years. In the last several weeks DHS has been made aware that I am now homeless again, and need a placement. My Doctor has ordered a single room "as treatment" and DHS is refusing. So

**INJURIES:** I am homeless — and dont feel safe at a womans shelter.

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

Physical abuse ("new placement post WIN west) Psychological abuse (staff at WIN; individuals at New placement post WIN; Being forced to prostitute to earn money to pay for safe, medically appropriate housing to avoid the streets. I stay in hotels and must sell my body to afford the rooms.

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

Monetary Damages; an order compelling DHS to house me according to my medical needs and providers recommendations

Page 6

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

March 21, 2019
Dated

Plaintiff's Signature

Akasha
First Name

Tonia
Middle Initial

BArker
Last Name

Stret Homeless
Street Address

County, City

State

917 496 6312
Telephone Number

enlightendpossiblities@gmail.com
Email Address (if available)

Zip Code

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☐ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

## CONSENT TO ELECTRONIC SERVICE

I hereby consent to receive electronic service of notices and documents in my case(s) listed below. I affirm that:

1.  I have regular access to my e-mail account and to the internet and will check regularly for Notices of Electronic Filing;

2.  I have established a PACER account;

3.  I understand that electronic service is service under Rule 5 of the Federal Rules of Civil Procedure and Rule 5.2 of the Local Civil Rules, and that I will no longer receive paper copies of case filings, including motions, decisions, orders, and other documents;

4.  I will promptly notify the Court if there is any change in my personal data, such as name, address, or e-mail address, or if I wish to cancel this consent to electronic service;

5.  I understand that I must regularly review the docket sheet of my case so that I do not miss a filing; and

6.  I understand that this consent applies only to the cases listed below and that if I file additional cases in which I would like to receive electronic service of notices of documents, I must file consent forms for those cases.

**Civil case(s) filed in the Southern District of New York:**

**Note:** This consent will apply to all cases that you have filed in this court, so please list all of your pending and terminated cases. For each case, include the case name and docket number (for example, John Doe v. New City, 10-CV-01234).

_____

_____

*BARNer , AKASHA , Tonia*
Name (Last, First, MI)

*Street        Homeless*
Address              City                     State              Zip Code

*917   496   6312          Enlightend possibilities @*
Telephone Number          E-mail Address          *gmail.*
                                                   *com*

*March 21, 2019*          *a. b*
Date                     Signature

**Return completed form to:**

Pro Se Intake Unit (Room 200)
500 Pearl Street
New York, NY 10007

J3R5barC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    AKASHA TANIA BARKER,

4                    Plaintiff,              New York, N.Y.

5              v.                            19 Civ. 2582 (JGK)

6    THE CITY OF NEW YORK,

7                    Defendant.

8    ------------------------------x

9                                           March 27, 2019
                                            3:15 p.m.
10
     Before:
11
                         HON. JOHN G. KOELTL,
12
                                            District Judge
13

14                              APPEARANCES

15

16   AKASHA TANIA BARKER, Pro Se

17   ZACHARY W. CARTER
          Corporation Counsel for the City of New York
18   BY:  JONATHAN PINES
     BY:   THOMAS ROBERTS
19        Assistant Corporation Counsel

20

21

22

23

24

25

1              (Case called)

2              THE DEPUTY CLERK:  All parties please state who they

3    are for the record, starting with counsel via phone.

4              MR. PINES:  This is Jonathan Pines, New York City Law

5    Department for the defendant DHS.

6              MS. BARKER:  My name is Akasha Barker.

7              THE COURT:  The reason that I scheduled the matter is

8    because I have the plaintiff's application for an emergency TRO

9    which asks for an accommodation in City public housing, as I

10   understand it, and when I have an application for a TRO my

11   regular practice is to call the parties in and to hear them and

12   usually to set up a schedule for the submission of papers

13   unless what I have on the TRO is sufficient for me to decide

14   one way or another whether to grant a TRO.

15             So, when I have a pro se litigant I give the pro se

16   litigant the opportunity to speak first or second because the

17   defendant is usually represented by a lawyer.  So, Ms. Barker,

18   you can speak first or you can speak second; as you wish.

19             MS. BARKER:  Is it possible that I could have Mariah

20   Lopez sit with me?

21             THE COURT:  Possible for you to have what?

22             MS. BARKER:  Mariah --

23             THE COURT:  You have so speak into the microphone.

24             MS. BARKER:  Mariah Lopez sit with me.

25             THE COURT:  Sure.

J3R5barC                          conference

1        MS. BARKER:  She is not an attorney.

2        THE COURT:  She's what?

3        MS. BARKER:  She is not an attorney or a lawyer but

4    she also has a pro se case, as well, and she has experience.

5        THE COURT:  Oh, yes.  You refer to her case in your

6    papers?

7        MS. BARKER:  Yes.

8        THE COURT:  She can sit with you.

9        MR. PINES:  Your Honor?

10        THE COURT:  Yes.

11        MR. PINES:  This is Jonathan Pines.  Could you just

12    indulge me for literally 15 seconds because there is an

13    attorney who is far more expert in this than I am who I think I

14    could patch in on this call.

15        THE COURT:  Absolutely.

16        MR. PINES:  I'm sorry?

17        THE COURT:  I said absolutely, yes.

18        MR. PINES:  Good.  Thank you so much.  Let me see if I

19    can conference him right now.  Thank you.

20        THE COURT:  Sure.

21        (pause)

22        MR. PINES:  Hello?

23        THE COURT:  Yes.

24        MR. PINES:  I wasn't able to patch him in on the phone

25    and I don't want to take your time while I run down the hall,

J3R5barC                        conference

1   so.

2               THE COURT:  No, hold on.  You can run down the hall.

3               MR. PINES:  Thank you, then.  Give me a half second.

4   Thank you.

5               THE COURT:  Sure.

6               (pause)

7               MR. PINES:  Your Honor?

8               THE COURT:  Yes; Hi, Mr. Pines.

9               MR. PINES:  Thank you, I have Tom Roberts here as well

10  which is I think someone somewhat familiar with the issues.

11              THE COURT:  Okay.  So, Ms. Barker, do you want to

12  begin or do you want the defendant to begin?

