UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE
2019 MAY 28 PM 2:31

Lopez

-v-                                                                 17-cv-3014

NYC Dept of Homeless Services et al

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-28-19

## Plaintiff's Response to WIN West's Motion to Dismiss

**In Response to Defendants WIN/Quinn's claims that Plaintiff named them as Defendants in this case because Plaintiff Quinn did not "lobby" DHS on her behalf for "Trans specific housing she sought":**

Plaintiff was never asking for Defendant Quinn to lobby DHS on her Behalf, rather that WIN comply with the law.

**In Response to Defendants WIN/Quinn claims that Plaintiff was seeking "Trans specific" accommodations:**

Plaintiff did not seek out Trans pacific housing (per se; solely), as a lone accommodation. Plaintiffs needs and accommodations were and continue to be. multi faceted and multi-pronged, and were consistent with protections and conditions covered under State and Federal Law (ADA; Fair Housing Act; NYS Human Rights Law).

Plaintiff requires **A.** a single room, which served a minimum of two purposes; privacy for dilation and as required by Plaintiff's PTSD; in addition to:

**B.** Service Animal, and **C.** Environment with minimal social stressors.
Plaintiffs Trans I.D. and treatment attract social attention in Cis-segregated facilities (Dog; need for single room). Defendants have the ability to create policies that maximize privacy for Trans individuals with

1

medical needs, and also the ability to comply with the law ( and thereby the needs relating to Trans individuals). Policies minimize restrictions on expression and which maximize privacy and comply with the law), are not, the status quo within the NYC homeless and shelter systems. Hence the need for and passage laws such as GENDA on a State level, and newly proposed NYC Council resolutions meant to continue to reform NYC Dept Of Correction and how it houses and treats Trans inmates.

The area of law, policy and adequate accommodation of Trans-related medical needs within publicly funded, Gender segregated facilities, is still evolving. What is clear though, is that society has evolved and as a result, within the democratic and legislative process, citizens across this state and nation are working to improve conditions for and relations with, Trans individuals. Especially as it relates to the need of Trans individuals who are forced to share space and close quarters with Cis individuals.

New ideas, solutions to old problems;, new ways of interpreting the most crucial legal questions about Trans civil rights and the Constitutionality of stifling or limiting Gender expression, are the future.

The Defendants WIN and Quinn would prefer this Court accept their legal arguments, and remain in the past.

Gender segregated facilities which lack certain (pro-treatment) Trans-friendly policies, deprive plaintiff full personal privacy in keeping with medical/mental health needs and Trans identity, and thus such facilities/policies are illegal. *The inability of Trans women to dilate post op can prove catastrophic, as is the case for most post op' instructions.

Lack of a single room also deprives Plaintiff reasonable accommodations under State and Federal Disability law (NYSHRL and the ADA), while also simultaneously creating, or subjecting Plaintiff to, undue social stressors; and increasing the likelihood that the plaintiff would experience uncomfortable questioning, unwanted extra attention and stigmatization by other shelter clients.

Subjecting Trans individuals with documented Gender Dysphoria, to social harassment based on their genitals at birth, is unlawful. Gender segregated environments full such harassment. No one should be subject to constant sex based questioning (like "What genitals do you have?"), mistreatment, linked to one's genitalia at birth, or medical condition.

There are certain groups and classes of individuals who have historically and realistically experienced increased and targeted bias, discrimination, prejudice and violence. This is precisely why there are anti bias crime statutes; New York City and State have laws and precedent establishing Trans individuals as being protected as both Trans individuals per se, as well as enjoying protection as a protected class under Disability provisions within state and local Human Rights Law (Jean Doe v Bell; GENDA)

Locker rooms, dorm settings and other gender segregated facilities are noted within NYC HRL Transgender I.D. amendment, known as Local Law 3, which Defendant Quinn helped author.

This amendment came about when NYC Council was made aware of the high number reports of harassment and even violence directed at Trans persons forced to navigate areas and facilities which are gender segregated; designed before Trans individuals became a protected class and group; locker rooms, dorm settings. But the intention and force of these laws are clear: we (society) are beyond assigning gender related collateral assessments upon Tans individuals. We let Trans individuals determine the basics and parameters of their personal; legal; social; professional and medical treatment. Which, when properly analyzed is equal to what Cis individuals demand and expect. Autonomy; basic respect and consideration (pronouns); privacy and equal protection under the law.

