J4U5lopC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MARIAH LOPEZ,

4              Plaintiff,              New York, N.Y.

5          v.                         17 Civ. 3014 (VEC)(OTW)

6  THE CITY OF NEW YORK,
   PROJECT RENEWAL,
7  QPS SECURITY,
   WIN, Inc.,
8  CHRISTINE C. QUINN,

9              Defendants.

10 ------------------------------x

11                                    April 17, 2019
                                      2:15 p.m.
12
   Before:
13
                     HON. ONA T. WANG,
14
                                      Magistrate Judge
15

16

17

18

19

20

21

22

23

24

25

J4U5lopC

1                                    APPEARANCES

2

3    MARIAH LOPEZ, Pro se

4    ZACHARY W. CARTER
          Corporation Counsel for the City of New York
5    BY:  THOMAS B. ROBERTS
          TONI BAEZ
6         Assistant Corporation Counsel

7    JACKSON LEWIS, P.C. (NY)
          Attorneys for Defendant Project Renewal
8    BY:  RICHARD I. GREENBERG

9    CLIFTON, BUDD & DeMARIA, LLP
          Attorneys for Defendant QPS Security
10   BY:  STEPHEN P. PISCHL

11   WILLKIE, FARR & GALLAGHER, LLP
          Attorneys for Defendants WIN, Inc. and Quinn
12   BY:  JILL K. GRANT

13

14

15

16

17

18

19

20

21

22

23

24

25

J4U5lopC                            conference

 1              (Case called)

 2              THE DEPUTY CLERK:  Parties, please state your name for

 3     the record.

 4              MS. LOPEZ:  Mariah Lopez.

 5              MR. ROBERTS:  Thomas Roberts, Assistant Corporation

 6     Counsel, for the New York City Department of Homeless Services.

 7              MR. GREENBERG:  Richard Greenberg, Jackson Lewis P.C.

 8     for defendant.

 9              MS. BAEZ:  Toni Baez, New York City Department of

10     Homeless Services.

11              MS. GRANT:  Jill Grant and Cusie Orellana from Willkie

12     Farr & Gallagher for defendant Women In Need and Christine

13     Quinn.

14              MR. PISCHL:  Stephen Pischl, Clifton, Budd & DeMaria

15     for defendant Quality Protection Services Incorporated.

16              THE COURT:  Okay.  Good afternoon.

17              Ms. Lopez, I am informed you also brought somebody on

18     your side?  Or no.

19              MS. LOPEZ:  You mean --

20              THE COURT:  Your dog.  Is your dog here?

21              MS. LOPEZ:  She is.

22              THE COURT:  I can't see your dog.

23              MS. LOPEZ:  She had a very good play in the park.  You

24     will hear her snoring in a second.

25              THE COURT:  That's very nice.  So, is she your service

1    animal that is referenced in the complaint?

2              MS. LOPEZ:  She is.  I realized just now that your

3    Honor has never seen the service animal in question.

4              THE COURT:  Right.  It might have been nice to have a

5    heads-up that she was coming today, simply because she hasn't

6    been here before.  But, that is fine.  It just would have been

7    nice to hear that.

8              What is her name?

9              MS. LOPEZ:  C-H-I-C-A -- just so I don't wake her up.

10             THE COURT:  All right.  We won't say her name out

11   loud.  Okay.

12             MS. LOPEZ:  She who must not be named.

13             THE COURT:  Okay, she who must not be named, but in a

14   good way.

15             MS. LOPEZ:  Yes.

16             THE COURT:  Okay.  So, we are here for a status

17   conference.  I think our first issue is that as of our last

18   conference in February we were working, among other things, for

19   Ms. Lopez to get pro bono counsel for the purposes of

20   settlement.  Now, I understand that does not seem to be working

21   out so --

22             MS. LOPEZ:  Well, just, it just didn't work with Seton

23   Hall, and Emery Celli Brinckerhoff, another firm had contacted

24   me and I didn't see the e-mail, I will be honest, I responded

25   as such to the firm, I think I was about two and a half three

weeks late, but part of the reason, your Honor, were the

reasons that were outlined or at least one of the reasons that

were outlined in the letter being the actual person Akasha

Barker, contacting me in her emergency.  So, no excuse, but

Seton Hall didn't work out and I just missed the firm's initial

e-mail, which I will obviously try to just be better about in

general.  I want to be clear that I am still open.

THE COURT:  Okay.

MS. LOPEZ:  I am not against seeking counsel for the

purposes --

THE COURT:  Is Emery Celli still a possibility?

MS. LOPEZ:  No.  And I don't understand why either.

And, with all due respect, you know, I've -- yeah, that's fine

I think I could just --

THE COURT:  I guess my question is is there something

that I can help with.

MS. LOPEZ:  Well, your Honor, I actually couldn't

figure out what happened, and maybe your Honor could because

when I responded to their e-mail -- so, I don't mean to get

ahead of myself but it is actually bulleted here for me to

discuss later and it ties in now, I had a conversation before

we walked in --

THE COURT:  I'm sorry to interrupt you but is there a

letter to the Court that mentions this or is this the first I

am hearing of it?

1        MS. LOPEZ:  No, this is the first because -- so --

2        THE COURT:  That's okay.  Tell me.

3        MS. LOPEZ:  -- in the last week or so and I saw the

4   e-mail because -- well, it probably isn't the reason but I

5   found the e-mail and contacted the firm in relation to another

6   person in addition to my case, if your Honor is still following

7   me.

8        So, I find their e-mail.  It is not unlikely or not

9   unusual for STARR, my organization, to make referrals to firms

10  anyway for cases.  So, I reached out to that firm -- the

11  firm -- and said myself and Akasha -- by the way, your Honor,

12  they indicated in the original e-mail, that they would invite

13  me to have Akasha contact them as well and so my response to

14  them was myself and Akasha are still interested.  And there was

15  this other situation that has arisen another transgender

16  person, a transgender male who is now homeless and in need of

17  services but had a separate civil rights issue.  So, their

18  response to me was we would love to deal with the new civil

19  rights issue but we can no longer represent, you know, sorry we

20  can't represent you or Akasha.  My response was if you can't

21  represent me and Akasha because you don't have the resources,

22  how could you represent this new individual?

23       So, if your Honor would like to potentially ask them

24  to re-explore I have no issue with them.  I did find it strange

25  that their own wording to me was that we are a small firm and

1    so we have to pick our cases but send us this other case.

2              And, just so your Honor is aware, I believe the other

3    case is worth a lot of money so I responded with a, you know,

4    it would be nice if you helped Akasha and myself, but.

5              THE COURT:  And who is Akasha?  I'm sorry.

6              MS. LOPEZ:  So, I mean, I had a bulleted list of

7    things that I was going to go over so would you like me, your

8    Honor, to update you on what I was going to update you?  This

9    is the settlement conference.

10             THE COURT:  No, this is not a settlement conference.

11   I actually have my own agenda that I put together and I try to

12   do it with --

13             MS. LOPEZ:  It is going to keep going back and forth.

14   You asked me who Akasha Barker is.  You are asking me as a

15   federal magistrate who Akasha Barker is, I will respond.

16             THE COURT:  I sit here as a federal magistrate judge

17   when court is in session.  I am trying to give you a sense of

18   the procedures that I expect will be followed here and one of

19   them is that it is that I would like to see -- I would like to

20   have some structure over the things we are going to discuss.

