| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #:_____<br>DATE FILED: 5/4/2023 |
| MARIAH LOPEZ,<br><br>                   Plaintiff,<br><br>           -against-<br><br>NYC DEPARTMENT OF HOMELESS SERVICE et al.,<br><br>                   Defendants. | 17-cv-3014 (MKV)<br><br>ORDER |

MARY KAY VYSKOCIL, United States District Judge:

This case is back before the Court on remand from the Second Circuit, which directed the Court to clarify whether it intended to preclude plaintiff's counsel from making a motion for attorney's fees and costs [ECF Nos. 262, 263]. Specifically, plaintiff appealed the Court's Order dated November 29, 2021 refusing to reopen the case or retain jurisdiction to entertain further motions [ECF No. 260]. On appeal, plaintiff's counsel stressed that the Court previously had agreed, on October 7, 2021, that counsel could move for attorney's fees within 14 days of the parties' final settlement [ECF No. 242]. Counsel apparently feigned confusion about why the Court later refused to continue to exercise jurisdiction in this case. The Second Circuit therefore instructed this Court to clarify whether it had intended to "supersede" its October 7, 2021 Order, or it simply made an error.

Counsel for both parties apparently failed to inform the Second Circuit that this Court had twice warned the parties that it would not continue to exercise jurisdiction unless and until the parties demonstrated the existence of this Court's Article III jurisdiction [ECF Nos. 246, 257]. The parties blatantly disregarded these Orders. An order about the timeframe in which an attorney may file a motion for attorney's fees cannot supersede this Court's constitutional obligation to inquire into the existence of its own jurisdiction throughout the life of a case. The Court cannot reopen

this case, retain jurisdiction to entertain motions, or award any relief unless the Court has Article III jurisdiction. Accordingly, by May 11, 2023, the parties shall file letters stating their positions on whether Plaintiff had standing and there was a live case or controversy between the parties before the parties reached their settlement.

## BACKGROUND

This case has a long and complicated history. Indeed, it has morphed into a fundamentally different case several times over the past six years. The Court recites below only the facts and procedural history necessary to illuminate the current posture of the case.

As explained in more detail below, in 2017, Plaintiff, proceeding *pro se*, initiated this case seeking to compel the New York City Department of Homeless Services to allow Plaintiff's dog to reside with Plaintiff at a particular shelter. The City immediately agreed to accommodate the dog, without regard to whether it was actually a service animal. Plaintiff, however, violated shelter rules, later refused a transfer to another shelter, and it is not clear whether Plaintiff has even been in the custody of the Department of Homeless Services at any time since 2017. But the case remained open, Plaintiff demanded more and broader relief, and lawyers from advocacy groups became involved. In 2021, this case seemed to come to an end when Plaintiff, Plaintiff's supposed *pro bono* counsel, the City, and the Magistrate Judge together devised a plan for "systemic reform" of the City's shelter system for transgender individuals.[1] Indeed, the City thanked Plaintiff for Plaintiff's "leadership" in the process.

This Court became concerned that it lacked Article III jurisdiction. In particular, the Court was concerned that Plaintiff lacked standing, the case was moot, and there was no genuine adversity between the parties. After the Magistrate Judge and the parties informed the Court they

---

[1] https://www.nytimes.com/2022/07/03/nyregion/transgender-rights-homeless-new-york-lawsuit.html

2

had reached a settlement, the Court twice warned the parties they would need to demonstrate the existence of Article III jurisdiction. The parties ignored those warnings while plaintiff's counsel pressed ahead with a request to seek attorney's fees. Without any assurance of the existence of its own jurisdiction, the Court refused to reopen the case or to retain jurisdiction to hear a motion for attorney's fees. Plaintiff appealed, and the Second Circuit remanded.

### A. Plaintiff Initiates a Case about a Dog.

Plaintiff Mariah Lopez, proceeding *pro se*, initiated this action on April 25, 2017 [ECF No. 2 ("Cmpl."); ECF No. 3; ECF No. 8 ("TRO")]. [2] At that time, Plaintiff was sleeping on a friend's floor, but the friend was moving, and Plaintiff was seeking a placement at Marsha's House, a homeless shelter that serves individuals who identify as homosexual or transgender [ECF No. 27 ¶ 10]. Cmpl. at 4. Plaintiff wanted to bring a dog to Marsha's House and claimed it was a service animal; the New York City Department of Homeless Services ("DHS") wanted proof the dog was a service animal, rather than merely a source of emotional support. *See* Cmpl. at 4. Plaintiff sought preliminary and permanent injunctive relief requiring the Department to place Plaintiff at Marsha's House and to accommodate the dog. Cmpl. at 5.