13              MS. BARKER:  Let defendant begin, please.

14              THE COURT:  Okay.

15              So, Mr. Pines or Mr. Parks, the plaintiff is seeking a

16  TRO, the gist of which is, as I understand it, asking for a

17  single room in city housing because the failure to provide a

18  single room is alleged to be in violation of the Americans with

19  Disabilities Act because of the plaintiff's medical conditions.

20              So, the immediate question is what is the City's

21  position on this?  I mean, I can ask for quick briefing.  I can

22  also refer the plaintiff to the Legal Assistance Group across

23  the street which provides legal assistance to litigants in the

24  Court who are pro se.  The other thing that jumps out from a

25  case such as this is whether the City can make some

1    accommodation for the plaintiff without going through this

2    process.  If the parties really can't work it out, then I have

3    to decide the TRO and I would give the City, I assume, a brief

4    time to respond to the TRO and give the plaintiff the

5    opportunity to reply on the TRO.

6           MR. ROBERTS:  Your Honor, Tom Roberts, assistant

7    corporation counsel for the defendant.

8           A couple things.  I have read the TRO application

9    yesterday.  Ms. Barker says that -- I don't think she's

10   presented herself to DHS and asked for homeless shelter system.

11   It seems that she should go to the shelter system and there

12   will be a placement made, recommendation, but I don't think

13   she's even done that to start with.

14          I will say it is highly, highly unlikely that she will

15   be given a single room.  We have almost no single rooms in the

16   system for single adults.  There are a very small handful of

17   them, they are generally given to people who are just coming

18   out of hospitals and otherwise probably -- now, DHS wouldn't

19   say this, but I think most of those folks should probably be in

20   nursing homes but they're in our system and some of them have

21   single rooms, but there are very few single rooms within the

22   system.  And I think the chances of DHS, when she is assigned

23   to a shelter, her getting a single room are extremely small.

24          I will also say that DHS often places -- the

25   assignments of the rooms is not totally within DHS' control.

1    We do control the assignment of people coming in to shelters.

2    Some of the shelters are operated by DHS employees.  I don't

3    know if any of those have single rooms but there are

4    certainly -- I think a majority of the shelters for single

5    adults are run through non-profit contractors and while those

6    non-profit contractors are obligated to take the people we send

7    to them and house them, I don't believe we go to the point of

8    telling them what room to assign their clients to.

9           So, there is a series of issues there but I think the

10   reality of -- I think she should go and apply and present

11   herself to DHS and say she wants a homeless process.  She is,

12   from what I saw in the papers she attached to it a letter from

13   a doctor, we have a process within DHS for evaluating requests

14   for reasonable accommodations.  It would be evaluated through

15   that and I think that procedure should be followed.  But, I

16   think at the end of the day I don't have a lot of hope that

17   they would in fact assign her to single room.  It is not

18   impossible, but I think it is highly unlikely.

19          THE COURT:  So, Ms. Barker, have you gone to DHS, the

20   Department of Homeless Services?

21          MS. BARKER:  I have actually spoke to Alana who works

22   with them in respect to placement.

23          THE COURT:  Have you actually gone and made the

24   application and included the doctor's letter?

25          MS. BARKER:  I haven't physically went to the

J3R5barC                    conference

1  location.  Being -- because of my medical issue I just came out

2  of a dangerous situation with, from their placement into where

3  I'm at -- where I was at a few weeks ago.

4            THE COURT:  I'm sorry.

5            MS. BARKER:  I was put into a dangerous situation

6  because of the DHS company and I am just coming out of that

7  right now.  I have spoken with --

8            MR. ROBERTS:  I'm sorry, your Honor.  We are having a

9  hard time hearing Ms. Barker.  If she can speak a little closer

10  to the microphone?

11            THE COURT:  Right.

12            Ms. Lopez, you are not helping Ms. Barker.

13            MS. BARKER:  So, they were aware of my medical

14  conditions through Alana and my lawyer, as well.

15            THE COURT:  You have a lawyer?

16            (pause)

17            THE COURT:  Ms. Barker?

18            MS. BARKER:  Yes; his name is Carmen Giordano.

19            THE COURT:  Ms. Lopez cannot answer these questions

20  for you.

21            MS. BARKER:  Correct.  But Alana works for the City.

22  I have also spoke to Brenda Bennett as well, who is head of the

23  mental health division for the organization as well.

24            THE COURT:  Where is your lawyer?  I mean is it a --

25            MS. BARKER:  He is on vacation.

J3R5barC                           conference

1          THE COURT:  And what did he do for you?  Who did he

2     represent you before?

3          MS. BARKER:  He sent a letter on my behalf to the DOH

4     as well as DHS.

5          THE COURT:  What's his last name.

6          MS. BARKER:  Giordano.

7          THE COURT:  Could you spell that for us?

8          MS. BARKER:  Hold on, please.  G-I-O-R-D-A-N-O.

9          THE COURT:  Have you contacted him in connection with

10     your application for temporary restraining order -- now, look.

11     I said that Ms. Lopez can sit with you but what you are doing

12     is you are having Ms. Lopez answer all of these questions for

13     you, even though --

14          MS. BARKER:  That's not --

15          THE COURT:  They're questions based upon your

16     knowledge or lack of knowledge.

17          I realize that Ms. Lopez has another case.  The

18     current case is not about Ms. Lopez; it's about you,

19     Ms. Barker.  So, you can't just be conveying what Ms. Lopez

20     wants you to say.  I'm asking you questions about your case.

21          MS. BARKER:  Right.

22          THE COURT:  So.

23          MS. BARKER:  Correct.  I'm sorry.  It's been a big

24     traumatic situation for me where she is helping me just clearly

25     put everything together, not -- they're all factual, just being

1    clarified in conjunction to how everything went.  It's been a

2    lot of very difficult few weeks at this moment, actually a full

3    year, to be honest.  And so, being placed into -- back into the

4    shelter system the way that they want me to be placed into the

5    shelter system would be a bit traumatic for me.

6              So, she is just trying to clarify things for me while

7    talking to you.