WIN and DHS assertion throughout this case, that it's Cis designed sex segregated facilities, do not pose a heightened risk for harassment and violence of Trans individuals versus facilities designed to be co-ed, or specifically for Trans or GLBTQ populations, is simply untrue. This feigned ignorance well accepted fact and legal precedent by WIN/Quinn is dangerous and is the type of passive aggressive civil rights offense which tends to threaten the progress which Trans individuals have made over the last several decades. True progress depends on enforcement and education of pro Trans laws; the candor of all parties (Cis and Trans alike); honesty, strong ethics and fair morals from all parties (Trans individuals included). None exist within WIN's arguments.

WIN is attempting to make the archaic and outdated arguments which are eerily similar those made by individuals and entities who "choose" ignore racism in the modern day.

WIN would have the Court believe that the agency has no knowledge of Trans individuals who are homeless and at WIN, experiencing harassment because they "stand" out. Or that anti Trans violence at WIN hasn't been an ongoing issue.

This line of defense, converse or literal, is the same as those who defend racism/racist policies, or deny its existence in the modern day (or the need for legislative, social or judicial remedies to correct it), by projecting that their fellow citizens are all "beyond" slavery...and color-blind.

Acting as if the world is color-blind doesn't make it so. Just as positing that Trans individuals in the shelter system (at WIN) "blend in" and do not require protections and accomodations....and don't face harassment linked to their Trans I.D., doesn't make it so.

Trans individuals facing homelessness often avoid shelters all together, choosing to remain in the streets rather than to be forced into gender segregated facilities designed for Cis gendered populations.

Additionally, on both a practical and constitutional note, Trans individuals who are forced into Cis designed facilities are almost always required to adapt; to go back into the "closet", or alter their behaviors and expressions to minimize the likelihood of being found out (as Trans) and/or harassed. This forced stifling of an individual's full identity (the need to 'go stealth") represents a violation of the First Amendment of the U.S. Constitution as well as other laws and long established principles of equal protection.

Throughout this nation's history, if and when minorities; those of a certain religion; those who were Gay, or mixed race individuals of lighter skin complexion, were forced to outright hide or otherwise shift away from their natural or adopted mannerisms, fashion, routines or practices, in to avoid harassment or discrimination, the error in equality seems apparent to us today. The system and society needed to change, not individuals.

Before (and even during) the civil rights era when fair-skinned Blacks and Hispanics blended in with the dominant white people and structures around them in order to access employment, healthcare or avoid violence, it's called this 'passing'. Needing to 'pass', has long been a life or death issue for minorities in this country, especially Transgender individuals. The same is true here. Whether Trans, Gay/Lesbian/Cis or mixed race, under U.S. law individuals cannot be expected to conform in order to contribute to their equality or safety.

When forced into Cisgender shelters...designed for Cis populations, Trans individuals literally cannot be themselves.

**In Response to Defendants WIN/Quinn arguments that Plaintiff claims to have been denied access to WIN:**

WIN contends that plaintiff claimed to have been denied access to WIN. However this is not what plaintiff asserts; plaintiffs filings articulate a narrative and allegations of WINs failure to provide reasonable accommodations and failure to acknowledge its legal liability, until it was too late. WIN's so called accommodations were inadequate, thus plaintiff requested additional accommodations, which were denied. additionally, Plaintiff asserts that WIN played a willing and active role in retaliation initiated by the Municipal Defendants.

**In Response to Defendants WIN/Quinn arguments as they relate to the "Neighborhood" issue raised by the Plaintiff:**

Defendants WIN/Quinn has the fact wrong; the so called "Neighborhood" issue was not necessarily a disqualifying factor or feature of WIN West in the Plaintiff's initial view. It is possible that if the referenced issue pertaining to Plaintiff's history in the neighborhood stood alone it may not have proved insurmountable as a mental health barrier and trigger.

However, once at WIN, Defendants offered Plaintiff inadequate accommodations relating to PTSD in person, Plaintiff realized the scope of the issues with a WIN placement.