21   So, because I didn't get any filings from the parties I created

22   my own agenda so I'm trying to follow my own agenda.

23             So, the follow-up questions regarding Akasha is in

24   relation to settlement but then I'm going to move on from

25   there.  Okay?

J4U5lopC                         conference

1        So Akasha is not a party or --

2        MS. LOPEZ:  She could be because I could file a motion

3   under 23(g), we could start to file a motion and so this is

4   what I'm saying.  You may have your own agenda but due process

5   says I still am the plaintiff and have certain rights under due

6   process.

7        THE COURT:  Right, but I control the agenda in my

8   courtroom.  I expect issues to be raised and fronted so what we

9   will do, going forward, we will go from my agenda today.  This

10  is how we have done it in the past.  And, as you will recall,

11  in the past at the end, I always say, *What other issues do you*

12  *have to bring up?*

13       MS. LOPEZ:  Yes, your Honor.

14       THE COURT:  So, you will be heard.

15       In the future what we will do is I will direct that

16  you put together your bulleted agenda, proposed agenda, file it

17  on the docket three days in advance, we will have the

18  defendants do their own agenda, and I will put together the

19  agenda based on those issues.  Okay?

20       MS. LOPEZ:  Yes, ma'am.

21       THE COURT:  That, I think, will be helpful, because

22  then everybody can see coming into the conference what we

23  anticipate discussing.

24       So, let me think about, was it an attorney from Emery

25  Celli who reached out to you?

1            MS. LOPEZ:  Yes, your Honor.  I could pull up the

2    e-mail, if you would like.

3            THE COURT:  Okay.  What I would like you to do for

4    this, and this is really just to start to see if there is some

5    way for this process to go forward, is I am going to direct

6    that you -- and I am going to direct it this way so that Emery

7    Celli knows that I'm thinking about this because they're not

8    before me right now, they're not here, so I am trying to figure

9    out the appropriate way for them to understand what is

10   happening.

11           So, what I am going to direct is that after you get

12   the transcript for this conference, that you forward a copy of

13   it to the contact at Emery Celli and you can copy my chambers'

14   e-mail address on it and indicate to them the page on the

15   transcript where I am going to ask them to respond in an

16   *ex parte* e-mail to chambers whether -- to indicate whether they

17   would be willing to consider pro bono representation for you

18   for the purposes of settlement.  Okay?  For purposes of

19   settlement discussions.

20           They're a really good firm.  They are a small firm, so

21   I understand if their resources are stretched.  On the other

22   hand, given the pace at which things have been happening, maybe

23   there may be a time when their resources free up when

24   settlement discussions might be productive and they might be

25   possible.

J4U5lopC                        conference

1          So, I'm going to try to see if I can follow up on that

2     and see if there is any way that they may be able to find

3     resources to free up or even if they free up at a later date,

4     whether that's a possibility.  Okay?

5          MS. LOPEZ:  Sure.

6          THE COURT:  I'm not sure that trying to push

7     settlement without, even mediated by me to try to push

8     settlement discussions without you having your own counsel is

9     going to be terribly productive because I think that puts a lot

10    of pressure on you because I understand that you wish to move

11    forward with discovery and your motion practice so that's a lot

12    of stuff going on.

13         So, let's see where that goes and if at the next

14    conference there has been no progress but you would still like

15    to pursue settlement discussions, we will talk about it then.

16    Okay?

17         MS. LOPEZ:  May I respond briefly?

18         THE COURT:  Yes.

19         MS. LOPEZ:  Actually, your Honor, I'm going to

20    politely, respectfully, push back and say if -- I wanted to

21    update you in a way that I think might have changed how your

22    Honor just directed me and I'm not -- I don't have an issue

23    with your order.  I think, though, when you hear the update,

24    you will potentially rethink it.

25         THE COURT:  Okay.  I'm all ears.

J4U5lopC                    conference

1            MS. LOPEZ:  Two things.

2            I may not -- I'm not going to keep entertaining the

3     thought of settlement forever.  There is not an unlimited offer

4     and actually it may stop here today.  I feel like I'm being

5     pushed around a little, even by the Court, and I will say it

6     from Judge Caproni making statements in the original portion of

7     the case about me needing to hide as a transgender person, page

8     69 of the May, I think it was 31st, hearing in front of Judge

9     Caproni so that means if she doesn't recuse herself this case

10    is going all the way to the Supreme Court, potentially, from

11    those statements, to the fact that now I'm feeling like your

12    Honor has heard me say multiple times that the City has not

13    responded with a specific counteroffer once, and an enumerated

14    counteroffer within the context of the circumstances and the

15    likelihood of my success on the merits.  They just keep talking

16    about housing that I may not need anymore considering all the

17    circumstances.  So, let's enumerate them.

18            I have live claims under the new Child Sex Abuse Act

19    that the City is aware of because Mr. Roberts, who asked within

20    this case, for my childhood records, certainly has proof of my

21    childhood records.  I find it hard to believe the City Law

22    Department doesn't know what happened to me when I was a

23    teenager.

24            So, my willingness to potentially be desperate for

25    settlement just sort of isn't there anymore.  I'm not

1    necessarily desperate for settlement.  And so, he is offering

2    me things like, you know, the only substantive counteroffer was

3    you can come into the shelter system.  I may not want to come

4    into the shelter system and I may not need to be so generous in

5    my settlement offers anymore.

6           And so, now I'm back before this Court and you have

7    attorneys in front of you and instead of directing the

8    attorneys in front of you to counteroffer or to engage somehow

9    or even to operate under the best practices and ethics as an

10   attorney and not treat a pro se plaintiff differently than any

11   other opposing counsel, your are ordering me to somehow, like,

12   re-engage a firm that just told me that they were too busy to

13   deal with our case.

14          So, what I think is more productive is this.  I'm

15   going to give you one last update or two contingent updates

16   that I think are relevant to other transgender people that I

17   think could be affected by our settlement and I'm going to fill

18   you in on people that you may not have known that have been

19   working behind the scenes to potentially support me and STARR

20   in getting the settlement that we need for myself and other

21   people.

22          So, Louis Sartori, who is the head of pro bono at

23   Legal Aid, has always suggested that I work with other

24   organizations like the Coalition for the Homeless or the

25   Transgender Legal Defense and Education Fund to bring the

J4U5lopC                    conference

1   narratives and stories of other transgender people together and

2   the issues that we face and sort of come up with a policy

3   demand or request of the City and come together as a group and

4   do that.

5          I approached TLDEF and Coalition for the Homeless when

6   this case first started and they were of no help, but Lou used

7   to represent me when I was a young person and I can honestly

8   say on the record, "I love me some Lou," and so whatever Lou

9   asks me to do I will do.

10         When Lou heard of Akasha and Jamel Young -- I am going

11  to name him on the record for the first time, this new

12  transgender man who has presented is now homeless and now will

13  be requesting a single room, and now will most likely be

14  denied -- Lou suggested that we reconsider bringing in the

15  Coalition for the Homeless.  And I said to Lou that would be

16  great, I always was open to this.  Can you get them to the

17  table?  And Lou said give me a couple weeks, Legal Aid is

18  reaching out.  But, all of this is in the context of me

19  choosing to give up either my day in court and my due process

20  rights under discovery or my discovery rights under due

21  process, and me choosing to let what I believe is the City get

22  away with what happened to me in 2017.  I am becoming less open

23  to that the longer this takes.  So, I think what should happen

24  is this Court should direct the attorneys in front of them to

25  counteroffer because that's what should happen.  And, there is

1    just one other pertinent thing about what I have been asking.