The case was originally assigned to Judge Caproni, who granted a Temporary Restraining Order ("TRO"). She "provisionally directed" the City to accommodate Plaintiff and the dog at Marsha's House. TRO at 2. Judge Caproni stressed that the defendants could still require Plaintiff to comply with shelter rules and City and State regulations and that Plaintiff's failure to comply with such rules and regulations would be grounds to dissolve the TRO. *Id.* at 2–3.

Immediately after Judge Caproni granted the TRO, the City informed the court that it would simply "accept into the homeless shelter system Plaintiff's dog, without regard to whether it is a

---

[2] Plaintiff is transgender and identifies as a woman [ECF No. 22 at 3].

service animal or emotional support animal" [ECF No. 11]. Thus, Judge Caproni issued an order directing Plaintiff to show cause why the TRO should not be dissolved [ECF No. 11]. Pro bono counsel from the firm Quinn Emanuel Urquhart & Sullivan, LLP entered a limited notice of appearance on Plaintiff's behalf and advised Judge Caproni that Plaintiff did not oppose dissolution of the TRO, provided that Defendants continued to allow Plaintiff's dog to remain "in the homeless shelter system" and that Plaintiff was "not transferred or otherwise removed from Marsha's House *because of*" the dog [ECF No. 14 (emphasis added)]. Accordingly, Judge Caproni dissolved the TRO [ECF No. 15].

With the resolution of the central issue in the case, the accommodation of Plaintiff's dog, Quinn Emanuel withdrew as pro bono counsel [ECF No. 19]. Judge Caproni then issued an order referring the case to Magistrate Judge Peck to handle all "scheduling, discovery, non-dispositive pretrial motions," issuing a Report and Recommendation on dispositive motions, and settlement efforts going forward [ECF No. 20].

**B. Plaintiff Again Seeks a TRO in Federal Court after Dissolution of a State Court TRO.**

Shortly thereafter, on May 30, 2017, Plaintiff, who was again proceeding *pro se*, again sought emergency relief in federal court [ECF Nos. 22, 23]. This time, Plaintiff sought a temporary restraining order prohibiting Plaintiff's transfer from Marsha's House to WIN West, a women's shelter. The Department of Homeless Services had sought to transfer Plaintiff because, the City asserted, starting "immediately upon arrival" at Marsha's House, Plaintiff "engaged in a pattern of violating the rules of Marsha's House and of threatening the employees . . . who sought to enforce those rules" [ECF No. 27 ¶ 18].

Plaintiff alleged that the Department of Homeless Services and the staff at Marsha's House had "use[d] petty infractions" and initiated the transfer to WIN West to retaliate against Plaintiff

for obtaining the TRO concerning Plaintiff's dog and for writing a "ten-page report outlining serious allegations of . . . misconduct" at Marsha's House [ECF No. 22 at 1, 2; ECF No. 23; ECF No. 40 at 6:2–4]. According to the City, however, Plaintiff had violated shelter rules by, among other things, making a thinly-veiled death threat to two employees [ECF No. 27-4 ("Incident Report 5/2/2017) ("the same thing that happened to your [dead] friend can happen to you"]; returning to the shelter "intoxicated and with a bottle of wine," which Plaintiff refused to surrender when asked [ECF No. 27 ¶ 32; ECF No. 27-13 ("Incident Report 5/7/2017")]; lighting candles and then leaving them unattended [ECF No. 27 ¶ 31]; twice allowing Plaintiff's dog to roam Marsha's House off-leash and unattended [ECF No. 27 ¶¶ 29, 30]; and threatening to "beat the shit out of" a food service worker for not giving another resident of Marsha's House a large enough meal [ECF No. 27 ¶ 35]. In the light of these incidents, the Department of Homeless Services had determined that Plaintiff should be transferred to a facility with greater mental health services and DHS police [ECF No. 27 ¶ 36; ECF No. 27-20; ECF No. 40 at 2:21–3:7].