8              THE COURT:  Have you been in touch with your lawyer

9    about your --

10             MS. BARKER:  Yes.

11             THE COURT:  -- about this application?

12             MS. BARKER:  Yes.  About this application that I have

13   put in?  No.  I became homeless while he has been on vacation.

14             THE COURT:  He must have a telephone number that you

15   can call him.

16             MS. BARKER:  I have left a message for him but I am --

17   I am -- I filed this on Friday while being on the streets and I

18   have been on the streets for a good few -- a good week and some

19   while he has been on vacation, so he is unreachable at this

20   moment.

21             THE COURT:  It's difficult for me to understand the

22   circumstances of your application.  You have been, at various

23   times, represented by a lawyer.  You explained to me that you

24   are now not in a shelter.  You are concerned about what the DHS

25   would give you if you go to DHS and present them with your

J3R5barC                          conference

1  doctor's letter but I'm limited in what I could do for you when

2  you don't go to DHS and get an adverse decision from DHS on

3  your application for a single room, particularly when your

4  lawyer could make the application and explain to DHS why you

5  need a single room.

6       What was the lawyer doing for you before he went on

7  vacation?

8       MS. BARKER:  He presented letters to the correct

9  people about where I should be placed in a safe environment

10 coming out of a dangerous environment.

11      THE COURT:  Who did he present the letter to?

12      MS. BARKER:  Mr. Roberts.

13      THE COURT:  Who?

14      MR. ROBERTS:  I think she is speaking of me.

15      I have not received any letter from Mr. Giordano.  I

16 did talk to him about two or three weeks ago with regard to

17 Ms. Lopez, but I have not received any letters from him or any

18 communications from him concerning Ms. Barker.

19      THE COURT:  One problem I am having, Ms. Barker, is

20 that you seem to be relaying what Ms. Lopez wants to say about

21 whatever case she has.  Are you sure that Mr. Giordano

22 represents you and not just Ms. Lopez?

23      MS. BARKER:  Oh he also represents me as well.

24      MS. LOPEZ:  And, your Honor, he doesn't represent me.

25 My apologies, he does not represent me.

J3R5barC                         conference

1          THE COURT:  Ms. Lopez, Mr. Parks, says Mr. Giordano

2    doesn't represent her.  Has his correspondence with you been on

3    behalf of Mr. Lopez?

4          MS. LOPEZ:  We do not have a retainer, your Honor.

5          THE COURT:  Are you there, Mr. Parks?

6          MR. ROBERTS:  Sorry, your Honor; it is Tom Roberts.

7          THE COURT:  I'm sorry.

8          MR. ROBERTS:  Not a problem.

9          I had a phone conversation with Mr. Giordano two or

10   three weeks ago in Ms. Lopez' case.  Magistrate Judge Wang has

11   scheduled a settlement conference and there was an effort to

12   find counsel for Ms. Lopez and Mr. Giordano called me saying

13   that he was considering that.

14         For what it is worth recently in that case, some law

15   students in Seton Hall were assigned to represent Ms. Lopez and

16   I had not heard further from Mr. Giordano so I didn't think he

17   was going do it.  But, maybe he will do it.  But I'm not --

18   Mr. Giordano has in no way communicated with me concerning

19   Ms. Barker.

20         THE COURT:  Is Mr. Giordano, does he have a law firm

21   or is he by himself?

22         MS. BARKER:  He has a law firm, he --

23         MR. ROBERTS:  I'm at Mr. Pines' desk at the moment.  I

24   exchanged e-mails with him and I could -- I'm afraid I would

25   have to walk back to my office, it would take two or three

J3R5barC                         conference

1    minutes to see what association, whether he is on his own.  I

2    apologize, I don't remember.  I didn't Google him to see

3    whether he was with a firm.

4              THE COURT:  Okay.  I am going to let you do that in

5    just a moment but can you tell me what the status of Ms. Lopez'

6    case is?

7              MR. ROBERTS:  So, Ms. Lopez' case is before Judge

8    Caproni and with Magistrate Judge Wang handling much of the

9    preliminaries, there is a telephone call scheduled with a

10   magistrate for September 17th -- sorry, April 17th, to I

11   believe coordinate before, there is a settlement discussion

12   which will probably take place at the end of April, early May.

13   I don't think we picked a date yet.

14             For the defendants -- there are a variety of

15   defendants, DHS is a defendant, the shelter, two shelter

16   operators where Ms. Lopez was assigned are also defendants, as

17   well as a security company that was -- the contractor of one of

18   the those shelter negotiators.

19             Most of the defendants have answered, the City has

20   answered, one of the shelter operators made a motion to dismiss

21   that is pending but everybody else has answered.  Discovery has

22   not yet begun.  I think there is also, for what it is worth, a

23   preliminary injunction motion.  Ms. Lopez made several

24   applications for TROs before Judge Caproni which were denied

25   and then there is a preliminary injunction motion which has

J3R5barC                          conference

1    been fully briefed and is pending before Judge Caproni and has

2    not been decided.

3            I think that's a complete statement of the status of

4    the case.

5            THE COURT:  And what are the allegations that

6    Ms. Lopez makes in her case?

7            MS. LOPEZ:  Your Honor?

8            MR. ROBERTS:  They're quite similar to the allegations

9    that are made in Ms. Barker's case.  There are probably some

10   additional ones but essentially an argument that she -- her --

11   that the ADA requires a reasonable accommodation of a single

12   room, that that's also made under various constitutional and

13   State and City Civil Human Rights Laws contentions, and then

14   there is various contentions with regard to the security,

15   essentially the security officers and some of the -- one of the

16   shelter operators called Project Renewal that they, I think

17   there is some sexual assault charges and other sort of tort

18   claims that they, while she was in residence, that she was

19   mistreated by them.

20           THE COURT:  Okay.  And in that case is Ms. Lopez, at

21   the moment, represented?  The case was being looked at by the

22   clinic at Seton Hall to represent her?

23           MS. LOPEZ:  Yes, your Honor.

24           MR. ROBERTS:  I don't know if they've made a notice of

25   appearance but there was an he e-mail exchange with Magistrate

J3R5barC                      conference

1   Judge Wang's chambers where they were agreeing to appear for

2   the settlement negotiation.  My understanding would be that it

3   was a limited appointment just for the settlement but I'm not

4   that -- I don't really know the details of that, but that's my

5   understanding of it.