Lack of a private room, coupled with WIN's ignorant insistence that it's Hell's kitchen location was 'adequate' for plaintiff mental health needs, simply overwhelmed Plaintiffs coping capacity. The new, extreme amount and severe nature stress and trauma Plaintiff was subject to in April. May and June of 2017, made staying at WIN and in that neighborhood too stressful for the Plaintiff.

4

Defendants stance that plaintiff was in essence fabricating childhood abuse, certainly didn't help matters either.

The overall stress created by Municipal Defendants failures to provide reasonable accomodations in the period leading up to and directly after Plaintiff was transferred to WIN (failures to provide *consistent* reasonable accomodations), created too much psychological stress for the plaintiff to handle. Plaintiffs claims against WIN/Quinn are neither baseless or frivolous.

**In Response to Defendants WIN/Quinn questions and claims regarding Jurisdiction; whether their being named in this proceeding is appropriate or legal:**

WIN need not question Plaintiff or this Court as to why they must answer or appear in this matter (in the SDNY), since these recent many of the claims naming WIN and Quinn were originally filed in State Court. The only reason they are now being litigated in Federal Court is by motion of Municipal Defendants to have this case removed (from State to Federal court). Plaintiff has standing to include the Defendants WIN and Ms Quinn in these proceedings by virtue of Due Process since Plaintiff alleges certain civil rights violations, and, the case is in Federal Court by motion of their co-Defendants. Simple. WIN/Quinn can thank their co Defendants, The City of New York for its motion, and expensive extended litigation linked to this case.

**In Response to Defendants WIN/Quinn arguments and challenges regarding Plaintiffs retaliation claims:**

Retaliation claims (by either DHS or any its contract agencies) are a part of Plaintiff's amended complaint.

Furthermore, WIN/Quinn cannot claim to be without fault or legal liability in this matter, since, as an extension or contractor of DHS, fully aware of Plaintiffs needs as a Trans Woman, as well as someone with a disability and multiple documented medical conditions requiring treatment.. WIN's failures to accommodate Plaintiffs needs in fact represent a denial of reasonable accommodations under the law. Their actions were intentional, and were meant to be in line with the Municipal Defendants (illegal and bad acts).

Plaintiff also believes and asserts that Defendants DHS/HRA WIN/Quinn sought to engage in retaliation against Plaintiff not only as it relates to whistleblowing at, and suing over, failures stemming from Plaintiffs brief stay at Marsha's. But also on a much larger scale.

DHS and WIN seem to have been engaged in an ongoing, unofficial agreement for WIN house "difficult" Trans women at WIN West. If true, this agreement would violate multiple laws, for various reasons.

Trans individuals have come forward since the beginning of this case with claims implicating WIN/Quinn and DHS in a pattern of 1. Denial of reasonable accommodations while at WIN 2. DHS/WIN

5

administrators minimizing and covering up dozens of instances of violence and harassment of Trans WIN clients by their Cis peers in the shelter as well as WIN staff and DHS police; 3. Transfer of Trans individuals (or the threat of transfer) who speak up about being abused or feeling harassed/unsafe, to less desirable DHS shelter placements.

**In Response to Defendant Quinn's arguments to dismiss claims relating to anti Trans comments and harassment; Plausible deniability:**

Defendant Quinn and Plaintiffs phone conversation links her to the case, and removes plausible deniability for Defendant as a matter of law. The rest is an issue of fact for trial.

Indeed Plaintiff personally expressed my well documented needs to Ms Quinn during our call before officially being transferred to WIN. Yet even after this call, WIN's positions were inconsistent with these needs. Quinns comments and actions can be attributed to an unlawful effort by WIN and Ms Quinn, to support DHS out of blind allegiance, as opposed to following the law and providing reasonable accommodations. WIN should have refused the proposed transfer of Plaintiff since WIN West couldn't accommodate Plaintiffs needs, just as shelter with no elevator and only a room on a top floor, must legally refuse a transfer of an individual with a wheelchair. It's common sense. If WIN couldn't accommodate Plaintiff's need for a single room, they should have refused the transfer, as is permissible under the current DHS regulations. If they could have provided the accommodations but refused, this is also illegal.

The WIN/Quinn-DHS trio, acted as one entity at certain points, and were aware that both a single room, in addition to a service animal, were minimal requirements and accomodations where plaintiff placement in any shelter was concerned.