2              So I have asked the City for $100,000, your Honor,

3    because I think it is consistent with the amount of time it

4    will take for me to heal from the emotional scars plus the

5    physical ones and the defamations of my character and

6    la-la-la-la-la-la.  I have asked them open new facilities or

7    engage in a written commitment to -- or myself and my

8    organization, in a written commitment to open new facilities

9    for transgender people that are homeless forthwith,

10   immediately.  I have asked them to sponsor and also to pay for

11   and to also put in writing a commitment to engage in a citywide

12   education campaign about service animals.

13             Something happened a week ago, your Honor.

14   Specifically the fact that you brought the dog up today makes

15   it more germane.  The ADA does not require me to give anybody

16   notice.  Period.  I could show up at the White House today and

17   I don't have to give anybody notice at all.  So, Mr. Roberts --

18   and again this goes back to me asking the Court, maybe you

19   should direct the municipal defendants make a reasonable

20   counteroffer consistent with the facts -- I have asked them

21   about this education campaign and these other bullets and

22   they've just been silent.

23             Well, when I got on the bus, the City bus the other

24   day on Facebook Live, so there is a video of this and it has

25   now gone viral, your Honor, a City bus driver asked me for

J4U5lopC                         conference

1    documents in complete violation of the ADA but, unlike what

2    people believe, I don't just file lawsuits frivolously to get

3    rich and I do understand the law and I can't file a lawsuit

4    under Title II just for him asking me for documents.  But the

5    MTA employee began to berate me and other MTA employees started

6    to share the video, your Honor, and they started to use

7    defamatory and demeaning language on the post, as City

8    employees, blatantly misrepresenting the law for millions

9    potentially to see, *She's wrong.  She has to have documents*,

10   these City employees repeatedly say on this video that is now

11   going viral.

12          There is a subsequent video, your Honor, much shorter,

13   of a bus driver on the same route the next day sort of

14   apologizing for the behavior of the other driver and

15   reiterating on the new video that they are indeed trained but

16   badly and they could use more training.

17          So, I don't think any of the settlement stipulations I

18   have put forth are unreasonable.  I will suffer the

19   psychological stresses of being homeless for this extended

20   period of time in my life for the rest of my life so the money

21   is appropriate, the need for transgender housing for people

22   that are transgender are obvious because of my case, but also

23   because of the new law that has passed your own agenda, there

24   is no possible way the City can maintain transgender people can

25   be themselves in every facility within the Department of

1    Homeless Services let alone the medical arguments, right?  I

2    think those are separate, but gender is very specific in how no

3    entity can restrict the expression of transgender people or

4    harass them or subject them to harassment.  And, obviously the

5    need for the education campaigns to be established and I think

6    lifetime vet care for my animal is only fair because if it came

7    down to an issue of, like, medical fact or scientific fact, I

8    think a vet or an animal expert would say, yeah, the dog has

9    been stressed out and will potentially face health problems in

10   the later years of her life.  So, me asking for some

11   commitment.

12        I will just end it, I know you guys are probably done

13   with me talking.  The City could just settle and potentially,

14   the only two that can be combined, maybe the City says we are

15   not going to give you lifetime vet care for your dog but we

16   will give you $120,000, that will work for me.

17        THE COURT:  So, sometimes whether I float the idea of

18   settlement or settlement conference between parties I make the

19   determination myself that the parties are simply too far apart.

20   Sometimes I say, look, you know, give them a good faith

21   counteroffer, let me see it as well and then maybe then I will

22   make a determination the parties are too far apart.

23        I will say that from my assessment and given what I

24   have seen in the status conferences that we have, I think the

25   parties may be too far apart.  However, your request is taken

1    so I'm going to direct the City to respond in a letter with a

2    potential counteroffer and/or response to Ms. Lopez' demands.

3    This is not to be filed on the docket but a copy will be sent

4    to the Court e-mail address, the chambers' e-mail address so we

5    can see that it's been done.

6           Regardless of what that says, I'm still going to go on

7    with even exploring with Emery Celli if they are willing to

8    take on the representation for you for settlement.  If, you

9    know, right now -- I hear the snoring now, that's funny -- but,

10   it might not happen.  It might.  Maybe things can change by the

11   time, maybe something will have changed so let's just keep all

12   of those options on the table right now.  Okay?  And we will

13   see where we are the next time we have a status conference

14   after we see the response from the City, after I get a response

15   from Emery Celli we will see where we are.  Okay?

16          Let's talk about, I guess next is the motion to

17   dismiss.

18          So, I guess defendants Quinn and WIN had filed their

19   motion to dismiss back in October and we were looking for a

20   date for your opposition but you didn't have your phones the

21   last time which you said you needed in order to frame your

22   opposition.  So, where were we with that?

23          MS. LOPEZ:  I did and, actually, I want to just say I

24   appreciate the Court for not just disregarding -- or not

25   considering my not filing it, it is just me disregarding it and

1    if you give me until tomorrow -- it was basically all the stuff

2    I said on the record that time and I know your Honor said you

3    would get the transcript.  It is basically the same thing, I

4    will file it by tonight.  I thought you had sort of stopped

5    looking for it and didn't want to drop it in the middle of

6    things.  I think making the Court believe that I could just do

7    that so I know that I am past the deadline.

8             THE COURT:  No, I am going to give you a new deadline

9    now that you have your phones back.  I will give you more time

10   than today or tomorrow but not a lot because you are saying

11   that it is basically ready to go.

12            MS. LOPEZ:  It is drawn up.  I just have to look over

13   it.

14            THE COURT:  Okay, so let's, can do you it by this

15   Friday, the 19th?

16            MS. LOPEZ:  Yes, your Honor.

17            THE COURT:  We will give you the 26th.

18            MS. LOPEZ:  Sure.

19            THE COURT:  So, your opposition is due April 26th, so

20   for the Quinn and WIN defendants, how much time do you need for

21   reply?

22            MS. GRANT:  We were given a month for our reply last

23   time.  It would be great if we can have that, which would be --

24   May 24th is four weeks, we could do that.

25            THE COURT:  So, May 24th will be your reply date.

1        Now we are on to discovery and, Ms. Lopez, I

2   understand you want discovery to proceed, right?

3        MS. LOPEZ:  I'm going to keep this one short and

4   sweet, your Honor.  I would like discovery to proceed.

5        THE COURT:  Okay.

6        MS. LOPEZ:  I would like your Honor to lift the stay

7   and to direct them and the civil defendants to start handing

8   documents over immediately.

9        THE COURT:  Okay.

10       MS. LOPEZ:  If that's to the firm, that would be fine

11  too.

12       THE COURT:  I'm sorry?

13       MS. LOPEZ:  If it ends up that the firm takes the case

14  then even, like I said, even helping to further discovery -- I

15  mean the settlement, excuse me, the material could go to the

16  firm but not me but, whoever gets it, I think we are entitled.

17       THE COURT:  So, have you propounded requests for

18  production yet, Ms. Lopez?

19       MS. LOPEZ:  I have done nothing since, having to do

20  with discovery since I was stunned and incarcerated by the, you

21  know, the City.