Plaintiff brought an Article 78 proceeding in New York State Supreme Court to stop the transfer [ECF No. 40 at 3:8–3:20]. The justice assigned to that case initially granted a TRO. However, after reviewing the City's exhibits documenting "all [Plaintiff's] violations of rules and all the threats that [Plaintiff] made against the staff" at Marsha's House, and hearing argument from both sides, the justice "lifted the TRO on the transfer to a different facility" [ECF No. 40 at 3:18–20, 4:14–5:2].

On the record at a hearing on May 31, 2017, Judge Caproni denied Plaintiff's request for a TRO prohibiting the City from transferring Plaintiff to WIN West [ECF No. 40 at 65:2–5].

5

### C. Plaintiff's Third Request for Emergency Relief

Two weeks later, on June 15, 2017, Plaintiff moved in federal court for emergency relief yet again, seeking a temporary restraining order directing the City to place Plaintiff back at Marsha's House [ECF No. 31]. Plaintiff had refused to go to WIN West and alleged that Plaintiff was homeless as a result [ECF Nos. 31, 32]. The judge handling emergency motions in Part I at the time, Judge Batts, denied Plaintiff's motion [ECF No. 32]. Judge Batts stressed that Plaintiff had already "left the custody of the Department of Homeless Services" [ECF No. 32 at 2].

### D. The Amended Complaint and Motion To Dismiss

On the record at a status conference, Judge Caproni decided to construe Plaintiff's third motion for emergency relief as an amended complaint [ECF Nos. 31, 39, 42]. Judge Caproni noted that the original complaint was about accommodating Plaintiff's dog and Plaintiff was now asking for totally different relief and arguing for trans-only shelters [ECF No. 42 at 8 ("The dog is accommodated. That's moot. That claim is dismissed.")]. Judge Caproni construed the Amended Complaint as asserting two claims, (1) Plaintiff's removal from Marsha's House was retaliatory, and (2) the only reasonable accommodation for Plaintiff's alleged disabilities was placement at Marsha's House. Judge Caproni also set a briefing schedule for a motion to dismiss.

In its motion to dismiss, the City argued only that the issues in the Amended Complaint were res judicata and barred by collateral estopped based on Plaintiff's parallel state court proceedings. The organization that runs Marsha's House, Project Renewal, also sought dismissal. Plaintiff did not file an opposition.

Magistrate Judge Peck issued a Report and Recommendation. He recommended denying the City's motion because the City had not shown res judicata or collateral estoppel and the City had not made any other arguments for dismissal. Magistrate Judge Peck recommended granting

in part and denying in part Project Renewal's motion to dismiss. Judge Caproni adopted the Report and Recommendation. Thereafter, when Magistrate Judge Peck retired, in 2018, Magistrate Judge Wang took over the referral.

### E. More Requests for Emergency Relief, Consolidation, and Another MTD

Plaintiff later filed even more requests for emergency relief, which were not granted. Plaintiff also filed another state case against WIN West and former speaker of the City Counsel of New York City Christine C. Quinn. The defendants removed. The new federal case, along with the pleading filed in that case, the Second Amended Complaint, was consolidated with this case. Magistrate Judge Wang recommended dismissing as to WIN West and Quinn [ECF No. 165]. Judge Caproni adopted the Report and Recommendation [ECF No. 175]. Plaintiff voluntarily dismissed as to Project Renewal, the organization that runs Marsha's House [ECF No. 155]. The sole remaining parties in the consolidated cases were now Plaintiff and the City.

### F. The Case Ceases To Proceed as Adversarial Litigation

At some point, this case ceased to proceed as normal, adversarial litigation. Most troubling, with respect to this Court's jurisdiction, it is not clear from the record that Plaintiff ever returned to the custody of the Department of Homeless Services after rejecting the placement at WIN West.[3] Indeed, it appears that in 2019, Plaintiff was not living primarily in New York City [ECF No. 181 at 2:10–11 (Magistrate Judge Wang explaining to defense counsel that Plaintiff was not appearing in person at a status conference because Plaintiff was attending classes outside of New York City); ECF No. 188 at 2:17–18 (Magistrate Judge Wang explaining that Plaintiff would be able to come to New York City for conferences going forward)].