6             THE COURT:  Okay.  Okay.

7             MR. ROBERTS:  For what it is worth, in Ms. Lopez' case

8   we have the, DHS has assigned her to the Park Slope Women's

9   Armory which she has declined to go to for now over a year and

10  a half because she contends that she cannot sleep in a communal

11  area with other people and that also she requires a private

12  place for medical procedures.

13            THE COURT:  Okay.

14            MR. ROBERTS:  Which are quite parallel to Ms. Barker's

15  contentions.

16            THE COURT:  Okay.

17            Ms. Lopez, are you being represented in your case?

18            MS. LOPEZ:  First of all, I just want to say thank

19  you, your Honor, for just letting me address factual stuff.

20            THE COURT:  Sure.

21            MS. LOPEZ:  No, I am not.

22            I do take issue though, your Honor, without trying at

23  all to chide the Court, but as a pro se litigant I take issue

24  with, especially when the opposition is the government, the

25  Court defers somehow to the government for facts that, about my

J3R5barC                        conference

1    case, that I could have answered.  I am quite proficient in

2    procedure and I could have answered everything Mr. Roberts

3    answered you factually, just without the tilt.

4           So, I would like to just update you and say I'm not

5    represented by the students at Seton Hall.  We have an

6    agreement to meet on Friday morning to discuss this and I just

7    want to get the big pink elephant out the room or address it.

8           I am not at all attempting to somehow orchestrate a

9    complementary lawsuit from another person as strategy.

10   Ms. Barker, as I'm indicating in a letter, your Honor, that I'm

11   going to file with Magistrate Wang as soon as we leave -- and I

12   have got a copy for the Court if you would like to see --

13   Ms. Barker contacted me out of the blue because I am an

14   activist and advocate, three, four weeks ago because she was in

15   a circumstance where she was going to become homeless.  I then

16   reached out to Carmen Giordano and asked him to help her.

17   Because Carmen could be helping her it became apparent that

18   maybe he should represent both of us.  And she has congestive

19   heart failure so I figured she needed the lawyer to send a

20   notice to cure more than I needed a lawyer for settlement.

21   That's how Mr. Giordano got involved.  Mr. Giordano sent notice

22   to cure, sent me a copy, said we will wait and see.  Ms. Barker

23   went into a respite.  The reason I know this, your Honor, is

24   because I ran a transgender non-profit call STAR so this is not

25   just me freelancing, we field emergencies.

J3R5barC                          conference

1        I assigned a staff to work with Ms. Barker to advocate

2   to DHS and the defense for an accommodation.  So, this is where

3   I am going say they have been duly notified and if there is an

4   issue of fact that Mr. Roberts wants to bring up, we don't

5   know, there were no e-mails, agents of the City are fully

6   unaware, that's an issue of fact we can have at a hearing.

7        They were made aware, Mr. Giordano was aware that they

8   had received this letter.  Ms. Barker went -- and not to

9   confuse you -- in a respite that is temporary, run also by the

10  City but outside of DHS.  When she went in this respite, I was

11  hoping someone would call her and maybe have a bed.

12  Mr. Giordano then -- and if your Honor likes I could furnish

13  the e-mail -- without me knowing, says Mariah, by the way I'm

14  going on vacation at the end of next week.  I e-mailed him and

15  say uh-oh, what happens when Ms. Barker becomes homeless while

16  you're away?  Him and I missed each other in an exchange to try

17  to talk about what to do.  Ms. Barker presented to me street

18  homeless last week and I did not know what to do.

19       So, your Honor, to be completely honest, I considered

20  and might still when I leave here, filing a motion under U.S.C.

21  23 in my case to potentially ask for class certification.

22  Before anyone even says you can't do that you're a pro se

23  litigant, that's not necessarily clear.  What is clear I, in my

24  case, might have a lawyer as of Friday morning that could help

25  Ms. Barker.

J3R5barC                    conference

1        I also just, you know, just me not wanting to run in

2  here and act like a lawyer, I told the lawyers from Seton Hall

3  you guys might want to come in for Akasha tomorrow because she

4  has a hearing.  It was last minute and they couldn't do that.

5        So, clearing up those facts.

6        In terms of our case, I want to be very clear to you.

7  I have been granted TROs as much as I have been denied them and

8  the parallels in our cases are abundant but there were some

9  issues unique to Akasha that I think made her situation more

10  urgent.

11        And, just in terms of Mr. Roberts not accurately

12  stating the posture of the case, your Honor, I am actually

13  technically winning.  We were in discovery on February 6th --

14  I'm an activist.  At a hearing, the Court stayed discovery

15  because I had been arrested and a phone taken.  Magistrate Wang

16  said I'm going to stay discovery until you get your phone back

17  because you say you can't function in this case.  Your Honor,

18  some of the evidence from the shelter is physically on the

19  phone so Magistrate Wang stayed discovery.

20        So, as your Honor will be aware anyway, I don't even

21  have to accept the help from the Seton Hall students, if I

22  want.  I am actually filing the motion for the Judge to lift

23  the stay on discovery regardless of the Seton Hall students'

24  representation because I have the right to discovery.

25        And again just to categorize, to be fair, I'm winning

1   against the City.  I have survived motions to dismiss.  The TRO

2   he is referring to is related to the fact that in December I

3   was contacted by a law enforcement entity looking to make an

4   arrest on someone who had sexually assaulted me that made me

5   being street homeless a little more dangerous.  I filed a TRO

6   in front of Judge Caproni asking her to consider irreparable

7   harm or the irreparable harm I could face coming from the

8   danger of the defendant in that criminal case.  So, I was

9   sexually assaulted, the DA wants to arrest the person.  That's

10  the nature of that TRO so I am giving you that.