WIN cannot deny being aware of the ongoing litigation between the municipal Defendants and Plaintiff. Thus, WIN must have known Plaintiffs needs before the transfer, and should have been more cautious in evaluating plaintiffs needs and offering accommodations. Whether WIN was cautious or not, Plaintiffs needs are well established, and so is the law; accommodations **Must** be made (for persons with Disabilities).

Plaintiff asserts and alleges that WIN's choice to disregard the obvious (the need for a single room; whether they could accommodate this need or not) is a component of the Defendants collusion, and, an element in the Municipal Defendants retaliatory scheme, efforts and actions, which are a result of two previous so-called victories by the plaintiff against the Defendants in State and Federal court. WIN was doing the City's bidding in going along with a plan by DHS to have plaintiff removed from Marsha's. The idea was to punish and silence the Plaintiff.

In terms of possible motives behind Defendant Quinn's actions Plaintiff asserts that Ms Quinn's years of service as a NYC public and elected official, made it easy for her to side with the City Law Department, whether or not the Law Departments positions were legal or vetted via the process of full litigation.

Defendant Quinn's behavior and actions as it relates to this matter, are consistent with her public persona over the course of her political career. With only a few notable exceptions, Defendant Quinn routinely sides with and expresses support for, New York City agencies and their policies, especially prominent fellow Democrat Party members, such as Mayor De Blasio (despite her new found criticism of the City's shelter system). Put simply, Defendant Quinn is a "New York politician's….New York Politician". Defendant Quinn toes the line, while making strategic political decisions to progressive her career as well as pet issues.

In addition to claims against Defendant Quinn as they relate to her role as head of WIN West, she is personally legal liable for statements which she made to Plaintiff during a phone call in 2017. Her statements left Plaintiff stunned.

Setting the actual wording used by Defendant Quinn during this call aside, her intention to challenge or question Plaintiffs Gender I.D., or motives for expressing said I.D., is what matters in this case. Whether reckless or intentional, Defendant Quinn's hurt the Plaintiff with her words; the pain was real, and the sentiment of sarcasm and presumption, violate laws meant to protect Trans individuals against harassment.

Mrs. Quinn's statements were meant to be inflammatory. Cis individuals have no business challenging and debating a Trans individual about what gender they "really" are, or "used to be" (however politely stated). Her statements questioned quite literally, who Plaintiff really is.

This is illegal under NYCHRL, and now GENDA, as well as other Local, State and Federal statutes.

Asking someone's (a Trans individual's) pronouns is legally allowed and encouraged, certainly. However, questioning an individual's motivations for Transitioning, **and** gender simultaneously, is **never** okay, and this line comments or questioning can easily be construed as harassment by Trans individuals.

The questioning and phrasing used by Ms Quinn would be equally offensive if phrased and contextualized differently. For instance, if a white owner of a restaurant remarked to an African American person who was seeking (and being refused) access to premium seating or services at said restaurant: "Do you really want to eat in my restaurant? Aren't there African American owned establishments out there?"

Or "the side table off in the back is very nice isn't it? If you don't like the table that is available, you can leave, and don't say i wouldn't serve you".

Or "There are plenty of black owned places you could patronize, you could go and sit up front at those establishments; Isn't that what the civil rights movement was about? Equal opportunity…accept our policies or go to a Black owned establishment"

Or, "We're not discriminating, because we allow black folks inside, and you are still being served".

7

All of the above are comparable examples of passive aggressive statements and questions which would mostly be deemed illegal and, which constitute harassment. Both the business and the employee would be subject to private cause of action by the individual who was the target/recipient of the comments. If a business questioned a person of color, civil rights or motives for exercising these rights, in the way Defendants questioned Plaintiffs Gender, the slight would be obvious.

The nuances of anti Trans discrimination, as well as the legal protections and prohibitions against it, are a bit more complex than textbook, straightforward 'denial of service', Jim Crow style raced based discrimination.

For a Trans person, feeling annoyed and alarmed at being questioned or challenged in one's identity or rights, would meet the legal standard for harassment under the law.

**For these reasons Plaintiff asks this Court to deny Defendant's Christine Quinn and WIN West motions to dismiss in its entirety.**

Mariah Lopez

Plaintiff, Pro se

8