22       THE COURT:  Okay.

23       MS. LOPEZ:  In January.

24       THE COURT:  So I guess defendant's proposal is for

25  discovery to close 120 days after the HIPAA release has been

J4U5lopC                        conference

1   signed so we are going to have to talk about the HIPAA release.

2              I recall that initially there was some discussion

3   about the HIPAA release because we were also talking about it

4   in terms of conversations with Ms. Waddy regarding settlement.

5   That said, I think that's off the table now, right, or at least

6   for the time being, but could the defendants just tell me why

7   you need the HIPAA release?  What you need from it?

8              MR. ROBERTS:  For her alleged disability and her

9   alleged need for a single room is tied into her medical

10  condition and we would like to see what her medical condition

11  is because as the initial evaluation with Dr. LaRock was that

12  she could live in a communal space with two or more people.

13  And so that, the basis for her claim here is based on her

14  medical condition and I think we have the absolute right to see

15  what her mental providers have prescribed over the years --

16             THE COURT:  Did you say mental or medical?

17             MR. ROBERTS:  Both medical and mental.

18             THE COURT:  Okay.

19             MR. ROBERTS:  But the main focus for me is mental

20  health.  There is a collateral medical issue concerning

21  dilation, so both are involved.

22             MS. LOPEZ:  Your Honor?

23             THE COURT:  Yes.

24             MS. LOPEZ:  We are in federal court and the municipal

25  defendants referring to my alleged disabilities is about to get

1    them sued again.

2            I get disability from the federal government because I

3    have been deemed legally disabled.  Please ask the municipal

4    defendants, specifically because this transcript will one day

5    potentially be historically important, to stop referring to my

6    disabilities that I get on a federal check for, as alleged, and

7    also, in the case Jane Doe v. Bell Judge Gans ruled across the

8    street in Supreme Court that me, Jane Doe in the case, that I

9    am disabled under New York State Human Rights Law.

10           It is demeaning.  It actually underscores what I was

11   going to say in opposition to their, like, we need every bit of

12   your medical documentation to see what's right in front of our

13   face and what's also, like, public historical record, like, oh

14   yes, Mariah gets disability because it was used in the City

15   when they tried to oppose paying for SRS because some like

16   carryover with insurance and Medicaid and kids in foster care

17   and I was disabled being eligible for Medicaid.  They know

18   this.

19           So it is just disrespectful.  I repeat the arguments I

20   made the last time.  Kylie made them aware of my current needs.

21           THE COURT:  Kylie is?

22           MS. LOPEZ:  Kylie Waddy.

23           THE COURT:  Okay, Ms. Waddy.

24           MS. LOPEZ:  Sorry.  Ms. Waddy is capable and able to

25   describe my current needs.  Every transgender person will have

1    a mix of providers in their life.  If we start to allow people

2    that oppose the rights of transgender people to pry into their

3    medical backgrounds as a way of simply making their legal

4    argument or fishing for what is in front of their face then we

5    are setting a dangerous legal precedent.  I have presented

6    myself as an open book before the Court and the municipal

7    defendants.  There is absolutely nothing they could glean from

8    my private medical records that they, one, is the irony, can't

9    get from their own records.  It hit me, your Honor, that all

10   the childhood records they've asked for in the discovery

11   request here, they have them because I was in foster care.  And

12   I litigated past the date I was out of care.

13          The case Lopez v. Mattingly was litigated in the First

14   Department two years after I left care and that case entailed

15   most of the documents that they're asking me for in terms of

16   childhood stuff, in terms of up-to-date medical stuff, your

17   Honor, in terms of like operative trans-related stuff.  They

18   have letters from my surgeon about the post-operative medical

19   needs of transgender people, specifically me, because he did my

20   surgery.  That's not going to change.

21          If what they would like is for me to be re-evaluated

22   by a top-of-the-line expert in the field of trans-related

23   medicine, then I would ask this Court to direct them to pay for

24   it, just like in the case Lopez v. Mattingly, they paid for

25   Dr. Christine Wheeler, who I believe, your Honor, is still

J4U5lopC                        conference

1    practicing.  I checked.

2            And so, if they want, I think that would be the most

3    continuity in my medical record and he did say medical and

4    mental health there.  So, who better, your Honor, than

5    Dr. Christine Wheeler, who evaluated me for, I believe, a total

6    of 25 clinical hours for the case with the City involving my

7    SRS when I was a young person but then -- this is key, your

8    Honor -- she went on to provide me with my pre-surgery letters

9    right before I went to Dr. Reed, and just a little

10   light-hearted moment, Dr. Reed handed me the phone right after

11   surgery and it was Dr. Wheeler on the phone.  And so one of the

12   first voices I heard after I got SRS was Dr. Wheeler.

13           If Mr. Roberts or the municipal defendants want any of

14   my childhood medical records in terms of my foster care

15   records, they have them.  They are not entitled to all of my

16   medical records to try to decipher, he just posited, whether or

17   not I'm actually legally disabled.  That's a matter of record.

18   They can confirm that on their own.  And, like in terms of the

19   treatment for trans people, again, it has been established by

20   Dr. Reed, specifically for post-operative dilation and, just,

21   it doesn't change and I think we are setting a bad precedent.

22           MR. ROBERTS:  Your Honor, so, if Ms. Lopez wants to

23   come to federal court she is subject to the rules of all

24   plaintiffs.  Not only are these records relevant to the items I

25   have said, but to damages.  And her proposition that I know

J4U5lopC                         conference

1    what is in her social security file or that I have access to

2    the medical records in another branch of City government, I

3    don't.  I am not entitled to go rummage around every file in

4    City government looking at her medical records.  I need a

5    release from her.  That's what I need, for HIPAA.

6          And, for her proposition that yes, maybe SSI has

7    declared her disabled.  I don't know that.  I am not part of

8    the federal government.  But, if they've made a finding of

9    disability it doesn't necessarily mean she's entitled to a

10   single room.

11         I would like to have the medical records that every

12   defendant is entitled to.  If she's going to come and play in

13   this field she ought to be asked to observe the same rules as

14   most plaintiffs.

15         THE COURT:  Okay.

16         MR. ROBERTS:  I'm sorry to be irritated but I have

17   listened to this go on and on and insulting me that it is

18   improper that I should --

19         THE COURT:  I understand.  I understand that you are

20   irritated and, you know, I think what I would like to explore

21   is whether there is another means to obtain substantially most

22   of the records that Ms. Lopez is referring to and then if there

23   is additional documents or other information that you need,

24   that we explore ways to get it.  I'm not ruling out a HIPAA

25   release because, Ms. Lopez, that is typically how these cases

J4U5lopC                         conference

go.  Counseled or not, any time a plaintiff puts their medical

or mental health at issue where it relates to damages, where it

relates to a reasonable accommodation, and this goes for, you

know, everything from Social Security benefits to employment

discrimination and everything else, HIPAA releases are

required.  Okay?  So, what I am going to do before going down

that route is to see if there is a volume of the stuff that can

be obtained otherwise.

            So, Ms. Lopez, you mentioned the Jane Doe v. Bell and

also Lopez v. Mattingly as resulting in court findings

regarding disability or having other evidence of medical or

mental health.  Are there records and were there documents and

other evidence produced?  And the other issue is are they

subject to a protective order and how long ago were those

cases?