---

[3] In August 2019, more than two years after this action commenced, Magistrate Judge Wang noted that Plaintiff had "rejected [the] placement at WIN West" and was presently outside the custody of the Department of Homeless Services [ECF No. 165 at 3].

Moreover, at some point, everyone involved in the case seemed to be on the same side: using the lawsuit as a vehicle to make whatever policy changes they all agreed should occur with respect to homeless shelters for transgender individuals. In late 2019, an attorney for the Center for Constitutional Rights appeared for the purpose of settlement [ECF No. 177; ECF No. 181 at 2–3]. The attorney for the City who had worked to defend against Plaintiff's case earlier in the litigation was replaced. Magistrate Judge Wang was ostensibly working to help the parties reach a settlement agreement, but she allowed the case to languish, with the parties simply submitting a status letter every so often, for years [ECF Nos. 190, 191, 192, 193, 194, 195, 196, 211, 212, 213, 214, 215, 217, 219, 220, 221, 222].

### G. This Court's Involvement

The case was reassigned to me in February 2020. For nearly a year and a half, this Court deferred to Magistrate Judge Wang's management of the case. But the Court was concerned that the case did not appear to be proceeding in the normal course. Thus, determined to move the case forward, the Court wrote in an Order dated July 1, 2021: "The parties have until September 30, 2021 to reach a settlement, but then this case is proceeding to summary judgment or to trial" [ECF No. 225]. The Court included some additional details and deadlines.

Upon more careful review of the history and posture of the case, the Court grew concerned that Article III jurisdiction did not exist. In particular, the Court was concerned that Plaintiff lacked standing. It did not appear that Plaintiff was in the custody of the Department of Homeless Services when Plaintiff filed the operative complaint. And it was not clear that Plaintiff was either homeless, or living primarily in New York City. Based on conversations with the Chambers of Magistrate Judge Wang, the Court also grew very concerned that there was no longer any genuine dispute between the parties.

In an Order date September 23, 2021, the Court wrote: "The Court has been informed by Magistrate Judge Wang, to whom these cases are referred, that the parties have reached a settlement in principle. Accordingly, IT IS HEREBY ORDERED that the above-captioned actions are discontinued without costs to any party and without prejudice to restoring the action to this Court's calendar if the parties are unable to memorialize their settlement in writing and as long as the application to restore the action is made by October 22, 2021. If no such application is made by that date, today's dismissal of the action is with prejudice" [ECF No. 240].

On October 5, 2021, the parties wrote a joint letter motion seeking time to file a motion for attorney's fees [ECF No. 241]. The Court granted the parties more time to move for attorney's fees, noting that the Court's Order dismissing the case without prejudice was not a final judgment [ECF No. 242]. The Court also granted the parties' request for an extension of time to move to reopen the case before dismissal with prejudice [ECF Nos. 243, 244]. But, instead of filing a motion for attorney's fees within that extended timeframe, the parties asked for a further conference with Magistrate Judge Wang [ECF No. 245].

In an Order dated November 8, 2021, the Court stated: "the Court will not extend the November 22, 2021 date for dismissal of this action with prejudice. **If the parties move to restore this action to the Court's calendar, they must satisfy the Court that there is a live case or controversy**" [ECF No. 246 (emphasis added)]. The Court communicated to Magistrate Judge Wang's Chambers the concern that the Court did not have Article III jurisdiction in this case. Nevertheless, Magistrate Judge Wang scheduled a further settlement conference with the parties to take place on November 22, 2021, simply disregarding the Court's Order stating that dismissal with prejudice would occur on November 22, 2021 unless the parties moved to restore the action and "satisf[ied] the Court that there [was] a live case or controversy."

9

Citing Magistrate Judge's Wang's order scheduling the conference, the parties requested another extension of time to move to reopen the case before dismissal with prejudice [ECF No. 256]. This put the Court in a difficult position. In an Order dated November 23, 2021, the Court stated: "Because Magistrate Judge Wang scheduled a further settlement conference, this request for a final one-day extension of time to complete the settlement is GRANTED. There will be no further extensions. If the parties fail to resolve the matter today and move to restore the action, they must include in their request a showing that a live case or controversy exists between the parties. **The Court will not restore the action without a showing that Article III jurisdiction exists**" [ECF No. 257 (emphasis added)].