11          So, I'm not a person that filed a bunch of frivolous

12  TROs.  For your information, your Honor, I met with the ADA on

13  Monday, ADA Lynda Weinman who has been waiting in that case,

14  waiting for her case to see if Judge Caproni rules on my motion

15  because -- and Mr. Roberts is on the phone, your Honor, you can

16  ask him this.  The ADA in Special Victims has told Mr. Roberts

17  that if she made an arrest I would be in danger.  That was all

18  the way back in December, just to contextualize my TRO.  I

19  don't file frivolous TROs, there was a need for me to go into a

20  shelter system and maybe get domestic violence services that

21  DHS was unwilling to provide.

22          The last thing I want to bring up is that I also

23  didn't just leap to Ms. Barker's aid.  Her name came up in the

24  context of an emergency TRO hearing last year involving WIN

25  West who has not been named as defendants but Ms. Barker could

J3R5barC                    conference

1    eventually name them.

2            I brought the transcript from the hearing in front of

3    Judge Caproni just to prove this wasn't us sort of huddling as

4    trans people saying, *What are we going to do?*  Akasha's name

5    was brought up originally in a TRO hearing because they were

6    trying to transfer me to the facility that she has now claimed

7    was harmful to her.  So, there is a transcript here just --

8            THE COURT:  What happened to that TRO?

9            MS. LOPEZ:  She wouldn't come and it was denied, your

10   Honor.  I will admit it, but with her here sitting here there

11   was a situation where Judge Caproni said where is this other

12   person?  Do you have another person saying she was abused at

13   WIN West?  And I called Akasha and she said, yes, this happened

14   to me but, no, I can't help because I'm scared of retaliation.

15           And with that, I'm going to be quiet so now you may

16   see sort of the circular nature of this.  I didn't expect her

17   to call me three weeks ago.  I'm winning my case.  I'm

18   barreling toward settlement.  And, just to end that, I'm not

19   asking for a bunch of money, I'm asking for them to open more

20   shelters for trans people which is ironic.  So, either way, the

21   City is resisting placing her properly now which could lead to

22   irreparable harm -- I don't have to justify failure and I was

23   granted an original TRO just like she is applying for for less

24   than she has.

25           So, Mr. Roberts is sort of trying to, I think,

J3R5barC                          conference

1   dissuade the Court in granting her TRO to try to paint a

2   picture as if we are frivolous litigants coming in every couple

3   of months and filing TRO.  No.  My original TRO was granted by

4   Judge Caproni because there was an issue of a service dog.  She

5   has a bad paw, your Honor, that's why she is not here, your

6   Honor.  That was two years ago, she is getting old.  But, when

7   Judge Caproni allowed the dog in, I had my own room.  Issues at

8   the shelter caused them to try to transfer me.  I filed an

9   Article 78 to block it which was granted -- he didn't tell you

10  that -- Judge Jaffee in Supreme Court granted a TRO in 2017

11  blocking the transfer.  The rest of that spring they spent

12  trying to get me transferred to the WIN facility where she was.

13  When he learned that she was there, your Honor, knowing her for

14  20 years -- her, myself, other trans people compared notes.

15  Everyone had been attacked.

16          So, that's the context of how she was brought into the

17  TRO hearing and literally I lost because she didn't show up.

18  That's probably why I lost.

19          THE COURT:  Ms. Barker, Ms. Lopez says you have a

20  lawyer Mr. Giordano.  Mr. Giordano is welcome to submit any

21  papers.  How long is he going to be away on vacation?

22          MS. LOPEZ:  I think it was two more weeks, I think he

23  said a month and it was planned in advance, so.  And I think it

24  is overseas to make it worse, your Honor.

25          THE COURT:  When did he say --

J3R5barC                          conference

1        MS. LOPEZ:  Friday last it was --

2        MS. BARKER:  Yes, it was Friday.

3        MS. LOPEZ:  It is three more weeks, it is the Friday

4   before so he had already been on vacation a week, your Honor,

5   with us trying everything but to file a lawsuit.

6        MS. BARKER:  Before I went into the respite.

7        THE COURT:  Do you have the contact information for

8   Mr. Giordano.

9        MS. LOPEZ:  Overseas or locally, your Honor?  You mean

10  now.yes, your Honor, I could -- I mean, his office I think is

11  devoid of him itself.

12       THE COURT:  What is it?

13       MS. LOPEZ:  I didn't memorize it, your Honor.  It is

14  in my phone.  New York County.  I believe his office on West or

15  East 121st Street, that I am certain, in the village of Harlem.

16       THE COURT:  Mr. Parker, can you get the contact

17  information for Mr. Giordano?  We will wait.

18       MR. ROBERTS:  I will be back in a minute, your Honor,

19  but it will take me -- it will probably be three minutes but I

20  will be back.

21       MS. LOPEZ:  Your Honor, it might be possible for me to

22  go downstairs --

23       THE COURT:  Please, keep your voice up.

24       MS. LOPEZ:  I could potentially get the letter, the

25  notice to cure if the Court is pleased, because I think that if

J3R5barC                    conference

1    I looked up the e-mail that Mr. Giordano sent me, it would also

2    have the forwarded information for who in the law department

3    received that letter, which is really important if the City is

4    going to try to say they were unaware of her medical

5    conditions.

6            The federal law section that she is using to try to

7    file this TRO says that, you know, if you can't go through the

8    normal avenue as well as a lawyer sending a letter to the City

9    and then receiving it, an official account, a notice to cure --

10           THE COURT:  I'm sorry.  What is the letter?

11           MS. LOPEZ:  The notice to cure and sort of putting

12   them on notice about her reasonable accommodations.  There is

13   elective remedies here.  People don't always have to fill out

14   their form and do it their way.  That came up in my case as

15   well.

16           THE COURT:  And that letter was sent by Mr. Giordano?

17           MS. LOPEZ:  Yes; at least two weeks ago.

18           THE COURT:  Sure.  If you have a copy of that

19   letter --

20           MS. LOPEZ:  What I mean is I would have to go past

21   security and get my phone, but this is important and

22   Ms. Barker's health, I would be willing to do so.

23           THE COURT:  Okay.  We will take a 10-minute break

24   while you get the letter.