            MS. LOPEZ:  So, let me just clear up what I was saying

as well because I don't think his characterization of what I

was implying is accurate.

            THE COURT:  Okay.  Stop.  Stop.  Stop.  Stop.  Right

now.  Both of you.

            MS. LOPEZ:  These are sensitive --

            THE COURT:  Stop.

            MS. LOPEZ:  -- medical records --

            THE COURT:  Stop.

            MS. LOPEZ:  -- I'm not going to be --

J4U5lopC                         conference

1              THE COURT:  Stop.

2              MS. LOPEZ:    -- bossed around in federal court about

3    my childhood records.

4              THE COURT:  If you do not stop right now this

5    conference is over.  Okay?  I had a conference this morning

6    with counseled parties on both sides and they could not stop

7    saying mean things about each other.  Some of them might have

8    been true, some of them might not have been.  I definitely

9    understood that everybody was very frustrated with each other

10   and I said, look.  We are here to try to move forward.  We are

11   here to try to move forward with discovery.

12             Ms. Lopez, you brought a case in federal court.  You

13   are ready to litigate it.  Let's move forward.  I don't want to

14   hear any more about how irritated you each are with each other.

15   I get it.  I have heard it.  I see it.

16             MS. LOPEZ:  That's not what I was going to refer to.

17   I was referring to the fact that -- and, you know, I'm going to

18   repeat quietly silent, or softly, I feel bullied as a person

19   that was in foster care, as a trans person with a disability

20   who is being forced, potentially, to hand over my childhood

21   records.  So, I'm going to repeat this.  No, I'm going to

22   repeat it, let everyone in the room hear it.

23             THE COURT:  I am listening.

24             MS. LOPEZ:  My childhood records are not going to help

25   the City on an open-ended subject.  If specifically what he

1    needs is to, one, establish my need for a single room now, I

2    ask this Court to direct him to get an expert now, a new expert

3    beyond any of his objections because of the credentials, they

4    pick them, they pay like they've done in those other cases.  If

5    he has a question about the consistencies, the consistence of

6    my diagnoses he can speak to -- because I've already posited

7    this as a great way to move forward, your Honor, right, to

8    quell over personalities -- Karen Freedman, who is the head of

9    Lawyers for Children, is one of the most respected lawyers in

10   the town and Karen is very familiar with my needs since I have

11   been 13 years old.  You can't get a lawyer in this town that

12   knows about my needs both currently and in the past and how my

13   records, coming full circle, won't help him.

14          So, I'm giving him a way to get the information he

15   needs about the consistency of my claims from an attorney who I

16   don't think he will question the credibility.  If Karen says

17   she's had a single room since we have had her, trust us, we

18   have litigated this, this is not going to help you, she's had

19   the same needs since she was a teenager, adolescent; this is

20   not her changing, yes we are aware of these diagnoses because

21   we have records consistent with what she is saying.  I have

22   released Karen.  So, I have expressly told Karen that she has

23   permission because -- and it may seem like I'm all over the

24   place but I'm not, I'm quote focused -- Karen will have to

25   potentially explain to Mr. Roberts what will happen if they

J4U5lopC                          conference

1   gets those childhood records because Lawyers for Children

2   represented me when I was in care at a time where they now may

3   have to navigate child sex abuse claims.

4           So, they are more than willing to have a conversation

5   with Mr. Roberts, Lou Sartori, too, because he used to

6   represent me on juvenile docket and was my lawyer during some

7   of the times where I was sexually abused while in foster care.

8           So, these records are not going to help Mr. Roberts.

9   I say we sort of pull a William Barr and we let somebody

10  characterize what's going on in my records and what's germane

11  and if again -- so, he cited a doctor, asked for current needs

12  and wanting to potentially update what the municipal

13  defendants' position is based on an assessment of my medical

14  needs and the current.

15          My position was always that that doctor was

16  unqualified, she had never met me, your Honor, never, and she

17  never reviewed.  So, this is also ironic.  Mr. Roberts is

18  admitting that the doctor found that I don't need a single room

19  but she didn't have my records.  How could she make that

20  determination?

21          So, I posit that maybe they get an expert to actually

22  see me and actually review my records, one that I'm okay with

23  reviewing my records -- I don't know, Dr. Christine Wheeler --

24  and they can ask Dr. Wheeler what my currents needs is.  The

25  medical portion I am just really going to have to push back.

1    Transgender people's medical needs post-op don't change in us

2    terms of their dilation needs so that will be static, your

3    Honor, they won't ever change.  They can't just go prying for

4    like -- do you want the date of my SRS?  They have it.  They

5    want a letter from my surgeon, when he performed surgery, when

6    he performed revisions, his directions to me; they have that.

7             MR. ROBERTS:  Your Honor, could I make a procedural

8    suggestion?

9             THE COURT:  Sure.

10            MR. ROBERTS:  That I propound HIPAA releases to

11   Ms. Lopez.  If she objects to them then they're objected, but I

12   think our talking about them in the abstract, I haven't even

13   written them yet.  I think it is appropriate for me to write

14   them, see whether she objects, and then we can confer and if we

15   disagree we come back.  But, talking about it in the abstract

16   here I don't think we are going to get to resolution.

17            THE COURT:  Before we get to that, and I think we will

18   get to that but before we get to that, Ms. Lopez, I asked you a

19   couple of questions.  Granted, they were compound questions, so

20   let me rephrase.

21            MS. LOPEZ:  Yes, your Honor.

22            THE COURT:  You mentioned two cases for which your

23   disability and your mental and medical health issues were at

24   issue.

25            MS. LOPEZ:  Yes, your Honor.

J4U5lopC                        conference

 1          THE COURT:  And what I heard from that is that there

 2   might have been evidence produced, documents or other things

 3   produced that might be relevant and responsive to what

 4   Mr. Roberts is looking for.

 5          MS. LOPEZ:  Yes.

 6          THE COURT:  So, I am just trying to understand if

 7   there is a way we can get those documents --

 8          MS. LOPEZ:  He has them.  They have them.

 9          THE COURT:  I don't want to hear that right now.  I

10   don't want to hear that right now because what I have heard

11   from Mr. Roberts is that they are different City agency and may

12   be very hard to hard to get -- no, no, no.

13          MS. LOPEZ:  I'm sorry.

14          THE COURT:  Stop.

15          Just tell me.  So, Jane Doe v. Bell, when was that

16   case decided?

17          MS. LOPEZ:  2002.

18          THE COURT:  So, one of the issues with that is that

19   maybe some municipal agency might still have retained the files

20   from that case.  The problem is that they haven't and that case

21   was now 17 years ago, then we don't have them anymore.  Okay?

22   So, that's one possibility but I'm not going to get into that

23   right now.  Okay?

24          What about Lopez v. Mattingly.  Is that the right case

25   name?

1        MS. LOPEZ:  Yes.  The case was finally decided from

2   the First Department, in the First Department in 2008 or '09

3   but it was started in 2005 or '06 and -- your Honor, unless the

4   City is objecting that I'm not the same plaintiff, I would just

5   ask that you assign this a homework for the City because

6   everything you are doing I believe Mr. Roberts has researched

7   already and they know the answers to.

8        THE COURT:  Okay.

9        MS. LOPEZ:  My original position is that they're

10   stalling and they're getting their way even with us going

11   through these motions here.