On November 29, 2021, the parties filed a stipulation of voluntary dismissal and proposed that the Court retain jurisdiction to entertain a later motion for attorney's fees [ECF No. 259]. The parties ignored the Court's repeated warning that the parties needed to demonstrate the existence of Article III jurisdiction. The Court refused to reopen the case or retain jurisdiction [ECF No. 260], and Plaintiff appealed [ECF No. 261]. The Second Circuit remanded the case and directed this Court to clarify whether it intended to preclude a motion for attorney's fees.

## DISCUSSION

The Court has, at all times throughout the life of a case, an independent "obligation to inquire into the existence" of its own jurisdiction. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 125–26 (2d Cir. 2011). The issue of jurisdiction "can never be forfeited or waived." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Without jurisdiction, the Court has no "power to hear a case" or to order any relief. *Id*.

Under Article III of the United States Constitution, federal court jurisdiction is confined "to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190,

10

2203 (2021).  It is well "settled" that the "case-or-controversy requirement . . . subsists through all stages of federal judicial proceedings." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 99 (2d Cir. 2011) (quoting *White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 167 (2d Cir. 2007)), *aff'd*, 568 U.S. 85 (2013).  "In order to qualify as a justiciable 'case or controversy' under Article III, '[t]he controversy must be definite and concrete, touching the legal relations of *parties having adverse legal interests*.'"  *Nike*, 663 F.3d at 94 (emphasis added) (alteration in original) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937)).

      The requirement that a plaintiff must have standing springs from the case-or-controversy requirement.  *See TransUnion*, 141 S. Ct. at 2203.  The plaintiff must have a personal stake in the case.  *Id.*  "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).  If the plaintiff does not have "an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."  *Id*. (internal quotation omitted).

      Moreover, and crucial here, if the plaintiff's stake in the litigation or the dispute between the parties "dissolve[s] at any time due to a change in circumstances, the case becomes moot."  *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 118 (2d Cir. 2001); *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) ("the 'personal stake' aspect of mootness doctrine" assures that federal courts preside over only "disputes they are capable of resolving); *Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994) (if named plaintiff's claims become moot before class certification, the entire case is moot).  "Whenever mootness

occurs, the court—whether trial, appellate, or Supreme—loses jurisdiction over the suit, which therefore must be dismissed." *Russman*, 260 F.3d at 118–19.

The Court is concerned that these threshold requirements for the exercise of Article III jurisdiction are not satisfied. The record in this case suggests that Plaintiff left the custody of the Department of Homeless Services in 2017 and never returned to the custody of the Department of Homeless Services prior to dismissal. There is also a question whether Plaintiff has even remained homeless and living in New York City. These issues cast serious doubt on whether Plaintiff has standing to press the claims in the operative complaint. The parties must also satisfy the Court that they maintained adverse interests prior to their settlement.

For all of these reasons, prior to the parties' request that the Court retain jurisdiction to award attorney's fees and the subsequent appeal, the Court twice ordered the parties to satisfy the Court of the existence of Article III jurisdiction. The parties ignored those orders. However, the Court constitutionally cannot reopen this case and entertain motions, let alone order relief, if the Court lacks jurisdiction.

Accordingly, by May 11, 2023, the parties shall file submissions addressing the existence of Article III jurisdiction. The parties must explain, in detail, and provide evidence to demonstrate: (1) whether Plaintiff presently is homeless or has a stable residence; (2) the dates during the life of this case when Plaintiff lacked any stable residence; (3) the dates, since this case began, that Plaintiff has been in the custody of the Department of Homeless Services; (4) the dates of Plaintiff's residence in New York City and whether Plaintiff currently resides primarily in New Yok City; and (5) whether Plaintiff has spent any extended periods (*e.g.* more than two weeks at a time) outside of New York City during the life of this case and, if so, what were the dates. The parties must also address: at the time the parties reached a settlement, what injury did Plaintiff

have that the City caused and that the Court could have redressed had the parties not reached a settlement? At what point did the City come to agree that its policies with respect to the shelter of transgender individuals required systemic reform? At that point, what was the remaining genuine dispute between the parties?

**SO ORDERED.**

**Date: May 4, 2023**
**New York, NY**

*Mary Kay Vyskocil*
**MARY KAY VYSKOCIL**
**United States District Judge**