25           MS. LOPEZ:  Thank you, your Honor.  I appreciate that.

J3R5barC                          conference

1              THE COURT:  Okay.  We will take a 10-minute break.

2              MR. ROBERTS:  Okay.

3              (Recess)

4              THE COURT:  Please, be seated.

5              So, Ms. Lopez, do you have that letter?

6              MS. LOPEZ:  So, I do.  I have to get a way to get it

7    to the official court e-mail.  I wasn't able to print it, I had

8    no means to do that.  I didn't know if the Court thought I was

9    going to be able to print it.  I appreciate the order about the

10   phone so I have access to it and I can work with the Clerk and

11   Court to get you --

12             THE COURT:  Mr. Fletcher can get it printed out, I

13   think.

14             THE DEPUTY CLERK:  Waiting for the instructions as to

15   what to do.

16             THE COURT:  Can you access the e-mail so that it gets

17   printed out?

18             MS. LOPEZ:  Sure, and I'm going to -- may I write down

19   your e-mail first and I will just forward it?

20             THE DEPUTY CLERK:  D-O-N-N-I-E underscore Fletcher,

21   F-L-E-T-C-H-E-R at nysd.uscourts.gov.

22             MS. LOPEZ:  And, your Honor, just for clarity, when I

23   went downstairs to recall this document it came to my attention

24   that just for the purposes of I think this Court trying to

25   figure out when the City was informed of Ms. Akasha's needs,

J3R5barC                    conference

1   there is actually a preceding e-mail that was sent to

2   Mr. Roberts on Akasha's behalf by myself including, cc-ing

3   Alana Redfield.  And, if it hasn't been described, Alana

4   Redfield is LGBT liaison, Alana's sole role is to help navigate

5   these situations.

6          So, I'm also going to forward the e-mail Mr. Roberts

7   got about Ms. Barker's case.

8          THE COURT:  Okay.

9          MS. LOPEZ:  I will send that right now.

10         MR. ROBERTS:  Your Honor, I did receive an e-mail from

11  Ms. Lopez concerning Ms. Barker.  I just didn't receive a

12  letter from Mr. Giordano.  If you would like Mr. Giordano's

13  contact information I now have it.

14         MS. LOPEZ:  I have it as well.

15         THE COURT:  Okay.  What is it?

16         MR. ROBERTS:  So, his name is Carmen Jack Giordano.

17  He identifies himself as principal attorney, Giordano Law

18  Offices, PLLC.

19         Do you want his e-mail address?

20         THE COURT:  Well, we have the printout now from his

21  letter to Ms. McAlpin.

22         MR. ROBERTS:  226 Lenox Avenue?

23         THE COURT:  Right.

24         MR. ROBERTS:  Okay, then you have got it.

25         THE COURT:  Dear Ms. McAlpin, my office has been

J3R5barC                              conference

1    retained by Ms. Barker regarding the ongoing problems and

2    damages she has endured since being placed in your living

3    facility.  First and foremost, your facility managers have

4    mistakenly and rather outrageously housed a biological male

5    with Ms. Barker, a transgender female.  As a result, Ms. Barker

6    has been subjected to ongoing sexual harassment, threats of

7    violence, and unwanted advances.  Additionally, Ms. Barker has

8    enumerated several problems including loss and destruction of

9    her personal property due to lack of security in your facility.

10            Unless these problems are addressed immediately, we

11   will consider all appropriate courses of action, including

12   litigation.  Kindly contact our office to discuss further.  If

13   we do not hear from you, we will proceed accordingly.  Giordano

14   Law Offices, PLLC, by Carmen Jack Giordano.

15            THE COURT:  Who is Ms. McAlpin?

16            MS. BARKER:  The contract agency.

17            THE COURT:  The contact?

18            MS. BARKER:  The contracted agency.

19            THE COURT:  Contracted agency?

20            MS. BARKER:  Uh-huh.

21            THE COURT:  What's the agency that we are talking

22   about?

23            MS. BARKER:  St. Joseph's/St. Vincent's Supportive

24   Housing.

25            THE COURT:  St. Joseph's/St. Vincent's.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MS. BARKER:  Supportive Housing; yes.

2          THE COURT:  Okay.

3          And there was a prior notification to the City.

4          MS. BARKER:  Yes.

5          MR. ROBERTS:  Your Honor, when I received that

6   notification I contacted DHS and their response was that

7   St. Joseph's is not a DHS agency, this is not a -- as I

8   understand it, she was placed at an SRO that DHS does not run

9   so those problems are not within the control of the City.  If

10  there was a private contractor who was making bad room

11  assignments, the issue should be brought up with the private

12  contractor.  And I don't know whether either person did say

13  they have a contract with the City.  All I understand is that

14  hoof --

15         MS. BARKER:  They did.

16         MR. ROBERTS:  They have -- they run SROs and that

17  Ms. Barker was at that SRO.

18         THE COURT:  SRO being?

19         MR. ROBERTS:  "Single room occupancy" is the way I am

20  using it.  That's what I understand it to be.

21         MS. BARKER:  It is a supportive housing program --

22         THE COURT:  No, stop.  Hold on.

23         MR. ROBERTS:  It was, as I understood it, some private

24  organization non-profit that was running the housing where she

25  was located, not a DHS facility and not a DHS contractor; that

J3R5barC                         conference

1     this was something that I was told was arranged through WIN

2     West which is another non-profit that does housing issues.

3     They run some shelters but they also run housing.

4              I believe, now I am getting this third-hand, but I

5     believe that WIN West referred Ms. Barker to

6     St. Joseph's/St. Vincent's but that St. Joseph's/St. Vincent's

7     matter is not within the City's control.

8              THE COURT:  Hold on one moment.

9              Okay.  So, I have just been given the e-mail from

10    Mr. Roberts to Ms. Lopez, various other people.

11             MR. ROBERTS:  I'm sorry.  What e-mail did I send

12    Ms. Lopez?

13             THE COURT:  Well, this is from Ms. Lopez to you dated

14    March 3, 2019.  I have received the transcript.  I am sending

15    this e-mail to all the defendants as a group.  One of these

16    individuals is Akasha Barker.  She had issues during the summer

17    of 2017.  All details in Ms. Barker's case pointed to such

18    legal policy theater.  Ms. Barker sought the plaintiff's help

19    as a well-known activist.  She is housed in supporting housing

20    with St. Joseph's/St. Vincent's in the Bronx.  She states that

21    there have been ongoing instances of violence and so she

22    complains also about the placement with a male-identified

23    individual.  And then you send a copy -- you, Mr. Roberts, sent

24    a copy of the transcript of the proceeding that occurred on

25    February 6.

1        MR. ROBERTS:  Your Honor?

2        THE COURT:  Yes.

3        MR. ROBERTS:  I don't know that it is relevant but,

4   your Honor, when I received Ms. Lopez' e-mail, I forwarded it

5   to my contact at DHS who advised me that St. Joseph's was not

6   within their responsibility but that they had forwarded the

7   same information to the St. Joseph's people to make sure that,

8   well, for St. Joseph's people to do whatever they felt was

9   appropriate.