12        THE COURT:  Ms. Lopez, I asked you not to characterize

13   what they were doing just like I asked them not to characterize

14   what you were doing.

15        MS. LOPEZ:  Sorry.  Sorry.  Sorry.

16        THE COURT:  Okay.  We are getting there.  I am moving

17   more slowly than you would like me to move but that is

18   unfortunately how I move.  It is one speed.  Okay?  We are

19   going to dot the Is and cross the Ts.  I am just trying to get

20   there.  I have not been living this case the way you have.

21   Nobody has been.  So, you are going to have to be patient with

22   all of us as we try to understand and work our ways around

23   there.  Okay?

24        So, I am ready to rule on this issue which is

25   Mr. Roberts, you are going to draft a HIPAA release propounded

1  to Ms. Lopez and, Ms. Lopez, if you object you are going to

2  give him a written objection, try to meet and confer, see if

3  there is any way to narrow it.

4          The other thing, I am going to give Mr. Roberts some

5  homework.  Mr. Roberts, I am going to give you however much

6  time you need on this, within reason, but you have been

7  reasonable with the timeline so far, is to inquire and try your

8  best to ascertain, with both the Jane Doe v. Bell case and the

9  Lopez v. Mattingly cases, what discovery was done and if those

10 files are still retained or exist somewhere.  I understand that

11 the federal rules set aside a certain procedure.  I am also

12 trying to get to a point where we can maybe move forward into

13 either some motion practice or actually get into discovery so

14 the case moves forward.  So, I understand that in some

15 circumstances I might not order a party do this but I'm

16 directing you to inquire and to try to figure out if those

17 records exist and, if so, where they exist and suggest some

18 possibilities, some ways to get the discovery that was produced

19 in those two cases.  All right?

20         How much time do you need to do that?

21         MR. ROBERTS:  May I have a month?

22         THE COURT:  Sure.

23         MS. LOPEZ:  Your Honor, I have a suggestion, actually,

24 that Mr. Roberts might, and the Court might, like.  I just

25 thought of something.

1          THE COURT:  Okay.

2          MS. LOPEZ:  I recently went to family court to review

3    some of the same documents that I say carry over in this case

4    and the potential new cases and I saw, with my own eyes, that

5    the entire file exists for my case under the D docket that I

6    referred that Lou Sartori represented me on, but also a lot of

7    the filings, cross-filings with, like, Lawyers for Children

8    towards the end.

9          Just to clear up, just so your Honor knows just as a

10   fact issue, I was represented by Lawyers for Children up until

11   point where the case Lopez v. Mattingly needed to be appealed

12   and then Legal Aid had more extensive appellate resources and

13   so Legal Aid took over but I knew Lou -- not to get too

14   confusing but this is going to be the file I am referencing

15   now -- I knew Lou from the D docket but the file that I am

16   referencing that, your Honor, I would be open to not only

17   asking your Court to like direct or order or whatever how this

18   Court can sort of get that file, that would be great, but he

19   could, Mr. Roberts can have that whole file including.  So,

20   they would not give certain things to me because they said that

21   they were mental health evaluation --

22         Did you just pass him a note, counsel for Christine

23   Quinn?

24         THE COURT:  It is okay to pass notes.  Please, go on.

25         MS. LOPEZ:  I just wanted to know it's on the record,

J4U5lopC                         conference

1   that's fine.  Passing notes.

2           So, the file has what I think are mental health

3   records germane to what Mr. Roberts is trying to glean.  Have I

4   had behavioral issues and/or needed a single room for a

5   consistent time in my life and how long have these medical

6   issues related to me being transgender been on the forefront of

7   my lodging considerations when I am in the custody of the state

8   or the City.

9           So, I would ask that if your Honor is able to order

10  the family court or however we can sort of --

11          THE COURT:  I can't order the New York State Court to

12  do anything.

13          MS. LOPEZ:  I didn't actually mean to sound so

14  ignorant to the law.

15          I would be quite interested, as well, in getting the

16  entire file for myself, and I think it can only help

17  Mr. Roberts because the information in that file has mental

18  health evaluations of me during my teen years going all the way

19  up until when I aged out of care.  And it is also by, like,

20  Court ordered, for Court ordered mental health evaluations for

21  placement, specifically about placement.

22          THE COURT:  I think that you have given us a lot of

23  information for Mr. Roberts to just look into this so what I am

24  going to add to Mr. Roberts' homework is that if there are

25  parts of the file that are inaccessible for some reason to, you

J4U5lopC                        conference

1    know, let us know if it is a sealing order or some other

2    protective order or there is some other reason why they're

3    inaccessible and then we will try to deal with it.  Okay?

4           MR. ROBERTS:  I can tell you that family court

5    records, by matter of law, are generally inaccessible.

6           THE COURT:  Accessible?

7           MR. ROBERTS:  Inaccessible; and they are generally

8    sealed and we have great difficulty obtaining them --

9           MS. LOPEZ:  Not if we all do it.

10          MR. ROBERTS:  -- there are times we do obtain them.

11          THE COURT:  Do not talk over each other, please.

12          MR. ROBERTS:  It won't be a protective order, it is

13   just baked into the statutes under the regulations.

14          THE COURT:  Now, I actually have a case that has

15   sealed filings on the docket because they pertain to or relate

16   to family court records, a completely unrelated case.  Is there

17   a process by which I can help that, so that if they're needed

18   in this case or they're to be used in this case they can be

19   kept under seal or if there is some other process by which

20   these can be kept sealed?

21          MR. ROBERTS:  I believe that the regulation that makes

22   the seal has, provides for people who have access, and one of

23   the provisions is a Court ordering the documents for the

24   receiving Court's own proceedings.  So I believe -- I don't

25   know how the family court deals with this but I was actually on

J4U5lopC                       conference

1   another case looking at this regulation over the last 24 hours

2   and there is a provision that the family court can make the

3   documents available to another Court for the other Court's

4   proceedings.

5           THE COURT:  Okay.  So, let's start there and if there

6   needs to be a Court order, you will draft a form order and we

7   will see what we get there.  Okay?

8           MR. ROBERTS:  And what is it you're --

9           MS. LOPEZ:  The whole file.

10          MR. ROBERTS:  -- I suspect -- do you want the whole

11  file?

12          MS. LOPEZ:  Yes.

13          MR. ROBERTS:  I have no idea.  I suspect it is quite

14  enormous.

15          MS. LOPEZ:  The whole file.

16          THE COURT:  You know what?  Stop.  Only one person

17  talks at a time because that is the only way the court reporter

18  can get an accurate transcript.  If I am talking, you two don't

19  talk.  Okay?  If one or the other of you is talking, you don't

20  interrupt the other one.  Okay?  That's basic civility and

21  respect.  It doesn't always happen in my courtroom, but we try.

22  As you have seen in the past, when you want to be heard I let

23  you be heard.  You just need to wait your turn.  Okay?

24          So, Mr. Roberts, yes, let's be over-inclusive right

25  now because I think that trying to get the whole file might

1   actually stave off certain arguments about what --

2              MR. ROBERTS:  I will send you the Court citation.  I

3   don't know the name of this case, I don't know what documents,

4   how to describe them.  I hesitate to be the one drafting an

5   order for you.  I don't know what is supposed to be in it.