10        That's really all I know about it.

11        THE COURT:  All right.  Several things are clear to me

12   from the current situation.

13        Ms. Barker has brought her lawsuit against the City of

14   New York DHS and HRA.  The lawsuit was filed on March 21st.  It

15   first came to my attention yesterday.  I believe it was

16   yesterday, along with the request for the TRO that had been

17   filed at the time that the lawsuit was brought.  Included with

18   the paper was the doctor's letter dated March 21, which talked

19   about the medical necessity of putting Ms. Barker in a room

20   without other people.  It appears that the facility that

21   Ms. Barker has been at where she has had problems was not,

22   itself, a DHS facility, or so the City alleges.

23        It would be useful.  I do not have enough information

24   at the moment to grant a TRO.  The facility that the plaintiff

25   has been at is not, on the representations of the defendant at

J3R5barC                              conference

1    this point, a DHS facility.  The plaintiff hasn't provided the

2    information to DHS and including the doctor's letter and asked

3    for a single room, even though the defendant says that's

4    unlikely to be granted, at least it is something that should be

5    done.

6              The plaintiff has been raising problems over a

7    substantial period of time.  In her complaint she talks about

8    situations that have been going on for years and most recently

9    a situation that has been going on for weeks.  In the last she

10   talks about what has been happening in the last seven weeks.

11             A TRO is issued for, at most, 14 days with the ability

12   to continue it for another 14 days until a preliminary

13   injunction is, can be decided.  So, I don't have and couldn't

14   on these papers, grant a temporary restraining order.  On the

15   other hand, I remain open to that issue.

16             Mr. Giordano made it clear in his letter that he

17   represents the plaintiff in connection with these issues.  What

18   I will do is to issue an order and make sure that it is

19   e-mailed to Mr. Giordano because he provides an e-mail address,

20   explaining that the plaintiff has filed a lawsuit and a request

21   for a TRO and asking that he submit papers as soon as possible

22   in support of the plaintiff's position, or make it clear that

23   he is not representing the plaintiff in connection with this

24   case.

25             I would also ask for any other papers in support or in

J3R5barC                          conference

1   opposition to the temporary restraining order -- the request

2   for the temporary restraining order, by this coming Monday, or

3   sooner if the plaintiff believes that she can make another

4   showing before Monday, April 1.  But, in any event, I want

5   papers by the City by Monday, April 1, and I will have another

6   conference on Tuesday, April 2, at 2:30 p.m.

7        I also have a final request which is the parties have

8   told me that there were, you know, there is a settlement

9   discussion with the magistrate judge in the Lopez case.  That's

10  fine, but the City should inquire of HRA whether, about the

11  availability of the possibility of a settlement of this case by

12  providing the plaintiff in some facility with a single room,

13  whether it be an HRA-run facility or a contract facility.

14       And if there is another possibility of settling the

15  case, the parties are welcome to -- well, it's difficult to,

16  for the defendant to talk to the plaintiff because the

17  plaintiff says she's represented by Mr. Giordano and the

18  defendant should only talk to the plaintiff through her counsel

19  so the defendant should reach out to Mr. Giordano,

20  independently of everything that I have said, to see if there

21  is some resolution that the plaintiff can have with HRA that

22  can resolve this case.

23       Is all of that clear?  Yes?

24       MR. ROBERTS:  Yes, your Honor.  Just so -- it is DHS

25  rather than HRA, but yes.

J3R5barC                         conference

1           THE COURT:  Okay.

2           MR. ROBERTS:  That's a quibble.

3           THE COURT:  Isn't there another City agency that deals

4    with this besides DHS?  Ms. Lopez is shaking her head no.

5           MR. ROBERTS:  I'm not aware of -- HRA, in general,

6    does public assistance in financial matters and doesn't, as I

7    understand it, does not deal directly with homeless in the city

8    issues, but I will ask further.  I don't believe there is but I

9    will explore that.

10          THE COURT:  What does APS do?  Adult Protective

11   Services?

12          MS. LOPEZ:  That's an option.

13          MR. PINES:  Your Honor, Adult Protective Services

14   provides for adults who have been adjudicated, who lack

15   capacity.

16          THE COURT:  Okay.

17          MR. PINES:  But I think those are in residence, I

18   don't think they provide residence itself.

19          THE COURT:  Okay.  Any other suggestions from the

20   plaintiff or Ms. Lopez?

21          MS. LOPEZ:  Yes, your Honor.

22          I just want to say, your Honor, that Ms. Barker and I,

23   we just want to be housed and we aren't actually trying to have

24   big fancy lawsuits in front of Article III judges and I would

25   say, also, I believe that there are some moving -- there are

J3R5barC                          conference

1   some changes that have occurred since my case even was filed in

2   this state that just make the City's position of we simply have

3   no single rooms just unsustainable.

4            GENDA was passed in our state and part of GENDA's

5   wording says that no entity, private or governmental, can limit

6   our expression as trans people.  So, whether Ms. Barker has

7   included this expressly, I am working very hard with

8   Mr. Roberts just to try to reach a settlement and not be in

9   court but in the vein and spirit of GENDA, me and Ms. Barker

10  respectively, I think, as trans people, just ask everyone to

11  sort of bear with us as trans people.  We sort of enter into

12  new territory on our rights as well.  I have already explained

13  to Mr. Roberts that I believed that even though I had existing

14  federal litigation that it would be possible to fold in new

15  violations of refusal to place transgender people into that

16  lawsuit under GENDA and I am just saying that I am willing to

17  help Ms. Akasha Barker in any way as an advocate that this just

18  hits close to home.