6              THE COURT:  Well, you and Ms. Lopez can work together

7   on that after you find out what is there.  I mean, that's after

8   you write the letter informing me of what might still exist and

9   where you might find it.

10              Is this, Ms. Lopez, when you are talking about the D

11   docket, is this Lopez v. Mattingly or something else?

12              MS. LOPEZ:  No, this is not it, to be clear.

13              I cited those cases because they're publicly known and

14   the facts of the them are well known to the law department.  I

15   cited the file, this file or the two files that I am

16   referencing because they sort of paint a longer picture than

17   even the files in those cases with and there are two separate

18   dockets, I just want to be very clear, there is a delinquency

19   docket for a prostitution charge when I was arrested when I was

20   14, and there is the entirety, I am willing to have him look at

21   the entirety of the Court's version of the family -- of the

22   foster care docket or case that Lawyers for Children

23   represented me from age 9 until I aged out of care.  And

24   literally, your Honor, the reason why I am even saying that he

25   should do back that far is because I am making an argument

1    about long-term damages in terms of about how the situation has

2    stressed me out and the possibility of going into a dorm, why

3    it is so traumatizing for me and literally why that is

4    traumatizing by the facts of it.  So, getting the records from

5    when I was in Children's Village or any of the congregant

6    settings when I was in the ACS in late '90s that would help

7    paint a pretty awful picture.

8              THE COURT:  Do you have any -- I'm not even --

9              MS. LOPEZ:  I can get the docket.  You want the docket

10   number.

11             THE COURT:  Yes.  If you have the docket number now,

12   provide it to Mr. Roberts after this conference so that you can

13   just go do your investigation.

14             MS. LOPEZ:  Sure.

15             MR. ROBERTS:  I won't be able to do any investigation

16   of the family court records.  They're sealed to me.

17             THE COURT:  Okay.

18             MR. ROBERTS:  I could, at most, present you with an

19   order.

20             THE COURT:  Okay.

21             MR. ROBERTS:  But family court records I just don't

22   have any access to those, as I understand.

23             THE COURT:  So the family court records, May 17th

24   is -- just draft a proposed order.  Try to show, try to get

25   Ms. Lopez' comments on it sometime during the week before.  I

1  will leave you to that on your own, I'm not going to

2  micro-manage that.

3      Ms. Lopez, it is in your interest if you have comments

4  to the proposed order to make comments.  I may not take them

5  all, I will have to review it, I will really have to do my own

6  research into what needs to happen, okay, and whether and how

7  my order would need to be drafted to make that happen.  Okay?

8      So, I think that's it on discovery for now because

9  that's such an initial stage.  Ms. Lopez, I mean, if certain

10 parts of certain records are sealed, we ultimately might need

11 to get some formal form of consent from you for those to be --

12      MS. LOPEZ:  I actually didn't want to interrupt you

13 earlier but I have been trying to get them for myself the last

14 couple of weeks and what I was just going to say is again,

15 Mr. Roberts nor -- I'm sorry.

16      I would like the law department to work with me

17 because I think talking to Lawyers for Children, like I have

18 been suggesting would be helpful, because when I went to family

19 court and I also learned the procedure, I am one of the

20 individuals with standing when I went into the court, I had

21 the -- I had an issue with the clerks, I have now turned to

22 Lawyers for Children and asked them to help me because I don't

23 like dealing with the clerks in family court and they said they

24 would help me.  So, Karen is not only aware that I am looking

25 for these records, she is aware of what I want them for and she

J4U5lopC                       conference

1    could probably get them quicker than all of us combined.

2            THE COURT:  Can you continue working with Ms. Freedman

3    and if you can get them through her or if she can help you get

4    them sooner, let us know.

5            MS. LOPEZ:  And I just want to be clear, just point of

6    fact or interest, what we are also fighting about is access to

7    the Judge's notes which I think would be particular -- that's

8    where we sort of came up with an issue.  The clerks didn't want

9    to hand over everything.  I made an argument they were of

10   historical significance.  They said it was intellectual

11   property, exactly, or work product or something and that's

12   where the argument came up.  I am happy to work with Lawyers

13   for Children and Karen Freedman because I am trying to get the

14   entire file for myself.

15           THE COURT:  All right.  You know what?  That takes

16   care of my agenda and my 3:00 conference is here or what is

17   going to be of my 3:00 conference is here.  So, let's hear what

18   else you have, what else you might have or what else you might

19   want to raise.  If I can't attend to it in the next 5 or 10

20   minutes we will take a break, do my 3:00 conference, and

21   reconvene, but I would like to see if we can wrap up so you can

22   all go home.

23           MS. LOPEZ:  I would like to wrap too, your Honor, but

24   sort of getting back to what I brought up in the beginning and

25   then I had a list of bulleted things that keep circling around

J4U5lopC                        conference

1   Jamel and Akasha's situation, and also just the timing of all

2   of these things and the length this case has gone on, I am

3   going to ask again that your Honor rule on my motion for

4   preliminary injunctive relief because I think the time I have

5   been having to do sex work to make my ends meet is way too

6   long.  I think the longer it takes for us to come to some type

7   of middle ground in terms of relief besides settlement the more

8   the settlement will be, right?  So, the longer I'm homeless the

9   more nightmares I have, the more stressed I am -- this is

10   awful -- but also we are leaving the window open for more

11   people like Jamel and Akasha to call me and say Hi, I am

12   transgender and homeless and I also have medical reasons why I

13   have a single room.

14          So, I guess what I am asking your Honor is we are

15   considering filing motion for class certification under

16   Section 23, and 23(g) would require that the Court appoint

17   counsel so that we don't have to worry about, oh, you guys

18   aren't lawyers.  Right?  We have a lawyer.

19          So, in keeping with the fact that a big fat class

20   action against the City wouldn't help any of us, right, because

21   then we would have other people that have to check in with

22   about settlement and we have the whole City-wide berth of trans

23   people to sort of consult with, I think this Court should

24   consider how long my request for preliminary injunctive relief

25   has been and not decided on, how long this case is taking, the

J4U5lopC                    conference

 1    potential for this to morph -- literally morph into a class

 2    action lawsuit very quick and then potentially direct the

 3    municipal defendants accordingly.  Because if I don't get

 4    housed soon, and these transgender people keep calling me and I

 5    keep having to educate them about their civil rights, there is

 6    nothing else to be expected than other pro se litigants showing

 7    up.

 8            THE COURT:  It is noted.  It is on my list.  I want to

 9    hear everybody's issues and we will see if we can deal with

10    them.  What's the next issue?

11            MS. LOPEZ:  Other than serious issues and that could

12    require class certification, none.

13            THE COURT:  Okay.

14            Mr. Roberts?

15            MR. ROBERTS:  Nothing, your Honor.

16            THE COURT:  All right.  So, Mr. Roberts, I am going to

17    ask you to give me the procedural status on the motion for

18    injunctive relief.  Is this the motion brought with your

19    complaint or is it the later one?

20            MS. LOPEZ:  I believe the motion that was -- I am

21    referring to preliminary injunctive relief one because the TRO

22    is in front of Judge Caproni and still not ruled on.  So, I am

23    referring to the one that was removed from state court that

24    transferred over which is a single room occupancy.  That is the

25    injunctive relief that I am asking for.  I think I repeated it

J4U5lopC                          conference

 1  in the TRO but the injunctive relief being requested carried

 2  over from state court is a single room or placement in a

 3  transgender facility, I think.