19           So, I will do my best to ask the Seton Hall students

20  if they're interested in, you know, potentially expediting our

21  case in a way that helps Ms. Barker.  So, for instance, if we

22  go in front of our judge and magistrate and a settlement stip

23  is new beds for transgender people, obviously that would

24  resolve Ms. Barker's conundrum as well.

25           But, one thing I don't think your Honor knows about

1    me, and I have held it back, I didn't want to seem pompous, I

2    have three landmark cases under my belt as a trans litigant,

3    literally set the bar for trans rights and the first case, Joel

4    A. v. Giuliani, was a class action prohibited by Marisol

5    settled in a way that I'm trying to settle this, my case, which

6    was, okay, in '98 there was only one facility for gay kids,

7    just like now, there is only one facility for trans, and the

8    argument from ACS at the time was we do what we want with our

9    kids, they're fine.  ACS would never put a gay or trans kid in

10   a non-gay or trans facility now and I have asked Mr. Roberts

11   for over a year, before Ms. Barker even approached me recently,

12   can you just help open a new facility and can we get sort of a

13   universal multi-faceted settlement.  If your Honor is not

14   aware, in the Joy case most of the settlement meat was policy

15   change.  We got $15,000 as young people.  The other two cases,

16   if your Honor will entertain, are where I really stretched my

17   legs as a trans litigant and that's why I am sort of relying on

18   my gut telling me, just like in those two cases which were

19   landmark, Jane Doe v. Bell, the State Court ruled that trans

20   people were protected under New York Human Rights Law as

21   disabled, and Lopez v. Mattingly, which was reversed by the

22   First Department eventually on technicality but the spirit of

23   the case was that the government needed to cover medical care

24   for trans people including surgeries and now all of Medicaid

25   pays for surgeries for trans people.

J3R5barC                       conference

1           So I have sort of been down this path before and I'm

2   familiar with the sort of ingredients, it looked very familiar

3   before, the City law department taking a staunch position, it

4   not really being consistent where we are as a society

5   medically.

6           So, I'm just really trying to help Ms. Barker in her

7   like day-to-day life but also, you know, do what I do as an

8   activist.

9           THE COURT:  Well, the federal courts, as well as the

10  state courts, are always attentive to the rights that people

11  have, as well as to the well-being of the litigants who appear

12  before them and if a case can be settled in a way that is

13  helpful to the litigants, that's great.

14          MS. LOPEZ:  Yes.

15          THE COURT:  Okay.  Well, I have set up a schedule and

16  I will also include, in the e-mail that I send out, the two

17  documents that were submitted today.

18          Is there anything else?

19          MS. LOPEZ:  Would you like a copy of the letter I'm

20  going to file with Magistrate Judge Wang just relating to the

21  settlement and how this -- I am informing of what happened here

22  but --

23          THE COURT:  No.  I don't want to --

24          MS. LOPEZ:  Sure.

25          THE COURT:  -- get the documents from the other case,

1    at least at the moment.

2            MS. LOPEZ:  Yes, your Honor.

3            THE COURT:  You're welcome to ask Magistrate Judge

4    Wang if she wants to settle this case but I doubt that she

5    would --

6            MS. LOPEZ:  I'm going to file motion for class

7    certification actually, your Honor.

8            THE COURT:  The magistrate judge appointed in this

9    case is Magistrate Judge Cott.

10           MS. LOPEZ:  Okay.

11           THE COURT:  C-O-T-T, who is a wonderful and long

12   serving Magistrate Judge.  Okay?

13           MS. LOPEZ:  Thank you, your Honor.

14           THE COURT:  All right.  Well, I will be seeing you all

15   next week and I wish you all well.

16           Again, Mr. Roberts, if you can, you should inquire

17   from -- you have all the documents or will have all the

18   documents including the doctor's letter and inquire of DHS

19   about a room for the plaintiff.  Yes?

20           MR. ROBERTS:  I hear you, your Honor.  I will inquire.

21           THE COURT:  Do more than inquire because it would

22   presumably resolve this case and I'm sure that if I thought

23   under the law I should require it, I'm sure that DHS would come

24   up with a room.  Right?  Right.

25           MR. ROBERTS:  We tend to comply with Court orders,

J3R5barC                        conference

1    your Honor.  Yes, sir.

2              THE COURT:  Okay.  Have a good day.

3              MS. LOPEZ:  Thank you, your Honor.

4              MS. BARKER:  Thank you.

5              MR. ROBERTS:  Thank you, your Honor.

6              (Phone line disconnected)

7              THE COURT:  I should ask, we are still on the record.

8    How do we send materials to Ms. Barker?  I mean, I'm going to

9    be issuing an order, I'm going to be sending it to

10   Mr. Giordano, Mr. Giordano should be providing that to

11   Ms. Barker but he hasn't filed a notice of appearance in the

12   case.  Is there any other phone?

13             MS. BARKER:  My e-mail is attached.

14             THE COURT:  I'm sorry?

15             MS. BARKER:  My e-mail is good as well.

16             MS. LOPEZ:  She has been getting e-mail.

17             THE COURT:  Oh.  Yes.

18             MS. LOPEZ:  That's how we knew to come today, she got

19   an e-mail.

20             THE COURT:  What?

21             MS. LOPEZ:  That's how we knew to come today, she got

22   an e-mail.

23             THE COURT:  So Mr. Fletcher has your e-mail?

24             MS. BARKER:  Yes.

25             MS. LOPEZ:  Yes.

J3R5barC                        conference

1         THE COURT:  Okay.  We will send this to your e-mail.

2    We also will order a copy of the transcript and make sure the

3    transcript is sent to both sides.

4         MS. BARKER:  Great.

5         MS. LOPEZ:  And if can you ask that to be forthwith

6    because I would actually use that in the request to magistrate

7    to consider settling the case.

8         THE COURT:  Sure.

9         MS. LOPEZ:  Thank you.  I appreciate that, your Honor.

10   Have a good day, your Honor.

11        THE COURT:  If the reporter can do the transcript by

12   tomorrow?

13        OFFICIAL REPORTER:  Yes, your Honor.

14        THE COURT:  Thank you.

15                            oOo

16

17

18

19

20

21

22

23

24

25