 4          THE COURT:  Okay.

 5          Mr. Roberts?

 6          MR. ROBERTS:  I'm sorry.  I didn't quite understand

 7  the question.

 8          As I understand it, there is one pending motion for

 9  preliminary injunction which is before Judge Caproni.

10          THE COURT:  Okay, and that was the motion that was

11  filed at the start of this lawsuit, right?

12          MR. ROBERTS:  No.

13          THE COURT:  Because there is also a motion for TRO

14  that was brought in December.

15          MS. LOPEZ:  Yes.

16          MR. ROBERTS:  Well, my understanding, I thought there

17  was one motion for TRO that was presently before Judge Caproni

18  which was fully briefed sometime I think last fall, and as I

19  understood it it evolved and was essentially a, the renewed --

20  there have been multiple requests for a TRO which had all

21  essentially, for the housing which have all been denied.

22          As I understood it, the most recent one was also

23  interpreted to include a request for preliminary injunction,

24  although it didn't say that the Court said, interpreted it that

25  way.  That has been briefed and is pending before Judge

J4U5lopC                          conference

1    Caproni.  As far as I know, that's the only motion pending.

2              THE COURT:  Okay.

3              MR. ROBERTS:  Other than the Quinn and WIN's motion to

4    dismiss, I am not aware of there being another motion pending

5    for preliminary injunction.  I think there is only one.

6              THE COURT:  Okay.  It is hard to keep track of

7    everything on docket but that was my understanding as well but,

8    unfortunately, as a magistrate judge, I don't have the

9    authority to rule on your motion.  I don't.  The best I can do

10   is a report and recommendation which, but only if the district

11   judge has referred it down to me.

12             MS. LOPEZ:  So the way I understood it and I have been

13   reading the transcript, it is almost like everybody here has

14   amnesia; when the municipal defendants moved to have the case

15   removed from state court, the relief being sought in that

16   motion transferred here and was being treated as a motion for

17   preliminary injunctive relief which a magistrate can rule on.

18             THE COURT:  No, I can't.

19             MS. LOPEZ:  Then that's the only fact that is sort of

20   at issue right now.  But, I think all parties have conceded

21   prior, because I have recently reviewed a transcript, I can

22   highlight it, that there were two motions in front of the Court

23   by myself for relief of some type; one of them was being

24   interpreted or being categorized as a motion for injunctive

25   relief and actually I think your Honor took pains to break down

J4U5lopC                          conference

1    the differences between injunctive relief and the TRO and so,

2    yes, that again I filed a TRO while that motion was still

3    undecided in December because of changes in living situation

4    and a threat to my safety.

5            So, even if it's procedurally appropriate that only

6    judges decide on motions or motions for preliminary injunctive

7    relief or TROs, it doesn't give me any faith in this Court as a

8    homeless person and as a pro se litigant that everybody can't

9    keep track of the motions.

10           I filed a motion because I needed relief and did not

11   like to have to prostitute to pay the bills.  This Court

12   clearly is tied up with other cases having to come in now and

13   even when Seton hall, the attorneys that this Court asked to

14   sit down with me, even when they sat down with me, they seemed

15   to want to impress me about with the amount of caseload each

16   Magistrate and Judge has.

17           THE COURT:  Okay.

18           MS. LOPEZ:  So I just --

19           THE COURT:  Okay.  Time out here.

20           MS. LOPEZ:  Yes.

21           THE COURT:  All of the motions in this case with the

22   exception of the Quinn and WIN defendants are motions for

23   equitable relief, injunctions, TROs.  They're a little bit

24   different but I don't have the ability to decide either one.

25           My understanding is I know that the December motion

J4U5lopC                        conference

1   for TRO was referred to me for report and recommendation.  I

2   issued a report and recommendation, that is before Judge

3   Caproni.  She has not ruled on it.  Okay?  That's the best I

4   can do on the equitable relief.

5          The motion to dismiss the Quinn and WIN defendants, I

6   do not remember if that was referred to me or not but that is a

7   dispositive motion which means that even if it were referred to

8   me the best I can do, okay, I have that motion.  So, when that

9   motion is fully briefed, I still won't actually be able to

10  decide the motion.  All I will be able to do is issue a report

11  and recommendation for Judge Caproni.  Okay?  That is the

12  extent of my power, that is the law.  There is nothing -- I

13  can't say, you know, I can't make it any different.  Okay?  I

14  am a magistrate judge, that is the law.

15         I could say I wish I could help you but I would be

16  acting outside of the law if I did anything other than a report

17  and recommendation.  However, I will convey to Judge Caproni

18  your frustrations about the timing of the motion for

19  preliminary injunction because I do understand that there is

20  something that has been fully briefed that dates from before I

21  became involved in this case.

22         MS. LOPEZ:  Your Honor, do I need to make a motion in

23  writing again, specifically to Judge Caproni, to have Judge

24  Caproni relieved from this case?  As I will reference again, on

25  page 69 of the May 31st proceedings, she said:  *Why don't you*

J4U5lopC                         conference

1       *just not tell people you're transgender?*

2                    The founding fathers had this thing called the First

3       Amendment.  I am sure you have heard of it.  And every person

4       that I have showed that to said *She did not say that.*  And so,

5       it is not appropriate at this time, obviously, unless she is

6       going to rule in my favor, for her to hear this case any

7       further or for her to be reviewing any documents in this case,

8       and her maintaining control or not recusing herself from this

9       case -- managing not control, excuse me, I will

10      recharacterize -- only sets this case up to be potentially

11      litigated for years to come.

12                   THE COURT:  Okay.

13                   MS. LOPEZ:  There is no way, if she stays on this case

14      and has made those statements, that there will not be issues

15      ripe for appeal if I lose.

16                   THE COURT:  Okay.  You know, you can make another

17      request for recusal.  Again, I don't have the power to decide

18      that so go right ahead.  You know what you need to do and

19      that's fully up to her to decide.  Okay?  All right.  I guess

20      we need to set another conference date.

21                   So, I am looking at late May or early June.

22                   MS. LOPEZ:  June is completely impossible for me.

23                   THE COURT:  I'm sorry?

24                   MS. LOPEZ:  June is completely impossible.  It is

25      STAR's 50th anniversary, the events at Stonewall, I am

J4U5lopC                        conference

completely booked and busy, and if we go that long settlement
will be off the table.

          THE COURT:  Right now settlement is off the table
because I am hearing that you are too far apart, but I have
also directed Mr. Roberts to provide you with a counteroffer.
Okay?  And we will see.

          So, is late May better?

          MS. LOPEZ:  For another conference?

          THE COURT:  Yes.

          MS. LOPEZ:  Sure, your Honor.

          THE COURT:  May 28th is the Tuesday after Memorial
Day.  How is May 28th?

          MS. LOPEZ:  That's fine for me.  That's fine, your
Honor.

          THE COURT:  3:00 p.m.?

          MS. LOPEZ:  Yes, your Honor.

          THE COURT:  Okay.  May 28, 3:00 p.m.

          MS. LOPEZ:  Thank you.

          Since my hope is that the Quinn and WIN defendants'
motion to dismiss will be fully briefed you don't need to
appear unless there is some issue that involves you.  Okay?

          MS. BAEZ:  Thank you.

          MS. GRANT:  Thank you very much.  We are adjourned.

                            o0o